**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Case No. _____**

TERRYLENE SACCHETTI, individually and
ROBERT MANGANELLI, individually and as
co-personal representatives of the Estate of GIANNI
MANGANELLI,

      Plaintiffs,

                                  CIVIL ACTION
vs.                                  JURY TRIAL DEMANDED

GALLAUDET UNIVERSITY and the
DISTRICT OF COLUMBIA,

      Defendants.

_____/

## COMPLAINT

Plaintiffs, TERRYLENE SACCHETTI, individually and ROBERT MANGANELLI,

individually and as co-personal representatives of the Estate of GIANNI MANGANELLI

("Plaintiff"), by and through undersigned counsel, bring this action against Defendants,

GALLAUDET UNIVERSITY ("Gallaudet") and the DISTRICT OF COLUMBIA ("District"),

based upon their own personal knowledge, information and belief as a result of investigation of

counsel, and facts that are a matter of public record, and allege as follows:

## INTRODUCTION

Gianni Manganelli ("Gianni"), son of Plaintiffs Terrylene Sacchetti and Robert

Manganelli, who was Deaf [1] and had other recognized mental and physical disabilities, died while

---

[1] Deaf culture describes the social beliefs, behaviors, art, literary traditions, history, values, and
shared institutions of communities that are affected by deafness and which use sign languages as
the main means of communication. When used as a cultural label especially within the culture,
the word deaf is often written with a capital D and referred to as "big D Deaf" in speech and sign.
When used as a label for the audiological condition, it is written with a lower case. *See* Carol A.;

a resident student at Gallaudet University as a result of the wrongful conduct of Defendants Gallaudet University and the District of Columbia.  In the fall of 2013, Gallaudet University recruited and accepted Gianni, offering him their Provost's Scholarship.  Despite knowledge of mental health issues of which he had been suffering, Gallaudet offered blatant assurances to Gianni and his parents and once he was on campus, catastrophically failed its duties causing his tragic and unnecessary death at the age of 23.  This Complaint outlines the extensive notice afforded to Gallaudet University over a prolonged period of time through a multitude of employees and departments, including but not limited to, Gallaudet's Department of Public Safety, Department of Student Affairs and Academic Support, Wellness Center, Office of Residential Life and Housing, Mental Health Center and its Behavioral Intervention Team, and their collective failures which demonstrate Gallaudet's massive breach of the duties it owed Gianni while he was entrusted to Gallaudet.  Further, the Complaint details the failures of the District of Columbia, through its Metropolitan Police Department, which served to compound the wrongful acts and omissions of Gallaudet University.  This lawsuit seeks to redress those wrongs perpetrated against Gianni and his parents by a university and police department that had a duty to protect him.

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff TERRYLENE SACCHETTI is the biological mother of Gianni Manganelli.  A native of California, Ms. Sacchetti moved east with Gianni's younger sister Catalene, for the purpose of providing a support network to her son Gianni while he attended Gallaudet University. Ms. Sacchetti currently resides in Takoma Park, Maryland, where she was residing at the time of Gianni's death.

---

Humphries, Tom *Inside Deaf Culture*. Cambridge, MA: Harvard University Press at 1

2.      Plaintiff ROBERT MANGANELLI is the biological father of Gianni Manganelli. As with Ms. Sacchetti, Mr. Manganelli moved east from California for the purpose of providing a support network to his son Gianni while he attended Gallaudet University.  Mr. Manganelli currently resides Arlington, Virginia, where he was residing at the time of Gianni's death.

3.      Ms. Sacchetti and Mr. Manganelli are the duly appointed co-personal representatives of the Estate of Gianni Manganelli.  They have never been legally married.

4.      Defendant Gallaudet University is a federally-chartered university, which maintains its principle place of business and campus at 800 Florida Avenue Northeast, Washington, DC 2002.

5.      The District of Columbia is a municipal corporation organized pursuant to the laws of the United States.  It is responsible for the hiring, training, supervision and conduct, including the acts and failures to act, of those officers, staff and employees of the District of Columbia's Metropolitan Police Department (MPD) committed within the course and scope of their employment, under the doctrine of *respondeat superior*.

6.      Jurisdiction is vested in this Court pursuant to 28 U.S.C. §1332, as Plaintiffs are residents of different states from Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Jurisdiction is also vested in this Court pursuant to 28 U.S.C. §1331 because at least some of the matters in controversy arise under the Constitution and laws of the United States, including pursuant to 42 U.S.C. §12101, *et seq*.  The Court has supplemental jurisdiction to hear Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2) as Defendants' principle places of business are in this District and the events giving rise to this

action occurred within this District.

9.      Furthermore, Plaintiffs have complied with all common law and statutory conditions precedent prior to the bringing of this action including providing timely notice to the District of Columbia in compliance with  D.C. Code §12-309.

## GENERAL ALLEGATIONS and FACTUAL BACKGROUND

*Family and Personal History*

10.     Gianni Manganelli was born on February 8, 1991 to parents Terrylene Sacchetti and Robert Manganelli.  In 2004, Ms. Sacchetti and Mr. Manganelli welcomed their second child, Catalene, Gianni's younger sister.  Gianni is deaf and began losing his hearing around two years of age.  Catalene is deaf as well and began to lose hearing around four years of age.

11.     Ms. Sacchetti is what is commonly referred to as "strong deaf," reflecting that her Deaf roots are multi-generational and that she is a native user of American Sign Language ("ASL").[2]  With Ms. Sacchetti, deafness spans five generations.  Mr. Manganelli, conversely, is hearing with no known history of deafness in his family.

12.     Both Ms. Sacchetti and Mr. Manganelli have been, and continue to be, staunch supporters of the Deaf community.  Terrylene, a successful working film/theater actress and performing ASL artist, has been a long-time advocate of Deaf education and is a well-known activist in the Deaf community.  Mr. Manganelli, a writer, director and filmmaker, has been a similar champion of the rights for the Deaf and hard of hearing.

---

[2] American Sign Language (ASL) is a visual language where the brain processes linguistic information through the eyes, and the shape, placement, and movement of the hands, as well as facial expressions and body movements, all which play important roles in conveying information. Sign language is not a universal language -- each country has its own sign language, and regions have dialects, much like the many languages spoken all over the world. Like any spoken language, ASL is a language with its own unique rules of grammar and syntax.   *See* *http://nad.org/issues/american-sign-language/what-is-asl*.

13.     At an early age, Gianni's intelligence was apparent – with a measured
Intelligence Quotient (IQ) in excess of 165.   Gianni, who was fully bilingual in ASL and
English, was reading and writing at advanced levels as early as two years old.   Despite his
deafness, Gianni was mainstreamed through most of his early schooling in Santa Monica,
California and even into high school in Irvine; but found himself suffering from communication
isolation from his hearing peers, as is not uncommon with mainstreamed deaf students.   These
years are difficult enough for kids, as it is, let alone for those children who also have to
constantly fight for special needs, such as interpreting services.   Gianni was acutely aware of the
struggles of many in the Deaf community and by the age of fourteen had, himself, become a
strong advocate for the D/deaf and hard of hearing.

14.     Gianni developed an interest in Japanese culture, prompted primarily by the
recognition that D/deaf Japanese children had historically not been afforded the same
opportunities as those in the U.S.   Self-taught, Gianni became fluent in Japanese sign language as
well as in Japanese written and spoken language.   Gianni developed a program for Japanese
youth on his own, with guidance from a local college program, and at 14 years old, took the first
of what would be several trips to Japan to teach sign language to D/deaf children.

15.     Over the course of the next five years, Gianni traveled to Japan for increasing
lengths of time, hoping each time to reach more children.   At 19 years old, Gianni traveled in
Japan for almost 10 weeks, going from province to province, educating and motivating young
D/deaf children in furtherance of his efforts to spread his message of hope and opportunity for a
community he held very dear and deserving.

16.     Both abroad and at home, Gianni, who was an extraordinarily brilliant and sensitive young man, thrived.  His personality was magnetic and he touched children, students, teachers and parents profoundly along the way.

17.     An early paper Gianni authored about his future, while he was in high school, caught the attention of his Principal and resulted in his being awarded a scholarship which served to fund an internship with renowned astrophysicist Dr. Jeffrey D. Cooke, at the W. M. Keck Observatory, a two-telescope astronomical observatory at 13,600 feet near the summit of Mauna Kea on the island of Hawai'i.

18.     Throughout high school, Gianni competed in Gallaudet University's Academic Bowl as the Captain of University High School for four consecutive years.  The competition pits Deaf students from around the country against each other in high level academic challenges. From 2006–2009 Gianni was named the Regional Tournament's Most Outstanding Player multiple times, and in his senior year, Gianni led his high school team to a national championship and was named the Most Outstanding Player in the nation.   Gianni's unprecedented success earned him the distinction as the only competitor in the history of the Academic Bowl to have won three Regional Most Outstanding Player awards and resulted in his becoming the first inductee into the Academic Bowl Hall of Fame.

19.     Not surprisingly, having been raised in and around the film industry, Gianni began to make a name for himself as well, landing roles in several television shows including Judging Amy, opposite Marlee Matlin, and the George Lopez show, to name a few.

20.     In 2009, Gianni was accepted by the Rochester Institute of Technology ("RIT"), and was awarded RIT's Presidential Scholarship.  Gianni continued to stand-out academically, publishing several papers.   Gianni was developing into gifted writer and photographer.

21.     Though it had never interfered with his productivity or creativity throughout elementary, middle and high school, Gianni had been experiencing shifts in mood states for several years.

22.     In August 2012, during his junior year of college, Gianni left RIT and returned home to California.

23.     While back in Los Angeles, Gianni enrolled in several classes at Santa Monica College.   In April 2013, Gianni experienced a significant seizure while in class, and was taken to the hospital.   It was the first of what would be several documented seizures.   Concerned with changes they were observing in his mental health, Gianni's parents decided to get Gianni evaluated and treated in Los Angeles.

***Concerns About Moving to Washington, D.C. and Attending Gallaudet***

24.     During that time period, and almost immediately upon his departure from RIT, Gianni was recruited by Gallaudet University in recognition of academic and artistic gifts. Gallaudet offered Gianni a scholarship.   Gianni explained to Gallaudet that he wanted time to stay in California and work on his mental health.   Gallaudet, through Charity Reedy, graciously agreed to keep the scholarship open for a year.   In 2013, Gianni expressed his desire to go to Gallaudet and as noted further below, Gallaudet, aware of Gianni's struggles with his mental health and seizures, accepted Gianni for the school year commencing in 2013, awarding him the Provost's Scholarship.

25.     Gallaudet was established in 1857 and is federally chartered.   In 1986, Congress enacted the Education of the Deaf Act, which provides the basic legal framework for Gallaudet University as it exists today.   The 1986 statute left Gallaudet under the direction and control of a Board of Trustees, of which several public members are appointed by Congress. Gallaudet

University has historically relied upon, and continues to rely upon, direct governmental appropriations for greater than 70% of its annual budget.  Those governmental appropriations provided to Gallaudet University exceed $120,000,000.00, annually.  Since its founding, Congress has exercised significant control over Gallaudet's real property, employment relationships, and certain aspects of its admissions policies, even controlling the number of international students entitled to enroll per year. The diplomas of all graduates are signed by the sitting President of the United States.

26.     However, Ms. Sacchetti and Mr. Manganelli were hesitant to send him back across the country without first investigating options available for mental health care in the Washington, D.C. area and ensuring that Gallaudet was capable of addressing Gianni's mental health issues.

27.     Ms. Sacchetti and Mr. Manganelli, though they had been living apart for several years, remained very close and committed to their children. Together they decided it would be best for Gianni if they were to relocate and move the family to the D.C. area to be a support system for Gianni while he was at school at Gallaudet.   At a great financial sacrifice, the family planned to uproot itself from California and move to the metropolitan DC area because of their faith in Gallaudet and resolve to find the right environment for Gianni.

28.     Before school began, and before moving, Ms. Sacchetti initiated extensive candid conversations with Gallaudet's Director of Gallaudet's Mental Health Center, Ms. Lauri Rush, as well as several from the housing and academic advisors departments, to ensure that Gallaudet was aware of Gianni's mental health struggles and capable of treating Gianni.  Her conversations were aimed at educating Gallaudet about Gianni's current and historical mental health and neurological issues in order to establish a support network and program that would be able to

provide the continuity of care Gianni needed, and to make sure Gianni was properly placed in the dormitory so as to allow for quick and easy access should a health issue arise. Ms. Rush was informed by Ms. Sacchetti that the Sacchetti-Manganelli family made a decision to uproot their lives in Los Angeles and to move with their son to Washington, D.C. to provide loving support for their son.

29.     Ms. Sacchetti detailed Gianni's history, expressed her concerns and inquired about Gallaudet's capacity and ability to address them, as well as whether there were competent deaf-friendly mental health programs in and around the District of Columbia.

30.     Thus, as of July 2013, through direct communication with Ms. Sacchetti, Gallaudet had actual knowledge that:

a)      Gianni had a history of seizures, both petit and grand mal;

b)      Gianni had a history of anxiety and depression that had most likely contributed to his premature departure from RIT despite his considerable academic achievement there;

c)      That after leaving RIT Gianni returned to Los Angeles and had been under a medical care for both mental health and neurological issues, with no clear diagnosis yet achieved on either front due to the communication barrier secondary to Gianni's deafness.

d)      Gianni had been through a battery of diagnostic testing and evaluations, and had been prescribed medication, including Depakote;

e)      Gianni had adverse reactions to the Depakote and was no longer taking it, with his doctor's knowledge;

f)     That without medication, or a viable alternative, Gianni was at increased risk for more seizures and related symptoms;

31.    Acutely aware of his own mental health issues, and driven to get better, Gianni was concerned and actually expressed distrust of Gallaudet's ability to help him, even before he arrived at Gallaudet.

32.    Indeed, as a direct result of Ms. Sacchetti's communication with Gallaudet, the school had actual or constructive knowledge that:

a)     Gianni wanted to help himself;

b)     Gianni's parents had been very involved with all aspects of his care;

c)     Gianni's parents were supportive and concerned about his well-being;

d)     Gianni's parents wanted to identify and establish a plan, prior to his arrival at school, to help Gianni with mental health and seizure issues, and to transition to life at Gallaudet;

e)     Gianni's parents were concerned that the lack of a substantial mental health program and treatment plan would set Gianni up for failure;

f)     Gianni's parents wanted to ensure that such a treatment protocol was not left for the last minute and that a program was in place upon his arrival;

g)     Gianni and his parents had significant concerns as to whether Gallaudet would be able to provide sufficient mental health help for Gianni;

h)     Gianni's family (mother, father and sister) was relocating to the DC area (Virginia, Maryland) to provide a support network for Gianni;

i)  Gianni and Gianni's family, in fact, were moving to the DC area because of the well-known documented lack of mental health care available for Deaf persons nationwide.

33.  Gallaudet recognized that the above concerns could be overwhelming for Gianni's parents and, in no uncertain terms, Gallaudet assured, and reassured, Ms. Sacchetti that Gallaudet was more than equipped to address Gianni's issues and would provide Gianni with the level of care he needed.  In fact, in furtherance of efforts to allay Ms. Sacchetti's concerns, Ms. Rush blatantly assured Ms. Sacchetti that "Gallaudet's services are the best in the area."

34.  Gianni and his parents relied upon Gallaudet's representations and assurances, ultimately to their own detriment.

**The Move to the Washington, D.C. Area.**

35.  In August 2013 Gianni arrived in Washington DC as a student at Gallaudet University.  In response to the concerns raised by Ms. Sacchetti, Gianni was specifically assigned to the first floor of the dormitory at Carlin Hall, which is typically reserved for students with medical or mental health needs, further reflecting Gallaudet's knowledge as far back as August.

36.  Gianni was in Washington DC, living on campus at Gallaudet University, only for the duration of and for the purpose of his studies at Gallaudet University.

37.  At the time Gianni began the 2013 school year at Gallaudet, he was a lawful resident of the state of California, with his primary residence located in Santa Monica, CA.

38.  Once Ms. Sacchetti relocated to Maryland, though Gianni was a dorm student residing on campus, Gianni's primary residence was with his mother in Maryland.

39.     Though his parents had relocated to Maryland and Virginia, respectively, neither Gianni, nor his parents, had any intention of remaining in Washington D.C. upon the conclusion of Gianni's studies at Gallaudet University.

40.     Gianni's schooling was provided for, financially, through a scholarship from Gallaudet and was additionally funded through a Vocational Rehabilitation ("VR") grant from his home state of California, where Gianni intended to return upon graduation.

41.     At the time, Gianni was a licensed driver in his home state of California and, despite having moved to the DC area, his parents continued to alternate travel back to California for their respective employment obligations.

42.     Aside from the financial support afforded by the scholarship and California VR grant, Gianni was financially dependent upon his mother and father, during the time he resided on campus at Gallaudet.

***Early Signs of Issues***

43.     On August 22, 2013, within a week of his arrival at Gallaudet, Gianni went to the United States Capitol building around 6:00pm and approached a Capitol policeman, demanding to speak with Congress.  Gianni was extremely agitated and was screaming uncontrollably.

44.     The officer immediately suspected a mental health issue, handcuffed Gianni and transported him, involuntarily, to the Comprehensive Psychiatric Emergency Health Program (CPEP) at the Department of Mental Health. During the transport, Gianni began to strike his head repeatedly against the side of the police car.

45.     Gianni was evaluated and the CPEP determined that Gianni had "symptoms of mental illness and as a result thereof, is likely to injure self" warranting his immediate and

involuntary admission to the facility.  Gianni was admitted and kept overnight for observation and re-assessment.

46.     Gianni's father, Mr. Manganelli, was contacted and provided CPEP staff with further history.

47.     Additionally, the CPEP staff recognized that Gianni was deaf and was a student at Gallaudet University.  CPEP nurse Barbara Turner, contacted Gallaudet's Department of Public Safety, notified them that one of their students was at their facility and requested an interpreter for Gianni.

48.     Gallaudet declined to provide an interpreter, contending Gallaudet does not supply interpreters for its students "for incidents outside of campus."

49.     Nurse Turner was left to resort to communicating with Gianni solely in writing.

50.     Nurse Turner further contacted Gallaudet's Mental Health Center and advised the Mental Health Center at Gallaudet to follow up with Gianni.  Nurse Turner took it upon herself to schedule an appointment for Gianni with a psychologist at Gallaudet for that afternoon, following his discharge from the CPEP.

51.     Gianni was placed on several medications and was discharged from the CPEP. At no time did anyone at Gallaudet follow up to ensure that Gianni ever filled the prescribed medicine, much less that he maintained medicine compliance, despite the known difficulty of ensuring that mentally challenged persons obtain and comply with prescription medicines. Further, no one from Gallaudet contacted either Ms. Sacchetti or Mr. Manganelli to discuss further follow-up.

52.     Gianni returned to school at Gallaudet on August 23, 2013.

53.     On the same date, Albert Dwight Benedict, Dean of Student Affairs and Academic Support, Theodore Baran, the Director of Gallaudet's Department of Public Safety (DPS), the Mental Health Center and several members of Gallaudet's Behavioral Intervention Team (BIT) were specifically notified of Gianni's incident and that Gianni had been taken to and assessed by the CPEP, yet neither the DPS nor BIT took any steps to follow-up and ensure that Gianni was no longer at risk.

54.     On August 23, 2013, during a cursory meeting at the Mental Health Center, Gianni signed authorization forms requesting and authorizing Gallaudet to communicate directly with Ms. Sacchetti and Mr. Manganelli about his mental health and to release such information to the Office of Student's with Disabilities (OSWD) and BIT.  On information and belief, there is no indication this was ever done

55.     Later that evening, Gallaudet's DPS responded to Gianni's dorm room where Gianni was complaining about wrist pain, related to his having been handcuffed the night before at the Capitol.

56.     Thuan Nguyen, one of Gallaudet's Coordinators of Residential Education ("CRE") was present as well, and describing Gianni as "irate" under circumstances in which such a reaction was clearly disproportionate and reflective of his underlying mental health issue, of which Gallaudet was clearly aware.

57.     On August 25, 2013 DPS and a Resident Assistant at Carlin Hall entered Gianni's dormitory room and confiscated two prescription bottles of medical cannabis and related items.

58.     Gianni was not present in the room at the time but later explained he had been prescribed the cannabis by his doctor in California, prior to leaving for DC, to help treat his seizures and that he needed the medication.

59.     Rather than assisting, or even offering to assist, Gianni to seek an alternative medication for his seizures, of which Gallaudet was well aware, Gallaudet's DPS instead merely told Gianni that if he had a seizure he should get himself to a hospital.  Gallaudet made no efforts to ensure that Gianni sought medical care to arrange alternative treatment for his seizures, despite the fact that it was apparent that they were depriving Gianni of the only current prescription Gianni had lawfully been prescribed, albeit in California, for his well-documented and known seizures.

60.     No one from Gallaudet, including DPS, contacted the Mental Health Center or the Behavioral Intervention Team to advise that they had just taken the only known medication from a student who had mental health issues and who had clearly exhibited erratic behavior on several occasions, including the hospitalization just days earlier. This occurred in great part due to the lack of established policies and procedures in place at Gallaudet to give guidance as to how to handle interactions with individuals with known or suspected mental health issues.

61.     Ignoring the critical issue, Gianni's mental health needs, Gallaudet instead, treated it as a drug issue, issuing him a citation and fining him for possession of the prescription cannabis.

62.     Aside from what Gallaudet knew even prior to Gianni's arrival, at least as of August 25, 2013, Gallaudet University and, in particular, its Office of Student Affairs and Academic Support, the Department of Public Safety (DPS), Behavioral Intervention Team (BIT), Mental Health Center (MHC), Coordinator of Residential Education (CRE) and Resident Assistant (RA) were all on actual notice that Gianni had a history of mental illness; that he had been transported to, and treated by, the CPEP in Washington DC for a serious psychotic episode related to his mental illness during which he intentionally and repeatedly struck his head against

a vehicle door; that he had been deemed a risk of harm to himself; that Gianni had a history of seizures for which he needed medication; and that the CPEP felt it was imperative for Gianni to be followed by Gallaudet's Mental Health Center (MHC).  Yet because of the lack of established policies and procedures in place at Gallaudet to give guidance as to how mental health issues are to be handled, there appears to have been no systematic effort to follow through and ensure Gianni's safety or the safety of those around him.

63.     Rather, over the next several weeks, Gallaudet merely went through the minimum motions:

a)      August 27, 2013 – Jessica Duhon, the Academic Advisor at Gallaudet, wrote to the Behavioral Intervention Team expressing concern for Gianni's welfare;

b)      August 27, 2013 - Gianni meets with Doris Zelaya at the MHC;

c)      September 4, 2013 – Ms. Zelaya inquires about scheduling some weekly sessions with Gianni;

d)      September 8, 2013 - Gianni responds that he doesn't think he needs them;

e)      Gallaudet failed, or refused, to notify or advise Gianni's parents.

64.     On September 10, 2013, Gianni was disciplined in his absence for possession of the prescription cannabis, despite Gallaudet's knowledge that he was prescribed the drug for his seizures.

65.     On September 11, 2013, MHC noted that Gianni was distrustful of the MHC as he was concerned they would not maintain confidentiality "***if he reported he wanted to hurt himself.***"  They noted his affect was flat but they were "closing" his case.

66.     Again, Gianni's parents were not notified.

67.     The following day, September 12, 2013, MHC asked Gianni to come "wrap things up," which Gianni agreed to do the following day, however:

    a)    September 13, 2013 - Gianni did not show up for the appointment;

    b)    September 17, 2013 - MHC wrote to Gianni again;

    c)    September 19, 2013 - Gianni agreed to come in on the following day but Ms. Shird was not available

68.     On September 25, 2013, Gianni requested that Gallaudet release information related to the confiscation of his prescription cannabis to Gianni's mother, Ms. Sacchetti, so that she could advocate on his behalf.  Gallaudet did not do so.

69.     Ms. Sacchetti had completed her move to Maryland by this time.  On September 26, 2013, in furtherance of her efforts to seek accommodations from Gallaudet, through the Office of Students with Disabilities, Ms. Sacchetti requested Gianni's records from the Mental Health Center.

70.     On September 27, 2013, William Kachman, of the MHC, wrote Ms. Sacchetti to advise it was doubtful the MHC could be of assistance as there really were no records that could be forwarded to the OSWD to obtain services.  He merely suggested she request Gianni's records from his prior doctors at UCLA in California.

71.     On September 30, 2013, Mr. Kachman met with Ms. Sacchetti and again told her the MHC did not have records nor had the MHC requested Gianni's prior records because "Gianni has not requested services."  He suggested that Gianni "get on the wait list" for an assessment.

72.     On October 8, 2013, Gianni filled out a questionnaire to be placed on the wait list for an assessment.

73.     On October 9, 2013, Gianni is moved off the first floor at Carlin Hall and placed in a room with someone who did not want a roommate and did not understand how to deal with Gianni's behavior, causing Gianni further isolation.

74.     On October 15, 2013, Kachman conducted an initial screening of Gianni noting that Gianni was agitated, confrontational, defensive and guarded.   He was experiencing "high levels of anxiety" and depression.   Kachman thought Gianni might possibly be suffering from Asperger's but would need further assessment.   Nevertheless, Gianni was removed from the wait list for assessment and was merely advised to call a medical doctor if he wanted to address his seizures.

75.     On October 17, 2013, Ms. Sacchetti asked Mr. Kachman to update her on the assessment.

76.     On October 21, 2013, Mr. Kachman wrote to Ms. Sacchetti advising there had not been an assessment but apprising her of the initial screening.

77.     The same date, Ms. Sacchetti wrote back and expressed concern over a number of issues, including her desire that *"the next time Gianni is in a depression episode where he becomes suicidal and ask me to stay with him, I will take him to straight to a mental health hospital."*

78.     On October 25, 2013, Mr. Kachman responded and advised that when there is a need for "emergency mental health care" Gallaudet usually sends "our students to either George Washington University Hospital or Georgetown University Hospital since they are good about getting interpreters."

79.     From that point forward, upon information and belief, there is no indication that anyone from Gallaudet, including its MHC, made any effort to provide treatment or care to Gianni, despite the increasingly concerning behavior, as detailed below.

***The Issues Continue***

80.     Though maintaining the ability to perform well academically and contribute productively, Gianni's behavior at school progressively declined over the next several months.

81.     Gianni's downward spiraling behavior was apparent to, and actually known by, Gallaudet through Gianni's Coordinators of Resident Education (CRE), RA, teachers, MHC, DPS, BIT and other administrators, yet there was sharing of information or plan put in place or implemented to prevent Gianni for spiraling further downward into mental illness.    This occurred in great part due to the lack of established policies and procedures in place at Gallaudet to give guidance as to how suspected incidents related to mental health issues are to be handled.

82.     Susan Mather, one of Gianni's teachers, wrote to Gallaudet expressing concern about Gianni.  In particular, Ms. Mather detailed an incident in her classroom in which Gianni's behavior had become disruptive and domineering.  When Ms. Mather asked Gianni to meet privately after class to continue the discussion, so as to allow others to participate, Gianni got onto all fours and began acting like a dog.  He crawled under his desk and eventually crawled out of the classroom.  Ms. Mather went to look for Gianni and found him in another classroom.  He turned and ran from her.

83.     Ms. Mather explained this was just one of several incidents over a couple of weeks involving Gianni's behavior which she described as strange and worrisome.  She noted he had become extremely anxious and agitated and expressed concern that Gianni was acting in a

physically aggressive manner that scared the other students.  Ms.  Mather stated that she was "concerned [for] students safety."

84.     Ms. Mather implored Gallaudet to suspend Gianni from her classroom until his behavior were under control, writing *I am concerned for his mental health.  He needs professional health counseling as soon as possible.*"

85.     Gallaudet's Director of the Office of Student Conduct responded and, sensing the Director's lack of exigency, Ms. Mather again expressed a need for urgency, asking that Gallaudet set something up for Gianni immediately, explaining Gianni's behavior *"is getting from bad to worse."*

86.     Rather than require a mental health evaluation, and despite its actual knowledge of Gianni's mental health history and progressively deteriorating behavior, Gallaudet, through the Office of Student Conduct elected instead to initiate disciplinary proceedings against Gianni for disrupting Ms. Mather's classroom.

87.     Gianni was issued a formal notice of the disciplinary charges and informed he had two choices:  (1) request a disciplinary conference or (2) accept responsibility and sanctions.

88.     Despite Gianni's requests and authority to do so, Gallaudet failed, or refused, to notify or advise Gianni's parents.

89.     Gianni attended the disciplinary conference by himself and agreed to accept responsibility.  Gallaudet sanctioned Gianni, expelling him from Ms. Mathers' class and ordering him to complete courses in "Personal Decision Making" and "Civility and Respect."

90.     No mental health counseling or intervention was ordered, conducted or even offered.

91.     It does not appear that the MHC was notified, in any manner, of any of this information or decision.  Moreover, if it was, in fact, notified, the MHC clearly did nothing in response.

92.     Again, the failure to act reasonably in the face of such apparent evidence of a student's mental health needs occurred in great part due to the lack of established policies and procedures in place at Gallaudet to give guidance as to how suspected and known incidents related to mental health issues are to be handled.

93.      Thus despite multiple academic disciplinary actions for disruptive behaviors (which the BIT was well aware), including Gianni's having being expelled from a Gallaudet course due to disruptive behaviors noted to have scared other students, the University neither notified Gianni's parents nor required Gianni to obtain mental health care.  This occurred despite Gallaudet personnel knowing that the Sacchetti-Manganelli moved to the metropolitan District of Columbia area solely for the purpose of ensuring a continuity of care for Gianni's mental health issues.

94.     Even if Gallaudet was not capable of providing mental health care to Gianni, despite its clear assurances to the contrary, the University could, and should, have made efforts to contact, and refer Gianni to, at least one of two qualified in-patient and out-patient programs within fifty miles of Gallaudet that specialize in Deaf patients.

***Gallaudet Continues to Ignore Obvious Signs and Warnings***

95.     In and around February-March 2014, yet another teacher, assistant professor Ines Gonzales, had also begun to notice that Gianni's behavior in class was increasingly more bizarre, paranoid, and disconnected.  This had been a frequent issue of discussion between her and her

supervisor, Associate Professor of Spanish Dr. Roberto Herrera, whose observations echoed her concerns.

96.     Because Gallaudet failed to equip its employees with the tools necessary to address these mental health issues, despite their frequency in school settings, there was no meaningful follow up.  Little, or no, training appears to have been available for Gallaudet professors and staff related to mental health issues, much less what applicable policies and procedures would govern the handling of mental health incidents or emergencies.  Gallaudet failed to properly train academic staff and faculty on the contours of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), including but not limited to the fact that observations regarding a student's behavior or observations gleaned from conversations with a student are not protected unless later documented in a record and are capable of being shared with others, including the student's parents who, in this case, were persistently seeking to be kept abreast of any developments with their son to ensure he was being reasonably cared for.

97.     On March 6, 2014, Gianni's professor, Christina Healy, prompted by several incidents she had observed in class over the past three weeks, wrote to the Director of Academic Advisors and the Behavioral Intervention Team (BIT), describing Gianni as "Behaviorally Disruptive/Bizarre Acting." She implored someone from Gallaudet to meet with Gianni as his behavior was "bizarre" and "concerning."  Her communication contained an email that she had sent to Gianni noting that Gianni had refused "to meet with her one-on-one multiple times" to discuss his behavior, despite her requests.

98.     Yet again, no mental health counseling or intervention was ordered, conducted or even offered.

99.     On March 22, 2014, Gianni contacted Thuan Nguyen, a Coordinator of Residence Education (CRE) and expressed his distress over an interaction he had with a Resident Assistant (RA) earlier that day.

100.    As with several previously documented incidents, it was apparent from Gianni's account of the events that Gianni's reaction was clearly disproportionate, inappropriate, bizarre and, as with his other behavior to that point in time, reflective of an ongoing and unresolved mental health issue which was progressing, yet none of the CRE's involved appeared to have done anything about their observations.

101.    Instead Gianni's classmates and professors suggest that Gianni's mental health was allowed to continue spiral downward, untreated, despite numerous warning signs, increased isolation, a disheveled appearance, and steep decline in academic performance.  Staff, students, and professionals who have subsequently been interviewed describe Gianni during this time period as "appearing lost," "disassociated" with a "blank face," often "wearing the same clothes around campus for weeks; "it was like [Gio][3] was invisible."

102.    A California Office of Vocational Rehabilitation counselor who had not seen Gianni for some time came to Gallaudet in late March and saw Gianni on March 25, the Tuesday before his death.  He was reportedly so shocked by Gianni's disheveled appearance that his first question to Gianni was whether he was homeless.

103.    During this time period, the extent of Gianni's decline was unknown to his parents.  Gianni was living on campus and was not communicating with them as regularly.  Conversely, his parents were trying to allow Gianni to regain independence while residing at Gallaudet.

---

[3] Gianni was affectionately known as Gio.

104.    On March 28, 2014, shortly after lunch, Gianni's roommate Spencer Opie, returned to their shared room to find Gianni, whom he had had a fairly normal interaction with earlier in the day, staring blankly at him in a disassociated manner, with no response to any of Spencer's efforts to communicate with him.  The sudden change in behavior startled Spencer, who tried to engage Gianni in in conversation, to no avail.

105.    Without provocation, Gianni started signing to Spencer in an incoherent and aggressive manner, accusing him of being nosy and "lurking" in his possessions. Gianni motioned as though he was drawing an imaginary line across the room and angrily told Spencer to "stay on [his] side of the room."  When Spencer tried to respond, Gianni raised his arm and then stormed out of the room.  Gianni did not touch Spencer nor did Spencer feel as though Gianni intended, or made any real effort, to touch or strike him.

106.    In fact, Spencer was worried about Gianni, and decided to go look for him.  He asked another student who lived on the floor, John Dellato, to help and, together, they went into the common bathroom down the hall, toward the direction Spencer had seen Gianni heading. When they looked in the bathroom, they found Gianni, fully dressed, hiding inside a shower stall with the lights out.

107.    Spencer sought help from Residential Life Housing Officer Brian Suchite.  No one from the Residential Life Housing Office made any effort to follow up, much less, contact the Mental Health Center, Behavioral Intervention Team ("BIT"), or even Gianni's parents despite the fact that Gianni had signed numerous mental health releases allowing such communications.

108.    Just after 3pm that same day, Gianni went to his advanced Spanish lab class which met from 3pm to 4 pm on Fridays.

109.     Gianni's language lab teacher assistant professor, Ines Gonzales, immediately observed that something was wrong with Gianni. Gianni had come in late, looked disheveled and was staring with a blank expression. He was not making eye contact with anyone and appeared disassociated. Ms. Gonzales tried to get Gianni's attention, and failed, as Gianni moved his computer and chair so he faced the opposite direction from others in the class, with his back towards her.

110.     Toward the end of class, when still unable to get Gianni's attention, she politely tapped him on the shoulder. Gianni erupted and angrily accused her of inappropriately touching him. She immediately explained she was only trying to get his attention and apologized for any offense he may have taken.

111.     Gianni told her that her apology was not accepted and continued to angrily repeat that her conduct was inappropriate and unacceptable. Gianni then abruptly cut off the conversation, held a piece of paper over his face and stormed out of the room.

112.     Ms. Gonzales was extremely concerned for Gianni's well-being. She had seen his behavior grow increasingly more bizarre, paranoid and disconnected over the months of February and March, and this had been a frequent issue of discussion between her and her supervisor, Associate Professor of Spanish Dr. Roberto Herrera's office. Nevertheless, this time seemed different and more pronounced. She was extremely concerned.

113.     After Gianni left, Ms. Gonzales immediately went into Dr. Roberto Herrera's office, but he was not there. She emailed him to express her concern and desire to try to get help for Gianni. Realizing that Dr. Herrera was away and might not get the email until Monday morning, Ms. Gonzales then went to the office of the Department Chair, Dr. Pilar Pinar. When Professor Pinar said she would look into it on Monday, Ms. Gonzales told her that Monday was

not soon enough – insisting that someone address it immediately and that Gianni's parents needed to be informed.

114.    In the meantime, around 4:30pm, John Dellatto, advised Resident Assistant Tyler Church about Gianni and the incident that had occurred earlier in the bathroom.

115.    Neither Professor Pinar nor RA Tyler took any steps to address Gianni's issues with urgency, much less make an effort to ensure that Gianni's parents were notified of Gianni's drastic deterioration in behavior.

***The Final Events***

116.    Around 5p.m. on March 28, 2014, Gianni sought help and went to meet with Adrienne Morgan, a Gallaudet Coordinator of Residential Education (herein "CRE").   Gianni told Ms. Morgan that he felt his boundaries had been violated by his roommate; that he no longer felt comfortable in his room and that he believed he was in imminent danger and feared for his safety**.**

117.    CRE Morgan rejected Gianni's request, telling him he did not meet the criteria for a room change and turned him away.   Gianni stormed out of the office, "running crazy" and "to the point where his shoes fell off" chasing after an imaginary person. Other witnesses reportedly saw Gianni running barefoot around the library and signing to himself.   Sadly, even Gianni's efforts to seek help for himself were flatly disregarded, enhancing his isolation and despair.

118.    Despite recognizing that Gianni's behavior must be symptomatic of his mental illness, Ms. Morgan made no effort to secure help or intervention from the Mental Health Center or Behavioral Intervention Team.

119.     She did, however, email her supervisor, advising that Gianni's behavior was bizarre and he "feels in danger" and CRE Morgan "alerted DPS" about Gianni's bizarre behavior in case anything were to "arise with this student later this evening," CRE Morgan further acknowledged the need to, and assurance that she would, conduct a "welfare check" on Gianni. Needless to say, she did not.

120.     Around the same time, RA Tyler Church submitted his report to Gallaudet advising of the incident he had learned of, involving Gianni.

121.     That evening, March 28, 2014, around 11pm, Spencer Opie returned to his dorm room, with a friend, Jason Scherrenberg, in an effort to get some belongings so that he could spend the night in Jason's room.  Spencer did not want to stay in the room with Gianni.

122.     When Spencer and Jason arrived at the room, Gianni was inside alone.  Gianni allowed Spencer to enter to get his things.  Gianni did not know Jason and did not want him to come into the room.

123.     When Jason tried to enter the room, Gianni tried to close the door but Jason placed his foot against the door preventing the door from closing.  Spencer and Jason left, and Gianni remained inside the room alone.

124.     Gianni immediately emailed CRE Thuan Nguyen, complaining that despite contacting DPS and CRE Morgan, his efforts to move to another room in which he felt more secure were being disregarded and that he continued to fear for his safety.  He wrote:  "Please assign me to a different room immediately.  This is an emergency situation.  I don't understand why the CRE at LLRH6 did not respond like it was an emergency situation—leading to the second violation of my personal boundaries tonight."

125.    In the meantime, Spencer spoke with Residential Life staff member Laura Crowder and asked to speak with Brian Suchite, the Residential Life Housing Officer whom Spencer had spoken with earlier. Residential Advisor Crowder then contacted Mr. Suchite, who told RA Crowder to call Gallaudet Department of Public Safety ("DPS").

126.    Gallaudet's Mental Health Center does not appear to have been contacted by any of the involved Gallaudet personnel at any point in time.

127.    At 12:30am on March 29, 2014, RA Laura Crowder contacted DPS and made a report about Gianni.

128.    Shortly thereafter, Officer Daniel Bauer of the Gallaudet Department of Public Safety responded to Gianni's room.  Gianni opened the door and stared blankly at Officer Bauer.

129.    Despite knowledge of Gianni's fragile mental state, Officer Bauer did not attempt to talk to Gianni or calm him down, but immediately and authoritatively directed Gianni to step out of his room.  Gianni continued to stare at him blankly.  Eventually, Officer Bauer took hold of Gianni's arm, placed Gianni him in handcuffs, removed him from his room and placed Gianni under arrest in the absence of probable cause, a warrant or any other legal justification.

130.    Captain Patrick Rader, also with the Department of Public Safety, arrived and entered Gianni's room.  Captain Rader confirmed there was no one inside.  Gianni remained silent, staring blankly.

131.    Captain Rader and Officer Bauer forced Gianni onto the ground, face down, with his hands handcuffed behind his back where he remained for roughly 40 minutes.  CRE Morgan was present.  After Gianni had been handcuffed and placed on the floor, Spencer Opie arrived.

132.    In CRE Morgan's presence, while Gianni was still on the ground, Spencer told the officers that Gianni had mental health issues and might be suffering from bipolar disorder.

Despite having seen Gianni behaving bizarrely earlier in the day and having prior knowledge of Gianni's mental health issues, CRE Morgan said nothing.

133.   DPS had knowledge, even prior to responding to Gianni's door that there was a significant mental health issue and risk; that Gianni had been exhibiting increasingly bizarre behavior; that he had previously been hospitalized and evaluated at the Comprehensive Psychiatric Emergency Health Program; and Bauer and Rader were specifically made aware at the scene that Gianni was suffering from mental illness.  Not to mention, his behavior alone, in their presence, coupled with the report which brought them to his door, bespoke of a symptomatic mental illness.

134.   DPS made absolutely no effort to seek mental health care.  They did not notify the Mental Health Center or the Behavioral Intervention Team.

135.   Gallaudet's written policies require that a Mental Health Center counselor is to be on-call 24 hours a day, for incidents such as this.  At no point in time did DPS, CRE Morgan or anyone else, for that matter, contact the on-call counselor in direct violation of Gallaudet's known policies.

136.   Moreover, the Comprehensive Psychiatric Emergency Health Program (CPEP), which was known to DPS to have had success with Gianni during another previous psychotic episode, was just 2.7 miles away.  Neither DPS nor anyone else made any effort to direct a transport to CPEP, or any other medical or mental health facility, for that matter.

137.   As Gianni lay on the ground in handcuffs, any perceived or real threat to others ceased to exist.  The only threat that Gianni posed at that moment was to himself.  With the scene secure, even assuming it hadn't been to that point in time, Gallaudet through its Department of Public Safety had a duty to provide Gianni with, or direct Gianni to, a medical or

mental health facility to get him treated for a mental illness they had actual knowledge that he was suffering from.

138.    Instead, DPS summoned the Metropolitan Police Department ("MPD") to have Gianni transported to jail.  The MPD responded and took Gianni off DPS's hands, delivering him to the 5th District station jail.

139.    Furthermore, at no point in time did Gallaudet, nor MPD, provide Gianni with an interpreter to facilitate communication.

140.    MPD responded, took custody of Gianni and transported him to Washington D.C.'s 5th District station.  Gianni remained in custody throughout the night and well into the afternoon of March 29, 2014.

141.    During that time, Gianni was ultimately moved to a cell block prior to his magistrate court appearance, along with other inmates whose appearances were also scheduled for the same time.

142.    While Gianni was on the cell block, the Pre-Trial Services Agency intended to conduct a diagnostic pre-arraignment screening of several inmates, Gianni included.  As Gallaudet's DPS and MPD failed to adequately document or communicate information related to Gianni, the Pre-Trial Services Agency was unaware that Gianni was deaf and in need of an interpreter.  A Pre-Trial Services staffer entered the cell block to conduct a screening and called Gianni's name and lock-up number.  When Gianni did not respond, the staffer moved on.  As a result, Gianni did not receive any kind of pre-arraignment screening which traditionally includes screening aimed at early identification of mental health issues to be reported to the Judge handling the first appearance.

143.    On March 29, 2014 in the late afternoon, Gianni was released from custody but ordered not to have contact with, nor come within 50 yards of his roommate.  Further, it was ordered that he was only allowed to return to his dorm room under escort by a police officer.

144.    On March 29, 2014, by approximately 8:00pm, having been confined for approximately 15 hours and awake for over 36 hours, Gianni had made his way back to campus where he was met by Gallaudet DPS and CRE Morgan, who escorted Gianni to his room where he gathered some personal items.

145.    Neither Morgan, DPS nor anyone from Gallaudet made any effort to order, arrange for or even suggest mental health intervention or counseling, much less ensure that Gianni's parents were contacted.

146.    Despite the fact that he was still a dorm student at the University, no one from Gallaudet bothered to make any provision for Gianni, nor did anyone, including the DPS and CRE Morgan arrange for Gianni's wallet with his campus keycard, ATM card, and transportation card be returned to him.

147.    Instead, CRE Morgan turned Gianni away. Gallaudet abandoned Gianni in an acute state of despair and panic, depriving him of a room and the means to obtain food and transportation, and directing him away from his room and outside into the night alone.

148.    Gianni was eventually able to contact his mother, and asked her to pick him up.

149.    Ms. Sacchetti had just finished an ASL poetry performance in Virginia and was carpooling with two friends.  They detoured to Gallaudet to pick him up.

150.    Gianni looked disheveled and was sweating profusely despite the cold dark day. He got into the back seat of his mother's car.

151.    Ms. Sacchetti sensed something was wrong but certainly had no idea as to the extent of Gianni's mental state, having had no knowledge of what had occurred over the previous 36 hours.  Gianni sat in passenger seat, staring straight ahead with blank eyes.  Ms. Sacchetti had never seen him that upset before.  He also told her that he did not have his wallet.

152.    Because there were others in the car, she did not want to ask him in front of them what was wrong and make him more uncomfortable than he already appeared to be.  They drove to her home.  When the two women got out of the car, Gianni said he changed his mind and wanted to go back to Gallaudet.

153.    Ms. Sacchetti did not understand and asked him to come upstairs to the apartment. She could not convince him to come upstairs and did not understand his sudden reluctance.  Had she known the extent of the issues and trauma he had been through she would have taken him directly to a hospital.  Gianni walked away from the car.  Ms. Sacchetti had to pick up her daughter and asked Gianni to wait for her.  He did not.  Ms. Sacchetti returned several minutes later to find him gone and spent hours looking for him.   As the metro station was open she thought he might have tried to take it back to Gallaudet.

154.    Ms. Sacchetti called Gallaudet DPS, expressing her concern about Gianni's mental status and the fact that he may not have his wallet.  Despite her expressing great concern, they refused to provide her with any information, instead telling her she should check back Monday morning.  Ms. Sacchetti was not informed of Gianni's arrest and the conditions of his release, which deprived Gianni's family of the opportunity to organize a search that may have prevented his death.

155.    At 5:00am on March 30, 2014, Gianni appeared at Ms. Sacchetti's apartment door.  He was cold, wet and distraught.  Ms. Sacchetti immediately woke her roommate and

asked her to call 911 and started getting dressed.  She was going to take him to the hospital. Before she could get her shoes on, Gianni ran out the door.  Again, Ms. Sacchetti chased after him, but he was gone.

156.    After several frantic and failed attempts to get in touch with police through the deaf relay services, asking strangers to call the police, and walking into the nearest emergency room, Ms. Sacchetti was finally able to reach the Montgomery County Police who began searching for Gianni.

157.    Tragically, the physical, emotional and mental trauma of all of the events outlined above became overwhelming.  Gianni's state of despair and desperation was irreparable. He was seized by an irresistible impulse which he could no longer resist.  Given the events leading up to this moment in time and Gianni's state of mind, caused by Defendants' wrongful conduct, Gianni saw his only option as the act of Seppuku, a Japanese ritual of self-inflicted disemboweling traditionally where samurai warriors, facing certain death at the hands of their captors, see Seppuku as their only viable option and last opportunity to regain honor.

158.    Just after 6:00am, Gianni was found by Montgomery County police along the shore of the Sligo Creek, near his mother's apartment in Silver Spring, Maryland.  He was deceased.

159.    At the age of 23, Gianni Manganelli's young and promising life was unnecessarily cut short as a result of all the acts and omissions set forth above as well as those set forth in paragraphs 192-259, below, which are specifically incorporated into these general allegations as though fully set forth herein.  Gallaudet University, which held itself out as a beacon to the Deaf community and which had assured Gianni and his parents that Gianni would be cared for, instead, ignored and failed him catastrophically.

## FIRST CAUSE OF ACTION

### Wrongful Death/Negligence
### against Defendant Gallaudet University

160.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–159 inclusive along with paragraphs 192-259 below, with the same force and effect as though more fully set forth at length herein.

161.     Plaintiffs bring this action in their own right and on behalf of the wrongful death beneficiaries of Decedent, Gianni Manganelli, pursuant to the District of Columbia Wrongful Death Act,  D.C. Code  §16-2702.

162.     At all material times, Gianni Manganelli was a duly enrolled student of Gallaudet University.  Gianni was receiving financial aid from Gallaudet in the form of scholarship awards and was living in a Gallaudet dormitory.

163.     Gallaudet's administrators, faculty, Coordinators of Residential Education, Resident Assistants and the officers, members and staff of its Department of Public Safety, Office of Students with Disabilities, Mental Health Center, Behavioral Intervention Team and others who have been identified throughout this complaint (with the exception of those employees of the District of Columbia) were, at all material times, employees of Defendant Gallaudet and all acts and omissions set forth, and incorporated, herein, were committed within the course and scope of their employment with Gallaudet.

164.    Defendant Gallaudet University is vicariously liable for the acts and omissions of its employees, including the failure to act, occurring within the course and scope of their employment, under the theory of *respondeat superior*.

165.    Defendant Gallaudet owed a general duty of reasonable care to its students, including Gianni Manganelli, to provide a reasonably safe environment for them and to ensure that the health and well-being of its students, including Gianni Manganelli, were protected from foreseeable harm at all times.

166.    Defendant Gallaudet owed a duty of reasonable care to its students, including Gianni Manganelli, to provide reasonable educational and medical/mental health services to members of its student body.

167.    Additionally, Gianni Manganelli enjoyed a special relationship with Gallaudet University by virtue of his status as a student with a disability, as that term is defined under the Americans with Disabilities Act, as a result of which Gallaudet owed a duty to Gianni to ensure he was protected from discrimination on account of his disability and from any harm which was reasonably foreseeable to flow from a breach of that duty.

168.    Further, Gallaudet affirmatively undertook a duty of reasonable care to Gianni Manganelli by expressly assuring Gianni and his parents that Gallaudet would provide the mental health care that Gianni needed, which assurances Gianni and the Plaintiffs relied upon to their detriment.  Through its specific representations and ensuing conduct, Gallaudet undertook to act, and in undertaking to act, Gallaudet had a duty to act in a non-negligent manner.

169.    Prior to the start of the 2013 school year, Gallaudet University had actual knowledge that Gianni was Deaf and suffered from a mental illness that required care and

treatment and that the absence of such care and treatment would expose Gianni to a reasonably foreseeable risk of harm.

170.    Moreover, at a minimum, as a result of the incident that occurred on August 22-23, 2013, described above, during which Gianni violently and repeatedly struck his head against a car door and was deemed by a psychiatric facility to have a mental illness posing a threat to injure himself, Gallaudet had actual knowledge that it was reasonably foreseeable that Gianni would harm himself, in the absence of treatment and care.

171.    At all material times hereto, Gallaudet had actual and constructive knowledge that Gianni was at risk of harm and that such risk of harm was reasonably foreseeable.

172.    Defendant Gallaudet breached its duties by and including, but not limited to, the following:

a.  ignoring Gianni Manganelli's disabilities and mental health issues;

b.  failing to reasonably respond to his condition;

c.  failing to provide reasonable care and treatment for known symptoms and conditions;

d.  causing his wrongful detention and arrest;

e.  failing to seek mental health care or intervention prior to transporting him to jail;

f.  unreasonably causing him to be transported to a jail rather than to a medical/mental health facility;

g.  failing to ensure Gianni had the benefit of an independent and objective interpreter;

h.  failing to provide Gianni with a reasonably safe environment before, during and following his wrongful arrest;

i.  denying him room, board and shelter;

j.  committing innumerable violations of the ADA;

k.  failing to notify his parents;

l.  and disregarding documented and known symptoms and conditions during the throes of a mental health crisis.

173.    Tragically, all of the acts and omissions of Gallaudet University, including those identified above, breached Gallaudet's duties and created such despair and desperation that Gianni figuratively and literally believed he had no place left to turn.

174.    As a direct and proximate result of Gallaudet's negligent conduct, Gianni suffered an irresistible impulse which, in his state of mind, he was not capable of repelling.   In the absence of the mental health care he needed and which should have been afforded to him by Gallaudet University at critical periods before reaching this watershed moment, Gianni had no capacity to refrain from or fight against this impulse.

175.    Gianni's only option, in his mind, was the act of Seppuku, a Japanese ritual originally reserved for samurai warriors as their last and only viable option. Gianni succumbed to the irresistible impulse caused by Gallaudet's negligent conduct and knelt down at the shore of the Sligo Creek using a knife to disembowel himself, ultimately causing his death.

176.    As a direct and proximate result of Gallaudet's negligence, Gianni Manganelli, died, causing the Plaintiffs' damages, loss, and other legal and equitable harm.

177.    As a direct and proximate result of the foregoing negligence, Gianni Manganelli's wrongful death beneficiaries have been caused to incur various funeral, burial, estate administration expenses and various other expenses related to Gianni Manganelli's death for which the Plaintiffs are entitled to compensation in these proceedings.

178.    As a direct and proximate result of the foregoing negligence, Decedent's wrongful death beneficiaries have been, continue to be, and will in the future be wrongfully deprived of Gianni Manganelli's companionship, guidance and services.

179.    As a direct and proximate result of the foregoing negligence, Decedent's wrongful death beneficiaries suffered, are suffering, and will continue to suffer damages for an indefinite period of time in the future and the beneficiaries have been wrongfully deprived of the contribution they would have received from the Decedent.

WHEREFORE, Plaintiffs demand judgment against Defendant Gallaudet for all general and special damages permissible under all applicable laws.

## SECOND CAUSE OF ACTION

### Survival Claim
### against Defendant Gallaudet University

180.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-179 inclusive along with paragraphs 192-259 below, with the same force and effect as though more fully set forth at length herein, all of which support and demonstrate the negligence of Defendant Gallaudet's conduct.

181.    This claim arises under the District of Columbia Survival Statute, D.C. Code § 12-101.

182.    As a direct and proximate result of the negligence of Defendant Gallaudet, Plaintiff's Decedent, Gianni Manganelli, suffered considerable pain and suffering prior to his death.

183.     As a direct and proximate result of the negligence of Defendant Gallaudet, Plaintiff's Decedent, Gianni Manganelli, suffered considerable mental anguish, fear, and emotional distress prior to his death.

184. As a direct and proximate result of the negligence of Defendant Gallaudet, Plaintiff's Decedent, Gianni Manganelli, suffered other economic and non-economic damages recoverable under the applicable District of Columbia law.

WHEREFORE, Plaintiffs demand judgment against Defendant Gallaudet for all general and special damages permissible under all applicable laws.

## THIRD CAUSE OF ACTION

### Negligent Infliction of Emotional Distress
### against Defendant Gallaudet University

185. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–184 inclusive along with paragraphs 192-259 below, with the same force and effect as though more fully set forth at length herein.

186. Defendant Gallaudet owed a duty of due care to timely notify Plaintiffs of serious injury or illness of Gianni Manganelli, in order to minimize, avoid or otherwise prevent catastrophic injury and death of Gianni Manganelli while enrolled as a student at Gallaudet and living in its dormitory.

187. All of the Defendant's negligent acts and omissions caused the wrongful arrest and detention of Gianni Manganelli which constitutes an impact under all applicable law.

188. The negligent acts and omissions to which Plaintiff was subjected, directly and proximately caused Plaintiff to suffer emotional distress which was manifested by physical injury.

189. The emotional distress and physical impairment, caused by the Defendant's negligent conduct, commenced, and manifested, almost immediately upon her having been

subjected to the wrongful and tortious conduct asserted herein; and, said emotional distress and physical impairment persisted through Gianni's death and as to the Plaintiffs continues to persist.

190.    More particularly, Gallaudet's tortious conduct proximately caused emotional distress manifested by physical injury in that Plaintiff's mental illness remained untreated, spiraled, became exacerbated and aggravated, continuing to interfere with, and ultimately prevented, the performance of his normal daily activities, ultimately causing his death.

191.    As a direct and proximate result of Gallaudet's negligent conduct, the Plaintiffs sustained emotional distress and seek the relief set forth in her Prayer for Relief below.

WHEREFORE, Plaintiffs demand judgment against Defendant Gallaudet for all general and special damages permissible under all applicable laws.


## FOURTH CAUSE OF ACTION

### Violation of 42 U.S.C. § 12101 *et seq.*
### against Defendant Gallaudet University
### *(wrongful arrest, failure to provide reasonable accommodations and failure to train)*

192.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–191 inclusive, with the same force and effect as though more fully set forth at length herein.

193.    The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

194.    Gianni Manganelli was deaf and suffered from a mental illness, both of which conditions substantially limited one or more of his life activities, was documented and were

conditions he was generally regarded to have suffered.  Gianni was a "qualified individual" within the meaning of the ADA.

195.    Gallaudet University's Department of Public Safety consists of officers, assistant supervisors and supervisors who have all been commissioned as "special police officers" by the District of Columbia, a public entity and who have been expressly afforded the power and authority to act under color of state law to effectuate arrests, both on and off the campus of Gallaudet University.

196.    Specifically, the power expressly vested in these employees of Gallaudet University entitles them to gather evidence, assert criminal allegations, conduct searches and seizures, effectuate detentions and arrests and initiate criminal prosecution, actions affecting the state and constitutional liberty rights of individuals who may reside, or otherwise be located on – and in some instances off - the campus of Gallaudet University.

197.    Gallaudet University Department of Public Safety employees have the express power and authority to perform these functions, including an arrest, independently without input or assistance from any other agency or entity.  Bringing an individual into custody constitutes a service, program or activity of a public entity.

198.    The structure of Gallaudet University's Department of Public Safety mirrors the structure of other governmental or municipal police departments in that it has a Chief of Police, Commanders, Lieutenants, Sergeants, Captains, Officers and a Communications Bureau which fields incoming 911 calls and non-emergent calls for services and, in turn, dispatches officers to respond to handle those calls.

199.    The power and authority vested in Gallaudet University's Department of Public Safety by virtue of its commission from the District of Columbia, enabled and caused the

Department of Public Safety to independently perform functions traditionally reserved exclusively for governmental entities.

200.    By virtue of having been commissioned by the District of Columbia and performing governmental functions pursuant to that commission, which functions could not have been performed in the same manner absent such commission, Gallaudet University's Department of Public Safety carried itself and acted as a governmental entity and/or an instrumentality of the government and thus was, for these purposes, a public safety department.

*Wrongful Arrest*

201.    On March 29, 2014, the Department of Public Safety effectuated the arrest and detention of Gianni Manganelli and made the decision to direct him to the 5th District jail.

202.    At the time Bauer and Rader were standing at Gianni's dormitory room door, Gallaudet University, through its Department of Public Safety including Bauer and Rader, was aware of Gianni's disability and unreasonably ignored or failed to recognize that Gianni Manganelli's behavior, in their presence, was conduct attributable to his disability and was not criminal conduct.

203.    Nevertheless, Bauer and Rader, and thus Gallaudet University through its DPS, seized Gianni Manganelli, placed him under arrest and caused his subsequent detention in jail. Failing to properly attribute Gianni's non-criminal conduct to his disability and disregarding his known disability caused his wrongful arrest, in violation of the ADA.

204.    Gianni Manganelli's arrest was wrongful and violative of the ADA.

    ***Failure to Provide Reasonable Accommodations***

205.   Encounters with individuals with disabilities, many of which involve either no criminal conduct or only nuisance crimes that may reflect the individual's disability, are an everyday part of law enforcement.

206.   Preserving the ADA's protections in those encounters is at the heart of the statute's non-discrimination mandate.

207.   The ADA requires police officers to provide reasonable accommodations for individuals with disabilities, including mental illness and deafness, at the time of arrest.

208.   Even operating under the assumption that Gianni Manganelli's arrest was initially justified and proper, once he was placed into handcuffs and secured, any threat that Gianni arguably posed to other individuals ceased to exist.

209.   At the time, there were at least three Gallaudet DPS officers present, along with one of Gallaudet's Coordinators of Residential Education and one of Gallaudet's Resident Assistants, all of whom were standing around and above Gianni as he was face down and handcuffed behind his back. The only person Gianni potentially posed a threat to from that moment forward was himself.

210.   Gallaudet University, including its DPS, CREs and RAs, was aware that Gianni Manganelli's conduct in the days preceding and including March 29, even up to the moment of his arrest, was symptomatic and reflective of his disability and that it required accommodation.

211.   Once Gianni Manganelli was placed into handcuffs, there was no reason that Gallaudet University could not have provided a reasonable accommodation for Gianni Manganelli's mental illness and deafness by contacting the on-call mental health department, directing that he be transported to a medical or mental health facility and providing an interpreter; and, in fact, Gallaudet University, through its Department of Public Safety was

required to do so.  Gallaudet, through its DPS, had a duty to reasonably accommodate Gianni's disability by handling and transporting him to a medical or mental health facility.

212.    Furthermore, maintaining Gianni, who was deaf and whose hands were his sole method of communication, in a position such that he was handcuffed behind his back when there was no evidence that he posed any threat to anyone on scene, was tantamount to taping his mouth shut and depriving him of the ability to communicate, a further deprivation of accommodations under the ADA.

213.    DPS disregarded its duty, intentionally ignored Gianni's known disability, and deprived Gianni, a qualified individual, from reasonable accommodations under the ADA.

214.    Instead, DPS summoned the District of Columbia's Metropolitan Police Department for the purpose of transporting Gianni to jail in utter disregard for Gianni's disabilities.

215.    The Metropolitan Police Department arrived and, without conducting any independent investigation, presumably relying upon "fellow officers," simply transported Gianni Manganelli to the 5th District station where he was held without the benefit of reasonable accommodations in the way of mental health care or an interpreter.

216.    Discrimination includes the failure to reasonably accommodate a person's disability.

217.    Gallaudet University, through the governmental actions of its commissioned DPS officers and employees, failed to reasonably accommodate Gianni Manganelli's disability thereby discriminating against him and violating the ADA, causing irreparable harm.

218.    By virtue of having commissioned DPS officers and transporting Gianni without having conducted its own investigation, the District of Columbia effectively ratified, endorsed and encouraged DPS's conduct and actions.

### *Failure to Provide Training*

219.    Discriminatory treatment based on a disability can be avoided by proper training.

220.    In light of, and incorporating, those facts and allegations set forth in all of the preceding paragraphs, an entity such as Gallaudet's DPS had an obligation and duty, to Gianni Manganelli and any other qualified individual they may have encountered, to provide training to its officers and personnel so as to educate them as to how to reasonably handle individuals with disabilities, including mental illness and deafness.

221.    Among the most basic of core functions of an entity such as the DPS is the lawful exercise of its police powers by those officials acting under color of law. These essential functions are activities covered by the ADA and the failure to properly train its officers and personnel for encounters with disabled persons caused Gianni Manganelli to be discriminated against and excluded from otherwise reasonable and necessary accommodations.

222.    Gallaudet University, through its DPS and other employees, had ample opportunity, knowledge and impetus, well in advance of March 29, 2014, to have created, drafted, adopted, modified and/or implemented policies and a training program to provide its DPS officers and employees with the tools and resources reasonably necessary to handle individuals with disabilities, such as mental illness and deafness.  Such modifications or implementations to its police policies, procedures and training are subject matters which are inherently included in the scope of those services, programs and activities covered under the ADA as accommodations to which individuals such as Gianni Manganelli were entitled.

223.    Gallaudet University's failure to modify or implement its police policies, procedures and training in this regard constitutes a failure to provide reasonable accommodations and this failure to train was a violation of the ADA.

224.    The conduct at the heart of this cause of action is conduct traditionally performed by governmental entities.   Such conduct is governmental action and therefore conduct of an instrumentality of the government and a public entity.

225.    Under these circumstances, the government has provided the authority to Gallaudet University, via its Department of Public Safety, that enhanced the power of Gallaudet University and its employees of the Department of Public Safety which caused and effectuated the arrest of Gianni Manganelli and the decision to have him transported to jail.

226.    On March 29, 2014 prior to, during and subsequent to the decision to detain, arrest and transport Gianni Manganelli to a jail facility, Gallaudet University, including its DPS and, even more specifically Officer Bauer and Captain Rader, were aware that Gianni suffered from a mental illness and was deaf.

227.    Gallaudet is a congressionally created corporation that serves governmental objectives and, more pointedly with respect to this cause of action, caused irreparable harm to Gianni Manganelli through the performance of governmental functions.

228.    Gianni Manganelli was, solely by reason of his disability, excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or was otherwise subjected to discrimination by Gallaudet University at a time when the University was acting as a public entity.

229.    Failure to employ techniques appropriate to dealing with an individual with a known mental illness constitutes precisely the sort of discrimination against individuals with disabilities that the ADA was intended to address.

WHEREFORE, Plaintiffs demand judgment against Defendant Gallaudet for all general and special damages permissible under all applicable laws.

### FOURTH CAUSE OF ACTION

**Violation of the ADA for Failure to Train for Disabilities –
against Defendant Metropolitan Police Department**

230.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–229 inclusive, with the same force and effect as though more fully set forth at length herein.

231.    The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

232.    Gianni Manganelli was deaf and suffered from a mental illness, both of which conditions substantially limited one or more of his life activities, was documented and were conditions he was generally regarded to have suffered.  Gianni was a "qualified individual" within the meaning of the ADA.

233.    District of Columbia is a municipal corporation organized pursuant to the laws of the United States.  It is responsible for the hiring, training, supervision and conduct, including the acts and failures to act, of those officers, staff and employees of the District of Columbia's Metropolitan Police Department (MPD) committed within the course and scope of their employment, under the doctrine of *respondeat superior.*

234.    District of Columbia's MPD employees have the express power and authority to effectuate an arrest and detention independently without input or assistance from any other agency or entity.  Bringing an individual into custody constitutes a service, program or activity of a public entity.

235.    At all material times, the District of Columbia was on notice that there was a need for a specialized police response to people with mental illness in the District of Columbia.

236.    On March 29, 2014, Gallaudet University's Department of Public Safety effectuated the arrest and detention of Gianni Manganelli, in the absence of probable cause or any other legal justification, and made the decision to direct him to the 5th District jail.

237.    At the time the DPS made that decision, it was aware of Gianni's disability and unreasonably ignored or failed to recognize that Gianni Manganelli's behavior, in their presence, was conduct attributable to his disability and was not criminal conduct.

238.    MPD officers responded to Gianni's dormitory following his arrest by the DPS. Upon their arrival it was made known to them that Gianni suffered from a mental illness and was deaf.  It was further known to MPD that by virtue of disabilities, Gianni was a qualified individual under the ADA.

239.    MPD was aware of Gianni's disability and unreasonably ignored or failed to recognize that the conduct which had been attributed to Gianni Manganelli was conduct attributable to his disability and was not criminal conduct.  Nevertheless, MPD, took custody of Gianni from the DPS and continued his wrongful arrest and detention by transporting him against his will to the 5th District jail.  Disregarding Gianni's known disability and failing to properly attribute Gianni's non-criminal conduct to his disability caused his wrongful arrest and detention, violating the ADA.

240.    Gianni Manganelli's arrest was wrongful and violative of the ADA, for which the District of Columbia is responsible and liable.

***Failure to Provide Reasonable Accommodations***

241.    Encounters with individuals with disabilities, many of which involve either no criminal conduct or only nuisance crimes that may reflect the individual's disability, are an everyday part of law enforcement.

242.    Preserving the ADA's protections in those encounters is at the heart of the statute's non-discrimination mandate.

243.    The ADA requires police officers to provide reasonable accommodations for individuals with disabilities, including mental illness and deafness, at the time of arrest.

244.    Even operating under the assumption that Gianni Manganelli's arrest was initially justified and proper, once he was placed into handcuffs and secured, any threat that Gianni arguably posed to other individuals ceased to exist.

245.    At the time MPD arrived, there were at least three Gallaudet DPS officers present, along with one of Gallaudet's Coordinators of Residential Education and one of Gallaudet's Resident Assistants, all of whom were standing around and above Gianni as he was face down and handcuffed behind his back. The only person Gianni potentially posed a threat to from that moment forward was himself.

246.    MPD was aware that the conduct attributed to Gianni Manganelli was symptomatic and reflective of his disability and that it required accommodation.

247.    With Gianni handcuffed and the area under control, there was no reason that the MPD could not have provided a reasonable accommodation for Gianni Manganelli's mental illness and deafness by contacting mental health care providers, transporting him to a medical or

mental health facility and providing him with an interpreter.  At that moment, having taken custody of Gianni at a time it was aware of Gianni's mental illness and deafness, the MPD had a duty to reasonably accommodate Gianni's disability by handling and transporting him to a medical or mental health facility and ensuring he had an interpreter.

248.    Furthermore, maintaining Gianni, who was deaf and whose hands were his sole method of communication, in a position such that he was handcuffed behind his back when there was no evidence that he posed any threat to the MPD was tantamount to taping his mouth shut and depriving him of the ability to communicate, a further deprivation of accommodations under the ADA.

249.    MPD disregarded its duty, intentionally ignored Gianni's known disability, and deprived Gianni, a qualified individual, from reasonable accommodations under the ADA.

250.    Instead, the MPD merely transported Gianni to jail.

251.    Discrimination includes the failure to reasonably accommodate a person's disability.

252.    The MPD had possession of Gianni at a critical moment and rather than accommodating his known disabilities by transporting to, or arranging for, mental health care, allowing him the use of hands to communicate and obtaining, or arranging for, an independent interpreter, the MPD failed to reasonably accommodate Gianni Manganelli's disability thereby discriminating against him and violating the ADA, causing irreparable harm.

***Failure to Provide Training***

253.    Discriminatory treatment based on a disability can be avoided by proper training.

254.    In light of, and incorporating, those facts and allegations set forth in all of the preceding paragraphs, an entity such as the District of Columbia and its Metropolitan Police

Department had an obligation and duty, to Gianni Manganelli and any other qualified individual they may have encountered, to provide training to its officers and personnel so as to educate them as to how to reasonably handle individuals with disabilities, including mental illness and deafness.

255.    Among the most basic of core functions of an entity such as the MPD is the lawful exercise of its police powers by those officials acting under color of law. These essential functions are activities covered by the ADA and the failure to properly train its officers and personnel for encounters with disabled persons caused Gianni Manganelli to be discriminated against and excluded from otherwise reasonable and necessary accommodations.

256.    The District of Columbia, through its MPD, had ample opportunity, knowledge and impetus, well in advance of March 29, 2014, to have created, drafted, adopted, modified and/or implemented policies and a training program to provide its officers and employees with the tools and resources reasonably necessary to handle individuals with disabilities, such as mental illness and deafness.   Such modifications or implementations to its police policies, procedures and training are subject matters which are inherently included in the scope of those services, programs and activities covered under the ADA as accommodations to which individuals such as Gianni Manganelli were entitled.

257.    The District of Columbia's failure to modify or implement its police policies, procedures and training in this regard constitutes a failure to provide reasonable accommodations and this failure to train was a violation of the ADA.

258.    Gianni Manganelli was, solely by reason of his disability, excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or was otherwise subjected to discrimination by the District of Columbia, through its MPD.

259.    Failure to employ techniques appropriate to dealing with an individual with a known mental illness constitutes precisely the sort of discrimination against individuals with disabilities that the ADA was intended to address.

WHEREFORE, Plaintiffs demand judgment against Defendant District of Columbia for all general and special damages permissible under all applicable laws.

### FIFTH CAUSE OF ACTION

**False Arrest – Common Law
against Defendant Gallaudet University**

260.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–259 inclusive, with the same force and effect as though more fully set forth at length herein.

261.    In addition to those categories of employees (ie, Coordinators of Residential Education, Mental Health Center staff, Behavioral Intervention Team staff, Resident Assistants, professors, administrators, etc.) whose conduct was outlined in the general allegations incorporated herein, all members of the Gallaudet Department of Public Safety (DPS), including but not limited to Officer Daniel Bauer ("Bauer") and Captain Patrick Rader ("Rader"), were also employees of Gallaudet University.

262.    At all material times hereto, Gallaudet University's employees, including Bauer and Rader, were acting within the course and scope of their employment with Gallaudet University.

263.    Gallaudet University is vicariously liable for the acts and omissions of its employees committed within the course and scope of their employment with Gallaudet University, under a theory of *respondeat superior.*

264. On March 29, 2014, Bauer and Rader used their power as "special police officers" commissioned by the District of Columbia, acted under color of state law, and physically restrained Gianni Manganelli, handcuffing him, forcing him to the ground and restricting his freedom of movement, intentionally causing his detention and arrest against his will and in the absence of probable cause and any other legal justification.

265. Gianni Manganelli's arrest was effectuated through the use of force and/or the threat of physical force, and Gianni Manganelli was aware of, and succumbed to, the power asserted over him.

266. Gallaudet University's acts and omissions proximately caused the false arrest/false imprisonment of Gianni Manganelli.

267. As a direct and proximate result of the acts and/or omissions of Gallaudet University causing Gianni Manganelli's false arrest/false imprisonment, Gianni was caused to suffer grievously including the loss of liberty, shame, humiliations, mental pain and anguish, emotional suffering and all other damages recoverable pursuant to law.

268. Moreover, the acts and omissions of Gallaudet University in causing the wrongful arrest of Gianni Manganelli were the proximate cause of Gianni Manganelli's untimely and tragic death, for which his Estate and survivors have suffered, and continue to suffer, and are entitled to all damages recoverable pursuant to law.

WHEREFORE, Plaintiffs demand judgment against Defendant Gallaudet University for all general and special damages permissible under all applicable laws.

## SIXTH CAUSE OF ACTION

**False Arrest – Common Law
Against the District of Columbia**

269.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1–268 inclusive, with the same force and effect as though more fully set forth at length herein.

270.     The District of Columbia is a municipal corporation organized pursuant to the laws of the United States.  It is responsible for the hiring, training, supervision and conduct, including the acts and failures to act, of those officers, staff and employees of the District of Columbia's Metropolitan Police Department (MPD) committed within the course and scope of their employment, under the doctrine of *respondeat superior*.

271.     On March 29, 2014, the District of Columbia, through its MPD, took custody of, arrested, and detained Gianni Manganelli in the absence of probable cause and any other legal justification.

272.     As a direct and proximate result of the acts and/or omissions of the District of Columbia causing Gianni Manganelli's false arrest/false imprisonment, Gianni was caused to suffer grievously including the loss of liberty, shame, humiliations, mental pain and anguish, emotional suffering and all other damages recoverable pursuant to law.

WHEREFORE, Plaintiffs demand judgment against Defendant District of Columbia for all general and special damages permissible under all applicable laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, respectfully requests that the Court enter judgment against Defendants and further demand:

a)     An award of damages against Defendants, jointly and severally, or otherwise as all applicable laws permit, including economic damages, pain and suffering, mental anguish/psychological injury, lost earning capacity, and any and all other compensatory and exemplary damages;

b)     An award of pre- and post-judgment interest, and reasonable costs and attorneys' fees incurred by Plaintiffs;

c)     A jury trial on all claims so triable; and

d)     Such other and further relief, whether in law or equity, as the Court may deem just and proper.

DATED: March 30th, 2015                     Respectfully submitted,

/s/ Justin D. Grosz
Justin D. Grosz
Washington D.C. Bar No. 1018414
MORELLI ALTERS RATNER LLP.
2675 NE 188 Street
Miami, Florida 33180
JGrosz@morellialters.com
Telephone: (305) 571-8550
Facsimile:   (305) 571-8558
***Attorneys for Plaintiffs***

## Verification

We, Terrylene Sacchetti and Robert Manganelli, are the parents of Gianni Manganelli and co-personal representatives of his Estate.   We have read the foregoing Complaint and to the best of our knowledge, based upon information currently available to us, the contents of the Complaint are true and accurate.

Dated:  _3-26-15_

_[signature]_

Terrylene Sacchetti, Individually
and as Co-Personal Representative
of the Estate of Gianni Manganelli

_[signature]_

Robert Manganelli, Individually
and as Co-Personal Representative
of the Estate of Gianni Manganelli