**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                              )
TERRYLENE SACCHETTI, et al.,       )
                                              )
      Plaintiffs,       )
                                              )
    v.                                )        Civil Action No. 15-455 (RBW)
                                              )
GALLAUDET UNIVERSITY and         )
the DISTRICT OF COLUMBIA,         )
                                              )
      Defendants.       )
———————————————————————)

**MEMORANDUM OPINION**

      The plaintiffs, Terrylene Sacchetti and Robert Manganelli, in their individual capacities

and as representatives of the Estate of Gianni Manganelli, bring this suit against defendants

Gallaudet University ("Gallaudet") and the District of Columbia ("District"), asserting violations

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213 (2012), and

common law claims for wrongful death, survival, negligent infliction of emotional distress, and

false arrest, arising out of the death of their son, Gianni Manganelli, in March 2014.  Compl.

¶¶ 160–272.  Currently pending before the Court are the defendants' motions to dismiss the

Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Defendant Gallaudet University's Motion To Dismiss [the] Plaintiffs' Complaint Pursuant to

Federal Rule of Civil Procedure 12(b)(6) ("Gallaudet's Mot."); Defendant District of Columbia's

Motion To Dismiss ("District's Mot.").  Upon careful consideration of the parties' submissions,

the Court concludes that each motion to dismiss must be granted in part and denied in part.[1]

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its
decision: (1) Gallaudet University's Memorandum in Support of Its Motion To Dismiss ("Gallaudet's Mem."); (2)
the Plaintiffs' Response in Opposition to Defendant Gallaudet University's Motion To Dismiss ("Pls.' Opp'n to
(continued . . . )

1

## I.   BACKGROUND

This is a sad case, which arises from Gianni Manganelli's ("Manganelli's") suicide committed near his mother's apartment in Silver Spring, Maryland, on March 30, 2014.  Compl. ¶¶ 157–59.

The following factual allegations are derived from the Complaint filed by the plaintiffs in this matter.  During the spring of 2013, Manganelli, who was deaf, gained acceptance and acquired a scholarship to attend Gallaudet by virtue of his impressive academic and personal achievements.  Id. ¶¶ 10, 18–20, 24.  Because Manganelli had been suffering from seizures beginning in April 2013 while he was a student in California, for which the plaintiffs sought treatment, id. ¶ 23, Manganelli's mother, plaintiff Terrylene Sacchetti ("Sacchetti"), "initiated extensive and candid conversations with Gallaudet's Director of Gallaudet's Mental Health Center, . . . as well as several [employees] from the housing and academic advisors departments, to ensure that Gallaudet was aware of [Manganelli's] mental health struggles and [was] capable of treating [Manganelli]."  Id. ¶ 28.  "Thus, as of July 2013, through direct communication with [] Sacchetti," Gallaudet allegedly knew that Manganelli had a history of seizures, depression, and anxiety; had been evaluated for undiagnosed mental health and neurological issues while living in California; had been prescribed the medication Depakote but had stopped taking that medication due to adverse reactions; and that, without the medication, Manganelli was at greater risk of seizures.  Id. ¶ 30.  Gallaudet allegedly "assured, and reassured [] Sacchetti that Gallaudet

( . . . continued)
Gallaudet's Mot."); (3) Gallaudet University's Reply Memorandum of Law in Support of Its Motion To Dismiss ("Gallaudet's Reply"); (4) the Memorandum of Points and Authorities in Support of Defendant District of Columbia's Motion To Dismiss ("District's Mem."); (5) the Plaintiffs' Response in Opposition to Defendant District of Columbia's Motion To Dismiss ("Pls.' Opp'n to District's Mot."); (6) the Reply to [the] Plaintiffs' Opposition to the District of Columbia's Motion To Dismiss ("District's Reply"); (7) the Plaintiffs' Surreply in Opposition to [the] Defendants' Motions To Dismiss ("Pls.' Surreply"); and (8) Gallaudet University's Response to [the] Plaintiffs' Surreply in Opposition to [the] Defendants' Motion To Dismiss ("Gallaudet's Surreply Response").

was more than equipped to address [Manganelli's] issues and would provide [Manganelli] with the level of care he needed," id. ¶ 33, and the plaintiffs purportedly "relied upon Gallaudet's representations and assurances," id. ¶ 34.   In August 2013, Manganelli relocated from California with his parents and sister to begin his studies at Gallaudet, where he lived on campus in a dormitory "typically reserved for students with medical or mental health needs . . . ." Id. ¶ 35.[2]

### A.   Manganelli's Behavioral Decline

Signs of trouble began shortly thereafter when, on August 22, 2013, Manganelli approached a member of the Capitol Police at the United States Capitol building and demanded to speak with Congress.  Id. ¶ 43.  During this encounter, he was "extremely agitated and was screaming uncontrollably."  Id.  The officer "immediately suspected a mental health issue," placed Manganelli in handcuffs, and transported him to the Department of Mental Health's Comprehensive Psychiatric Health Program facility.  Id. ¶ 44.  During the transport to the facility, Manganelli struck his head repeatedly against the car door.  Id.  Manganelli's father was contacted and advised about the situation, as was Gallaudet's Department of Public Safety ("Gallaudet Police").  Id. ¶¶ 46–47.  The facility determined that Manganelli was exhibiting signs of mental illness and detained him overnight "for observation and reassessment."  Id. ¶ 45. A nurse at the facility contacted Gallaudet's Mental Health Center to advise it to follow up with Manganelli, and scheduled a psychiatric appointment at Gallaudet on Manganelli's behalf, to take place upon his discharge from the facility.  Id. ¶ 50.

Manganelli returned to Gallaudet on August 23, 2013.  Id. ¶ 52.  That evening, Gallaudet Police were called to Manganelli's room, and he was described as being disproportionately "irate" in his complaints about pain in his wrists caused by the handcuffs.  Id. ¶¶ 55–56.  Despite

---

[2] During the relevant time frame, Sacchetti resided in Maryland, id. ¶ 38, while Manganelli's father, plaintiff Robert Manganelli, resided in Virginia, id. ¶ 39.

having been notified of the previous day's events, Gallaudet took no steps to follow up on Manganelli's mental health condition.  See id. ¶ 53 (stating that the Dean of Student Affairs, the Director of Gallaudet Police, Gallaudet's Mental Health Center, and "several members of Gallaudet's Behavioral Intervention Team" were notified about the prior day's incident but did not "t[ake] any steps to follow-up and ensure that [Manganelli] was no longer at risk").  Two days later, on August 25, 2013, Gallaudet Police "confiscated two prescription bottles of cannabis and related items" from Manganelli's room.  Id. ¶ 57.  Manganelli stated that he needed the cannabis, which "had been prescribed . . . by his doctor in California, prior to leaving for [the District], to help treat his seizures."  Id. ¶ 58.  Without his parents' knowledge, Gallaudet disciplined Manganelli for possessing cannabis on campus.  See id. ¶¶ 61, 64.

On August 27, 2013, an academic advisor wrote to Gallaudet's Behavioral Intervention Team to express her concern about Manganelli's welfare.  Id. ¶ 63(a).  That same day, Manganelli met with an individual named Doris Zelaya at Gallaudet's Mental Health Center, who later attempted to schedule "weekly sessions" with Manganelli.  Id. ¶ 63(b)–(c).  A few days later, on September 8, 2013, Manganelli responded that he did not "think he need[ed] them."  Id. ¶ 63(e).  On September 11, 2013, Gallaudet's Mental Health Center "closed" Manganelli's file despite noting that Manganelli had expressed his concern that it "would not maintain confidentiality 'if he reported he wanted to hurt himself.'"  Id. ¶ 65 (emphasis omitted). Manganelli's parents were not made aware of Manganelli's confidentiality concern.  Id. ¶ 66. And, in response to Sacchetti's request for Gallaudet's mental health records regarding Manganelli, Gallaudet represented that it had none because "[Manganelli] ha[d] not requested services."  See id. ¶¶ 69–71.

About a month later, in October 2013, Manganelli received an "initial screening" at Gallaudet's Mental Health Center, which noted that he "was agitated, confrontational, defensive[,] and guarded," and that he was "experiencing 'high levels of anxiety' and depression." Id. ¶ 74. Despite identifying these problems, and potential symptoms of Asperger's syndrome, no further assessment was provided at that time. Id. Sacchetti asked Gallaudet's Mental Health Center to notify her "the next time [Manganelli] is in a depression episode where he becomes suicidal" so she could "take him straight to a mental health hospital." Id. ¶ 77 (emphasis omitted). In response, Gallaudet's Mental Health Center informed her that in the event "emergency mental health care" was needed, Gallaudet usually sent students to George Washington University Hospital or Georgetown University Hospital. Id. ¶ 78.

After the October 2013 initial screening, Manganelli's behavior continued to decline. Id. ¶ 80. A Gallaudet instructor named Susan Mather described an incident in which Manganelli "got on all fours and . . . began acting like a dog" in her classroom, then fled to another classroom when she attempted to confront him. Id. ¶ 82. Mather stated that this was "just one of several incidents over a couple of weeks . . . which she described as strange and worrisome." Id. ¶ 83. She also stated that Manganelli acted "in a physically aggressive manner that scared the other students" and that she was "concerned [for] students['] safety." Id. (first alteration in original). Mather asked Gallaudet to remove Manganelli from her classroom, stating that she was "concerned for his mental health," that "he need[ed] professional health counseling as soon as possible," and that his situation was going "from bad to worse." Id. ¶¶ 84–85 (emphasis omitted). Manganelli was disciplined for his behavior in Mather's class, id. ¶¶ 86–87, without his parents' knowledge, id. ¶ 88. Contrary to Mather's requests, Manganelli was not required to obtain mental health counseling. See id. ¶¶ 90–91.

In February or March 2014, another Gallaudet instructor, Ines Gonzales, also noticed Manganelli's "increasingly more bizarre, paranoid, and disconnected" behavior. Id. ¶¶ 94–95. A third instructor, Roberto Herrera, shared Gonzales' concerns. Id. ¶ 95. Also in early March 2014, a fourth Gallaudet instructor, Christina Healy, contacted Gallaudet's Director of Academic Advisers and Behavioral Intervention Team to alert them that Manganelli's conduct in her classroom was "bizarre" and "concerning," and that Manganelli had refused to meet with her to discuss his conduct on several occasions. Id. ¶ 97. Manganelli did not receive any mental health counseling following these reports. Id. ¶ 98.

Several individuals who were interviewed following their observations of Manganelli described his affect during this time as "appearing lost," "dissociated," with a "blank face," and often "wearing the same clothes around campus for weeks." Id. ¶ 101. A vocational rehabilitation counselor who had previously counseled Manganelli in California, and who saw Manganelli at Gallaudet on March 25, 2014, was "reportedly so shocked by [Manganelli's] disheveled appearance that his first question to [Manganelli] was whether he was homeless." Id. ¶ 102. Manganelli's parents were not aware of his condition during this period because he "was living on campus and was not communicating with them as regularly," and because they "were trying to allow [Manganelli] to regain independence while residing at Gallaudet." Id. ¶ 103.

### B. The Events Preceding Manganelli's Suicide

After lunch on March 28, 2014, Manganelli confronted his roommate, Spencer Opie, in an "incoherent and aggressive manner, accusing him of being nosy and 'lurking' in his possessions," and "drawing an imaginary line across the room and angrily [telling Opie] to 'stay on [his] side of the room." Id. ¶¶ 104–05 (second alteration in original). "When [Opie] tried to respond, [Manganelli] raised his arm and then stormed out of the room." Id. ¶ 105. Because

Opie "was worried about [Manganelli]", Opie and another student "decided to look for him," and found him "fully dressed, hiding inside a [bathroom] shower stall with the lights out."  Id. ¶ 106. Opie and the other student each notified a Gallaudet residential housing official about the incident, see id. ¶¶ 107, 114, but Manganelli's parents were not notified, id. ¶ 107.

Manganelli then went to his 3:00 p.m. Spanish class that Friday afternoon, taught by Gonzales.  Id. ¶ 108.  Gonzales observed that "something was wrong" with Manganelli, as "[h]e was not making eye contact with anyone and appeared dissociated."  Id. ¶ 109.  At the end of the class, when Gonzales tapped Manganelli on his shoulder to get his attention, Manganelli "erupted and angrily accused her of inappropriately touching him," id. ¶ 110, then held a piece of paper over his face and left the classroom, id. ¶ 111.  Gonzales alerted Herrera by email and spoke to the department chairperson, Pilar Pinar, about her concerns regarding Manganelli.  Id. ¶ 113.  Pinar stated that she would "look into it on Monday," but Gonzales "insist[ed] that someone address it immediately and that [Manganelli's] parents needed to be informed."  Id. ¶ 113.

That same day, after the incident in Gonzales' classroom, Manganelli met a Gallaudet residential housing official named Adrienne Morgan to complain about his roommate, stating that he "felt his boundaries had been violated by his roommate; that he no longer felt comfortable in his room[,] and that he believed he was in imminent danger and feared for his safety."  Id. ¶ 116.  Morgan told Manganelli that he "did not meet the criteria for a room change."  Id. ¶ 117. Manganelli "stormed out of the [Morgan's] office, 'running crazy' and 'to the point where his shoes fell off' . . . ."  Id.  Other students reported seeing Manganelli "running barefoot around the library and signing to himself."  Id.  Morgan did not notify Gallaudet's mental health providers regarding his interaction with Manganelli or conduct a "welfare check" on Manganelli, id.

¶¶ 118–19; she did, however, alert Gallaudet Police "about [Manganelli's] bizarre behavior in case anything were to 'arise with this student later in the evening,'" id. ¶ 119.

Late on the night of March 28, 2014, Opie (Manganelli's roommate) returned to their room with a friend named Jason Scherrenberg, to collect some belongings so Opie could spend the night in Scherrenberg's room. Id. ¶ 121. Manganelli allowed Opie to enter the room; however, when Scherrenberg attempted to enter, Manganelli tried to close the door, and Scherrenberg "placed his foot against the door." Id. ¶¶ 122–23. After Opie and Scherrenberg left, Manganelli emailed another residential housing official asking to be assigned to another room "immediately," that it was an "emergency situation," and that this latest incident was "the second violation of [his] personal boundaries . . . ." Id. ¶ 124.

Meanwhile, Opie had notified a residential housing official named Laura Crowder about what had occurred, and she called Gallaudet Police at 12:30 a.m. on March 29, 2014, to make a police report. Id. ¶¶ 125–27. However, Gallaudet's Mental Health Center was not notified. Id. ¶ 126. Two officers from Gallaudet Police went to Manganelli's room, and when they arrived, Manganelli "stared blankly" at them. See id. ¶ 128 ("[Manganelli] opened the door and stared blankly at Officer Bauer."); id. ¶ 130 ("[Manganelli] remained silent, staring blankly."). The Gallaudet Police officers handcuffed Manganelli's hands behind his back and held him, face down, on the ground for approximately forty minutes. Id. ¶ 131. Opie subsequently returned to the room and told the Gallaudet Police officers that Manganelli "had mental health issues and might be suffering from bipolar disorder." Id. ¶ 132. Gallaudet Police did not notify Gallaudet's Mental Health Center or Behavioral Intervention Team about the encounter with Manganelli, id. ¶ 134, but instead, notified the District's Metropolitan Police Department ("MPD"), id. ¶ 138. MPD officers transported Manganelli to the local MPD station house, where Manganelli

remained "throughout the night and well into the afternoon," id. ¶ 140.  Neither Gallaudet nor the

MPD provided an interpreter to Manganelli during the course of his detention.  Id. ¶ 139.  While

being detained, the District's Pretrial Services Agency "intended to conduct a diagnostic, pre-

arraignment screening" of Manganelli prior to his upcoming court arraignment; however,

because Gallaudet Police and the MPD failed to document or communicate Manganelli's

deafness, the Pretrial Services Agency was unaware that Manganelli "was deaf and in need of an

interpreter."  Id. ¶ 142.  Thus, when a Pretrial Services Agency staffer called out Manganelli's

name and received no response, the staffer "moved on," and Manganelli was not screened for

any mental health issues prior to his arraignment.  Id.  At his arraignment, Manganelli was

released with orders not to contact or come within fifty yards of Opie, and was only permitted to

return to his dorm room with a police escort.  Id. ¶ 143.

     After Manganelli was released from custody during the afternoon of March 29, 2014, he

returned to Gallaudet's campus, where he was escorted by a residential housing official to collect

some belongings from his room.  Id. ¶¶ 143–44.  Manganelli then contacted his mother and

asked her to pick him up.  Id. ¶ 148.  When Sacchetti arrived in her car, she observed that

Manganelli "looked disheveled and was sweating profusely despite the cold dark day."  Id.

¶ 150.  She "sensed something was wrong" but "ha[d] no knowledge of what had occurred over

the past 36 hours."  Id. ¶ 151.  Sacchetti "had never seen [Manganelli] that upset before," id., but

because there were other individuals in her car, she did not ask him what was wrong, and instead

drove him to her home, id. ¶ 152.  Manganelli refused to enter Sacchetti's apartment, stated that

he wanted to go back to Gallaudet's campus, and walked away from the car.  Id. ¶ 153.  Sacchetti

left to pick up her daughter, and when she returned "several minutes later," Manganelli was

gone.  Id.  Believing he had returned to Gallaudet, Sacchetti called Gallaudet Police, but she was

not informed about the previous night's events, and instead was told to "check back Monday morning." Id. ¶ 154.

Manganelli returned to his mother's home at 5:00 a.m. on March 30, 2014, appearing "cold, wet, and distraught." Id. ¶ 155. Sacchetti asked her roommate to call 911 and prepared to take Manganelli to the hospital, but Manganelli "ran out the door." Id. Sacchetti, who is also deaf, id. ¶ 11, made several attempts to alert law enforcement, and walked to the closest emergency room, id. ¶ 156. She was able to contact the Montgomery County, Maryland police department, which joined the search for Manganelli. Id. Shortly after 6:00 a.m., Manganelli was found dead near his mother's home, apparently due to a self-inflicted wound to his abdomen. Id. ¶¶ 157–58.

## II.    STANDARDS OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(6)

To survive the defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the allegations in the complaint must state a facially plausible claim for recovery. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The court, which is required to assume that all well-pleaded allegations in the complaint are true, must find that the complaint is sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555; see Iqbal, 556 U.S. at 678 ("To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quoting Twombly, 550 U.S. at 570)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Legal conclusions masquerading as factual allegations are not enough to survive a motion to dismiss. Browning v. Clinton, 292 F.3d 235,

242 (D.C. Cir. 2002).  Although the court must, in general, limit its review to the allegations in the complaint, it may consider "documents upon which the complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."  Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (quoting Hinton v. Corr. Corp. of Am., 624 F. Supp. 2d 45, 46 (D.D.C. 2009)).

### B.   Federal Rule of Civil Procedure 56

The defendants each attached to their replies in support of their dispositive motions police incident and arrest reports relating to the March 28, 2014 altercation that lead to Manganelli's arrest, which had neither been attached nor referenced by the plaintiffs in the Complaint, nor cited by the defendants' in their opening briefs.  See Gallaudet Reply, Exhibit ("Ex.") 1 (MPD incident report); District Reply, Ex. A (MPD arrest/prosecution report).  The Court therefore afforded the parties an opportunity to supplement their briefs in light of the MPD reports.  See Dec. 14, 2015 Minute Order.  The submission of the MPD reports as attachments to the defendants' replies implicates Federal Rule of Civil Procedure 12(d), which provides that "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the Court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).

"The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court."  Flynn v. Tiede-Zoeller, Inc., 412 F. Supp. 2d 46, 50 (D.D.C. 2006).  In exercising this discretion, a "reviewing court should not automatically treat a dismissal where external materials were not excluded as a summary judgment, although such treatment may be the most common result . . . .  Rather, the reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the

procedural requirements of the applicable rules were observed."  <u>Tele-Commc'ns of Key West, Inc. v. United States</u>, 757 F.2d 1330, 1334 (D.C. Cir. 1985).  "A motion may be treated as one for summary judgment even if the parties have not been provided with notice or an opportunity for discovery if they have had a reasonable opportunity to contest the matters outside of the pleadings such that they are not taken by surprise."  <u>Bowe-Connor v. Shinseki</u>, 845 F. Supp. 2d 77, 86 (D.D.C. 2012).  And, if the claims present only questions of law, they may be considered on their merits pursuant to either a motion to dismiss under Rule 12(b)(6) or a motion for summary judgment under Rule 56.  <u>Marshall Cnty. Health Care Auth. v. Shalala</u>, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  While "there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment[,]" <u>id.</u>, "[i]t is probably the better practice for a district court to always convert to summary judgment," <u>id.</u> at 1226 n.5.

A Rule 56 motion for summary judgment can be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Steele v. Schafer</u>, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  <u>Id.</u>  The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (quoting Rule 56).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment; rather, "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## III.   ANALYSIS

### A.   The Plaintiffs' Wrongful Death/Negligence and Survival Claims Against Gallaudet (the First and Second Causes of Action)

The plaintiffs contend that they are entitled to damages from Gallaudet under the District's wrongful death and survival statutes[3] due to Gallaudet's alleged negligence with regard to Manganelli's mental health decline, arrest, and subsequent suicide.  Compl. ¶¶ 160–84.  The plaintiffs allege that Gallaudet breached duties of care arising out of its special relationship with Manganelli and the plaintiffs—a relationship allegedly forged from the pre-enrollment assurances Gallaudet made regarding its ability to address Manganelli's seizures and mental

---

[3] The District of Columbia wrongful death statute provides, in part, that, "[w]hen, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured . . . to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death . . . ."  D.C. Code § 16-2701 (2012).  Under the District's survival statute, "[o]n the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased."  D.C. Code § 12-101.

health problems, id. ¶¶ 167–70, and that Gallaudet's purported negligent conduct caused Manganelli's mental state to decline to the point where he could not resist the impulse to commit suicide, id. ¶¶ 173–74.  As discussed more fully below, the plaintiffs' negligence (and consequently, their wrongful death and survival) claims fail because the Complaint does not establish any duty of care on Gallaudet's part to attempt to prevent Manganelli's suicide.

"It is a familiar principle that a person is liable to another in negligence only if it can be shown that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." Haynesworth v. D.H. Stevens Co., 645 A.2d 1095, 1097–98 (D.C. 1994).  The plaintiffs rely on the "Good Samaritan" principle of tort law as the basis for Gallaudet's purported duty of care.  See Pls.' Opp'n to Gallaudet's Mot. at 10–11 (citing Restatement (Second) of Torts § 323).  This principle provides that

> one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or thing, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); see Haynesworth, 645 A.2d at 1997 (recognizing that Restatement (Second) of Torts § 323 "is well known and readily applied, where appropriate").  Gallaudet counters that the plaintiffs' reliance on the "Good Samaritan" principle is misplaced in light of specific case law addressing the question whether, and under what circumstances, a university owes a duty to prevent a student from committing suicide.  See Gallaudet Reply at 2 ("Gallaudet respectfully submits that Plaintiffs' attempt to distract the Court's attention to theories of liability that remain untested in this context essentially concedes the validity of . . . the numerous cases Gallaudet cited from throughout the United States

requiring a 'special relationship' between the university and the student for a duty to prevent the student's suicide to arise.").

Gallaudet's suggestion that section 323 of the Restatement has not been applied in the context of a university student suicide is not wholly accurate.  In <u>Jain v. Iowa</u>, prior to a student's suicide, university employees were aware that the student had previously tried to commit suicide by inhaling exhaust fumes, a university counselor had attempted to help the student through counseling, and the university had a policy of informing parents when a student engaged in self-destructive behavior.  617 N.W.2d 293, 295–96, 298 (Iowa 2000).  The plaintiff asserted that the university's failure to inform the student's parents of his prior suicide attempt and other suicidal behaviors, contrary to the university's policy, implicated duties under section 323 of the Restatement.  <u>See</u> <u>id.</u> at 297–99.  The Iowa Supreme Court, reviewing the trial court's grant of summary judgment in favor of the university, concluded that the record, when viewed in the light most favorable to the plaintiff, established that the university offered to help the student cope with his suicidal ideations, but that the student rebuffed these efforts.  <u>Id.</u> at 299.  The record also failed to establish that the student "relied, to his detriment, on the services gratuitously offered by these same personnel."  <u>Id.</u> at 299–300.  In light of these facts, the court concluded that "no legal duty on the part of the university arose under Restatement section 323 as a matter of law." <u>Id.</u> at 300.  In contrast, in <u>Leary v. Wesleyan University</u>, the Connecticut Superior Court, applying section 323 of the Restatement, found that the university police officers, by undertaking to transport the student to a hospital after he complained of a panic attack but failing to ensure that he obtained medical attention, breached a duty owed to the student, who committed suicide shortly after being dropped off at the hospital.  No. CV055003943, 2009 WL 865679, at *6–8 (Conn. Super. Ct. Mar. 10, 2009).

Other courts that have addressed a university's duty to prevent student suicides have done so without invoking section 323 of the Restatement, but have nonetheless analyzed whether a "special relationship" existed between the university and the student that gave rise to such a legal duty.  For example, the federal district court in Schieszler v. Ferrum College found the existence of a special relationship under circumstances in which the college had been made aware that the student sent multiple notes to his girlfriend stating that he was going to commit suicide.  236 F. Supp. 2d 602, 609 (W.D. Va. 2002).  After the first note, campus police officers and resident services discovered the defendant in his dormitory with self-inflicted bruises, and the college required the student to sign a statement that he would not hurt himself again.  Id. at 605. Thereafter, the college was informed that the student sent a second note to his girlfriend indicating that he was having suicidal ideations.  Id.  However, campus police and resident services failed to take any action in response to the second note.  Id.  After a third note of desperation authored by the student, campus police found the student deceased in his dormitory in the same manner he had previously threatened to kill himself in the first note.  Id.  The court concluded that the college knew the student was likely to harm himself, that there was "an imminent probability that the decedent would try to hurt himself," and that the defendants had documentation of this specific harm, all of which established a "special relationship" between the college and deceased student.  Id. at 609.

Similarly, in Shin v. Massachusetts Institute of Technology, the Massachusetts Superior Court found that a special relationship existed between the university and a student, which required the university to take reasonable measures to ensure the student's safety.  No. 02-0403, 2005 Mass. Super. LEXIS 333, at *36–37 (Mass. Super. Ct. June 27, 2005).  There, the student had received treatment at the university multiple times throughout her first two years for self-

inflicted cutting behavior, suicidal ideations, and diagnosed depression and personality disorders. Id. at *1–12.  Throughout this period, the student participated in mental health counseling and treatment provided by the university, but her condition steadily deteriorated.   Id.  Two days prior to her suicide, she told another student that she planned to kill herself. Id. at *11–12.  Campus police were alerted about the suicide threat, and the student was transported to the university's mental health center; however, upon arrival, a physician determined that she was not acutely suicidal.  Id.  The student subsequently committed suicide by self-inflicted burns.  Id. at *14–15. Because the school was aware of the student's mental health history over a period of two years and there was sufficient evidence that they could reasonably foresee that the student would injure herself, the court found a "special relationship" between the student and the university.  Id. at *36–37.

The principles applied by the courts utilizing section 323 of the Restatement and the "special relationship" analysis are not irreconcilable and impact the Court's view as to whether the facts here support the plaintiffs' negligence claims.  This case is not unlike Jain, which analyzed the question of whether the university owed a duty arising out of section 323 of the Restatement, and the Court is persuaded that the negligence claim must fail under the analysis required by the Restatement.  Section 323(a) requires a showing that Gallaudet's failure to exercise due care in fulfilling its alleged undertaking increased the risk of harm to Manganelli or that Manganelli relied on the undertaking to his detriment.  Restatement (Second) of Torts § 323(a), (b).  The Complaint alleges that, knowing Manganelli's past history of seizures, depression, and anxiety, Compl. ¶ 30, Gallaudet "assured, and reassured[] . . . Sacchetti that Gallaudet was more than equipped to address [Manganelli's] issues and would provide [Manganelli] with the level of care he needed,"  Compl. ¶ 33.  But Gallaudet's Mental Health

Center offered treatment to Manganelli in September 2013, following the August 2013 incident at the Capitol, which he refused.  Id. ¶ 63.  Indeed, Manganelli harbored distrust for the effectiveness of Gallaudet's mental health services.  Id. ¶ 31 (Manganelli "was concerned and actually expressed distrust of Gallaudet's ability to help him, even before he arrived at Gallaudet.").  In addition, the plaintiffs make no allegation that Manganelli proactively sought mental health treatment from Gallaudet and was denied assistance.  See generally Compl.  Thus, based on the facts alleged in the complaint, the Court concludes that the plaintiffs have failed to establish a duty of care arising out of the "Good Samaritan" principle reflected in the Restatement (Second) of Torts § 323.  See Jain, 617 N.W.2d at 299–300 (no duty arising from section 323 of the Restatement where university employees' efforts to provide mental health services to the student after his first suicide attempt were rebuffed because (a) no action by the university increased the risk of harm to the student, and (b) the student did not rely on these services to his detriment).

    Moreover, unlike the student suicide cases in which courts found the existence of a "special relationship" that imposed an obligation upon the university to prevent a student suicide, the Complaint does not allege that Manganelli showed signs of suicidal ideation, reported that he was suicidal, or had a previous suicide attempt that was known to Gallaudet.  See, e.g., Scheizler, 236 F. Supp. 2d at 609 (college's awareness of the student's suicide notes rendered it foreseeable to the college that the student would attempt suicide); Shin, 2005 Mass. Super. LEXIS 333 at *36–37 (university's knowledge of student's suicidal behavior over a two-year period established a special relationship).  To be sure, the Complaint alleges that Manganelli's behavior was bizarre, and at times hostile, but never suicidal.  See, e.g., Compl. ¶¶ 43, 82, 97, 101.  And although Sachetti asked to be notified "the next time Manganelli is in a depression episode where

he becomes suicidal," id. ¶ 77, the Complaint fails to allege that Manganelli ever expressed

suicidal thoughts or intentions to anybody, see generally id.  The Complaint is therefore

insufficient to establish that Manganelli's suicide was foreseeable to Gallaudet.  Accordingly, the

Court concludes that the plaintiffs have failed to establish the existence of a special relationship

between Manganelli and Gallaudet that required Gallaudet to take reasonable care to attempt to

prevent Manganelli's suicide, and as a result, their wrongful death and survival claims, which are

predicated on a theory of negligence, fail.[4]

## B.   The Plaintiffs' Negligent Infliction of Emotional Distress Claim Against Gallaudet (the Third Cause of Action)

The District of Columbia "adhere[s] to the traditional rule that there can be no recovery

for mental distress and its consequences resulting exclusively from observation of harm or

danger to a third person," Williams v. Baker, 572 A.2d 1062, 1069 (D.C. 1990) (en banc).  There

are two exceptions to this rule, however.  First, a claim can be maintained if a plaintiff shows

that she or he was either "physically endangered by the defendant's negligent activity," Johnson

v. District of Columbia, 728 A.2d 70, 77 (D.C. 1999).  Second, a claim can be pursued even if

the plaintiff did not suffer any physical injury, provided that

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being[;] (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff[;] and (3)

---

[4] The plaintiffs also argue that the "irresistible impulse" doctrine set forth in Restatement (Second) of Torts § 455, which the District of Columbia recognized in District of Columbia v. Peters, 527 A.2d 1269, 1275 (D.C. 1987), applies here as an alternative basis for establishing Gallaudet's liability grounded on negligence.  See Pls.' Opp'n to Gallaudet's Mem. at 12.  The irresistible impulse doctrine is an exception to the general rule that "one may not recover in negligence for the suicide of another."  Peters, 527 A.2d at 1275.  However, this doctrine goes to the issue of causation, which is a question distinct from the existence of a duty owed by the defendant.  See id. ("The act of suicide . . . generally is considered a deliberate, intentional, and intervening act that precludes a finding that a given defendant is, in fact, responsible for the decedent's death."); see also Sindler v. Litman, 887 A.2d 97, 109–10 (Md. Ct. Spec. App. 2005) ("Under the proximate cause analysis, the general rule is that 'one may not recover damages in negligence for the suicide of another. . . .'" (quoting Peters, 527 A.2d at 1276)).  Because the Court concludes that the plaintiffs have failed to plausibly allege that Gallaudet owed a duty of reasonable care to attempt to prevent Manganelli's suicide, the Court need not reach the issue of proximate cause.

negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 810–11 (D.C. 2011)).

The Complaint alleges that Gallaudet owed a duty to inform the plaintiffs about any serious illness or injury incurred by Manganelli "to minimize, avoid[,] or otherwise prevent catastrophic injury and death of . . . Manganelli," Compl. ¶ 186 (emphasis added). But, as the Court has already concluded, the Complaint fails to sufficiently allege that Gallaudet undertook an obligation to attempt to prevent Manganelli's suicide. See supra at Part III.A. Because the negligent infliction of emotional distress claims turn on the same alleged duty of reasonable care to attempt to prevent Manganelli's suicide, the Court must grant Gallaudet's motion to dismiss the plaintiffs' third cause of action.[5]

## C. The Plaintiffs' False Arrest Claims Against Both Defendants (the Sixth and Seventh Causes of Action)

Under District of Columbia law, to establish a claim for false arrest, a plaintiff must show: "(1) a detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." Harris v. U.S. Dep't of Veterans Affairs, 776 F.3d 907, 911–12 (D.C. Cir. 2015). However, probable cause for an arrest defeats a claim for false arrest. Id. at 912 (citing Gabrou v. May Dep't Stores Co., 462 A.2d 1102, 1104 (D.C. 1983) (per curiam)). The key issue for the Court to decide is therefore whether Manganelli's March 28, 2014 arrest was lawful. Dent v. May Dep't Stores Co., 459 A.2d 1042, 1044 (D.C. 1982) ("The gist of any complaint for false arrest or false imprisonment [] is an unlawful detention[.]" (quoting Clark v. District of Columbia, 311 A.2d 508, 511 (D.C. 1973))).

---

[5] The Complaint obliquely alleges that some "physical impairment . . . continues to persist as to the [p]laintiffs," to support their negligent infliction of emotional distress claim, Compl. ¶ 189, but such an allegation is too vague to state a claim under Rule 12(b)(6), see Twombly, 550 U.S. at 555 (complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")

"When the plaintiff in a false arrest case shows that he was arrested without a warrant, a rebuttable presumption arises that the arrest was unlawful, and the burden shifts to the [defendant] . . . ." Karriem v. District of Columbia, 717 A.2d 317, 320 (D.C. 1998).  Once the burden shifts to the defendant, the central issue becomes "whether the arresting officer was justified in ordering the arrest of the plaintiff . . . ." Scott v. District of Columbia, 493 A.2d 319, 321 (D.C. 1985) (quoting Dellums v. Powell, 566 F.2d 167, 175 (D.C. Cir. 1977)).  "The assessment of probable cause [for an arrest] is an objective one." Wesby v. District of Columbia, 765 F.3d 13, 19 (D.C. Cir. 2014).  "An arrest is supported by probable cause if, 'at the moment the arrest was made, the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime." Id. (alteration in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)); see also Barnhardt v. District of Columbia, 723 F. Supp. 2d 197, 214 (D.D.C. 2010) (probable cause "denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" (citing Gerstein v. Pugh, 420 U.S. 103, 112 (1975), and quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979))).

The plaintiffs contend that the Complaint sufficiently alleges that the defendants lacked probable cause to arrest Manganelli, because when Gallaudet Police arrived on the scene, Manganelli, who was alone in his room, allegedly only "stared blankly" at the officers, and that Gallaudet Police and the MPD knew that Manganelli "had mental health issues." See Compl. ¶¶ 128–29, 132.  Gallaudet asserts that Manganelli's "refusal to cooperate or even respond to the [Gallaudet Police] officers' requests and directions," Gallaudet's Mem. at 31, coupled with the

report of an altercation between Manganelli, his roommate Opie, and Opie's friend

Scherrenberg, see id. (citing Compl. ¶¶ 121–23), established probable cause to arrest Manganelli

that night.  Gallaudet's Mem. at 31.  And the District argues that, "unless there were facts present

to place the [MPD] officers on notice that probable cause might not exist," the MPD officers

who arrived on the scene after Gallaudet Police had restrained Manganelli "were entitled to rely

on the arrest made by [Gallaudet Police] officers given that arrests are required to be supported

by probable cause."  District's Mem. at 21.

   To support their assertions that Gallaudet Police and the MPD had probable cause for the

arrest, the defendants rely on the MPD incident and arrest/prosecution reports attached to their

replies, which the Court shall treat as materials outside of the pleadings requiring the defendants'

Rule 12(b)(6) motions to be converted to Rule 56 motions for summary judgment.  See generally

supra Part II.B.  "[D]isputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at

248.  Accordingly, the Court finds that the parties' inconsistent accounts of the events of March

28 and 29, 2014, raise a genuine dispute of material fact as to the plaintiffs' false arrest claims.

Compare Compl. ¶¶ 122–23 (on the night of March 28, 2014, "[Manganelli] allowed [Opie] to

enter [the dorm room] to get his things" and that "[w]hen [Scherrenberg] tried to enter the room,

[Manganelli] tried to close the door but [Scherrenberg] placed his foot against the door

preventing the door from closing.  [Opie] and [Scherrenberg] left . . . ."), and id. ¶ 127 (Gallaudet

employee "contacted [Gallaudet Police] and made a report about [Manganelli]"), with Gallaudet

Reply, Ex. 1 (MPD incident report) ("On . . . March 29, 2014 at approximately 12:00 a.m., S-1

attempted throwing his fist at C-1.  S-1 later told C-2 that if he came inside of the room, that he

was going to fight him.").  Given that no discovery has been conducted, the Court will deny

without prejudice the defendants' converted motions for summary judgment on the false arrest claims, to allow the parties sufficient time to develop the factual record on the critical question of whether Manganelli's arrest by Gallaudet Police, and his continued detention by the MPD, were lawful.

### D.   The Plaintiffs' ADA Claims Against Gallaudet (the Fourth Cause of Action)

The plaintiffs predicate their ADA claims against Gallaudet on Title II of the statute, which prohibits discrimination on the basis of disability by any "public entity."  <u>See</u> Compl. ¶ 193 ("The [ADA] . . . provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a <u>public entity</u>, or be subjected to discrimination by any such entity." (emphasis added)); <u>see also</u> 42 U.S.C. § 12132.  Gallaudet contends that the plaintiff's ADA claims fail because, as a matter of law, it is not a "public entity" under Title II.

To determine whether Gallaudet is a "public entity" for ADA purposes, the Court must begin with the language of the statute.  <u>See</u> <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469, 476 (1992) ("The controlling principle . . . is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written.").  In relevant part, the ADA defines "public entity" to encompass "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government[] . . . ." 42 U.S.C. § 12131(1)(A), (B).  The term "State" includes the District of Columbia.  <u>Id.</u> § 12103(2).  Thus, whether the plaintiffs' ADA claims against Gallaudet may proceed turns on whether Gallaudet is an "instrumentality of a State or States or local government."

Gallaudet argues that, as a federally chartered university, it is not an "instrumentality" of the District of Columbia.  Gallaudet's Surreply Response at 3–4.  Gallaudet cites in support of its

position Mwambira-Simera v. Howard University, 692 F. Supp. 2d 65 (D.D.C. 2010), see

Gallaudet's Surreply Response at 2–3, which held that the plaintiff's Title II claims against

Howard University ("Howard") failed to state a claim upon which relief could be granted

because Howard "is a private educational institution," not a "public entity," as that term is

defined in Title II, Mwambira, 692 F. Supp. 2d at 70.  Gallaudet argues that, like Howard, it is a

federally chartered private university, and that this Court should therefore apply Mwambira's

analysis.  Gallaudet's Surreply Response at 3; see generally Becker v. Gallaudet Univ., 66 F.

Supp. 2d 16, 18–19 (D.D.C. 1999) (discussing the history, including the incorporation by

Congress, of Gallaudet University).

 In opposition, the plaintiffs contend that the Court should focus its inquiry on the specific

conduct at issue, i.e., the Gallaudet Police officers' interaction with Manganelli, and conclude

that Gallaudet (through Gallaudet Police) acted as a government instrumentality.  Pls.' Surreply

at 3–5.  In support of this position, the plaintiffs principally rely on the Supreme Court's test for

whether an alleged government actor's conduct rises to the level of government action "for

constitutional purposes," Pls.' Surreply at 3–4, which was enunciated in San Francisco Arts &

Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522 (1987).[6]  The plaintiffs'

reliance on San Francisco Arts and its progeny is the fatal flaw in their argument.  There, the

Supreme Court's analysis concerned an alleged constitutional violation, specifically, whether the

defendant was "a governmental actor to whom the prohibitions of the Constitution apply."  483

U.S. at 542; see id. ("The [plaintiff] argues that . . . [the defendant's conduct] is discriminatory

in violation of the Fifth Amendment.").  Here, the Complaint does not assert any constitutional

---

[6] The San Francisco Arts test consists of three factors: "(1) the nexus between the government and the challenged
action, (2) whether the alleged government actor performed functions traditionally exclusively reserved to the
government, and (3) whether the government coerced or encouraged the challenged action."  Becker, 66 F. Supp. 2d
at 21 (quoting Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 75 F.3d 1401, 1409 (9th Cir. 1996)).

claims against Gallaudet.  Instead, the plaintiffs plead claims under the ADA, which expressly defines for its own purposes when an entity qualifies as a "public entity."  The plaintiffs do not cite, and the Court is unaware of, any authority that has extended the San Francisco Arts analysis to whether an entity is a "public entity" under the ADA, and the Court will not do so here.

The Court is persuaded by Mwambira's analysis, 693 F. Supp. 2d at 70, and by the observation in San Francisco Arts, that even federally chartered organizations "do not thereby lose their essentially private character," merely by virtue of such a charter, 483 U.S. at 544.  The Court therefore concludes that the Complaint fails to state a claim upon which relief can be granted against Gallaudet under Title II of the ADA.

### E.  The Plaintiffs' ADA Claims Against the District (the Fifth Cause of Action)[7]

> To state a claim under Title II [of the ADA,] a plaintiff must allege: (1) that he is a "qualified individual with a disability"; (2) who "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity"; and (3) that "such exclusion, denial of benefits, or discrimination was by reason of his disability."

Lee v. Corr. Corp. of Am., 61 F. Supp. 3d 139, 142–43 (D.D.C. 2014) (quoting Alston v. District of Columbia, 561 F. Supp. 2d 29, 37 (D.D.C. 2008)).  The Complaint alleges that the MPD continued Manganelli's wrongful detention after his initial arrest by Gallaudet Police, Compl. ¶ 239, failed to reasonably accommodate Manganelli's deafness and mental illness by failing to transport him to a mental health facility or provide him an interpreter, id. ¶¶ 241–52, and failed

---

[7] This cause of action is mislabeled the "Fourth Cause of Action" in the Complaint, compare heading above Compl. ¶ 230 with heading above id. ¶ 192, causing all subsequent causes of action to be mislabeled.  For ease of reference, the Court has re-labeled the remaining causes of action by continuing the consecutive numbering, starting with the ADA claims asserted against the District, which begin at paragraph 230 of the Complaint.

to train its officers on how to handle individuals with disabilities, such as Manganelli, id. ¶¶ 253–60.[8]

At the outset, the Court will dispose of the District's argument that the plaintiffs are not entitled to damages for their ADA claim.[9]  Notwithstanding the scope of Title II of the ADA, the District argues that the plaintiffs' claims must be dismissed because "at most, [they] plead facts that assert that the District was negligent in its dealings with [Manganelli] by allegedly failing to properly accommodate him."  District's Mem. at 20.  The Court appreciates that "[a] plaintiff may recover compensatory damages for violations of Title II of the ADA . . . if he proves that the defendant's discriminatory actions were intentional," Pierce v. District of Columbia, __ F. Supp. 3d __, 2015 WL 5330369, at * 19 (D.D.C. 2015); see also Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) ("All circuits to decide the question have held that to recover compensatory damages under . . . the ADA . . . , a plaintiff must establish that the agency's discrimination was intentional."); however, the Court does not share the District's narrow reading of the plaintiffs' allegations.  The Complaint alleges that the MPD knew that Manganelli was deaf and suffering from a mental illness, Compl. ¶ 238, and despite this knowledge, failed to provide him with an interpreter or transport him to a medical or mental health facility, id. ¶¶ 239, 247.  Drawing all reasonable inferences in favor of the plaintiffs, the Court concludes that these allegations are sufficient to state a plausible claim that the MPD's conduct was intentional.  See, e.g., Pierce, __ F. Supp. 3d at __, 2015 WL 533 369, at *20 (observing that "while the D.C. Circuit has not addressed the appropriate legal standard for establishing intentional

---

[8] The District does not dispute that Manganelli was a qualified individual with a disability under the ADA or that the District is a public entity.  District's Mem. at 10, 14.

[9] Although the Court may treat the District's arguments as conceded due to the plaintiffs' failure to respond to this argument in their opposition, see Ali v. D.C. Court Servs., 538 F. Supp. 2d 157, 161 (D.D.C. 2008) ("If a plaintiff . . . files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), the Court declines to do so here.

discrimination in violation of . . . Title II, the majority of circuits that have considered the standards issue have held that the 'deliberate indifference' standard is appropriate," and holding that the District's "knowing failure to evaluate [the deaf plaintiff's] need for accommodation and to provide the auxiliary aids easily satisfies [the deliberate indifference] standard.").

The allegations against the District raise the question of the extent to which Title II of the ADA applies to arrests and post-arrest conduct by police officers, a question that is not yet settled.  See City of San Francisco v. Sheehan, __ U.S. __, __, 135 S. Ct. 1765, 1772–73 (2015) (declining to address the question whether and to what extent 42 U.S.C. § 12132 applies to the arrest of a qualified individual with a disability because the issue was not properly before the Supreme Court); Ryan v. Vt. State Police, 667 F. Supp. 2d 378, 386 (D. Vt. 2009) ("[W]hether an arrest itself is 'a program, service or activity' covered by the ADA . . . is currently a subject of debate among the . . . Circuits").  Nevertheless, case law from other circuits is instructive.  As the plaintiffs raise three separate theories for the District's liability under the ADA, the Court shall address each—in conjunction with the available case law—in turn below.

### 1.  Wrongful Arrest

> In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees.

Waller ex rel. Estate of Hunt v. City of Danville, Va., 556 F.3d 171, 175 (4th Cir. 2009); see Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999) (citation omitted) (same); see, e.g., J.V. v. Alberquerque Public Schools, 813 F.3d 1289, 1296 (10th Cir. 2016) ("In this case, Officer Sanchez . . . handcuffed C.V. based on his conduct—two hours of disruptive behavior, including running from room to room and kicking . . . Officer Sanchez and refusing to stop—not by reason

of his disability . . . .   Appellants fail to cite any evidence showing his conduct indeed was a manifestation of his disability."); Gohier, 186 F.3d at 1222 (concluding that the officer "did not misperceive lawful conduct caused by [the deceased's] disability as criminal activity and then arrest him for that conduct . . . ."); Lewis v. Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997) (denying officers' motion for summary judgment because a genuine question of material fact existed as to whether the defendants "knew [the plaintiff] was deaf but refused to take steps to communicate with him and then arrested him because he did not respond to them appropriately.").   With respect to the first category, the plaintiffs assert that Manganelli's detention by the MPD was wrongful because, given the MPD's alleged knowledge of Manganelli's disabilities, there was no basis to interpret his blank stare as unlawful conduct.   See Pls.' Opp'n to District's Mot. at 5; Compl. ¶ 202.

The District relies on a police report in its attempt to clarify the facts surrounding Manganelli's arrest, specifically, whether Gallaudet Police's initial arrest was due to Manganelli's unlawful conduct (i.e., the earlier altercation between Manganelli, Opie, and Scherrenberg) or due to Gallaudet Police's misperception of lawful conduct (i.e., Manganelli's blank stare and failure to respond to commands when Gallaudet Police responded to his room).[10] District's Reply at 6 & Ex. A (MPD arrest/prosecution Report).   Because the police report was

---

[10] The District's argument that the MPD officers were "privileged to reasonably rely on an arrest made by fellow law enforcement when taking [Manganelli] into custody," and that the "Plaintiffs allege no additional conduct after the initial arrest (which was made before MPD officers were on the scene) that could constitute conduct attributable to any disability that . . . [Manganelli] had that was mistaken as criminal conduct," District's Mem. at 12–13, necessarily relies on the factual predicate that Gallaudet Police's initial arrest of Manganelli (and as a result, the MPD officers' continued restraint of Manganelli) was supported by probable cause, see Bolger v. District of Columbia, 608 F. Supp. 2d 10, 23–24 (D.D.C. 2009) ("[T]he law is clear . . . that 'an officer may rely on another officer's determination of probable cause to make an arrest' even if the arresting officer does not have firsthand knowledge of the facts supporting probable cause . . . .   However, the law is equally clear that an arresting officer is only permitted to rely on such representations . . . if it was objectively reasonable for him or her to do so under the circumstances." (citations omitted) (quoting Barham v. Salazar, 556 F.3d 844, 850 (D.C. Cir. 2009) (Henderson, J., concurring)).   Because this version of the events is supported by material outside the pleadings, the Court must allow the parties an opportunity for meaningful discovery on this factual dispute.

attached to the District's reply and thus may not properly be considered on a motion to dismiss, the Court converts the District's motion to dismiss the ADA claims into a motion for summary judgment, and will deny the motion without prejudice to allow the parties additional time to develop the factual record through discovery on this issue.

### 2. Failure To Provide Reasonable Accommodations

The plaintiffs allege that, once Manganelli was handcuffed and the area secured, "there was no reason that the MPD could not have provided a reasonable accommodation for . . . Manganelli's mental illness and deafness by contacting mental health care providers, transporting him to a medical or mental health facility[,] and providing him with an interpreter." Compl. ¶ 247; see also id. ("At that moment, having taken custody of [Manganelli] at a time it was aware of [Manganelli's] mental illness and deafness, the MPD had a duty to reasonably accommodate [Manganelli's] disability by handling and transporting him to a medical or mental health facility and ensuring he had an interpreter."). The plaintiffs argue that this alleged failure falls into the second category of Title II violations. See Pls.' Opp'n to District's Mot. at 6–8. Under this theory, liability exists even though the "police properly investigated and arrested a person with a disability for a crime unrelated to that disability, [because] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." Gohier, 186 F.3d at 1220–21 (citing Gorman v. Bartch, 152 F.3d 907, 912–13 (8th Cir. 1998), which recognized such a claim); see also J.H. ex rel J.P. v. Bernalillo Cnty., 806 F.3d 1255, 1261 (10th Cir. 2015) (assuming, without deciding, that "accommodations may be necessary when disabled individuals are arrested," and stating that "[i]f a police officer incurs a duty to reasonably accommodate a person's disability during an arrest, this duty would have a risen only if [the

officer] had known that [the arrestee] needed an accommodation."); <u>Tucker v. Tennessee</u>, 539

F.3d 526, 537 (6th Cir. 2008) ("As an initial matter, we find that the ADA applies to . . . post-

arrest detention . . . ."), <u>abrogated on other grounds by</u> <u>Anderson v. City of Blue Ash</u>, 798 F.3d

338 (6th Cir. 2015); <u>Waller</u>, 556 F.3d at 175 (assuming that a duty of reasonable accommodation

exists under the ADA but concluding that the requested accommodations were not reasonable

under the circumstances present in that case); <u>Bircoll v. Miami-Dade Cnty.</u>, 480 F.3d 1072,

1085–88 (11th Cir. 2007) (holding that Title II of the ADA applied to police officers' conduct

during and after the arrest of a deaf motorist, but nevertheless concluding that summary

judgment was properly granted in favor of the county because the requested accommodations

were not reasonable).

To support their claims, the plaintiffs principally rely on the Fifth Circuit's opinion in

<u>Hainze v. Richards</u>, 207 F.3d 795 (5th Cir. 2000).  <u>See</u> Pls.' Opp'n to District's Mot. at 7.  In that

case, a police officer shot and killed a man who was mentally ill, and who had approached the

police officer at a rapid pace, with what the officer believed was a knife, moments before the

officer shot him.  <u>Hainze</u>, 207 F.3d at 797.  The Fifth Circuit held that "Title II [of the ADA]

does not apply to an officer's on-the-street responses to reported disturbances or other similar

incidents, whether or not those calls involve subjects with mental disabilities, <u>prior to the</u>

<u>officer's securing the scene and ensuring that there is no threat to human life.</u>"  <u>Id.</u> at 801

(emphasis added).

The <u>Hainze</u> court further concluded that

> [o]nce the area was secure and there was no threat to human safety, the [officers]
> would have been under a duty to reasonably accommodate [the deceased's]
> disability in handling and transporting him to a mental health facility.  That would
> have put this case squarely within the holdings of <u>Pennsylvania Dep't of</u>
> <u>Corrections v. Yeskey</u> and the cases that have followed.

Id. at 802; see also Pls.' Opp'n to District's Mot. at 7 (quoting this language from Hainze in support of the plaintiffs' reasonable accommodation argument).  The Supreme Court in Pennsylvania Dep't of Corrections v. Yeskey expressly extended Title II's application to programs provided in state prisons, regardless of whether a disabled inmate's participation in the program is mandatory as opposed to voluntary.  524 U.S. 206, 210–211 (1998).  And, in a case involving an arrest of an individual with a disability, the Eighth Circuit stated that "[a plaintiff's] allegations that the defendants denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of . . . Title II of the ADA . . . ."  Gorman, 152 F.3d at 913.

In light of the case authority cited by the plaintiffs, the Court is persuaded that when viewed in a light most favorable to the plaintiffs, the Complaint states a plausible claim under Title II of the ADA against the MPD for failure to accommodate Manganelli's disabilities. Specifically, the Complaint alleges that "[u]pon their arrival [at Gallaudet] it was made known to [the MPD officers] that [Manganelli] suffered from a mental illness and was deaf," Compl. ¶ 238, and that "once he was placed into handcuffs and secured, any threat that [Manganelli] arguably posed to other individuals ceased to exist," id. ¶ 244.  The Complaint further alleges that the MPD officers were "aware that the conduct attributed to . . . Manganelli was symptomatic and reflective of his disability," id. ¶  246, and that "maintaining [Manganelli], who was deaf and whose hands were his sole method of communication, in a position such that he was handcuffed behind his back . . . was tantamount to taping his mouth shut and depriving him of the ability to communicate . . . ," id. ¶ 248.[11]  Moreover, it is irrelevant whether Manganelli

---

[11] It bears noting that the United States Department of Justice's regulations implementing Title II of the ADA provide that "[a] public entity shall take appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as effective as communications with others."  28 C.F.R. § 35.160(a)(1) (2015).

requested an accommodation—which plausibly could not have been made here because

Manganelli's means of communication (his hands) were handcuffed behind his body—because,

as another member of this Court concluded, where a "disability is obvious and indisputably

known to the provider of services, no request is necessary." Pierce v. District of Columbia, __ F.

Supp. 3d __, __, 2015 WL 5330369, at *14 (D.D.C. 2015). Whether the plaintiffs can establish

that the MPD officers' alleged conduct amounted to a denial of reasonable accommodations for

Manganelli's disabilities is a question properly reserved for resolution until a meaningful

opportunity for discovery is provided. See, e.g., Waller, 556 F.3d at 177 ("Having now had the

benefit of further argument and discovery, we think plaintiff has not indicated what the officers

reasonably might be expected to do that they did in fact not do."). The Court therefore concludes

that these allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6).

### 3. Failure To Train

The plaintiffs allege that the District "fail[ed] to properly train its officers and personnel

for encounters with disabled persons," Compl. ¶ 255, and "fail[ed] to modify or implement its

police policies, procedures[,] and training" resulting in discrimination against Manganelli,

id. ¶ 257. The Court is unaware of any cases in this Circuit that have addressed whether Title II

of the ADA envisions failure-to-train claims such as the plaintiffs'. As the District points out,

however, several district courts outside this jurisdiction have been presented with the question

and have either declined to recognize the existence of such a claim or avoided addressing the

question. District's Mem. at 18 (collecting cases).

The plaintiffs cite portions of the ADA's legislative history and two district court cases to

support their argument that the Court should allow their failure-to-train claims to proceed under

the ADA. Pls.' Opp'n to District's Mot. at 9–10. The House Committee on the Judiciary

observed that "to comply with the [ADA's] non-discrimination mandate, it is often necessary to provide training to public employees about disability. . . . [D]iscriminatory treatment based on disability can be avoided by proper training." H.R. Rep. No. 101–485, pt. III, at 473 (1990). And the courts in Jackson v. Inhabitants of Town of Sanford, Civ. No. 92-12-P-H, 1994 WL 589617, at *6 (D. Me. Sept. 23, 1994), and Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 239 (M.D. Pa. 2003), each rejected the assertion that a failure-to-train claim could not proceed under Title II of the ADA. Furthermore, the Tenth Circuit has also recognized the existence of a failure-to-train claim under certain circumstances. Bernalillo County, 806 F.3d at 1262 ("[T]he county could incur liability for failure to train only if [the officer] had committed a constitutional or statutory violation." (citing Ellis ex rel. Estate of Ellis v. Ogden City, 589 F.3d 1099, 1104–05 (10th Cir. 2009) (upholding dismissal of Section 1983 claim against municipality because plaintiffs failed to show an underlying constitutional violation))).

In Roberts v. City of Omaha, the Eighth Circuit held that the plaintiff's failure-to-train claim under the ADA could proceed if the plaintiff showed the defendant's "deliberate indifference to his alleged right to be free from discrimination . . . ," 723 F.3d 966, 976 (8th Cir. 2013). Citing this case, the District argues that, should the Court allow the plaintiffs' failure-to-train claims, the "deliberate indifference" standard should apply, District's Mem. at 18–19, a proposition that goes unchallenged by the plaintiffs, see generally Pls.' Opp'n to District's Mot. at 9–11. And, as this Circuit observed in Warren v. District of Columbia, albeit in the context of alleged constitutional violations under 42 U.S.C. § 1983,

> "Deliberate indifference" . . . "is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations," but did not act. Although this is an objective standard, it involves more than mere negligence. It does not require the city to take reasonable care to discover and prevent constitutional violations. It simply means that, faced with actual or constructive

> knowledge that its agents will probably violate constitutional rights, the city may
> not adopt a policy of inaction.

353 F.3d 36, 39 (D.C. Cir. 2004) (quoting Baker v. District of Columbia, 326 F.3d 1302, 1306

(D.C. Cir. 2003).

These considerations cause the Court to conclude, even assuming a cause of action for

failure to train exists under the ADA, that the Complaint here fails to plausibly allege that the

District acted with deliberate indifference.  The plaintiffs allege that the District, "through its

MPD, had ample opportunity, knowledge, and impetus, well in advance of March 29, 2014, to

have created, drafted, adopted, modified, and/or implemented policies and a training program to

provide its officers with tools and resources to handle individuals with disabilities, such as

mental illness and deafness," Compl. ¶ 256, and that the District's "failure to modify or

implement its policies, procedures[,] and training in this regard constitutes a failure to provide

reasonable accommodations and this failure to train was a violation of the ADA," Id. ¶ 257.  The

Court finds that these allegations are merely conclusory, providing no specific factual allegations

to even suggest that the District knew or should have known prior to Manganelli's death that the

MPD's handling of deaf and mentally ill citizens would likely violate the ADA, and yet failed to

act.  See, e.g., Warren, 353 F.3d at 39 ("Warren has alleged that the District 'knew or should

have known' about the ongoing constitutional violations [against him], but did nothing.  If

Warren can prove the violations, and prove as well that the District had actual or constructive

knowledge of them, he will have established the District's liability." (emphasis added)).  The

plaintiffs' allegations here suggest that the District should have proactively created such tools

and resources, but such an allegation does not rise to the level of deliberate indifference.  See id.

(deliberate indifference standard "does not require the city to take reasonable care to discover

and prevent constitutional violations."). The Court therefore concludes that the plaintiffs'

failure-to-train allegations are insufficient to state a claim for relief under the ADA.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Gallaudet's motion to dismiss the

plaintiffs' wrongful death/negligence, survival, negligent infliction of emotional distress, and

ADA claims, and will deny Gallaudet's motion to dismiss the false arrest claim asserted against

Gallaudet. The Court will grant the District's motion to dismiss the ADA claim asserted against

it, but only to the extent that claim alleges a failure to train, and deny the District's motion with

respect to the false arrest claim.[12]

**SO ORDERED** this 20th day of April, 2016.

REGGIE B. WALTON
United States District Judge

---

[12] The Court shall contemporaneously issue an Order consistent with this Memorandum Opinion.