## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TERRYLENE SACCHETTI, individually and ROBERT MANGANELLI, individually and as co-personal representatives of the Estate of GIANNI MANGANELLI,**

**Plaintiffs,**

**vs.**

**GALLAUDET UNIVERSITY,**

**and**

**THE DISTRICT OF COLUMBIA**

**Defendants.**

**Case No. 1:15-cv-00455-RBW**

## DEFENDANT GALLAUDET UNIVERSITY'S
## MOTION TO EXCLUDE TESTIMONY OF
## PLAINTIFF'S EXPERT MICHAEL WELNER, M.D.

Defendant Gallaudet University, by counsel and pursuant to Rule 702 of the Federal Rules of Evidence, moves this Honorable Court to exclude testimony of any kind from Plaintiffs' designated expert, Michael Welner, M.D., as his opinions are inadmissible under the Federal Rules of Civil Procedure. For the reasons more fully set forth in the Defendant's Memorandum of Points and Authorities, Defendant respectfully requests that the Court grant its motion and exclude any testimony or evidence from Michael Welner, M.D.

Alternatively, in accordance with Local Civil Rule 7(f), Defendant Gallaudet University respectfully requests a hearing on its motion to exclude Dr. Welner.

Dated: December 18, 2017

Respectfully submitted,

GALLAUDET UNIVERSITY
By Counsel,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP


*/s/ Jason R. Waters*
Jason R. Waters (# 491066)
Peter M. Moore (# 985713)
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
Phone: (703) 245-9300
Fax: (703) 245-9301
jason.waters@wilsonelser.com
peter.moore@wilsonelser.com
*Counsel for Defendant Gallaudet University*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of December 2017, the forgoing was served

via CM/ECF for the U.S. District Court of the District of Columbia to all counsel of record.

<u>*/s/ Jason R. Waters*</u>
Jason R. Waters (# 491066)
Peter M. Moore (# 985713)
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
Phone: (703) 245-9300
Fax: (703) 245-9301
jason.waters@wilsonelser.com
peter.moore@wilsonelser.com
*Counsel for Defendant Gallaudet University*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**TERRYLENE SACCHETTI, individually
and ROBERT MANGANELLI, individually
and as co-personal representatives of the
Estate of GIANNI MANGANELLI,**

           **Plaintiffs,**

**vs.**

**GALLAUDET UNIVERSITY,**

**and**

**THE DISTRICT OF COLUMBIA**

           **Defendants.**

**Case No. 1:15-cv-00455-RBW**

_____

**DEFENDANT GALLAUDET UNIVERSITY'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFFS' EXPERT MICHAEL WELNER, M.D.**

_____

Jason R. Waters (D.C. 491066)
Peter M. Moore (D.C. 985713)
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
8444 Westpark Drive, Suite 510
McLean, Virginia 22102-5102
Tel.: (703) 245-9300
Fax: (703) 245-9301
Jason.Waters@wilsonelser.com
Peter.Moore@wilsonelser.com
*Counsel for Gallaudet University*

762925v.4

**Table of Contents**

Table of Authorities ..................................................................................................... ii, iii

**Introduction** ....................................................................................................................... 1

**Factual Background** ........................................................................................................... 1

**Dr. Welner's Designation & Deposition** ........................................................................ 8

**Argument** .......................................................................................................................... 11

I.      **Pursuant to Rule 702, Dr. Welner's opinions must be reliable and relevant to be admitted at trial.** ......................................................................................................... 11

II.     **Dr. Welner's opinion that Gianni's arrest caused his suicide is not reliable because it is not based on scientific data and analysis.** ........................................... 12

III.    **Dr. Welner's opinions are not reliable because they lack factual support or contradict the existing record.** ................................................................................ 17

IV.    **Welner's opinions are also irrelevant to Plaintiffs' false arrest claim** .................... 19

V.     **Many of Dr. Welner's "professional opinions" are not opinions within the scope of psychiatric medicine and are unsupported by scientific data and analysis.** ..... 22

**Conclusion** ....................................................................................................................... 23

i

# Table of Authorities

## **Cases**

*Ambrosini v Labarraque*
  101 F.3d 129 (D.C. Cir. 1996) ............................................................................11

*Barnes v. Dist. Of Columbia*
  452 A.2d 1198 (D.C. 1982) ................................................................................20

*\*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
  509 U.S. 579 (1993)..............................................................................1, 11, 23

*Doe v. Safeway, Inc.*
  88 A.3d 131 (D.C. 2014) ....................................................................................19

*Evans v. Wash. Met. Area Trans. Auth.*
  674 F. Supp. 2d 175 (D.D.C. 2009) ....................................................................11

*Dist. of Columbia v. Peters*
  527 A.2d 1269 (D.C. 1987) ................................................................................21

*Gaither v. Dist. of Columbia*
  831 F. Supp. 2d 56 (D.D.C. 2011) ......................................................................12

*General Electric Co. v. Joiner*
  522 U.S. 136 (1997).....................................................................................11, 17

*Harris v. U.S. Dep't of Veterans Affairs*
  776 F.3d 907 (D.C. Cir. 2015). ...........................................................................11

*Kakeh v. Utd. Planning Org., Inc*
  587 F. Supp. 2d 125 (D.D.C. 2008) ....................................................................11

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................11

*Maras v. Avis Rent A Car Sys.*,
  393 F. Supp. 2d 801 (D. Minn. 2005) ................................................................15

*Matthews v. Kroger Texas, LP*
  2015 U.S. Dist. LEXIS 178967 * (N.D. Tex. Aug. 21, 2015).............................15

*McClain v. Metabolife Int'l, Inc.*
  401 F.3d 1233 (11th Cir. 2005) ..........................................................................12

*Miller v. Pfizer Inc.
    196 F. Supp. 2d 1062 (D. Kan. 2002), *aff'd* 356 F.3d 1326 (10th Cir. 2004),
    *cert. denied*, 543 U.S. 917 (2004) ............................................................... 16, 17

Nnadili v. Chevron USA, Inc.
    435 F. Supp. 2d 93 (D.D.C. 2006) ....................................................................... 20

Ohio v. U.S. Dept. of the Interior
    880 F.2d 432 (D.C. Cir. 1989) ............................................................................. 12

Parker v. Stein
    557A.2d 1319 (D.C. 1983) .................................................................................. 20

Phillips v. Dist. of Columbia
    458 A.2d 722 (D.C. 1983); ................................................................................. 20

Roche v. Lincoln Property Co.
    278 F. Supp. 2d 744 (E.D. Va. 2003); *aff'd* 175 F. App'x 597 (4th Cir. 2004) .... 12

Rolen v. Hansen Bev. Co.
    193 F. App'x 468 (6th Cir. 2006) ....................................................................... 12

United States v. Day
    524 F.3d 1361 (D.C. Cir. 2008) .......................................................................... 11

United States v. Scholl
    959 F. Supp. 1189 (D. Az. 1997) ........................................................................ 15

*Young v. Burton
    567 F. Supp. 2d 121 (D.D.C. 2008) .............................................................. 12, 14

## **<u>Rules</u>**

*Federal Rule of Evidence 702 .................................................................................. 11, 23

## Introduction

Defendant Gallaudet University ("Gallaudet"), by counsel and pursuant to Rule 702 of the Federal Rules of Evidence, moves to exclude all testimony by Plaintiffs' designated expert psychiatrist, Michael Welner, M.D. Dr. Welner's disclosure and deposition testimony demonstrate that he intends to opine that Gianni Manganelli committed suicide as a result of the actions of officers of Gallaudet's Department of Public Safety ("DPS") around midnight on March 29, 2014 – more than 30 hours before Gianni's death near his mother's apartment. Relying on *ipse dixit* and *post poc ergo propter hoc*, Dr. Welner's opinions fail to meet the threshold requirements of reliability and relevance under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Accordingly, Gallaudet respectfully submits that this Court should exclude Dr. Welner.

## Factual Background

Gianni Manganelli was born on February 8, 1991. (SMF ¶ 1.)[1] His parents are Plaintiffs Terrylene Sacchetti and Robert Manganelli. (SMF ¶ 2.) Gianni lost his hearing at age two (SMF ¶ 3.) Gianni, his mother, and several generations of her family are deaf. (SMF ¶ 4.) Gianni committed suicide near his mother's apartment on March 30, 2014, and discovery in this case revealed extensive evidence of a long history of untreated psychiatric problems that preceded Gianni's enrollment at Gallaudet and his detention on March 29, 2014.

Gianni enrolled at Rochester Institute of Technology ("RIT") after graduating from high school. (SMF ¶ 7.) When Gianni enrolled at RIT, he indicated that he experienced "depression" and "suicidal thoughts or acts" in his past history. (SMF ¶ 8.) He acknowledged self-harm and

---

[1]  Defendant Gallaudet respectfully refers the Court to the Statement of Material Uncontested Facts, which accompanies Gallaudet's contemporaneously filed Motion for Summary Judgment. (See Dkt. 59.) References to general factual and documentary support for this motion, as well as Gallaudet's Motion for Summary Judgment, are referred to herein as "SMF." Additional factual support for this motion will be identified separately.

1

"seriously considering suicide" both before college and after starting college. (SMF ¶ 12.) He confirmed using marijuana, synthetic marijuana, LSD, and alcohol. (SMF ¶ 14.) He indicated a family history of depression, anxiety, and substance abuse. (SMF ¶ 15.) At one point, RIT's Department of Public Safety brought Gianni to see a counselor after he authored what his father feared to be a suicide "goodbye" note. (SMF ¶ 9.) Gianni denied suicidal ideation, but he claimed to have seen two UFO's and interpreted this as a sign that his life was going to change. (SMF ¶ 10.)

Gianni eventually withdrew from RIT and returned to California, where he sought a prescription for medical marijuana from Allen Frankel, M.D. (SMF ¶ 17-18.) Gianni advised Dr. Frankel of prior diagnoses for "severe depression/borderline personality disorder." (SMF ¶ 19.) Gianni added, "I have chronic depression that I see a psychologist about (since diagnosis at 14)." (SMF ¶ 24.) Gianni also saw a psychiatrist briefly at St. John's Mental Health Program for Deaf & Hard of Hearing People in June 2013. (SMF ¶ 28-44.) He reported "ruminating thoughts, irritability, uncontrolled anger impulses and past [suicidal ideation]." (SMF ¶ 29.)

Dr. Burton Roger, a psychiatrist, noted a "long-standing history of anxiety (dating back to age 9/10 according to the patient's mother, who was there for the appointment)." (SMF ¶ 32.) Gianni believed that his "mood had been very unstable since he was approximately 14." (SMF ¶ 33.) Gianni remembered "many nights" when he would "lie awake … trembling" as his parents "yell[ed] angrily at each other." (SMF ¶ 35.) Gianni also shared that he experienced "rage episodes" during which he threw and broke objects. (SMF ¶ 36.) He related one such episode in May 2013, and his mother recalled the same event during her deposition. (SMF ¶ 37.)

Dr. Roger noted a family history of alcoholism and mood disorders. (SMF ¶ 38.) Gianni complained that his mother "was not very effective in her parenting and was somewhat absent in

trying to teach him to coordinate his care, as well as to understand and cope with life." (SMF ¶ 39.) Gianni expressed frustration with his mother's insistence on pursuing a holistic approach to his treatment. (SMF ¶ 40.) Dr. Burton diagnosed an "explosive disorder and associated recurrent generalized anxiety and major depression as well as the habituation to marijuana." (SMF ¶ 41.) Dr. Roger prescribed Depakote, which is used to treat both seizures and psychosis. (SMF ¶ 42.) Gianni quickly found that he did not like the side effects and refused to continue the medication after only a few days of treatment. (SMF ¶ 43.)

During the summer of 2013, Gianni decided that he wanted to enroll at Gallaudet University. (SMF ¶ 45.) Shortly after Gianni arrived on Gallaudet's campus, Gianni appeared on Capitol Hill demanding to speak with a congressman. (SMF ¶ 49.) His behavior was strange enough that Capitol Police arrested Gianni and sent him to the Comprehensive Psychiatric Emergency Program ("CPEP"). (SMF ¶ 49-54.) CPEP's notes reflect that Gianni was screaming and incomprehensible. (SMF ¶ 52.) CPEP released Gianni with prescriptions for medication and instructions to contact Gallaudet's Counseling and Psychological Services ("CAPS") program. (SMF ¶ 53-54.) During her deposition, Ms. Sacchetti seemed to believe that Capitol Police simply did not understand Gianni's "California style." (SMF ¶ 55.)

Following the incident on Capitol Hill, CAPS made several attempts between August and October 2013 to work with Gianni. (SMF ¶ 56.) William Kachman, Ph.D., CAPS's director, met with Gianni at least once. (SMF ¶ 56.) In addition to Dr. Kachman, Mental Health Counselor Carla Shird made numerous attempts to set up counseling sessions with Gianni, who repeatedly declined these overtures. (SMF ¶ 56.) He denied suicidal ideation or plans to hurt others, and he stated that he did not believe he had "mental health issues." (SMF ¶ 56.) Notably, Ms. Sacchetti also spoke with Dr. Kachman, and she promised "[t]he next time Gianni is in a depression

3

episode where he becomes suicidal and asks me to stay with him, I will take him straight to the hospital." (SMF ¶ 60.)

In March 2014, Gianni was living with Spencer Opie in Ballard West dormitory. (SMF ¶ 64.) Gianni began to have problems in one class with instructor, Christina Healy, who found Gianni's behavior was disruptive and frequently off-topic. (SMF ¶ 65-66.) Around the same time, Gianni met with Jim Moore, his vocational rehabilitation counselor. (SMF ¶ 67-71.) During this meeting, which occurred about a week before Gianni's suicide, Mr. Moore noted that Gianni's appearance was quite disheveled. (SMF ¶ 69.) Mr. Moore questioned whether Gianni had a place to live, and Gianni confirmed that he was living in the dorm at Gallaudet. (SMF ¶ 70.) Gianni explained that he dressed that way because when he cleans up people "want to have sex" with him. (SMF ¶ 70.) Mr. Moore attempted to get Gianni to seek mental health services at Gallaudet, which Gianni refused. (SMF ¶ 71.)

On March 28, 2014, Spencer Opie returned to the dorm room he shared with Gianni after lunch. (SMF ¶ 73.) Gianni stared menacingly at Mr. Opie and accused him of various affronts. (SMF ¶ 74.) Gianni insisted that Mr. Opie stay on his side of the room. (SMF ¶ 74.) Eventually, Gianni raised a hand as if to hit Mr. Opie. (SMF ¶ 75.) He did not make contact. (SMF ¶ 75.) Instead, Gianni stormed out of the room. (SMF ¶ 75.) Mr. Opie was concerned about Gianni and went to look for him. (SMF ¶ 76.) Mr. Opie and another student, John Delatto, found Gianni in the men's shower. (SMF ¶ 76.) Again, Gianni reacted with threats of violence toward Mr. Opie. (SMF ¶ 77.)

Mr. Opie feared for his safety as a result of the encounter. (SMF ¶ 78.) He spoke with a friend, Jason Scherrenberg, about the issue. (SMF ¶ 79.) They decided to go to the dorm room when Gianni was in class to collect some belongings so Mr. Opie could stay at Mr.

Scherrenberg's room. (SMF ¶ 79.) Gianni went to his afternoon Spanish Lab. (SMF ¶ 80.)
During the class, Gianni stared blankly, and his instructor became concerned. (SMF ¶ 80.) She
attempted to get his attention by touching his shoulder, and he became angry and accused her of
sexually assaulting him. (SMF ¶ 81.)

After this class, Gianni visited Adrienne Morgan, a Coordinator of Residential Education
(CRE). (SMF ¶ 82.) He asked for another room because he felt threatened by his roommate.
(SMF ¶ 82.) Ms. Morgan inquired, but she did not feel Gianni's explanation justified an
emergency room re-assignment. (SMF ¶ 83.) Gianni was unsatisfied with the encounter and
stormed out of Ms. Morgan's office, leaving one shoe behind. (SMF ¶ 84.) He apparently ran
outside and walked in circles around the library signing to himself. (SMF ¶ 85.) Ms. Morgan
reported Gianni's bizarre behavior to DPS via email.  (SMF ¶ 86.)

Around midnight, Mr. Opie returned to the dorm to collect additional belongings. (SMF ¶
87.) He brought Mr. Scherrenberg with him because he was concerned for his safety. (SMF ¶
87.) Gianni reacted violently when Mr. Scherrenberg attempted to enter the room and tried to
block the door. (SMF ¶ 88.) Gianni also threatened to fight Mr. Scherrenberg if he entered the
room. (SMF ¶ 88.) Messrs. Opie and Scherrenberg then went to Laura Crowder, the Residential
Assistant  (RA) for Ballard West, to report what happened. (SMF ¶ 89.) Ms. Crowder prepared a
report of the incident on Gallaudet's reporting system, Maxient. (SMF ¶ 90.) She also contacted
Gallaudet's DPS via instant message. (SMF ¶ 91.) At the same time, Gianni sent an email
complaining about the incident to another CRE, Thuan Ngyuen. (SMF ¶ 92.)

About 12:30 a.m., Gallaudet's DPS dispatcher, Pierre Butler, contacted Lieutenant Daniel
Bauer, a deaf member of Gallaudet's DPS, about the events in Gianni's and Mr. Opie's room via
text message. (SMF ¶ 93.) Lieutenant Bauer responded immediately to the dorm. (SMF ¶ 95-96.)

When he reached the room, the door was shut. (SMF ¶ 96.) He stayed outside the room and texted for backup. (SMF ¶ 96.) Shortly thereafter, Gianni opened the door. (SMF ¶ 97.) Lieutenant Bauer attempted to communicate with Gianni, but Gianni refused to answer his questions. (SMF ¶ 100-101.) Gianni had one hand by his side or behind his back. (SMF ¶ 103.) The room was dark, and Lieutenant Bauer could not tell if other students were in the room. (SMF ¶98.) When Gianni continued to refuse Lieutenant Bauer's instructions or answer his questions, Lieutenant Bauer advised Gianni that he was going to place Gianni in handcuffs for both of their safety. (SMF ¶ 102-105.) Lieutenant Bauer handcuffed Gianni and moved him into the hallway. (SMF ¶ 106.)

About the same time, Lieutenant Bauer's supervisor, Captain Patrick Rader, who is also deaf, arrived on the scene. (SMF ¶ 109.) Captain Rader and Lieutenant Bauer told Gianni that they intended to remove the handcuffs and move his hands forward so they could communicate. (SMF ¶ 111.) When they removed the handcuffs, both Captain Rader and Lieutenant Bauer felt that Gianni attempted to resist their efforts. (SMF ¶ 112-113.) To gain control of the situation, Lieutenant Bauer and Captain Rader took Gianni to the ground to re-cuff him in the back. (SMF ¶ 114.) Gianni remained on the floor for some time as others arrived on the scene. (SMF ¶ 110-118.)

MPD removed Gianni from campus shortly after 1:00 a.m. (SMF ¶ 135.) Gianni was taken to MPD's District 5 for processing. (SMF ¶ 138.) The next morning, Gianni appeared in Superior Court, and he received a no-contact order. (SMF ¶ 139.) After his release on March 29, 2014, Gianni went back to campus. (SMF ¶ 140.) Gianni contacted DPS to escort him to his dorm room to collect some belongings. (SMF ¶ 140.) Gianni told the DPS officer that he planned to go to his mother's home. (SMF ¶ 141.) About the same time, Gianni sent several texts to his

6

mother asking her to pick him up. (SMF ¶ 143.) The texts told her that his life was in danger and that he would be dead if she did not pick him up immediately. (SMF ¶ 144.)

Upon receiving the texts, Ms. Sacchetti did not attempt to contact DPS about Gianni's texts. (SMF ¶ 146.) Ms. Sacchetti picked up Gianni on campus, but she did not ask him about the messages. (SMF ¶ 147.) Despite promising to seek emergency treatment the next time Gianni had a depression episode in which he became suicidal, Ms. Sacchetti did not take her son to a hospital. (SMF ¶ 149.) Eventually, Ms. Sacchetti arrived at her apartment in Silver Spring, Maryland. (SMF ¶ 153.) At this point, Ms. Sacchetti and Gianni began to argue. (SMF ¶ 153.) Gianni demanded to return to Gallaudet, and she refused to take him. (SMF ¶ 154.) Gianni stormed off. (SMF ¶ 154.) She followed him in her car, attempting to communicate with him through the driver's window. (SMF ¶ 154-155.) Gianni walked into a nearby restaurant, apparently without his wallet, and she followed him inside. (SMF ¶ 155.) Gianni directed her to leave, and she complied. (SMF ¶ 155.) She went to pick up her daughter from a friend's house and tried, without success, to find Gianni on her way home. (SMF ¶ 156.)

Gianni returned to his mother's apartment around 5:00 a.m. on March 30, 2014. (SMF ¶ 157.) At this point, Gianni indicated that he wanted a "last drink of mead." (SMF ¶ 160.) He reportedly accused his mother of trying to kill him and stated, "I have no choice but to kill myself." (SMF ¶ 158-159.) He told Ms. Sacchetti that she was suffocating him. (SMF ¶ 158-159.) She attempted to convince him to go to the hospital, and she went to get dressed when he seemed to agree. (SMF ¶ 160-161.) Once she left the room, however, Gianni grabbed a kitchen knife and left the apartment. (SMF ¶ 162, 165.) Ms. Sacchetti attempted to follow him, but she could not keep up. (SMF ¶ 163.) She returned to the apartment and contacted the police. (SMF ¶

7

163.) Shortly thereafter, around 6:00 a.m., Gianni was found deceased from self-inflicted knife wounds in a local creek. (SMF ¶ 164.)

After Gianni's suicide, Montgomery County Police Department officers interviewed Ms. Sacchetti and Mr. Manganelli. (SMF ¶ 166.) The police department's records reflected that Ms. Sacchetti stated that Gianni used a variety of drugs, including marijuana, and "K2" – synthetic marijuana – among other substances, to "ease the war in his head." (SMF ¶ 166.) The report reflects her statement that Gianni suffered from "schizoaffective disorder" and that Gianni had made prior suicide attempts. (SMF ¶ 167.) During her deposition, however, she faulted the interpreter and denied making these statements. (SMF ¶ 168.)

### Dr. Welner's Designation & Deposition

Plaintiffs designated psychiatrist Michael Welner, M.D. in an attempt to establish a causal nexus in this case by means of *ipse dixit* opinion testimony. (Ex. A,  Plaintiffs' Rule 26(a)(2) Discl.; Ex. B, Report of Michael Welner, M.D.) In his report, Dr. Welner opines that "the arrest and its consequences precipitated Gianni Manganelli's suicide." (Ex. B, Report of Michael Welner, M.D. at 2-6.)  He claims that Gallaudet should have intervened prior to and following Gianni's arrest to provide mental health services. (Ex. B, Report of Michael Welner, M.D. at  6-10.)[2] He further opines that because Plaintiff Terrylene Sacchetti was not aware of her son's arrest, she could not have done anything to prevent his suicide. (Ex. B, Report of Michael Welner, M.D. at  10-12.)

Dr. Welner's report is bereft of references to medical or scientific principles. (Ex. B, Report of Michael Welner, M.D.) He admittedly failed to review Gianni's complete medical record or the second volume of Ms. Sacchetti's deposition. (Ex. C, Welner Dep. at 47:5-49:16;

---

[2] This is precisely the negligence theory already rejected by this Court due to the lack of any special relationship between Gianni and Gallaudet. (Dkt. 28, Dkt. 30.)

125:10-125:12.) Dr. Welner offers multiple opinions on matters that are not appropriate for a forensic psychiatrist, such as questions of the degree of Gallaudet's culpability. (Ex. B, Report of Michael Welner, M.D. at 10-12; Ex. C, Welner Dep. at 190:8-193:12.) He has published on the need for second reviews in forensic cases, but no such review was conducted in this case. (Ex. D, Michael Welner M.D. et al., *Peer Reviewed Forensic Consultation in Practice: Multidisciplinary Oversight in Common Expertise*, 59 J. FORENSIC SCIS. 1254 (2014); Ex. E, David J. Robinson & Dr. Michael Welner, *Courts face challenges with forensic psychiatry, psychology evidence*, CHICAGO DAILY LAW BULLETIN, Oct. 17, 2012, at 5; Ex. F, David J. Robinson & Dr. Michael Welner, *Courts need to demand higher standards from psychiatric evidence*, CHICAGO DAILY LAW BULLETIN, Oct. 24, 2012, at 5; Ex. G, David J. Robinson & Dr. Michael Welner, *Judges can follow certain standards so expertise doesn't mislead*, CHICAGO DAILY LAW BULLETIN, Oct. 31, 2012, at 5. Ex. C, Welner Dep. at 38:5-7.) Dr. Welner failed to offer a diagnosis for Gianni. Ex. C, Welner Dep. at 82:18-83:25.) Most importantly, Dr. Welner speculates, without factual support and contrary to the factual record, as to the impact of the arrest on Gianni's mental state in the hours preceding his suicide. (Ex. B, Report of Michael Welner, M.D.; Ex. C, Welner Dep.)

Frankly, Dr. Welner's opinions strain credulity too far. He opines that Ms. Sacchetti, Gianni's mother, despite being with Gianni in the hours leading up to his suicide, despite numerous texts from her son in which he repeatedly told her that his life was "in danger," despite her knowledge of Gianni's prior mental health history and prior suicidal ideation, could not have done anything to prevent her son's suicide. (Ex. B, Report of Michael Welner, M.D at 10-12.; Ex. C, Welner Dep. at 166:22-188:6; SMF ¶ 144-164.) Yet, he offers the specious opinion that Gallaudet's DPS officers, who had never met Gianni, had no knowledge of his mental health

history, and had no knowledge of any suicidal threats[3] or prior suicidal ideation are directly responsible for his suicide almost 30 hours after being released from police custody. (Ex. B, Report of Michael Welner, M.D. at 6-10; Ex. C, Welner Dep. at 185:20-188:6.) Dr. Welner's opinions are speculative and wholly without factual support.[4]

Rather, as Dr. Welner admitted at deposition, his opinions are based solely on temporal proximity between the arrest and subsequent suicide; i.e. *post hoc ergo propter hoc.* (Ex. C, Welner Dep. at 114:7-117:3.) Dr. Welner never met Gianni, never treated Gianni, and never undertook a forensic psychiatric evaluation of Gianni. (Ex. B, Report of Michael Welner, M.D.; Ex. C, Welner Dep. at 49:17-50:24.) Dr. Welner did not speak with any of Gianni's treating mental health care providers before rendering his opinions in this case. (Ex. C, Welner Dep. at 49:17-50:24.) In fact, Dr. Welner declined to make any sort of formal psychiatric diagnosis in this case. Instead, he simply opined that the arrest was part of a "cascade of events" which led Gianni to feel "hopelessness" and ultimately resulted in his suicide. (Ex. C, Welner Dep. at 82:10-83:25, 114:7-117:3, 232:14-232:25, 235:11-236:20.) As such, Dr. Welner offers nothing more than a circuitous narrative purporting to causally relate Gianni's suicide to his prior arrest based solely on temporal proximity and his own *ipse dixit,* without even a suggestion of scientific or medical analysis to support his conclusions. Accordingly, Dr. Welner's proffered opinions are, unreliable, irrelevant, and inadmissible.

---

[3] There is no evidence or suggestion that Gianni expressed suicidal thoughts to DPS or any other employee of Gallaudet at any time. Ex. C, Welner Dep. at 185:20-186:9, 186:17-187:10.

[4] Dr. Welner has a history of making such sweeping unsupported conclusions in the guise of offering "psychiatric opinion." He recently stated in a national television broadcast that CNN is partially responsible for the October 1, 2017 mass shooting in Las Vegas. He stated, "I think that CNN's going to have to answer how they demonize gun enthusiasts and how CNN actually contributes to mass shooting, and I think that they do." Dr. Welner opined that Stephen Paddock, the Las Vegas gunman, did not seem to fit the profile of many other mass shooters, and, therefore, concluded that the cause of the shooting must have been his hatred for gun owners and guns themselves. Dr. Welner continued, "Absolutely, people who are gun enthusiasts and who are populists or nationalists in this country are dehumanized. They're demonized." "[Stephen Paddock's] mind-set is that they deserve to die." https://youtu.be/I5rD1_rxG5c Last visited 11/28/2017.

## Argument

I. **Pursuant to Rule 702, Dr. Welner's opinions must be reliable and relevant to be admitted at trial.**

Under Rule 702 of the Federal Rules of Evidence, expert testimony is only admissible if it is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Trial court judges have a "gatekeeping" responsibility to exclude evidence that does not meet these requirements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 598 (1993). Rule 702 identifies relevant expert testimony as testimony where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702 (a); *see also Daubert*, 509 U.S. at 592.

An expert opinion must be not only relevant but also reliable. A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods. *Daubert*, 509 U.S. at 592-93; *accord Ambrosini v Labarraque*, 101 F.3d 129, 132-35 (D.C. Cir. 1996); *Kakeh v. Utd. Planning Org., Inc*, 587 F. Supp. 2d 125, 130 (D.D.C. 2008). As the Supreme Court explained in *General Electric Co. v. Joiner*,

> [t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

522 U.S. 136, 146 (1997); *accord Evans v. Wash. Met. Area Trans. Auth.*, 674 F. Supp. 2d 175, 178 (D.D.C. 2009). Judges of this Court have applied this standard to exclude expert testimony that is simply unsupported by the relevant facts and data of the case. *See United States v. Day*, 524 F.3d 1361, 1369 (D.C. Cir. 2008) (upholding exclusion of expert offered to opine that

11

defendant's depression and brain damage meant he did not have sufficient intent to commit crime where record included no evidence of depression); *see also Gaither* v. *Dist. of Columbia*, 831 F. Supp. 2d 56, 66 (D.D.C. 2011) (excluding testimony of attorney offered on issue of criminal sentence likely to have been given to decedent).

Just as opinions linked to data only by an expert's *ipse dixit* are deemed unreliable, opinions based solely on temporal proximity also fail to satisfy *Daubert*'s reliability test. *See e.g.*, *Young v. Burton,* 567 F. Supp. 2d 121, 128-29 (D.D.C. 2008) (rejecting temporal proximity as sole grounds for causation of injuries allegedly from toxic spill); *Roche v. Lincoln Property Co.,* 278 F. Supp. 2d 744, 764 (E.D. Va. 2003), *aff'd* 175 F. App'x 597 (4th Cir. 2004) (same in toxic mold case). "[I]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Rule 702." *Roche*, 278 F. Supp. 2d at 752 (internal citations omitted). "Drawing conclusions about causation from temporality is a common logical fallacy known as *post hoc ergo propter hoc* (after the fact, therefore because of the fact), and is as unpersuasive in the courts as it is in the scientific community."  *Young*, 567 F. Supp. 2d at 140; *see also Ohio v. U.S. Dept. of the Interior*, 880 F.2d 432, 473 (D.C. Cir. 1989) (rejecting "the *post hoc ergo propter hoc* fallacy" in the causation analysis of biological injury in a toxic spill); *accord McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) (same); *Rolen v. Hansen Bev. Co.*, 193 F. App'x 468, 473 (6th Cir. 2006) ("Expert opinions based upon nothing more than the logical fallacy of *post hoc ergo propter hoc* typically do not pass muster under *Daubert*.").

## II. Dr. Welner's opinion that Gianni's arrest caused his suicide is not reliable because it is not based on scientific data and analysis.

Dr. Welner's testimony fails to meet Daubert's requirement of reliability. His testimony is the product of fallacious *post hoc ergo propter hoc* reasoning and *ipse dixit* declarations.

12

Accordingly, this Court should exclude Dr. Welner from testifying at trial and decline to consider his opinions in response to Gallaudet's motion for summary judgment.

Contrary to Dr. Welner's opinions, there is no evidence to support a conclusion that Gianni's arrest caused his suicide. Gianni did not commit suicide during the arrest or while in custody. Gianni did not express suicidal thoughts to Gallaudet's DPS or any other employee of Gallaudet – a fact conceded by Dr. Welner. (Ex. C, Welner Dep. at 117:8-117:15, 185:20-188:6.) And Gianni did not even mention the arrest to Plaintiffs or anyone else prior to his suicide. (SMF ¶ 178.) Rather, Ms. Sacchetti testified that just prior to his suicide, Gianni accused her of trying to smother him and declared that he had no choice but to kill himself. (SMF ¶ 158-159.) Nothing done or said by Gianni in the hours prior to his suicide indicates he was thinking about his arrest, much less that his suicide was motivated by the arrest.

Not surprisingly, given this total lack of evidence, Dr. Welner openly admitted at deposition that the <u>sole</u> basis for his conclusion that Gianni's March 29, 2014 arrest caused his subsequent suicide is the temporal proximity between the two events. Dr. Welner testified as follows:

> Q: So what this really relates to, in your view, is the timing of the events and his suicide, the relationship between when they happened and when Gianni's suicide occurred?
>
> **A: That's correct.**
>
> Q: Okay.  And it's the proximal relationship between the suicide and when these events occurred that is the, from a psychiatric perspective, the basis of your opinion?
>
> **A: Yes, it is.**
>
> Q: Is there anything else?
>
> **A: No. The time course is important to me.**

Q: Is there anything other than the time course?

　　　Mr. Grosz: Form.  Than what?

Q: That is a medical basis for your opinion?

　　**A: Nope. I think - - I want to add this. This is responsive to anything else, but it's not exactly anything else. I think that the time course is important, because it is particularly notable to me because he was already demonstrating disorganization of thinking and poor control of his behavior that had not necessarily acted out in a suicidal way, but he was showing signs of unraveling. And so that coupled with the time course is significant. Do I feel that this would have happened were he not to be psychotic and all of the other circumstances? I don't know. But what I would like to say is the fact that he was psychotic and showing that he was disorganized in his thinking and also disorganized in his behavior. Whatever hopelessness that he would have experienced with the circumstances of the events, it would have diminished his capabilities of coping with the kinds of stressors that he was presented with.**

(Ex. C, Welner Dep. at 115:15-117:3.) Dr. Welner could not have been clearer – the close proximity in time between Gianni's arrest and suicide is the basis for his purported psychiatric opinion as to causation. Dr. Welner's comments about how Gianni, in his view, was "already demonstrating disorganization of thinking and poor control of his behavior" only amplifies the importance of the temporal relationship in Dr. Welner's opinion. Moreover, these comments demonstrate Dr. Welner's concession that Gianni's psychiatric condition preceded his detention. This is classic *post hoc ergo propter hoc* reasoning and is "as unpersuasive in the courts as it is in the scientific community." *Young*, 567 F. Supp. 2d at 140. For this reason alone, Dr. Welner's testimony is unreliable and should be excluded.

　　In addition to relying on *post hoc ergo propter hoc* reasoning, Dr. Welner's opinions as to causation also fall squarely into the category of impermissible *ipse dixit*. He offers no factual support for his conclusions, nor any foundation in scientific evaluation or analysis. In his report,

14

Dr. Welner states that Gianni was "overtly psychotic" at the time of his arrest, but does not articulate any basis for this seeming diagnosis or how it relates to the subsequent suicide. (Ex. B, Report of Michael Welner, M.D. at 7.) Accordingly, Dr. Welner was invited during his deposition to elaborate and provide a basis for this purported "psychotic" diagnosis. Dr. Welner declined, however, saying that Gianni suffered from some psychosis in March 2014, but that the specific nature or origin of this psychosis was "unclear." (Ex. C, Welner Dep. at 82:10-83:8.) While there were a number of different possible diagnoses, according to Dr. Welner, it was "hopelessness," not psychosis, that caused Gianni's suicide. (Ex. C, Welner Dep. at 82:10-83:8, 114:7-117:3, 232:14-232:25, 235:11-236:20.) Not surprisingly, as such, at no point in his report or testimony does Dr. Welner ever refer to a treatise, manual, study, or any other source of scientific data that might support his purported diagnosis or conclusions regarding Gianni's alleged "hopelessness." (Ex. B, Report of Michael Welner, M.D.; Ex. C, Welner Dep.)

Federal courts frequently exclude psychiatrists from giving unreliable opinions under *Daubert*. *Nichols v. Am. Nat'l Ins. Co.,* 154 F.3d 875, 883 (8th Cir. 1998) (excluding psychiatric opinion when theories did not meet *Daubert* criteria); *Matthews v. Kroger Texas, LP*, 2015 U.S. Dist. LEXIS 178967 at *4-6 (N.D. Tex. Aug. 21, 2015) (excluding psychiatric testimony when proposed expert had not evaluated or treated patient, could not give a diagnosis, and the opinions would be "speculative and lacking in scientific validity"); *United States v. Scholl*, 959 F. Supp. 1189, 1194-97 (D. Az. 1997) (psychiatric expert excluded when opinion "barely rises above mere speculation"); *Maras v. Avis Rent A Car Sys.*, 393 F. Supp. 2d 801, 807-08 (D. Minn. 2005) (excluding psychiatric testimony as to trauma causing fibromyalgia when theory had not been tested or peer reviewed, had no known error rate, and had failed to gain general acceptance).

Notably, one federal court in Kansas excluded a preeminent psychiatrist and psycho-pharmacologist who offered far more scientific support for his causation opinions in a suicide case than Dr. Welner does here. In *Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1062 (D. Kan. 2002), *aff'd* 356 F.3d 1326 (10th Cir. 2004), *cert. denied*, 543 U.S. 917 (2004), the parents of a thirteen year old child brought a wrongful death claim against the manufacturer of Zoloft alleging that the drug caused their son to commit suicide. Plaintiffs' expert intended to opine that Zoloft could cause suicide in persons experiencing depression, in general, and specifically caused the suicide of the plaintiffs' child. *Miller*, 196 F. Supp. 2d. at 1066.

The expert relied on two of his own studies, his meta-analysis of the defendant's data, accepted factors for determining the causation of drug reactions, and three other studies. *Id.* at 1067-87. Nevertheless, the *Miller* court concluded that "glaring, overwhelming, and unexplained" flaws in the proposed expert's methodology justified excluding the expert's testimony as to general causation. Regarding specific causation, defendant argued that the proposed expert "had not even bothered to review much of the factual evidence regarding [the child's] symptoms, behavior, and social and family circumstances." *Id.* at 1085. The court noted that the expert's analysis "ignored undisputed evidence that [the child] engaged in suicidal thoughts and behavior before he first took Zoloft." *Id.* at 1086. Determining that the proposed testimony gave "scant attention to evidence of factors – other than Zoloft – that may have caused [the child's] suicide," the court concluded that the proffered expert's opinion on specific causation did not satisfy Rule 702 and *Daubert* "because it [did] not use sufficient facts and data and it [was] not the product of reliable principles and methods." *Id.* at 1087.

Dr. Welner offers far less support for his opinions than did the *Miller* expert. Dr. Welner offers no diagnosis or theory on which to base his opinions and provides no scientific data, study,

treatise, or other clinical grounding for his conclusion or the implicit theory on which it rests. Furthermore, like the expert in *Miller*, Dr. Welner formed his conclusions upon an incomplete factual review of Gianni's extensive history of prior suicidal thoughts and ideation. As such, Dr. Welner's testimony should be excluded as failing to meet the reliability standards set forth in Rule 702 and *Daubert* and its progeny.

### III.   Dr. Welner's opinions are not reliable because they lack factual support or contradict the existing record.

Dr. Welner admitted that he had not conducted a complete review of the record in this case, and he conceded that he did not obtain a second opinion, despite having published on the need for second opinions to provide validity to forensic testimony. As such, it is not surprising that his opinions about the effect of Gianni's arrest on his psychiatric state either lack factual support and contradict the record outright.

Most notably, Dr. Welner's testimony about Gianni's "hopelessness" finds scant support. Dr. Welner infers, without any evidence, that Gianni must have been experiencing "hopelessness" because his standing at Gallaudet was in jeopardy due to the problems he was having in Professor Healy's class. (Ex. B, Report of Michael Welner, M.D. at 2-6; Ex. C, Welner Dep. at 57:1-75:10, 95:23-96:25.) Gianni specifically told Jim Moore before the suicide, however, that he was no longer experiencing problems with Professor Healy. (SMF ¶ 68.) Dr. Welner admits there is absolutely no evidence that Gianni's academic standing at Gallaudet was in jeopardy. (Ex. C, Welner Dep. at 61:9-66:24, 89:10-93:3, 95:23-96:25.) There is no evidence that Gianni expressed "hopelessness" over his difficulties in Professor Healy's class. (Ex. C, Welner Dep. at 70:18-72:24.) And Gianni actually maintained a 4.0 GPA for the prior Fall 2013 semester. (Ex. C, Welner Dep. at 61:9-66:24, 95:23-96:25; SMF ¶ 62.)

17

Dr. Welner further concludes that Gianni was experiencing "hopelessness" because he was essentially evicted from Gallaudet. (Ex. B, Report of Michael Welner, M.D. at 5-6; Ex. C, Welner Dep. at 86:20-89:6; 114:7-117:3, 235:11-236:20.) There is absolutely no evidence that Gallaudet ever evicted Gianni. (Ex. C, Welner Dep. at 86:20-89:6, 154:9-154:25, 235:11-236:20) Most notably, Superior Court issued the no-contact order, not Gallaudet, which Dr. Welner concedes. (Ex. C, Welner Dep. at 86:20-89:6.) Even so, the court's no-contact order simply instructed Gianni to avoid Messrs. Opie or Scherrenberg. (SMF ¶ 139.) It neither instructed Gianni to leave campus, nor did it prohibit Gianni from attending classes. (SMF ¶ 139.) In fact, Dr. Welner was not aware of the fact that Gianni returned to campus after being released and was in a friend's dorm room for several hours before he contacted DPS to collect his belongings to go home with his mother. (Ex. C, Welner Dep. at 85:23-92:1, 235:11-236:20.)

Dr. Welner focuses on the fact that Gallaudet did not give Gianni an alternative room on the night of his release. Dr. Welner concedes, however, that Gianni advised Gallaudet that he was staying with his mother and that no evidence exists to show that Gianni asked for an alternative room on campus that night. (Ex. C, Welner Dep. at 86:20-93:3, 103:19-105:1, 151:19-24.) Gianni obviously did not perceive that he had been "evicted" because he demanded that his mother return him to campus after they had an argument upon arriving at her apartment. (SMF ¶ 153.) Even so, the notion that alternative housing at Gallaudet would have been preferable to returning home with his mother, as Dr. Welner perceives Gianni's then-existing state of mind,  is patently unfounded and speculative.

Similarly, Dr. Welner's opinion that Gianni's mother could not have affected the outcome are untenable. (Ex. B, Report of Michael Welner, M.D. at 10-12; Ex. C, Welner Dep. at 166:22-188:6.) Dr. Welner admits that Gallaudet's DPS officers had no knowledge of the fact

18

that Gianni was experiencing a psychiatric emergency and that nothing suggested to them that Gianni was suicidal. (Ex. C, Welner Dep. at 185:20-188:6.) Yet, he claims that DPS officers should have committed Gianni for involuntary psychiatric treatment. (Ex. B, Report of Michael Welner, M.D. at 7; Ex. C, Welner Dep. at 139:2-140:3, 143:18-147:19.) At the same time, Dr. Welner opines that Gianni's mother, who received texts from her son indicating that he felt his life was in danger, could not have appreciated that her son was suicidal. (Ex. B, Report of Michael Welner, M.D. at 10-12; Ex. C, Welner Dep. at 166:22-188:6.) DPS officers received no such communications. (Ex. C, Welner Dep. at 185:20-188:6.)

This contradiction is critical because Dr. Welner seems to ignore the fact that Ms. Sacchetti promised to seek medical help the "next time" Gianni was in a depression state in which he became suicidal. (Ex. C, Welner Dep. at 173:30-178:15; SMF ¶ 60-61.) Dr. Welner also disregards the verified allegation in Plaintiffs' complaint indicating that Ms. Sacchetti had never seen Gianni that upset before when she picked him up on campus. (Ex. C, Welner Dep. at 168:9-169:15; SMF ¶ 148.) Dr. Welner's opinions with respect to Ms. Sacchetti are neither medical nor scientific, and they undermine the legitimacy of any actual expert opinion he could offer in this case.

## IV.   Dr. Welner's opinions are also irrelevant to Plaintiffs' false arrest claim.

To prove false arrest, a plaintiff must establish: (1) detention/restraint against his will within boundaries fixed by the defendant; and (2) the unlawfulness of the detention/restraint. *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 911-12 (D.C. Cir. 2015); *accord Doe v. Safeway, Inc.,* 88 A.3d 131, 132 (D.C. 2014). If the evidence establishes these two elements, then a plaintiff is entitled to nominal damages and compensation for any physical suffering and mental anguish, including fright, shame, and mortification from the indignity and disgrace that

resulted from the false arrest itself.  *Nnadili v. Chevron USA, Inc*., 435 F. Supp. 2d 93, 99-100

(D.D.C. 2006) (citing *Parker v. Stein*, 557A.2d 1319, 1323-34 (D.C. 1983)). A plaintiff may also

recover reasonable and necessary expenses incurred due to the arrest, including loss of earnings

while arrested or detained, and attorney's fees incurred in securing release from the false arrest

and damages for any loss of liberty. *Phillips v. Dist. of Columbia*, 458 A.2d 722, 725 (D.C.

1983); *accord Barnes v. Dist. of Columbia*, 452 A.2d 1198, 1999-2000 (D.C. 1982).

      The lawfulness of the arrest is an issue of law outside of Dr. Welner's expertise about

which he correctly declined to opine. (Ex. C, Welner Dep. at 139:2-140:3, 143:18-147:7.) Dr.

Welner does purport to opine, however, that Gallaudet exhibited "contempt and indifference" for

Gianni by failing to provide mental health services prior to or as an alternative to his arrest. (Ex.

B, Report of Michael Welner, M.D. at 10; Ex. C, Welner Dep. at 190:8-193:12.) Most

importantly, Dr. Welner is not qualified, as a psychiatrist, to give an opinion as to Gallaudet's

alleged level of culpability. The fact that he strains the boundaries of his own expertise to do so

impeaches the balance of his opinions. This Court already dismissed the negligence claims

against Gallaudet, and Dr. Welner's opinions about whether Gallaudet should have provided

mental health services in the hours leading up to Gianni's arrest are legally immaterial and

irrelevant to the question of whether Gallaudet had legal justification to detain Gianni and

whether such detention caused Gianni's suicide.

      Regarding causation, Dr. Welner's opinions are irrelevant because they do not relate to

the applicable legal standard. As indicted in Gallaudet's motion for summary judgment,

Plaintiffs must show that Gallaudet's detention of Gianni brought about a delirium or insanity

that rendered Gianni incapable of resisting the impulse to commit suicide. RESTATEMENT

(SECOND) OF TORTS § 455 ("If the actor's negligent conduct <u>so brings about</u> the delirium or

insanity of another as to make the actor liable for harm done by the other to himself while delirious or insane, if his delirium or insanity . . . makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.") (emphasis added); *see also Dist. of Columbia v. Peters,* 527 A.2d 1269, 1275 (D.C. 1987) (adopting the Restatement (Second) approach for the District of Columbia). Dr. Welner's opinions fail to address the elements of this standard.

Most notably, Dr. Welner's report purports to address whether the arrest had "any causal relationship" to Gianni's suicide. During his deposition, Dr. Welner conceded that Gianni's arrest was not the only cause of his suicide. He even went so far as to interrupt questioning to correct an earlier response that might have been construed as identifying the arrest as the sole cause of Gianni's suicide. (Ex. C, Welner Dep. at 232:14-232:25.) Rather, he claimed that "the arrest and its consequences precipitated Gianni Manganelli's suicide" and testified that it was part of "cascade of events leading to suicide." (Ex. B, Report of Michael Welner M.D. at 6; Ex. C, Welner Dep. at 232:14-232:25.) "Any causal relationship" and one part of a "cascade of events," however, are not the correct legal standards of causation.

The standard is whether the arrest triggered the mental condition that caused the individual to experience an irresistible impulse to commit suicide. *Peters,* 527 A.2d  at 1275. Far from meeting this standard, Dr. Welner admits that Gianni was experiencing the psychiatric condition that lead to his suicide prior to the arrest. Dr. Welner also conceded that Gianni could have survived the arrest if his mother had taken him for emergency medical treatment when he texted her that his life was in danger. (Ex. C, Welner Dep. at 237:4-13.) In fact, the only time Dr. Welner appeared to embrace the "irresistible impulse" standard was when Plaintiffs' counsel improperly elicited the previously undisclosed opinion through leading questions at the end of

21

the deposition. Ex. C, Welner Dep. at 233:18-234:21.) Accordingly, Dr. Welner's opinions are legally irrelevant because they fail to address the irresistible impulse standard and, to the extent they do address this standard, concede that Gallaudet's alleged conduct does not render it liable under the irresistible impulse standard. Even if the standard were "substantial factor," Gallaudet respectfully submits that Dr. Welner's opinions seek to lower the causal threshold and Gallaudet may not be held legally responsible on that basis, either.

As such, not only are Dr. Welner's opinions in this matter with respect to the detention and subsequent suicide unreliable, they are also ultimately irrelevant to the material legal questions involved in this case. Accordingly, Dr. Welner's testimony should be excluded.

**V.    Many of Dr. Welner's "professional opinions" are not opinions within the scope of psychiatric medicine and are unsupported by scientific data and analysis.**

Throughout the course of his testimony, Dr. Welner frequently offered commentary on subjects outside his designated expertise in psychiatric medicine under the guise of his "professional opinion." Perhaps the most egregious example of this is his opinion that Gallaudet acted with "contempt and indifference" toward Gianni. (Ex. B, Report of Michael Welner, M.D. at 10; Ex. C, Welner Dep. at 190:8-193:12.) Dr. Welner is not an expert in higher education or in university policing standards. The fact that Dr. Welner attempts to defend such an opinion as a matter of psychiatry reveals the lack of credibility of his opinions in their entirety. Moreover, this Court already dismissed the Plaintiffs' negligence claims against Gallaudet, and Dr. Welner's opinion in this regard is entirely superfluous.

Another example of Dr. Welner opining beyond his expertise is his attempt to exonerate Gianni's mother. (Ex. B, Report of Michael Welner, M.D. at 10-12; Ex. C, Welner Dep. at 166:22-188:6.) His opinion that Ms. Sacchetti would have called Gallaudet if she had known of Gianni's arrest is not a matter of psychiatric opinion. Furthermore, it is incredible that Dr.

Welner claims Ms. Sachetti's could not have known Gianni was suicidal when she received Gianni's text messages indicating his life was in danger, yet opines that the university acted with contempt and indifference for Gianni while simultaneously conceding that Gallaudet's DPS officers had no basis for concluding that Gianni was in psychiatric distress at the time of his arrest. Regardless, Ms. Sacchetti's responsibility or lack thereof for the events of March 29-30, 2014, leading up to Gianni's suicide is not a matter of psychiatric opinion appropriate for expert testimony. It is the testimony of a hired apologist, and it has no place in this lawsuit.

Similarly, Dr. Welner gives baseless non-expert opinions about his assessment of Gianni's academic standing at Gallaudet to support his unfounded opinion that Gianni experienced "hopelessness" leading up to the suicide. (Ex. B, Report of Michael Welner, M.D. at 5-6; Ex. C, Welner Dep. at 57:1-75:10, 95:23-96:25.) Dr. Welner has no information to support his assertion that Gianni was in any academic peril or that Gianni became unwelcome on campus. (Ex. C, Welner Dep. at 61:9-66:24, 89:10-93:3, 95:23-96:25.) He has no basis for believing that Gianni felt that he was in academic trouble or had been evicted. (Ex. C, Welner Dep. at 57:1-75:10, 89:10-93:3, 95:23-96:25, SMF ¶62-63, 68.) The fact that Gianni wanted to return to campus after his mother picked him up directly contradicts Dr. Welner's opinion. (SMF ¶ 153.) In any event, Dr. Welner has no expertise sufficient to give an opinion about Gianni's standing at Gallaudet. Accordingly, Gallaudet respectfully submits that this Court should exclude Dr. Welner.

## Conclusion

Gallaudet University respectfully submits that for these reasons, the testimony and opinions of Michael Welner, M.D. must be excluded from this case pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Dr.

Welner's opinions are nothing more than *ipse dixit* statement without factual support, much less any scientific analysis or foundation. Dr. Welner simply provides a narrative assigning blame for Gianni Manganelli's suicide without making a coherent psychiatric diagnosis or even undertaking a psychiatric evaluation. Most importantly, Dr. Welner concedes that his opinions in this case are based entirely on the temporal proximity between Gianni Manganelli's arrest and subsequent suicide. Such *post hoc ergo propter hoc* reasoning has never been condoned by this Court.

WHEREFORE, Gallaudet University respectfully requests that this Court enter an order excluding any testimony or opinions from Michael Welner, M.D. in this action. Alternatively, Defendant respectfully requests a hearing on its motion to exclude Dr. Welner and any further relief as this Court deems just.

Dated: December 18, 2017                Respectfully submitted,

                                        GALLAUDET UNIVERSITY,

                                        By Counsel,

                                        */s/ Jason R. Waters*
                                        Jason R. Waters (# 491066)
                                        Peter M. Moore (# 985713)
                                        WILSON, ELSER, MOSKOWITZ, EDELMAN &
                                        DICKER LLP
                                        8444 Westpark Drive, Suite 510
                                        McLean, VA 22102
                                        Phone: (703) 245-9300
                                        Fax: (703) 245-9301
                                        jason.waters@wilsonelser.com
                                        peter.moore@wilsonelser.com
                                        *Counsel for Defendant Gallaudet University*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 18th day of December 2017, the forgoing was served

via CM/ECF for the U.S. District Court of the District of Columbia to all counsel of record.


*/s/ Jason R. Waters*
Jason R. Waters (# 491066)
Peter M. Moore (# 985713)
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
Phone: (703) 245-9300
Fax: (703) 245-9301
jason.waters@wilsonelser.com
peter.moore@wilsonelser.com
*Counsel for Defendant Gallaudet University*

762925v.4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**TERRYLENE SACCHETTI, individually and ROBERT MANGANELLI, individually and as co-personal representatives of the Estate of GIANNI MANGANELLI,**

        **Plaintiffs,**

**vs.**

**GALLAUDET UNIVERSITY,**

**and**

**THE DISTRICT OF COLUMBIA**

        **Defendants.**

**Case No. 1:15-cv-00455-RBW**

## [PROPOSED] ORDER

Upon consideration of Defendant's Motion to Exclude Testimony of Plaintiffs' Expert Michael Welner, M.D. and any opposition thereto, and there appearing good cause, it is on this _____ day of _____ 20_____,

**ORDERED**, that Defendant's Motion is **GRANTED** and it is further;

**ORDERED**, that any testimony, opinions, and/or evidence in support of Plaintiffs' claim from Michael Welner, M.D. in this matter are **EXCLUDED**.

_____
Judge Reggie B. Walton
United States District Judge

Copy: All Counsel of Record

763153v.1