# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## Case No. 1:15-cv-455-RBW

TERRYLENE SACCHETTI, individually and
ROBERT MANGANELLI, individually and as
co-personal representatives of the Estate of GIANNI
MANGANELLI,

       Plaintiffs,                                   JURY TRIAL DEMANDED

vs.

GALLAUDET UNIVERSITY and the
DISTRICT OF COLUMBIA,

       Defendants.

_____/

## PLAINTIFFS' Rule 26(a)(2)
## DISCLOSURE OF EXPERT TESTIMONY

      Pursuant to Fed. R. Civ. P. 26(a)(2), Local Rule 26.2 and this Court's initial and subsequent

scheduling orders [DE 45, 48], plaintiffs Terrylene Sacchetti and Robert Manganelli, individually

and as co-personal representatives of the Estate of Gianni Manganelli, hereby serve their

disclosure (1) identifying the names of two experts whom the Plaintiffs may use at trial to present

evidence under Federal Rules of Evidence 702, 703, or 705, as to issues of liability, in compliance

with Rule 26(a)(2)(A); and (2) providing written reports, prepared and signed by the respective

witnesses, in compliance with Rule 26(a)(2)(B):

1) Mr. Jack Ryan
   Legal & Liability Risk Management Institute
   5250 E. US HWY 36, Ste. 1103
   Avon, IN 46123

2) Michael Welner, M.D.
   The Forensic Panel Corp.
   224 West 30th Street



EXHIBIT
A

Suite 806
New York, NY 10001

DATED: May 30, 2017                    MORELLI ALTERS LLP
                                       *Counsel for the Plaintiffs*

                                       /s/ Justin D. Grosz
                                       Justin D. Grosz
                                       Washington D.C. Bar No. 1018414
                                       DCOTA | Design Center of the Americas
                                       1855 Griffin Road, Suite C-470
                                       Dania Beach, Florida 33004
                                       JGrosz@morellialters.com
                                       Telephone: (305) 571-8550
                                       Facsimile (305) 571-8558

Case 1:15-cv-00455-RBW Document 52 Filed 05/30/17 Page 3 of 3

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 30, 2017, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

all counsel of record, including, to:


Jason R. Waters
Peter Moore
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
8444 Westpark Drive, Suite 510
McLean, Virginia 22102-5102
(703) 245-9300
(703) 245-9301
Jason.Waters@wilsonelser.com
Madelaine.Kramer@wilsonelser.com
*Counsel for Gallaudet University*

Steven Anderson
Assistant Attorney General
441-4th Street, NW
6th Floor South
Washington, D.C. 20001
steve.anderson@dc.gov
*Counsel for the District of Columbia*

/s/ *Justin D. Grosz*
Justin D. Grosz



## THE FORENSIC PANEL

224 W. 30th ST., SUITE 806  NEW YORK, NY 10001  TEL: 212.535.9286  FAX: 212.535.3259  MICHAEL WELNER, M.D., CHAIRMAN

Justin D. Grosz
Morelli Alters LLP
Design Center of the Americas
1855 Griffin Road
Suite C-470
Dania Beach, FL 33004

**Re: Sacchetti et al v. Gallaudet University et al**

May 30, 2017

Dear Mr. Grosz,

Pursuant to your request, I have reviewed a range of records in connection with the events preceding the death of Gianni Manganelli. He was a 23-year-old Deaf student of Gallaudet University who was found dead at 6:15 AM on March 30, 2014. Mr. Manganelli, according to his mother, Terrylene Sacchetti, absconded from her home around 4:50 AM, after having conveyed messages to her that he may be killed or may kill himself. She called police to assist in locating him. A search soon thereafter discovered Mr. Manganelli lying face up in nearby Sligo Creek with self-inflicted stab wounds from a butcher knife taken from Ms. Sacchetti's kitchen, including the slicing open of his abdomen. The Maryland State Medical Examiner ruled the cause of death to be a suicide.

Gianni Manganelli, in the midst of his studies at Gallaudet University at the time of his death, had also been living in the University dormitories. On March 28, 2014, he was arrested very late in the evening and charged with Simple Assault for reportedly threatening his roommate Spencer Opie and Mr. Opie's friend, Jason Scherrenberg. On March 29, Mr. Manganelli was released from custody but court-ordered to stay away from the two complainants. Gallaudet did not provide Mr. Manganelli with alternative housing, and he left campus and killed himself hours later.

The matter is referred for my forensic psychiatric assessment to specifically assess the following questions:

1. *Did the arrest of Gianni Manganelli have any causal relationship to his death? If so, how?*
2. *Did the information available to Gallaudet necessitate mental health intervention or other steps as a result of the arrest and its aftermath? What resources were available to Gallaudet University? Would intervention have made a difference in the outcome?*
3. *What could Terrylene Sacchetti have done to prevent Gianni Manganelli's death, given the sequence of events, what she knew, and when she knew it?*



EXHIBIT
B



EXHIBIT
WELNER
85
P4 7/14/17

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 2

## SOURCES OF INFORMATION

1. D.C. Metropolitan Police Department reports
2. Montgomery Police Department reports
3. Affidavit of Jason Scherrenberg, March 29, 2014
4. Affidavit of Spencer Opie, March 29, 2014
5. Montgomery Police Department interview of Terrylene Sacchetti, March 31, 2014
6. Records of admission to DOMH Comprehensive Psychiatric Emergency Program, August 22, 2013
7. St. John's Health Center admission, June-July 2013
8. Deposition of Lt. Daniel Bauer, March 6, 2017
9. Deposition of Capt. Patrick Rader, March 6, 2017
10. Deposition of Adrienne Morgan, March 7, 2017
11. Autopsy and toxicology report of Gianni Manganelli
12. Records of Greenbridge Medical Services
13. Email correspondence among Gallaudet administration, August 2013-March 2014
14. Application for Office of Students With Disabilities
15. Procedure for DPS CRE on call in responding to incidents
16. Gioconnect.org, featuring video of Gianni Manganelli performing in 2012
17. Deposition of Terrylene Sacchetti, May 1, 2017
18. Discussion with Terrylene Sacchetti, May 29, 2017
19. Rememberinggio.wordpress.com
20. Text messaging between Gianni Manganelli and Terrylene Sacchetti, March 2014
21. Deposition of Robert Manganelli, May 2, 2017
22. Stay Away Order, March 29, 2014
23. Office of the Chief Medical Examiner Investigative Report
24. Records of Santa Monica UCLA Medical Center
25. Records of Westside Family Health Center
26. Records of Marna Geisler, M.D.
27. Rochester Institute of Technology Medical Records
28. Handwritten notes of Gianni Manganelli, late March 2014

## FORENSIC PSYCHIATRIC ASSESSMENT

*1. Did the arrest of Gianni Manganelli have any causal relationship to his suicide? If so, how?*

Gallaudet internal correspondence notes Mr. Manganelli's conflict with his linguistics teacher, Christine Healy, from even before March 2014. According to Ms. Healy, Mr. Manganelli would ask off-topic questions in class and argue with her, distracting other students from learning. She reported an occasion in which he refused to participate in a classroom Jeopardy activity, put his feet up on his desk and blew his nose with a sheet of paper.

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 3

The friction between Mr. Manganelli and Ms. Healy escalated over a class assignment (a mock debate) scheduled for April 1. He expressed concerns that the activity would present serious legal questions under the Americans with Disabilities Act. Ms. Healy contacted administration, as did Gianni Manganelli, in early March. Among other things, she cited him to be disruptive and behaving bizarrely. Academic Advisor Jessica Duhon queried Thelma Schroder, Director of Academic Advising, about whether the Behavioral Intervention Team (BIT) should be involved, an idea Ms. Healy had endorsed.

On March 10, Mr. Manganelli reached out to Ms. Duhon in an email:

> "I'm not having a good time with my professor in this class—Christina Healy. She's a graduate student teaching the course. She's making it especially difficult for me to complete the class by blocking my questions, and strongly wording emails in such a way that I look bad, and was flagged for academic conduct. I'll have to be very careful, but I can still pass the class, and I can't afford to drop or fail this class. I'm sending you an email because I need some resources on how to deal with bullying professors. Do you know anyone on campus that I can go to to discuss this matter? Gallaudet protocol requires me to discuss things with Ms. Healy but I am intimidated and afraid of being alone with her. I'm hoping you might help me out because I'm worried. My VR support is on the line and I don't want it threatened by an egotistical professor who is out to make my life hell. She has singled me out in the classroom."

Ms. Duhon referred Mr. Manganelli to a grievance counselor. Mr. Manganelli responded within minutes, writing "Have you read my email fully? I know the grievance position, but it is not helping my situation right now." However, Mr. Manganelli did promptly contact the grievance counselor, Jim Moore, seeking his immediate involvement. Mr. Moore replied by email that he did not have time to meet until sometime between March 24 and March 28.

On March 11, Mr. Manganelli and Ms. Healy met after class. The meeting, by both accounts, improved the tension of their relationship, with his expressing understanding that he was interrupting class, and her agreeing to provide him with more information for the April 1 assignment.

In an email to Mary Thumann and Ms. Duhon on March 12, Ms. Healy wrote that she had informed Mr. Manganelli that DPS was aware of the situation, and "ready to come escort him out of class if he is being disruptive and unwilling to leave." She further informed him that she "had planned to contact BIT, but will give him another chance."

Whether the entire Gallaudet staff experienced BIT as punitive or whether this was the appraisal of Ms. Healy, she conveyed these impressions to Ms. Thumann and Ms. Duhon,

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 4

and both superiors did nothing to reframe that intervention plan and the perspective it conveyed.

Consistent with the above, there is no record of follow up with Mr. Manganelli by Ms. Duhon, Ms. Schroder, Mr. Moore, or BIT, although the April 1 exercise was looming. Mr. Manganelli agreed to proceed, despite his unresolved misgivings. In my professional opinion, Mr. Manganelli had already substantively failed a fall 2013 course with Dr. Sue Mather and was desperate to avoid further jeopardizing his standing at Gallaudet.

The evidence reflects his continued and even worsening irrational thinking and expression. On the afternoon of March 28, he reportedly confronted his roommate Spencer Opie by making irrational accusations, then staring at him, then swinging at him and almost hitting him. According to Mr. Opie, he later found Mr. Manganelli hiding in the shower.

Mr. Opie left the room and sought out a friend, Jason Scherrenberg, who lived close by in the dorm. Mr. Manganelli went to public safety and complained about Spencer Opie. Officials there referred him to Adrienne Morgan, the CRE (Coordinator of Residential Education) on call that evening.

Mr. Manganelli immediately wrote to Ms. Morgan, requesting a different roommate. According to Ms. Morgan, she directed him to come to her office, which he did at 5 PM that day. Mr. Manganelli, she recounts, said his roommate would stare at him, touch his things, and make him feel uncomfortable. She subsequently characterized the conversation to another CRE, Thuan Nguyen, and the Director of Residential Life, Susan Hanrahan, as bizarre. Ms. Morgan did not notify BIT or a mental health counselor. However, she notified the Public Safety department at 5:56 PM because "she felt it important for them to know."

Ms. Morgan recalls that she planned to do a welfare check on Mr. Manganelli later that evening, further demonstrating her awareness of the seriousness of Mr. Manganelli's mental deterioration. However, she did not follow through on that plan.

Mr. Opie, meanwhile, reportedly spoke to Brian Suchite, who was in charge of the Ballard West dorm. That night, campus police were called to Mr. Manganelli's and Mr. Opie's dorm room based on reports that "ten people" were in the room and under threat.

In the encounter that followed, which occurred shortly after midnight on March 29, Mr. Manganelli opened the door to responding Gallaudet Police Lt. Daniel Bauer but did not comply with orders to leave his room. Lt. Bauer responded by handcuffing him. He briefly released Mr. Manganelli, but then physically took him down when he made a movement. Mr. Manganelli remained handcuffed until DC Metropolitan police arrived.

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 5

Gallaudet Police Capt. Patrick Rader recalls Gianni Manganelli inquiring, repeatedly, "why am I handcuffed," as he lay restrained on his stomach, quiet, calm and staring with a blank look. Capt. Rader relates that despite having been informed that Mr. Manganelli was "bipolar," he neither contacted BIT nor had ever been trained about how to contact such team.

Mr. Manganelli was eventually led away by DC Metropolitan police, who placed him under arrest for Simple Assault and Threats to do Bodily Harm.

While the above was unfolding on March 29, correspondence from Professor Pilar Pinar to administrators described Mr. Manganelli's behavior over the past few weeks as "somewhat worrisome." In an email to Ms. Duhon at 11:59 AM, Professor Pinar wrote that his instructors in Spanish were seeing "blackout spells."

> "When Ines Gonzalez gently tapped Gianni to check on him during the lab session, he reacted aggressively and threateningly towards Ms. Gonzalez. Two of his classmates shared with Ms. Gonzalez that they were worried about both his physical and emotional health. Apparently he had just had an incident with his roommates right before the lab session. I believe the incident was reported to the dorm's RA, but I don't know any details. I believe this situation needs prompt action. We don't know whether he is currently under medical care, but it seems to me that he needs to be referred to counseling services or to health services."

Although police released him later on March 29, the DC court issued a Stay Away Order, essentially barring him from his dormitory home. No alternative arrangements were made available for his campus housing, although emergency housing was available. Mr. Manganelli's personal writings from his last hours noted:

> "emergency purposes   (not enough reason to put me in emergency room) trying to get info to put me in emergency room even though I already gave enough info)"

Gianni Manganelli was effectively evicted from the Gallaudet community at a time that he was already mindful of his precarious standing at the University, at a time of crisis, and without any provision for what would then happen to him.

Mr. Manganelli killed himself just hours after being released from custody, and brutally, eviscerating himself with a butcher knife. For those who remember him to be a keen enthusiast of Japanese culture, this method of seppuku evokes suicide in the context of dishonor.

Recorded correspondence among Gallaudet teachers and administrators overwhelming reflect that Gianni Manganelli could not even cope with the day-to-day demands of the

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 6

classroom. How then would he have been expected to cope with an abrupt handcuffing, arrest, eviction and separation from the school?

It is clear from Mr. Manganelli's communications with others that he was proud and strong-willed. For someone who realized that he was in academic trouble, the shame of the arrest and removal from Gallaudet – with his entire academic future on the line – was all the more personally powerful.

Even before news of his arrest, Pilar Pinar was writing to administration, observing that Gianni Manganelli needed help, and fast. What instead transpired was his arrest and removal.

No other stressors preceded Mr. Manganelli's suicide, which occurred within hours of his eviction from campus. There is no evidence that it had been planned well in advance. Mr. Manganelli used a weapon that he acquired only just before he killed himself. He wrote no note. His toxicology screen on autopsy was negative.

It is therefore my professional opinion, with a reasonable degree of psychiatric certainty, that the arrest and its consequences precipitated Gianni Manganelli's suicide.

> 2. *Did the information available to Gallaudet necessitate mental health intervention or other steps as a result of the arrest and its aftermath? What resources were available to Gallaudet University? Would intervention have made a difference in the outcome?*

Police demonstrated the safe disposition of someone with psychiatric illness in their handling of Gianni Manganelli on August 23, 2013, when he was admitted to the DOMH's Comprehensive Psychiatric Emergency Program. At that time, he presented as highly agitated and irrational.

Prior to that hospital admission, Gallaudet was not apparently aware of Mr. Manganelli's psychiatric problems. The decedent himself had characterized his issues as a seizure disorder.

By August 24, 2013, however, Mr. Manganelli was identified to the Gallaudet Behavioral Intervention Team (BIT). His mother, Terrylene Sacchetti, established herself to administration at Gallaudet as a source and support, particularly as it related to his behavioral difficulties. Records reflect that he was connected to the BIT team by August 24, 2013. According to Ms. Sacchetti, at least four senior Gallaudet officials were aware of Mr. Manganelli's mental health problems and potential for ongoing psychiatric needs. These included: Dwight Benedict, Dean of Student Life; Ted Baran, DPS (Public Safety Director); Susan Hanrahan, Housing Director; and Lauri Rush, a senior official with the

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 7

BIT team and personal acquaintance of Ms. Sacchetti. These four were to coordinate approaches to the individual student.

Ms. Rush recused herself from treatment planning because of her personal relationship with Ms. Sacchetti and her family; email correspondence reflects that Ms. Rush agreed to assign Mr. Manganelli to a responsible replacement for herself.

Records show that Mr. Manganelli visited Academic Advisor Jessica Duhon on August 27, 2013 and expressed peculiar thinking, which she recorded as "UFO, wars, guns… they are hiding the password." With that, Ms. Duhon wrote to Thelma Schroder, Director of Academic Advising, "Does he have a second disability?" Ms. Schroder forwarded the correspondence to the BIT team. This correspondence demonstrates that there was awareness of Mr. Manganelli's major mental illness up and down the Gallaudet institutional hierarchy.

But on March 29, 2014, Mr. Manganelli was swiftly removed the University community without any effort to engage BIT, mental health counseling, or his mother as a support or shelter. She knew nothing of the arrest in the thirty hours preceding his death. She knew nothing of his request to change roommates in the two full days preceding Gianni's death.

As was the case when he was detained in August 2013, Gianni Manganelli could have been even involuntarily admitted to a psychiatric hospital. He was not. And therefore, the overtly irrational thinking and behavior that prompted the police being called would have received the appropriate urgent attention it needed.

The very basis of Mr. Manganelli's arrest was his purported dangerousness and the threats he was thought to be at risk to revisit. The decedent's risk to others was demonstrated by the arrest alone, the psychiatric relevance was reflected in the arrest of an otherwise docile person. That history would have been a sufficient basis for commitment. If Gianni Manganelli were dangerous enough to warrant removal from the dormitory, how would he not be 1) dangerous enough to commit, or 2) at least work with his family to commit?

Mr. Manganelli was overtly psychotic at the time of the arrest. Hospital intervention, given his history of threats to others, would have prompted psychotropic treatment with or without his consent.

Gallaudet's public safety procedures note that responsibility is ceded to the DC Metropolitan Police Department in cases of "imminent threat." So, Gallaudet deemed Mr. Manganelli an imminent threat. Yet there was no referral to the hospital or report to BIT. And although Lt. Bauer and Capt. Rader concede that they were aware that he had a psychiatric problem, public safety procedures require a referral to the mental health counselor on call in the event of a "mental health incident," neither of them made such a referral.

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 8

A policy to hand off an arrestee to the police department does not eliminate the reality that Gallaudet knew Gianni Manganelli was acutely mentally ill and that they knew he would be soon released from custody. Yet despite the availability of counseling, BIT intervention, and a concerned family, Gallaudet and its administration did nothing. Nothing. If Gianni Manganelli were not connected to BIT under these circumstances, what circumstances would the entire program be for? If the University were to be aware of whom to notify in case of emergency, is it not emergency enough that a student is placed under arrest while ill, and thrown off campus?

Mr. Manganelli had a history of refusing treatment with psychotropic medicine. However, an arrest on an assault charge is more than sufficient basis for medication treatment, even over objection, on the basis of dangerousness. The history thus demonstrates that there would have been even more therapeutic potential for a hospital admission than had prompted his earlier admission – which did happen.

Yet Gianni Manganelli was routed to an exclusively non-psychiatry track. There was no evaluation of his bizarre behavior; there was handcuffing, arrest, and a Stay Away order.

There was no engagement of his parents as Gianni's behavior became disruptive, there was planning with the administration for how to remove him from the classroom. It was clear then that he was irrational and inappropriate.

Gallaudet's Behavioral Intervention Team is for those who have emotional needs. Mr. Manganelli was referred, appropriately, to BIT after his hospitalization in August 2013. Nevertheless, there is no record of BIT being engaged during Mr. Manganelli's confrontation with his roommate or his arrest. Lt. Bauer indicates that he was aware, at the time of his arrest, that Gianni Manganelli had mental problems. He was also aware that there was a BIT program. However, he did not contact mental health services. Nor did Adrienne Morgan, even after police were called to the dorms and she was on the scene. And, no protocol existed for when BIT needed to be engaged.

Gianni Manganelli's arrest was elective. At the time of his encounter with Lt. Bauer, he was not agitated, not violent, not threatening. Officers referred him to the DC police for arrest only because of their perception of his risk. It is precisely because of this assessment of his risk, and the established vehicles for mental health intervention (both BIT and CPEP, where he was known to clinical staff) that alternatives to arrest, the experience of arrest, the experience of eviction and separation and rejection from Gallaudet were available. Gianni Manganelli, a known irrational person with known erratic behavior, was routed to an exclusively criminal justice and punitive track when multiple constructive pathways were available, and through different critical points in time.

Gallaudet University, its police officers, and Adrienne Morgan erred in referring Gianni Manganelli for arrest and incarceration, subjecting an individual who was known to be

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 9

irrational and mentally ill to the experience of extreme physical submission (the time of his arrest), treatment as a threat (removal from the dorms and with criminal charges for Simple Assault pressed), and further alienation from the institution where he needed to succeed at a precarious time. Those actions collectively were precipitants to his suicide. However, the suicide that followed Gallaudet's actions could have potentially been prevented had the University provided Mr. Manganelli with alternative housing at the point of initial complaint, at the point police were called, or upon the order separating him from his roommate.

Gallaudet had the available provision for emergency housing that is specifically provided, according to Adrienne Morgan, in instances of conflict between students. She characterized these as "rooms available when students have conflicts," and notably, "if there is an act of violence or we need to separate students."

Instead, the University offered or assigned no alternative shelter to Mr. Manganelli. Ms. Morgan was aware of the request Gianni Manganelli had made to separate from his roommate. She was concerned enough to have alerted public safety immediately afterward, six hours before police were called. But she did not arrange for alternative housing. Moreover, she did not follow through on plans to do a welfare check on Mr. Manganelli.

After midnight, Ms. Morgan came to the scene before Mr. Manganelli was taken away, under arrest. After he was released on March 29, Mr. Manganelli was forced off campus after he was released from jail. Gallaudet did so, once again, without consultation of BIT or Ms. Sacchetti. The effects of this decision are borne in the urgency of his texts to his mother that evening.

LIFE IN DANGER
PICK ME UP RIGHT NOW

Ms. Sacchetti had no context in which to consider this message. There was no stress identified to her; she was unaware of the degree of conflict he was experiencing with his teacher, even as that teacher was writing letters seeking to arrange for DPS to remove him from the classroom the next time he would be argumentative. There was no conflict between Mr. Manganelli and his parents, or within the family otherwise; no argument. He had no recent breakups with a significant other.

Ms. Sacchetti was completely unaware that Gianni had the accumulating conflicts, the fracture of the relationship with the roommate, the arrest, and finally, the eviction and exclusion from the campus. She reports that they had been in regular contact through March. Prior to March 29, his last text to his mother was March 23. They had last seen each other on March 15, and Ms. Sacchetti recalls that they had a good time, even though he had been spooked the day before with the idea that someone had hacked his computer.

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 10

Based on Mr. Manganelli's poor communication and responsiveness to police, Gallaudet could never have expected him to address his predicament or to convey any risk to his mother. Nor did Gallaudet consider the impact that prosecuting someone for assault and excluding him from campus would have on an actively psychotic person. There is no record of consideration of the fallout of these impactful decisions; rather, evidence reflects choices without deliberating consequences, and choices geared entirely around the orderly classroom and dormitories. Mr. Manganelli proved, as a member of the Gallaudet University family, to be more than just someone to be whisked away by a call to DPS.

Accounting for the fallout of Gallaudet's prosecuting, evicting, and excluding Gianni Manganelli could have been easily done without any undue allocation of resources or manpower. Evidence reflects, from Ms. Healy to Ms. Morgan to the police themselves, a pattern for engaging public safety to intervene in a situation that all saw as a psychiatric one. With a plan that was removal, removal, and removal, it is not surprising that Mr. Manganelli eventually responded to the threats and removals by removing himself. That a mental health protocol was available for a person who was obviously quite ill underscores contempt that emerged from Gallaudet's exasperation with Gianni Manganelli's struggles with his teachers, be it Ms. Healy or, months earlier, Dr. Sue Mather.

With a matter of notification and engagement of BIT, a mental health counselor, and Ms. Sacchetti at the time of his arrest, and even at the time of his release from custody, there would have been ample time to intervene with crisis intervention that would have saved Gianni Manganelli from suicide.

That nothing was done, under the circumstances, and by so many (campus police, Adrienne Morgan, Ms. Healy, and numerous responsible and informed administrators) is reflective of contempt for and indifference to Mr. Manganelli and his safety, and of his family who were more than committed to responding where the school would not.

> 3. *What could Terrylene Sacchetti have done to prevent Gianni Manganelli's death, given the sequence of events, what she knew, and when she knew it?*

Ms. Sacchetti, with no context or warning, received the following text messages at approximately 8:30PM on March 29:

LIFE IN DANGER
PICK ME UP RIGHT NOW

CARLIN HALL
I am in my old room at
Carlin pls come pick me
up right NOW because
my life is in danger

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 11

He texted his father,

> "Dad, I'm in danger, immediate danger. Have mom come pick me up."

Ms. Sacchetti responded by driving to Gallaudet and picking up her son within the hour.

Terrylene Sacchetti and Bob Manganelli cultivated a longstanding closeness and responsive devotion to their son Gio. Ms. Sacchetti, after Gianni Manganelli enrolled at Gallaudet, moved across the country from California to be close to him and accessible. Records reflect that he enjoyed a close relationship with both of his parents.

However, neither his father nor his mother was informed of or aware of what had transpired in school. Ms. Sacchetti had two adult passengers when she picked up her son near Carlin Hall. In response to her question of where the clothes were that he might have packed, Gianni Manganelli reported that his belongings, wallet and key card were with public safety.

They arrived at Ms. Sacchetti's home sometime close to 10 PM. Ms. Sacchetti advised the others that she was going to pick up her daughter from a party; Mr. Manganelli indicated that he wanted to return to the school. His mother asked him to stay with her that night, and to come with her to pick up his sister, but he walked slowly into a nearby Pollo Loco restaurant. Ms. Sacchetti went to pick up her daughter, expecting him to be safe. When she returned, however, Gianni was gone. She texted him at 11:08 PM, and eventually went to sleep at 1 AM.

Ms. Sacchetti awoke to a loud sound the door to the outside. There was Gianni Manganelli, with his backpack, bass guitar, and jacket; his shoes and socks were wet, as if he had been walking in a creek. According to Ms. Sacchetti, he told her,

> "You tried to suffocate me, right? You tried to suffocate me with a pillow, right? And I have two choices. Either I will kill myself or..."

She relates that she tried to calm him down. He asked her for a "last drink" of Mead, a honey-based alcoholic beverage he often prepared. Then abruptly, he absconded – without his bass guitar or backpack. His mother was unable to catch him.

Ms. Sacchetti notified police at 4:51 AM to search for him; his body was found at 6:13 AM lying face up on a rock, with both forearms lacerated and his abdomen slashed open. The wounds were inflicted with a knife he had apparently just taken from his mother's kitchen.

There was no stressor that Ms. Sacchetti was aware of, that he made her aware of. She had seen him psychotic on other occasions, and so Gianni Manganelli being irrational would not in and of itself have represented his suicidality, without any context for her concern.

Re: Gianni Manganelli
*The Forensic Panel – Michael Welner, M.D.*
May 30, 2017

Page 12

In November, 2011, while enrolled at the Rochester Institute of Technology, Gianni Manganelli sent his parents a letter declaring his love for them such that they worried this was a suicidal note. The parents reached out to the campus for a welfare check; although their son was safe and not contemplating suicide then, his parents remained sensitive and ready to jump in and go anywhere to protect him.

Were the school – which Terrylene Sacchetti entrusted with the sensitivity to address the disabilities of her son – to have made her aware of Mr. Manganelli's current predicament, the record reflects that Ms. Sacchetti would have proactively mobilized the supports to stabilize her son in his crisis and would have established a safe setting for him while his crisis was being managed.

However, Mr. Manganelli killed himself without his parents being aware of the nature of his crisis.

So glaring was Gallaudet's detachment from mitigating the Manganelli crisis of their own creation that not one Gallaudet official contacted the Manganelli family for over a day after his suicide to inform the mourners what had happened. According to Ms. Sacchetti, she learned of the conflict, his arrest, and subsequent eviction only on Monday when she went to the public safety division on Monday to retrieve his wallet.

Because Ms. Sacchetti and Bob Manganelli had no information made available to them, they had no wherewithal to report their son as a risk to himself or to others. He was known to refuse treatment, and assistance would have only been available to her were he to be known to be a risk to himself or to others.

The evidence demonstrates, through the indifference of Gallaudet and its staff, that nothing was done despite repeated points at which multiple responsible employees could have advised her of the crisis and enlisted her to assist where the University did not, could not, or would not.

Thank you for the opportunity to review this sensitive matter. If you have any other questions or evidence for my review, please do not hesitate to contact me.

Very sincerely yours,

Michael Welner, M.D.
Chairman, The Forensic Panel
Clinical Professor of Psychiatry, Icahn School of Medicine at Mt. Sinai



# Transcript of Michael Welner, M.D.

**Date:** July 14, 2017
**Case:** Sacchetti, et al. -v- Gallaudet University, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**



EXHIBIT

C

_____

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - - - - - -x
     TERRYLENE SACCHETTI, individually,
3    and ROBERT MANGANELLI, individually
     and as co-personal representatives
4    of the Estate of GIANNI MANGANELLI,
                                     Case No.:
5                 Plaintiffs,        1:15-cv-00455-RBW

6    vs.

7    GALLAUDET UNIVERSITY
     800 Florida Avenue NE
8    Washington, D.C.  20002

9    and

10   THE DISTRICT OF COLUMBIA,

11                Defendants.

12   - - - - - - - - - - - - - - - - - - -x

13

14

15           DEPOSITION of MICHAEL WELNER, M.D., taken by

16   Plaintiffs at 150 East 42nd Street, New York, New

17   York, on Friday, July 14, 2017, commencing at 1:16

18   p.m., before Pamela Grimaldi, a Registered

19   Professional Reporter and Notary Public within and for

20   the State of New York.

21

22

23

24

25

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    2

```
1    A P P E A R A N C E S:

2

3            MORELLI ALTERS LLP
                  Attorneys for the Plaintiffs
4                 1855 Griffin Road, Suite C-470
                  Dania Beach, Florida  33004
5                 305.571.8550

6            BY:  JUSTIN D. GROSZ, ESQ.
                  (JGrosz@morellialters.com)

7

8            WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
                  Attorneys for Defendant Gallaudet
9                 8444 Westpark Drive, Suite 510
                  McLean, Virgina  22102
10                703.245.9300

11           BY:  JASON R. WATERS, ESQ.
                  (Jason.Waters@WilsonElser.com)
12

13

14           OFFICE OF THE ATTORNEY GENERAL
                  Attorneys for Defendant
15                District of Columbia
                  441 Fourth Street NW, 6th Floor
16                Washington, D.C.  20001
                  202.724.6607

17           BY:  STEVEN J. ANDERSON, ESQ.
                  (Steve.Anderson@dc.gov)
18

19

20

21

22

23

24

25
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    3

1                    I N D E X    P A G E

2    Witness

3    M. Welner

4         By Mr. Waters                                    4

5         By Mr. Anderson                                219

6         By Mr. Grosz                                   232

7         By Mr. Waters                                  235

8

9

10                        EXHIBITS

11   Defendants'
     Exhibits            Description                    Page
12
         82      Corrected Notice of Expert Deposition    4
13
         83      ThumbDrive with documents responsive     5
14               to subpoena

15       84      Expert Disclosure                        6

16       85      Expert Report                            6

17       86      Curriculum Vitae                         7

18       87      Fall 2013 and Spring 2014 Grades report 62

19       88      California Department of Rehabilitation 106
                 Case Notes of Jim Moore
20

21

22

23

24

25

1    MICHAEL WELNER, M.D., called as a witness,

2          having been first duly sworn by Pamela

3          Grimaldi, a Notary Public within and for

4          the State of New York, was examined and

5          testified as follows:

6    EXAMINATION

7    BY MR. WATERS:

8          Q    Good afternoon, Dr. Welner.

9          A    Good afternoon.

10         Q    We met this afternoon.  My name is

11   Jason Waters.  I represent Gallaudet University in a

12   lawsuit brought by Terrylene Sacchetti and Robert

13   Manganelli, as representatives of their deceased

14   son, Gianni Manganelli.

15               I understand that you are serving and

16   you are here today as an expert designated by the

17   Plaintiffs in this matter.

18         A    Yes.

19         Q    Okay.  And you are here pursuant to

20   our Notice of Deposition, Expert Deposition?

21         A    Yes, that's correct.

22               (Corrected Notice of Expert

23          Deposition was marked as Defendant's

24          Exhibit No. 82 for identification, as of

25          this date.)

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    5

1    BY MR. WATERS:

2         Q    Doctor, I want to mark what we're

3    going to call Exhibit 82 the Corrected Notice of

4    Expert Deposition.  Is that the notice that you

5    received?

6         A    Yes.

7         Q    Okay.  And there are a variety of

8    different documents that are listed, materials that

9    we asked you to bring with you today.

10        A    Yes.

11        Q    And you brought with you -- you gave

12   me today a ThumbDrive.

13        A    Yes.

14        Q    And does this represent the materials

15   that are requested on the notice?

16        A    Yes.  It includes everything that

17   you've requested.

18        Q    Okay.  Is this a complete set of your

19   file in this matter?

20        A    Yes.

21                  MR. WATERS:  I'm going to mark

22            that as Exhibit 83.  We'll take a

23            picture of it and then mark it as 83.

24                  (ThumbDrive with documents

25            responsive to Subpoena was marked as

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    6

```
 1                Defendant's Exhibit No. 83 for
 2                identification, as of this date.)
 3    BY MR. WATERS:
 4         Q    We were provided expert disclosure for
 5    you in this case, and I'm going to mark that as
 6    Exhibit 84.  Have you seen a copy of your expert
 7    disclosure in this matter?
 8         A    I don't think so.
 9                    (Expert Disclosure was marked as
10                Plaintiff's Exhibit No. 84 for
11                identification, as of this date.)
12    BY MR. WATERS:
13         Q    I'm going to show you what's been
14    marked as Exhibit 84, Plaintiff's Rule 26(a)(2)
15    Disclosure of Expert Testimony.  Have you seen that
16    before?
17         A    I have not.  Just saw it now.
18                    (Expert Report was marked as
19                Defendant's Exhibit No. 85 for
20                identification, as of this date.)
21    BY MR. WATERS:
22         Q    I'm going to mark as Exhibit 85 the
23    report that we received as being your report for the
24    Manganelli case.  There's a 12-page report dated May
25    30, 2017 and signed by you.  Is this a fair and
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    7

1   complete copy of the report prepared by you in this

2   matter?

3            A       Yes, it is.

4            Q       Does this contain opinions you purport

5   to give in this case and the basis for those

6   opinions?

7            A       It does.

8                         (Curriculum Vitae was marked as

9                 Defendant's Exhibit No. 86 for

10                identification, as of this date.)

11  BY MR. WATERS:

12           Q       I'm going to mark as Exhibit 86 the

13  curriculum vitae we were provided by you in this

14  matter.  It is 27 pages long, and undated.  Is this

15  a current copy of your curriculum vitae?

16           A       I think so.  I'm pretty sure that it

17  is.

18           Q       If you wouldn't mind taking a look at

19  it and letting me know if there's anything you would

20  like to add to your curriculum vitae that we were

21  provided in this case.

22           A       I think it's current.  I'll look at

23  one more spot and see that it's current.

24                   Yeah, it's current.

25           Q       Thank you.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    8

```
 1                    Have you provided a testimonial
 2    history in this case, by that I mean have you
 3    provided a list of all cases in which you have
 4    testified as an expert either in deposition or at
 5    trial for the last four years?
 6         A     I may have.  If it was requested, then
 7    we provided it.  I am not sure, because that's the
 8    kind of thing that my administrators usually take
 9    care of.  But if it was requested, we can definitely
10    provide it.
11         Q     I can represent to you that I have not
12    seen a copy of that.
13                         MR. GROSZ:  I'll check.
14                         MR. WATERS:  And the rules do
15              require it.
16         A     We can get that to you.  We can get it
17    to you quickly.  Not a problem.
18         Q     The listed publications on here and
19    presentations, is this a full and complete list of
20    the presentations and publications you've offered?
21         A     There are a couple of presentations
22    this year, but they are updated versions of
23    presentations that otherwise appear.  In other
24    words, I've -- they are -- I regularly lecture at
25    Beth Israel Medical Center as part of my academic
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    9

1    responsibilities, and the lectures that I have given

2    in 2017 are the same topics as the ones I gave in

3    2016.  They haven't been added, but they are

4    represented in the CV.  So for all intents and

5    purposes, it's complete.

6            Q     Okay.  Would you briefly summarize

7    your educational history.

8            A     Sure.  I received my MD from the

9    University of Miami in Florida.  From there I

10   completed a postgraduate internship, rotating

11   internship, in psychiatry, medicine, and emergency

12   medicine at Beth Israel Medical Center in New York.

13   From there I completed a residency in psychiatry at

14   Beth Israel Medical Center in New York.  And

15   simultaneously with my last year of residency

16   training, psychiatry, I completed a fellowship

17   training in forensic psychiatry at the University of

18   Pennsylvania at Philadelphia.

19           Q     And what are your board

20   certifications?

21           A     Board-certified in -- ah, yes.  Yes,

22   it's in here.  This is updated.

23                 I am board-certified in psychiatry and

24   forensic psychiatry, and I am recertified in

25   forensic psychiatry twice.  And currently -- I have

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    10

1    been board-certified in psychopharmacology.  That

2    certification is no longer offered by that body.  So

3    I have not had an opportunity to renew that

4    certification, which requires an examination.

5              And in terms of disaster medicine, I

6    am board-certified in disaster medicine, however, I

7    have not been active in disaster medicine.  So

8    for -- in all candor, it's essentially a dormant

9    board certification because I'm not practicing in

10   that realm right now.

11        Q    Would you explain to me what disaster

12   medicine is.

13        A    It's the intersection of different

14   medical specialties with a variety of disasters.

15   For example, what kind of medical and psychiatric

16   issues, not just within psychiatry, but also all the

17   way across the spectrum of medicine, are pertinent

18   to tornadoes and the survivors of tornadoes, to

19   toxic spills, to hurricanes, to earthquakes, to

20   9/11, terrorist incidents?  They can be manmade

21   disasters, natural disasters.  But each of them have

22   unique medical concerns that wouldn't necessarily

23   come up in any other discipline in medicine.

24              The things that you need to know for

25   disaster psychiatry, therapeutically, as well as

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    11

1    assessment-wise, may be very different from

2    conventional posttraumatic stress disorder

3    assessment.  And so it is with other areas of

4    medicine.  There's certain areas of epidemiology and

5    emergency medicine and infectious disease that

6    really do lend themselves to certain disaster

7    situations that you never really see in other areas

8    of medicine.  So it has coalesced into its own realm

9    of subspecialty medicine in recent years.

10          Q     I understand that your board

11   certifications are in psychiatry and forensic

12   psychiatry from the American Board of Psychiatry and

13   neurology; is that correct?

14          A     Correct.

15          Q     Are you a board-certified neurologist?

16          A     I am not.

17          Q     Have you had any training in

18   neurology?

19          A     I have.  And in order to achieve board

20   certification in psychiatry, there is a neurology

21   component of the exam.  You have to demonstrate a

22   proficiency for it.  One has to have an awareness of

23   neurology.  But it's not the same, by any stretch of

24   the imagination, it's not the same day-to-day

25   practice in neurology that a person who sees

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    12

1    neurology patients has.

2          Q     Given your background in neurology,

3    would you be able to identify organic or structural

4    foci on a brain scan that would have potential

5    psychiatric or psychological impact?

6          A     Sure.  Sure.  There may be some

7    questions that would be beyond my qualification.  If

8    they are, I'll say it.  But if it's the kind of

9    thing that comes up in the course of psychiatric

10   practice, I'd be qualified -- and the reason is that

11   before one arrives at a psychiatric diagnosis, one

12   has to rule out medical causes and different causes

13   that can masquerade as psychiatric causes, and

14   sometimes part of that workup is neuroimaging or

15   other evidence that speaks to a neurological

16   condition.  So you have to have some proficiency for

17   confounders.  But once it gets into a realm that is

18   really squarely neurology, that's --

19         Q     By "confounders," you mean multiple

20   explanations for the cause of the same -- multiple

21   factors explaining the same symptom, I think is what

22   I was driving at.

23         A     Correct.

24         Q     So you are active in psychiatry and

25   forensic psychiatry on your board certifications?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    13

```
1              A      Yes, sir.
2              Q      You are active in disaster -- you are
3       certified in disaster medicine, but that's an
4       inactive --
5              A      It's inactive because I'm not
6       practicing it.  I'm not deploying -- excuse me.  I'm
7       not going to --
8              Q      Are you okay?
9              A      Thank you for asking.
10             I'm not going to see it.  That's
11      Syria.  That's where you practice disaster
12      psychiatry.  You go where the war is.  You go where
13      the earthquake is.  Doctors Without Borders.  If
14      you're not practicing, it's not a skill that you're
15      relying on.
16             Q      And you indicated you are no longer
17      actively certified in psychopharmacology because
18      it's no longer active; did I understand that
19      correctly?
20             A      I originally certified in clinical
21      psychopharmacology from this organization in 2003,
22      and because psychopharmacology evolves, there are
23      new medications, there are new understandings about
24      medications, risks, benefits, applications.  Their
25      arrangement was that one gets recertified every four
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    14

1    years. So I recertified in 2007. But after 2010,

2    they stopped offering recertification.

3            So while I continue to practice

4    psychopharmacology in the clinical realm, and I

5    continue to maintain my skills, there's no

6    wherewithal for certification; there's no certifying

7    body anymore that exists. So I have the

8    certification, but it really was meant to be renewed

9    every four years, and that possibility isn't -- it

10   doesn't exist anymore.

11           And so it goes with forensic

12   psychiatry: Even though you haven't necessarily

13   asked the question, within forensic psychiatry, one

14   should -- one is supposed to maintain certification,

15   and recertification is every 10 years. I

16   recertified this year. I ran into a scheduling

17   conflict with something like this last year, just

18   was unable to arrange, and they only offer the

19   examination once a year, so I took the examination

20   this year, recertified. And so I've maintained that

21   certification through -- from 1996 when I originally

22   certified.

23       Q    So both of the -- do I understand that

24   correctly, that both of the certifications in

25   psychiatry and forensic psychiatry have been active

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    15

1    and have been continuously active?

2        A    Yes.  In psychiatry there's no

3    requirement for sitting for a recertification exam.

4    There's a requirement that one maintain involvement

5    in continuing medical education activities and to

6    demonstrate that, but it's not, for example, what

7    one would see, not only in forensic psychiatry, but

8    also psychopharmacology, where you're actually

9    sitting for an exam where you're getting a series of

10   questions and you've got to score at a certain level

11   or you're just not going to be provided

12   recertification.  You have to demonstrate a test

13   proficiency.

14       Q    What's the difference between

15   psychiatry and forensic psychiatry?

16       A    Psychiatry is the broader universe of

17   mental health as a scientific discipline, and it

18   includes all of the subspecialties, whether it be

19   child psychiatry, substance abuse psychiatry,

20   geriatric psychiatry, forensic psychiatry, although

21   the discipline itself day to day may have very

22   little intersection with those subspecialty areas.

23            Forensic psychiatry is a very diverse

24   universe, civil law, criminal law, in my universe,

25   securities law, which is one of these niches that

1    very few people have exposure to.  But there are

2    many different aspects of the law where psychiatry

3    and the law intersect where there's a specific

4    question that has scientific significance, and the

5    questions may be fairly common in the psychiatric

6    legal context, but in the criminal -- I'm sorry, in

7    the clinical realm, you'd never see it.

8                    For example, and totally unrelated to

9    this:  Disputed confessions.  Now that's an area

10   where it may come up in the forensic context.

11   There's absolutely no clinical context in which a

12   disputed confession would ever arise.

13                   On the other hand, in forensic

14   psychiatry there's a lot of consideration of

15   questions of violence.  And that may come up in the

16   clinical realm as well.  So sometimes there are

17   things you see both in clinical and forensic, in a

18   way (indicating) -- and I'm making a motion like a

19   Venn diagram -- where you see certain overlap, but

20   then there are certain realms not only in the

21   forensic, but also clinical, where you'd never seen

22   them in forensic.  So there's overlap, but they are

23   clearly very different universes.

24        Q     Simply put, is forensic psychiatry

25   working with attorneys in legal matters where

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    17

1    psychiatric issues become pertinent to the

2    litigation?

3           A      Yeah, sure.  Working with legal

4    matters.  Sometimes you don't even actually work

5    with attorneys.  But that may lend itself to another

6    question.  But it's -- even simply put, it's working

7    within legal matters where there's a specific

8    context to the clinical question.

9           Q      What is psychopharmacology?

10          A      It's the discipline of treatment of

11   psychiatric conditions with physical measures,

12   either medication -- typically medication, but it

13   may also include things like magnetotherapy, or

14   light therapy, or electroconvulsive therapy.  As

15   opposed to psychotherapy.

16          Q      As you are aware, this case concerns a

17   student at Gallaudet University who committed

18   suicide.

19          A      Yes.

20          Q      Have you given presentations

21   concerning the specific topic of suicide in

22   psychiatric -- from a psychiatric perspective?

23          A      I have given perspectives on death

24   investigation in forensic psychiatry, and within

25   forensic psychiatry, I've covered the various arenas

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    18

1    in which death investigation is pertinent, one of

2    which is suicide.

3          Q     The presentations that you're

4    discussing were not specifically on the topic of

5    suicide, correct?

6          A     No.  Within the presentation, there

7    was, you know, specific focus on suicide, but it

8    focused on several things within a broader

9    presentation about death investigation and forensic

10   psychiatry.

11         Q     Looking at your CV, can you identify

12   those presentations for me?  And I apologize, I know

13   it's several pages.

14         A     What I would call your attention to is

15   the lectures for the psychiatric residents at Beth

16   Israel that appear in 2016 and as well as this year,

17   2017.  I would also -- and 2014.  I'm trying to see

18   whether it's there in 2015.  It may not have been

19   2015.  The New York County Medical Examiner's

20   Office, "Forensic Psychiatry in Death Investigation:

21   Psychological Autopsy and Assessment of Motive."

22   And when I reference assessment of motive, what

23   would have been the motive behind death, suicide

24   being one of those motives.

25               And I'm going to -- if you give me a

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    19

1    moment to just take a closer look, those are the
2    ones that jump out because they are most recent.
3              I think there's a lecture noted here
4    December 4 -- I'm sorry, March 2004 I was a
5    distinguished lecturer in legal medicine at the
6    American College of Legal Medicine annual meeting,
7    and this lecture on "Death Investigation and Medical
8    Malpractice," specifically, I believe that suicide
9    was a focus within that lecture, and a distinct,
10   different lecture from the ones I had mentioned
11   before.
12       Q    Any others?
13       A    I'll -- I'm almost done.
14       Q    Okay.  Take your time.
15       A    In 1999 I lectured through the Osler
16   Institute for their forensic psychiatry board review
17   program, and lectured on "Psychological Autopsy for
18   Civil Courts," and that would be on suicide versus
19   homicide versus accident.  That's it.
20       Q    Do you still have copies of the
21   materials you used for these presentations?
22       A    Certainly the more recent ones.  Once
23   I get back to 2004 -- I may still have them, I just
24   haven't looked for them in a while.  But there's a
25   good chance I can come up with them.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    20

```
 1          Q     I'd like to make a request for those,
 2   if you don't mind.
 3          A     Sure.
 4          Q     The same question with respect to
 5   articles and publications.  Have you published on
 6   the issue of suicide?
 7          A     I know the article that's referenced
 8   on page 14 of my CV, "Gaps in Mental Health:
 9   Suicides and Homicides," suicides covers that.  And
10   it's a pretty accessible article, anticipating your
11   next question.
12          Q     I have a copy of it.
13          A     Okay.  I need to perhaps go over this
14   a little bit more closely, but that immediately
15   jumps out, so you already have it.
16                There are some articles here which I
17   may not be sure, but I'm going to raise it just in
18   case.
19          Q     What page is that?
20          A     These are older.  When we go back to
21   The Forensic Echo, which is published before 2001,
22   the first article that catches my attention is on
23   page 17, "Anxiety Draws Water Guns in Prison," and
24   in particular, I believe that that relates to
25   suicide, because the crux of that article, as I
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                           21

```
 1    recall it, again, 16 years later, is that what was

 2    contributing to prison suicides was that anxiety was

 3    being undertreated.

 4            Q      Was this a letter that you authored?

 5            A      No.  It was an editorial.

 6            Q      Was this published on your firm's

 7    website, ForensicPanel.com?

 8            A      It was -- it was accessible on

 9    ForensicPanel.com, but it was actually published in

10    paper form.  The Forensic Echo was a monthly

11    periodical that between 1997 and 2001 was published.

12            Q      Were you associated with The Forensic

13    Echo?

14            A      Yes, I was the publisher.

15            Q      You were the publisher of The Forensic

16    Echo.

17            A      Editor in chief.  But it was a paper.

18    But when we ceased publication, we basically

19    archived everything on ForensicPanel.com.  So that's

20    why -- I think that's why it -- that's why a lot of

21    these references -- I don't know whether it's

22    available anymore, but I think the reason that it's

23    listed there is that once it was out of publication,

24    we maintained it on the Web site for quite a while.

25            Q      I was going to ask, because we were
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                        22

1    unable to locate any of the articles on The Forensic
2    Echo.  Do you still have copies of them?
3            A    We have a lot of them.  I'll try to
4    get that one.
5            Q    Please.
6            A    I think part of the reason that
7    catches my attention is we worked on a prison
8    suicide, and it was very evocative of the issues
9    that had been raised in that article, and that's why
10   I seem to think that's a suicide-related article.
11   And I will -- I ought to -- for that reason, I ought
12   to be able to find it.  I'll give it a good look.
13           Q    Okay.
14           A    Same vein, "Suicides Versus Homicides:
15   A Tougher Call on Sharp Forced Death."  It's right
16   there in the title.  I'll look for it.  I'll see
17   what we can find.
18                "Suicide By Watch" (corrections
19   conditions) --
20           Q    Page, please.
21           A    I'm sorry.  Bottom of page 18.
22   "Suicide by Watch."
23           Q    And what was this about?
24           A    Corrections conditions.
25           Q    Oh, this was, again, the same issue

1    with regard to treatment of anxiety?

2         A    I don't know.  I don't know.  Probably

3    not, because one of the things I'm very proud of,

4    and guess this I can say as a person who -- we had a

5    very discerning readership, professional audience,

6    and we were an ahead-of-the-curve publication.  I'd

7    never get away with writing the same thing twice.  I

8    had to keep it fresh.  So if I wrote about something

9    in 2001, chances are it was very different from what

10   was written in 2000.  So I'll -- but I must say that

11   I don't remember that article, I'd have to go back

12   and look at it.  But the title is sort of hard to

13   miss.

14              I don't know whether this has to do

15   with suicide, but because it's come up in suicide

16   teaching, I want to make sure that I flag it for

17   you, is there's an article on page 19, People v.

18   Miller, case commentary on homosexual panic.

19         Q    Okay.

20         A    Now, that article may have related to

21   something -- some violence directed at others, but

22   because that specific topic is a risk factor in

23   certain populations for suicide, I want to make sure

24   I don't overlook it.  And yes, I'll have to go back

25   and check what that was about.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    24

```
1                     There's a couple of articles here
2      about psychological autopsy.  Again, I couldn't tell
3      you -- they are both on page 20 -- couldn't tell you
4      whether they encompassed suicide or not, but they
5      are there.
6            Q     If they do, please, if you wouldn't
7      mind reviewing them and providing them, I'd
8      appreciate it.
9            A     I'll look for them.
10                  You know what?  Can I have -- I'll
11     tell you what they are, and then perhaps you can
12     make sure that the request --
13           Q     I'll provide a request to Mr. Grosz.
14           A     State v. Vannier, V-A-N-N-I-E-R, which
15     is on page 20, and then there's some in here, death
16     investigation, State v. Stevens.  I just don't
17     remember those articles at all.  But because they
18     say what they say, then I need to take a closer
19     look.
20                  There's an articles here that denotes
21     physician-assisted suicide on page 23, 1997, "The
22     Supreme Court Makes a Doctor's Appointment."  I
23     think it -- I don't think it was dealing with
24     suicide from a clinical standpoint, as I recall,
25     because it was an op ed.  I think it had to do with
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                        25

1    a Supreme Court decision about physician-assisted

2    suicide and the role of a physician in all of this.

3    So I don't know that that necessarily related to

4    suicide, but I want to at least account for it in my

5    testimony here.  So I don't think that that fits.

6              I think that's it.

7         Q    Okay.  I'm going to add a couple to

8    the list that are not related to suicide but they

9    appear to be publications in The Forensic Echo.

10        A    Sure.

11        Q    I'd like to request a copy of "Hired

12   Gun:  Does Money or Bias Taint Your Expert."

13        A    Okay.

14        Q    And "The Dog Ate My Integrity."

15        A    Okay.

16        Q    Since I don't have a copy of the

17   testimonial history, to your knowledge, are you able

18   to tell me as you sit here today how many cases

19   you've participated in in civil litigation as a

20   forensic expert?

21        A    Cases I've participated in in civil

22   litigation?  Scores, many scores of cases.  I think

23   to say "hundreds" would be an exaggeration, but many

24   scores of cases over the course of 25 years.  My

25   participation is as an examiner and also as a peer

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    26

```
 1    reviewer.  In our practice we have several different
 2    specialties and disciplines in cases that I'm not
 3    involved in, but because I'm chairman, I still have
 4    quite a bit of proximity to.  So that covers a lot
 5    of ground.
 6              Q     How about this:  How many cases have
 7    you -- civil cases, to your knowledge, have you been
 8    designated as an expert on the civil side?
 9              A     I know you're not going to like this
10    answer, but many.  That's not something that I
11    typically keep track of.  We do keep track of
12    testimony, but we don't really keep track of a
13    rolling tally of how many we've been either
14    designated or consulted because, of course, there's
15    a -- it's a subset of consulting.
16              Q     Of those cases, how many have you
17    testified in in depositions such as the one we're
18    doing today?
19              A     All right.  Well, I'm going to give
20    you that so that you'll be able to see.  But I will
21    tell you that I testify very seldom.  And I probably
22    testify at this point one to four times a year,
23    deposition or trial.  Most of that testimony is in
24    criminal matters.  Occasionally there are civil
25    matters.  But certainly in recent years -- in my
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    27

```
 1   early career I testified in a number of -- in my
 2   first two, three years of practice, I testified in a
 3   number of Workers' Compensation cases, so those are
 4   in the civil side.  And there have been several
 5   cases in the personal injury realm, a couple of
 6   employment law cases, civil law may -- I don't know
 7   whether you consider securities within that realm,
 8   but that's --
 9          Q    Yes.
10          A    Okay.  But most of my testimony has
11   been criminal, and I would say that probably over
12   the course of the last 10 years, all together, it's
13   fair to say that I testify in deposition and trial
14   one to four times a year.
15          Q    And that includes civil and criminal?
16          A    Civil and criminal together.
17          Q    Of the cases that you recall working
18   on on the civil side, do you know how many involved
19   suicides?
20          A    I couldn't tell you.  But I will tell
21   you this:  It's a small subset, because the -- well,
22   let me go back and look, because we're talking about
23   the ones of testimony, and they may -- the testimony
24   cases may not be representative of the whole sample.
25   Suicide cases are a small subset of my overall
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    28

1    forensic portfolio.  Now, there are other aspects of

2    my professional life in which they are much more

3    dominant.  But certainly within the forensic realm,

4    it's a small component of the experience that I've

5    had.

6            Q      Could you estimate by percentage how

7    many cases that you have participated in in the

8    forensic capacity that involve suicides?

9            A      It's hard to say.  I'm sure that it's

10   more than 10.  Would it reach 20?  Possibly.  But

11   that's really the -- that's the -- that's what we're

12   talking about, that kind of number.

13           Q      Do you recall the names -- I didn't

14   mean to cut you off.

15                  Do you recall any of the names of

16   those cases and where they were venued?

17           A      I'd have to go back over them.

18           Q      Do you recall in those cases how

19   frequently you were testifying on behalf of

20   plaintiffs in those cases as opposed to on behalf of

21   defendants?

22           A      Well, on the civil side, my

23   testimony -- my consultation history is more

24   representative of consulting to defense.  How that

25   is reflected in testimony, I have to, again, go back

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                      29

1    and look at the percentages.  The -- I'd have to go

2    back.  I can tell you absolutely that from a

3    standpoint of consultation, I am definitely

4    consulted more, much more by defense.

5           Q     Is that the civil and criminal or just

6    civil?

7           A     In civil.  Criminal's another story.

8    And then historically, things have sort of evolved

9    on the criminal side.  But on civil I think that

10   percentage has been that way for a long time.

11              In terms of testimony, it's hard to

12   say, again, because I'm trying to remember the last

13   time I -- well, the last time -- I can tell you the

14   most recent testimony that I've given in the civil

15   cases in non-suicide has been for defense, past few

16   times.

17              Last time I have testified on the

18   civil side for a plaintiff was probably a suicide

19   case.  I can think of two that come to mind that I

20   testified in.  One was -- one was in New York,

21   Upstate New York, there was a police officer who had

22   been admitted to the hospital and was discharged and

23   killed himself.  I testified on behalf of plaintiff

24   in that.  It was several years ago:  I'd have to go

25   and look up the name of the case.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    30

```
 1                 The other case that I've testified on
 2     behalf of plaintiff in a suicide case, that was a
 3     number of years ago, but I remember it, and it had
 4     to do with suicide, was Schiccitano,
 5     S-C-H-I-C-C-I-T-A-N-O, and that was in Nassau County
 6     Court.  That was a murder-suicide.  But the focus of
 7     my testimony related to suicide because it had to do
 8     with treatment as it related to the decedent who
 9     killed himself and killed his paramour.  And that
10     was the area of my focus.
11           Q     Have you testified on behalf of
12     defendants in suicide cases?
13           A     I don't think so.  I've consulted but
14     I've not testified.  I don't think so.  I need to go
15     back and look.
16           Q     Let me ask this:  Of your forensic
17     practice, how much, in a percentage of time, do you
18     spend working on criminal matters as opposed to
19     civil matters?
20           A     That varies, but I can tell you right
21     now, it definitely varies over a three-, four-month
22     period.  It really depends.  And the nature of the
23     cases that the practice is involved in are often
24     very involved, and so unlike other kinds of
25     practices, or firms, we have a lower volume and
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    31

1    higher complexity cases.  And that's why the

2    percentages vary, because if we're working on, for

3    example, at any one time as a practice, eight, nine,

4    ten cases, it doesn't take much to change that

5    composition from 40 to 60 to 70 percent.

6                  I think at this -- right now, my best

7    estimate is that 30 percent of our work right now is

8    civil, 70 criminal.  And I think I can safely say

9    that we haven't had a period where criminal was not

10   a -- at least 25 percent of what we were doing for

11   really quite a number of years.  It's always been

12   there and very much a part of the practice.  But

13   there have been periods in which most of what we

14   were doing was civil.

15        Q     When you described your civil, you

16   indicated that, I guess -- I just want to make sure

17   we're on the same page as to what that discipline

18   includes.  You mentioned that there are personal

19   injury cases?

20        A     Sure.

21        Q     You mentioned that there are Workers'

22   Compensation?

23        A     Yes, there have been.

24        Q     Employment?

25        A     Yes.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              32

```
 1              Q      Securities?
 2              A      Yes.   If one would define it that way.
 3    I'm not sure whether attorneys see it the same way.
 4    I just -- the way forensic psychiatrists look at the
 5    universe is they say -- they break it down to
 6    criminal, family, and everything else.   And
 7    everything else sort of gets swept into civil.   That
 8    may not necessarily be the way you look at it, and
 9    that's why I'm a little bit uncertain.   But that's
10    what doesn't fit into the family and doesn't fit
11    into the criminal.   And I do virtually no family
12    law-related work.
13              Q      So do the four categories I just
14    mentioned sum up what you're doing on the civil
15    side?
16              A      Well, I haven't done Workers' Comp in
17    many, many years.
18              Q      So currently it's personal injury,
19    employment, and securities?
20              A      I think that's fair to say.   I would
21    even say personal injury and securities.
22    Employment -- employment we did much more of until
23    several years ago and then we really sort of
24    deemphasized that within the practice, we moved away
25    from it, just as we moved away from family law.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          33

```
 1          Q      Between personal injury and
 2    securities, how does it break down in terms of
 3    percentages in terms of the amount of time you spend
 4    on forensic matters?
 5          A      It depends on -- it depends on -- you
 6    know, it's kind of like a Bogart movie, it depends
 7    on the day moon knocks on the glass with its story.
 8    You don't know what the next story is.  It really
 9    depends.
10          Q      Let's say for the last year.
11          A      Last year has been more personal
12    injury than securities.  The year before was
13    definitely more securities.
14          Q      Have you had prior cases with
15    Mr. Grosz's firm?
16          A      No.
17          Q      Have you worked with Mr. Grosz in the
18    past?
19          A      Didn't know him, never met him.  Or
20    his firm.
21          Q      Have you worked with -- and forgive
22    me, I don't know how the firm is organized -- the
23    Morelli firm here in New York?
24          A      I don't -- I don't know them.  I may
25    have encountered them many years ago during the
```

1    Workers' Compensation universe, because some of the

2    Workers' Compensation firms did personal injury

3    work, and that was just -- it was literally a

4    20-year-ago life that really just sort of attenuated

5    and...

6         Q     Have you had prior cases with Weitz &

7    Luxenberg?

8         A     The name is familiar.

9         Q     Do you recall working with them?

10        A     I don't know what kind of firm they

11   are, but the name of the firm is familiar.  They may

12   just be familiar because they are famous.  But I

13   certainly don't recall a specific case with them.

14   And if I had any notable case -- in my career, if I

15   have a notable case, I'll remember the attorneys for

16   years and what firm they are.  So the name is

17   familiar, I just can't tell you whether it's because

18   I worked with them, opposite them, or whether they

19   were in the news in a case that rang a bell.  Just

20   like Morelli.  It's a familiar name.

21        Q     Okay.  I understand that you are

22   currently the chairman of The Forensic Panel?

23        A     Yes, sir.

24        Q     And what's the current working

25   address?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    35

1          A      224 West 30th Street, No. 806.

2          Q      And that's here in New York City?

3          A      Yes.

4          Q      Okay.  And you have been the chairman

5    of The Forensic Panel since 1998?

6          A      Correct.

7          Q      What is The Forensic Panel?

8          A      Forensic Panel is a multi-specialty

9    practice, primarily consulting on medical/legal

10   matters in several disciplines:  Behavioral

11   sciences, forensic pathology, and certain medical

12   subspecialties, as well as toxicology and radiology.

13         Q      And how many employees are there at

14   the Forensic Panel?

15         A      Four full-time employees.  The

16   consultants are independent contractors who

17   participate and are compensated for their work

18   within The Forensic Panel in accordance with their

19   time, as opposed to ongoing salaried employees.

20         Q      Of the four full-time employees, do

21   you include yourself among them, or are there four

22   in addition to yourself?

23         A      I include myself.

24         Q      Okay.  And who are the other three

25   full-time employees?

```
 1          A     We have a senior case manager, we have
 2    a project manager who doubles as a junior case
 3    manager, and we have a director of research.
 4          Q     What do the case managers do?
 5          A     Case managers function as paralegals,
 6    for all intents and purposes.  They are responsible
 7    for managing document traffic, for scheduling, for
 8    facilitating communication and expediting not only
 9    in terms of the attorneys involved in the case but
10    also among the experts.  They are responsible for
11    coordinating peer review when it happens.
12    Responsible for recruiting peer reviewers, making
13    sure that their needs are responded to in a timely
14    manner.  They are responsible for fact-checking when
15    it's needed.  So they are responsible for having
16    enough proximity to the case such that if I, for
17    example, might pose a question with the case manager
18    and I'll say, I'm not really sure about this, can
19    you go look it up, the case manager is responsible
20    for being able to get me that response in a timely
21    manner so I don't have to go deep diving every time
22    I have a question.  So that's among the
23    responsibilities.
24                The case manager recruits specific
25    consultants.  If we say, You know, this is a case
```

1    that we think is right for Jeff, then the case

2    manager will call Jeff and will say, Hey, this is

3    what the case is about, does it fit your schedule,

4    and that kind of thing.  So that's an overview of

5    their responsibilities.

6                    And also they assist with research to

7    make it much more -- much more expedited.  If

8    there's a topic -- for example, I have an

9    interesting topic right now in another matter.  I

10   interviewed this person yesterday.  And it's arcane,

11   scientifically.  But I want to know everything there

12   is to know about it.  And that would include -- that

13   would inspire considerable effort on my part if I

14   did that alone, which adds to a lot of cost to the

15   case.  If I involve a case manager that has

16   sufficient fluency in library work and research^,

17   that I can get that corpus of material brought to me

18   and culled to relevance so that I can then consume

19   it in a much more efficient way.

20        Q    Do I understand correctly that of the

21   employees of The Forensic Panel, you're the only

22   testifying expert?

23        A    Full-time employees, yes.  But, again,

24   other testifying experts are all independent

25   contractors in The Forensic Panel.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    38

```
 1         Q     And about how many independent
 2   contractors are there?
 3         A     We have a relationship with somewhere
 4   between 30 to 50 right now.
 5         Q     Okay.  Was the report that you
 6   prepared in this case peer reviewed?
 7         A     No.
 8         Q     Is there a reason?
 9         A     Yeah.  The attorney in our initial
10   discussions made it very clear that resources were
11   very limited in the case, and so the evaluation
12   proceeded in unusual, but it worked, step-wise
13   fashion.  In other words, the attorney approached
14   us, presented a case, and asked for our thoughts.  I
15   thought, I'm not sure.  Posed the question of would
16   you be able to address the question of, you know,
17   some of these questions in a preliminary way so that
18   we might be able to have a better sense of the
19   psychiatric viability, and what would you need to
20   look at in order to be able to further inform?
21               So it was Justin that I was in touch
22   with.  And so I conveyed to him what would be
23   informative to me, and we resolved to revisit that
24   once I had an opportunity to look at things in a
25   very preliminary way, which we did.  And it was at
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    39

1    that time where, not immediately, but when I

2    presented my impressions to him, where we resolved

3    to continue to work together but with an uncertain

4    plan.  And then when Mr. Grosz had, I think, more of

5    a sense of the relevance of where the issues were

6    that I was focusing on, then we spoke about the

7    materials that I would like to receive and what I

8    would focus on.  But there was a real premium to

9    doing anything that we could to exploring this in a

10   way that was as cost-effective as possible without

11   reaching a point where I was unable to achieve

12   medical certainty.

13            At some point you basically -- you

14   just don't have enough material to venture an

15   opinion.  And that's the risk in any case.  And the

16   more -- well, it depends on the case.  There are

17   certain cases in which it's just not possible unless

18   one has a variety of different source materials, and

19   then reviewing those source materials would make it

20   impossible for a budget to accommodate.

21        Q    Do you normally have your opinions

22   peer reviewed?

23        A    Yeah.  We like to have them peer

24   reviewed in every case.  It doesn't happen.

25        Q    Is there a recommendation in every

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    40

1    case to have your opinions peer reviewed?

2         A    Every case we recommend.  Sometimes --

3    there are several reasons why we don't have peer

4    review, and sometimes it is the issue of someone

5    basically saying, Look, anything we can do to

6    minimize the cost of this evaluation, you know,

7    we're going to do everything we can.  And sometimes

8    that happens from individuals or individual

9    attorneys, and sometimes it also happens from

10   agencies.  Some agencies have a case in which they

11   have not necessarily budgeted the way they've

12   budgeted for other cases.  And while they appreciate

13   peer review, they want to cut every corner they can,

14   so...

15        Q    I understand the -- the way I

16   understand it, the report in this case was not peer

17   reviewed for budgetary reasons?

18        A    Absolutely.

19             Can I clarify something quickly?

20        Q    Actually, I wanted to turn to another

21   topic?

22             MR. GROSZ:  Well, he should be

23        able to clarify his response.

24        A    It's brief.

25        Q    Okay.  Go ahead.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    41

```
 1          A     Again, it's not to be -- not to be
 2   cute.
 3               Your question was the report was not
 4   peer reviewed, but peer review involves more than
 5   the report.  So it's more than just the expense
 6   that's incurred by a report, but the evaluation
 7   itself becomes peer reviewed before it ever gets to
 8   a report, and that's where the expense comes from,
 9   the steps along the way.  And in this case it wasn't
10   done for budgetary reasons.
11          Q     Either before the report was prepared
12   or after the report was prepared?
13          A     That's correct.  We'll typically have
14   a peer review in the course of the evaluation, and
15   then we'll have a peer review before it gets to a --
16   or we'll have a peer review after it gets to the
17   stage of a report.  In this case we probably would
18   have had three stages because of how we proceeded
19   with the case.  There was sort of an early stage,
20   then there was a later stage, and then there was a
21   report prepared.  And the later stage was based on
22   quite a bit more information than the first stage.
23          Q     When were you first contacted about
24   working on this case?
25          A     In 2016, late 2016.
```

1                   MR. GROSZ:  Not to mislead

2              anyone, it was actually '14, the

3              initial.

4        Q     Were you provided materials at the

5    outset to review?

6        A     No.  No.  These were early discussions

7    and there was -- again, back to that earlier

8    consideration of whether it could even be done --

9    whether it would even be feasible from a cost

10   standpoint.

11             After quite a delay of time, then

12   Mr. Grosz went forward and provided some materials

13   and asked to give him some of that preliminary

14   feedback.

15       Q     Are the materials that you were

16   provided the ones that are listed on the report?

17       A     Yes.

18       Q     The list is 1 through 28?

19       A     All together, sure.

20       Q     Have you been provided with any

21   additional materials other than what's listed on 1

22   through 28?

23       A     Yes.

24       Q     What materials have you been provided

25   since you prepared a report on May 30, 2017?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    43

1        A      It's not that.  We were provided with

2    a lot of -- a lot more materials than that, and what

3    I did was I focused on materials that I thought

4    would be able to inform me about the salient

5    questions that I was asked to address, again, for

6    cost containment reasons.  So we were provided with

7    a number of materials, and we have, but I did not

8    review.  And those are all included in the

9    ThumbDrive that I've given you.  I haven't seen

10   them.

11       Q      Okay.

12       A      We have them.  We were given them and

13   we were given -- basically, we were given the

14   freedom to say, Whatever you think you need to

15   review, review.  But please be considerate to the

16   overall resources.  And that's kind of how it was

17   arranged.

18       Q      So the materials you reviewed are the

19   ones that are listed on the 1 through 28?

20       A      That's correct.

21       Q      And the materials that you did not

22   review are materials that you did not feel were

23   necessary for your opinion?

24       A      No.  They are materials that I made a

25   choice that were not likely to be informative.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                44

```
 1    There may be things within those materials that are
 2    informative and may ultimately even impact my
 3    opinion.  But I had to make a judgment call, and I
 4    did, that they were more directly related.
 5                  Just, for example, there are materials
 6    that related to remembrances of Mr. Manganelli, and
 7    for the issues that were presented to my attention,
 8    I made the judgment call that those were less likely
 9    to be informative to the questions that are
10    reflected in the report, and so I didn't look at
11    them.
12                  There's the deposition of Mr. Opie,
13    which I received later.  Now he was there, he's was
14    obviously an informant.  But I also had some
15    information that related to Mr. Opie on March 28,
16    2013 that was available for my review, and I made a
17    judgment call that I was sufficiently informed.
18    Certainly within that deposition there may be points
19    that he raised that may be pertinent to a question
20    and they would be additionally informative.  But
21    that was the kind of triage that I was going through
22    of really targeting and focusing on sources of
23    information where I felt there was an ambiguity, or
24    there was more ambiguity of the areas that I was
25    trying to explore and resolve.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    45

```
1          Q     Are the materials listed in 1 through
2   28 the materials you relied upon in preparing your
3   report and formulating your opinions?
4          A     Correct.  Yes.
5          Q     Are they the type of materials that
6   are normally relied upon by experts in forensic
7   psychology in order to reach an opinion?
8          A     Yes.
9          Q     What were the terms of your engagement
10  with Mr. Grosz's firm?
11         A     I would be paid hourly for my time,
12  and I would be paid at a half-day or full-day rate
13  for testimony such as this.
14         Q     Okay.  And what is your rate, your
15  hourly rate?
16         A     650 an hour for everything but court
17  time, and court time is 3250 half day, 6500 for full
18  day.
19         Q     And so far to date, how many hours
20  have you put into this matter?
21         A     Somewhere in excess of 50 hours.
22         Q     Have you issued an invoice yet?
23         A     We have.
24         Q     Would you please provide a copy of
25  that invoice?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    46

```
 1          A     Sure.
 2          Q     Or any invoices, I should say.
 3                MR. GROSZ:  I think it's on the
 4          ThumbDrive.
 5          Q     Do you know the total amount that you
 6   have invoiced so far?
 7          A     No, I don't.  The reason I said
 8   somewhere around 50 is because I think
 9   mathematically, I think it's somewhere around the
10   area of 30K, and perhaps slightly more, and that
11   would get us around that area of 50 hours.
12          Q     Okay.  So 50 hours times 650 is about
13   32,500?
14          A     Somewhere around there.
15          Q     All right.  And did you spend time
16   preparing for today's deposition?
17          A     I did.
18          Q     And how much time did you spend
19   preparing for today's deposition?
20          A     I spent between two and three hours
21   preparing.  And I sat down with Mr. Grosz for a
22   couple of hours earlier.
23          Q     In addition to the two, three hours?
24          A     That's correct.  I went over my report
25   and my notes, that I provided also on ThumbDrive,
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                47

```
 1    and then I sat down with Mr. Grosz.
 2          Q    Did you do anything else to prepare
 3    for today's deposition?
 4          A    No.
 5          Q    I just want to make sure I understand.
 6    The materials that are listed 1 through 28 are the
 7    sources of information that you're relying on that
 8    you've decided that are pertinent to what you're
 9    doing in the case.  The other materials are ones
10    that you elected not to review for budgetary
11    reasons?
12          A    The sources here are sources I
13    reviewed.  Now, the sources may not have been
14    pertinent ultimately to my report, but I reviewed
15    them with an eye toward forming the report.  So the
16    report is based on what I reviewed and ultimately
17    chose to include.
18               The sources that I chose not to
19    review, I did not choose -- actually, for two
20    reasons.  One, because I had to make decisions about
21    what I thought would be most informative at the
22    time, and two, I had to do it by May 30.  So I had
23    to make a decision, because I did receive -- I
24    should tell you, I received a lot, and perhaps even
25    most of the materials that I reviewed fairly late in
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    48

1    the game.  But I made a decision of saying, okay,

2    within this period of time, in as efficient a way,

3    what can I identify that I think is going to be most

4    informative, and those are -- and I also had to make

5    a decision about whom I could speak to who could be

6    most informative as a collateral source beyond

7    materials.  And that's why I chose to speak to his

8    mom.  But what I'm saying is that was a selective

9    process.  There were a number of people who I could

10   have spoken to, and I spoke to her because I thought

11   that there were probably the greatest number of

12   questions that I could pose to her that I would find

13   informative as opposed to perhaps a smaller number

14   of questions that I might direct to someone else.

15        Q     Okay.  How much -- how long prior to

16   May 30 was it that you received the materials that

17   you reviewed?

18        A     Less than a month.  It would have been

19   a few weeks.  It was in May.

20        Q     Okay.  Have you received any

21   additional documents since May 30, 2017?

22        A     We have.

23        Q     What materials are those?

24        A     Not many, but I think we got the

25   second part of the transcribed deposition of his

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    49

```
1    mom, the Sacchetti deposition, because it was two

2    parts.  The second part we definitely received

3    later.  I think there's one other deposition that I

4    know we received more recently, which was the Moore

5    deposition.

6                    MR. GROSZ:  The records from

7            Moore.

8                    MR. WATERS:  Oh, okay.

9        A    I'm sorry.  The vocational counselor,

10   his information.  Not his deposition.  His records.

11               There may have been more, but it was a

12   much smaller quantity of records.

13       Q    When you list the depositions on the

14   information that you reviewed, does that include

15   deposition exhibits?

16       A    Yes.

17       Q    Okay.  You indicated that you

18   interviewed Ms. Sacchetti?

19       A    Yes.

20       Q    Did you interview anyone other than

21   Ms. Sacchetti?

22       A    I did not.

23       Q    Did you have any discussions with any

24   of Gianni's medical practitioners?

25       A    Never.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     50

```
 1          Q     Just to be clear, you have never met
 2   Gianni Manganelli?
 3          A     Correct, I have not -- I never met
 4   him.
 5          Q     You never interviewed Gianni
 6   Manganelli?
 7          A     No.
 8          Q     You never treated Gianni Manganelli?
 9          A     I did not.
10          Q     And you were not a witness to any of
11   the events in this case?
12          A     That's correct.
13          Q     Tell me about your interview with
14   Ms. Sacchetti.  When did it happen?
15          A     It happened a day or two before I
16   submitted the report.  Actually, it's noted here as
17   May 29, so it happened the day before the report,
18   about a day.
19          Q     How long did the interview take?
20          A     About three hours.  It was a very long
21   interview.
22          Q     And how did you conduct the interview?
23   Was it in person?
24          A     By phone.
25          Q     It was by phone?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    51

```
 1            A      (Witness nods his head.)
 2            Q      Was it by video relay?
 3            A      It was over my cell phone.  That was
 4     it.
 5                   Oh --
 6            Q      Was there an interpreter?
 7            A      Yes.  When the interview started, we
 8     did some video thing so that we could make eye
 9     contact, she could see me, I could see her.  And
10     then we opted to just a straight cell phone
11     discussion with an interpreter.
12            Q      Okay.  Did you take notes of that
13     interview?
14            A      I did.
15            Q      Are those notes on the flash drive
16     that you provided?
17            A      Yes, they are.
18            Q      What did you learn during the
19     interview?
20            A      A lot.  It's probably best to
21     reference the notes because there's stuff that's not
22     in the report.  I did talk to her about the last
23     night of his life, I talked about her recollections
24     in a reconstructive manner, walking back from her
25     hearing from him the evening before he killed
```

1    himself.  I inquired about her recollections of --

2    or her awareness of the problems that he was having

3    at Gallaudet, what had been communicated to her

4    about what I had read in the records of problems in

5    specific classes, like Christine Healy's class, how

6    much she was aware of that.

7                I talked to her about her -- the

8    nature of her communication with Gallaudet when he

9    first started there, whom she communicated with, the

10   nature of her relationship with the head of BIT, who

11   sort of conflicted herself out of ongoing

12   involvement in his case, how they knew each other,

13   history of that relationship, how that -- what then

14   happened after this Lauri Rush conflicted herself

15   out.  Who was aware that she knew of Gianni's mental

16   health problems.  Gianni's history with mental

17   health care, his attitude about mental health

18   treatment.  And there are a number of other topics,

19   but they are represented in the notes, and they

20   are -- and the notes are digital, so they are easy

21   to understand.

22        Q    Did you type the notes or were they

23   transcribed for you?

24        A    I just -- while I was on the phone I

25   took notes (indicating typing motion).

1          Q     Did you ever interview Mr. Manganelli?

2          A     I did not.

3          Q     Okay.  Looking at your report of May

4    30 -- actually, I meant to ask before we get into

5    that.  You indicated that you also received the

6    second half of Mr. Sacchetti's deposition.  Have you

7    reviewed that?

8          A     I have not.

9          Q     You have not.  Okay.  Did you review

10   the records from the California Department of

11   Rehabilitation?

12         A     No, I have not.

13         Q     All right.  Did you attempt at any

14   point to create a chronology of Gianni's educational

15   counseling and medical history as part of your

16   preparation of your report?

17         A     Yes and no.  Yes insofar as I wanted

18   to get a sense of the nature and timing of his

19   mental health treatment at Gallaudet.  And no in the

20   sense that the focus of the questions brought for my

21   review related to March 2013 at a point where he was

22   not in treatment and had not been in treatment.  So

23   it was pertinent to my understanding of the matter,

24   but it was incidental to what I was focusing on.

25         Q     Okay.  How -- in looking at the first

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    54

```
 1    page of your report, there are three questions that

 2    your report addresses.  Were these questions that

 3    you formulated or they were questions that you were

 4    asked to answer?

 5         A     Well, primarily questions that I

 6    formulated based on what I thought I had enough

 7    information to address.  If it was a question that I

 8    didn't have enough information to address, there

 9    would really be no point writing about it.  So the

10    nature of the dialogue we had is, you know, it

11    was -- I don't know that it was necessarily as

12    open-ended as, you know, what do you think, but on

13    some level it was.  It was, What do you make of

14    this?  What stands out to you?  What strikes you as

15    notable?  And -- but beyond that, what strikes you

16    as notable in terms of accounting for a variety of

17    different explanations?  Because as I think we

18    talked about a little bit earlier in the deposition,

19    we used the word confound.  You can take a look at

20    something and say, well, I'm looking at this and

21    that's what this means to me, while there are a

22    variety of different explanations, and that's why

23    you introduce collateral sources, because then you

24    account.

25              And so what I wanted to identify were
```

1    the areas in which I felt I had sufficient

2    information and say, okay, well, I've accounted for

3    the range of possibilities, and given all of the

4    information I have, this is something that I can

5    speak to.  And so it was a by-product of the

6    discussion that we had about just the areas -- and

7    not only that, but also series of qualification.

8              I'm a forensic psychiatrist.  Death is

9    a very complicated area in litigation.  It touches

10   in different matters.  The relationship of the death

11   of a person with psychiatric illness to police

12   activity is a nuanced one.  There are areas in that

13   that I don't have expertise and I can't speak to.

14   There are areas that I do have sufficient expertise.

15   So it was also just kind of defining what the

16   boundaries were and to say, well, I'm not qualified

17   to offer an opinion in that.  That's for somebody

18   else or for nobody at all.  But to say, oh, yes,

19   this is something that is within my area of

20   expertise -- and that's how that formulates.

21              So I think from a topical standpoint,

22   it was something that I communicated as part of a

23   dialogue.  And then in terms of the actual wording,

24   that was something that I arrived at and presented

25   on my own.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    56

```
 1          Q      So the wording of the three questions
 2    is yours?
 3          A      Yes.
 4          Q      Okay.  And the first question that you
 5    intended to address was, Did the arrest of Gianni
 6    Manganelli have any causal relationship to his
 7    death?  If so, how?
 8                 Correct?
 9          A      Yes.
10          Q      And the second question was, Did the
11    information available to Gallaudet necessitate
12    mental health intervention or other steps as a
13    result of the arrest and its aftermath?  What
14    resources were available to Gallaudet University?
15    What intervention would have made a difference in
16    the outcome?
17                 Correct?
18          A      Yes.
19          Q      And the third question was, What could
20    Terrylene have done -- forgive me -- what could
21    Terrylene Sacchetti have done to prevent Gianni
22    Manganelli's death, given the sequence of events,
23    what she knew, and when she knew it?
24                 Correct?
25          A      Correct.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              57

```
 1            Q     Okay.  Looking at the first topic, Did
 2     the arrest of Gianni Manganelli have causal
 3     relationship to his suicide?  If so, how?
 4                  Would you agree with me that the first
 5     paragraph here relates the encounters he was having
 6     with a linguistics teacher, Christine Healy, in or
 7     around March 2014?
 8            A     Yes.
 9            Q     Okay.  And these are factual
10     recitation of the materials you reviewed?
11            A     Yes.  Although I have a correction.  I
12     should say 2013.  This says March 2014.  It really
13     should be 2013.  Or should it be -- I'm sorry.  I'm
14     sorry.  2014.  Scratch that.  I've been saying 2013.
15     2014.
16            Q     Okay.  And you continue to relate that
17     event in the second paragraph of that section,
18     correct?
19            A     Correct.
20            Q     And then you relate on March 10 that
21     Mr. Manganelli reached out to Jessica Duhon, who is
22     the -- who was his academic advisor?
23            A     Academic advisor, that's correct.
24            Q     And then you continue to relate a
25     summary of the facts that you learned from the
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    58

```
 1   information you reviewed in the following paragraph,
 2   correct?
 3           A       That's correct.
 4           Q       And that continues on the paragraph
 5   beginning, On March 11, as well?
 6           A       Yes, sir.
 7           Q       Okay.  And then again in the
 8   paragraph, In an email to Mary Thumann and Ms. Duhon
 9   on March 12, again, relating the same incident?
10           A       Yes.
11           Q       Then you go on on page 4 -- would you
12   agree with me that until that point, until the end
13   of the paragraph in an email to Mary Thumann, there
14   is -- it is simply a factual recitation; that
15   there's no indication of any psychiatric opinion
16   that is included in -- up to that point?
17           A       What it is, it is certainly a
18   selective detailing of information that I've
19   condensed to provide a basis for an opinion that I
20   identify to being psychiatrically relevant.
21           Q       My question was very specific.  The
22   first section of this report from -- under heading
23   1, page 2, until the final -- until the end of that
24   paragraph, In an email to Mary Thumann, at the
25   bottom of page 3, is a recitation of facts that
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              59

```
 1    you've learned from the materials you've reviewed;

 2    it does not include any psychiatric opinion,

 3    correct?

 4           A      That's correct.

 5           Q      And then you go on to say that,

 6    Whether the entire Gallaudet staff experienced BIT

 7    as punitive or whether this was the appraisal of

 8    Ms. Healy, she conveyed these impressions to Ms.

 9    Thumann and Ms. Duhon, and both superiors did

10    nothing to reframe that intervention plan and the

11    perspective it conveyed.

12                  Correct?

13           A      Yes.

14           Q      And that is also your assessment of

15    the factual summary, not a psychiatric opinion,

16    correct?

17           A      No, that's actually an opinion.

18           Q      You believe that's a psychiatric

19    opinion?

20           A      Sure.

21           Q      That you're qualified to give as a

22    medical expert in psychiatry?

23           A      Sure.

24           Q      That somebody didn't do something?

25           A      No.  It's my opinion that Ms. Healy
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                        60

```
1    experienced the BIT as punitive.

2            Q     Is that what you said here?  You said,

3    Whether the entire Gallaudet staff experienced the

4    BIT as punitive or whether this was the appraisal of

5    Ms. Healy, she conveyed these impressions to

6    Ms. Thumann and Ms. Duhon.

7            A     That's correct.

8            Q     Are you saying that Ms. Healy

9    interpreted the BIT as punitive?

10           A     Yes.

11           Q     Have you spoken with Ms. Healy?

12           A     I relied on the record.

13           Q     Is there anything in the records that

14   Ms. Healy considered the BIT as punitive?

15           A     Correct, there is.

16           Q     And what is that?

17           A     In the previous paragraph she said,

18   She had planned to contact BIT, but will give him

19   another chance.  And the -- if she was experiencing

20   the BIT as something therapeutic, then she would

21   have recommended it as a therapeutic measure as

22   opposed to something that, if he can demonstrate

23   that he's going to behave himself, she won't

24   recommend him for a therapeutic intervention.

25           Q     Are you aware -- go ahead.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                61

```
1          A      Something therapeutic is supposed to
2     be constructive.
3          Q      Are you aware that the director of the
4     mental health center is a member of BIT?
5          A      Not specifically, but I would assume
6     so.   I would certainly hope that the director of
7     mental health would be the head of BIT.  It wouldn't
8     be -- it wouldn't be a radiologist.
9          Q      You indicated here on page 4 in the
10    next paragraph, In my professional opinion,
11    Mr. Manganelli had already substantively failed a
12    fall 2013 class with Dr. Sue Mather and was
13    desperate to avoid jeopardizing his standing at
14    Gallaudet.
15                And that is your opinion?
16         A      That's my opinion.
17         Q      Okay.  And what is your basis for the
18    assessment that Gianni had already substantively
19    failed a fall 2013 class?
20         A      Because he basically had to scramble
21    to resolve that as a withdrawal with a teacher who
22    made it quite clear that he was failing the
23    expectations of that course and he was not
24    fulfilling assignments and he was not fulfilling
25    assignments even when he was given the opportunity
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    62

1    to do so, and that he was -- had clearly fallen

2    short.

3              Q     And this was the fall 2013 class?

4              A     I'm sorry.  The fall 2000 -- fall --

5    that's right.  Fall 2013 class.  That's correct.

6              Q     Okay.

7                    MR. WATERS:  What was our last

8              exhibit?  I think it was either the

9              report or CV.

10                   MR. GROSZ:  The CV was 86.

11                   MR. WATERS:  And the report's

12             85?

13                   MR. GROSZ:  Correct.

14                   MR. WATERS:  Okay.  I'm going to

15             mark this as 87.

16                   (Fall 2013 and Spring 2014

17             Grades report, Bates No. Gianni 0775,

18             was marked as Plaintiff's Exhibit No. 87

19             for identification, as of this date.)

20    BY MR. WATERS:

21             Q     This is Bates labeled Gianni 0775.

22    This is Gianni's grade reports from fall 2013 and

23    spring 2014.

24                   MR. GROSZ:  What is the Bates

25             number?

1             MR. WATERS:  The Bates is Gianni

2         0775.

3         Q     Have you seen that before, Doctor?

4         A     I don't think so.

5         Q     And you would agree with me that it

6    indicates for fall 2003 [verbatim], Gianni had a 4.0

7    average in the three classes that he completed and

8    that he withdrew from Sign Language & Sign Systems,

9    correct?

10        A     It's listed as a withdrawal.  It's

11   consistent with my last answer.

12        Q     Well, he didn't fail that class,

13   correct?

14        A     He spent all that time in that class

15   and he had nothing to show for it.

16        Q     It did not indicate that -- he did not

17   indicate that he received an F in that class?

18        A     That's correct.

19        Q     That's correct.

20              And you would agree with me that the

21   spring 2014, at least as of midterms, Gianni's GPA,

22   he is listed as having a C in the same class by

23   midterms, in LIN 101?

24        A     Yes, I agree.

25        Q     Okay.  And that he had a C plus in

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          64

1    Math 206?

2         A     Correct.

3         Q     A B minus in Math 213 [verbatim]?

4         A     Yes.

5         Q     And an A in Spanish 112?

6         A     Correct.

7         Q     And then roughly, forgive my math, his

8    GPA would have been about a 2.75, based on those?

9         A     I'll defer to your math.

10        Q     All right.  You indicate that Gianni

11   was desperate to avoid further jeopardizing his

12   standing at Gallaudet.

13              What evidence do you have that Gianni

14   was desperate?

15        A     Referencing page 3, when he wrote to

16   his academic adviser, he said -- he said "My VR

17   support is on the line, and I don't want it

18   threatened by an egotistical professor who is out to

19   make my life hell.  She has singled me out in the

20   classroom."

21              And the email trail from Christina

22   Healy reflects to me that she was frustrated with

23   him, exasperated with him, found him unsuitable for

24   her classroom, to the point that she was -- that she

25   was seeking out support from the -- from a swathe of

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          65

1    the upper chain of command at Gallaudet to get

2    Public Safety involved to have him pulled out of the

3    classroom.  And that his unsuitability for that

4    classroom, and his behavior, was evocative, but not

5    replicative, evocative of some of the problems that

6    he had in Dr. Mather's class in the fall.  And he

7    was aware of those problems.  He was aware of the

8    poor fit of his behavior, his classroom

9    presentation, conceded it, at least by her account

10   in an email correspondence also in March.  But that

11   she had resolved to have him removed from the

12   classroom the next time she felt that he did not

13   comport himself in the way that she would prefer.

14        Q    How is it that he comported himself as

15   inappropriate in the class?

16        A    He would ask questions that were not

17   relevant to the topic.  He would be argumentative

18   with her.  At least that's what she listed.  At one

19   point he debated or disputed whether an assignment

20   was appropriate because of its implications for ADA.

21   At one point she made reference to his putting his

22   foot up on the desk.  So those were examples that

23   she provided.

24        Q    We established that Gianni had a

25   withdrawal in Linguistics 101 in the fall 2013

1    semester, correct?

2            A     Yes, sir.

3            Q     And that by midterms he had a C in the

4    same class with Professor Healy around March of

5    2014, correct?

6            A     Yes.

7            Q     And is there anything in this letter

8    that indicates to you that the email that Gianni

9    sent that -- that -- Gianni also indicated in this

10   letter that he believed he could still pass the

11   class, correct?

12           A     Yes.  He was not hopeless at that

13   point.

14           Q     Okay.  He was not hopeless at that

15   point?

16           A     He was not hopeless.  He was -- he

17   was, as I noted on the next page, the word that I

18   used was desperate, and by his account, he said, I

19   can't afford to drop or fail this class.

20           Q     He never used the word "desperate,"

21   did he?

22           A     No.  But I think that his -- I think

23   that his letter conveys a tone of -- as well as the

24   sequence of events -- conveys a tone of desperation.

25           Q     That's your interpretation of his

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                67

1    March 20 email?

2           A    That's my -- that's right.

3           Q    Did he give any other writings or

4    communications, Gianni, I mean, not Ms. Healy, but

5    Gianni's communication, did you see any other

6    communications from Gianni with respect to this

7    class that support your opinion that he was

8    desperate to avoid further jeopardizing his standing

9    at Gallaudet?

10          A    He followed up immediately in his

11   communication.  He wasn't letting things lag.  There

12   were times that his responses were within minutes,

13   so he demonstrated an urgency.  He attempted to set

14   up a meeting with Mr. Moore as quickly as possible

15   when Mr. Moore was referred to him.  And not

16   withstanding that he was uncomfortable with

17   circumstances such as they were, he conceded to

18   proceed with an exercise that he had great

19   reservations for proceeding with because he

20   ultimately was left with no choice.  He was forced

21   to work it out with his teacher because there was no

22   other avenue for working it out, and working it out

23   meant proceeding with an assignment that he didn't

24   want to proceed with.

25          Q    Gianni was a 23-year-old adult

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    68

```
 1    university student, correct?
 2             A      Correct.
 3             Q      And would you expect a university
 4    student to have the maturity to work out problems
 5    that they are having with professors in order to
 6    succeed in their classes?
 7             A      I don't think psychosis has anything
 8    to do with maturity.  I think psychosis has
 9    something to do with one's mental organization.
10    It's a very important point here.
11             Q      Doctor, you didn't answer my question.
12             A      I am answering your question.  He was
13    cited for inappropriate behavior.  It had nothing to
14    do with maturity.  It had to do with the
15    deterioration of his psychiatric illness.  And a
16    person who is deteriorating -- maturity is something
17    that one establishes, you know, at a healthy
18    baseline.  Sure, a healthy 23-year-old, one would
19    expect to have maturity, although in certain
20    instances when there's a conflict with a teacher,
21    you can't.
22                    But at that point what was being
23    reflected was inconsistent with the performance that
24    would have given him a C at his midterms.  If he was
25    behaving this way at the beginning of the class, he
```

```
 1   wouldn't have had a C at midterms.  The information
 2   that was provided by Inez González later --
 3           Q     We're going to get to that.
 4           A     I'm not going on a tangent.  I'm
 5   consistent with the same thing -- was that the
 6   deterioration was noted more recently.  This wasn't
 7   something that people were attributing to the very
 8   beginning of the term.  So it was a fairly recent
 9   deterioration, and that she had cited, Christina
10   Healy wasn't saying, Ever since this guy walked into
11   my classroom he's been behaving this way, but she
12   talked about a current state of affairs that may
13   have been going on for some period, but by her
14   expression, I didn't pick up that it was something
15   that had been going on from the beginning of the
16   term.
17                And so putting all of that together,
18   my conclusion, my opinion, was that he was
19   deteriorating psychiatrically, and that it reflected
20   psychosis, and that what is here is not a by-product
21   of maturity.  And even if maturity was an issue,
22   that psychosis was responsible for his behaving
23   bizarrely, for his speaking inappropriately, for
24   what was later cited as his deterioration of his
25   appearance, that he wasn't bathing, or he wasn't
```

1    caring for himself and people noticed a difference

2    in his appearance.

3         Q      Thank you for that clarification.

4                I want to make sure that I understood

5    something you said correctly.  By March 10, okay, 19

6    days before the arrest, Gianni was experiencing, in

7    your opinion, psychosis and a deteriorating

8    condition?

9         A      Yes.

10        Q      Before his arrest?

11        A      That's correct.

12        Q      And he was experiencing that same

13   deteriorating condition and psychosis when he was in

14   the episode that was described in Ms. González's

15   class, correct, also before his arrest?

16        A      That is my professional interpretation

17   of that material.

18        Q      Okay.  Did you see anything from

19   Gallaudet University -- and I'm not talking about

20   the instructor in the class, but from Gallaudet

21   University -- indicating that Gianni was -- that his

22   standing at the university was in jeopardy at any

23   time as the result of the incident in Ms. Healy's

24   class?

25        A      If somebody says you're going to have

1   Public Safety haul you out of a classroom, I would
2   say -- and it's not met with great resistance from
3   the administration, I would say that there is
4   support for the teacher's perspective that, I don't
5   want this guy in my class because I can't control
6   him.  And when you get to a place where a person is,
7   Well, the next time we're going to have the cops,
8   the cops at the university, haul you out of a class,
9   I would say that it's a fairly -- it's a fairly good
10  indication that you don't have a stable standing
11  within the university.
12              The other thing I would point out is
13  that he had already been cited for misconduct
14  because of marijuana possession in the fall.  He had
15  already withdrawn, I note that he had withdrawn, but
16  that his teacher, Sue Mather, had complained about
17  him, had called attention to the idea that he was
18  impaired, and was failing him, and he scrambled to
19  somehow extract a withdrawal from the jaws of an F.
20       Q    Did you see anything from the
21  university telling Gianni that he was going to be
22  suspended?
23       A    No.
24       Q    Did you see anything from the
25  university saying that Gianni was going to be put on

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    72

```
 1   probation?
 2         A     No.
 3         Q     Did you see anything from the
 4   university telling Gianni that he was going to be
 5   removed by DPS from the class?
 6         A     Yes.
 7         Q     You believe that was conveyed to
 8   Gianni, that he was going to be removed by DPS from
 9   the class?
10         A     The teacher conveyed that she was
11   going to call DPS.
12         Q     To Gianni?
13         A     What did she convey to him?  I didn't
14   see anything.
15         Q     And you indicated that, by this point,
16   by the event that was happening in early March 2013,
17   Gianni was already experiencing, quote, "even
18   worsening irrational thinking and expression"?
19         A     I'm sorry.  I need some clarification
20   from you.  When you say by this event, what do you
21   mean?
22         Q     I'm sorry.  The event with Professor
23   Healy in March 2013.
24         A     Yes, I think that --
25               MR. GROSZ:  '14.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    73

1              MR. WATERS:  You're right.

2          Strike this.  Let's go back.

3      Q     By the way, by this time in March

4    2014, were you aware that Gianni had actually wanted

5    to leave Gallaudet and had expressed a desire to

6    return to California?

7      A     I'm not aware of that.

8      Q     Were you aware that his parents, who

9    had moved to the D.C. area, did not want to return

10   to California because of their recent move?

11     A     I'm not aware of that.

12     Q     Do you see anything indicating that

13   Gianni attempted to withdraw from Ms. Healy's class?

14     A     No.  Again, referencing the

15   discussion, in my professional opinion, his

16   correspondence was motivated by a desire to pass the

17   class.  He was trying to resolve the situation

18   through the channels that he had available to him.

19     Q     And by this point it's your opinion

20   that he was exhibiting worsening irrational thinking

21   and expression?

22     A     Yes.

23     Q     And that was before the arrest?

24     A     That's correct.

25     Q     And that included the interaction with

1    Spencer Opie on March 28 in the afternoon?

2         A    Yes, that's correct.

3         Q    And that's the incident where Gianni

4    swung at Spencer Opie, almost hitting him?

5         A    That's correct.

6         Q    It also includes the interaction with

7    Jason Scherrenberg that evening?

8         A    That's correct.

9         Q    It also includes the interaction with

10   Adrienne Morgan, who characterized Gianni's

11   presentation as bizarre?

12        A    That's correct.

13        Q    And it includes the interaction with

14   Instructor González?

15        A    That's correct.

16        Q    And all of those events were prior to

17   Gianni's arrest?

18        A    That's correct.

19             Can I take a two-minute break to just

20   run across the hall?

21                  MR. WATERS:  Of course.  I'll do

22        the same.

23                  (Whereupon, a recess was taken

24        between 2:58 and 3:09 p.m.)

25   BY MR. WATERS:

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              75

1          Q     Okay.  So the events you described,

2     Doctor, with respect to Ms. Healy's class, you

3     indicated that Gianni had worsening irrational

4     thinking and expression.  Would you agree with me

5     that those are not indicative of any suicidality at

6     that time?

7          A     No, I would agree with you.

8          Q     He had not expressed any suicidal

9     ideation or intent?

10         A     That's correct.

11         Q     I just want to make sure the record's

12    clear.

13               And the events that he described that

14    related with regard to Mr. Opie, the irrational

15    accusations, staring at him, swinging and almost

16    hitting him, would you agree that those do not

17    indicate that Gianni was suicidal at that point?

18         A     Yes, I would agree with you.

19         Q     And the events described with

20    Mr. Scherrenberg, the threat to Mr. Scherrenberg

21    when he returned to the room with Mr. Opie, that

22    does not indicate that Gianni was suicidal at that

23    point?

24         A     No, it did not.

25         Q     Also the interactions with Ms. Morgan

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    76

```
 1    do not indicate Gianni was suicidal?

 2           A     I agree, it does not.

 3           Q     Now, you were familiar with the events

 4    of the arrest from the materials you've reviewed,

 5    correct?

 6           A     Yes.

 7           Q     And have you reviewed Lieutenant

 8    Bauer's deposition?

 9           A     Yes.

10           Q     And Captain Rader's deposition --

11           A     I did.

12           Q     -- as you related it in your report?

13           A     Yes.

14                       (A discussion was held off the

15                  record.)

16    BY MR. WATERS:

17           Q     You indicated -- well, before that,

18    you're aware that Lieutenant Bauer did not know

19    Gianni before he met him that night in Gianni's dorm

20    room?

21           A     I'm aware of that.

22           Q     And Lieutenant Bauer had never seen

23    Gianni before?

24           A     I'm aware of that.

25           Q     And he was not aware of the issues in
```

1    Ms. Healy's class?

2           A     I'm aware of that.  Yes, that's my

3    understanding.

4           Q     And he was not aware of the issues in

5    Instructor González's class?

6           A     I don't think anyone asked him about

7    Ms. Healy's class, but I saw no indication that he

8    was familiar with the academic progress of Gianni

9    Manganelli.

10          Q     And he wasn't aware of the issues that

11   arose in Ms. González's class earlier that weekend?

12          A     I saw no indication that he was aware.

13   Nobody asked him, but I saw no indication that he

14   was aware of that.

15          Q     And at the point that Lieutenant Bauer

16   first encountered Gianni, he would not have been,

17   he, Lieutenant Bauer, would not have been aware of

18   the encounter with Morgan earlier that afternoon?

19          A     That's right.

20                     MR. GROSZ:  Form.

21          A     He would not have been aware.

22          Q     And --

23          A     Or he was not -- he was not aware.  He

24   could have been aware, because Morgan said that she

25   was notifying Public Safety.  But he was not aware.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          78

1          Q     And that's the clarification.  There's

2     no evidence that Lieutenant Bauer was aware of what

3     had transpired between Adrienne Morgan and Gianni

4     Manganelli when he first encountered Gianni

5     Manganelli on the night of March 28, 2013?

6          A     I agree with that.

7          Q     You indicated that Lieutenant Bauer

8     did not -- that Gianni Manganelli did not comply

9     with Lieutenant Bauer's orders to leave his room; is

10    that correct?

11         A     Yes.

12         Q     And that Lieutenant Bauer handcuffed

13    Gianni, briefly released Mr. Manganelli, but then

14    physically took him down when he, Gianni, made a

15    movement, correct?

16         A     Yes.

17         Q     You are aware that Lieutenant Bauer

18    described that movement as resisting, as he was

19    attempting to resist what they were trying to

20    accomplish?

21                    MR. GROSZ:  Form.

22         A     He experienced it as Mr. Manganelli

23    resisting.

24         Q     As Lieutenant Bauer describes it, it

25    was more than a movement, correct?

```
 1                    MR. GROSZ:   Form.

 2         A     It was a wave.  He experienced it as

 3   resisting and he took him down.  It wasn't an action

 4   of attacking him or struggling, but it was a wave,

 5   and he wanted him not to move and couldn't get him

 6   not to move, so he experienced that as resisting.

 7         Q     And Captain Bauer recalled that Gianni

 8   was repeatedly inquiring, Why am I handcuffed?  Is

 9   that correct?  It's on page 5 of your report.

10         A     Captain -- I don't know if you said --

11   it was Captain Rader, not Bauer.

12         Q     I'm sorry.  Captain Rader.

13         A     Yes, that's correct.

14         Q     And that Captain Bauer [verbatim]

15   described Gianni as being quiet, calm, and staring

16   with a blank look, correct?

17         A     Correct.

18         Q     You would agree with me that remaining

19   silent is not an indication of suicidality, correct?

20         A     That's correct.

21         Q     In fact, when somebody is the subject

22   of a police investigation, it's a constitutional

23   right, correct?

24         A     The right to remain silent has to do

25   with just the nature of the statements one makes.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    80

1    The Constitutional right doesn't relate, for

2    example, to a person's preference to talk about the

3    Miami Hurricanes.  It's what you talk about as

4    opposed to the idea of actual silence.

5            Q     But would you agree with me that the

6    silence itself is not indicative of a psychosis?

7            A     That's correct.

8            Q     Or that he was suicidal?

9            A     That's correct.

10           Q     Okay.  And the blank stare, not

11   evidence of suicidality?

12           A     That's correct.

13           Q     Okay.  And the fact that he was not

14   complying with the officer's instructions is not

15   evidence of suicidality?

16           A     That's correct.

17           Q     And the fact that he was asking why he

18   was handcuffed is not evidence of suicidality?

19           A     That's correct.

20           Q     And are you aware of any evidence that

21   Lieutenant Bauer learned that Gianni was bipolar

22   prior to making the initial detention?

23           A     You mean prior to handcuffing him?

24           Q     Yes.

25           A     I'm not aware of any evidence of that.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          81

```
 1            Q      But you indicated that he learned

 2     that -- that he was informed that Gianni was bipolar

 3     after the initial detention, correct?

 4            A      After the initial restraint, correct.

 5            Q      Do you know how he learned that -- how

 6     he heard that Gianni was bipolar?

 7            A      There were others who came upon the

 8     scene.  There was Adrienne Morgan who came and

 9     informed officers.  Spencer Opie came and informed

10     officers.  Those were two sources of information.

11     Yes.

12            Q      Was Gianni bipolar?

13            A      I don't know.

14            Q      You are aware that they searched the

15     room for any indication of psychiatric medications

16     and found none?

17            A      Yes.

18            Q      That's correct?

19            A      That's correct.

20            Q      You indicated that neither Lieutenant

21     Bauer nor Captain Rader contacted BIT or had been

22     trained how to contact the BIT team.  You're aware

23     that their boss, Director Ted Baron, is a member of

24     the BIT, correct?

25            A      Yes.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                           82

1          Q     And that in communicating with
2    Director Ted Baron, they are informing the BIT?
3          A     I don't know what they communicated
4    with Ted Baron and when.
5          Q     Would you agree with me that even
6    assuming that it is correct that Gianni was bipolar,
7    that bipolar does not necessarily mean that he was
8    suicidal?
9          A     Not necessarily, that's correct.
10         Q     Let me ask you about this.  In your
11   professional opinion, are you able to reach a
12   diagnosis as to Gianni's mental health condition
13   from the time frame of early March 2014 until the
14   point when he was arrested, the first contact with
15   DPS?  What -- how would you diagnose Gianni's
16   condition at that point?
17         A     I would say that there are indications
18   that he had a psychotic condition.  Its origin, or
19   its specific nature, is unclear.  It could have been
20   bipolar illness, it could have been medical in
21   nature, it could have been schizophrenia, it could
22   have been a psychotic depression.  But it was not
23   stress-induced, so it would not have been a brief
24   reactive condition.
25               But it was -- it was borne out by the

1    kinds of features, specifically, the decline in his

2    appearance, as well as the decline in his self-care,

3    that reflects something more sustained as opposed to

4    a really bad day and then a person normalizing, and

5    then other bad days.  But something that was either

6    progressive or just continuous.  And that that

7    increasingly called attention to itself over the

8    course of March.

9        Q      You mentioned the words "continuous"

10   and "sustained."  Over what period of time?

11       A      I can't account for before March.  But

12   the first indication of it was Christina Healy

13   feeling the need to reach beyond herself because she

14   could not resolve his classroom presentation the way

15   she would other things that might arise, and would

16   be expected to do so.  And so I would need more

17   information.  But I was giving her the presumptive

18   benefit of the doubt that she would not alert

19   superiors at the first sign of a recalcitrant

20   student; that that's something she would have

21   noticed as a bit of a pattern and she suggested it

22   as such.

23              So how long before March is hard to

24   say, but the first evidence of something coming up

25   is in March, and so that's my reference point.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                84

```
1          Q     You're aware of the incident in
2    October 2013 where Gianni was in Susan Mather's
3    class, got on all fours and barked like a dog?
4          A     Yes.
5          Q     Would you consider that as part of the
6    same continuous, sustained psychosis?
7          A     I don't know.
8          Q     What about the incident where he was
9    actually hospitalized at CPEP?
10         A     Could have been the same condition,
11   but I don't know whether it was in the same --
12   context of the same episode.  I think that -- I
13   would conclude that someone who is not on active
14   antipsychotics who have presented such as he did,
15   yelling that he wanted to speak to Congressman Bob
16   Manganelli, he wouldn't have gotten three As in the
17   fall semester; he wouldn't have been able to sustain
18   a successful academic performance, I don't care how
19   brilliant he is.
20               Now, in terms of, again, barking like
21   a dog in that class, I don't know whether that's
22   something that manifested itself October onward or
23   for a period of time.  I don't know whether that
24   would have reflected him being intoxicated at the
25   time, you know, that specific incident.  What's
```

1    notable to me about the March period, not wanting to
2    go too far afield, is that there are these data
3    points that pop up in March from different
4    observations, as well as the marker of the lack of
5    hygiene and lack of self-care that reflect more than
6    just a bad day, and something that's more in the
7    continuous realm.
8              Is it possible that he was laboring
9    under this all the way from October and through --
10   it is possible.  I would need more information.  But
11   I think that Dr. Mathers' depiction, which is pretty
12   dramatic, and -- is such that if it were a
13   continuous episode, I would have expected there to
14   be other notations from other people between October
15   and March, and that leads me to believe that
16   whatever was happening in October was separate, but
17   may have been part of the same condition that ebbed
18   and flowed (indicating).
19        Q    Is it possible that the same condition
20   ebbing and flowing extended long before Gianni
21   appeared at Gallaudet University?
22        A    Oh, sure.
23        Q    After Gianni was removed from campus
24   by the Metropolitan Police Department, he was taken
25   to a D.C. court and issued a stay-away order, and

```
1    was released from police, Metropolitan Police
2    Department's, custody, correct?
3             A       Correct.
4             Q       Do you know what time of the day on
5    March 29 Gianni was released?
6             A       I'd be guessing.  I don't know for
7    certain.
8             Q       Do you know where he went after he was
9    released?
10            A       I'm not sure.
11            Q       Do you know that he was returned to
12   campus after he was released?
13            A       I'm aware that he returned to campus.
14   I don't know whether he directly returned to campus,
15   but I know that at some point he returned to campus.
16            Q       Are you aware that he spent at least
17   some period of time in a friend's dorm room before
18   he went to retrieve his belongings?
19            A       I'm not aware of that.
20            Q       Okay.  You indicated that Gianni was
21   effectively evicted from Gallaudet University.  That
22   was your phrase, "effectively evicted," correct?
23            A       Yes.
24            Q       You are aware that the D.C. court
25   issued the stay-away order, correct?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    87

```
 1              A      That's correct.
 2              Q      That Gallaudet University did not
 3       issue a stay-away order?
 4              A      That's correct.
 5              Q      All right.  And that -- I believe you
 6       said you weren't aware whether Gianni spent some
 7       time in a friend's room?
 8              A      I wasn't aware of that.
 9              Q      Before that?  Okay.
10                     Are you aware of any Gallaudet
11       University personnel telling Gianni that he had to
12       leave campus?
13              A      I know that Adrienne Morgan was with
14       him prior to his leaving campus.
15              Q      And that was to collect his
16       belongings?
17              A      Yes, although it's unclear to me,
18       because when he left campus, he didn't have his
19       wallet, he didn't have his belongings.  So he left
20       campus without his belongings and they were at
21       Public Safety.  So I'm -- I don't have enough
22       information to establish where collection begins and
23       confiscation ends, because he didn't collect them,
24       even though he was with someone --
25              Q      He did collect some of his things,
```

1    though, correct?

2         A    Yes.  I don't have a clear

3    understanding of what he actually did have.  I know

4    more of what he didn't have.  And he certainly left

5    campus without some of his belongings, in spite of

6    being with Adrienne Morgan for some period of time

7    after he came back to campus.

8         Q    Do you know what period of time he was

9    with Adrienne Morgan?

10        A    I don't know.  I don't remember.

11        Q    Do you know if Adrienne Morgan ever

12   told Gianni he had to leave campus?

13        A    I don't know.

14        Q    He was also with a DPS officer.  Do

15   you know if the officer ever told Gianni that he had

16   to leave campus?

17        A    I don't know.

18        Q    Do you know if there was any

19   communication with Gianni telling him that he

20   couldn't stay at his friend's dorm room?

21        A    I don't know.

22        Q    Do you know if at that time when he

23   returned to campus, Gianni asked either Adrienne or

24   the officer who escorted him to his room for

25   alternative housing on campus?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    89

```
 1          A     I know that he asked Adrian Morgan for
 2    alternative housing on the 28th, and he communicated
 3    that it was not available, or that he was told that
 4    it was not available.
 5          Q     I'm asking about the 29th, though.
 6          A     I don't know one way or the other.
 7          Q     You indicate that he was mindful of
 8    his precarious standing at the university.
 9          A     Yes.
10          Q     Okay.  What information leads you to
11    believe that at that time Gianni was considering his
12    precarious standing at the university?
13          A     He had been arrested.  He was told
14    that he wasn't allowed to get back into his room.
15    And he was not afforded an opportunity to live on
16    campus even in an emergency room that would be
17    available that he knew to ask for.  And he was told
18    that that wasn't available.
19          Q     Well, we don't know that he asked for
20    that on the 29th, correct?
21          A     But he was aware of it if he asked for
22    it on the 28th.
23          Q     Please answer my question.  There's no
24    evidence that he asked for it on the 29th when he
25    returned to campus?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                           90

1          A     I don't know.  But I'm answering your

2     question about whether he was aware of his

3     precarious standing at the university, is that he --

4     that he receives numerous indications within that

5     period of time, not to mention the arrest the night

6     before -- to mention the arrest the night before,

7     that was unclear to him as to why he was being

8     arrested, that he was not wanted at the university.

9          Q     Anybody ever say that to him, he was

10    not wanted at the university?

11         A     Well, when one hauls you out of your

12    dorm room and you say, Why am I being arrested, and

13    you are taken away, and then you are presented with

14    a no-contact order, and you are -- and you are then

15    collecting your -- made to collect your belongings

16    with no provision for where you're going to be

17    sleeping that night, and no suggestion -- I mean,

18    there's no evidence presented that someone had

19    suggested, Why don't you stay with a friend on

20    campus?  But it was more, You need to leave this

21    room.  Then the priorities that are conveyed are --

22    the priorities are that we want to create some

23    distance.

24         Q     D.C. court issued the stay-away order,

25    not my client, correct?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    91

```
 1          A      D.C. court did not issue an order
 2    saying that your client could not provide him with
 3    an emergency order --
 4          Q      I'm sorry.  Please answer my question.
 5    The D.C. court issued the stay-away order, not
 6    Gallaudet University, correct?
 7                      MR. GROSZ:  He is answering the
 8              question.
 9                      MR. WATERS:  He is not answering
10              the question, Justin.
11          A      D.C. court issued a stay-away order
12    from his room and his roommates.  Not the
13    university.
14          Q      Okay.  Correct.  And you have no
15    information Gianni -- whether Gianni asked on the
16    night of the 29th for an alternative room on campus?
17          A      I don't know whether he asked that
18    day.  I don't know one way or another.
19          Q      He did make arrangements for a place
20    to stay; he stayed with his mother -- or he had
21    called his mother to stay with her, correct?
22          A      I think she would have liked for him
23    to stay with her, but he called and asked her to get
24    him, and conveyed that his life was in danger, and
25    that was the -- how he reached out to her, and with
```

1    urgency at the time.

2         Q     And at this time are you aware of any

3    statement from the university telling Gianni that he

4    was in, quote, "precarious standing"?

5         A     I need to add something to the

6    previous answer because it's important.

7               He did not convey to her that he was

8    not allowed on campus at the time, that he needed a

9    place to stay because he had no place to stay.  So

10   she was unaware at the time.  What he conveyed was

11   his sense of peril that he could be killed and she

12   needed to get him right away.

13              Now -- I'm sorry.  Your next question

14   was what?

15        Q     We'll talk more about the text with

16   Mom.

17        A     All right.

18        Q     My question was, are you aware of any

19   statement from the university at any point in this

20   exchange that told Gianni that he was in precarious

21   standing?  Specifically told Gianni, You may be

22   suspended?

23        A     No, I'm not aware of it.

24        Q     You might be expelled?

25        A     I'm not aware of it.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                        93

```
1              Q     You might be put on probation?
2      Anything to indicate that at all?
3              A     I'm not aware of it.
4              Q     You indicated in the next paragraph of
5      your report on page 5 that Mr. Manganelli killed
6      himself, quote, "just hours after being released
7      from custody."  But you don't know when he was
8      released from police custody?
9              A     Sometime on the 29th.
10             Q     Okay.  So if he was released around
11     midday on the 29th, that would be about 17 hours
12     after he was released from custody, correct?
13             A     That's correct.
14             Q     And when he returned to the university
15     campus, and when he went with the officer to
16     retrieve his belongings from his room, he was not in
17     DPS custody at that point, was he?
18             A     I don't think so.
19             Q     Okay.  And so it was -- could have
20     been approximately -- nearly a full day since he was
21     released from D.C. police custody before he
22     committed suicide?
23             A     If it was 23 hours, it would still be
24     just some hours.  It's -- it is -- it was not a full
25     day, many activities, and he was, in my estimation,
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    94

```
 1    a person who was psychotic.  And so the time-thought
 2    continuum is quite disrupted during that period, and
 3    there may be periods of frenetic disorganized
 4    thought, and there may be periods of just vacancy,
 5    where a person is just detached and there's not much
 6    going on.  So in my professional opinion, that's
 7    hours.
 8           Q     There's no dispute that the suicide
 9    did not happen on university campus?
10           A     That's correct.
11           Q     He had gone home with his mother?
12           A     That's correct.
13           Q     And left his mother's home where he
14    committed suicide?
15           A     That's correct.
16           Q     You indicated that, For those who
17    remember him to be a keen enthusiast of Japanese
18    culture, this method of seppuku evokes suicide in
19    the context of dishonor.
20           A     Yes.
21           Q     Are you an expert in Japanese culture?
22           A     No.
23           Q     Do you purport to be an expert in
24    Japanese ritual suicide?
25           A     No.  But the -- I can tell you, given
```

1    my expertise in death investigation, and having had

2    proximity to a number of suicides, that

3    disemboweling is a very unusual method of suicide.

4    And he was an enthusiast of Japanese culture.  And

5    so the fact that he was, and the fact that he

6    committed this very unusual method as opposed to

7    just slicing open his arms, which is a far more

8    common method, and which would have been successful

9    in his case, it's a consideration that I made note

10   of.

11        Q    Doctor, are you prepared to testify to

12   a reasonable degree of certainty in psychiatric

13   medicine that Gianni Manganelli committed suicide by

14   seppuku?

15        A    No.  I'm prepared to testify that it's

16   a reasonable consideration because it is a very

17   peculiar method, and when something peculiar

18   happens, even in a psychotic individual, there is

19   relevance to each individual.  Now, there may be

20   other explanations for how he might commit suicide

21   by disemboweling, and one possible explanation is

22   seppuku, which is associated with dishonor.

23        Q    You get into, in the next paragraph,

24   that, Gianni Manganelli could not even cope with the

25   day-to-day demands of the classroom.

```
 1                      Did I read that correctly?
 2           A      I'm sorry, could you please refer me
 3    to the page?
 4           Q      Bottom of page 5.
 5           A      That's correct.
 6           Q      Okay.  As we established from the
 7    exhibit that I showed you before, Gianni had a 4.0
 8    GPA in the fall 2013 semester?
 9           A      He had a 4.0 GPA with a withdrawal.
10           Q      With one withdrawal.  Are you aware
11    that, based on that 4.0 GPA, that he was offered or
12    put up for a STEM Scholarship?
13           A      I'm not aware of that.
14           Q      Are you aware that he was admitted to
15    Gallaudet University with a President's Scholarship,
16    which was a full ride?
17           A      I'm aware that he was on scholarship
18    in admission, yes.
19           Q      And you would agree with me that his
20    spring semester GPA appeared to be 2.75, at least by
21    March?
22           A      Not consistent with scholarship
23    performance, but yes, I'm familiar with that.  Or
24    I'm -- that's what his GPA appears to have been at
25    the time of his death.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          97

1          Q       Okay.  And just so we're clear,
2     there's no indication that the arresting officers --
3     or that Lieutenant Bauer or Captain Rader had any
4     knowledge of whether Gianni was coping day to day in
5     his academic standing in school?
6          A       Not at the time that they came to see
7     him.  Only after they had the opportunity to get
8     information from people like his CRE and his
9     roommate -- or the CRE and his roommate.
10         Q       Do you have any knowledge that the
11    roommate was aware with what had happened in
12    Christina Healy's class?
13         A       I have no understanding one way or
14    another.  I don't know what he would have conveyed
15    to his roommate about it.
16         Q       Do you have any knowledge that
17    Ms. Morgan was aware of what happened in Ms. Healy's
18    class?
19         A       There's no indication that he shared
20    that with her or that she would have any reason to
21    be aware of it.
22         Q       You indicated that for someone who
23    realized he was in academic trouble, shame of arrest
24    and removal from Gallaudet, with his entire academic
25    future on the line, was all the more personally

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                98

```
1    powerful.
2                 Did I read that correctly?
3         A     Yes.
4         Q     Okay.  And we established that Gianni
5    was not in academic trouble, correct?
6         A     No, I don't agree with that.
7         Q     He had a 4.0 in the fall semester?
8         A     A 4.0 in the fall semester with a
9    withdrawal from a class, and in the spring semester
10   in midterms, he had a 2.75, but there were no final
11   exams, and final exams would have been administered
12   at a time where he was confronted with an assignment
13   that he made clear that he didn't think he could do,
14   and that led to -- there is indication from another
15   class that he was behaving inappropriately and that
16   he had attracted the concern of his teacher.
17                 And so the timing of his performance
18   on midterms, which is clearly lower than a 4.0,
19   would -- and what is noted from March, after which
20   there is no testing because he's dead, there's no
21   reason for me to believe that his performance on
22   final exams would not have reflected psychotic
23   thinking.
24                 Now, whether he would have passed
25   anything, or whether he would have achieved a place
```

1    on April 1 of some kind of a confrontation with

2    Christina Healy because he would be unable to

3    complete an assignment, one just cannot conclude.

4    But what I'm saying is the -- as they like to say in

5    the car commercials, past performance does not

6    necessarily reflect future performance.  So he

7    was -- he did not do as well -- he did not perform

8    at a level of scholarship material in his midterm.

9    The scholarship was financially important,

10   obviously, and may have made the difference to what

11   could or could not have been affordable.

12            But going beyond that, there is no

13   evidence available to me that he was tested after a

14   period in which he was manifesting psychotic

15   symptoms.  So the -- there is -- in my professional

16   opinion, he was running into trouble in his

17   classroom, and his performance had already been

18   declining as manifested by his midterms.

19            Q    He was not on suspension, correct?

20            A    No, he wasn't.

21            Q    He was not on probation, correct?

22            A    Not yet.

23            Q    He was not under any threat of

24   suspension or probation, correct?

25            A    Well, ultimately in terms of

1    disposition of his marijuana citation in the fall, I

2    don't have a full accounting of how that was

3    reflected in his record or how that was communicated

4    to him, especially because marijuana was confiscated

5    from his room, or marijuana paraphernalia was

6    confiscated from his room on the night of his

7    arrest, and the disposition of that.  Again, he was

8    dead before anyone could sort it all out.

9                    So he had -- he had certainly not

10   reached any kind of understanding with the

11   university that he would be permitted to use

12   marijuana in the dorm room.  And he had already been

13   cited for that from a disciplinary standpoint.

14                    So -- and in terms of fallout from his

15   arrest, when a person is arrested on campus, there

16   are repercussions.  What those are are unclear, but

17   it's not an incidental event in a person's life.

18   It's a significant event.  And so the idea that he

19   would not have associated an arrest with at least

20   some kind of consequence for the university itself

21   is -- that doesn't make any sense.

22                    Now, what those consequences were, it

23   was too early to tell.

24        Q    Did you have any indication from the

25   records you reviewed that there was -- that

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                               101

```
 1   Gallaudet intended to take any type of punitive
 2   action in relation to the arrest?
 3          A      Well, yeah, they kicked him out of his
 4   room.  That's one thing.  They did.
 5          Q      He had a stay-away order from a D.C.
 6   court?
 7          A      So he had a stay-away order.  You
 8   know, he could have had a stay-away order -- just a
 9   moment.  I'm answering your question.
10               They could have had Mr. Opie stay with
11   his friend like he had earlier.  He went down the
12   hall, stayed with his friend.  They could have made
13   an arrangement to say, you can stay in the room,
14   your friend stays down the hall.  We'll sort this
15   out when we can get you an emergency room.
16          Q      And Gianni came back to campus after
17   being released from the police and spent several
18   hours in another friend's room.  He couldn't have
19   stayed there?
20          A      I don't know.
21          Q      You aren't aware of DPS telling him
22   he couldn't stay there?
23          A      Hang on a moment.  I guess you'll have
24   to depose the friend to see whether an offer was
25   made and whether the friend was available.
```

```
 1          Q      But you haven't seen anything to say
 2     otherwise?
 3          A      I don't know what was available to him
 4     in terms of staying.  You know, he could go and
 5     visit a friend's room.  If it's a two-person room,
 6     how are you going to fit a third person?
 7          Q      You haven't seen anything --
 8          A      I'm sorry.  I need to answer the
 9     question.  There's no indication there was an empty
10     bed in the room.  And these are dorms that are often
11     filled.
12          Q      Have you seen anything from the
13     university telling Gianni that he could not stay on
14     campus the night of the 29th, at all?
15          A      Yes.
16          Q      What?
17          A      There was no emergency room provided
18     to him.
19          Q      And he didn't ask for one that night,
20     did he?
21          A      He asked for one the day before.
22          Q      The day before, but not that night?
23          A      In my professional opinion, if he was
24     told the night before that there was one that was
25     not available, whether he asked or was not, that it
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    103

1    would not be unreasonable for him to conclude the

2    next day that something was not available as opposed

3    to saying, Well, gee, there may be a difference,

4    something may open up now on Saturday, because

5    Saturday they clean all the rooms as if it's a

6    hotel; that somebody may have checked out.  That

7    this is a dorm where things are much more less

8    static, there's a lot less movement, in terms of

9    people having places to stay.  It's not like, Well,

10   this person is going to stay in this room for one

11   night and then the next night it's going to be

12   yours, again, as if it's a Holiday Inn.

13        Q     Have you ever been to Gallaudet

14   University?

15        A     No, I have not.

16        Q     Have you ever visited the dorms at

17   Gallaudet University?

18        A     I haven't.

19        Q     So you haven't spoken with anybody

20   about what the conditions were at the dorms at

21   Gallaudet University in March 2014?

22        A     No, I have not.

23        Q     All right.  And to be clear, there's

24   nothing indicating that Gallaudet University told

25   Gianni that he could not stay at his friend's dorm

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                           104

```
 1    room that night, correct?
 2           A    That's correct.
 3           Q    And to be clear, there's nothing from
 4    Gallaudet University that told Gianni, You are
 5    evicted from campus, correct?  You can't be here?
 6           A    There's no official notice.
 7           Q    There's no notice at all that says
 8    that, correct?
 9           A    Well, there is notice in the sense
10    that his belongings are confiscated, and I don't
11    know how you can stay in a place where your
12    belongings are confiscated.  If your belongings are
13    confiscated, where do you get clothes to dress in,
14    where do you get your toiletries to clean yourself?
15           Q    You think they confiscated his
16    toiletries and his clothes?
17           A    No.  They confiscated some aspect of
18    his belongings.
19           Q    There's nothing from Gallaudet
20    University that said, Gianni, you're off campus, you
21    can't be here, correct?
22           A    There's no official notice saying, You
23    have to be off campus.
24           Q    And there's no notice at all saying
25    that, nothing that says that, correct?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    105

```
 1              A      Not that I'm aware of.
 2              Q      You indicated here that there were no
 3    other stressors that preceded Mr. Manganelli's
 4    suicide.  Did I read that correctly?
 5              A      Yes.
 6              Q      And what time frame are we referring
 7    to the stressors with respect to Gianni's suicide?
 8              A      In the period preceding.
 9              Q      What period?
10              A      Well, in my professional opinion, when
11    he wasn't arrested, before he was arrested, at the
12    time of his arrest he was not suicidal.  At the time
13    of his suicide, he was suicidal.  And so in the
14    intervening period, spanning the time of his arrest
15    to the time of his suicide, he became suicidal, and
16    there were no other stressors occurring within that
17    period of time.
18              Q      You would agree that Gianni was -- I
19    believe you testified that Gianni was experiencing
20    psychosis leading up to the arrest on March 29 and
21    the symptoms of psychosis?
22              A      Yes.
23              Q      Okay.  Are you aware of prior comments
24    Gianni had made about ideation of suicide or threats
25    of suicide?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              106

```
 1          A     I'm aware of his being asked about it
 2    and his saying that he would not kill himself
 3    because of his closeness to his sister.  I'm aware
 4    of his being at RIT and his parents being concerned
 5    at some point that he might be suicidal because he
 6    had expressed -- the way he expressed himself to
 7    them, they interpreted it as odd and -- loving,
 8    but -- in a sentimental way, but they wondered
 9    whether that was reflective of his being suicidal.
10    But that's all I'm aware of.
11                       MR. WATERS:  What was my last
12                 exhibit, was it 88?
13                       MR. GROSZ:  I think it was 87.
14                       MR. WATERS:  I think it was
15                 grades.
16                       THE WITNESS:  87.
17                       (California Department of
18                 Rehabilitation Case Notes of Jim Moore
19                 were marked as Defendant's Exhibit No.
20                 88 for identification, as of this date.)
21    BY MR. WATERS:
22          Q     I'm going to show you a document
23    marked as Exhibit 88.  This is the California
24    Department of Rehabilitation case notes from Jim
25    Moore.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    107

```
1              A     Okay.
2              Q     The entry date is March 31, 2014.  It
3       reflects a meeting with Gianni on March 24, 2014.
4       The Bates number range is DOR00140 to DOR00141.
5       Have you seen this, Doctor?
6              A     I have it, but I have not seen it.  I
7       just received it.
8              Q     Would you mind taking a look at it for
9       me?
10             A     Sure.
11             Q     Take your time.
12             A     Okay.
13             Q     So you would agree with me that this
14      appears to reflects that Jim Moore, a counselor from
15      the California Department of Rehabilitation, made a
16      site visit to Gallaudet and met with Gianni on March
17      2014?
18             A     Yes.
19             Q     And that that meeting lasted
20      approximately 40 minutes?
21             A     Yes.
22             Q     And that Mr. Moore indicated that
23      Gianni appeared unkempt and had a body odor?
24             A     That's correct.
25             Q     And that when he expressed concern
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    108

1   about Gianni's appearance, Gianni confirmed that he

2   was living in a dorm room, correct?

3           A       Well, he expressed concern about

4   whether he actually even had a place to live.

5           Q       Right.  And Gianni indicated that he

6   was living in a dorm room.

7           A       That's correct.

8           Q       Gianni indicated that he needed to

9   dress like this to keep people from picking on him?

10          A       Yes.

11          Q       All right.  And that Gianni was

12  constantly bothered by people picking on him, and he

13  stated, quote, "Whenever I clean up and dress

14  better, people bother me and want to have sex with

15  me," correct?

16          A       Yes, that's correct.

17          Q       Does this reflect rational thinking?

18          A       No.

19          Q       At this point is this consistent with

20  the psychosis that you described previously?

21          A       That's correct.

22          Q       Okay.  And all of this was prior to

23  the arrest?

24          A       That's correct.

25          Q       Gianni related that he was, quote,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          109

```
 1    having difficulty with his instructor in
 2    linguistics, correct?
 3          A     Yes.
 4          Q     And this is Christine Healy, correct?
 5          A     Yes.
 6          Q     And that he described that Christine
 7    Healy was disrespecting him whenever he would ask
 8    questions during the class because his questions
 9    were off topic, correct?
10          A     Correct.
11          Q     He said that he felt that he was the
12    only person being picked on in class, correct?
13          A     Yes.
14          Q     And Gianni asked Mr. Moore if he could
15    intervene, but Mr. Moore was unable to do so because
16    it was a university matter, correct?
17          A     Well, Mr. Moore said that he could
18    not.  Mr. Moore told him that he would not.
19          Q     Uh-huh.  Okay.  Would you agree with
20    me that this does not reflect that Gianni told
21    Mr. Moore that he was concerned that he was in a
22    precarious academic situation?
23          A     You mean that -- that passage?
24          Q     Right.
25          A     I don't think it reflects one way or
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                110

1    the other.  He's clearly having a problem in the

2    class.  It's a class that he's repeating, and he's

3    struggling.

4         Q    But you would agree with me that this

5    paragraph does not say Gianni said he felt that he

6    was in a precarious academic scenario?

7         A    No, he didn't express that.

8         Q    And Mr. Moore reviewed Gianni's grades

9    which were, quote, "unremarkable," and indicated

10   that he had met minimum requirements for continued

11   support per DOR guidelines, correct?  It's the next

12   paragraph.

13        A    Yes, he indicated that.

14        Q    The next page he indicated that with

15   regard to his well-being, Gianni asserted that he

16   was not getting along with his mother and father.

17   He stated that he needs medication that he was

18   prescribed from California, but he could not obtain

19   his medication in Washington, D.C. because this is a

20   federal property.

21        A    Yes.

22        Q    Is that correct?

23        A    That's correct.

24        Q    It indicates that Mr. Moore suggested

25   that Gianni see a doctor at the student health

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    111

1    center on campus and he refused, correct?

2            A      That's correct.

3            Q      Also suggested that he see a counselor

4    for treatment at the mental health center on campus

5    and he again refused?

6            A      That's correct.

7            Q      Mr. Moore strongly encouraged him to

8    seek assistance from qualified professionals and

9    again he refused?

10           A      Correct.

11           Q      Doctor, do you consider the fact that

12   Gianni expressed that he was not getting along with

13   his mother to be a stressor in March of 2014?

14           A      Not particularly, because when he

15   was -- when he was substantively evicted from

16   Gallaudet, he called his mom and asked her to come

17   and get him.

18           Q      And they got in a fight that night?

19                  MR. GROSZ:   Form.

20           A      I don't know whether they got in a

21   fight.

22           Q      They got into an argument that night?

23           A      I need a little bit more specific

24   guidance.  She wanted him to come with her to go and

25   pick up his sister, and he elected to go into a

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    112

```
1    restaurant and then took off.  But in terms of
2    whether they got into a fight, I need a little bit
3    more direction from you about what you're talking
4    about.
5           Q    I just want to be clear.  Have you had
6    a chance to review her second portion of her
7    deposition testimony?
8           A    No, I didn't.
9           Q    Okay.  And just to be clear, you do
10   not consider the fact that he expressed that he was
11   not getting along with his mother at this time, five
12   days before his suicide, to be a stressor in his
13   life?
14          A    No, not necessarily, because not
15   getting along -- just as -- you've asked me a number
16   of questions to say that a person who's bipolar,
17   that doesn't make them suicidal.  There are plenty
18   of people who are bipolar who kill themselves, but
19   there are plenty of people who don't.  There are
20   plenty of people who have psychosis who kill
21   themselves, and there are plenty of people who
22   don't.
23              The idea of a person -- whether at the
24   time in his psychotic thinking he characterized the
25   relationship as his not getting along, whether that
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     113

```
1    was his irrational expression at the time or
2    genuinely whether they had a conflicted relationship
3    is not an acute risk factor or stressor for suicide.
4    That -- because if it were, then there might have
5    been suicidal expression at that point.  And there
6    wasn't.  So no, it's not an indication of a suicidal
7    stressor.
8            Q    Are you aware that he wanted to go
9    back to California and wanted to leave Gallaudet
10   University as of March of 2014?
11           A    I'm not aware of it.
12           Q    Are you aware that his parents
13   essentially refused?
14           A    I'm sorry, March what?
15           Q    In March of 2014.
16           A    March when?
17           Q    In or around March of 2014.
18           A    I'm not aware of it.
19           Q    Are you aware at any time during his
20   tenure at Gallaudet University Gianni expressed that
21   he wanted to return to California?
22           A    I'm not aware of it.
23           Q    Are you aware that his parents refused
24   to return to California with him?
25                        MR. GROSZ:  Form.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                           114

```
 1              A      I'm not aware of it.
 2              Q      Would you consider that to be a
 3      stressor in Gianni's life in March of 2014 if he
 4      wanted to return to California but his family
 5      refused?
 6              A      Sure, it could be.
 7              Q      You indicated here that it is your
 8      professional opinion within a reasonable degree of
 9      psychiatric certainty that the arrest and its
10      consequences precipitated Gianni Manganelli's
11      suicide.
12              A      Yes.
13              Q      What do you mean by "precipitated"?
14              A      He became hopeless.  And hopeless has
15      a direct relationship to suicide.
16              Q      What's your evidence that Gianni
17      became hopeless?
18              A      Because he -- he left campus with no
19      place -- he left campus with a great sense of
20      urgency.  He did so at a time where several data
21      points reflect the university's rejection and
22      repudiation of him, whether it be his arrest,
23      whether it be the fulfillment of a separation order
24      by kicking him out of his room, whether not making
25      an emergency room available to him, or giving him
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    115

1    anyplace to stay, whether it be that coupled with

2    the lack of resolution of what was happening in a

3    linguistics class that he was repeating, that the

4    combination of these events contributed to his

5    hopelessness about his prospects at Gallaudet.

6              Whether, additionally, he was

7    concerned about being able to stay there, because he

8    preferred to use some variant of cannabis and could

9    not in Washington.  But the confluence of these, and

10   with the university's posture of removing him from a

11   secure, stable structure, in my professional opinion

12   its time relationship to his suicide reflected

13   hopelessness, because hopelessness relates to

14   suicidal choice as opposed to psychosis.

15        Q    So what this really relates to, in

16   your view, is the timing of the events and his

17   suicide, the relationship between when they happened

18   and when Gianni's suicide occurred?

19        A    That's correct.

20        Q    Okay.  And it's the proximal

21   relationship between the suicide and when these

22   events occurred that is the, from a psychiatric

23   perspective, the basis of your opinion?

24        A    Yes, it is.

25        Q    Is there anything else?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     116

```
 1          A     No.   The time course is important to
 2     me.
 3          Q     Is there anything other than the time
 4     course?
 5                    MR. GROSZ:   Form.   That what?
 6          Q     That is a medical basis for your
 7     opinion?
 8          A     Nope.
 9                I think -- I want to add this.   This
10     is responsive to anything else, but it's not exactly
11     anything else.
12                I think that the time course is
13     important, but it's particularly notable to me
14     because he was already demonstrating disorganization
15     of thinking and poor control of his behavior that
16     had not necessarily acted out in a suicidal way, but
17     he was showing signs of unraveling.   And so that
18     coupled with the time course is significant.
19                Do I feel that this would have
20     happened were he not to be psychotic and all of the
21     other circumstances?   I don't know.   But what I
22     would like to say is the fact that he was psychotic
23     and showing that he was disorganized in his thinking
24     and also disorganized in his behavior.   Whatever
25     hopelessness that he would have experienced with the
```

1   circumstances of the events, it would have

2   diminished his capabilities of coping with the kinds

3   of stressors that he was presented with.

4        Q     But disorganized thinking and

5   disorganized behavior are not themselves indications

6   that Gianni was suicidal, correct?

7        A     That's correct.

8        Q     And there was no expression to anyone

9   at Gallaudet University that Gianni was hopeless

10  following the arrest, correct?

11       A     That's correct.

12       Q     Okay.  And there's no expression at

13  any time that Gianni -- to anyone at the Gallaudet

14  University that Gianni was suicidal?

15       A     That's correct.

16       Q     Your second opinion, Did the

17  information available to Gallaudet necessitate

18  mental health intervention or other steps as a

19  result of the arrest and its aftermath?  What

20  research was available to Gallaudet University?

21  Would intervention have made a difference in the

22  outcome?

23             The first portion of your report on

24  this regard relates to the event on August 23, 2013

25  when Gianni was admitted at CPEP, correct?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    118

```
1              A      Correct.
2              Q      The comprehensive psychiatric
3     emergency program.
4              A      That's correct.
5              Q      Do you know what happened on that day?
6              A      He was agitated and he was banging on
7     a car, and he was demanding to see Congressman
8     Manganelli, and police took him to the hospital.
9              Q      Okay.  And they had to forcibly
10    medicate him, didn't they?
11             A      That's correct.
12             Q      And he was yelling loudly and
13    repeating the same sentence?
14             A      Yes.
15             Q      And he was exhibiting psychosis then?
16             A      Yes.
17             Q      Okay.  Was there any indication at
18    that time Gianni was suicidal?
19             A      No.
20             Q      And you indicated that prior to that
21    time, that Gallaudet was not apparently aware of Mr.
22    Manganelli's psychiatric problems, correct?
23             A      Certainly not of his being psychotic.
24             Q      Okay.  What were his psychiatric
25    problems at that time?
```

1          A     You mean prior to his having a

2     psychotic -- a hospitalization with psychosis?

3          Q     Well, the statement is, quote, "Prior

4     to the" -- I'm sorry.  "Prior to that hospital

5     admission, Gallaudet was not apparent --

6                I do speak English, I swear.

7                "Prior to that hospital admission,

8     Gallaudet was not apparently aware of Mr.

9     Manganelli's psychiatric problems."

10         A     Yes.

11         Q     My question to you is what were

12    Mr. Manganelli's psychiatric problems in August

13    2013?

14         A     He had some condition which was

15    characterized by psychotic symptoms, and he had a

16    history of some degree of anxiety and depression at

17    earlier times.  And by his account, and also,

18    actually, by medical treatment, presentation, for

19    seizures.

20         Q     You're aware that following the

21    hospitalization at CPEP, Gallaudet repeatedly

22    offered services at the mental health center for

23    him?

24         A     I'm aware that he saw a few people.

25         Q     And that they offered counseling

```
 1    services for him, correct?

 2          A     I don't have any documentation about

 3    what they specifically offered him.

 4          Q     Are you aware that they encouraged him

 5    to attend counseling?

 6          A     Again, I'm not aware of who "they" is.

 7          Q     Gallaudet's mental health services

 8    center.

 9          A     I understand.  And I'm not aware of

10    any reference from the mental health services or any

11    documentation saying we believe that you should seek

12    counseling and when that happened.  That's not

13    information I've been provided.

14          Q     Okay.  Were you provided information

15    showing that Gianni repeatedly declined those

16    offers?

17          A     I know from what we referenced earlier

18    with Mr. Moore that he declined.  I know from what

19    Terrylene Sacchetti told me that he saw two

20    counselors and a psychiatrist.  Did he see those

21    people; they were made available to him.  And that

22    he -- that he had -- he didn't want to continue with

23    either -- with any of them, but for different

24    reasons.  That's the extent of my awareness.

25                I do know that Sue Mather had
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    121

```
 1    referenced whether he needed to be seen by someone,

 2    but I don't know whether that extended into his

 3    being offered or encouraged to go and seek

 4    psychiatric services at that point.  That's the

 5    extent of my awareness.

 6            Q      You indicate on page 7 with respect to

 7    the communications Ms. Duhon had with Thelma

 8    Schroeder about asking whether Gianni had a second

 9    disability.  You said, This correspondence

10    demonstrates that there was awareness of

11    Mr. Manganelli's major mental illness up and down

12    the Gallaudet institutional hierarchy.

13            Correct?

14            A      Yes.

15            Q      Okay.  What was his major mental

16    illness as of August 27, 2013?

17            A      If he had some kind of a psychotic

18    condition, that would have been a major mental

19    illness.

20            Q      Are you aware of any evidence

21    suggesting that the officers that appeared at

22    Gianni's dorm room on March 28/29, 2014 had any

23    knowledge of his prior psychosis?

24            A      You mean the August 23?

25            Q      No.  Are you aware of --
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    122

```
1          A       No, but I'm saying -- when you say
2     "prior," you're talking about August 23?
3          Q       Well, you said that Gallaudet was
4     aware up and down the institutional hierarchy.
5          A       Yes.
6          Q       Do you have any evidence that shows
7     that the officers who appeared at Mr. Manganelli's
8     dorm room on March 28/29, 2014 had knowledge of Mr.
9     Manganelli's major mental illness?
10         A       At the time they first appeared, no.
11    But during the course of their appearance and prior
12    to his being taken into custody, yes.  As they
13    became aware that he had bipolar illness and that
14    they were informed by Adrienne Morgan of her
15    characterizations of him.
16         Q       Would characterizing his behavior as
17    bizarre be the same thing as saying somebody has a
18    major mental illness?
19         A       Not necessarily.  Yes or no.  It might
20    be.  It's certainly the characterization of somebody
21    who is -- having a diagnosis of bipolar illness
22    would be an awareness of major mental illness.
23         Q       And you'd agreed with me previously
24    that the officer searched the room for medication
25    for treatment of bipolar disorder and found nothing,
```

```
1   correct?

2        A    I agree that that's what took place.

3        Q    But you agree with me that when they

4   showed up at the door, they had no knowledge of

5   Gianni's major mental illness?

6        A    Yes.

7                    MR. GROSZ:  You're talking about

8             those two officers, in particular?

9                    MR. WATERS:  Yes.  Thank you.

10       Q    Now, you indicated that,

11  Mr. Manganelli was removed from the university

12  community on March 29, 2014 without any effort to

13  engage BIT, mental health counseling, or Gianni's

14  mother.

15            Correct?

16       A    That's correct.

17       Q    You're not an attorney, correct?

18       A    Of course not.

19       Q    And you're not testifying about the

20  District of Columbia's domestic violence laws,

21  correct?

22       A    No.

23       Q    And you're not aware of the domestic

24  violence laws in the District of Columbia with

25  respect to mandatory arrest for respondents in
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    124

1    domestic violence situations?

2            A    I'm not aware.

3            Q    Okay.  Doctor, is it your -- are you

4    opining in this statement that the university had an

5    obligation to contact the student's parents when

6    making an arrest?

7            A    I don't know what the legalities are

8    of an obligation.  What I am opining is if they

9    contacted his mother, he'd still be alive.

10           Q    You indicated that she knew nothing of

11   the arrest in the 30 hours preceding his death.  You

12   are aware that he told her that DPS had his wallet,

13   correct?

14           A    Yes.

15           Q    You are aware that she did not ask him

16   about the text that he sent her on the car ride home

17   after picking him up on campus, correct?

18           A    I'm just not sure.

19           Q    Next paragraph you indicated, As was

20   the case when he was detained in August 2013, Gianni

21   Manganelli could have been --

22           A    I'm sorry, I need to add to the other

23   answer, because I was thinking about our telephone

24   discussion, which you have the notes of.  I

25   understand you haven't had a chance to review them.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          125

```
 1                    As I recall, I did ask her about
 2   him -- her impressions of him after she picked him
 3   up, and she said that he was uncommunicative; that
 4   he was sweating and in distress, but he was
 5   uncommunicative, he was quiet.  I don't believe that
 6   I asked her did you ask him about the texts.  But
 7   my -- she did convey to me that he was remote; that
 8   he was not engagable.  So that much I recall from
 9   the discussion.
10         Q    And you have not read her second part
11   of her deposition?
12         A    No.
13         Q    So you have not read the questioning
14   where she was asked about what she discussed with
15   Gianni, if anything, about the text messages?
16         A    No, I didn't read it.
17         Q    So you have no reason to dispute that
18   the testimony shows that she did not ask him about
19   what those texts meant on their car ride home?
20         A    If that's what she testified to, sure,
21   I have no reason to dispute it.  And it's not
22   inconsistent with what I gathered from her.  I'm
23   just adding that to your understanding from my
24   discussion with her, which wasn't informed by that
25   deposition.  Independent of that I asked her about
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          126

```
 1    what he was like on the car ride, and that's what
 2    she shared with me.
 3          Q      You indicated that Gianni could have
 4    been involuntarily admitted to a psychiatric
 5    hospital.  He was not.  This is the night of March
 6    29, 2014, that you believe that Gianni could have
 7    been involuntarily admitted to a psychiatric
 8    hospital?
 9          A      He could have been admitted on the
10    28th involuntarily.
11          Q      I'm sorry.  Okay.  The 28th or the
12    29th?
13          A      Correct.
14          Q      Okay.  All right.  So based on the
15    information that was available to Gallaudet's
16    Department of Public Safety officers on the 28th and
17    29th, around midnight, I guess, there was cause to
18    detain Gianni against his will?
19                    MR. GROSZ:  Form.
20          A      You mean psychiatrically?
21          Q      Yes.
22          A      Sure.  Because the whole point of his
23    being taken into custody was that he was a danger to
24    his roommate and the roommate's friend, that he was
25    assaultive, ultimately charged with simple assault.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    127

1          Q      And to do so, there was cause to
2     restrict his personal movement?
3          A      Sure, especially because it was
4     accompanied by symptoms of psychosis.  You know, it
5     becomes arguable when it's an issue of two people
6     just having a dispute.  You know, a person doesn't
7     get psychiatrically hospitalized just because two
8     people have an argument that culminates in a fight.
9     But when there's indication that someone has either
10    past psychiatric illness or diagnosis of bipolar
11    illness, isn't taking medication, police haven't
12    found any medicine he's taking, and the sense from a
13    complainant that if someone makes an irrational
14    assertion, then takes a swing at him, then threatens
15    someone else, then danger to self, danger to others,
16    at least on the basis of danger to others, it would
17    have been a completely defensible decision to commit
18    him, especially because, in my professional
19    experience, what will happen is if somebody gets
20    referred for admission is they are given the
21    opportunity to sign in voluntarily.  And every
22    indication is that he would never have signed in
23    voluntarily.
24               The only way to get him treatment
25    would have been to sign him in involuntarily, which

1    then could have been done, it was a golden

2    opportunity to do so.  And, in fact, the only time

3    that he had actually received psychiatric treatment

4    was the last time he had been involuntarily

5    committed and then was ultimately treated with an

6    antipsychotic and symptoms improved.

7          Q    I think you anticipated my next two

8    questions, which were:  There was cause at that time

9    to send Gianni to a psychiatric hospital against his

10   will?

11         A    Yes.

12         Q    And there was cause to force him to

13   take medication against his will?

14         A    Yes.

15         Q    Okay.  And it's your opinion that

16   that's what should have been done?

17         A    Yes.

18         Q    The next paragraph you state, The very

19   basis of Mr. Manganelli's arrest was his purported

20   dangerousness and threats.

21         A    Yes.

22         Q    He was thought to be at risk to

23   revisit.

24         A    I'm sorry, could you direct me to

25   where we are?

1          Q     It's page 7, a little bit more than

2     halfway down.  The very basis of Mr. Manganelli's

3     arrest was his purported dangerousness and the

4     threats he was thought to be at risk to revisit.

5          A     Yes.

6          Q     Okay.  So the decedent's risk to

7     others was demonstrated by the arrest alone.  The

8     psychiatric relevance was reflected in the arrest of

9     an otherwise docile person.

10               So do I understand this correctly that

11    because he was exhibiting threatening behavior to

12    others, it was apparent to the arresting officers

13    that he was in a psychiatric emergency?

14                         MR. GROSZ:  Form.

15    BY MR. WATERS:

16         Q     I'm just trying to understand it.

17         A     No.  What I'm saying is that the

18    factual narrative that was accepted and operative to

19    the officer's decisions was that he was assaultive

20    and threatening.  And notwithstanding that he was

21    quiet and docile, which he would have been in the

22    emergency room, he would have seen the doctor --

23    what the typical procedure is if somebody gets

24    brought in, officers will bring somebody else, and

25    you as a psychiatrist examine someone, and they

1    present the way they present.

2                Based on how he presented to police,

3    based on how he presented to Adrienne Morgan, just

4    in his physical manner, he wasn't highly agitated --

5    she found him bizarre, but he wasn't menacing to

6    her.  He was -- now, of course, she felt the need to

7    do a welfare check later, but there wasn't anything

8    about him that she felt extended beyond what was

9    going on between him and his roommate.  She

10   experienced it as something limited to their

11   conflict.  But it was significant enough that he

12   would be arrested and then -- and that -- and

13   separated from the roommate and the friend.

14               If he presented to an emergency room,

15   it's my professional opinion, especially because of

16   his aversion to psychiatric treatment, that he would

17   have presented in a composed way, basically

18   advocating, I don't need to be here, why am I here,

19   in other words, why are you arresting me?  But that

20   by virtue of that history of officers saying, well,

21   the reason he's here is because he took a swing at

22   his roommate, he's saying irrational things.  And we

23   talked to a CRE who said he's irrational, and a

24   roommate's friend came in and merely knocked at the

25   door and he basically said, If you come in here,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    131

1    things are going to get physical, he would have been

2    committed with that kind of history.

3         Q     Doctor, is it your opinion that any

4    time an otherwise docile person --

5         A     Sorry.  I need to add one important

6    tag.

7               Were you to present in an emergency

8    room, the standard procedure would be to get his

9    previous medical history, and if he got his previous

10   medical history, which would have demonstrated he

11   had a previous psychiatric admission at which time

12   he responded to antipsychotics, at which time he

13   needed to be treated involuntarily, that that would

14   have heightened the -- or that that would have eased

15   the decision tree for a doctor to say, okay, well,

16   this is how it was handled in the past, it resolved

17   irrational behavior, and so that's how we're going

18   to deal with it now.  You can sign in voluntarily

19   and that dialogue would have taken place.  In my

20   professional opinion, he would have refused, at

21   which point, they would have had reason, by virtue

22   of the arrest, to involuntarily commit him.

23        Q     Doctor, is it your opinion that any

24   time an otherwise docile person is arrested for

25   making threats, that that person should be admitted

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    132

```
 1    to a psychiatric institution?
 2         A    No.  But he would have presented with
 3    a history of bipolar illness and a history of other
 4    informants who experienced him as bizarre and
 5    irrational.  And in those circumstances, in my
 6    professional opinion, yes.
 7         Q    Even if D.C. law required the arrest
 8    for a domestic violence dispute?
 9                   MR. GROSZ:  Form.
10         A    I don't know that I understand the
11    question.
12         Q    That he should have been taken to a
13    psychiatric hospital even if D.C. law required the
14    arrest of somebody in relation to a domestic
15    violence dispute?
16                   MR. GROSZ:  Form.
17         A    The two are not mutually exclusive, at
18    least in my experience.  I evaluated quite a number
19    of people in multiple emergency rooms that I worked
20    in in which police brought someone in.  And they
21    would bring someone in and have them psychiatrically
22    evaluated and they were under arrest.  And in
23    certain instances, they are admitted to the hospital
24    and arraigned while they were on the inpatient unit.
25                   So one don't necessarily preclude the
```

```
 1    other.  The idea of admitting someone
 2    psychiatrically doesn't mean that you drop the
 3    charges if the person doesn't remain in custody.
 4    It's a -- and, again, this is more experience -- I
 5    don't know how it's -- it relates in D.C., but I
 6    would have to imagine that it's the same thing
 7    because it's a common circumstance of people who
 8    do -- we're not even talking about things such as
 9    here about whether it's -- it is -- you know,
10    whether he should have been arrested, which is part
11    of the legal question.
12              You know, you have instances where
13    someone pulls a knife on someone, stabs somebody,
14    they are highly agitated, they get taken to an
15    emergency room, and they are cuffed, and examined,
16    and if they get admitted, they are still under
17    arrest.  They get arraigned on the unit.  But where
18    they are actually taken has to do with the nature of
19    the arrangement they have with the police
20    department, because there are certain places they
21    will take people like that and certain places they
22    will not.
23         Q    So is it fair to say that this
24    paragraph is not saying that the threats themselves
25    were enough to commit Gianni?
```

1         A     The threats themselves.  It was the

2    threats and the available history.

3         Q     The available history being that his

4    roommate said Gianni was bipolar and Adrienne Morgan

5    said that he was acting bizarrely?

6         A     And also the roommate, roommate's

7    history that he was making accusations that were --

8    that, by the roommate's account, were bizarre.

9         Q     What accusations?

10        A     Staring and touching his things, and

11   that was a basis for hitting him.  Telling somebody

12   who might come into the room to merely help move his

13   things that -- you know, it's why the physical

14   threat and assault was taking place and not just the

15   nature of it.  If the nature of the confrontation

16   was, you know, He called me a putz and I didn't like

17   it, well, then, that's very different from the idea

18   of, I'm going to swing at you because I don't want

19   you coming into my room when I -- when you're merely

20   helping your friend to get things.  That's

21   irrational.

22        Q     You indicated that Gianni was overtly

23   psychotic at the time of the arrest?

24        A     Yes.

25        Q     What behavior at the time of the

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     135

```
 1    arrest was overtly psychotic?
 2          A     The threat to the friend that inspired
 3    a call to the police.  That's behavior.
 4          Q     Well, the threat to the friend
 5    happened that afternoon, correct?  That happened
 6    several hours before, correct?
 7                      MR. GROSZ:  Form.
 8          A     But it's contemporaneous with the
 9    arrest.
10          Q     I'm saying at the time of the arrest,
11    in the hallway --
12          A     The actual time --
13          Q     -- at midnight, when the arrest is
14    actually taking place, what of Gianni's behavior was
15    overtly psychotic?
16          A     I would characterize it as ambiguous,
17    because he was not responsive to police, and no one
18    bothered to ask the question is he not responsive
19    because he's irrational and he's really confused?
20    In other words, his noncompliance with the request
21    to step away from his room, and his silence, and his
22    repeating, Why am I being arrested, over and over
23    again, and his blank stare, is that consistent with
24    psychosis?  Yes.  Is that in and of itself de facto
25    conclusive that there couldn't be some other
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    136

```
 1    explanation?  No.  So that's why I'm saying, it's
 2    ambiguous.
 3          Q     So not complying with the police isn't
 4    necessarily psychosis?
 5          A     That's correct.
 6          Q     And asking why is not psychosis,
 7    correct?
 8          A     That's correct.
 9          Q     And staying silent is not psychosis,
10    correct?
11          A     That's correct.
12          Q     And a blank stare is not psychosis,
13    correct?
14          A     Not -- again, not in a vacuum, no.
15          Q     The next paragraph you indicated
16    that --
17          A     I need to add this brief point.
18                He was recuffed.  He was first cuffed
19    and then recuffed.  And the rationale of Officer
20    Bauer, Lieutenant Bauer, was that he was not
21    responsive.  And that's extremely poor judgment.
22    You've got an officer who tells you, Step away from
23    the door, there's no reason not to, and he didn't.
24    And so he displayed extremely poor judgment.
25                And so Lieutenant Bauer describes
```

1    uncuffing him in an effort to just give him freedom

2    of movement, and his movements resulted in his

3    getting recuffed, which was, again, extremely poor

4    judgment.  And so while there are multiple ways to

5    interpret that, when one factors in this history of

6    bizarre behavior that resulted in the police being

7    called in the first place, and the experience of

8    Adrienne Morgan coming and telling police that she

9    experienced him bizarre, enough that she had planned

10   to do a welfare check on him later anyway, that she

11   notified Public Safety about him, that if you couple

12   that together, it would be reasonable to ask, well,

13   gee, is the fact that he didn't respond by walking

14   away from the door and he's got a blank stare and he

15   keeps repeating, Why am I cuffed, are we seeing the

16   same thing?

17            Now, I am not saying that absolutely,

18   positively those points in a vacuum are de facto

19   indications of psychosis.  But the totality, it

20   would be a very reasonable interpretation that his

21   unexpected behavior which prompted Lieutenant Bauer

22   to have enough alarm to restrain him, would be

23   explained by the same irrational disorganization in

24   his head that was contributing to how he related to

25   others.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    138

```
 1        Q     Okay.
 2                    MR. WATERS:  I'm going to move
 3              to strike.  It's nonresponsive.
 4                    MR. GROSZ:  I disagree.
 5                    MR. WATERS:  Well, this is going
 6              on and on and on to the point that it's
 7              interfering with my ability to conduct
 8              the deposition, Justin.
 9                    MR. GROSZ:  Respectfully, you've
10              been going for, what, four hours?
11              Roughly.
12                    MR. WATERS:  Not even.
13                    MR. GROSZ:  We started just at
14              1:00, and now it's 4:30.
15                    MR. WATERS:  Right and we
16              started -- it's three hours 15.
17                    MR. GROSZ:  Okay.
18                    MR. WATERS:  I'm getting
19              constant additional answers that are
20              argument and that are not responsive to
21              my questions.  I think it's
22              inappropriate, and we'll take it up with
23              the court at the appropriate time.
24                    MR. GROSZ:  That's fine.  We
25              agree to disagree.
```

```
 1    BY MR. WATERS:
 2          Q     Doctor, I just want to make sure we're
 3    clear about this.  You're not giving any opinions as
 4    to the legality of the arrest, correct?
 5          A     No.
 6          Q     Okay.  That's not correct?
 7          A     No, I'm not giving those opinions.
 8    That is correct, I'm not giving those opinions.
 9          Q     So you're not giving the opinion that
10    there was not sufficient cause, okay, based on the
11    information available to the police officers to
12    arrest Gianni on a criminal offense, correct?
13          A     I'm not giving that opinion.
14          Q     Okay.  The opinion you're giving is
15    that instead of arresting him and pursuing a
16    criminal track, they should have pursued a
17    commitment track, correct?
18          A     What my opinion is, they should have
19    incorporated a psychiatric track.  It's not the
20    police officers who can commit someone.  But if
21    police officers pursued a psychiatric track, then
22    psychiatrists would have committed him.  That's what
23    I'm saying.  And if they committed him, he would be
24    alive.  That's what I'm saying.  And -- that's what
25    I'm saying.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    140

1              Q      So you're giving no opinion as to the

2      underlying basis for the arrest?

3              A      That's a legal issue.

4              Q      Okay.  At the bottom of page 7 you

5      reference, Public Safety procedures require referral

6      from a mental health counselor on call in the event

7      of a mental health incident.

8                     Are you referring to Gallaudet's

9      public safety procedures?

10             A      Yes.

11             Q      Are you aware that those same

12     procedures require DPS officers to defer to

13     Metropolitan Police in domestic violence disputes?

14             A      I'm not aware of those -- I'm not

15     aware of the notion of deferral and what that means.

16     In other words, I don't know whether deferral means

17     that D.C. is -- takes over.  I'm not aware of

18     whether D.C. kind of overrules what DPS informs

19     them.  I'm just not aware of the legal arrangement.

20             Q      Are you aware that it's Gallaudet's

21     policy that if it is determined that the incident

22     could have been classified as domestic violence,

23     D.C. law requires DPS to contact D.C. MPD regardless

24     of the wishes of the victims and the respondents?

25             A      I'm not aware, but I'm aware if --

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    141

1    that's -- as you're reading it to me, I'm aware of

2    that now.

3            Q      You indicated that Gianni had a

4    history of refusing treatment with psychotropic

5    medicine?

6            A      Yes.

7            Q      Is that in reference to the Depakote

8    that he was given for seizures?

9            A      That's correct.

10           Q      Is Depakote --

11           A      I'm sorry.  I don't know whether he

12   was given Depakote for seizures.  Depakote is an

13   antiseizure medicine, but it's also psychotropic,

14   and it's possible that the doctor who prescribed it

15   represented to him, or it was his interpretation

16   that he was taking an antiseizure medicine, but he

17   was actually taking something that was prescribed to

18   him because of its psychotropic properties.  So

19   that's an important distinction.

20           Q      I was just about to ask.  Depakote is

21   off label for antipsychotics?

22           A      It's a mood stabilizer.  And certainly

23   in the psychiatric community, prescribers liberally

24   prescribe medications for O-F-F label reasons.  And

25   Depakote is a staple of mood stabilizer treatment.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    142

1         Q    Okay.  Are you -- I just want to make

2    sure that I'm clear.  Is that -- his course with

3    Depakote, is that what you're referring to here in

4    the paragraph on page 8?

5         A    Yes.

6         Q    Okay.  Are you aware of any other

7    attempt to put him on psychotropic medicine?

8         A    I believe that there was -- I believe

9    that he may have been recommended for an

10   antidepressant, that there's somewhere in the record

11   that he was.  But he was not compliant for any

12   period of time, if he was.

13        Q    Do you know what they gave him at

14   CPEP?

15        A    Geodone.

16        Q    What is that?

17        A    It's a antipsychotic.  They may have

18   given him another antipsychotic in CPEP, and then

19   once he was admitted, they gave him Geodone.

20             I want to go back in the record to see

21   whether he got Haldol, because I feel that he may

22   have had Haldol done when they first encountered

23   him.  But he did get Geodone, which is an

24   antipsychotic.

25        Q    Okay.  By the way, Gianni had a

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    143

```
 1   history of refusing medical treatment?

 2          A      Oh, yes, correct.

 3          Q      And in lieu of medication, he treated

 4   with a -- he self-medicated with marijuana,

 5   cannabis-related substances and other illegal drugs,

 6   correct?

 7                     MR. GROSZ:   Form.

 8          A      His characterization of the

 9   cannabis-related was self-medicating.  There were

10   other drugs he may well have used, and I don't know

11   whether he experienced that as self-medication or

12   just simply recreation and whether he drew a

13   distinction.  But the way he characterized the

14   cannabis derivative was that it was self-medicating.

15          Q      And you're aware that was illegal in

16   the District of Columbia when Gianni was there?

17          A      Yes, I am.

18          Q      You indicated at the bottom of this

19   page that Gianni Manganelli's arrest was elective.

20          A      Yes.

21          Q      You're not making a legal opinion as

22   to the legal requirements on the arresting officers

23   to arrest in a domestic violence situation, correct?

24          A      No.  What I am -- what I am pointing

25   to is that there's a CAD form in which DPS
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    144

1   notifying D.C. police on the dispatcher response, Do
2   you want us to send EMS?  And so with the
3   presentation by DPS to the D.C. police, which
4   included characterization of him as bizarre, that
5   the decision that might have been made at that point
6   might have been either a psychiatric drug or a
7   police track, depending on who came and how they
8   assessed the situation.
9            But the EMS was declined and -- by
10  DPS, and the police went.  And then procedurally
11  what happens from there is not part of my expertise.
12  But there were points at which other aspects of his
13  history were being considered, and so the idea of --
14  I don't know whether an arrest would be mandatory.
15  I understand from what you're saying is that police
16  would have -- D.C. police would have to be called if
17  there's a domestic violence situation.  I don't know
18  whether they are obliged to arrest someone once they
19  come there and try to sort it all out.
20       Q     But that's a legal issue?
21       A     That's correct.
22       Q     All right.  Either way, the
23  circumstances that existed on March 28/29, Gianni's
24  either leaving with the police pursuing a criminal
25  track under arrest, or he's being detained and

1    removed from campus against his will and taken to a

2    psychiatric hospital involuntarily, correct?

3           A     Or taken by police to a psychiatric

4    hospital as a prelude to arrest for some sort of

5    clearance to say, you know, We have this history,

6    let's get a doctor's opinion and see whether we're

7    dealing with something that we can kind of move to

8    the next step, take him down to the station and

9    process him, or whether he really needs a closer

10   focus and we'll resolve this in an emergency room.

11          Q     I guess my question is, either way it

12   involves Gianni leaving campus involuntarily?

13          A     Again, I don't know if he was obliged

14   to be removed from the area.  The fact that he was

15   handcuffed, I don't know when once you are

16   handcuffed whether that obliges whatever authority,

17   be it DPS or the D.C. police, that he is legally

18   obliged to be removed, or whether the campus is

19   legally obliged to remove him from the room,

20   especially because the complaint was made and he had

21   a different characterization of events, and that, I

22   think, is a legal issue.

23          Q     Assuming that's the case, though,

24   okay, either way, Gianni's going to be leaving

25   campus involuntarily:  He's either going to the

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    146

```
1    psychiatric hospital against his will, or he's going

2    with the police in cuffs?

3         A    No.  But what I'm saying is I don't

4    know.  My point is they could just as soon take the

5    cuffs off and say, You know what, we're not going to

6    make an arrest here.  We're going to figure out some

7    kind of a resolution that doesn't involve his

8    detention.  And those are -- I mean, and this is

9    from experience.  Police officers respond to

10   domestic incidents all the time.  They don't always

11   culminate in arrest.  Some of them culminate in

12   officers speaking to people and dealing with the

13   principals and then making some kind of a plan.  And

14   I think that that -- it's situation-specific.

15                   And also, I guess this intersects with

16   the obligations under D.C. law.  I worked on a

17   number of different cases in which domestic violence

18   is involved, and some of them result in arrest, some

19   of them result in hospitalization, some of them

20   result in relatives getting involved and people

21   being separated.  There are any number of

22   possibilities.  In terms of the necessity of

23   removing him from the scene, that becomes a legal

24   issue.  But in terms of -- as a matter of

25   experience, there are a range of possibilities for
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                        147

```
1    how this could have ended up even after his being

2    handcuffed.

3           Q     I do understand from the report,

4    because I think it's in here three times, that there

5    was cause to remove Gianni involuntarily and commit

6    him?

7           A     Yes.

8           Q     All right.  You indicated here that,

9    Gallaudet University erred in referring Gianni for

10   arrest and incarceration.

11                You're not giving a legal opinion

12   there, correct?

13          A     I'm giving a psychiatric opinion.

14          Q     Based on Gianni's mental state?

15          A     Yes.

16          Q     Doctor, are you aware under D.C.'s

17   involuntary commitment statute that Gianni would

18   still need to be arrested?

19          A     I'm not aware.

20          Q     Okay.  You indicated on -- I'm looking

21   at page 9, The suicide that followed Gallaudet's

22   actions could have potentially been prevented had

23   the university provided Mr. Manganelli with

24   alternative housing at the point of initial

25   complaint, at the point police were called, upon the
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     148

```
1    order separating from his roommate, correct?
2            A     Yes.
3            Q     So it's your view that Gianni could
4    have decided not to take his own life if Gallaudet
5    had provided alternative housing at the point of
6    initial complaint.  I'm assuming you mean when he
7    first spoke with Ms. Morgan, correct?
8            A     Correct.
9            Q     Okay.  And Gianni, if he had been
10   given another room, could have made the decision not
11   to commit suicide?
12           A     Correct.
13           Q     Okay.  You said at the point police
14   were called, so are you referring to, then, when DPS
15   arrived in his room and made the initial detention?
16           A     Correct.
17           Q     And found out that he was --
18           A     Even before they detained, when they
19   came to his room.
20           Q     Okay.  So let's break that down.  When
21   they first came to his room, if they had provided
22   him with an alternative room, he could have made the
23   decision not to commit suicide?
24           A     It's possible, sure.
25           Q     Okay.  After he was detained by
```

1    Gallaudet DPS, is it your opinion that if he had

2    been provided alternative housing, he could have

3    made the decision not to commit suicide?

4          A    Yes.

5          Q    And when he returned to campus with

6    the order separating him from his roommate, if the

7    university had given him alternative housing on

8    campus, it is your decision that he could have

9    made -- that he could have decided not to commit

10   suicide?

11         A    Yes.  It's my impression.

12         Q    All right.  Now, he did ultimately get

13   alternative housing at his mother's apartment that

14   night, correct?

15         A    Yes.  He was -- he had that available

16   to him.

17         Q    But the fact that he had alternative

18   housing at his mother's home didn't prevent his

19   suicide, correct?

20         A    That's correct.

21         Q    So I've got this straight:  If

22   Gallaudet had provided alternative housing, Gianni

23   could have decided not to commit suicide?

24         A    Correct.

25         Q    But the fact that he had alternative

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    150

```
 1    housing with his mother did not prevent his suicide?
 2         A    That's right.  And again, I addressed
 3    this before.  It's not homelessness per se.  It's
 4    the idea of eviction in the context of his overall
 5    relationship to Gallaudet and how important the
 6    structure and stability of that aspect of his life
 7    was to him.
 8         Q    But he wasn't homeless.  He had his
 9    mother's place.
10         A    Exactly.  That's my -- that's exactly
11    what I'm saying.  It's not homelessness per se.
12         Q    Now, at the bottom -- toward the
13    middle of page 9 you indicated Mr. Manganelli was
14    forced off campus?
15         A    Yes.
16         Q    Was physical force used by Gallaudet
17    University to remove him from campus?
18         A    No.
19         Q    He was not instructed by DPS or
20    anybody else, You must leave campus, correct?
21         A    No.  But he was provided no place to
22    go to sleep.  So what would have been the
23    alternative?  He wouldn't be sleeping in the student
24    union.
25         Q    Again, you're aware that he had
```

1    friends on campus and had spent time with his

2    friends that afternoon?

3         A     But the point being, you know, there's

4    no indication -- it's one thing to spend the night

5    with someone and say, Can I crash at your place for

6    a day.  It's another thing to then just sort of

7    presume, Well, then, you can move in with me

8    indefinitely.

9              And it's a fundamental need, the idea

10   of shelter.  And there was no plan, no provision for

11   where he was going to stay indefinitely after that.

12   So that's very real, that -- and there was -- that's

13   it.  There was no -- there was no shelter available

14   to him from Gallaudet, which is a separate issue

15   from whether, in theory, he might have found

16   somebody who was willing to accommodate him for

17   whatever day, or even over the course of the rest of

18   the weekend.

19        Q     There's no evidence that Gianni asked

20   either Ms. Morgan or the officer who escorted him to

21   his room to provide alternative housing that night?

22        A     On the 29th?

23        Q     Correct.

24        A     Yes.

25        Q     But there is evidence on the 29th that

```
 1    he asked his mom to pick him up and take him home?
 2          A     That's correct.
 3          Q     Okay.  And when he texted his mother,
 4    he said, Life in danger, pick me up now, correct?
 5          A     That's correct.
 6          Q     You indicated that Ms. Sacchetti had
 7    no context in which to consider this message?
 8          A     That's correct.
 9          Q     What context is necessary to
10    understand the message from your child saying, Life
11    is in danger, pick me up now?
12          A     I have no place to go.  I've been told
13    to get out of my room, I've been told to stay out of
14    my -- away from my roommate.  I got arrested by the
15    cops who threw me on the floor and cuffed me behind
16    my back, and I've been in custody for half a day,
17    and -- and I don't have my wallet.  It's a bad
18    night.
19                Now, of course, if she knew that, then
20    immediately, in my professional opinion, she would
21    have connected with a responsible senior person at
22    Gallaudet, because she had arranged that
23    infrastructure and moved to Washington specifically
24    so she could be in a position to be responsive, and
25    would have been in a position to actively intervene,
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    153

1   recognizing that he was in the middle of a crisis of

2   some kind.

3          Q     Life in danger, pick me up now, isn't

4   enough to tell her he's in crisis?

5          A     I think he was saying a lot of

6   irrational things.  He was saying that he couldn't

7   wear certain clothes because people would make

8   passes at him.  He had told his mother a couple

9   weeks earlier that his computer was hacked.  It

10  would be very difficult for her to differentiate

11  that from anything else that he might have said that

12  was irrational.  But when she did act was with the

13  urgency.  She immediately dropped everything and

14  went and picked him up.

15         Q     The text messages, which were marked

16  as Exhibit 57, I'm going to provide you a copy of

17  them.

18         A     Thank you.

19         Q     The very first text message says, Life

20  in danger.  Pick me up now.  Carlin Hall.

21               Correct?

22         A     Yes.

23         Q     Nothing in that -- and by the way,

24  Carlin Hall was not where he was living?

25         A     That's correct.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     154

1          Q     And that would indicate that he was at
2     a dorm where he was not living?
3          A     I don't know.  He may have been there
4     because it was by a street where you pick someone
5     up.  Some dorms are places that you access in a
6     pedestrian way and some dorms are ones that you can
7     drive right up to.  So I didn't know what to make of
8     that one way or the other.
9          Q     The next sentence says, I am in my old
10    room at Carlin.  Please come and pick me up right
11    now because my life is in danger.
12         A     Okay.  Fair enough.  Correct.
13         Q     And there's nothing in here that
14    says -- where Gianni said that, I've been evicted
15    from campus, correct?
16         A     No, it doesn't say.
17         Q     There's nothing in here that says if
18    he had been arrested, correct?
19         A     No.  That's correct.
20         Q     There's nothing in here saying that
21    there's a stay-away order, correct?
22         A     That's correct.
23         Q     And there's nothing in here saying
24    that the university is kicking him off campus?
25         A     There's nothing there, correct.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          155

1          Q      Now, you were aware that the people

2     who were in the car with Ms. Sacchetti included a

3     Gallaudet employee, Yvonne Black, correct?

4          A      Yes.  For whatever reason, I can't

5     place her as a Gallaudet employee, but I remember

6     there was a hearing impaired person who was in the

7     car, and it was one of the people who went to pick

8     him up.

9          Q      Assuming she was a Gallaudet employee,

10    with a statement like, Life in danger.  Pick me up

11    now, are you aware of any effort Ms. Sacchetti made

12    to contact Gallaudet University, either herself or

13    through her passenger, who was a Gallaudet employee,

14    to contact DPS or anybody at the university saying,

15    My son's telling me his life is in danger.  He's in

16    Carlin Hall.  I'm on my way.  Please help?

17         A      She went to pick him up.

18         Q      But she didn't contact Gallaudet on

19    her way to pick him up to tell them about the

20    urgency of the message?

21         A      No.

22         Q      In fact, when she picked him up, she

23    didn't ask him anything about the text messages?

24         A      Not that I'm aware of, no.

25         Q      And on the way home, the path back to

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    156

```
1    her apartment led right past a psychiatric hospital.
2    Are you aware of that?
3              A     I'm not aware of that.
4              Q     And on the way home they stopped at a
5    liquor store.  Are you aware of that?
6              A     Not aware of that.
7              Q     Okay.  And when Gianni went out to
8    buy -- to go into the store, he realized he didn't
9    have his wallet and told his mother that.  Are you
10   aware of that?
11             A     I'm not aware of what happened in the
12   store because I wasn't aware that they stopped in
13   the store.
14             Q     Are you aware that he told his mother
15   that he did not have his wallet?
16             A     I'm aware of that.
17             Q     That DPS had his wallet?
18             A     Yes.
19             Q     And that she did not ask why DPS had
20   his wallet?
21             A     I'm not aware of that.
22             Q     You would agree with me that he
23   indicated on multiple different times in this text
24   message that his life was in danger?
25             A     Correct.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                        157

1          Q     But he never indicated anything about

2     being arrested or evicted from campus?

3          A     No, he did not.

4          Q     You indicated that there was no

5     conflict between Mr. Manganelli and his parents, or

6     within his family otherwise, no argument, correct?

7          A     Yes.

8          Q     You are aware now that at least as of

9     March 4, Gianni was indicating he was arguing with

10    his parents?

11         A     You mean here (indicating)?

12         Q     Yes.

13         A     Where he says he wasn't getting along

14    with his parents?  Yes, I'm aware of that.

15         Q     You're also aware that, are you not,

16    that his father had a history of alcoholism?

17         A     It's not something that I really

18    strongly considered, if I was aware of it.

19         Q     Are you aware that his parents didn't

20    get along?

21                    MR. GROSZ:  Form.

22         Q     Historically.

23                    MR. GROSZ:  Form.

24         A     Well, they divorced, so that -- that's

25    something I presumed.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                       158

```
 1           Q     Did you ever learn anything about
 2     Gianni's rage episodes?
 3           A     I only saw mention of them.
 4                 I just want to give you a heads up
 5     because I had scheduled this 1:00 to 5:00.  I have a
 6     call at 5:15.  So I know we started a little late,
 7     so --
 8           Q     Do you have an estimation as to how
 9     long the call will last?
10           A     The call will last about 10 minutes.
11           Q     That's fine.
12                 I'm going to show you what's been
13     marked as Exhibit 51, and then we can stop for your
14     call.
15           A     Well, the call's at 5:15.  You have 15
16     minutes.  I just wanted to give you a heads up so
17     that I wasn't ambushing you.
18           Q     Okay.
19                      (A discussion was held off the
20                 record.)
21           Q     Have you seen this report before?
22     This is from -- who is this from?  It's from Burton
23     Roger, MD, a psychiatrist.
24           A     Maybe.  I need to look at it a little
25     more closely.  It's not -- no, I didn't see it.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    159

```
1            Q      Okay.
2            A      I definitely didn't see it.
3            Q      I'd like to point out some things.
4                   Looking at Present Illness, with
5      regard to Gianni, This individual has a
6      long-standing history of anxiety dating back to 9 or
7      10, according to the patient's mother.
8                   Were you aware of that?
9            A      No.
10           Q      Okay.
11           A      I had awareness of a previous history
12     of anxiety.  I didn't have an awareness of it
13     extending back many years.
14           Q      Going down further, were you aware
15     that he had shifts in -- that there were shifts in
16     patient mood states and irritability at about age 14
17     or 15?
18           A      No, I was not aware of that.
19           Q      Going down the page a few paragraphs
20     down --
21           A      I'm sorry.  Just a moment.  I'm just
22     trying to catch up with you.
23           Q      Okay.  Sure.
24           A      Okay.  Where are you going to?
25           Q      "Patient believes."
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    160

```
1          A     Okay.  Hang on just a moment.  I'm
2    almost there.
3                Okay.  Yes, I'm there.
4          Q     He indicates that he believes his mood
5    has been very unstable since approximately age 14.
6    He recalls many nights around age 5 to 10 or 11 when
7    he had better hearing that he would lie awake at
8    night trembling when hearing his parents yelling
9    angrily with each other.
10         A     Yes.
11         Q     Had you been aware of that before?
12         A     No.
13         Q     On the next paragraph, Starting around
14   age 14, he began having rage episodes where he would
15   throw and break objects.  On May 20, 2013 he had a
16   severe one in which rage welled up in him with a
17   degree of intensity never before experienced.
18               Were you aware of that?
19         A     No.
20         Q     Did you ever discuss that with
21   Ms. Sacchetti?
22         A     No.
23         Q     Were you aware that she testified that
24   Gianni, on the May rage episode, went into the house
25   and broke all his prized possessions?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              161

```
 1           A     No.
 2           Q     Looking on the next page.  Indicates
 3   some family history, that there's a history of
 4   alcoholism and mood disorders.  Were you aware of
 5   that?
 6           A     No.
 7           Q     Developmental History --
 8           A     I'm sorry.  I'm not sure that I wasn't
 9   aware of some family history of alcoholism.  But in
10   terms of mood disorders, that's more unfamiliar to
11   me.
12           Q     Developmental History.  You'd agree
13   with me that Gianni told Dr. Burton, or Dr. Roger,
14   He sometimes feels his mother was not very effective
15   in her parenting and was somewhat absent in trying
16   to teach him and coordinate his care, as well as
17   help him understand and cope with life.
18                 Is that correct?
19           A     That's what it says, yes.
20           Q     Were you aware of that?
21           A     No.
22           Q     Did Ms. Sacchetti tell you anything to
23   that affect?
24           A     No.
25           Q     Mental Status Examination.  About
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    162

```
 1    halfway through that paragraph it indicates that
 2    Gianni was expressing anger at his mother's
 3    recommendation that he see a chiropractor and
 4    holistic medicine physician for his complex of
 5    symptoms.
 6              Were you aware of that?
 7         A    No.
 8         Q    Would you recommend that Gianni, given
 9    the rage episode that he described, and the mood
10    order, and the anxiety he described in this report,
11    would you recommend that he treat with holistic
12    medicine?
13         A    No.
14         Q    The diagnosis that Dr. Roger made on
15    the Axis I was explosive disorder with associated
16    recurrent general anxiety, major depression, as well
17    as habituation of marijuana.
18              Were you aware of that diagnosis?
19         A    No.
20         Q    On the Axis IV, for stressors he
21    included recent rage episodes, possibly secondary to
22    an underlying discharge in the brain, possibly
23    prefrontal cortex.
24              Were you aware of that?
25         A    No.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    163

```
 1              Q       Doctor, are you aware of what gliosis
 2       is?
 3              A       Yes.
 4              Q       What is it?
 5              A       It's a neurological condition that has
 6       to do with glial cells and the overgrowth of them.
 7              Q       And glial cells is basically like the
 8       tissue around the cerebral cortex?
 9              A       Yes.  It's a type of nerve cell.
10              Q       Can foci in the gliosis result in the
11       patient exhibiting psychiatric disorders, a
12       particular -- at localized portions of the brain?
13              A       Sure.  It's always where it happens.
14              Q       Prefrontal cortex?
15              A       Yeah.
16              Q       Have you seen any evidence indicating
17       that Gianni had had -- that his medical evaluations
18       and reports had found gliosis on the prefrontal
19       cortex?
20              A       I haven't seen.
21              Q       His generalized functioning score was
22       48.  That's moderate to severe, correct?
23              A       That's correct.
24              Q       And then the next page of the same
25       document indicates --
```

1          A     I don't think I have it.

2          Q     Okay.  I'm sorry.  That's 52.

3          A     I just got two pages here.  That's it.

4          Q     Okay.  I'm sorry.  I'll show you that

5     one too.

6                I'm going to show you what's been

7     marked as Exhibit 52 from St. John's family -- Child

8     and Family Developmental Center.  And this was from

9     what appears to be July 18, 2018.  2013.  Not 2018.

10         A     Uh-huh.

11         Q     On the Axis I he's diagnosed with

12    bipolar disorder not otherwise specified and

13    cannabis dependence.

14         A     Uh-huh.

15         Q     Were you aware of that diagnosis?

16         A     Yes, I was aware of him having been

17    diagnosed with bipolar disorder.

18         Q     Have you ever seen a document where he

19    was diagnosed with bipolar disorder, other than what

20    the roommate had said?

21         A     I feel like there's documentation that

22    made reference to bipolar disorder.  I didn't feel

23    like it was the first time I had seen it with the

24    roommate.  Somewhere.  And this may have been even

25    the document that I saw, because it says St. John's,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    165

```
1    and I do believe that I saw some record from
2    St. John's, although what you just provided me with,
3    I definitely did not see that document.
4            Q     On the Axis IV for psychosocial and
5    environmental problems, he checked off No. 1,
6    problems with primary support group, meaning his
7    parents and family.
8            A     Yes.
9            Q     For lack of emotional support?
10           A     Yes.
11           Q     Were you aware of that?
12           A     No.
13           Q     Down toward the bottom, Initial
14   problems and complaints, and its listed as rapid
15   mood shifts, rage episodes, irritability, sadness,
16   difficulty falling asleep, and SI.
17                 SI being suicidal ideation, correct?
18           A     Correct.
19           Q     So at least as of May 29, 2013, Gianni
20   is expressing suicidal ideation?
21           A     Correct.
22           Q     And his current GAF score at that time
23   was 46, which is even declined from the prior
24   report?
25           A     Correct.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    166

1        Q    GAF is essentially a measure of a
2   person's current risk state in terms of how they
3   were presenting at that particular moment?
4        A    Global Assessment of Function.  It's
5   a -- it's a gross appraisal, and it would be
6   imperceptible to compare 46 to 49, but I can
7   appreciate that whoever prepared this is trying to
8   say that the person's current function is less than
9   it was at its best, and that that's the purpose
10  behind it.  That person probably couldn't otherwise
11  distinguish it but is trying to make a point that
12  there is some slight decline from his best.
13        Q    All right.
14        A    In the past year, that is.
15                THE WITNESS:  I'm going to run
16            across the hall for a quick second.
17                    (A discussion was held off the
18            record.)
19                    (Whereupon, a recess was taken
20            between 5:06 and 5:12 p.m.)
21  BY MR. WATERS:
22        Q    So you indicated on page 10 that,
23  Gallaudet could never have expected him, Gianni, to
24  address his predicament or convey any risk to his
25  mother.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                         167

```
 1              Correct?
 2         A    Sorry.  I just need to get to where
 3    you are.  Can you --
 4                   MR. GROSZ:  First line on page
 5              10.
 6         Q    First line, page 10.  Gallaudet could
 7    never have expected Gianni to address his
 8    predicament or convey any risk to his mother.
 9         A    Yes, I wrote that, correct.
10         Q    Would you agree with me that when
11    Gianni is telling his mother, My life is in danger.
12    Come pick me up, that he's conveying risk to her?
13         A    I just don't know.  I don't know.
14         Q    Given her experience with Gianni's
15    rage episodes and prior anxiety, and the issues that
16    were described in the report that I just showed you,
17    Exhibit 51, do you think Ms. Sacchetti had knowledge
18    that Gianni had problems such that him saying that,
19    My life is in danger.  Come pick me up, would be
20    indicative of a psychiatric emergency?
21         A    I really just don't know.  I don't
22    know.  You reference what you had just shown me.  It
23    certainly reflects upon him as having instances of
24    being very dramatic, enough to when you talk about
25    rage episodes, it's very dramatic.  How that
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                168

1    reflected in his communication, what he would say

2    and the way he related to his mom, it's not clear to

3    me.

4              What is clear to me from that text

5    exchange is that she felt the need to reassure him

6    repeatedly that she was going to be there.  I'll be

7    there in X minutes and X minutes.  But I can't -- I

8    can't extrapolate any more than that.

9         Q    Are you aware that Ms. Sacchetti's

10   complaint specifically alleged that at the time

11   Ms. Sacchetti sensed something was wrong?

12        A    Well, yeah.

13        Q    And she confirmed that much in your

14   interview?

15        A    Well, no.  But, I mean, her actions

16   confirmed that.  She dropped everything and ran to

17   get him.  She might not necessarily have done that

18   under other circumstances.  She might have said, Can

19   you wait an hour?  Can you wait -- I'll be there in

20   a little while.  But she clearly responded to him

21   with immediacy.

22        Q    Are you aware that she specifically

23   stated in her Complaint, Ms. Sacchetti had never

24   seen him that upset before?

25        A    If it's in the -- you mean the civil

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    169

```
 1    complaint?
 2            Q      Paragraph --
 3            A      I'm sure I read it.  But it's clearly
 4    not something that registered with me and it wasn't
 5    in my report.  But if it's in the Complaint, I'm
 6    aware of it.  I read it.
 7            Q      Would that be significant to you,
 8    knowing that she had never seen him that upset
 9    before with knowledge of the rage episodes that he
10    had exhibited in May of the preceding year?
11            A      Significant in terms of what?
12            Q      In terms of her appreciation for the
13    importance of those text messages reflecting a
14    psychiatric emergency?
15            A      Again, I'm not sure.
16            Q      If she --
17            A      I'm not sure.  You know, there's a
18    history of rage that comes and goes and presents
19    conflict within the family, or at least contributes
20    to conflict in the family that results in his
21    getting psychiatric referral.  And then there's more
22    rage that's even worse, even worse.  I think when
23    you get to the idea of psychiatric emergency, you're
24    talking danger to self or others.  And I don't know
25    how the two of those translate.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    170

```
1                    Please keep in mind that when he was
2      psychiatrically committed the time before, he was
3      committed by police officers who saw him highly
4      agitated.  So I can't -- I don't know what to do
5      with that with any level of certainty.
6                    I think it's important to reference
7      back that discussion we had about episodes as
8      opposed to some continuous period of time.  And
9      these explosive instances that are referenced, there
10     is a discussion of them being neurological in
11     origin.  Okay.  That's a consideration.  There's the
12     influence of substances and whether, at a period of
13     his intoxication with a particular substance, he
14     could be explosive during that time.  Or it's
15     explosiveness indicative of a purely psychiatric
16     condition.  So there's a variety of explanations.
17                    What they all speak to is the idea
18     that he's really bad at one point and then it stops
19     and it's over.  So it's not clear to me whether
20     there was anything for her to experience it as a
21     worse variant of what she had seen before, other
22     explosive instances, or whether she had the
23     expectations that if she just took him home, he'd be
24     better based on previous experience of other
25     explosive episodes.  Or whether there would have
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    171

```
1   been reason to believe, for her to believe, that
2   this was part of some sort of continuous period of
3   deterioration.  I don't know.
4          Q     Let me make sure we're clear about
5   this.  Gianni sent a series of texts to his mom on
6   March 29.
7          A     Correct.
8          Q     On multiple occasions in that series
9   of texts he tells his mom, My life is in danger.  I
10  might be dead?
11         A     Correct.
12         Q     Correct?
13               When she picks him up, she doesn't ask
14  him about what those texts meant, correct?
15         A     Correct.
16         Q     But her Complaint says she had never
17  seen him this upset before.
18         A     Correct.
19         Q     Given those circumstances, you don't
20  think Ms. Sacchetti had enough to understand that
21  her son was in a psychiatric emergency at that
22  point?
23         A     No, because what if he were just
24  intoxicated?
25         Q     Was there any indication he was
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    172

```
1    intoxicated?
2          A     Yeah.  He's a drug user.
3          Q     Did Ms. Sacchetti say that he was
4    intoxicated?
5          A     But she knew he was a drug user.
6          Q     Did she say that?
7          A     My point is she wouldn't know whether
8    he was intoxicated or not.  That's my point.
9          Q     Did she say that in her interview with
10   you?
11         A     I didn't ask her.
12         Q     Well, you asked her what he appeared
13   like?
14         A     Yes.
15         Q     And she said sweaty, withdrawn.  I
16   don't think that was the word you used.  Remote.
17         A     Uncommunicative.
18         Q     Uncommunicative.  She didn't
19   describe --
20         A     He was agitated, but uncommunicative?
21         Q     She didn't describe him as
22   intoxicated?
23         A     But I didn't specifically ask did you
24   think that he had taken something or not, because a
25   person could be intoxicated and sweating and
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                      173

1   physically agitated.  I didn't ask her the question,

2   Did you think he might be intoxicated?

3            Q     Are you -- to your knowledge, did

4   Ms. -- was Ms. Sacchetti aware of prior suicidal

5   episodes that Gianni had experienced?

6            A     The only indication of awareness that

7   I ever had was that communication that he had with

8   his parents where they got very worried and they

9   alerted people at RIT because they wondered whether

10  he was suicidal.  I wasn't aware of other suicidal

11  episodes such that may have been referenced in the

12  note that you gave me from the 29th.

13           Q     Have you read her communications with

14  Bill Kachman at Gallaudet University?

15           A     No.

16           Q     I'm going to show you what's been

17  marked as Exhibit 77.

18           A     That's the psychiatrist, right?

19           Q     Yes.

20           A     Yeah.  I haven't read them.

21           Q     Psychologist.

22           A     Psychologist?

23           Q     Yeah.

24           A     All right.

25           Q     Okay.  So Dr. Kachman's report on the

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                        174

```
1    first page indicates that it's reflecting a meeting

2    with Gianni on October 15.  And the second

3    paragraph, Dr. Kachman reports that, Gianni was

4    keeping these emotions under control, reported no

5    unmanageable difficulties, and declined services

6    stating that he preferred to cope with them on his

7    own.

8              Do you see that in the document?

9         A    I don't have the document.

10        Q    It's right here (indicating).

11        A    Oh, sorry.

12        Q    It's the second paragraph.

13        A    Yes, I see it.

14        Q    And then he goes on two paragraphs

15   down to indicate that, There was no evidence of

16   psychotic thinking during the session, although his

17   thinking was confused during the initial period when

18   he was distressed?

19        A    Yes.

20        Q    Then the next page is the beginning of

21   an email chain between Dr. Kachman and Terrylene

22   Sacchetti?

23        A    Uh-huh.

24        Q    And on October 21, 2013 Dr. Kachman

25   indicates, Despite my efforts, he was not able to
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    175

```
 1    identify any mental health areas that were
 2    problematic, and continued to believe that his only
 3    concern was the seizure disorder.
 4           A     Yes.
 5           Q     And then a couple pages back reflects
 6    the communication from Dr. Kachman to Ms. Sacchetti
 7    on October 25, 2013.
 8           A     I'm sorry.  When is that?
 9           Q     This is the document 1011 at the
10    bottom.
11           A     Okay.  Yes.  I got it.
12           Q     And Dr. Kachman is responding to an
13    email from Ms. Sacchetti which is on the second part
14    of that page.
15           A     Sure.
16           Q     And Ms. Sacchetti indicates that,
17    Gianni does have depression that he needs taken care
18    of.
19                 Did Ms. Sacchetti tell you that Gianni
20    had depression when you interviewed her?
21           A     I think it came up, as just something
22    that he had had in the past.
23           Q     And in the next paragraph he says, I
24    do believe that it is dangerous for him to be alone
25    in CA state if he decides to go alone because of his
```

1    depression episodes that comes and goes, indicating

2    that Ms. Sacchetti was aware that his depression

3    would come and go?

4           A     Uh-huh.

5           Q     Is that a yes?

6           A     Yes.  I'm sorry.

7           Q     Did she indicate to you that he had

8    depression episodes that came and went?

9           A     We only had talked about depression,

10   but we didn't talk about episodes that came and

11   went.  I think that her detailing of that was a lot

12   more limited and -- much more limited in detail.

13          Q     A couple paragraphs down,

14   Ms. Sacchetti writes, The next time Gianni is in a

15   depression episode where he becomes suicidal and

16   asks me to stay with him, I will take him straight

17   to a mental health hospital.

18                Did I read that correctly?

19          A     Yes.

20          Q     Were you aware of that statement?

21          A     No.

22          Q     So it does reflect that, one,

23   Ms. Sacchetti was aware that Gianni had depression

24   episodes?

25          A     Correct.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          177

1          Q     Two, that Ms. Sacchetti was aware that

2     his depression episodes could lead to him becoming

3     suicidal?

4          A     That's correct.

5          Q     And three, that they've happened

6     before?

7          A     That's correct.

8          Q     And that she was aware that when those

9     happened, she needed to take him to the hospital?

10         A     That's correct.

11         Q     The bottom of that paragraph she says,

12    I want to be prepared for the next time, and that

13    could be anywhere from three weeks to several

14    months.  Who knows.  I just helped him through one

15    recently.  Meaning a depression episode where he

16    becomes suicidal.

17              MR. GROSZ:  Form.

18         Q     Correct?

19         A     Presumably.

20         Q     Did she ever discuss with you that he

21    had one or more depression episodes where he became

22    suicidal?

23         A     No.

24         Q     Were you aware that he had depression

25    episodes where he became suicidal?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                   178

```
 1           A       No.
 2           Q       Considering that Ms. Sacchetti was
 3     aware that Gianni experienced depression episodes
 4     where he became suicidal, and that she had written
 5     that within five months of his texts on the evening
 6     of March 29, do you think that the text messages,
 7     Come pick me up.  I could be dead, his appearance in
 8     the car as she described it, and the Complaint
 9     admission that she had never seen him so upset, with
10     that knowledge of having prior episodes in which he
11     became suicidal, suggest to Ms. Sacchetti or should
12     have suggested to Ms. Sacchetti that he was
13     experiencing a psychiatric episode of an urgent
14     nature?
15           A       It could and it could not.
16           Q       Have you seen the Montgomery County
17     police report?
18           A       Yes.
19           Q       So you're aware Ms. Sacchetti
20     described her son as psychoaffective?
21           A       Schizoaffective.
22           Q       Okay.  The word that's used I think is
23     "psychoaffective."  But the diagnosis is actually
24     schizoaffective?
25           A       Schizoaffective.  I'm assuming that's
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    179

1    what she was referring to, yes.  Schizoaffective.

2              Q    What is schizoaffective?

3              A    Well, schizoaffective is different

4    from bipolar illness, and that's why I was saying

5    before that he could have had a psychotic condition,

6    could have reflected a variety of possibilities.  It

7    could have been psychotic depression.  And now we're

8    speaking about identifying depression.  So it could

9    have been an expression of depression.  It could

10   have been an expression of bipolar illness, which is

11   a different diagnosis.  And it could have also been,

12   alternatively, a manifestation of schizoaffective

13   disorder or of schizophrenia.  Those are four

14   different diagnoses for which the presentation that

15   I've described as psychosis would have fit in any

16   one of those.

17             Q    Was Gianni schizoaffective?

18             A    I don't know.  I'm saying it's -- he

19   could have had any one of those diagnoses because

20   there's an overlap of symptoms, because there's not

21   enough information available to resolve that yet.

22                  And by the way, even if he was

23   formally diagnosed with depression at another time

24   doesn't mean that that wasn't his diagnosis.  He was

25   at an age group in which a person may originally

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                         180

```
 1    appear to have depression, but then as a person
 2    becomes more acquainted with someone's condition and
 3    has a longer view, changes that conclusion to say
 4    that a person has schizoaffective disorder.
 5           Q     You're aware that she told Montgomery
 6    County police that she tried to get Gianni medical
 7    help but he refused?
 8           A     Yes.
 9           Q     You're also aware that she told them
10    that he self-medicated with marijuana and K2?
11           A     Yes.
12           Q     Do you know what K2 is?
13           A     Ketamine.
14           Q     The horse sedative?
15           A     Used for a lot of things, and it's a
16    recreational -- powerful recreational drug.
17           Q     And what effect does it have on the
18    human brain?
19           A     It can have a lot of effects, but it
20    could be implicated in psychotic thinking.  That's
21    one of the reasons why I mentioned, is he taking an
22    intoxicant?  It wasn't just marijuana that he was
23    using, but he was using -- I saw other drugs over
24    the course of his notes that were mentioned that he
25    had used at one time or another.  So if he used an
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    181

1    intoxicant, your behavior can change, and you flash

2    forward six, 10 hours later and behavior is very

3    different.  So it has to be factored in.  Are we

4    seeing schizoaffective disorder or are we seeing

5    effects of intoxication.

6         Q    He also has at times indicated that he

7    used LSD and synthetic marijuana.  Is that spice?

8         A    It goes by a variety of different

9    names.  Spice is one variant, but there are many,

10   many variants of synthetic marijuana.  And both

11   synthetic marijuana by any -- not by any, but by a

12   number of different iterations, as well as LSD, can

13   be implicated in episodic irrational behavior and

14   even rage.

15        Q    Ms. Sacchetti described that Gianni

16   self-medicated to help ease, quote, "the war going

17   on in his head"?

18        A    Yes.

19        Q    Would that indicate to you that

20   Ms. Sacchetti had been aware for some time that

21   Gianni at least had a war going on in his head?

22        A    Yes.

23        Q    She also told the police that she knew

24   her son was having an episode by the way he was

25   acting?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    182

```
 1              A     Yes.

 2              Q     And that's what she told the police?

 3              A     Yes.

 4              Q     About the drive home?

 5              A     Correct.

 6              Q     That she knew he was having an

 7    episode?

 8              A     Correct.

 9              Q     So she knew he was in a psychiatric

10    emergency?

11              A     Again, an episode of what?  An episode

12    of intoxication or an episode of an acute

13    psychiatric condition?

14              Q     Did you ask her?

15              A     I did not.

16              Q     Are you aware that Mr. Manganelli and

17    Ms. Sacchetti advised Montgomery County police that

18    after transferring to Gallaudet Gianni's, quote,

19    "episodes occurred every few months and he would

20    contact his mother for help.  This pattern continued

21    on March 30, 2014 when Manganelli texted his mother

22    and father asking to be picked up because he was

23    going to be killed"?

24              A     Correct.

25              Q     And based on the fact that these were
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    183

```
 1   recurring episodes and that she knew that he was
 2   experiencing an episode when she picked him up on
 3   March 29, it is your opinion that Ms. Sacchetti
 4   still did not have enough information to appreciate
 5   that her son was in a psychiatric emergency?
 6         A     Well, I think there are -- it's -- I
 7   realize that you're using the term "psychiatric
 8   emergency."  And I'm not -- just as I'm not being an
 9   attorney, you're not being a psychiatrist, but
10   you're being clear.  But you're actually not being
11   clear.  We need to draw a distinction.
12               A psychiatric emergency.  What's a
13   psychiatric emergency?  A person can be highly
14   agitated and yet not represent a danger to others or
15   a danger to themselves.  The level of agitation --
16   hopelessness correlates more closely with suicide
17   than a level of extreme agitation.  Otherwise, for
18   example, everybody who gets meth intoxicated would
19   be out there killing themselves.  You get highly,
20   highly agitated.
21               So while a person who is highly
22   agitated and overwrought -- and understand I'm just
23   using substances as an example.  Let's just say
24   explosive.  A person is explosively angry, may be
25   explosively angry, and maybe, under certain
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    184

1    circumstances at risk for, like, breaking everything
2    around them, doesn't equate with homicidality, which
3    is a choice -- even if someone makes an irrational
4    choice, it's a choice, or a choice to kill
5    themselves.
6               So I appreciate what you're saying is
7    psychiatric emergency.  And yeah, you know, it
8    would -- it certainly is scary.  It might require
9    that a person be separated and either dry out or be
10   assuaged or see somebody.  But a person who comes to
11   the emergency room, for example, who's highly
12   agitated, let's say in the context of conflict, and
13   let's say they identify that there's no substance in
14   his system, if a person's not a danger to themselves
15   or others and says, I don't want treatment, and, I
16   don't want to come in the hospital, you give them
17   Ativan, you calm them down, you sedate them, and if
18   they still don't want to come in, you send them on
19   their way.
20              So the two -- yeah, some people who
21   are highly agitated may be a danger to someone else
22   or themselves.  But it's not a hand-in-glove fit.
23   And that's the disconnect, apart from the idea that
24   did she have an expectation because of his previous
25   history of drug abuse that if she just let him cool

1    off, that in three hours he would be better?  Or if

2    she just talked him through whatever he happened to

3    be -- I don't know.  So that's why I'm saying that

4    the presumption is not possible.  And, actually,

5    especially because the only history she had is he

6    had these explosive episodes, in reflecting on them,

7    when they were associated with depression; he

8    expressed suicidality to her, and he told -- and she

9    committed that the next time she would take him to

10   an emergency room.

11                 This whole thing, I can be killed, and

12   all of this, I don't know how he expressed himself

13   at other times.  What I do know is that when he

14   expressed to her at 5:00 in the morning, before he

15   took off, that he would kill himself, or he might

16   kill himself, that she made plans to take him.  I

17   don't know how that distinguished itself in her mind

18   from how he had expressed earlier, or what her plan

19   was that evening.  I did not ask her.

20          Q    Ms. Sacchetti knew that her son had

21   depression episodes in which he became suicidal?

22          A    Correct.

23          Q    The arresting officers for Gallaudet

24   DPS had no such knowledge?

25          A    The arresting officers did not know

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    186

```
1    about the depression episodes in which he became

2    suicidal, that's correct.

3           Q     She knew that he had episodes, and

4    that they were recurring episodes?

5           A     That's correct.

6                  MR. GROSZ:  Form.

7           Q     The DPS officers had no such

8    knowledge?

9           A     That's correct.

10          Q     She was aware that he had previously

11   expressed suicidal ideation on different occasions

12   in prior settings?

13          A     That's correct.

14          Q     The DPS officers had no such

15   knowledge?

16          A     That's correct.

17          Q     She sent texts in which she told -- he

18   sent texts in which he told his mother on multiple

19   occasions, I could be dead.  My life is in danger?

20          A     That's correct.

21          Q     No such communication --

22                  MR. GROSZ:  Just for

23               clarification, you said multiple

24               occasions.  You're talking about one

25               event?
```

1        Q     There were multiple texts in which he
2    indicated in that chain that his life was in danger.
3        A     That's correct.
4        Q     Those were not communicated to DPS?
5        A     He didn't communicate that -- that's
6    correct.
7        Q     She picked him up on campus and
8    described his condition in the Complaint as the most
9    upset she's ever seen him?
10       A     That's correct.
11       Q     All of that together isn't enough --
12   and she had previously committed to taking him to
13   the hospital the next time he had an episode.
14       A     That's correct.
15       Q     She didn't do that?
16       A     That's correct.
17       Q     She drove right past one?
18       A     That's correct.
19       Q     And she didn't ask him about what
20   those texts meant?
21       A     That's correct.
22       Q     Are you aware that she had told the
23   police, the Montgomery County police, that he had
24   made a prior attempt at suicide by smothering
25   himself?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                              188

```
 1           A      Yes.
 2                  I'm sorry.  No, I'm not aware that she
 3      said that.  So I'm aware now.
 4           Q      Okay.  You're aware that that's in the
 5      Montgomery County police report?
 6           A      Yes.
 7           Q      And that's something you did review in
 8      preparation for your --
 9           A      I reviewed the Montgomery police
10      report.  It's something that if I didn't reference
11      it when I read it the first time, it didn't register
12      with me.
13           Q      Do you know what happened when Gianni
14      and his mother arrived back at her apartment after
15      she picked him up on campus?
16           A      I was under the impression that he
17      never got into the apartment.
18           Q      Right.  At least the parking lot of
19      her apartment building?
20           A      Yeah.  That she asked him to go and
21      pick up his sister, and then he went off to a
22      restaurant, and she went to join him.  And he
23      separated, and she went to pick up the sister with
24      the impression that he was going to be in that
25      restaurant.  And when she came back, he wasn't
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          189

```
 1    there.
 2          Q     Were you aware that they got into an
 3    argument in the parking lot?
 4          A     I'm not aware of that.
 5          Q     Are you aware that Gianni wanted him
 6    to return her to Gallaudet campus?
 7                      MR. GROSZ:  Her to return him.
 8                      MR. WATERS:  Yes.
 9          Q     Strike that.
10                Were you aware that Gianni asked his
11    mother to return him to Gallaudet's campus?
12          A     I'm not aware of that.
13          Q     Are you aware that Gianni, when she
14    was -- when she was leaving to pick up the sister
15    and Gianni was walking away, that she followed him
16    in the car trying to convince him to get into the
17    car with her?
18          A     Not aware of that.
19          Q     Are you aware that she followed him
20    into the restaurant and continued to argue with him
21    there?
22          A     I'm aware that she followed him to the
23    restaurant and then she separated.  That's as much
24    as I'm familiar with.
25          Q     She knew he did not have his wallet
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    190

```
 1   when he went into the restaurant?

 2           A      That's correct.

 3           Q      Are you aware that he instructed her

 4   to leave the restaurant?

 5           A      No.  I'm just aware that he said he

 6   wanted to be in the restaurant and she wanted him to

 7   come with her.  That's the extent of what I'm aware.

 8           Q      Doctor, your report on two instances

 9   describes Gallaudet's conduct as contempt, and

10   contempt for and indifference to Mr. Manganelli.

11           A      Yes.

12           Q      Is that a psychiatric opinion?

13           A      It's a professional opinion, that's

14   correct.

15           Q      It's a psychiatric opinion that

16   Gallaudet expressed contempt?

17           A      It's my opinion as a psychiatrist.

18   It's not a clinical term.  It is my opinion that

19   what I was witnessing was contempt.

20           Q      Is contempt a medical diagnosis?

21           A      "Contempt" is a word just like any

22   other word in my report.  It's a word that has

23   meaning, and I was using a descriptive word with an

24   awareness of its meaning.

25           Q      And as a psychiatrist, you believe
```

1    you're qualified to describe Gallaudet's conduct as

2    contempt and indifference?

3           A      It's my opinion.

4           Q      What makes a psychiatrist

5    appropriately qualified to make an opinion that a

6    university acts with contempt?

7           A      Disregarding information that's

8    available to them and not accounting for the

9    available information of someone who is in acute

10   need of psychiatric services, and prioritizing, with

11   some level of urgency, public safety issues.

12          Q      That's not a diagnosis, though, is it?

13          A      This report contains, and any report

14   contains verbiage that's not diagnostic in nature.

15   It's my opinion.

16          Q      And you don't need to be a

17   psychiatrist to reach your own conclusions about

18   whether the university acted with contempt or not,

19   correct?

20          A      One doesn't need to be.  But in my

21   professional opinion, they had a substantial amount

22   of information available to them which was

23   psychiatric in nature, and their urgency and

24   priority was on the public safety plane, and their

25   responsiveness to his requests were unsympathetic

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          192

1    and unresponsive and not taking into account a

2    compassionate consideration of the person in

3    distress with psychiatric illness who they may have

4    approached differently.

5           Q    Is it your opinion that a psychiatrist

6    is necessary to reach that conclusion?

7           A    I think it depends.  I think in

8    certain circumstances, yes.

9           Q    But --

10          A    I'm answering your question.

11          Q    Go ahead.

12          A    I think in certain circumstances a

13   psychiatrist is required to offer an opinion of the

14   obviousness of what they were not acting on or

15   overlooking or deliberately ignoring.

16          Q    And you don't feel a layperson could

17   reach the same conclusion?

18          A    In some instances, depending on the --

19   depending on what we're talking about, a layperson

20   could reach that opinion.  In some instances, a

21   psychiatric opinion is more informative and more

22   embedded in a clinical experience of how a psychotic

23   person presents.

24          Q    The questions that were asked on the

25   first page of this report have nothing to do with

1   your assessment of Gallaudet's culpability, do they?

2          A     They do and they don't.  They do

3   insofar as my direct questions and my opinions.

4   They don't insofar as legal considerations.  The,

5   Mental health intervention based on information

6   available to Gallaudet was necessitated, is not a

7   legal finding, it's a psychiatric opinion.  But it

8   certainly impacts on the overall consideration and

9   that's why I was asked to offer an opinion.  It is a

10  component of what the attorney has to consider about

11  whether he presents as part of his case.  But it's

12  not sine qua non.  It's just one component.

13         Q     Gianni, when he returned to his

14  mother's apartment in the middle of the night, made

15  a statement to her, You tried to suffocate me,

16  right, you tried to suffocate me with a pillow,

17  right?  Referring to his mother.

18         A     Yes.

19         Q     Are you aware she said something

20  similar in her deposition?

21         A     She said that to me on the phone also.

22  I wasn't aware of what she said in the deposition.

23         Q     What did she say to you on the phone

24  as to what he said?

25         A     That.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    194

```
 1            Q     He tried to suffocate me?

 2            A     Yes.

 3            Q     And then he made the threat to kill

 4    himself?

 5            A     Yes.

 6            Q     Okay.  So when he made the threat to

 7    kill himself, he made it in the context of a

 8    statement to his mother about his mother suffocating

 9    him, correct?

10            A     I don't know if it was in that

11    context, but it certainly followed it.

12            Q     Well, quote, "You tried to suffocate

13    me, right?  You tried to suffocate me with a pillow,

14    right?  And I have two choices:  Either I will kill

15    myself or," end quote.

16            A     Correct.

17            Q     And he said nothing about being

18    arrested or evicted from Gallaudet campus?

19            A     That's correct.

20            Q     And in the car ride home he said

21    nothing about being evicted from Gallaudet campus or

22    arrested?

23            A     That's correct.

24            Q     And in the argument in the parking

25    lot, you have no knowledge about whether he said
```

1    anything about Gallaudet arresting him or evicting

2    him from campus?

3            A     I'm not even aware that there was an

4    argument.  I'm not aware of the theatrics of it, or

5    the color.  All I'm aware of is that there was a

6    disagreement.  He wanted to go in one direction, she

7    wanted to follow.  So the substance of what was

8    exchanged there, I have no idea one way or another.

9            Q     And part of that is because you didn't

10   read the deposition, the second part of her

11   deposition?

12           A     That's correct.

13                     MR. GROSZ:  In fairness so the

14               question's not misleading, it wasn't

15               available at the time of the disclosure.

16                     MR. WATERS:  I got a rough.

17                     MR. GROSZ:  Yeah.  We wouldn't

18               rely on a rough.

19                     MR. WATERS:  I had a copy of the

20               transcript before May 30.

21                     MR. GROSZ:  Not the final

22               version.

23   BY MR. WATERS:

24           Q     Well, have you been asked to

25   supplement your opinions based on the second half of

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    196

1    the deposition?

2         A    I haven't been asked but, you know, if

3    I would choose to, you know, I'd choose to.  It's my

4    prerogative.  What I did was I completed work on

5    this case and immediately pivoted to something else

6    and, really, have not had the wherewithal to sit

7    down and go through all of the evidence that we've

8    received that I had not really had a chance to go

9    through.  I went through what I went through at the

10   time, as I probably noted in this report.

11              Yeah, If you have any other questions

12   or evidence for my review, please don't hesitate to

13   contact me.  So there's always the consideration in

14   the course of work that one's going to look at more

15   stuff.  I submitted the report on the 30th, and here

16   we are.  A month and a half in my life is like it

17   goes in two minutes, because I'm immediately jumping

18   from one deadline to the next.  So is it conceivable

19   that I could review this and in some way impact my

20   opinion?  Absolutely.  I don't know what's in there

21   until I read it.

22        Q    But you've given your report and now

23   you've given testimony and you have not read that

24   transcript?

25        A    That's correct.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                         197

1          Q      Okay.  You indicated that

2    Ms. Manganelli had seen Gianni psychotic on other

3    occasions.  What other occasions are you referring

4    to?

5          A      I'm sorry.  If you can -- I'm sorry,

6    where are you?

7          Q      Bottom of page 11.

8          A      Got it.

9                 I was referencing him talking about

10   his computer being hacked and his -- and his --

11   other people trying to have sex with him and coming

12   on to him, which I experienced and interpreted as

13   irrational.

14         Q      Was he psychotic, overtly psychotic,

15   on the car ride home?

16         A      He was very upset.  He wasn't barking

17   like a dog.  He wasn't -- in a way, it's a situation

18   that's -- he was distressed.  He was not overtly

19   psychotic in the car.  Although I want to think

20   about it.  And just reflecting on it, everything

21   that is attributed to him, no.  I mean, he was

22   distressed, and as she put it, upset, angry.  But in

23   the car, no.

24         Q      So is it your opinion, Doctor, that

25   Gallaudet had cause to have Gianni involuntarily

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    198

```
1    committed in a psychiatric unit?
2           A      Correct.
3           Q      Based on the threats made to the
4    roommate?
5           A      Correct.
6           Q      Threat made to the roommate's friend.
7    His silent and blank stare presentation that
8    evening.
9           A      No.
10          Q      No?
11          A      Threats to the roommate.
12          Q      Threats to the roommate.
13          A      Threats to the roommate's friend.  In
14   the context of a history of his bizarreness.
15          Q      Okay.  Well, I'm asking about the
16   officers who are arresting him, the people who are
17   there.  Daniel Bauer, Patrick Rader.
18          A      Yes.
19          Q      So they become aware of the threats to
20   the roommate, the threats to the friend.  Adrienne
21   Morgan tells them that he was acting bizarre
22   earlier.
23          A      Correct.
24          Q      The roommate says that Gianni was
25   diagnosed bipolar?
```

```
 1              A       Correct.

 2              Q       Is there anything else that tells

 3    those individuals that night, then and there, in

 4    your opinion that Gallaudet has basis to have Gianni

 5    committed, or does that cover everything?

 6              A       I think it substantively does.

 7              Q       But on the other hand, the mother who

 8    knows that he has depression episodes in which he

 9    becomes suicidal, rage episodes, is committed to

10    taking him to the hospital the next time he has an

11    episode --

12              A       No.  The next time he's suicidal.

13              Q       An episode in which he becomes

14    suicidal.

15              A       That, yes.

16              Q       Receives the text messages that says

17    that he could be dead, that his life was in danger,

18    and sees him in the car more upset than he has ever

19    been in his life, does not have cause to have him

20    psychiatrically committed?

21              A       Cause?  Look, she's a concerned

22    mother.  She has cause to have him -- to take him to

23    a psychiatric emergency room.  But he wouldn't

24    necessarily be admitted.  If he came to an emergency

25    room and said, I think that someone's going to kill
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    200

1    me, and on closer scrutiny there's no history of

2    threat, there's no history of expressed suicidal

3    ideation, he wouldn't be admitted.

4              My point as it relates to the

5    officers, while there's no dramatic text preceding,

6    it relates to the idea of threat.  And the policy

7    issue of whether people should be expressed based on

8    the drama of their words or the substance of their

9    words is a totally different issue.

10             People get committed not by the

11   dramatics of their expression, but by the specific

12   implications of their expression.  I'm going to kill

13   somebody or harm someone physically, or I'm going to

14   kill myself.  They get committed whether they say it

15   quietly or loudly.  And if a person is breaking

16   everything in the home, you know, again, was this as

17   angry as she's ever seen when he sits quietly in the

18   car when the previous history that you described it

19   to me were periods where he just smashes everything

20   around him and he wasn't doing that in the car?

21             Whether it was or it wasn't, he was

22   sitting in a car composed.  And whether he would

23   have been admitted^ ultimately involuntarily, is

24   arguable.  Was there reason for a concerned mother

25   to take him to an emergency room if he was highly

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                         201

1    agitated and highly upset?  Sure, it's possible that

2    if she would conclude that he wasn't intoxicated and

3    that within a couple of hours he would not be more

4    calm, that she could not calm him or placate him,

5    sure.  But I didn't see anything in him saying, I

6    could be killed, that says, I'm suicidal and I want

7    to die.  One is paranoid and one is suicide.

8                  So while the word "kill" is

9    significant, it's meaningful and it's important and

10   it certainly conveys his distress, I'm not reading

11   anything in what he said that suggested that he was

12   intending to kill himself.

13        Q     There's a lot to unpack in that,

14   Doctor.

15                  Are you telling me that based on all

16   the information she had with regards to his prior

17   depression episodes in which he becomes suicidal,

18   his rage episodes, her commitment to take him to the

19   hospital the next time he becomes suicidal, and the

20   text that he sent indicating that his life was in

21   danger, that she didn't have reason to take him to a

22   psychiatric hospital?

23        A     No.  What I said was she didn't have

24   reason to conclude that he was suicidal.  That's

25   what I said.  Just a moment.  Because, look, this is

1    the same person who was admitted in August 2013

2    highly agitated, but not suicidal.  This is a person

3    who had a variety of problems, and, you know, just

4    explosiveness, in which he wasn't suicidal.

5              So there were times in which he had

6    problems that he was suicidal.  There were times in

7    which he had problems in which he was dramatic but

8    not suicidal.  There were times in which he had --

9    he was dramatic, which would not have ultimately

10   necessitated or prompted a hospitalization, even the

11   St. John's note that we went over.  He wasn't

12   referred for inpatient care because of a history of

13   explosiveness.  He was dealt with as an outpatient.

14             So it really comes down to the

15   expectation.  Was -- did she have an expectation

16   then that he was a threat to someone else or that he

17   was intending to kill himself?  That's what I'm

18   responding to in terms of your question.

19        Q    Did she --

20        A    Do I think that she had reason to

21   believe that he was in a lot of distress?  Sure.

22   Did she have reason to believe that it was a

23   psychiatric in nature?  Possibly.  Or intoxicated.

24   I think that that -- she knew he was using drugs.

25   She knew he had psychiatric problems.  He had a

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    203

1    couple of things going on with him.  And that's the

2    best I can answer the question.

3         Q     Did she have reason to take him to the

4    psychiatric hospital that night based on what she

5    knew and the text messages she received?

6                   MR. GROSZ:  Form.

7         A     Well, she certainly had reason to take

8    him to a psychiatric hospital when he said, I'm

9    going to kill myself, as an alternative.  Either

10   kill myself or something else.

11        Q     Before that?

12        A     I certainly can't say no, because he

13   was expressing himself very dramatically.  But at

14   the same time, I have absolutely no reference point

15   of how he would express himself to her when he was

16   being highly demanding.  I don't know anything about

17   their ongoing style of communication.  I do know

18   that there are instances in which he was explosive

19   in which he harmed no one or himself.  The worst

20   thing that was attributed to him was destruction of

21   property on a specific instance.  But he was -- he

22   had rage attacks.

23             Does a person get taken to a hospital

24   for rage attacks?  No.  No.  It's an outpatient

25   problem, because it's episodic, it's like a

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    204

```
 1    summer -- like a summer shower:  It comes, it rains
 2    heavily, and it's gone, and there's sunshine
 3    afterward.
 4              So my point to you is that there are a
 5    variety of ways to explain what he was -- what he
 6    was -- what he was demonstrating to her based on the
 7    context of her having no other information.  If she
 8    had the information from Gallaudet, then she would
 9    have known that this was arising in the context of a
10    significantly stressful event, whether it be the
11    arrest alone and his interpretation of what it
12    meant, or the fracture of his housing at Gallaudet
13    and what that meant.
14              But whatever it was, she at least
15    would have had information to relate it to something
16    that had just happened as opposed to whether he just
17    happened to take something and was kind of working
18    it through his system, or whether it was just anger
19    that she had seen at other times which didn't
20    necessarily relate itself to a particular stress.
21              So with no context?  We don't know how
22    many times she may have seen that before.
23        Q     She didn't have no context, Doctor.
24        A     Pardon?
25        Q     She didn't have no context, Doctor.
```

1    She knew that he had prior episodes, depression

2    episodes, in which he had become suicidal.  He had

3    previously expressed suicidal ideation.  He had --

4    she had committed to take him to the hospital the

5    next time he became suicidal.

6            A    That's right.

7            Q    I'm sorry.  I'm not finished with my

8    question.

9                 And he's saying, My life is in danger.

10   You're telling me that that was not capable -- that

11   Mrs. Sacchetti was not capable of interpreting that

12   phrase, My life is in danger, in the context of

13   knowledge of his prior suicidality, his prior

14   episodes in which he became suicidal, that she was

15   not capable of interpreting that as being an

16   expression of possible suicidality at that time?

17                    MR. GROSZ:  Form.

18           A    I didn't say she wasn't capable.  I

19   didn't say she wasn't capable.  Sure she was

20   capable.  But you asked a different question.

21   Should she have.  And what I'm saying to you is

22   there's a difference between explosiveness and a

23   difference between suicidality.  There's a

24   difference between explosiveness and depression.

25   And she specifically said that if he became suicidal

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          206

```
 1   in the context of an episode of depression, she
 2   would take him in.
 3           Q     Aren't we parsing hairs a little bit?
 4           A     No, we're not.
 5           Q     We've got him saying, Pick me up, my
 6   life is in danger, and she says in the Complaint,
 7   I've never seen him as upset.
 8                      MR. GROSZ:  Form.
 9           A     It's paranoid.
10                      MR. GROSZ:  And asked and
11             answered.
12           A     It's paranoid.
13           Q     She also said that he was having an
14   episode to the Montgomery County police when she
15   picked him up.
16           A     Did she say he was having an
17   episode --
18           Q     Yes.
19           A     -- of depression?
20           Q     Said he was having an episode, the
21   same episode that she described before.
22           A     No.  Because if they were all episodes
23   of depression, he would not have been diagnosed with
24   an explosive disorder.  And that's what he was
25   diagnosed with.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                         207

1          Q      He was also diagnosed with bipolar
2     disorder.
3          A      And that's my point.  You are making
4     my point.  We are saying the same thing.
5          Q      I respectfully disagree, Doctor.
6          A      Okay.  The record will show what it
7     will show.
8                 He's a person who was diagnosed with
9     bipolar disorder.  He's a person for whom there was
10    possibly schizoaffective disorder, which would have
11    meant psychotic symptoms, which are paranoia, which
12    are not suicidality.  He was a person who had
13    explosive rage.  He's a person who also abused
14    substances, which may have explained some, none, or
15    all of his explosive rages.  So he was a person who
16    had multiple problems, multiple problems, multiple
17    problems, that may have coexisted.  A person can
18    have depression, and separate from that, can have an
19    explosive condition.  Two different things.
20         Q      Mrs. Sacchetti certainly could have
21    taken him to the hospital, couldn't she?
22         A      Sure she could have taken him.
23                THE WITNESS:  It's 6:00.  What's
24           the plan?
25                MR. GROSZ:  It's 6:00.  We've

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                      208

```
1                    got to go until he's done.
2                         THE WITNESS:  Oh, is that so?
3                         MR. GROSZ:  Yeah.
4                         THE WITNESS:  How does that --
5              can we go off the record for a minute?
6                         MR. WATERS:  Sure.
7                         (A discussion was held off the
8              record.)
9                         (Whereupon, a recess was taken
10             between 6:01 and 6:05 p.m.)
11   BY MR. WATERS:
12        Q     Doctor, you have a statement in here
13   that Terrylene Sacchetti entrusted the university
14   with the sensitivity to address her son's
15   disabilities?
16        A     Yes.
17        Q     Okay.  And, again --
18        A     Page?
19        Q     That's page 12.
20        A     Got it.
21        Q     Mr. Manganelli was a 23-year-old adult
22   at that time?
23        A     Yes.
24        Q     You indicate, quote, "So glaring was
25   Gallaudet's detachment from mitigating the
```

1    Manganelli crisis of their own creation, that not

2    one Gallaudet official contacted the Manganelli

3    family for over a day after his suicide to inform

4    the mourners what happened."

5              Is that a psychiatric opinion?

6         A    It is a -- it is a factual recounting

7    of a basis for my psychiatric opinion.

8         Q    And a layperson could reach the same

9    conclusion?

10                  MR. GROSZ:  Form.

11        Q    Correct?

12        A    I'm not sure.  I think -- I think that

13   I have worked on matters involving deaths in

14   campuses, and deaths when someone is part of an

15   organization that cares for them or has some measure

16   of relationship to them, whether it is in a

17   workplace, whether it is a school, whether it is

18   a -- some other area of belonging or affiliation.

19   And in my experience, after a death, there is a

20   reaching out to mourners.  And that's a basis of my

21   experience which jurors may not necessarily

22   appreciate from their own professional experience

23   because they don't have the proximity and repeated

24   exposure to death and its aftermath that I do.

25        Q     Is this statement --

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    210

```
 1          A      It is possible that on the -- you
 2    asked the question.  If you don't like my answer,
 3    then --
 4          Q      Doctor, you just spent five minutes
 5    telling me I've got till 6:30.  I don't want till
 6    6:30 for one answer.
 7          A      I spent 10 seconds telling you you
 8    have until 6:30 and it's because I was feeling like
 9    I wanted to be conciliatory when my temptation was
10    to say you have until 6:15, and I decided to
11    overlook that you were being contentious with your
12    own impatience, wasting your own time.
13          Q      Doctor, with all due respect --
14          A      Let me -- I'm going to get back to my
15    own answer.
16                 And my answer is:  It is possible that
17    some jurors would be able to look at this from a
18    common sense perspective and say, It follows that
19    when you are at a school with the level of intimacy
20    of Gallaudet, that has a special community for which
21    it prides itself on a level of concern, that they,
22    on their own, would come to the interpretation that
23    it would be a glaring detachment.  And I can't say
24    that universally about a juror.  But I can say that
25    those two factors coexist.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          211

1          Q     Doctor, is that a psychiatric
2     diagnosis that you're making in that statement?
3          A     It's not a diagnosis.  I'm sharing my
4     experience in dealing with the aftermath of death,
5     which is specialized knowledge.
6          Q     To your knowledge, Gianni never said
7     anything about being arrested in the car ride home
8     with his mother?
9          A     Yes.
10         Q     And no time after -- any time after
11    his mom picked him up until his suicide, he never
12    said anything about be arrested?
13         A     That's correct.
14         Q     He never said anything about the
15    stay-away order?
16         A     That's correct.
17         Q     You mentioned before that Gianni --
18    his parents expressed concern that Gianni had sent
19    them a suicide goodbye when he was in Rochester?
20         A     That he had sent them a letter which
21    they had interpreted as possibly a suicide goodbye.
22         Q     And Rochester Institute of
23    Technology's public safety department was involved
24    in that?
25         A     I don't know.  But they contacted the

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    212

1    institution, and the institution investigated and
2    followed up with them.
3         Q     Were you aware that he had indicated
4    to Rochester Institute of Technology that he had
5    purposely injured himself without suicidal intent,
6    both prior to and after starting college?
7         A     I'm not -- that -- I'm not familiar
8    with that.
9         Q     Were you aware that he had told
10   Rochester Institute of Technology that he had
11   seriously considered suicide both prior to and after
12   starting college?
13        A     I wasn't aware of that.
14        Q     Do you have the Rochester Institute of
15   Technology records?
16        A     I have them.
17        Q     Were you aware that Gianni had told a
18   doctor at Greenbridge Medical Services that on March
19   27, 2013, that he had been diagnosed with severe
20   depression, borderline personality disorder, being
21   deaf, and insomnia?
22        A     I don't recall the diagnosis of
23   borderline personality disorder.
24        Q     Were you aware that he had listed
25   depression, can be suicidal sometimes, as a concern

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    213

```
1    to his doctor at Greenbridge -- doctor (indicating

2    quotes), at Greenbridge Medical Services on March

3    27, 2013?

4          A    I'm not familiar with that.

5          Q    Were you aware that he told that

6    doctor that, I have chronic depression that I see a

7    psychologist, seen since 14?

8          A    I'm not aware of that.

9          Q    Were you aware that Gianni had advised

10   his doctor that he had abused prescription ADD meds

11   for two or three months three years ago but stopped?

12         A    Yes.

13         Q    Have you ever seen the MRI of brain

14   without contrast taken May 1, 2013?

15         A    I have not seen it.

16         Q    Indicating hyperintense T2 signal

17   noted in the left inferior frontal gyrus white

18   matter?

19         A    I have not seen it.

20         Q    Which may represent a small focus of

21   gliosis?

22         A    I have not seen it.

23         Q    Were you aware that Gianni had

24   indicated that he refused contact with his father?

25         A    No.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    214

1          Q     Is that consistent with having a good
2     relationship with his parents?
3          A     Of course not.
4                    MR. GROSZ:  Form.
5          Q     Are you aware that he described his
6     father as verbally abusive?
7                    MR. GROSZ:  Form as to time.
8                    MR. WATERS:  June 12, 2013.
9          A     I don't recall that.
10         Q     And you'd agree that that's not
11    consistent with a good relationship with his
12    parents?
13         A     That's not consistent with a good
14    relationship with his father.
15         Q     Have you ever spoken with Dr. Roger?
16         A     No.
17         Q     Or Mr. Brushaber?
18         A     No.
19         Q     So you don't know whether they
20    were diag -- prescribing Depakote to treat seizures
21    or if they were trying to essentially off-label
22    treat him for psychosis?  I'm sorry.  Manic
23    episodes, as a mood stabilizer.
24         A     For psychotropic reasons.  No, I
25    don't.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    215

1        Q     Would you have recommended that Gianni
2   stop taking Depakote?
3        A     I would, because he was having
4   apparently bad physical side effects.  But there
5   might have been alternatives that he might have been
6   better suited to taking.
7        Q     Isn't one called Tregerol [ph]?
8        A     Tegretol.
9        Q     Tegretol.  Sorry.  Thank you.
10       A     That's an option.
11       Q     Do you know if that was ever
12   recommended or tried?
13       A     I don't know.
14       Q     Would you have recommended that Gianni
15   try -- essentially, treat himself holistically or
16   using nonmedical methods?
17       A     No.
18       Q     Would you have ever recommended that
19   he treat with -- his conditions with cannabis?
20       A     No.
21       Q     Or with any cannabis-related
22   substance?
23       A     No.
24       Q     Are you aware his father reported a
25   history of alcoholism?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    216

1           A      I believe you asked me that earlier.

2           Q      I'm sorry.

3           A      That's okay.  But I believe you asked

4    me, and I believe I said before that I had some

5    passing awareness of alcohol abuse in the family,

6    but it wasn't something that registered with me in

7    terms of what I was focusing on.

8           Q      Are you aware that Doris Zelaya from

9    Mental Health Center at Gallaudet reached out to

10   Gianni between August 28 and September 4, 2013 to

11   set up appointments and Gianni declined, stating

12   that he does not feel he needs weekly counseling,

13   Only counseling when I feel like I really need it?

14          A      I'm not aware of that.

15          Q      Were you aware that on September 11,

16   2013 Gianni told Ms. Zelaya that he did not want to

17   receive individual counseling and did not trust the

18   therapist of the center due to policy; did not like

19   that they could break confidentiality if he reports

20   to hurt himself or others?

21          A      I'm not aware of that.

22          Q      Are you aware that Gianni told Jim

23   Moore at the California Department of Rehabilitation

24   to see if he could switch schools to go back to

25   California to study music education?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     217

```
 1              A     I am not.
 2              Q     Are you aware that Gianni said that he
 3    could not rely on his parents for financial help?
 4              A     I'm not aware of that.
 5              Q     You were engaged in this case by
 6    Mr. Grosz's firm, correct?
 7              A     Correct.
 8              Q     You were not hired by the Defendants?
 9              A     I was not.
10              Q     You were hired -- you charged $3,250
11    for your deposition today?
12              A     That's correct.
13              Q     And you require payment of that in
14    advance?
15              A     Yes.
16              Q     And you advised my office that you
17    would not appear if we did not wire the funds
18    yesterday?
19              A     That's correct, because we had not
20    received them.  We had notified you well in advance,
21    and -- of our policy, which everybody else adheres
22    to, and you did not adhere to it.  And so as a
23    courtesy, I agreed to pay [verbatim] today because
24    you rectified the error, and so we are here today.
25              Q     And we wired those funds to you
```

```
 1   yesterday?

 2           A    Correct.

 3           Q    You agree that you were not hired by

 4   my law firm for this case?

 5           A    Yes.

 6           Q    All right.  And that we did not agree

 7   to the terms that you had for the engagement that

 8   brought you here?

 9           A    I don't know that you didn't agree.

10   If you didn't agree, you wouldn't have wired the

11   funds.  You weren't coerced to do so.

12           Q    If I wanted your deposition, I had to

13   wire the funds?

14           A    That's usually the way things go.

15                    MR. WATERS:  Okay.  I think at

16              this time that's all I have.

17                    MR. GROSZ:  Steve, do you have

18              any questions?

19                    MR. ANDERSON:  I got four

20              minutes before he leaves?

21                    MR. WATERS:  Ten.

22                    MR. ANDERSON:  I do have one or

23              two questions during the four minutes

24              which are left.

25                    MR. GROSZ:  Steve, no one's
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    219

1                     restricting you, so ask away.

2       EXAMINATION

3       BY MR. ANDERSON:

4               Q       Can you hear me, Doctor?

5               A       I hear you just fine.

6               Q       Okay.  My question is, it seems to me

7       we are agreed that the guy, Gio, has mental health

8       problems, right?

9               A       Correct.

10              Q       And your opinion is that his arrest

11      caused him to commit suicide?

12              A       My opinion is that his arrests were

13      responsible for his suicide because of what followed

14      the arrests.  It is conceivable under a different

15      set of scenarios that he could have been taken into

16      custody and not suicided, had different things taken

17      place.  For example, his being arrested and brought

18      to psychiatric services and then provided treatment

19      because he was a danger to other people, as

20      evidenced by his having been arrested.

21              Q       Yeah.  But isn't it possible that --

22      you're not saying that if he had not been arrested,

23      he wouldn't have committed suicide anyway.  Can you

24      know that or are you saying that?

25              A       There is no evidence that I have found

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                               220

1    of his suicidality prior to his arrest.  So it is my

2    opinion that were he not to have been arrested,

3    there's no indication that he would have committed

4    suicide.

5            Q    Well, I guess my fundamental problem

6    with this is that it seems like his mental illness

7    causes the suicide, and that the definition of

8    mental illness is the failure to respond in a normal

9    manner.  And so normally people, after they get

10   arrested, especially, and they get released, they

11   don't commit suicide, right?

12           A    Suicide is quite frequently noted in

13   people who have been arrested for the first time and

14   within a very short period of time after their going

15   into custody.

16           Q    How about after they are released from

17   custody, do you know that that happens frequently?

18           A    I don't know that it's been studied

19   about how frequently it happens.  But what's been

20   actually studied and noted has been for those who

21   are in jail custody.  I would have to actually go

22   and specifically look at the outpatient population

23   of -- or not outpatient population, but of those

24   released shortly after being arrested.

25           Q    And that would make a difference?

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          221

```
 1   Like if there was no indication that people who had
 2   been arrested and released had any greater chance of
 3   suicide, then that would affect your opinion that in
 4   this case his suicide was caused by his arrest,
 5   right?
 6          A     Well, as I said, it's not the arrest
 7   in a vacuum.  It's the arrest and everything that
 8   accompanied it.
 9          Q     Well, it's arrest because he's
10   mentally ill, right?
11          A     I'm not sure I understand your
12   question.  No.  Because there are folks who, by
13   virtue of their hopelessness, have an acute sense of
14   hopelessness and do not have a psychiatric illness
15   who may commit suicide.  They may have intense shame
16   and humiliation, and under those circumstances, may
17   suicide.  So the diagnosis is less directly related
18   than hopelessness.
19          Q     Well, doesn't the fact that he didn't
20   commit suicide after he got arrested the first
21   time -- this was his second arrest that we know
22   about -- doesn't the fact that he didn't commit
23   suicide the first time he got arrested and was
24   released, doesn't that show that it was something
25   more than merely being arrested?
```

```
 1          A      That's right.  I agree.  That's what I
 2    had answered a few minutes ago.  I said that it was
 3    the series of events that are attributable to the
 4    arrest and what happened in the aftermath.  In the
 5    first arrest, he went into a hospital, he was
 6    treated for psychosis, he left the hospital, and
 7    there really were no ramifications.  It didn't
 8    jeopardize his standing in any way, and he really
 9    resumed life, as he knew it, prior.  There were no
10    broader repercussions.
11               The repercussions are as I discussed.
12    There are some that I haven't even thought of that
13    were alluded to, your cocounsel here, who was
14    talking about the idea of like, Well, he had
15    conflict with his parents, and so maybe going to
16    them as an alternative would have been something
17    that he particularly didn't look forward to, or the
18    idea that if he were to lose his scholarship, he
19    would know his parents weren't going to support him.
20    I hadn't even considered those as additive to his
21    stresses.  But now that they've come up on your
22    deposition, I would add them to my opinion.
23               So I think it's a broader context of
24    the implications of the arrest as they were
25    manifested, not in his head, but his being evicted
```

1    from his room and being denied the opportunity for

2    alternative housing on campus and how he would have

3    interpreted that in the context of a highly

4    conflicted experience within one class that had not

5    been resolved.  That was significant enough to him

6    at the time that he took it up with administration.

7                So I'm really -- I'm speaking to what

8    would have engendered in him a sense of hopelessness

9    as opposed to the idea of assuming that he got

10   hopeless because he got arrested.  There would be no

11   reason, if he just basically went back to things as

12   they previously were.

13           Q    But his response to being arrested is

14   flawed because of his mental health problems, right?

15           A    Every suicidal decision is flawed.

16   And that includes the decision to suicide by people

17   who are completely rational.  When a young man, who

18   is exposed as being a homosexual by his roommate,

19   who shows his surreptitious tape, and by virtue of

20   humiliation, goes and jumps off the George

21   Washington Bridge, that's a flawed decision.  But he

22   may not have a psychiatric diagnosis.  But the

23   implications for him of having been exposed are such

24   that he makes the decision within a fairly short

25   period of time that's borne of his hopelessness.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    224

1                 When the Secretary -- when the
2      nominated Secretary of the Navy is exposed for
3      having Fake Medals with no previous psychiatric
4      diagnosis, and, in fact, a presidential appointee,
5      that well thought of, and upon publication of his
6      exposure of being a fraud, goes out on his front
7      lawn and shoots himself dead, that's a flawed
8      decision.  But it's not borne of psychiatric
9      diagnosis.
10                So there's a distinction between
11     hopelessness and psychiatric diagnosis, but
12     certainly a person who is -- who is disorganized,
13     who is psychotic, who is ill, is not going to cope
14     as well as a person who is not ill.  A person who
15     may have a particular level of disorganization, or
16     even depression, may not cope as well, certainly has
17     a loss of resilience, relative to a person who does
18     not have the same condition.
19          Q     How can you tell that his suicide
20     wasn't the normal progression of his disease
21     process?  Whatever was going on with the seizures
22     and his brain problems, how can you tell that they
23     just didn't get worse to the place where he
24     committed suicide, and that this arrest, like the
25     other arrest, was just something that happened along

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    225

1    the way?

2          A      Because there was no progression of

3    his seizures, as an example, because there was --

4    there was no advancement of symptoms of his

5    condition beyond the idea of this confrontation that

6    he had with a roommate, which played itself out in

7    his communication with Adrienne Morgan, which was --

8    which then manifested itself in how he related to --

9    to Spencer Opie's friend, who wanted to gain entry

10   that night.  And so it relates to his irrational

11   interpretation and his seeking alternative

12   arrangements for where he was living.  It happened

13   to culminate in arrest.  But there's no indication

14   that were he to have been given alternative housing

15   when he sought it out on the 28th, that he would

16   have been suicidal in his place.

17                He would -- I would have expected he

18   would have continued to be psychotic.  But he was

19   invested in continuing to -- I'm sorry, in

20   succeeding in his classes, he was going to his

21   classes, he was participating in the exercises.  His

22   behavior was peculiar and it was attracting

23   attention, but he was voicing no suicidal ideation

24   to his -- to anyone around him.

25                Now, he was referencing paranoid

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                  226

```
 1   thinking.  He was talking about themes which were
 2   paranoid.  He was paranoid of his roommate, who he
 3   took a swing at.  He was paranoid of people making
 4   passes at him.  He was paranoid of his computer
 5   being hacked.  He was paranoid when he said people
 6   were trying to kill him.
 7        Q     And he wasn't washing, he wasn't
 8   taking a bath?
 9        A     That's correct.  That's right.
10        Q     Doesn't it look like he's getting
11   worse over time?
12        A     Oh, sure, it does.
13        Q     He's attacking his roommate.  He's not
14   washing.  He's acting like a dog.
15        A     No.  But the barking like a dog
16   happened in October the year previous.  That was at
17   a different time.  And in a way, what you're
18   pointing out is that he could have very
19   demonstrative and clearly ridiculous, bizarre
20   behavior, and there it was in October, and then here
21   we are having a discussion about what happened in
22   March, and he didn't advance further down the mammal
23   food chain in terms of his behavior.  He wasn't
24   defecating, he wasn't advancing that behavior to
25   something that was just clearly incompatible with
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    227

```
 1    operating in a class.
 2                  So I think that he would have
 3    continued to deteriorate with symptoms of a
 4    psychotic condition.  But psychosis does not equate
 5    with suicidality.
 6          Q     What's the relationship between
 7    psychosis and suicide?
 8          A     It's -- if a person is suicidal and
 9    they are psychotic, then they are at greater risk
10    because they don't have the coping organization to
11    pull themselves together and make a wiser, more
12    adaptive choice.  In other words, if a person is
13    suicidal and they are interpreting their environment
14    in an irrational way, they don't have the kind of
15    resources to reason through the idea of psychosis
16    being a poor choice.  But that also presupposes that
17    they're psychotic.
18                  The psychosis -- suicide is not a
19    symptom of psychosis.  Psychosis is best broken down
20    into basically four different realms.  One -- I'm
21    sorry.  Five.  One is -- and you can use the
22    mnemonic BRECC, B-R-E-C-C.
23                  B is for behavior.  An example,
24    barking like a dog.
25                  R is for sense of reality.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                               228

1    Hallucinations or delusions, fixed false ideas.

2    Now, there are irrational, fixed, false ideas that

3    are attributed to him.  There's no history that's

4    attributed to him of hallucinations.  So that's the

5    R, where reality is disturbed.

6              Three is emotion.  Now, the question

7    could be raised, does his volatile emotion, is that

8    reflective of psychosis?  You know, in and of itself

9    it could be, it could not be.  When a person has

10   volatile emotions and has other symptoms, you say

11   ah-ha, the emotions are part of the psychosis.  But

12   if a person has volatile emotions, it may be mood

13   irritability that's part of depression, or it may be

14   part of whatever was neurological going on with him,

15   or it may be part of this explosive thing that

16   people were writing about in one are more of the

17   visits.

18              But emotions can be reflective of --

19   and when I say "emotions," I mean irrational

20   emotions, like a response to crying inappropriately,

21   laughing inappropriately, overly emotive response to

22   something that is completely out of context.  That's

23   an irrational psychotic expression of emotion.

24              The C, the next one, is for

25   communication.  Buckle my shoe with a white cord on

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    229

1    the ceiling.  Do you understand what I just said?

2    Of course not.  It makes no sense.  That is known as

3    a loose association.  It makes sense to me, but it

4    doesn't make sense to anybody who's listening.  And

5    that's reflective of psychotic communication.  So

6    that's the fourth one.

7              And the fifth one is cognition, where

8    a person is disoriented, disorganized in terms of

9    synthesizing their environment, and presents as

10   confused.

11             And so BRECC.

12             Now, what did I not say?  Suicidal.

13   Suicide has nothing to did with psychosis in and of

14   itself.  But a person --

15        Q    Let me just ask you this, and this

16   will be my last question because I have concert

17   tickets and I'm leaving.

18             He had evidence before he committed

19   suicide of both psychosis and being suicidal.

20   There's a record on -- of both his suicidal ideation

21   and that he's mentally ill.  And it also looks like

22   he's getting worse over time.  And so how do you

23   know that this just was not the normal progression?

24   He could have as easily been arrested as he could

25   have done something else which -- had a flat tire,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     230

```
 1   which would not lead a normal person to suicide.
 2   How can you say that the arrest was any different
 3   than bouncing a check?
 4        A    Well, an arrest is a significant event
 5   in a person's life.  And an arrest in his life would
 6   have been more significant than a person who was not
 7   invested in maintaining good standing at Gallaudet.
 8   And the arrest occurred at Gallaudet.  It had clear
 9   consequences, the consequences being forcibly -- and
10   I mean forcibly, not by physical force, but
11   essentially by requirement, removed from his room
12   without any kind of provision for staying on campus.
13   So there were clear consequences.  It was more of --
14   more than an arrest.  It was an arrest with
15   consequences.
16             So no, I can't say that something
17   wouldn't have happened if he wasn't arrested that
18   might have eventually put him in a position of being
19   hopeless.  It is certainly possible.  As we noted
20   from the earlier deposition questions and testimony,
21   he had been suicidal at other times.  I'm not here
22   saying that he couldn't potentially have been
23   suicidal at some other point in the future.  Not at
24   all.
25             What I am saying is, Gee, he suicided.
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     231

1    He didn't just have suicidal thinking, but he

2    actually carried through with the suicide, and it

3    happened to be in immediate time proximity to

4    something that was a significant event in his life,

5    not only in its infrequency, but in its

6    significance.  Whether the significance was broad

7    and irreversible, we don't have the opportunity to

8    depose him.  But it certainly had consequences for

9    him in the very short-term.

10                   And at the time, as I pointed out in

11   my report, where he really was -- you know, we can

12   look at his grades all we want, but he clearly had

13   problems in the fall with one teacher, repeated a

14   class, had problems with the next teacher, took it

15   up with administration, and certainly he would not

16   have characterized -- with all due respect to

17   Mr. Moore, he would not have characterized his

18   academic situation as unremarkable.  Of course it

19   was remarkable.  He took the initiative himself.  So

20   he had a convergence of a lot of things.

21                   Of course he made an extremely

22   regrettable and irrational decision.  But suicide is

23   always a regrettable and irrational decision, again,

24   with all consideration of the whole

25   physician-assisted suicide discussion.  But that's

```
 1    not what we're talking about here.
 2                    MR. ANDERSON:  Okay.  Well, that
 3              does it for me.  I'm going to leave now.
 4                    THE WITNESS:  Have a good
 5              concert.
 6                    (A discussion was held off the
 7              record.)
 8    EXAMINATION
 9    BY MR. GROSZ:
10         Q     Doctor, you would agree that at the
11    time of the arrest on March 29 of 2014, Gianni was
12    suffering from a mental illness or condition?
13         A     Correct.
14         Q     Would you agree that this state of
15    hopelessness that you discussed was triggered by the
16    arrest?
17                    MR. WATERS:  Objection.
18         A     Yes.
19         Q     Would you agree that the state of
20    hopelessness that you have discussed is an abnormal
21    mental condition?
22                    MR. WATERS:  Objection.
23         A     I need to clarify my last answer.  It
24    was the arrest and what it then -- the cascade of
25    events that then followed.
```

1          Q      Okay.

2          A      Yes, that's an abnormal mental

3     condition.  Hopelessness is a symptom.  It is --

4     actually has even more correlation with suicide than

5     it does -- than depression does with suicide.

6          Q      And then would it be fair to say that

7     the arrest and the events that followed the arrest,

8     meaning the manner in which he was treated, being

9     taken to the jail in the Fifth District rather than

10    any intervention, being sent back to campus and not

11    offered any alternative, being escorted to his room

12    and escorted out, not being provided with a room,

13    and having previously been denied a request for a

14    room, that those events drove him from his state of

15    psychosis into his state of hopelessness?

16                     MR. WATERS:  Objection.

17         A      Yes.

18         Q      Would you agree that at the time

19    Gianni was in a state of hopelessness, that he was

20    essentially stripped of his ability to refuse

21    impulses --

22                     MR. WATERS:  Objection.

23         Q      -- to commit suicide?

24                     MR. WATERS:  Objection.

25         A      Essentially, yes.

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    234

```
 1          Q      Explain that.
 2                     MR. WATERS:  Objection.
 3          A      The -- he was on his own for a period
 4   of a few hours and he was alone with his thoughts.
 5   And so he was stripped of his ability to process
 6   through his future in a rational way.  And so I say
 7   essentially yes, because he acted on a suicidal
 8   impulse.  But he acted on a suicidal impulse after
 9   processing through his future in a highly irrational
10   way.  And making a choice at that time.
11                  So I think that it's my professional
12   opinion that during that period of time when he was
13   on his own, he wasn't interacting with anyone, so he
14   was alone with himself.  So it wasn't that he just
15   acted on impulse.  It was that he contemplated, and
16   whatever it was he was contemplating, he didn't have
17   any of the influence or impact of any support around
18   him that would have mediated it.  And that by the
19   time he reconnected with his mother, that he was
20   already there.  And he went home and he picked up
21   the knife and then he left.
22          Q      And you're talking about even before
23   he reconnected with Mom to take him away from
24   Gallaudet?  You're talking about the time period in
25   between the actual arrest and the time that
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    235

```
 1   Ms. Sacchetti picks him up at the school?  You're
 2   talking about this time that he had to kind of
 3   ruminate in his own thoughts?
 4           A     Yes.
 5                      MR. WATERS:  Objection.
 6                      MR. GROSZ:  Thank you.
 7                      MR. WATERS:  I have some
 8           follow-ups.
 9   EXAMINATION
10   BY MR. WATERS:
11           Q     The period of hopelessness that you're
12   talking about when he was alone is the period from
13   when he was discharged from the police until his mom
14   picked him up?
15           A     I think the period of hopelessness is
16   when he went off campus and he called his mom and
17   said to, Come and get me.
18           Q     Okay.  So it's not the period that was
19   before he went to his room with the police officer
20   and CRE to get his personal belongings?
21           A     In my professional opinion, when it
22   was clear to him that he was off campus and that he
23   was -- that he didn't have any recourse for staying,
24   that at least I'm comfortable that, under those
25   circumstances, that was when he was hopeless.  I
```

1    don't have enough information about what he was

2    doing that day to get a sense of what he was saying

3    and what he was communicating with people and

4    whether he was trying to make arrangements.  That's

5    a bit of a blank slate.

6              But what I do have is that when he

7    engaged his mom, he did it with a tone of urgency

8    and desperation, and that at that time he was

9    experiencing hopelessness and it culminated in his

10   suicide.

11        Q    Were you aware that a friend was with

12   him when Mom picked him up?  He wasn't alone.  Were

13   you aware of that?

14        A    No.

15        Q    Were you aware that he was in a

16   friend's room before he went to collect his

17   belongings?

18        A    Yes, yes.

19        Q    So he wasn't alone?

20        A    Okay.

21        Q    Okay.  I believe you testified to this

22   and I just want to make sure.  This is my last line.

23   If Gianni -- it's your opinion that if Gianni had

24   gotten alternative housing at Gallaudet University

25   after being discharged from the police, that he

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                     237

```
 1   could have made the decision not to commit suicide,
 2   correct?
 3           A      Yes.
 4           Q      And is it also your opinion that if
 5   Mom had taken him to the psychiatric hospital on her
 6   way home, that he could have made the decision not
 7   to commit suicide?
 8           A      If his mother had him involuntarily
 9   committed.  If his mother was aware that he had been
10   a threat to others, that he had been -- and if his
11   mother would have been able to succeed in having him
12   involuntarily committed, that he would not have
13   committed suicide.
14           Q      Okay.  While he wasn't alone, to our
15   knowledge, when he was on campus, he was alone after
16   his mother left to go pick up his sister, correct?
17           A      That's correct.  That's correct.
18           Q      And he was alone until about 5:00 in
19   the morning at that point?
20           A      That's right.  And that's what I was
21   speaking about.  He was alone with his thoughts, and
22   he had an opportunity to turn things over, and there
23   wasn't anyone, such as a friend, that he might have
24   been in a dorm room --
25           Q      Or a mother?
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    238

```
 1          A     -- or a mother, to bounce things off
 2    of and to say, Well, you know, let's go in on Monday
 3    and we'll work it out with Public Safety, or we'll
 4    do what we have at campus.  Oh, so this is what's
 5    going on.  You know, it's not as bad as you think.
 6                        MR. WATERS:  That's all I have.
 7                        THE WITNESS:  Okay.  All right.
 8                        THE COURT REPORTER:  Can I get
 9               orders on the record, please?
10                        MR. WATERS:  Doctor, do you
11               prefer to read and sign?
12                        THE WITNESS:  I'll read it.
13                        (A discussion was held off the
14               record.)
15                        MR. WATERS:  Rough -- it's my
16               standard Planet Depo order.  But rough,
17               mini.  I like electronic version too.
18                        MR. GROSZ:  Everything but the
19               rough.
20                        (Whereupon, at 6:46 p.m. the
21               deposition was concluded.)
22
23
24
25
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    239

```
 1              C E R T I F I C A T E

 2

 3   STATE OF_____:

 4   COUNTY/CITY OF_____:

 5

 6   Before me, this day, personally appeared

 7   MICHAEL WELNER, M.D., who, being duly sworn, states

 8   that the foregoing transcript of his/her

 9   Deposition, taken in the matter, on the date, and

10   at the time and place set out on the title page

11   hereof, constitutes a true and accurate transcript

12   of said deposition.

13

14                    _____

15                         MICHAEL WELNER, M.D.

16

17
     SUBSCRIBED and SWORN to before me this_____
18   day of _____, 2017, in the

19   jurisdiction aforesaid.

20

21

22

23   _____    _____

24   My Commission Expires            Notary Public

25
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    240

```
 1                    C E R T I F I C A T E

 2    STATE OF NEW YORK  )

 3                       ) ss.

 4    COUNTY OF NEW YORK )

 5              I, PAMELA GRIMALDI,

 6          Registered Professional Reporter and

 7          Notary Public of the State of New

 8          York, do hereby certify that the

 9          foregoing Deposition, of the

10          witness, Michael Welner, M.D., taken

11          at the time and place aforesaid, is

12          a true and correct transcription of

13          my shorthand notes; that reading and

14          signing was requested.

15              I further certify that I am

16          neither counsel for nor related to

17          any party to said action, nor in any

18          wise interested in the result or

19          outcome thereof.

20              IN WITNESS WHEREOF, I have

21          hereunto set my hand this 21st day

22          of July, 2017.

23
                    _Pamela Grimaldi_
24          _____

25              PAMELA GRIMALDI, RPR
```

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                      241

| A | | | |
|---|---|---|---|
| **a) (2** | **accompanied** | 13:2, 13:18, | 138:19 |
| 6:14 | 127:4, 221:8 | 14:25, 15:1, | **additionally** |
| **ability** | **accomplish** | 84:13 | 44:20, 115:6 |
| 138:7, 233:20, | 78:20 | **actively** | **additive** |
| 234:5 | **accordance** | 13:17, 152:25 | 222:20 |
| **able** | 35:18 | **activities** | **address** |
| 12:3, 22:12, | **according** | 15:5, 93:25 | 34:25, 38:16, |
| 25:17, 26:20, | 159:7 | **activity** | 43:5, 54:7, |
| 36:20, 38:16, | **account** | 55:12 | 54:8, 56:5, |
| 38:18, 38:20, | 25:4, 54:24, | **acts** | 166:24, 167:7, |
| 40:23, 43:4, | 65:9, 66:18, | 191:6 | 208:14 |
| 82:11, 84:17, | 83:11, 119:17, | **actual** | **addressed** |
| 115:7, 174:25, | 134:8, 192:1 | 55:23, 80:4, | 150:2 |
| 210:17, 237:11 | **accounted** | 135:12, 234:25 | **addresses** |
| **abnormal** | 55:2 | **actually** | 54:2 |
| 232:20, 233:2 | **accounting** | 15:8, 17:4, | **adds** |
| **absent** | 54:16, 100:2, | 21:9, 40:20, | 37:14 |
| 161:15 | 191:8 | 42:2, 47:19, | **adhere** |
| **absolutely** | **accurate** | 50:16, 53:4, | 217:22 |
| 16:11, 29:2, | 239:11 | 59:17, 73:4, | **adheres** |
| 40:18, 137:17, | **accusations** | 84:9, 88:3, | 217:21 |
| 196:20, 203:14 | 75:15, 134:7, | 108:4, 119:18, | **administered** |
| **abuse** | 134:9 | 128:3, 133:18, | 98:11 |
| 15:19, 184:25, | **achieve** | 135:14, 141:17, | **administration** |
| 216:5 | 11:19, 39:11 | 178:23, 183:10, | 71:3, 223:6, |
| **abused** | **achieved** | 185:4, 220:20, | 231:15 |
| 207:13, 213:10 | 98:25 | 220:21, 231:2, | **administrators** |
| **abusive** | **acquainted** | 233:4 | 8:8 |
| 214:6 | 180:2 | **acute** | **admission** |
| **academic** | **across** | 113:3, 182:12, | 96:18, 119:5, |
| 8:25, 57:22, | 10:17, 74:20, | 191:9, 221:13 | 119:7, 127:20, |
| 57:23, 64:16, | 166:16 | **ada** | 131:11, 178:9 |
| 77:8, 84:18, | **act** | 65:20 | **admitted** |
| 97:5, 97:23, | 153:12 | **adaptive** | 29:22, 96:14, |
| 97:24, 98:5, | **acted** | 227:12 | 117:25, 126:4, |
| 109:22, 110:6, | 116:16, 191:18, | **add** | 126:7, 126:9, |
| 231:18 | 234:7, 234:8, | 7:20, 25:7, | 131:25, 132:23, |
| **accepted** | 234:15 | 92:5, 116:9, | 133:16, 142:19, |
| 129:18 | **acting** | 124:22, 131:5, | 199:24, 200:3, |
| **access** | 134:5, 181:25, | 136:17, 213:10, | 202:1 |
| 154:5 | 192:14, 198:21, | 222:22 | **admitted^** |
| **accessible** | 226:14 | **added** | 200:23 |
| 20:10, 21:8 | **action** | 9:3 | **admitting** |
| **accident** | 79:3, 101:2, | **adding** | 133:1 |
| 19:19 | 240:17 | 125:23 | **adrian** |
| **accommodate** | **actions** | **addition** | 89:1 |
| 39:20, 151:16 | 147:22, 168:15 | 35:22, 46:23 | **adrienne** |
| | **active** | **additional** | 74:10, 78:3, |
| | 10:7, 12:24, | 42:21, 48:21, | |

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    242

81:8, 87:13,
88:6, 88:9,
88:11, 88:23,
122:14, 130:3,
134:4, 137:8,
198:20, 225:7
**adult**
67:25, 208:21
**advance**
217:14, 217:20,
226:22
**advancement**
225:4
**advancing**
226:24
**advised**
182:17, 213:9,
217:16
**adviser**
64:16
**advisor**
57:22, 57:23
**advocating**
130:18
**affairs**
69:12
**affect**
161:23, 221:3
**affiliation**
209:18
**afford**
66:19
**affordable**
99:11
**afforded**
89:15
**afield**
85:2
**aforesaid**
239:20, 240:11
**after**
14:1, 41:12,
41:16, 42:11,
52:14, 81:3,
81:4, 85:23,
86:8, 86:12,
88:7, 93:6,
93:12, 97:7,

98:19, 99:13,
101:16, 124:17,
125:2, 147:1,
148:25, 151:11,
182:18, 188:14,
209:3, 209:19,
211:10, 212:6,
212:11, 220:9,
220:14, 220:16,
220:24, 221:20,
234:8, 236:25,
237:15
**aftermath**
56:13, 117:19,
209:24, 211:4,
222:4
**afternoon**
4:8, 4:9, 4:10,
74:1, 77:18,
135:5, 151:2
**afterward**
204:3
**again**
21:1, 22:25,
24:2, 28:25,
29:12, 37:23,
41:1, 42:7,
43:5, 58:7,
58:9, 73:14,
84:20, 100:7,
103:12, 111:5,
111:9, 120:6,
133:4, 135:23,
136:14, 137:3,
145:13, 150:2,
150:25, 169:15,
182:11, 200:16,
208:17, 231:23
**against**
126:18, 128:9,
128:13, 145:1,
146:1
**age**
159:16, 160:5,
160:6, 160:14,
179:25
**agencies**
40:10

**agitated**
118:6, 130:4,
133:14, 170:4,
172:20, 173:1,
183:14, 183:20,
183:22, 184:12,
184:21, 201:1,
202:2
**agitation**
183:15, 183:17
**ago**
29:24, 30:3,
32:23, 33:25,
213:11, 222:2
**agree**
57:4, 58:12,
63:5, 63:20,
63:24, 75:4,
75:7, 75:16,
75:18, 76:2,
78:6, 79:18,
80:5, 82:5,
96:19, 98:6,
105:18, 107:13,
109:19, 110:4,
123:2, 123:3,
138:25, 156:22,
161:12, 167:10,
214:10, 218:3,
218:6, 218:9,
218:10, 222:1,
232:10, 232:14,
232:19, 233:18
**agreed**
122:23, 217:23,
219:7
**ah**
9:21
**ah-ha**
228:11
**ahead**
40:25, 60:25,
192:11
**ahead-of-the-cur-
ve**
23:6
**alarm**
137:22

**alcohol**
216:5
**alcoholism**
157:16, 161:4,
161:9, 215:25
**alert**
83:18
**alerted**
173:9
**alive**
124:9, 139:24
**all**
8:3, 9:4, 10:8,
10:16, 15:18,
24:17, 25:2,
26:19, 27:12,
36:6, 37:24,
42:19, 43:8,
46:15, 53:13,
55:3, 55:18,
63:14, 64:10,
69:17, 74:16,
84:3, 85:9,
87:5, 92:17,
93:2, 97:25,
100:8, 102:14,
103:5, 103:23,
104:7, 104:24,
106:10, 108:11,
108:22, 116:20,
126:14, 144:19,
144:22, 146:10,
147:8, 149:12,
160:25, 166:13,
170:17, 173:24,
185:12, 187:11,
195:5, 196:7,
201:15, 206:22,
207:15, 210:13,
218:6, 218:16,
230:24, 231:12,
231:16, 231:24,
238:6, 238:7
**alleged**
168:10
**allowed**
89:14, 92:8
**alluded**
222:13

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    243

**almost**
19:13, 74:4,
75:15, 160:2
**alone**
37:14, 129:7,
175:24, 175:25,
204:11, 234:4,
234:14, 235:12,
236:12, 236:19,
237:14, 237:15,
237:18, 237:21
**along**
41:9, 110:16,
111:12, 112:11,
112:15, 112:25,
157:13, 157:20,
224:25
**already**
20:15, 61:11,
61:18, 71:13,
71:15, 72:17,
99:17, 100:12,
116:14, 234:20
**also**
10:16, 15:8,
16:21, 17:13,
18:17, 25:25,
36:10, 37:6,
40:9, 44:14,
46:25, 48:4,
53:5, 55:7,
55:15, 59:14,
65:10, 66:9,
70:15, 74:6,
74:9, 75:25,
88:14, 111:3,
116:24, 119:17,
134:6, 141:13,
146:15, 157:15,
179:11, 180:9,
181:6, 181:23,
193:21, 206:13,
207:1, 207:13,
227:16, 229:21,
237:4
**alternative**
88:25, 89:2,
91:16, 147:24,

148:5, 148:22,
149:2, 149:7,
149:13, 149:17,
149:22, 149:25,
150:23, 151:21,
203:9, 222:16,
223:2, 225:11,
225:14, 233:11,
236:24
**alternatively**
179:12
**alternatives**
215:5
**alters**
2:3
**although**
15:20, 57:11,
68:19, 87:17,
165:2, 174:16,
197:19
**always**
31:11, 146:10,
163:13, 196:13,
231:23
**ambiguity**
44:23, 44:24
**ambiguous**
135:16, 136:2
**ambushing**
158:17
**american**
11:12, 19:6
**among**
35:21, 36:10,
36:22
**amount**
33:3, 46:5,
191:21
**anderson**
2:27, 3:5,
218:19, 218:22,
219:3, 232:2
**anderson@dc**
2:28
**anger**
162:2, 204:18
**angrily**
160:9

**angry**
183:24, 183:25,
197:22, 200:17
**annual**
19:6
**another**
17:5, 29:7,
37:9, 40:20,
60:19, 91:18,
97:14, 98:14,
101:18, 142:18,
148:10, 151:6,
179:23, 180:25,
195:8
**answer**
26:10, 54:4,
63:11, 68:11,
89:23, 91:4,
92:6, 102:8,
124:23, 203:2,
210:2, 210:6,
210:15, 210:16,
232:23
**answered**
206:11, 222:2
**answering**
68:12, 90:1,
91:7, 91:9,
101:9, 192:10
**answers**
138:19
**anticipated**
128:7
**anticipating**
20:10
**antidepressant**
142:10
**antipsychotic**
128:6, 142:17,
142:18, 142:24
**antipsychotics**
84:14, 131:12,
141:21
**antiseizure**
141:13, 141:16
**anxiety**
20:23, 21:2,
23:1, 119:16,

159:6, 159:12,
162:10, 162:16,
167:15
**any**
10:23, 11:17,
11:23, 19:12,
22:1, 28:15,
31:3, 34:14,
39:15, 42:20,
46:2, 48:20,
49:23, 50:10,
53:13, 56:6,
58:15, 59:2,
67:3, 67:5,
70:22, 75:5,
75:8, 80:20,
80:25, 81:15,
87:10, 88:18,
92:2, 92:18,
92:19, 97:3,
97:10, 97:16,
97:20, 99:23,
100:10, 100:21,
100:24, 101:1,
113:19, 117:13,
118:17, 120:2,
120:10, 120:23,
121:20, 121:22,
122:6, 123:12,
127:12, 131:3,
131:23, 139:3,
142:6, 142:11,
146:21, 155:11,
163:16, 166:24,
167:8, 168:8,
170:5, 171:25,
175:1, 179:15,
179:19, 181:11,
190:21, 191:13,
196:11, 211:10,
215:21, 218:18,
221:2, 222:8,
230:2, 230:12,
233:10, 233:11,
234:17, 235:23,
240:17
**anybody**
90:9, 103:19,

150:20, 155:14,
229:4
**anymore**
14:7, 14:10,
21:22
**anyone**
42:2, 49:20,
77:6, 100:8,
117:8, 117:13,
225:24, 234:13,
237:23
**anyplace**
115:1
**anything**
7:19, 39:9,
40:5, 47:2,
60:13, 66:7,
68:7, 70:18,
71:20, 71:24,
72:3, 72:14,
73:12, 93:2,
98:25, 102:1,
102:7, 102:12,
115:25, 116:3,
116:10, 116:11,
125:15, 130:7,
153:11, 155:23,
157:1, 158:1,
161:22, 170:20,
195:1, 199:2,
201:5, 201:11,
203:16, 211:7,
211:12, 211:14
**anyway**
137:10, 219:23
**anywhere**
177:13
**apart**
184:23
**apartment**
149:13, 156:1,
188:14, 188:17,
188:19, 193:14
**apologize**
18:12
**apparent**
119:5, 129:12
**apparently**
118:21, 119:8,

215:4
**appear**
8:23, 18:16,
25:9, 180:1,
217:17
**appearance**
69:25, 70:2,
83:2, 108:1,
122:11, 178:7
**appeared**
85:21, 96:20,
107:23, 121:21,
122:7, 122:10,
172:12, 239:6
**appears**
96:24, 107:14,
164:9
**applications**
13:24
**appointee**
224:4
**appointment**
24:22
**appointments**
216:11
**appraisal**
59:7, 60:4,
166:5
**appreciate**
24:8, 40:12,
166:7, 183:4,
184:6, 209:22
**appreciation**
169:12
**approached**
38:13, 192:4
**appropriate**
65:20, 138:23
**appropriately**
191:5
**approximately**
93:20, 107:20,
160:5
**april**
99:1
**arcane**
37:10
**archived**
21:19

**area**
16:9, 30:10,
46:10, 46:11,
55:9, 55:19,
73:9, 145:14,
209:18
**areas**
11:3, 11:4,
11:7, 15:22,
44:24, 55:1,
55:6, 55:12,
55:14, 175:1
**aren't**
101:21, 206:3
**arenas**
17:25
**arguable**
127:5, 200:24
**argue**
189:20
**arguing**
157:9
**argument**
111:22, 127:8,
138:20, 157:6,
189:3, 194:24,
195:4
**argumentative**
65:17
**arise**
16:12, 83:15
**arising**
204:9
**arms**
95:7
**arose**
77:11
**around**
46:8, 46:9,
46:11, 46:14,
57:7, 66:4,
93:10, 113:17,
126:17, 160:6,
160:13, 163:8,
184:2, 200:20,
225:24, 234:17
**arraigned**
132:24, 133:17

**arrange**
14:18
**arranged**
43:17, 152:22
**arrangement**
13:25, 101:13,
133:19, 140:19
**arrangements**
91:19, 225:12,
236:4
**arrest**
56:5, 56:13,
57:2, 70:6,
70:10, 70:15,
73:23, 74:17,
76:4, 90:5,
90:6, 97:23,
100:7, 100:15,
100:19, 101:2,
105:12, 105:14,
105:20, 108:23,
114:9, 114:22,
117:10, 117:19,
123:25, 124:6,
124:11, 128:19,
129:3, 129:7,
129:8, 131:22,
132:7, 132:14,
132:22, 133:17,
134:23, 135:1,
135:9, 135:10,
135:13, 139:4,
139:12, 140:2,
143:19, 143:23,
144:14, 144:18,
144:25, 145:4,
146:6, 146:11,
146:18, 147:10,
204:11, 219:10,
220:1, 221:4,
221:6, 221:7,
221:9, 221:21,
222:4, 222:5,
222:24, 224:24,
224:25, 225:13,
230:2, 230:4,
230:5, 230:8,
230:14, 232:11,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

245

232:16, 232:24,
233:7, 234:25
**arrested**
82:14, 89:13,
90:8, 90:12,
100:15, 105:11,
130:12, 131:24,
133:10, 135:22,
147:18, 152:14,
154:18, 157:2,
194:18, 194:22,
211:7, 211:12,
219:17, 219:20,
219:22, 220:2,
220:10, 220:13,
220:24, 221:2,
221:20, 221:23,
221:25, 223:10,
223:13, 229:24,
230:17
**arresting**
97:2, 129:12,
130:19, 139:15,
143:22, 185:23,
185:25, 195:1,
198:16
**arrests**
219:12, 219:14
**arrived**
55:24, 148:15,
188:14
**arrives**
12:11
**article**
20:7, 20:10,
20:22, 20:25,
22:9, 22:10,
23:11, 23:17,
23:20
**articles**
20:5, 20:16,
22:1, 24:1,
24:17, 24:20
**asked**
5:9, 14:13,
38:14, 42:13,
43:5, 54:4,
77:6, 77:13,

88:23, 89:1,
89:19, 89:21,
89:24, 91:15,
91:17, 91:23,
102:21, 102:25,
106:1, 109:14,
111:16, 112:15,
125:6, 125:14,
125:25, 151:19,
152:1, 172:12,
188:20, 189:10,
192:24, 193:9,
195:24, 196:2,
205:20, 206:10,
210:2, 216:1,
216:3
**asking**
13:9, 80:17,
89:5, 121:8,
136:6, 182:22,
198:15
**asks**
176:16
**asleep**
165:16
**aspect**
104:17, 150:6
**aspects**
16:2, 28:1,
144:12
**assault**
126:25, 134:14
**assaultive**
126:25, 129:19
**asserted**
110:15
**assertion**
127:14
**assessed**
144:8
**assessment**
11:3, 18:21,
18:22, 59:14,
61:18, 166:4,
193:1
**assessment-wise**
11:1
**assignment**
65:19, 67:23,

98:12, 99:3
**assignments**
61:24, 61:25
**assist**
37:6
**assistance**
111:8
**associated**
21:12, 95:22,
100:19, 162:15,
185:7
**association**
229:3
**assuaged**
184:10
**assume**
61:5
**assuming**
82:6, 145:23,
148:6, 155:9,
178:25, 223:9
**ate**
25:14
**ativan**
184:17
**attacking**
79:4, 226:13
**attacks**
203:22, 203:24
**attempt**
53:13, 142:7,
187:24
**attempted**
67:13, 73:13
**attempting**
78:19
**attend**
120:5
**attention**
18:14, 20:22,
22:7, 44:7,
71:17, 83:7,
225:23
**attenuated**
34:4
**attitude**
52:17
**attorney**
2:21, 38:9,

38:13, 123:17,
183:9, 193:10
**attorneys**
2:4, 2:13,
2:22, 16:25,
17:5, 32:3,
34:15, 36:9,
40:9
**attracted**
98:16
**attracting**
225:22
**attributable**
222:3
**attributed**
197:21, 203:20,
228:3, 228:4
**attributing**
69:7
**audience**
23:5
**august**
117:24, 119:12,
121:16, 121:24,
122:2, 124:20,
202:1, 216:10
**authored**
21:4
**authority**
145:16
**autopsy**
18:21, 19:17,
24:2
**available**
21:22, 44:16,
56:11, 56:14,
73:18, 89:3,
89:4, 89:17,
89:18, 99:13,
101:25, 102:3,
102:25, 103:2,
114:25, 117:17,
117:20, 120:21,
126:15, 134:2,
134:3, 139:11,
149:15, 151:13,
179:21, 191:8,
191:9, 191:22,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    246

193:6, 195:15
**avenue**
1:12, 67:22
**average**
63:7
**aversion**
130:16
**avoid**
61:13, 64:11,
67:8
**awake**
160:7
**awareness**
11:22, 52:2,
120:24, 121:5,
121:10, 122:22,
159:11, 159:12,
173:6, 190:24,
216:5
**away**
23:7, 32:24,
32:25, 90:13,
92:12, 135:21,
136:22, 137:14,
152:14, 189:15,
219:1, 234:23
**axis**
162:15, 162:20,
164:11, 165:4

**B**

**b-r-e-c-c**
227:22
**back**
19:23, 20:20,
23:11, 23:24,
27:22, 28:17,
28:25, 29:2,
30:15, 42:7,
51:24, 73:2,
88:7, 89:14,
101:16, 113:9,
142:20, 152:16,
155:25, 159:6,
159:13, 170:7,
175:5, 188:14,
188:25, 210:14,
216:24, 223:11,

233:10
**background**
12:2
**bad**
83:4, 83:5,
85:6, 152:17,
170:18, 215:4,
238:5
**banging**
118:6
**barked**
84:3
**barking**
84:20, 197:16,
226:15, 227:24
**baron**
81:23, 82:2,
82:4
**based**
41:21, 47:16,
54:6, 64:8,
96:11, 126:14,
130:2, 130:3,
139:10, 147:14,
170:24, 182:25,
193:5, 195:25,
198:3, 200:7,
201:15, 203:4,
204:6
**baseline**
68:18
**basically**
21:18, 39:13,
40:5, 43:13,
61:20, 130:17,
130:25, 163:7,
223:11, 227:20
**basis**
7:5, 58:19,
61:17, 115:23,
116:6, 127:16,
128:19, 129:2,
134:11, 140:2,
199:4, 209:7,
209:20
**bates**
62:17, 62:21,
62:24, 63:1,

107:4
**bath**
226:8
**bathing**
69:25
**bauer**
76:18, 76:22,
77:15, 77:17,
78:2, 78:7,
78:12, 78:17,
78:24, 79:7,
79:11, 79:14,
80:21, 81:21,
97:3, 136:20,
136:25, 137:21,
198:17
**bauer's**
76:8, 78:9
**beach**
2:6
**became**
105:15, 114:14,
114:17, 122:13,
177:21, 177:25,
178:4, 178:11,
185:21, 186:1,
205:5, 205:14,
205:25
**become**
17:1, 198:19,
205:2
**becomes**
41:7, 127:5,
146:23, 176:15,
177:16, 180:2,
199:9, 199:13,
201:17, 201:19
**becoming**
177:2
**bed**
102:10
**before**
1:23, 6:16,
12:11, 19:11,
20:21, 33:12,
41:7, 41:11,
41:15, 50:15,
50:17, 51:25,

53:4, 63:3,
70:6, 70:10,
70:15, 73:23,
76:17, 76:19,
76:23, 83:11,
83:23, 85:20,
86:17, 87:9,
90:6, 93:21,
96:7, 100:8,
102:21, 102:22,
102:24, 105:11,
112:12, 135:6,
148:18, 150:3,
158:21, 160:11,
160:17, 168:24,
169:9, 170:2,
170:21, 171:17,
177:6, 179:5,
185:14, 195:20,
203:11, 204:22,
206:21, 211:17,
216:4, 218:20,
229:18, 234:22,
235:19, 236:16,
239:6, 239:18
**began**
160:14
**beginning**
58:5, 68:25,
69:8, 69:15,
174:20
**begins**
87:22
**behalf**
28:19, 28:20,
29:23, 30:2,
30:11
**behave**
60:23
**behaving**
68:25, 69:11,
69:22, 98:15
**behavior**
65:4, 65:8,
68:13, 116:15,
116:24, 117:5,
122:16, 129:11,
131:17, 134:25,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

247

135:3, 135:14,
137:6, 137:21,
181:1, 181:2,
181:13, 225:22,
226:20, 226:23,
226:24, 227:23
**behavioral**
35:10
**behind**
18:23, 152:15,
166:10
**being**
6:23, 18:24,
21:3, 36:20,
58:20, 68:22,
79:15, 84:24,
88:6, 90:7,
90:12, 93:6,
101:17, 106:1,
106:4, 106:9,
109:12, 115:7,
118:23, 121:3,
122:12, 126:23,
134:3, 135:22,
137:6, 144:13,
144:25, 146:21,
147:1, 151:3,
157:2, 165:17,
167:24, 170:10,
183:8, 183:9,
183:10, 194:17,
194:21, 197:10,
203:16, 205:15,
210:11, 211:7,
212:20, 219:17,
220:24, 221:25,
222:25, 223:1,
223:13, 223:18,
224:6, 226:5,
227:16, 229:19,
230:9, 230:18,
233:8, 233:10,
233:11, 233:12,
236:25, 239:7
**believe**
19:8, 20:24,
59:18, 72:7,
85:15, 87:5,

89:11, 98:21,
105:19, 120:11,
125:5, 126:6,
142:8, 165:1,
171:1, 175:2,
175:24, 190:25,
202:21, 202:22,
216:1, 216:3,
216:4, 236:21
**believed**
66:10
**believes**
159:25, 160:4
**bell**
34:19
**belonging**
209:18
**belongings**
86:18, 87:16,
87:19, 87:20,
88:5, 90:15,
93:16, 104:10,
104:12, 104:18,
235:20, 236:17
**benefit**
83:18
**benefits**
13:24
**best**
31:6, 51:20,
166:9, 166:12,
203:2, 227:19
**beth**
8:25, 9:12,
9:14, 18:15
**better**
38:18, 108:14,
160:7, 170:24,
185:1, 215:6
**between**
15:14, 21:11,
33:1, 38:4,
46:20, 74:24,
78:3, 85:14,
115:17, 115:21,
130:9, 157:5,
166:20, 174:21,
205:22, 205:23,

205:24, 208:10,
216:10, 224:10,
227:6, 234:25
**beyond**
12:7, 48:6,
54:15, 83:13,
99:12, 130:8,
225:5
**bias**
25:12
**bill**
173:14
**bipolar**
80:21, 81:2,
81:6, 81:12,
82:6, 82:7,
82:20, 112:16,
112:18, 122:13,
122:21, 122:25,
127:10, 132:3,
134:4, 164:12,
164:17, 164:19,
164:22, 179:4,
179:10, 198:25,
207:1, 207:9
**bit**
20:14, 26:4,
32:9, 41:22,
52:10, 54:18,
59:6, 60:1,
60:4, 60:9,
60:14, 60:18,
60:20, 61:4,
61:7, 81:21,
81:22, 81:24,
82:2, 83:21,
111:23, 112:2,
123:13, 129:1,
206:3, 236:5
**bizarre**
74:11, 122:17,
130:5, 132:4,
134:8, 137:6,
137:9, 144:4,
198:21, 226:19
**bizarrely**
69:23, 134:5
**bizarreness**
198:14

**black**
155:3
**blank**
79:16, 80:10,
135:23, 136:12,
137:14, 198:7,
236:5
**board**
9:19, 10:9,
11:10, 11:12,
11:19, 12:25,
19:16
**board-certified**
9:21, 9:23,
10:1, 10:6,
11:15
**bob**
84:15
**body**
10:2, 14:7,
107:23
**bogart**
33:6
**borderline**
212:20, 212:23
**borders**
13:13
**borne**
82:25, 223:25,
224:8
**boss**
81:23
**both**
14:23, 14:24,
16:17, 24:3,
59:9, 181:10,
212:6, 212:11,
229:19, 229:20
**bother**
108:14
**bothered**
108:12, 135:18
**bottom**
22:21, 58:25,
96:4, 140:4,
143:18, 150:12,
165:13, 175:10,
177:11, 197:7

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

248

bounce
238:1
bouncing
230:3
boundaries
55:16
brain
12:4, 162:22,
163:12, 180:18,
213:13, 224:22
break
32:5, 33:2,
74:19, 148:20,
160:15, 216:19
breaking
184:1, 200:15
brecc
227:22, 229:11
bridge
223:21
brief
40:24, 82:23,
136:17
briefly
9:6, 78:13
brilliant
84:19
bring
5:9, 129:24,
132:21
broad
231:6
broader
15:16, 18:8,
222:10, 222:23
broke
160:25
broken
227:19
brought
4:12, 5:11,
37:17, 53:20,
129:24, 132:20,
218:8, 219:17
brushaber
214:17
buckle
228:25

budget
39:20
budgetary
40:17, 41:10,
47:10
budgeted
40:11, 40:12
building
188:19
burton
158:22, 161:13
buy
156:8
by-product
55:5, 69:20

**C**

c
2:5
ca
175:25
cad
143:25
california
3:22, 53:10,
73:6, 73:10,
106:17, 106:23,
107:15, 110:18,
113:9, 113:21,
113:24, 114:4,
216:23, 216:25
call
5:3, 18:14,
22:15, 37:2,
44:3, 44:8,
44:17, 72:11,
135:3, 140:6,
158:6, 158:9,
158:10, 158:14
call's
158:15
called
4:1, 71:17,
83:7, 91:21,
91:23, 111:16,
134:16, 137:7,
144:16, 147:25,
148:14, 215:7,

235:16
calm
79:15, 184:17,
201:4
came
81:7, 81:8,
81:9, 88:7,
97:6, 101:16,
130:24, 144:7,
148:19, 148:21,
175:21, 176:8,
176:10, 188:25,
199:24
campus
85:23, 86:12,
86:13, 86:14,
86:15, 87:12,
87:14, 87:18,
87:20, 88:5,
88:7, 88:12,
88:16, 88:23,
88:25, 89:16,
89:25, 90:20,
91:16, 92:8,
93:15, 94:9,
100:15, 101:16,
102:14, 104:5,
104:20, 104:23,
111:1, 111:4,
114:18, 114:19,
124:17, 145:1,
145:12, 145:18,
145:25, 149:5,
149:8, 150:14,
150:17, 150:20,
151:1, 154:15,
154:24, 157:2,
187:7, 188:15,
189:6, 189:11,
194:18, 194:21,
195:2, 223:2,
230:12, 233:10,
235:16, 235:22,
237:15, 238:4
campuses
209:14
can't
34:17, 55:13,

66:19, 68:21,
71:5, 83:11,
104:5, 104:21,
155:4, 168:7,
168:8, 170:4,
203:12, 210:23,
230:16
candor
10:8
cannabis
115:8, 143:14,
164:13, 215:19
cannabis-related
143:5, 143:9,
215:21
cannot
99:3
capabilities
117:2
capable
205:10, 205:11,
205:15, 205:18,
205:19, 205:20
capacity
28:8
captain
76:10, 79:7,
79:10, 79:11,
79:12, 79:14,
81:21, 97:3
car
99:5, 118:7,
124:16, 125:19,
126:1, 155:2,
155:7, 178:8,
189:16, 189:17,
194:20, 197:15,
197:19, 197:23,
199:18, 200:18,
200:20, 200:22,
211:7
care
8:9, 52:17,
84:18, 161:16,
175:17, 202:12
career
27:1, 34:14
cares
209:15

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

caring
70:1
carlin
153:20, 153:24,
154:10, 155:16
carried
231:2
cascade
232:24
case
1:8, 3:23, 6:5,
6:24, 7:5, 7:21,
8:2, 17:16,
20:18, 23:18,
29:19, 29:25,
30:1, 30:2,
34:13, 34:14,
34:15, 34:19,
36:1, 36:2,
36:4, 36:5,
36:9, 36:16,
36:17, 36:19,
36:24, 36:25,
37:1, 37:3,
37:15, 38:6,
38:11, 38:14,
39:15, 39:16,
39:24, 40:1,
40:2, 40:10,
40:16, 41:9,
41:17, 41:19,
41:24, 47:9,
50:11, 52:12,
95:9, 106:18,
106:24, 124:20,
145:23, 193:11,
196:5, 217:5,
218:4, 221:4
cases
8:3, 25:18,
25:21, 25:22,
25:24, 26:2,
26:6, 26:7,
26:16, 27:3,
27:5, 27:6,
27:17, 27:24,
27:25, 28:7,
28:16, 28:18,

28:20, 29:15,
30:12, 30:23,
31:1, 31:4,
31:19, 33:14,
34:6, 39:17,
40:12, 146:17
catch
159:22
catches
20:22, 22:7
categories
32:13
causal
56:6, 57:2
cause
12:20, 126:17,
127:1, 128:8,
128:12, 139:10,
147:5, 197:25,
199:19, 199:21,
199:22
caused
219:11, 221:4
causes
12:12, 12:13,
220:7
ceased
21:18
ceiling
229:1
cell
51:3, 51:10,
163:9
cells
163:6, 163:7
center
8:25, 9:12,
9:14, 61:4,
111:1, 111:4,
119:22, 120:8,
164:8, 216:9,
216:18
cerebral
163:8
certain
11:4, 11:6,
15:10, 16:19,
16:20, 23:23,

35:11, 39:17,
68:19, 86:7,
132:23, 133:20,
133:21, 153:7,
183:25, 192:8,
192:12
certainly
19:22, 26:25,
28:3, 34:13,
44:18, 58:17,
61:6, 88:4,
100:9, 118:23,
122:20, 141:22,
167:23, 184:8,
193:8, 194:11,
201:10, 203:7,
203:12, 207:20,
224:12, 224:16,
230:19, 231:8,
231:15
certainty
39:12, 95:12,
114:9, 170:5
certification
10:2, 10:4,
10:9, 11:20,
14:6, 14:8,
14:14, 14:21
certifications
9:20, 11:11,
12:25, 14:24
certified
13:3, 13:17,
13:20, 14:22
certify
240:8, 240:15
certifying
14:6
chain
65:1, 174:21,
187:2, 226:23
chairman
26:3, 34:22,
35:4
chance
19:25, 60:19,
112:6, 124:25,
196:8, 221:2

chances
23:9
change
31:4, 181:1
changes
180:3
channels
73:18
characterization
122:20, 143:8,
144:4, 145:21
characterizations
122:15
characterize
135:16
characterized
74:10, 112:24,
119:15, 143:13,
231:16, 231:17
characterizing
122:16
charged
126:25, 217:10
charges
133:3
check
8:13, 23:25,
130:7, 137:10,
230:3
checked
103:6, 165:5
chief
21:17
child
15:19, 152:10,
164:7
chiropractor
162:3
choice
43:25, 67:20,
115:14, 184:3,
184:4, 227:12,
227:16, 234:10
choices
194:14
choose
47:19, 196:3
chose
47:17, 47:18,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

250

48:7
**christina**
64:21, 69:9,
83:12, 97:12,
99:2
**christine**
52:5, 57:6,
109:4, 109:6
**chronic**
213:6
**chronology**
53:14
**circumstance**
133:7
**circumstances**
67:17, 116:21,
117:1, 132:5,
144:23, 168:18,
171:19, 184:1,
192:8, 192:12,
221:16, 235:25
**citation**
100:1
**cited**
68:13, 69:9,
69:24, 71:13,
100:13
**city**
35:2, 239:4
**civil**
15:24, 19:18,
25:19, 25:21,
26:7, 26:8,
26:24, 27:4,
27:6, 27:15,
27:16, 27:18,
28:22, 29:5,
29:6, 29:7,
29:9, 29:14,
29:18, 30:19,
31:8, 31:14,
31:15, 32:7,
32:14, 168:25
**clarification**
70:3, 72:19,
78:1, 186:23
**clarify**
40:19, 40:23,

232:23
**class**
52:5, 61:12,
61:19, 62:3,
62:5, 63:12,
63:14, 63:17,
63:22, 65:6,
65:15, 66:4,
66:11, 66:19,
67:7, 68:25,
70:15, 70:20,
70:24, 71:5,
71:8, 72:5,
72:9, 73:13,
73:17, 75:2,
77:1, 77:5,
77:7, 77:11,
84:3, 84:21,
97:12, 97:18,
98:9, 98:15,
109:8, 109:12,
110:2, 115:3,
223:4, 227:1,
231:14
**classes**
52:5, 63:7,
68:6, 225:20,
225:21
**classified**
140:22
**classroom**
64:20, 64:24,
65:3, 65:4,
65:8, 65:12,
69:11, 71:1,
83:14, 95:25,
99:17
**clean**
103:5, 104:14,
108:13
**clear**
38:10, 50:1,
61:22, 75:12,
88:2, 97:1,
98:13, 103:23,
104:3, 112:5,
112:9, 139:3,
142:2, 168:2,

168:4, 170:19,
171:4, 183:10,
183:11, 230:8,
230:13, 235:22
**clearance**
145:5
**clearly**
16:23, 62:1,
98:18, 110:1,
168:20, 169:3,
226:19, 226:25,
231:12
**client**
90:25, 91:2
**clinical**
13:20, 14:4,
16:7, 16:11,
16:16, 16:17,
16:21, 17:8,
24:24, 190:18,
192:22
**closely**
20:14, 158:25,
183:16
**closeness**
106:3
**closer**
19:1, 24:18,
145:9, 200:1
**clothes**
104:13, 104:16,
153:7
**co-personal**
1:6
**coalesced**
11:8
**cocounsel**
222:13
**coerced**
218:11
**coexist**
210:25
**coexisted**
207:17
**cognition**
229:7
**collateral**
48:6, 54:23

**collect**
87:15, 87:23,
87:25, 90:15,
236:16
**collecting**
90:15
**collection**
87:22
**college**
19:6, 212:6,
212:12
**color**
195:5
**columbia**
1:2, 1:15,
2:23, 123:24,
143:16
**columbia's**
123:20
**com**
2:10, 2:18,
21:7, 21:9,
21:19
**combination**
115:4
**come**
10:23, 16:10,
16:15, 19:25,
23:15, 29:19,
111:16, 111:24,
130:25, 134:12,
144:19, 154:10,
167:12, 167:19,
176:3, 178:7,
184:16, 184:18,
190:7, 210:22,
222:21, 235:17
**comes**
12:9, 41:8,
169:18, 176:1,
184:10, 202:14,
204:1
**comfortable**
235:24
**coming**
83:24, 134:19,
137:8, 197:11
**command**
65:1

commencing
1:22
commentary
23:18
comments
105:23
commercials
99:5
commission
239:25
commit
95:20, 127:17,
131:22, 133:25,
139:20, 147:5,
148:11, 148:23,
149:3, 149:9,
149:23, 219:11,
220:11, 221:15,
221:20, 221:22,
233:23, 237:1,
237:7
commitment
139:17, 147:17,
201:18
committed
17:17, 93:22,
94:14, 95:6,
95:13, 128:5,
131:2, 139:22,
139:23, 170:2,
170:3, 185:9,
187:12, 198:1,
199:5, 199:9,
199:20, 200:10,
200:14, 205:4,
219:23, 220:3,
224:24, 229:18,
237:9, 237:12,
237:13
common
16:5, 95:8,
133:7, 210:18
communicate
187:5
communicated
52:3, 52:9,
55:22, 82:3,
89:2, 100:3,

187:4
communicating
82:1, 236:3
communication
36:8, 52:8,
67:5, 67:11,
88:19, 168:1,
173:7, 175:6,
186:21, 203:17,
225:7, 228:25,
229:5
communications
67:4, 67:6,
121:7, 173:13
community
123:12, 141:23,
210:20
comp
32:16
compare
166:6
compassionate
192:2
compensated
35:17
compensation
27:3, 31:22,
34:1, 34:2
complainant
127:13
complained
71:16
complaint
145:20, 147:25,
148:6, 168:10,
168:23, 169:1,
169:5, 171:16,
178:8, 187:8,
206:6
complaints
165:14
complete
5:18, 7:1,
8:19, 9:5, 99:3
completed
9:10, 9:13,
9:16, 63:7,
196:4

completely
127:17, 223:17,
228:22
complex
162:4
complexity
31:1
compliant
142:11
complicated
55:9
comply
78:8
complying
80:14, 136:3
component
11:21, 28:4,
193:10, 193:12
comport
65:13
comported
65:14
composed
130:17, 200:22
composition
31:5
comprehensive
118:2
computer
153:9, 197:10,
226:4
conceded
65:9, 67:17
conceivable
196:18, 219:14
concern
98:16, 107:25,
108:3, 175:3,
210:21, 211:18,
212:25
concerned
106:4, 109:21,
115:7, 199:21,
200:24
concerning
17:21
concerns
10:22, 17:16

concert
229:16, 232:5
conciliatory
210:9
conclude
84:13, 99:3,
103:1, 201:2,
201:24
concluded
238:21
conclusion
69:18, 180:3,
192:6, 192:17,
209:9
conclusions
191:17
conclusive
135:25
condensed
58:19
condition
12:16, 70:8,
70:13, 82:12,
82:16, 82:18,
82:24, 84:10,
85:17, 85:19,
119:14, 121:18,
163:5, 170:16,
179:5, 180:2,
182:13, 187:8,
207:19, 224:18,
225:5, 227:4,
232:12, 232:21,
233:3
conditions
17:11, 22:19,
22:24, 103:20,
215:19
conduct
50:22, 138:7,
190:9, 191:1
confession
16:12
confessions
16:9
confidentiality
216:19
confirmed
108:1, 168:13,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

168:16
**confiscated**
100:4, 100:6,
104:10, 104:12,
104:13, 104:15,
104:17
**confiscation**
87:23
**conflict**
14:17, 68:20,
130:11, 157:5,
169:19, 169:20,
184:12, 222:15
**conflicted**
52:11, 52:14,
113:2, 223:4
**confluence**
115:9
**confound**
54:19
**confounders**
12:17, 12:19
**confrontation**
99:1, 134:15,
225:5
**confronted**
98:12
**confused**
135:19, 174:17,
229:10
**congressman**
84:15, 118:7
**connected**
152:21
**consequence**
100:20
**consequences**
100:22, 114:10,
230:9, 230:13,
230:15, 231:8
**consider**
27:7, 84:5,
111:11, 112:10,
114:2, 152:7,
193:10
**considerable**
37:13
**considerate**
43:15

**consideration**
16:14, 42:8,
95:9, 95:16,
170:11, 192:2,
193:8, 196:13,
231:24
**considerations**
193:4
**considered**
60:14, 144:13,
157:18, 212:11,
222:20
**considering**
89:11, 178:2
**consistent**
63:11, 69:5,
96:22, 108:19,
135:23, 214:1,
214:11, 214:13
**constant**
138:19
**constantly**
108:12
**constitutes**
239:11
**constitutional**
79:22, 80:1
**constructive**
61:2
**consultants**
35:16, 36:25
**consultation**
28:23, 29:3
**consulted**
26:14, 29:4,
30:13
**consulting**
26:15, 28:24,
35:9
**consume**
37:18
**contact**
51:9, 60:18,
81:22, 82:14,
124:5, 140:23,
155:12, 155:14,
155:18, 182:20,
196:13, 213:24

**contacted**
41:23, 81:21,
124:9, 209:2,
211:25
**contain**
7:4
**containment**
43:6
**contains**
191:13, 191:14
**contemplated**
234:15
**contemplating**
234:16
**contemporaneous**
135:8
**contempt**
190:9, 190:10,
190:16, 190:19,
190:20, 190:21,
191:2, 191:6,
191:18
**contentious**
210:11
**context**
16:6, 16:10,
16:11, 17:8,
84:12, 94:19,
150:4, 152:7,
152:9, 184:12,
194:7, 194:11,
198:14, 204:7,
204:9, 204:21,
204:23, 204:25,
205:12, 206:1,
222:23, 223:3,
228:22
**continue**
14:3, 14:5,
39:3, 57:16,
57:24, 120:22
**continued**
110:10, 175:2,
182:20, 189:20,
225:18, 227:3
**continues**
58:4
**continuing**
15:5, 225:19

**continuous**
83:6, 83:9,
84:6, 85:7,
85:13, 170:8,
171:2
**continuously**
15:1
**continuum**
94:2
**contractors**
35:16, 37:25,
38:2
**contrast**
213:14
**contributed**
115:4
**contributes**
169:19
**contributing**
21:2, 137:24
**control**
71:5, 116:15,
174:4
**conventional**
11:2
**convergence**
231:20
**convey**
72:13, 92:7,
125:7, 166:24,
167:8
**conveyed**
38:22, 59:8,
59:11, 60:5,
72:7, 72:10,
90:21, 91:24,
92:10, 97:14
**conveying**
167:12
**conveys**
66:23, 66:24,
201:10
**convince**
189:16
**cool**
184:25
**coordinate**
161:16

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    253

coordinating
36:11
cope
95:24, 161:17,
174:6, 224:13,
224:16
copies
19:20, 22:2
coping
97:4, 117:2,
227:10
cops
71:7, 71:8,
152:15
copy
6:6, 7:1, 7:15,
8:12, 20:12,
25:11, 25:16,
45:24, 153:16,
195:19
cord
228:25
corner
40:13
corpus
37:17
corrected
3:14, 4:22, 5:3
correction
57:11
corrections
22:18, 22:24
correctly
13:19, 14:24,
37:20, 70:5,
96:1, 98:2,
105:4, 129:10,
176:18
correlates
183:16
correlation
233:4
correspondence
65:10, 73:16,
121:9
cortex
162:23, 163:8,
163:14, 163:19

cost
37:14, 40:6,
42:9, 43:6
cost-effective
39:10
could
28:6, 39:9,
42:8, 48:5,
48:9, 48:12,
51:8, 51:9,
56:19, 56:20,
66:10, 77:24,
82:19, 82:20,
82:21, 83:14,
84:10, 91:2,
92:11, 93:19,
95:24, 96:2,
98:13, 99:11,
100:8, 101:8,
101:10, 101:12,
102:4, 102:13,
103:25, 109:14,
109:17, 110:18,
114:6, 115:8,
124:21, 126:3,
126:6, 126:9,
128:1, 128:24,
140:22, 146:4,
147:1, 147:22,
148:3, 148:10,
148:22, 149:2,
149:8, 149:9,
149:23, 152:24,
166:23, 167:6,
170:14, 172:25,
177:2, 177:13,
178:7, 178:15,
179:5, 179:6,
179:7, 179:8,
179:9, 179:11,
179:19, 180:20,
186:19, 192:16,
192:20, 196:19,
199:17, 201:4,
201:6, 207:20,
207:22, 209:8,
216:19, 216:24,
217:3, 219:15,

226:18, 228:7,
228:9, 229:24,
237:1, 237:6
couldn't
24:2, 24:3,
27:20, 79:5,
88:20, 101:18,
101:22, 135:25,
153:6, 166:10,
207:21, 230:22
counsel
240:16
counseling
53:15, 119:25,
120:5, 120:12,
123:13, 216:12,
216:13, 216:17
counselor
49:9, 107:14,
111:3, 140:6
counselors
120:20
county
18:19, 30:5,
178:16, 180:6,
182:17, 187:23,
188:5, 206:14,
239:4, 240:4
couple
8:21, 24:1,
25:7, 27:5,
46:22, 137:11,
153:8, 175:5,
176:13, 201:3,
203:1
coupled
115:1, 116:18
course
12:9, 25:24,
26:14, 27:12,
41:14, 61:23,
74:21, 83:8,
116:1, 116:4,
116:12, 116:18,
122:11, 123:18,
130:6, 142:2,
151:17, 152:19,
180:24, 196:14,

214:3, 229:2,
231:18, 231:21
court
1:1, 24:22,
25:1, 30:6,
45:16, 45:17,
85:25, 86:24,
90:24, 91:1,
91:5, 91:11,
101:6, 138:23,
238:8
courtesy
217:23
courts
19:18
cover
199:5
covered
17:25
covers
20:9, 26:4
cpep
84:9, 117:25,
119:21, 142:14,
142:18
crash
151:5
cre
97:8, 97:9,
130:23, 235:20
create
53:14, 90:22
creation
209:1
criminal
15:24, 16:6,
26:24, 27:11,
27:15, 27:16,
29:5, 29:9,
30:18, 31:8,
31:9, 32:6,
32:11, 139:12,
139:16, 144:24
criminal's
29:7
crisis
153:1, 153:4,
209:1

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

254

crux
20:25
crying
228:20
cuffed
133:15, 136:18,
137:15, 152:15
cuffs
146:2, 146:5
culled
37:18
culminate
146:11, 225:13
culminated
236:9
culminates
127:8
culpability
193:1
culture
94:18, 94:21,
95:4
current
7:15, 7:22,
7:23, 7:24,
34:24, 69:12,
165:22, 166:2,
166:8
currently
9:25, 32:18,
34:22
curriculum
3:20, 7:8,
7:13, 7:15, 7:20
custody
86:2, 93:7,
93:8, 93:12,
93:17, 93:21,
122:12, 126:23,
133:3, 152:16,
219:16, 220:15,
220:17, 220:21
cut
28:14, 40:13
cute
41:2
cv
9:4, 18:11,

20:8, 62:9,
62:10

**D**

danger
91:24, 126:23,
127:15, 127:16,
152:4, 152:11,
153:3, 153:20,
154:11, 155:10,
155:15, 156:24,
167:11, 167:19,
169:24, 171:9,
183:14, 183:15,
184:14, 184:21,
186:19, 187:2,
199:17, 201:21,
205:9, 205:12,
206:6, 219:19
dangerous
175:24
dangerousness
128:20, 129:3
dania
2:6
daniel
198:17
data
85:2, 114:20
date
4:25, 6:2,
6:11, 6:20,
7:10, 45:19,
62:19, 106:20,
107:2, 239:9
dated
6:24
dating
159:6
day
15:21, 33:7,
45:17, 45:18,
50:15, 50:17,
50:18, 83:4,
85:6, 86:4,
91:18, 93:20,
93:25, 97:4,
102:21, 102:22,

103:2, 118:5,
151:6, 151:17,
152:16, 209:3,
236:2, 239:6,
239:19, 240:21
day-to-day
11:24, 95:25
days
70:6, 83:5,
112:12
de
135:24, 137:18
dead
98:20, 100:8,
171:10, 178:7,
186:19, 199:17,
224:7
deadline
196:18
deaf
212:21
deal
131:18
dealing
24:23, 145:7,
146:12, 211:4
dealt
202:13
death
17:23, 18:1,
18:9, 18:20,
18:23, 19:7,
22:15, 24:15,
55:8, 55:10,
56:7, 56:22,
95:1, 96:25,
124:11, 209:19,
209:24, 211:4
deaths
209:13, 209:14
debated
65:19
deceased
4:13
decedent
30:8
decedent's
129:6

december
19:4
decided
47:8, 148:4,
149:9, 149:23,
210:10
decides
175:25
decision
25:1, 47:23,
48:1, 48:5,
127:17, 131:15,
144:5, 148:10,
148:23, 149:3,
149:8, 223:15,
223:16, 223:21,
223:24, 224:8,
231:22, 231:23,
237:1, 237:6
decisions
47:20, 129:19
decline
83:1, 83:2,
166:12
declined
120:15, 120:18,
144:9, 165:23,
174:5, 216:11
declining
99:18
deemphasized
32:24
deep
36:21
defecating
226:24
defendant
2:13, 2:22
defendant's
4:23, 6:1,
6:19, 7:9,
106:19
defendants
1:16, 3:11,
28:21, 30:12,
217:8
defense
28:24, 29:4,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                                255

29:15
**defensible**
127:17
**defer**
64:9, 140:12
**deferral**
140:15, 140:16
**define**
32:2
**defining**
55:15
**definitely**
8:9, 29:3,
30:21, 33:13,
49:2, 159:2,
165:3
**definition**
220:7
**degree**
95:12, 114:8,
119:16, 160:17
**delay**
42:11
**deliberately**
192:15
**delusions**
228:1
**demanding**
118:7, 203:16
**demands**
95:25
**demonstrate**
11:21, 15:6,
15:12, 60:22
**demonstrated**
67:13, 129:7,
131:10
**demonstrates**
121:10
**demonstrating**
116:14, 204:6
**demonstrative**
226:19
**denied**
223:1, 233:13
**denotes**
24:20
**depakote**
141:7, 141:10,

141:12, 141:20,
141:25, 142:3,
214:20, 215:2
**department**
3:22, 53:10,
85:24, 106:17,
106:24, 107:15,
126:16, 133:20,
211:23, 216:23
**department's**
86:2
**dependence**
164:13
**depending**
144:7, 192:18,
192:19
**depends**
30:22, 33:5,
33:6, 33:9,
39:16, 192:7
**depiction**
85:11
**deploying**
13:6
**depo**
238:16
**depose**
101:24, 231:8
**deposition**
1:20, 3:14,
4:20, 4:23, 5:4,
8:4, 26:23,
27:13, 44:12,
44:18, 46:16,
46:19, 47:3,
48:25, 49:1,
49:3, 49:5,
49:10, 49:15,
53:6, 54:18,
76:8, 76:10,
112:7, 125:11,
125:25, 138:8,
193:20, 193:22,
195:10, 195:11,
196:1, 217:11,
218:12, 222:22,
230:20, 238:21,
239:9, 239:12,

240:9
**depositions**
26:17, 49:13
**depression**
82:22, 119:16,
162:16, 175:17,
175:20, 176:1,
176:2, 176:8,
176:9, 176:15,
176:23, 177:2,
177:15, 177:21,
177:24, 178:3,
179:7, 179:8,
179:9, 179:23,
180:1, 185:7,
185:21, 186:1,
199:8, 201:17,
205:1, 205:24,
206:1, 206:19,
206:23, 207:18,
212:20, 212:25,
213:6, 224:16,
228:13, 233:5
**derivative**
143:14
**describe**
172:19, 172:21,
191:1
**described**
31:15, 70:14,
75:1, 75:13,
75:19, 78:18,
79:15, 108:20,
109:6, 162:9,
162:10, 167:16,
178:8, 178:20,
179:15, 181:15,
187:8, 200:18,
206:21, 214:5
**describes**
78:24, 136:25,
190:9
**description**
3:12
**descriptive**
190:23
**designated**
4:16, 26:8,

26:14
**desire**
73:5, 73:16
**desk**
65:22
**desperate**
61:13, 64:11,
64:14, 66:18,
66:20, 67:8
**desperation**
66:24, 236:8
**despite**
174:25
**destruction**
203:20
**detached**
94:5
**detachment**
208:25, 210:23
**detail**
176:12
**detailing**
58:18, 176:11
**detain**
126:18
**detained**
124:20, 144:25,
148:18, 148:25
**detention**
80:22, 81:3,
146:8, 148:15
**deteriorate**
227:3
**deteriorating**
68:16, 69:19,
70:7, 70:13
**deterioration**
68:15, 69:6,
69:9, 69:24,
171:3
**determined**
140:21
**developmental**
161:7, 161:12,
164:8
**diag**
214:20
**diagnose**
82:15

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

256

diagnosed
164:11, 164:17,
164:19, 179:23,
198:25, 206:23,
206:25, 207:1,
207:8, 212:19
diagnoses
179:14, 179:19
diagnosis
12:11, 82:12,
122:21, 127:10,
162:14, 162:18,
164:15, 178:23,
179:11, 179:24,
190:20, 191:12,
211:2, 211:3,
212:22, 221:17,
223:22, 224:4,
224:9, 224:11
diagnostic
191:14
diagram
16:19
dialogue
54:10, 55:23,
131:19
dicker
2:12
die
201:7
difference
15:14, 56:15,
70:1, 99:10,
103:3, 117:21,
205:22, 205:23,
205:24, 220:25
different
5:8, 10:13,
11:1, 12:12,
16:2, 16:23,
19:10, 23:9,
26:1, 39:18,
54:17, 54:22,
55:10, 85:3,
120:23, 134:17,
145:21, 146:17,
156:23, 179:3,
179:11, 179:14,

181:3, 181:8,
181:12, 186:11,
200:9, 205:20,
207:19, 219:14,
219:16, 226:17,
227:20, 230:2
differentiate
153:10
differently
192:4
difficult
153:10
difficulties
174:5
difficulty
109:1, 165:16
digital
52:20
diminished
117:2
direct
48:14, 114:15,
128:24, 193:3
directed
23:21
direction
112:3, 195:6
directly
44:4, 86:14,
221:17
director
36:3, 61:3,
61:6, 81:23,
82:2
disabilities
208:15
disability
121:9
disagree
138:4, 138:25,
207:5
disagreement
195:6
disaster
10:5, 10:6,
10:7, 10:11,
10:25, 11:6,
13:2, 13:3,

13:11
disasters
10:14, 10:21
discerning
23:5
discharge
162:22
discharged
29:22, 235:13,
236:25
disciplinary
100:13
discipline
10:23, 15:17,
15:21, 17:10,
31:17
disciplines
26:2, 35:10
disclosure
3:18, 6:4, 6:7,
6:9, 6:15,
195:15
disconnect
184:23
discuss
160:20, 177:20
discussed
125:14, 222:11,
232:15, 232:20
discussing
18:4
discussion
51:11, 55:6,
73:15, 76:14,
124:24, 125:9,
125:24, 158:19,
166:17, 170:7,
170:10, 208:7,
226:21, 231:25,
232:6, 238:13
discussions
38:10, 42:6,
49:23
disease
11:5, 224:20
disemboweling
95:3, 95:21
dishonor
94:19, 95:22

disorder
11:2, 122:25,
162:15, 164:12,
164:17, 164:19,
164:22, 175:3,
179:13, 180:4,
181:4, 206:24,
207:2, 207:9,
207:10, 212:20,
212:23
disorders
161:4, 161:10,
163:11
disorganization
116:14, 137:23,
224:15
disorganized
94:3, 116:23,
116:24, 117:4,
117:5, 224:12,
229:8
disoriented
229:8
dispatcher
144:1
displayed
136:24
disposition
100:1, 100:7
dispute
94:8, 125:17,
125:21, 127:6,
132:8, 132:15
disputed
16:9, 16:12,
65:19
disputes
140:13
disregarding
191:7
disrespecting
109:7
disrupted
94:2
distance
90:23
distinct
19:9

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

257

distinction
141:19, 143:13,
183:11, 224:10
distinguish
166:11
distinguished
19:5, 185:17
distress
125:4, 192:3,
201:10, 202:21
distressed
174:18, 197:18,
197:22
district
1:1, 1:2, 1:15,
2:23, 123:20,
123:24, 143:16,
233:9
disturbed
228:5
diverse
15:23
diving
36:21
divorced
157:24
docile
129:9, 129:21,
131:4, 131:24
doctor
5:2, 63:3,
68:11, 75:2,
95:11, 107:5,
110:25, 111:11,
124:3, 129:22,
131:3, 131:15,
131:23, 139:2,
141:14, 147:16,
163:1, 190:8,
197:24, 201:14,
204:23, 204:25,
207:5, 208:12,
210:4, 210:13,
211:1, 212:18,
213:1, 213:6,
213:10, 219:4,
232:10, 238:10
doctor's
24:22, 145:6

doctors
13:13
document
36:7, 106:22,
163:25, 164:18,
164:25, 165:3,
174:8, 174:9,
175:9
documentation
120:2, 120:11,
164:21
documents
3:16, 5:8,
5:24, 48:21
dog
25:14, 84:3,
84:21, 197:17,
226:14, 226:15,
227:24
doing
26:18, 31:10,
31:14, 32:14,
39:9, 47:9,
200:20, 236:2
domestic
123:20, 123:23,
124:1, 132:8,
132:14, 140:13,
140:22, 143:23,
144:17, 146:10,
146:17
dominant
28:3
done
19:13, 32:16,
41:10, 42:8,
56:20, 56:21,
128:1, 128:16,
142:22, 168:17,
208:1, 229:25
door
123:4, 130:25,
136:23, 137:14
dor
107:4, 110:11
doris
216:8
dorm
76:19, 86:17,

88:20, 90:12,
100:12, 103:7,
103:25, 108:2,
108:6, 121:22,
122:8, 154:2,
237:24
dormant
10:8
dorms
102:10, 103:16,
103:20, 154:5,
154:6
doubles
36:2
doubt
83:18
down
32:5, 33:2,
46:21, 47:1,
78:14, 79:3,
101:11, 101:14,
121:11, 122:4,
129:2, 145:8,
148:20, 159:14,
159:19, 159:20,
165:13, 174:15,
176:13, 184:17,
196:7, 202:14,
226:22, 227:19
dps
72:5, 72:8,
72:11, 82:15,
88:14, 93:17,
101:21, 124:12,
140:12, 140:18,
140:23, 143:25,
144:3, 144:10,
145:17, 148:14,
149:1, 150:19,
155:14, 156:17,
156:19, 185:24,
186:7, 186:14,
187:4
dr
4:8, 61:12,
65:6, 85:11,
161:13, 162:14,
173:25, 174:3,

174:21, 174:24,
175:6, 175:12,
214:15
drama
200:8
dramatic
85:12, 167:24,
167:25, 200:5,
202:7, 202:9
dramatically
203:13
dramatics
200:11
draw
183:11
draws
20:23
dress
104:13, 108:9,
108:13
drew
143:12
drive
2:14, 51:15,
154:7, 182:4
driving
12:22
drop
66:19, 133:2
dropped
153:13, 168:16
drove
187:17, 233:14
drug
144:6, 172:2,
172:5, 180:16,
184:25
drugs
143:5, 143:10,
180:23, 202:24
dry
184:9
due
210:13, 216:18,
231:16
duhon
57:21, 58:8,
59:9, 60:6,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

258

121:7
**duly**
4:2, 239:7
**during**
33:25, 51:18,
94:2, 109:8,
113:19, 122:11,
170:14, 174:16,
174:17, 218:23,
234:12

**E**

**each**
10:21, 52:12,
95:19, 160:9
**earlier**
42:7, 46:22,
54:18, 77:11,
77:18, 101:11,
119:17, 120:17,
153:9, 185:18,
198:22, 216:1,
230:20
**early**
27:1, 41:19,
42:6, 72:16,
82:13, 100:23
**earthquake**
13:13
**earthquakes**
10:19
**ease**
181:16
**eased**
131:14
**easily**
229:24
**east**
1:21
**easy**
52:20
**ebbed**
85:17
**ebbing**
85:20
**echo**
20:21, 21:10,
21:13, 21:16,

22:2, 25:9
**ed**
24:25
**edelman**
2:12
**editor**
21:17
**editorial**
21:5
**education**
15:5, 216:25
**educational**
9:7, 53:14
**effect**
180:17
**effective**
161:14
**effectively**
86:21, 86:22
**effects**
180:19, 181:5,
215:4
**efficient**
37:19, 48:2
**effort**
37:13, 123:12,
137:1, 155:11
**efforts**
174:25
**egotistical**
64:18
**eight**
31:3
**either**
8:4, 17:12,
26:13, 41:11,
62:8, 83:5,
88:23, 120:23,
127:9, 144:6,
144:22, 144:24,
145:11, 145:24,
145:25, 151:20,
155:12, 184:9,
194:14, 203:9
**elected**
47:10, 111:25
**elective**
143:19

**electroconvulsive**
17:14
**electronic**
238:17
**else**
32:6, 32:7,
47:2, 48:14,
55:18, 115:25,
116:10, 116:11,
127:15, 129:24,
150:20, 153:11,
184:21, 196:5,
199:2, 202:16,
203:10, 217:21,
229:25
**elser**
2:12
**email**
58:8, 58:13,
58:24, 64:21,
65:10, 66:8,
67:1, 174:21,
175:13
**embedded**
192:22
**emergency**
9:11, 11:5,
89:16, 91:3,
101:15, 102:17,
114:25, 118:3,
129:13, 129:22,
130:14, 131:7,
132:19, 133:15,
145:10, 167:20,
169:14, 169:23,
171:21, 182:10,
183:5, 183:8,
183:12, 183:13,
184:7, 184:11,
185:10, 199:23,
199:24, 200:25
**emotion**
228:6, 228:7,
228:23
**emotional**
165:9
**emotions**
174:4, 228:10,

228:11, 228:12,
228:18, 228:19,
228:20
**emotive**
228:21
**employee**
155:3, 155:5,
155:9, 155:13
**employees**
35:13, 35:15,
35:19, 35:20,
35:25, 37:21,
37:23
**employment**
27:6, 31:24,
32:19, 32:22
**empty**
102:9
**ems**
144:2, 144:9
**encompassed**
24:4
**encounter**
77:18
**encountered**
33:25, 77:16,
78:4, 142:22
**encounters**
57:5
**encouraged**
111:7, 120:4,
121:3
**end**
58:12, 58:23,
194:15
**ended**
147:1
**ends**
87:23
**engagable**
125:8
**engage**
123:13
**engaged**
217:5, 236:7
**engagement**
45:9, 218:7
**engendered**
223:8

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

259

english
119:6
enough
36:16, 39:14,
54:6, 54:8,
87:21, 130:11,
133:25, 137:9,
137:22, 153:4,
154:12, 167:24,
171:20, 179:21,
183:4, 187:11,
223:5, 236:1
enthusiast
94:17, 95:4
entire
59:6, 60:3,
97:24
entrusted
208:13
entry
107:2, 225:9
environment
227:13, 229:9
environmental
165:5
epidemiology
11:4
episode
70:14, 84:12,
85:13, 160:24,
162:9, 176:15,
177:15, 178:13,
181:24, 182:7,
182:11, 182:12,
183:2, 187:13,
199:11, 199:13,
206:1, 206:14,
206:17, 206:20,
206:21
episodes
158:2, 160:14,
162:21, 165:15,
167:15, 167:25,
169:9, 170:7,
170:25, 173:5,
173:11, 176:1,
176:8, 176:10,
176:24, 177:2,

177:21, 177:25,
178:3, 178:10,
182:19, 183:1,
185:6, 185:21,
186:1, 186:3,
186:4, 199:8,
199:9, 201:17,
201:18, 205:1,
205:2, 205:14,
206:22, 214:23
episodic
181:13, 203:25
equate
184:2, 227:4
erred
147:9
error
217:24
escorted
88:24, 151:20,
233:11, 233:12
especially
100:4, 127:3,
127:18, 130:15,
145:20, 185:5,
220:10
esq
2:9, 2:17, 2:27
essentially
10:8, 113:13,
166:1, 214:21,
215:15, 230:11,
233:20, 233:25,
234:7
establish
87:22
established
65:24, 96:6,
98:4
establishes
68:17
estate
1:7
estimate
28:6, 31:7
estimation
93:25, 158:8
evaluated
132:18, 132:22

evaluation
38:11, 40:6,
41:6, 41:14
evaluations
163:17
even
14:12, 17:4,
17:6, 32:21,
42:8, 42:9,
44:2, 47:24,
61:25, 69:21,
72:17, 82:5,
87:24, 89:16,
95:18, 95:24,
108:4, 132:7,
132:13, 133:8,
138:12, 147:1,
148:18, 151:17,
164:24, 165:23,
169:22, 179:22,
181:14, 184:3,
195:3, 202:10,
222:12, 222:20,
224:16, 233:4,
234:22
evening
51:25, 74:7,
178:5, 185:19,
198:8
event
57:17, 72:16,
72:20, 72:22,
100:17, 100:18,
117:24, 140:6,
186:25, 204:10,
230:4, 231:4
events
50:11, 56:22,
66:24, 74:16,
75:1, 75:13,
75:19, 76:3,
115:4, 115:16,
115:22, 117:1,
145:21, 222:3,
232:25, 233:7,
233:14
eventually
230:18

ever
16:12, 41:7,
53:1, 69:10,
88:11, 88:15,
90:9, 103:13,
103:16, 158:1,
160:20, 164:18,
173:7, 177:20,
187:9, 199:18,
200:17, 213:13,
214:15, 215:11,
215:18
every
13:25, 14:9,
14:15, 36:21,
39:24, 39:25,
40:2, 40:13,
127:21, 182:19,
223:15
everybody
183:18, 217:21
everything
5:16, 21:19,
32:6, 32:7,
37:11, 40:7,
45:16, 153:13,
168:16, 184:1,
197:20, 199:5,
200:16, 200:19,
221:7, 238:18
evicted
86:21, 86:22,
104:5, 111:15,
154:14, 157:2,
194:18, 194:21,
222:25
evicting
195:1
eviction
150:4
evidence
12:15, 64:13,
78:2, 80:11,
80:15, 80:18,
80:20, 80:25,
83:24, 89:24,
90:18, 99:13,
114:16, 121:20,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

260

122:6, 151:19,
151:25, 163:16,
174:15, 196:7,
196:12, 219:25,
229:18
**evidenced**
219:20
**evocative**
22:8, 65:4,
65:5
**evokes**
94:18
**evolved**
29:8
**evolves**
13:22
**exactly**
116:10, 150:10
**exaggeration**
25:23
**exam**
11:21, 15:3,
15:9
**examination**
4:6, 10:4,
14:19, 161:25,
219:2, 232:8,
235:9
**examine**
129:25
**examined**
4:4, 133:15
**examiner**
25:25
**examiner's**
18:19
**example**
10:15, 15:6,
16:8, 31:3,
36:17, 37:8,
44:5, 80:2,
183:18, 183:23,
184:11, 219:17,
225:3, 227:23
**examples**
65:22
**exams**
98:11, 98:22

**exasperated**
64:23
**excess**
45:21
**exchange**
92:20, 168:5
**exchanged**
195:8
**exclusive**
132:17
**excuse**
13:6
**exercise**
67:18
**exercises**
225:21
**exhibit**
4:24, 5:3,
5:22, 6:1, 6:6,
6:10, 6:14,
6:19, 6:22, 7:9,
7:12, 62:8,
62:18, 96:7,
106:12, 106:19,
106:23, 153:16,
158:13, 164:7,
167:17, 173:17
**exhibited**
169:10
**exhibiting**
73:20, 118:15,
129:11, 163:11
**exhibits**
3:10, 3:12,
49:15
**exist**
14:10
**existed**
144:23
**exists**
14:7
**expect**
68:3, 68:19
**expectation**
184:24, 202:15
**expectations**
61:23, 170:23
**expected**
83:16, 85:13,

166:23, 167:7,
225:17
**expedited**
37:7
**expediting**
36:8
**expelled**
92:24
**expense**
41:5, 41:8
**experience**
28:4, 127:19,
132:18, 133:4,
137:7, 146:9,
146:25, 167:14,
170:20, 170:24,
192:22, 209:19,
209:21, 209:22,
211:4, 223:4
**experienced**
59:6, 60:1,
60:3, 78:22,
79:2, 79:6,
116:25, 130:10,
132:4, 137:9,
143:11, 160:17,
173:5, 178:3,
197:12
**experiencing**
60:19, 70:6,
70:12, 72:17,
105:19, 178:13,
183:2, 236:9
**expert**
3:14, 3:18,
3:19, 4:16,
4:20, 4:22, 5:4,
6:4, 6:6, 6:9,
6:15, 6:18, 8:4,
25:12, 25:20,
26:8, 37:22,
59:22, 94:21,
94:23
**expertise**
55:13, 55:14,
55:20, 95:1,
144:11
**experts**
36:10, 37:24,

45:6
**expires**
239:25
**explain**
10:11, 204:5,
234:1
**explained**
137:23, 207:14
**explaining**
12:21
**explanation**
95:21, 136:1
**explanations**
12:20, 54:17,
54:22, 95:20,
170:16
**explore**
44:25
**exploring**
39:9
**explosive**
162:15, 170:9,
170:14, 170:22,
170:25, 183:24,
185:6, 203:18,
206:24, 207:13,
207:15, 207:19,
228:15
**explosively**
183:24, 183:25
**explosiveness**
170:15, 202:4,
202:13, 205:22,
205:24
**exposed**
223:18, 223:23,
224:2
**exposure**
16:1, 209:24,
224:6
**express**
110:7, 203:15
**expressed**
73:5, 75:8,
106:6, 107:25,
108:3, 111:12,
112:10, 113:20,
185:8, 185:12,

185:14, 185:18,
186:11, 190:16,
200:2, 200:7,
205:3, 211:18
**expressing**
162:2, 165:20,
203:13
**expression**
69:14, 72:18,
73:21, 75:4,
113:1, 113:5,
117:8, 117:12,
179:9, 179:10,
200:11, 200:12,
205:16, 228:23
**extended**
85:20, 121:2,
130:8
**extending**
159:13
**extent**
120:24, 121:5,
190:7
**extract**
71:19
**extrapolate**
168:8
**extreme**
183:17
**extremely**
136:21, 136:24,
137:3, 231:21
**eye**
47:15, 51:8

**F**

**facilitating**
36:8
**fact**
79:21, 80:13,
80:17, 95:5,
111:11, 112:10,
116:22, 128:2,
137:13, 145:14,
149:17, 149:25,
155:22, 182:25,
221:19, 221:22,
224:4

**fact-checking**
36:14
**facto**
135:24, 137:18
**factor**
23:22, 113:3
**factored**
181:3
**factors**
12:21, 137:5,
210:25
**facts**
57:25, 58:25
**factual**
57:9, 58:14,
59:15, 129:18,
209:6
**fail**
63:12, 66:19
**failed**
61:11, 61:19
**failing**
61:22, 71:18
**failure**
220:8
**fair**
6:25, 27:13,
32:20, 133:23,
154:12, 233:6
**fairly**
16:5, 47:25,
69:8, 71:9,
223:24
**fairness**
195:13
**fake**
224:3
**fall**
3:21, 61:12,
61:19, 62:3,
62:4, 62:5,
62:16, 62:22,
63:6, 65:6,
65:25, 71:14,
84:17, 96:8,
98:7, 98:8,
100:1, 231:13
**fallen**
62:1

**falling**
165:16
**fallout**
100:14
**false**
228:1, 228:2
**familiar**
34:8, 34:11,
34:12, 34:17,
34:20, 76:3,
77:8, 96:23,
189:24, 212:7,
213:4
**family**
32:6, 32:10,
32:11, 32:25,
114:4, 157:6,
161:3, 161:9,
164:7, 164:8,
165:7, 169:19,
169:20, 209:3,
216:5
**famous**
34:12
**far**
45:19, 46:6,
85:2, 95:7
**fashion**
38:13
**father**
110:16, 157:16,
182:22, 213:24,
214:6, 214:14,
215:24
**feasible**
42:9
**features**
83:1
**federal**
110:20
**feedback**
42:14
**feel**
43:22, 116:19,
142:21, 164:21,
164:22, 192:16,
216:12, 216:13
**feeling**
83:13, 210:8

**feels**
161:14
**fellowship**
9:16
**felt**
44:23, 55:1,
65:12, 109:11,
110:5, 130:6,
130:8, 168:5
**few**
16:1, 29:15,
48:19, 119:24,
159:19, 182:19,
222:2, 234:4
**fifth**
229:7, 233:9
**fight**
111:18, 111:21,
112:2, 127:8
**figure**
146:6
**file**
5:19
**filled**
102:11
**final**
58:23, 98:10,
98:11, 98:22,
195:21
**financial**
217:3
**financially**
99:9
**find**
22:12, 22:17,
48:12
**finding**
193:7
**fine**
138:24, 158:11,
219:5
**finished**
205:7
**firm**
33:15, 33:20,
33:22, 33:23,
34:10, 34:11,
34:16, 45:10,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

262

217:6, 218:4
**firm's**
21:6
**firms**
30:25, 34:2
**first**
4:2, 20:22,
27:2, 41:22,
41:23, 52:9,
53:25, 56:4,
57:1, 57:4,
58:22, 77:16,
78:4, 82:14,
83:12, 83:19,
83:24, 117:23,
122:10, 136:18,
137:7, 142:22,
148:7, 148:21,
153:19, 164:23,
167:4, 167:6,
174:1, 188:11,
192:25, 220:13,
221:20, 221:23,
222:5
**fit**
32:10, 37:3,
65:8, 102:6,
179:15, 184:22
**fits**
25:5
**five**
112:11, 178:5,
210:4, 227:21
**fixed**
228:1, 228:2
**flag**
23:16
**flash**
51:15, 181:1
**flat**
229:25
**flawed**
223:14, 223:15,
223:21, 224:7
**floor**
2:24, 152:15
**florida**
1:12, 2:6, 9:9

**flowed**
85:18
**flowing**
85:20
**fluency**
37:16
**foci**
12:4, 163:10
**focus**
18:7, 19:9,
30:6, 30:10,
39:8, 53:20,
145:10, 213:20
**focused**
18:8, 43:3
**focusing**
39:6, 44:22,
53:24, 216:7
**folks**
221:12
**follow**
195:7
**follow-ups**
235:8
**followed**
67:10, 147:21,
189:15, 189:19,
189:22, 194:11,
212:2, 219:13,
232:25, 233:7
**following**
58:1, 117:10,
119:20
**follows**
4:5, 210:18
**food**
226:23
**foot**
65:22
**force**
128:12, 150:16,
230:10
**forced**
22:15, 67:20,
150:14
**forcibly**
118:9, 230:9,
230:10

**foregoing**
239:8, 240:9
**forensic**
9:17, 9:24,
9:25, 11:11,
12:25, 14:11,
14:13, 14:25,
15:7, 15:15,
15:20, 15:23,
16:10, 16:13,
16:17, 16:21,
16:22, 16:24,
17:24, 17:25,
18:9, 18:20,
19:16, 20:21,
21:10, 21:12,
21:15, 22:1,
25:9, 25:20,
28:1, 28:3,
28:8, 30:16,
32:4, 33:4,
34:22, 35:5,
35:7, 35:8,
35:11, 35:14,
35:18, 37:21,
37:25, 45:6,
55:8
**forensicpanel**
21:7, 21:9,
21:19
**forgive**
33:21, 56:20,
64:7
**form**
21:10, 77:20,
78:21, 79:1,
111:19, 113:25,
116:5, 126:19,
129:14, 132:9,
132:16, 135:7,
143:7, 143:25,
157:21, 157:23,
177:17, 186:6,
203:6, 205:17,
206:8, 209:10,
214:4, 214:7
**formally**
179:23

**forming**
47:15
**formulated**
54:3, 54:6
**formulates**
55:20
**formulating**
45:3
**forward**
42:12, 181:2,
222:17
**found**
64:23, 81:16,
122:25, 127:12,
130:5, 148:17,
151:15, 163:18,
219:25
**four**
8:5, 13:25,
14:9, 26:22,
27:14, 32:13,
35:15, 35:20,
35:21, 138:10,
179:13, 218:19,
218:23, 227:20
**four-month**
30:21
**fours**
84:3
**fourth**
2:24, 229:6
**fracture**
204:12
**frame**
82:13, 105:6
**fraud**
224:6
**freedom**
43:14, 137:1
**frenetic**
94:3
**frequently**
28:19, 220:12,
220:17, 220:19
**fresh**
23:8
**friday**
1:22

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                                    263

friend
90:19, 101:11,
101:12, 101:14,
101:24, 101:25,
126:24, 130:13,
130:24, 134:20,
135:2, 135:4,
198:6, 198:13,
198:20, 225:9,
236:11, 237:23
friend's
86:17, 87:7,
88:20, 101:18,
102:5, 103:25,
236:16
friends
151:1, 151:2
front
224:6
frontal
213:17
frustrated
64:22
fulfilling
61:24
fulfillment
114:23
full
8:19, 45:17,
93:20, 93:24,
96:16, 100:2
full-day
45:12
full-time
35:15, 35:20,
35:25, 37:23
function
36:5, 166:4,
166:8
functioning
163:21
fundamental
151:9, 220:5
funds
217:17, 217:25,
218:11, 218:13
further
38:20, 64:11,

67:8, 159:14,
226:22, 240:15
future
97:25, 99:6,
230:23, 234:6,
234:9

G

gaf
165:22, 166:1
gain
225:9
gallaudet
1:11, 2:13,
4:11, 17:17,
52:3, 52:8,
53:19, 56:11,
56:14, 59:6,
60:3, 61:14,
64:12, 65:1,
67:9, 70:19,
70:20, 73:5,
85:21, 86:21,
87:2, 87:10,
91:6, 96:15,
97:24, 101:1,
103:13, 103:17,
103:21, 103:24,
104:4, 104:19,
107:16, 111:16,
113:9, 113:20,
115:5, 117:9,
117:13, 117:17,
117:20, 118:21,
119:5, 119:8,
119:21, 121:12,
122:3, 147:9,
148:4, 149:1,
149:22, 150:5,
150:16, 151:14,
152:22, 155:3,
155:5, 155:9,
155:12, 155:13,
155:18, 166:23,
167:6, 173:14,
182:18, 185:23,
189:6, 190:16,
193:6, 194:18,

194:21, 195:1,
197:25, 199:4,
204:8, 204:12,
209:2, 210:20,
216:9, 230:7,
230:8, 234:24,
236:24
gallaudet's
120:7, 126:15,
140:8, 140:20,
147:21, 189:11,
190:9, 191:1,
193:1, 208:25
game
48:1
gaps
20:8
gathered
125:22
gave
5:11, 9:2,
142:13, 142:19,
173:12
gee
103:3, 137:13,
230:25
general
2:21, 162:16
generalized
163:21
genuinely
113:2
geodone
142:15, 142:19,
142:23
george
223:20
geriatric
15:20
getting
15:9, 110:16,
111:12, 112:11,
112:15, 112:25,
137:3, 138:18,
146:20, 157:13,
169:21, 226:10,
229:22
gianni's
49:24, 52:15,

52:16, 53:14,
62:22, 63:21,
67:5, 74:10,
74:17, 76:19,
82:12, 82:15,
105:7, 108:1,
110:8, 114:3,
115:18, 121:22,
123:5, 123:13,
135:14, 144:23,
145:24, 147:14,
158:2, 167:14,
182:18
gio
219:7
give
7:5, 18:25,
22:12, 26:19,
42:13, 59:21,
60:18, 67:3,
137:1, 158:4,
158:16, 184:16
given
9:1, 12:2,
17:20, 17:23,
29:14, 43:9,
43:12, 43:13,
55:3, 56:22,
61:25, 68:24,
94:25, 127:20,
141:8, 141:12,
142:18, 148:10,
149:7, 162:8,
167:14, 171:19,
196:22, 196:23,
225:14
giving
83:17, 114:25,
139:3, 139:7,
139:8, 139:9,
139:13, 139:14,
140:1, 147:11,
147:13
glaring
208:24, 210:23
glass
33:7
glial
163:6, 163:7

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

264

**gliosis**
163:1, 163:10,
163:18, 213:21
**global**
166:4
**go**
13:12, 20:13,
20:20, 23:11,
23:24, 27:22,
28:17, 28:25,
29:1, 29:24,
30:14, 36:19,
36:21, 40:25,
58:11, 59:5,
60:25, 73:2,
85:2, 102:4,
111:24, 111:25,
113:8, 121:3,
142:20, 150:22,
152:12, 156:8,
175:25, 176:3,
188:20, 192:11,
195:6, 196:7,
196:8, 208:1,
208:5, 216:24,
218:14, 220:21,
237:16, 238:2
**goes**
14:11, 169:18,
174:14, 176:1,
181:8, 196:17,
223:20, 224:6
**going**
5:3, 5:21, 6:5,
6:13, 6:22,
7:12, 13:7,
13:10, 15:11,
18:25, 20:17,
21:25, 25:7,
26:9, 26:19,
40:7, 44:21,
48:3, 60:23,
62:14, 69:3,
69:4, 69:13,
69:15, 70:25,
71:7, 71:21,
71:25, 72:4,
72:8, 72:11,

90:16, 94:6,
99:12, 102:6,
103:10, 103:11,
106:22, 130:9,
131:1, 131:17,
134:18, 138:2,
138:5, 138:10,
145:24, 145:25,
146:1, 146:5,
146:6, 151:11,
153:16, 158:12,
159:14, 159:19,
159:24, 164:6,
166:15, 168:6,
173:16, 181:16,
181:21, 182:23,
188:24, 196:14,
199:25, 200:12,
200:13, 203:1,
203:9, 210:14,
220:14, 222:15,
222:19, 224:13,
224:21, 225:20,
228:14, 232:3,
238:5
**golden**
128:1
**gone**
94:11, 204:2
**gonzález**
69:2, 74:14
**gonzález's**
70:14, 77:5,
77:11
**good**
4:8, 4:9,
19:25, 22:12,
71:9, 214:1,
214:11, 214:13,
230:7, 232:4
**goodbye**
211:19, 211:21
**gotten**
84:16, 236:24
**gov**
2:28
**gpa**
63:21, 64:8,

96:8, 96:9,
96:11, 96:20,
96:24
**grade**
62:22
**grades**
3:21, 62:17,
106:15, 110:8,
231:12
**great**
67:18, 71:2,
114:19
**greater**
221:2, 227:9
**greatest**
48:11
**greenbridge**
212:18, 213:1,
213:2
**griffin**
2:5
**grimaldi**
1:23, 4:3,
240:5, 240:25
**gross**
166:5
**grosz**
2:9, 3:6, 8:13,
24:13, 33:17,
39:4, 40:22,
42:1, 42:12,
46:3, 46:21,
47:1, 49:6,
62:10, 62:13,
62:24, 72:25,
77:20, 78:21,
79:1, 91:7,
106:13, 111:19,
113:25, 116:5,
123:7, 126:19,
129:14, 132:9,
132:16, 135:7,
138:4, 138:9,
138:13, 138:17,
138:24, 143:7,
157:21, 157:23,
167:4, 177:17,
186:6, 186:22,

189:7, 195:13,
195:17, 195:21,
203:6, 205:17,
206:8, 206:10,
207:25, 208:3,
209:10, 214:4,
214:7, 218:17,
218:25, 232:9,
235:6, 238:18
**grosz's**
33:15, 45:10,
217:6
**ground**
26:5
**group**
165:6, 179:25
**guess**
23:4, 31:16,
101:23, 126:17,
145:11, 146:15,
220:5
**guessing**
86:6
**guidance**
111:24
**guidelines**
110:11
**gun**
25:12
**guns**
20:23
**guy**
69:10, 71:5,
219:7
**gyrus**
213:17

---

**H**

**habituation**
162:17
**hacked**
153:9, 197:10,
226:5
**hairs**
206:3
**haldol**
142:21, 142:22
**half**
45:17, 53:6,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

265

152:16, 195:25,
196:16
**half-day**
45:12
**halfway**
129:2, 162:1
**hall**
74:20, 101:12,
101:14, 153:20,
153:24, 155:16,
166:16
**hallucinations**
228:1, 228:4
**hallway**
135:11
**hand**
16:13, 199:7,
240:21
**hand-in-glove**
184:22
**handcuffed**
78:12, 79:8,
80:18, 145:15,
145:16, 147:2
**handcuffing**
80:23
**handled**
131:16
**hang**
101:23, 160:1
**happen**
39:24, 50:14,
94:9, 127:19
**happened**
50:15, 50:17,
52:14, 97:11,
97:17, 115:17,
116:20, 118:5,
120:12, 135:5,
156:11, 177:5,
177:9, 185:2,
188:13, 204:16,
204:17, 209:4,
222:4, 224:25,
225:12, 226:16,
226:21, 230:17,
231:3
**happening**
72:16, 85:16,

115:2
**happens**
36:11, 40:8,
40:9, 95:18,
144:11, 163:13,
220:17, 220:19
**hard**
23:12, 28:9,
29:11, 83:23
**harm**
200:13
**harmed**
203:19
**haul**
71:1, 71:8
**hauls**
90:11
**head**
51:1, 52:10,
61:7, 137:24,
181:17, 181:21,
222:25
**heading**
58:22
**heads**
158:4, 158:16
**health**
15:17, 20:8,
52:16, 52:17,
53:19, 56:12,
61:4, 61:7,
82:12, 110:25,
111:4, 117:18,
119:22, 120:7,
120:10, 123:13,
140:6, 140:7,
175:1, 176:17,
193:5, 216:9,
219:7, 223:14
**healthy**
68:17, 68:18
**healy**
57:6, 59:8,
59:25, 60:5,
60:8, 60:11,
60:14, 64:22,
66:4, 67:4,
69:10, 72:23,

83:12, 99:2,
109:4, 109:7
**healy's**
52:5, 70:23,
73:13, 75:2,
77:1, 77:7,
97:12, 97:17
**hear**
219:4, 219:5
**heard**
81:6
**hearing**
51:5, 155:6,
160:7, 160:8
**heavily**
204:2
**heightened**
131:14
**held**
76:14, 158:19,
166:17, 208:7,
232:6, 238:13
**hell**
64:19
**help**
134:12, 155:16,
161:17, 180:7,
181:16, 182:20,
217:3
**helped**
177:14
**helping**
134:20
**here**
4:16, 4:19,
8:18, 9:22,
19:3, 20:16,
24:1, 24:15,
24:20, 25:5,
25:18, 33:23,
35:2, 47:12,
50:16, 57:5,
60:2, 61:9,
68:10, 69:20,
104:5, 104:21,
105:2, 114:7,
130:18, 130:21,
130:25, 133:9,

142:3, 146:6,
147:4, 147:8,
154:13, 154:17,
154:20, 154:23,
157:11, 164:3,
174:10, 196:15,
208:12, 217:24,
218:8, 222:13,
226:20, 230:21,
232:1
**hereby**
240:8
**hereof**
239:11
**hereunto**
240:21
**herself**
52:11, 52:14,
83:13, 155:12
**hesitate**
196:12
**hey**
37:2
**hierarchy**
121:12, 122:4
**higher**
31:1
**highly**
130:4, 133:14,
170:3, 183:13,
183:19, 183:20,
183:21, 184:11,
184:21, 200:25,
201:1, 202:2,
203:16, 223:3,
234:9
**himself**
29:23, 30:9,
52:1, 60:23,
65:13, 65:14,
70:1, 93:6,
106:2, 106:6,
185:12, 185:15,
185:16, 187:25,
194:4, 194:7,
201:12, 202:17,
203:13, 203:15,
203:19, 212:5,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

266

215:15, 216:20,
224:7, 231:19,
234:14
**hired**
25:11, 217:8,
217:10, 218:3
**historically**
29:8, 157:22
**history**
8:2, 9:7,
25:17, 28:23,
52:13, 52:16,
53:15, 119:16,
130:20, 131:2,
131:9, 131:10,
132:3, 134:2,
134:3, 134:7,
137:5, 141:4,
143:1, 144:13,
145:5, 157:16,
159:6, 159:11,
161:3, 161:7,
161:9, 161:12,
169:18, 184:25,
185:5, 198:14,
200:1, 200:2,
200:18, 202:12,
215:25, 228:3
**hitting**
74:4, 75:16,
134:11
**holiday**
103:12
**holistic**
162:4, 162:11
**holistically**
215:15
**home**
94:11, 94:13,
124:16, 125:19,
149:18, 152:1,
155:25, 156:4,
170:23, 182:4,
194:20, 197:15,
200:16, 211:7,
234:20, 237:6
**homeless**
150:8

**homelessness**
150:3, 150:11
**homicidality**
184:2
**homicide**
19:19
**homicides**
20:9, 22:14
**homosexual**
23:18, 223:18
**hope**
61:6
**hopeless**
66:12, 66:14,
66:16, 114:14,
114:17, 117:9,
223:10, 230:19,
235:25
**hopelessness**
115:5, 115:13,
116:25, 183:16,
221:13, 221:14,
221:18, 223:8,
223:25, 224:11,
232:15, 232:20,
233:3, 233:15,
233:19, 235:11,
235:15, 236:9
**horse**
180:14
**hospital**
29:22, 118:8,
119:4, 119:7,
126:5, 126:8,
128:9, 132:13,
132:23, 145:2,
145:4, 146:1,
156:1, 176:17,
177:9, 184:16,
187:13, 199:10,
201:19, 201:22,
203:4, 203:8,
203:23, 205:4,
207:21, 222:5,
222:6, 237:5
**hospitalization**
119:2, 119:21,
146:19, 202:10

**hospitalized**
84:9, 127:7
**hotel**
103:6
**hour**
45:16, 168:19
**hourly**
45:11, 45:15
**hours**
45:19, 45:21,
46:11, 46:12,
46:20, 46:22,
46:23, 50:20,
93:6, 93:11,
93:23, 93:24,
94:7, 101:18,
124:11, 135:6,
138:10, 138:16,
181:2, 185:1,
201:3, 234:4
**house**
160:24
**housing**
88:25, 89:2,
147:24, 148:5,
149:2, 149:7,
149:13, 149:18,
149:22, 150:1,
151:21, 204:12,
223:2, 225:14,
236:24
**however**
10:6
**human**
180:18
**humiliation**
221:16, 223:20
**hundreds**
25:23
**hurricanes**
10:19, 80:3
**hurt**
216:20
**hygiene**
85:5
**hyperintense**
213:16

---
**I**
---

**idea**
71:17, 80:4,

100:18, 112:23,
133:1, 134:17,
144:13, 150:4,
151:9, 169:23,
170:17, 184:23,
195:8, 200:6,
222:14, 222:18,
223:9, 225:5,
227:15
**ideas**
228:1, 228:2
**ideation**
75:9, 105:24,
165:17, 165:20,
186:11, 200:3,
205:3, 225:23,
229:20
**identification**
4:24, 6:2,
6:11, 6:20,
7:10, 62:19,
106:20
**identify**
12:3, 18:11,
48:3, 54:25,
58:20, 175:1,
184:13
**identifying**
179:8
**ignoring**
192:15
**ill**
221:10, 224:13,
224:14, 229:21
**illegal**
143:5, 143:15
**illness**
55:11, 68:15,
82:20, 121:11,
121:16, 121:19,
122:9, 122:13,
122:18, 122:21,
122:22, 123:5,
127:10, 127:11,
132:3, 159:4,
179:4, 179:10,
192:3, 220:6,
220:8, 221:14,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

267

232:12
**imagination**
11:24
**imagine**
133:6
**immediacy**
168:21
**immediate**
231:3
**immediately**
20:14, 39:1,
67:10, 152:20,
153:13, 196:5,
196:17
**impact**
12:5, 44:2,
196:19, 234:17
**impacts**
193:8
**impaired**
71:18, 155:6
**impatience**
210:12
**imperceptible**
166:6
**implicated**
180:20, 181:13
**implications**
65:20, 200:12,
222:24, 223:23
**importance**
169:13
**important**
68:10, 92:6,
99:9, 116:1,
116:13, 131:5,
141:19, 150:5,
170:6, 201:9
**impossible**
39:20
**impression**
149:11, 188:16,
188:24
**impressions**
39:2, 59:8,
60:5, 125:2
**improved**
128:6

**impulse**
234:8, 234:15
**impulses**
233:21
**inactive**
13:4, 13:5
**inappropriate**
65:15, 68:13,
138:22
**inappropriately**
69:23, 98:15,
228:20, 228:21
**incarceration**
147:10
**incident**
58:9, 70:23,
74:3, 84:1,
84:8, 84:25,
140:7, 140:21
**incidental**
53:24, 100:17
**incidents**
10:20, 146:10
**include**
17:13, 35:21,
35:23, 37:12,
47:17, 49:14,
59:2
**included**
43:8, 58:16,
73:25, 144:4,
155:2, 162:21
**includes**
5:16, 15:18,
27:15, 31:18,
74:6, 74:9,
74:13, 223:16
**incompatible**
226:25
**inconsistent**
68:23, 125:22
**incorporated**
139:19
**increasingly**
83:7
**incurred**
41:6
**indefinitely**
151:8, 151:11

**independent**
35:16, 37:24,
38:1, 125:25
**indicate**
63:16, 63:17,
64:10, 75:17,
75:22, 76:1,
89:7, 93:2,
121:6, 154:1,
174:15, 176:7,
181:19, 208:24
**indicated**
13:16, 31:16,
49:17, 53:5,
61:9, 66:9,
72:15, 75:3,
76:17, 78:7,
81:1, 81:20,
86:20, 93:4,
94:16, 97:22,
105:2, 107:22,
108:5, 108:8,
110:9, 110:13,
110:14, 114:7,
118:20, 123:10,
124:10, 124:19,
126:3, 134:22,
136:15, 141:3,
143:18, 147:8,
147:20, 150:13,
152:6, 156:23,
157:1, 157:4,
166:22, 181:6,
187:2, 197:1,
212:3, 213:24
**indicates**
63:6, 66:8,
110:24, 160:4,
161:2, 162:1,
163:25, 174:1,
174:25, 175:16
**indicating**
16:18, 52:25,
70:21, 73:12,
85:18, 103:24,
157:9, 157:11,
163:16, 174:10,
176:1, 201:20,

213:1, 213:16
**indication**
58:15, 71:10,
77:7, 77:12,
77:13, 79:19,
81:15, 83:12,
97:2, 97:19,
98:14, 100:24,
102:9, 113:6,
118:17, 127:9,
127:22, 151:4,
171:25, 173:6,
220:3, 221:1,
225:13
**indications**
82:17, 90:4,
117:5, 137:19
**indicative**
75:5, 80:6,
167:20, 170:15
**indifference**
190:10, 191:2
**individual**
40:8, 95:18,
95:19, 159:5,
216:17
**individually**
1:4, 1:5
**individuals**
40:8, 199:3
**inez**
69:2
**infectious**
11:5
**inferior**
213:17
**influence**
170:12, 234:17
**inform**
38:20, 43:4,
209:3
**informant**
44:14
**informants**
132:4
**information**
41:22, 44:15,
44:23, 47:7,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

268

49:10, 49:14,
54:7, 54:8,
55:2, 55:4,
56:11, 58:1,
58:18, 69:1,
81:10, 83:17,
85:10, 87:22,
89:10, 91:15,
97:8, 117:17,
120:13, 120:14,
126:15, 139:11,
179:21, 183:4,
191:7, 191:9,
191:22, 193:5,
201:16, 204:7,
204:8, 204:15,
236:1
**informative**
38:23, 43:25,
44:2, 44:9,
44:20, 47:21,
48:4, 48:6,
48:13, 192:21
**informed**
44:17, 81:2,
81:9, 122:14,
125:24
**informing**
82:2
**informs**
140:18
**infrastructure**
152:23
**infrequency**
231:5
**initial**
38:9, 42:3,
80:22, 81:3,
81:4, 147:24,
148:6, 148:15,
165:13, 174:17
**initiative**
231:19
**injured**
212:5
**injury**
27:5, 31:19,
32:18, 32:21,

33:1, 33:12,
34:2
**inn**
103:12
**inpatient**
132:24, 202:12
**inquired**
52:1
**inquiring**
79:8
**insofar**
53:17, 193:3,
193:4
**insomnia**
212:21
**inspire**
37:13
**inspired**
135:2
**instance**
203:21
**instances**
68:20, 132:23,
133:12, 167:23,
170:9, 170:22,
190:8, 192:18,
192:20, 203:18
**instead**
139:15
**institute**
19:16, 211:22,
212:4, 212:10,
212:14
**institution**
132:1, 212:1
**institutional**
121:12, 122:4
**instructed**
150:19, 190:3
**instructions**
80:14
**instructor**
70:20, 74:14,
77:5, 109:1
**integrity**
25:14
**intended**
56:5, 101:1

**intending**
201:12, 202:17
**intense**
221:15
**intensity**
160:17
**intent**
75:9, 212:5
**intents**
9:4, 36:6
**interacting**
234:13
**interaction**
73:25, 74:6,
74:9, 74:13
**interactions**
75:25
**interested**
240:18
**interesting**
37:9
**interfering**
138:7
**internship**
9:10, 9:11
**interpret**
137:5
**interpretation**
66:25, 70:16,
137:20, 141:15,
204:11, 210:22,
225:11
**interpreted**
60:9, 106:7,
197:12, 211:21,
223:3
**interpreter**
51:6, 51:11
**interpreting**
205:11, 205:15,
227:13
**intersect**
16:3
**intersection**
10:13, 15:22
**intersects**
146:15
**intervene**
109:15, 152:25

**intervening**
105:14
**intervention**
56:12, 56:15,
59:10, 60:24,
117:18, 117:21,
193:5, 233:10
**interview**
49:20, 50:13,
50:19, 50:21,
50:22, 51:7,
51:13, 51:19,
53:1, 168:14,
172:9
**interviewed**
37:10, 49:18,
50:5, 175:20
**intimacy**
210:19
**intoxicant**
180:22, 181:1
**intoxicated**
84:24, 171:24,
172:1, 172:4,
172:8, 172:22,
172:25, 173:2,
183:18, 201:2,
202:23
**intoxication**
170:13, 181:5,
182:12
**introduce**
54:23
**invested**
225:19, 230:7
**investigated**
212:1
**investigation**
17:24, 18:1,
18:9, 18:20,
19:7, 24:16,
79:22, 95:1
**invoice**
45:22, 45:25
**invoiced**
46:6
**invoices**
46:2

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

269

involuntarily
126:4, 126:7,
126:10, 127:25,
128:4, 131:13,
131:22, 145:2,
145:12, 145:25,
147:5, 197:25,
200:23, 237:8,
237:12
involuntary
147:17
involve
28:8, 37:15,
146:7
involved
26:3, 27:18,
30:23, 30:24,
36:9, 65:2,
146:18, 146:20,
211:23
involvement
15:4, 52:12
involves
41:4, 145:12
involving
209:13
irrational
72:18, 73:20,
75:3, 75:14,
113:1, 127:13,
130:22, 130:23,
131:17, 132:5,
134:21, 135:19,
137:23, 153:6,
153:12, 181:13,
184:3, 197:13,
225:10, 227:14,
228:2, 228:19,
228:23, 231:22,
231:23, 234:9
irreversible
231:7
irritability
159:16, 165:15,
228:13
israel
8:25, 9:12,
9:14, 18:16

issue
20:6, 22:25,
40:4, 69:21,
87:3, 91:1,
127:5, 140:3,
144:20, 145:22,
146:24, 151:14,
200:7, 200:9
issued
45:22, 85:25,
86:25, 90:24,
91:5, 91:11
issues
10:16, 17:1,
22:8, 39:5,
44:7, 76:25,
77:4, 77:10,
167:15, 191:11
iterations
181:12
itself
15:21, 17:5,
41:7, 80:6,
83:7, 84:22,
100:20, 135:24,
185:17, 204:20,
210:21, 225:6,
225:8, 228:8,
229:14
iv
162:20, 165:4

J

jail
220:21, 233:9
japanese
94:17, 94:21,
94:24, 95:4
jason
2:17, 2:18,
4:11, 74:7
jaws
71:19
jeff
37:1, 37:2
jeopardize
222:8
jeopardizing
61:13, 64:11,

67:8
jeopardy
70:22
jessica
57:21
jgrosz@morellial-
ters
2:10
jim
3:23, 106:18,
106:24, 107:14,
216:22
john's
164:7, 164:25,
165:2, 202:11
join
188:22
judgment
44:3, 44:8,
44:17, 136:21,
136:24, 137:4
july
1:22, 164:9,
240:22
jump
19:2
jumping
196:17
jumps
20:15, 223:20
june
214:8
junior
36:2
jurisdiction
239:20
juror
210:24
jurors
209:21, 210:17
justin
2:9, 38:21,
91:10, 138:8

K

k2
180:10, 180:12
kachman
173:14, 174:3,

174:21, 174:24,
175:6, 175:12
kachman's
173:25
keen
94:17
keep
23:8, 26:11,
26:12, 108:9,
170:1
keeping
174:4
keeps
137:15
ketamine
180:13
kicked
101:3
kicking
114:24, 154:24
kill
106:2, 112:18,
112:20, 184:4,
185:15, 185:16,
194:3, 194:7,
194:14, 199:25,
200:12, 200:14,
201:8, 201:12,
202:17, 203:9,
203:10, 226:6
killed
29:23, 30:9,
51:25, 92:11,
93:5, 182:23,
185:11, 201:6
killing
183:19
kind
8:8, 10:15,
12:8, 28:12,
33:6, 34:10,
37:4, 43:16,
44:21, 55:15,
99:1, 100:10,
100:20, 121:17,
131:2, 140:18,
145:7, 146:7,
146:13, 153:2,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

270

204:17, 227:14,
230:12, 235:2
**kinds**
30:24, 83:1,
117:2
**knew**
52:12, 52:15,
56:23, 89:17,
124:10, 152:19,
172:5, 181:23,
182:6, 182:9,
183:1, 185:20,
186:3, 189:25,
202:24, 202:25,
203:5, 205:1,
222:9
**knife**
133:13, 234:21
**knocked**
130:24
**knocks**
33:7
**knowing**
169:8
**knowledge**
25:17, 26:7,
97:4, 97:10,
97:16, 121:23,
122:8, 123:4,
167:17, 169:9,
173:3, 178:10,
185:24, 186:8,
186:15, 194:25,
205:13, 211:5,
211:6, 237:15
**known**
204:9, 229:2
**knows**
177:14, 199:8

**L**

**label**
141:21, 141:24
**labeled**
62:21
**laboring**
85:8
**lack**
85:4, 85:5,

115:2, 165:9
**lag**
67:11
**language**
63:8
**last**
8:5, 9:15,
14:17, 27:12,
29:12, 29:13,
29:17, 33:10,
33:11, 51:22,
62:7, 63:11,
106:11, 128:4,
158:9, 158:10,
229:16, 232:23,
236:22
**lasted**
107:19
**late**
41:25, 47:25,
158:6
**later**
21:1, 41:20,
41:21, 44:13,
49:3, 69:2,
69:24, 130:7,
137:10, 181:2
**laughing**
228:21
**lauri**
52:14
**law**
15:24, 15:25,
16:2, 16:3,
27:6, 32:25,
132:7, 132:13,
140:23, 146:16,
218:4
**law-related**
32:12
**lawn**
224:7
**laws**
123:20, 123:24
**lawsuit**
4:12
**layperson**
192:16, 192:19,

209:8
**lead**
177:2, 230:1
**leading**
105:20
**leads**
85:15, 89:10
**learn**
51:18, 158:1
**learned**
57:25, 59:1,
80:21, 81:1,
81:5
**least**
25:4, 31:10,
63:21, 65:9,
65:18, 86:16,
96:20, 100:19,
127:16, 132:18,
157:8, 165:19,
169:19, 181:21,
188:18, 204:14,
235:24
**leave**
73:5, 78:9,
87:12, 88:12,
88:16, 90:20,
113:9, 150:20,
190:4, 232:3
**leaves**
218:20
**leaving**
87:14, 144:24,
145:12, 145:24,
189:14, 229:17
**lecture**
8:24, 19:3,
19:7, 19:9,
19:10
**lectured**
19:15, 19:17
**lecturer**
19:5
**lectures**
9:1, 18:15
**led**
98:14, 156:1
**left**
67:20, 87:18,

87:19, 88:4,
94:13, 114:18,
114:19, 213:17,
218:24, 222:6,
234:21, 237:16
**legal**
16:6, 16:25,
17:3, 17:7,
19:5, 19:6,
35:9, 133:11,
140:3, 140:19,
143:21, 143:22,
144:20, 145:22,
146:23, 147:11,
193:4, 193:7
**legalities**
124:7
**legality**
139:4
**legally**
145:17, 145:19
**lend**
11:6, 17:5
**less**
44:8, 48:18,
103:7, 103:8,
166:8, 221:17
**let's**
33:10, 73:2,
145:6, 148:20,
183:23, 184:12,
184:13, 238:2
**letter**
21:4, 66:7,
66:10, 66:23,
211:20
**letting**
7:19, 67:11
**level**
15:10, 54:13,
99:8, 170:5,
183:15, 183:17,
191:11, 210:19,
210:21, 224:15
**liberally**
141:23
**library**
37:16

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

271

**lie**
160:7
**lieu**
143:3
**lieutenant**
76:7, 76:18,
76:22, 77:15,
77:17, 78:2,
78:7, 78:9,
78:12, 78:17,
78:24, 80:21,
81:20, 97:3,
136:20, 136:25,
137:21
**life**
28:2, 34:4,
51:23, 64:19,
91:24, 100:17,
112:13, 114:3,
148:4, 150:6,
152:4, 152:10,
153:3, 153:19,
154:11, 155:10,
155:15, 156:24,
161:17, 167:11,
167:19, 171:9,
186:19, 187:2,
196:16, 199:17,
199:19, 201:20,
205:9, 205:12,
206:6, 222:9,
230:5, 231:4
**light**
17:14
**liked**
91:22
**likely**
43:25, 44:8
**limited**
38:11, 130:10,
176:12
**lin**
63:23
**line**
64:17, 97:25,
167:4, 167:6,
236:22
**linguistics**
57:6, 65:25,

109:2, 115:3
**liquor**
156:5
**list**
8:3, 8:19,
25:8, 42:18,
49:13
**listed**
5:8, 8:18,
21:23, 42:16,
42:21, 43:19,
45:1, 47:6,
63:10, 63:22,
65:18, 165:14,
212:24
**listening**
229:4
**literally**
34:3
**litigation**
17:2, 25:19,
25:22, 55:9
**little**
15:22, 20:14,
32:9, 54:18,
111:23, 112:2,
129:1, 158:6,
158:24, 168:20,
206:3
**live**
89:15, 108:4
**living**
108:2, 108:6,
153:24, 154:2,
225:12
**llp**
2:3, 2:12
**localized**
163:12
**locate**
22:1
**long**
7:14, 29:10,
48:15, 50:19,
50:20, 83:23,
85:20, 158:9
**long-standing**
159:6

**longer**
10:2, 13:16,
13:18, 180:3
**look**
7:18, 7:22,
19:1, 22:12,
22:16, 23:12,
24:9, 24:19,
27:22, 29:1,
29:25, 30:15,
32:4, 32:8,
36:19, 38:20,
38:24, 40:5,
44:10, 54:19,
79:16, 107:8,
158:24, 196:14,
199:21, 201:25,
210:17, 220:22,
222:17, 226:10,
231:12
**looked**
19:24
**looking**
18:11, 53:3,
53:25, 54:20,
57:1, 147:20,
159:4, 161:2
**looks**
229:21
**loose**
229:3
**lose**
222:18
**loss**
224:17
**lot**
16:14, 21:20,
22:3, 26:4,
37:14, 43:2,
47:24, 51:20,
103:8, 153:5,
176:11, 180:15,
180:19, 188:18,
189:3, 194:25,
201:13, 202:21,
231:20
**loudly**
118:12, 200:15

**loving**
106:7
**lower**
30:25, 98:18
**lsd**
181:7, 181:12
**luxenberg**
34:7

**M**

**made**
38:10, 43:24,
44:8, 44:16,
48:1, 56:15,
61:22, 65:21,
78:14, 90:15,
95:9, 98:13,
99:10, 101:12,
101:25, 105:24,
107:15, 117:21,
120:21, 144:5,
145:20, 148:10,
148:15, 148:22,
149:3, 149:9,
155:11, 162:14,
164:22, 185:16,
187:24, 193:14,
194:3, 194:6,
194:7, 198:3,
198:6, 231:21,
237:1, 237:6
**magnetotherapy**
17:13
**maintain**
14:5, 14:14,
15:4
**maintained**
14:20, 21:24
**maintaining**
230:7
**major**
121:11, 121:15,
121:18, 122:9,
122:18, 122:22,
123:5, 162:16
**make**
20:1, 23:16,
23:23, 24:12,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

272

31:16, 37:7,
39:19, 44:3,
47:5, 47:20,
47:23, 48:4,
51:8, 54:13,
64:19, 70:4,
75:11, 91:19,
100:21, 112:17,
139:2, 142:1,
146:6, 153:7,
154:7, 166:11,
171:4, 191:5,
220:25, 227:11,
229:4, 236:4,
236:22
**makes**
24:22, 79:25,
127:13, 184:3,
191:4, 223:24,
229:2, 229:3
**making**
16:18, 36:12,
80:22, 114:24,
124:6, 131:25,
134:7, 143:21,
146:13, 207:3,
211:2, 226:3,
234:10
**malpractice**
19:8
**mammal**
226:22
**man**
223:17
**manager**
36:1, 36:2,
36:3, 36:17,
36:19, 36:24,
37:2, 37:15
**managers**
36:4, 36:5
**managing**
36:7
**mandatory**
123:25, 144:14
**manganelli**
1:5, 1:7, 4:13,
4:14, 6:24,

44:6, 50:2,
50:6, 50:8,
53:1, 56:6,
57:2, 57:21,
61:11, 77:9,
78:4, 78:5,
78:8, 78:13,
78:22, 84:16,
93:5, 95:13,
95:24, 118:8,
123:11, 124:21,
147:23, 150:13,
157:5, 182:16,
182:21, 190:10,
197:2, 208:21,
209:1, 209:2
**manganelli's**
56:22, 105:3,
114:10, 118:22,
119:9, 119:12,
121:11, 122:7,
122:9, 128:19,
129:2, 143:19
**manic**
214:22
**manifestation**
179:12
**manifested**
84:22, 99:18,
222:25, 225:8
**manifesting**
99:14
**manmade**
10:20
**manner**
36:14, 36:21,
51:24, 130:4,
220:9, 233:8
**many**
16:2, 25:18,
25:22, 25:23,
26:6, 26:10,
26:13, 26:16,
27:18, 28:7,
32:17, 33:25,
35:13, 38:1,
45:19, 48:24,
93:25, 159:13,

160:6, 181:9,
181:10, 204:22
**march**
19:4, 44:15,
53:21, 57:7,
57:12, 57:20,
58:5, 58:9,
65:10, 66:4,
67:1, 70:5,
72:16, 72:23,
73:3, 74:1,
78:5, 82:13,
83:8, 83:11,
83:23, 83:25,
85:1, 85:3,
85:15, 86:5,
96:21, 98:19,
103:21, 105:20,
107:2, 107:3,
107:16, 111:13,
113:10, 113:14,
113:15, 113:16,
113:17, 114:3,
121:22, 122:8,
123:12, 126:5,
144:23, 157:9,
171:6, 178:6,
182:21, 183:3,
212:18, 213:2,
226:22, 232:11
**marijuana**
71:14, 100:1,
100:4, 100:5,
100:12, 143:4,
162:17, 180:10,
180:22, 181:7,
181:10, 181:11
**mark**
5:2, 5:21,
5:23, 6:5, 6:22,
7:12, 62:15
**marked**
4:23, 5:25,
6:9, 6:14, 6:18,
7:8, 62:18,
106:19, 106:23,
153:15, 158:13,
164:7, 173:17

**marker**
85:4
**mary**
58:8, 58:13,
58:24
**masquerade**
12:13
**material**
37:17, 39:14,
70:17, 99:8
**materials**
5:8, 5:14,
19:21, 39:7,
39:18, 39:19,
42:4, 42:12,
42:15, 42:21,
42:24, 43:2,
43:3, 43:7,
43:18, 43:21,
43:22, 43:24,
44:1, 44:5,
45:1, 45:2,
45:5, 47:6,
47:9, 47:25,
48:7, 48:16,
48:23, 57:10,
59:1, 76:4
**math**
64:1, 64:3,
64:7, 64:9
**mathematically**
46:9
**mather**
61:12, 71:16,
120:25
**mather's**
65:6, 84:2
**mathers**
85:11
**matter**
4:17, 5:19,
6:7, 7:2, 7:14,
37:9, 45:20,
53:23, 109:16,
146:24, 213:18,
239:9
**matters**
16:25, 17:4,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    273

17:7, 26:24,
26:25, 30:18,
30:19, 33:4,
35:10, 55:10,
209:13
**maturity**
68:4, 68:8,
68:14, 68:16,
68:19, 69:21
**maybe**
158:24, 183:25,
222:15
**mclean**
2:15
**md**
9:8, 158:23
**mean**
8:2, 12:19,
28:14, 67:4,
72:21, 80:23,
82:7, 90:17,
109:23, 114:13,
119:1, 121:24,
126:20, 133:2,
146:8, 148:6,
157:11, 168:15,
168:25, 179:24,
197:21, 228:19,
230:10
**meaning**
165:6, 177:15,
190:23, 190:24,
233:8
**meaningful**
201:9
**means**
54:21, 140:15,
140:16
**meant**
14:8, 53:4,
67:23, 125:19,
171:14, 187:20,
204:12, 204:13,
207:11
**measure**
60:21, 166:1,
209:15
**measures**
17:11

**medals**
224:3
**mediated**
234:18
**medical**
8:25, 9:12,
9:14, 10:14,
10:15, 10:22,
12:12, 15:5,
18:19, 19:7,
35:9, 35:11,
39:12, 49:24,
53:15, 59:22,
82:20, 116:6,
119:18, 131:9,
131:10, 143:1,
163:17, 180:6,
190:20, 212:18,
213:2
**medicate**
118:10
**medication**
17:12, 110:17,
110:19, 122:24,
127:11, 128:13,
143:3
**medications**
13:23, 13:24,
81:15, 141:24
**medicine**
9:11, 9:12,
10:5, 10:6,
10:7, 10:12,
10:17, 10:23,
11:4, 11:5,
11:8, 11:9,
13:3, 19:5,
19:6, 95:13,
127:12, 141:5,
141:13, 141:16,
142:7, 162:4,
162:12
**meds**
213:10
**meeting**
19:6, 67:14,
107:3, 107:19,
174:1

**member**
61:4, 81:23
**menacing**
130:5
**mental**
15:17, 20:8,
52:15, 52:16,
52:17, 53:19,
56:12, 61:4,
61:7, 68:9,
82:12, 111:4,
117:18, 119:22,
120:7, 120:10,
121:11, 121:15,
121:18, 122:9,
122:18, 122:22,
123:5, 123:13,
140:6, 140:7,
147:14, 161:25,
175:1, 176:17,
193:5, 216:9,
219:7, 220:6,
220:8, 223:14,
232:12, 232:21,
233:2
**mentally**
221:10, 229:21
**mention**
90:5, 90:6,
158:3
**mentioned**
19:10, 31:18,
31:21, 32:14,
83:9, 180:21,
180:24, 211:17
**merely**
130:24, 134:12,
134:19, 221:25
**message**
152:7, 152:10,
153:19, 155:20,
156:24
**messages**
125:15, 153:15,
155:23, 169:13,
178:6, 199:16,
203:5
**met**
4:10, 33:19,

50:1, 50:3,
71:2, 76:19,
107:16, 110:10
**meth**
183:18
**method**
94:18, 95:3,
95:6, 95:8,
95:17
**methods**
215:16
**metropolitan**
85:24, 86:1,
140:13
**miami**
9:9, 80:3
**michael**
1:20, 4:1,
239:7, 239:15,
240:10
**midday**
93:11
**middle**
150:13, 153:1,
193:14
**midnight**
126:17, 135:13
**midterm**
99:8
**midterms**
63:21, 63:23,
66:3, 68:24,
69:1, 98:10,
98:18, 99:18
**might**
36:17, 38:18,
48:14, 83:15,
92:24, 93:1,
95:20, 106:5,
113:4, 122:19,
134:12, 144:5,
144:6, 151:15,
153:11, 168:17,
168:18, 171:10,
173:2, 184:8,
185:15, 215:5,
230:18, 237:23
**miller**
23:18

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

274

mind
7:18, 20:2,
24:7, 29:19,
107:8, 170:1,
185:17
mindful
89:7
mini
238:17
minimize
40:6
minimum
110:10
minus
64:3
minute
208:5
minutes
67:12, 107:20,
158:10, 158:16,
168:7, 196:17,
210:4, 218:20,
218:23, 222:2
misconduct
71:13
mislead
42:1
misleading
195:14
miss
23:13
mitigating
208:25
mnemonic
227:22
moderate
163:22
mom
48:8, 49:1,
92:16, 111:16,
152:1, 168:2,
171:5, 171:9,
211:11, 234:23,
235:13, 235:16,
236:7, 236:12,
237:5
moment
19:1, 101:9,

101:23, 159:21,
160:1, 166:3,
201:25
monday
238:2
money
25:12
montgomery
178:16, 180:5,
182:17, 187:23,
188:5, 188:9,
206:14
month
48:18, 196:16
monthly
21:10
months
177:14, 178:5,
182:19, 213:11
mood
141:22, 141:25,
159:16, 160:4,
161:4, 161:10,
162:9, 165:15,
214:23, 228:12
moon
33:7
moore
3:23, 49:4,
49:7, 67:14,
67:15, 106:18,
106:25, 107:14,
107:22, 109:14,
109:15, 109:17,
109:18, 109:21,
110:8, 110:24,
111:7, 120:18,
216:23, 231:17
more
7:23, 19:22,
20:14, 28:2,
28:10, 28:23,
29:4, 32:22,
33:11, 33:13,
37:7, 37:19,
39:4, 39:16,
41:4, 41:5,
41:22, 43:2,

44:4, 44:24,
46:10, 49:4,
49:11, 69:6,
78:25, 83:3,
83:16, 85:5,
85:6, 85:10,
88:4, 90:20,
92:15, 95:7,
97:25, 103:7,
111:23, 112:3,
129:1, 133:4,
158:25, 161:10,
168:8, 169:21,
176:12, 177:21,
180:2, 183:16,
192:21, 196:14,
199:18, 201:3,
221:25, 227:11,
228:16, 230:6,
230:13, 230:14,
233:4
morelli
2:3, 33:23,
34:20
morgan
74:10, 75:25,
77:18, 77:24,
78:3, 81:8,
87:13, 88:6,
88:9, 88:11,
89:1, 97:17,
122:14, 130:3,
134:4, 137:8,
148:7, 151:20,
198:21, 225:7
morning
185:14, 237:19
moskowitz
2:12
most
19:2, 26:23,
27:10, 29:14,
31:13, 47:21,
47:25, 48:3,
48:6, 187:8
mother
91:20, 91:21,
94:11, 110:16,

111:13, 112:11,
123:14, 124:9,
150:1, 152:3,
153:8, 156:9,
156:14, 159:7,
161:14, 166:25,
167:8, 167:11,
182:20, 182:21,
186:18, 188:14,
189:11, 193:17,
194:8, 199:7,
199:22, 200:24,
211:8, 234:19,
237:8, 237:9,
237:11, 237:16,
237:25, 238:1
mother's
94:13, 149:13,
149:18, 150:9,
162:2, 193:14
motion
16:18, 52:25
motivated
73:16
motive
18:21, 18:22,
18:23
motives
18:24
mourners
209:4, 209:20
move
73:10, 79:5,
79:6, 134:12,
138:2, 145:7,
151:7
moved
32:24, 32:25,
73:9, 152:23
movement
78:15, 78:18,
78:25, 103:8,
127:2, 137:2
movements
137:2
movie
33:6
mpd
140:23

mri
213:13
much
28:2, 29:4,
30:17, 31:4,
31:12, 32:22,
37:7, 37:19,
46:18, 48:15,
49:12, 52:6,
94:5, 103:7,
125:8, 168:13,
176:12, 189:23
multi-specialty
35:8
multiple
12:19, 12:20,
132:19, 137:4,
156:23, 171:8,
186:18, 186:23,
187:1, 207:16
murder-suicide
30:6
music
216:25
must
23:10, 150:20
mutually
132:17
myself
35:23, 194:15,
200:14, 203:9,
203:10

**N**

name
4:10, 29:25,
34:8, 34:11,
34:16, 34:20
names
28:13, 28:15,
181:9
narrative
129:18
nassau
30:5
natural
10:21
nature
30:22, 52:8,

52:10, 53:18,
54:10, 79:25,
82:19, 82:21,
133:18, 134:15,
178:14, 191:14,
191:23, 202:23
navy
224:2
nd
1:21
ne
1:12
nearly
93:20
necessarily
10:22, 14:12,
25:3, 32:8,
40:11, 54:11,
82:7, 82:9,
99:6, 112:14,
116:16, 122:19,
132:25, 136:4,
168:17, 199:24,
204:20, 209:21
necessary
43:23, 152:9,
192:6
necessitate
56:11, 117:17
necessitated
193:6, 202:10
necessity
146:22
need
10:24, 20:13,
24:18, 30:14,
38:19, 43:14,
72:19, 83:13,
83:16, 85:10,
90:20, 92:5,
102:8, 111:23,
112:2, 124:22,
130:6, 130:18,
131:5, 136:17,
147:18, 151:9,
158:24, 167:2,
168:5, 183:11,
191:10, 191:16,

191:20, 216:13,
232:23
needed
36:15, 92:8,
92:12, 108:8,
121:1, 131:13,
177:9
needs
36:13, 110:17,
145:9, 175:17,
216:12
neither
81:20, 240:16
nerve
163:9
neuroimaging
12:14
neurological
12:15, 163:5,
170:10, 228:14
neurologist
11:15
neurology
11:13, 11:18,
11:20, 11:23,
11:25, 12:1,
12:2, 12:18
never
11:7, 16:7,
16:21, 23:7,
33:19, 49:25,
50:1, 50:3,
50:5, 50:8,
66:20, 76:22,
127:22, 157:1,
160:17, 166:23,
167:7, 168:23,
169:8, 171:16,
178:9, 188:17,
206:7, 211:6,
211:11, 211:14
new
1:21, 1:25,
4:4, 9:12, 9:14,
13:23, 18:19,
29:20, 29:21,
33:23, 35:2,
240:2, 240:4,

240:7
news
34:19
next
20:11, 33:8,
61:10, 65:12,
66:17, 71:7,
92:13, 93:4,
95:23, 103:2,
103:11, 110:11,
110:14, 124:19,
128:7, 128:18,
136:15, 145:8,
154:9, 160:13,
161:2, 163:24,
174:20, 175:23,
176:14, 177:12,
185:9, 187:13,
196:18, 199:10,
199:12, 201:19,
205:5, 228:24,
231:14
niches
15:25
night
51:23, 76:19,
78:5, 90:5,
90:6, 90:17,
91:16, 100:6,
102:14, 102:19,
102:22, 102:24,
103:11, 104:1,
111:18, 111:22,
126:5, 149:14,
151:4, 151:21,
152:18, 160:8,
193:14, 199:3,
203:4, 225:10
nights
160:6
nine
31:3
no-contact
90:14
nobody
55:18, 77:13
nods
51:1

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

276

nominated
224:2
non
193:12
non-suicide
29:15
noncompliance
135:20
none
81:16, 207:14
nonmedical
215:16
nonresponsive
138:3
nope
116:8
normal
220:8, 224:20,
229:23, 230:1
normalizing
83:4
normally
39:21, 45:6,
220:9
notable
34:14, 34:15,
54:15, 54:16,
85:1, 116:13
notary
1:24, 4:3,
239:25, 240:7
notations
85:14
note
71:15, 95:9,
173:12, 202:11
noted
19:3, 50:16,
66:17, 69:6,
98:19, 196:10,
213:17, 220:12,
220:20, 230:19
notes
3:23, 46:25,
51:12, 51:15,
51:21, 52:19,
52:20, 52:22,
52:25, 106:18,

106:24, 124:24,
180:24, 240:13
nothing
59:10, 63:15,
68:13, 103:24,
104:3, 104:19,
104:25, 122:25,
124:10, 153:23,
154:13, 154:17,
154:20, 154:23,
154:25, 192:25,
194:17, 194:21,
229:13
notice
3:14, 4:20,
4:22, 5:3, 5:4,
5:15, 104:6,
104:7, 104:9,
104:22, 104:24
noticed
70:1, 83:21
notified
137:11, 217:20
notifying
77:25, 144:1
notion
140:15
notwithstanding
129:20
nuanced
55:12
number
27:1, 27:3,
28:12, 30:3,
31:11, 43:7,
48:9, 48:11,
48:13, 52:18,
62:25, 95:2,
107:4, 112:15,
132:18, 146:17,
146:21, 181:12
numerous
90:4
nw
2:24

O

o-f-f
141:24

objection
232:17, 232:22,
233:16, 233:22,
233:24, 234:2,
235:5
objects
160:15
obligation
124:5, 124:8
obligations
146:16
obliged
144:18, 145:13,
145:18, 145:19
obliges
145:16
observations
85:4
obtain
110:18
obviously
44:14, 99:10
obviousness
192:14
occasionally
26:24
occasions
171:8, 186:11,
186:19, 186:24,
197:3
occurred
115:18, 115:22,
182:19, 230:8
occurring
105:16
october
84:2, 84:22,
85:9, 85:14,
85:16, 174:2,
174:24, 175:7,
226:16, 226:20
odd
106:7
odor
107:23
of
239:4
of
239:3

off-label
214:21
offense
139:12
offer
14:18, 55:17,
101:24, 192:13,
193:9
offered
8:20, 10:2,
96:11, 119:22,
119:25, 120:3,
121:3, 233:11
offering
14:2
offers
120:16
office
2:21, 18:20,
217:16
officer
29:21, 88:14,
88:15, 88:24,
93:15, 122:24,
136:19, 136:22,
151:20, 235:19
officer's
80:14, 129:19
officers
81:9, 81:10,
97:2, 121:21,
122:7, 123:8,
126:16, 129:12,
129:24, 130:20,
139:11, 139:20,
139:21, 140:12,
143:22, 146:9,
146:12, 170:3,
185:23, 185:25,
186:7, 186:14,
198:16, 200:5
official
104:6, 104:22,
209:2
often
30:23, 102:10
oh
22:25, 49:8,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

277

51:5, 55:18,
85:22, 143:2,
174:11, 208:2,
226:12, 238:4
**old**
154:9
**older**
20:20
**once**
12:17, 14:19,
19:22, 21:23,
38:24, 142:19,
144:18, 145:15
**one**
7:23, 11:22,
12:11, 13:25,
14:13, 14:14,
15:4, 15:7,
15:25, 18:1,
18:24, 22:4,
23:3, 26:17,
26:22, 27:14,
29:20, 31:3,
32:2, 39:18,
47:20, 49:3,
55:12, 65:18,
65:21, 68:17,
68:18, 79:25,
89:6, 90:11,
91:18, 95:21,
96:10, 97:13,
99:3, 101:4,
102:19, 102:21,
102:24, 103:10,
109:25, 131:5,
132:25, 135:17,
137:5, 151:4,
154:8, 155:7,
160:16, 164:5,
170:18, 176:22,
177:14, 177:21,
179:16, 179:19,
180:21, 180:25,
181:9, 186:24,
187:17, 191:20,
193:12, 195:6,
195:8, 196:18,
201:7, 203:19,

209:2, 210:6,
215:7, 218:22,
223:4, 227:20,
227:21, 228:16,
228:24, 229:6,
229:7, 231:13
**one's**
68:9, 196:14,
218:25
**ones**
9:2, 19:2,
19:10, 19:22,
27:23, 42:16,
43:19, 47:9,
154:6
**ongoing**
35:19, 52:11,
203:17
**only**
14:18, 15:7,
16:20, 36:8,
37:21, 55:7,
97:7, 109:12,
127:24, 128:2,
158:3, 173:6,
175:2, 176:9,
185:5, 216:13,
231:5
**onward**
84:22
**op**
24:25
**open**
95:7, 103:4
**open-ended**
54:12
**operating**
227:1
**operative**
129:18
**opie**
44:12, 44:15,
74:1, 74:4,
75:14, 75:21,
81:9, 101:10
**opie's**
225:9
**opining**
124:4, 124:8

**opinion**
39:15, 43:23,
44:3, 45:7,
55:17, 58:15,
58:19, 59:2,
59:15, 59:17,
59:19, 59:25,
61:10, 61:15,
61:16, 67:7,
69:18, 70:7,
73:15, 73:19,
82:11, 94:6,
99:16, 102:23,
105:10, 114:8,
115:11, 115:23,
116:7, 117:16,
128:15, 130:15,
131:3, 131:20,
131:23, 132:6,
139:9, 139:13,
139:14, 139:18,
140:1, 143:21,
145:6, 147:11,
147:13, 149:1,
152:20, 183:3,
190:12, 190:13,
190:15, 190:17,
190:18, 191:3,
191:5, 191:15,
191:21, 192:5,
192:13, 192:20,
192:21, 193:7,
193:9, 196:20,
197:24, 199:4,
209:5, 209:7,
219:10, 219:12,
220:2, 221:3,
222:22, 234:12,
235:21, 236:23,
237:4
**opinions**
7:4, 7:6,
39:21, 40:1,
45:3, 139:3,
139:7, 139:8,
193:3, 195:25
**opportunity**
10:3, 38:24,

61:25, 89:15,
97:7, 127:21,
128:2, 223:1,
231:7, 237:22
**opposed**
17:15, 28:20,
30:18, 35:19,
48:13, 60:22,
80:4, 83:3,
95:6, 103:2,
115:14, 170:8,
204:16, 223:9
**opposite**
34:18
**opted**
51:10
**option**
215:10
**order**
11:19, 38:20,
45:7, 68:5,
85:25, 86:25,
87:3, 90:14,
90:24, 91:1,
91:3, 91:5,
91:11, 101:5,
101:7, 101:8,
114:23, 148:1,
149:6, 154:21,
162:10, 211:15,
238:16
**orders**
78:9, 238:9
**organic**
12:3
**organization**
13:21, 68:9,
209:15, 227:10
**organized**
33:22
**origin**
82:18, 170:11
**originally**
13:20, 14:21,
179:25
**osler**
19:15
**other**
8:23, 10:23,

11:3, 11:7,
12:15, 16:13,
28:1, 30:1,
30:24, 35:24,
37:24, 38:13,
40:12, 42:21,
47:9, 49:3,
49:20, 52:12,
52:18, 56:12,
67:3, 67:5,
67:22, 71:12,
83:5, 83:15,
85:14, 89:6,
95:20, 105:3,
105:16, 110:1,
116:3, 116:21,
117:18, 124:22,
130:19, 132:3,
133:1, 135:20,
135:25, 140:16,
142:6, 143:5,
143:10, 144:12,
154:8, 160:9,
164:19, 168:18,
170:21, 170:24,
173:10, 180:23,
185:13, 190:22,
196:11, 197:2,
197:3, 197:11,
199:7, 204:7,
204:19, 209:18,
219:19, 224:25,
227:12, 228:10,
230:21, 230:23

**others**
19:12, 23:21,
81:7, 127:15,
127:16, 129:7,
129:12, 137:25,
169:24, 183:14,
184:15, 216:20,
237:10

**otherwise**
8:23, 102:2,
129:9, 131:4,
131:24, 157:6,
164:12, 166:10,
183:17

**ought**
22:11

**out**
12:12, 19:2,
20:15, 21:23,
52:11, 52:15,
54:14, 57:21,
64:18, 64:19,
64:25, 65:2,
67:21, 67:22,
68:4, 71:1,
71:8, 71:12,
82:25, 90:11,
91:25, 100:8,
101:3, 101:15,
103:6, 114:24,
116:16, 144:19,
146:6, 148:17,
152:13, 156:7,
159:3, 183:19,
184:9, 209:20,
216:9, 224:6,
225:6, 225:15,
226:18, 228:22,
231:10, 233:12,
238:3, 239:10

**outcome**
56:16, 117:22,
240:19

**outpatient**
202:13, 203:24,
220:22, 220:23

**outset**
42:5

**over**
20:13, 25:24,
27:11, 28:17,
30:21, 46:24,
51:3, 83:7,
83:10, 135:22,
140:17, 151:17,
170:19, 180:23,
202:11, 209:3,
226:11, 229:22,
237:22

**overall**
27:25, 43:16,
150:4, 193:8

**overgrowth**
163:6

**overlap**
16:19, 16:22,
179:20

**overlook**
23:24, 210:11

**overlooking**
192:15

**overly**
228:21

**overrules**
140:18

**overtly**
134:22, 135:1,
135:15, 197:14,
197:18

**overview**
37:4

**overwrought**
183:22

**own**
11:8, 55:25,
148:4, 174:7,
191:17, 209:1,
209:22, 210:12,
210:15, 210:22,
234:3, 234:13,
235:3

---

**P**

**page**
3:12, 6:24,
20:8, 20:19,
20:23, 22:20,
22:21, 23:17,
24:3, 24:15,
24:21, 31:17,
54:1, 58:11,
58:23, 58:25,
61:9, 64:15,
66:17, 79:9,
93:5, 96:3,
96:4, 110:14,
121:6, 129:1,
140:4, 142:4,
143:19, 147:21,
150:13, 159:19,

161:2, 163:24,
166:22, 167:4,
167:6, 174:1,
174:20, 175:14,
192:25, 197:7,
208:18, 208:19,
239:10

**pages**
7:14, 18:13,
164:3, 175:5

**paid**
45:11, 45:12

**pamela**
1:23, 4:2,
240:5, 240:25

**panel**
34:22, 35:5,
35:7, 35:8,
35:14, 35:18,
37:21, 37:25

**panic**
23:18

**paper**
21:10, 21:17

**paragraph**
57:5, 57:17,
58:1, 58:4,
58:8, 58:13,
58:24, 60:17,
61:10, 93:4,
95:23, 110:5,
110:12, 124:19,
128:18, 133:24,
136:15, 142:4,
160:13, 162:1,
169:2, 174:3,
174:12, 175:23,
177:11

**paragraphs**
159:19, 174:14,
176:13

**paralegals**
36:5

**paramour**
30:9

**paranoia**
207:11

**paranoid**
201:7, 206:9,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

279

206:12, 225:25,
226:2, 226:3,
226:4, 226:5
**paraphernalia**
100:5
**pardon**
204:24
**parenting**
161:15
**parents**
73:8, 106:4,
113:12, 113:23,
124:5, 157:5,
157:10, 157:14,
157:19, 160:8,
165:7, 173:8,
211:18, 214:2,
214:12, 217:3,
222:15, 222:19
**parking**
188:18, 189:3,
194:24
**parsing**
206:3
**part**
8:25, 12:14,
22:6, 31:12,
37:13, 48:25,
49:2, 53:15,
55:22, 84:5,
85:17, 125:10,
133:10, 144:11,
171:2, 175:13,
193:11, 195:9,
195:10, 209:14,
228:11, 228:13,
228:14, 228:15
**participate**
35:17
**participated**
25:19, 25:21,
28:7
**participating**
225:21
**participation**
25:25
**particular**
20:24, 123:8,

163:12, 166:3,
170:13, 204:20,
224:15
**particularly**
111:14, 116:13,
222:17
**parts**
49:2
**party**
240:17
**pass**
66:10, 73:16
**passage**
109:23
**passed**
98:24
**passenger**
155:13
**passes**
153:8, 226:4
**passing**
216:5
**past**
29:15, 33:18,
99:5, 127:10,
131:16, 156:1,
166:14, 175:22,
187:17
**path**
155:25
**pathology**
35:11
**patient**
159:16, 159:25,
163:11
**patient's**
159:7
**patients**
12:1
**patrick**
198:17
**pattern**
83:21, 182:20
**pay**
217:23
**payment**
217:13
**peculiar**
95:17, 225:22

**pedestrian**
154:6
**peer**
25:25, 36:11,
36:12, 38:6,
39:22, 39:23,
40:1, 40:3,
40:13, 40:16,
41:4, 41:7,
41:14, 41:15,
41:16
**pennsylvania**
9:18
**people**
16:1, 23:17,
48:9, 69:7,
70:1, 85:14,
97:8, 103:9,
108:9, 108:12,
108:14, 112:18,
112:19, 112:20,
112:21, 119:24,
120:21, 127:5,
127:8, 132:19,
133:7, 133:21,
146:12, 146:20,
153:7, 155:1,
155:7, 173:9,
184:20, 197:11,
198:16, 200:7,
200:10, 219:19,
220:9, 220:13,
221:1, 223:16,
226:3, 226:5,
228:16, 236:3
**percent**
31:5, 31:7,
31:10
**percentage**
28:6, 29:10,
30:17
**percentages**
29:1, 31:2,
33:3
**perform**
99:7
**performance**
68:23, 84:18,

96:23, 98:17,
98:21, 99:5,
99:6, 99:17
**perhaps**
20:13, 24:11,
46:10, 47:24,
48:13
**peril**
92:11
**period**
30:22, 31:9,
48:2, 69:13,
83:10, 84:23,
85:1, 86:17,
88:6, 88:8,
90:5, 94:2,
99:14, 105:8,
105:9, 105:14,
105:17, 142:12,
170:8, 170:12,
171:2, 174:17,
220:14, 223:25,
234:3, 234:12,
234:24, 235:11,
235:12, 235:15,
235:18
**periodical**
21:11
**periods**
31:13, 94:3,
94:4, 200:19
**permitted**
100:11
**person**
11:25, 23:4,
37:10, 50:23,
55:11, 68:16,
71:6, 83:4,
94:1, 94:5,
100:15, 102:6,
103:10, 109:12,
112:16, 112:23,
127:6, 129:9,
131:4, 131:24,
131:25, 133:3,
152:21, 155:6,
166:10, 172:25,
179:25, 180:1,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                    280

180:4, 183:13,
183:21, 183:24,
184:9, 184:10,
192:2, 192:23,
200:15, 202:1,
202:2, 203:23,
207:8, 207:9,
207:12, 207:13,
207:15, 207:17,
224:12, 224:14,
224:17, 227:8,
227:12, 228:9,
228:12, 229:8,
229:14, 230:1,
230:6
**person's**
80:2, 100:17,
166:2, 166:8,
184:14, 230:5
**personal**
27:5, 31:18,
32:18, 32:21,
33:1, 33:11,
34:2, 127:2,
235:20
**personality**
212:20, 212:23
**personally**
97:25, 239:6
**personnel**
87:11
**perspective**
17:22, 59:11,
71:4, 115:23,
210:18
**perspectives**
17:23
**pertinent**
10:17, 17:1,
18:1, 44:19,
47:8, 47:14,
53:23
**ph**
215:7
**philadelphia**
9:18
**phone**
50:24, 50:25,

51:3, 51:10,
52:24, 193:21,
193:23
**phrase**
86:22, 205:12
**physical**
17:11, 130:4,
131:1, 134:13,
150:16, 215:4,
230:10
**physically**
78:14, 173:1,
200:13
**physician**
25:2, 162:4
**physician-assist-
ed**
24:21, 25:1,
231:25
**pick**
69:14, 111:25,
152:1, 152:4,
152:11, 153:3,
153:20, 154:4,
154:10, 155:7,
155:10, 155:17,
155:19, 167:12,
167:19, 178:7,
188:21, 188:23,
189:14, 206:5,
237:16
**picked**
109:12, 125:2,
153:14, 155:22,
182:22, 183:2,
187:7, 188:15,
206:15, 211:11,
234:20, 235:14,
236:12
**picking**
108:9, 108:12,
124:17
**picks**
171:13, 235:1
**picture**
5:23
**pillow**
193:16, 194:13

**pivoted**
196:5
**placate**
201:4
**place**
71:6, 91:19,
92:9, 98:25,
104:11, 108:4,
114:19, 123:2,
131:19, 134:14,
135:14, 137:7,
150:9, 150:21,
151:5, 152:12,
155:5, 219:17,
224:23, 225:16,
239:10, 240:11
**places**
103:9, 133:20,
133:21, 154:5
**plaintiff**
29:18, 29:23,
30:2
**plaintiff's**
6:10, 6:14,
62:18
**plaintiffs**
1:9, 1:21, 2:4,
4:17, 28:20
**plan**
39:4, 59:10,
146:13, 151:10,
185:18, 207:24
**plane**
191:24
**planet**
238:16
**planned**
60:18, 137:9
**plans**
185:16
**played**
225:6
**please**
22:5, 22:20,
24:6, 43:15,
45:24, 89:23,
91:4, 96:2,
154:10, 155:16,

170:1, 196:12,
238:9
**plenty**
112:17, 112:19,
112:20, 112:21
**plus**
63:25
**point**
26:22, 39:11,
39:13, 53:14,
53:21, 54:9,
58:12, 58:16,
64:24, 65:19,
65:21, 66:13,
66:15, 68:10,
68:22, 71:12,
72:15, 73:19,
75:17, 75:23,
77:15, 82:14,
82:16, 83:25,
86:15, 92:19,
93:17, 106:5,
108:19, 113:5,
121:4, 126:22,
131:21, 136:17,
138:6, 144:5,
146:4, 147:24,
147:25, 148:5,
148:13, 151:3,
159:3, 166:11,
170:18, 171:22,
172:7, 172:8,
200:4, 203:14,
204:4, 207:3,
207:4, 230:23,
237:19
**pointed**
231:10
**pointing**
143:24, 226:18
**points**
44:18, 85:3,
114:21, 137:18,
144:12
**police**
29:21, 55:11,
79:22, 85:24,
86:1, 93:8,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017                          281

| | | | |
|---|---|---|---|
| 93:21, 101:17, 118:8, 127:11, 130:2, 132:20, 133:19, 135:3, 135:17, 136:3, 137:6, 137:8, 139:11, 139:20, 139:21, 140:13, 144:1, 144:3, 144:7, 144:10, 144:15, 144:16, 144:24, 145:3, 145:17, 146:2, 146:9, 147:25, 148:13, 170:3, 178:17, 180:6, 181:23, 182:2, 182:17, 187:23, 188:5, 188:9, 206:14, 235:13, 235:19, 236:25 **policy** 140:21, 200:6, 216:18, 217:21 **poor** 65:8, 116:15, 136:21, 136:24, 137:3, 227:16 **pop** 85:3 **population** 220:22, 220:23 **populations** 23:23 **portfolio** 28:1 **portion** 112:6, 117:23 **portions** 163:12 **pose** 36:17, 48:12 **posed** 38:15 **position** 152:24, 152:25, 230:18 **positively** 137:18 | **possession** 71:14 **possessions** 160:25 **possibilities** 55:3, 146:22, 146:25, 179:6 **possibility** 14:9 **possible** 39:10, 39:17, 67:14, 85:8, 85:10, 85:19, 95:21, 141:14, 148:24, 185:4, 201:1, 205:16, 210:1, 210:16, 219:21, 230:19 **possibly** 28:10, 162:21, 162:22, 202:23, 207:10, 211:21 **postgraduate** 9:10 **posttraumatic** 11:2 **posture** 115:10 **potential** 12:4 **potentially** 147:22, 230:22 **powerful** 98:1, 180:16 **practice** 11:25, 12:10, 13:11, 14:3, 26:1, 27:2, 30:17, 30:23, 31:3, 31:12, 32:24, 35:9 **practices** 30:25 **practicing** 10:9, 13:6, 13:14 **practitioners** 49:24 | **precarious** 89:8, 89:12, 90:3, 92:4, 92:20, 109:22, 110:6 **preceded** 105:3 **preceding** 105:8, 124:11, 169:10, 200:5 **precipitated** 114:10, 114:13 **preclude** 132:25 **predicament** 166:24, 167:8 **prefer** 65:13, 238:11 **preference** 80:2 **preferred** 115:8, 174:6 **prefrontal** 162:23, 163:14, 163:18 **preliminary** 38:17, 38:25, 42:13 **prelude** 145:4 **premium** 39:8 **preparation** 53:16, 188:8 **prepare** 47:2 **prepared** 7:1, 38:6, 41:11, 41:12, 41:21, 42:25, 95:11, 95:15, 166:7, 177:12 **preparing** 45:2, 46:16, 46:19, 46:21 **prerogative** 196:4 **prescribe** 141:24 | **prescribed** 110:18, 141:14, 141:17 **prescribers** 141:23 **prescribing** 214:20 **prescription** 213:10 **present** 130:1, 131:7, 159:4 **presentation** 18:6, 18:9, 65:9, 74:11, 83:14, 119:18, 144:3, 179:14, 198:7 **presentations** 8:19, 8:20, 8:21, 8:23, 17:20, 18:3, 18:12, 19:21 **presented** 38:14, 39:2, 44:7, 55:24, 84:14, 90:13, 90:18, 117:3, 130:2, 130:3, 130:14, 130:17, 132:2 **presenting** 166:3 **presents** 169:18, 192:23, 193:11, 229:9 **president's** 96:15 **presidential** 224:4 **presumably** 177:19 **presume** 151:7 **presumed** 157:25 **presumption** 185:4 |

presumptive
83:17
presupposes
227:16
pretty
7:16, 20:10,
85:11
prevent
56:21, 149:18,
150:1
prevented
147:22
previous
60:17, 92:6,
131:9, 131:11,
159:11, 170:24,
184:24, 200:18,
224:3, 226:16
previously
108:20, 122:23,
186:10, 187:12,
205:3, 223:12,
233:13
prides
210:21
primarily
35:9, 54:5
primary
165:6
principals
146:13
prior
33:14, 34:6,
48:15, 74:16,
80:22, 80:23,
87:14, 105:23,
108:22, 118:20,
119:1, 119:3,
119:4, 119:7,
121:23, 122:2,
122:11, 165:23,
167:15, 173:4,
178:10, 186:12,
187:24, 201:16,
205:1, 205:13,
212:6, 212:11,
220:1, 222:9
priorities
90:21, 90:22

prioritizing
191:10
priority
191:24
prison
20:23, 21:2,
22:7
prized
160:25
probably
23:2, 26:21,
27:11, 29:18,
41:17, 48:11,
51:20, 166:10,
196:10
probation
72:1, 93:1,
99:21, 99:24
problem
8:17, 110:1,
203:25, 220:5
problematic
175:2
problems
52:2, 52:4,
52:16, 65:5,
65:7, 68:4,
118:22, 118:25,
119:9, 119:12,
165:5, 165:6,
165:14, 167:18,
202:3, 202:6,
202:7, 202:25,
207:16, 207:17,
219:8, 223:14,
224:22, 231:13,
231:14
procedurally
144:10
procedure
129:23, 131:8
procedures
140:5, 140:9,
140:12
proceed
67:18, 67:24
proceeded
38:12, 41:18

proceeding
67:19, 67:23
process
48:9, 145:9,
224:21, 234:5
processing
234:9
professional
1:24, 23:5,
28:2, 61:10,
70:16, 73:15,
82:11, 94:6,
99:15, 102:23,
105:10, 114:8,
115:11, 127:18,
130:15, 131:20,
132:6, 152:20,
190:13, 191:21,
209:22, 234:11,
235:21, 240:6
professionals
111:8
professor
64:18, 66:4,
72:22
professors
68:5
proficiency
11:22, 12:16,
15:13
program
19:17, 118:3
progress
77:8
progression
224:20, 225:2,
229:23
progressive
83:6
project
36:2
prompted
137:21, 202:10
properties
141:18
property
110:20, 203:21
prospects
115:5

proud
23:3
provide
8:10, 24:13,
45:24, 58:19,
91:2, 151:21,
153:16
provided
6:4, 7:13,
7:21, 8:1, 8:3,
8:7, 15:11,
42:4, 42:12,
42:16, 42:20,
42:24, 43:1,
43:6, 46:25,
51:16, 65:23,
69:2, 102:17,
120:13, 120:14,
147:23, 148:5,
148:21, 149:2,
149:22, 150:21,
165:2, 219:18,
233:12
providing
24:7
provision
90:16, 151:10,
230:12
proximal
115:20
proximity
26:4, 36:16,
95:2, 209:23,
231:3
psychiatric
10:15, 12:5,
12:9, 12:11,
12:13, 16:5,
17:1, 17:11,
17:22, 18:15,
38:19, 55:11,
58:15, 59:2,
59:15, 59:18,
68:15, 81:15,
95:12, 114:9,
115:22, 118:2,
118:22, 118:24,
119:9, 119:12,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

283

121:4, 126:4,
126:7, 127:10,
128:3, 128:9,
129:8, 129:13,
130:16, 131:11,
132:1, 132:13,
139:19, 139:21,
141:23, 144:6,
145:2, 145:3,
146:1, 147:13,
156:1, 163:11,
167:20, 169:14,
169:21, 169:23,
170:15, 171:21,
178:13, 182:9,
182:13, 183:5,
183:7, 183:12,
183:13, 184:7,
190:12, 190:15,
191:10, 191:23,
192:3, 192:21,
193:7, 198:1,
199:23, 201:22,
202:23, 202:25,
203:4, 203:8,
209:5, 209:7,
211:1, 219:18,
221:14, 223:22,
224:3, 224:8,
224:11, 237:5
**psychiatrically**
58:20, 69:19,
126:20, 127:7,
132:21, 133:2,
170:2, 199:20
**psychiatrist**
55:8, 120:20,
129:25, 158:23,
173:18, 183:9,
190:17, 190:25,
191:4, 191:17,
192:5, 192:13
**psychiatrists**
32:4, 139:22
**psychiatry**
9:11, 9:13,
9:16, 9:17,
9:23, 9:24,

9:25, 10:16,
10:25, 11:11,
11:12, 11:20,
12:24, 12:25,
13:12, 14:12,
14:13, 14:25,
15:2, 15:7,
15:15, 15:16,
15:19, 15:20,
15:23, 16:2,
16:14, 16:24,
17:24, 17:25,
18:10, 18:20,
19:16, 59:22
**psychoaffective**
178:20, 178:23
**psychological**
12:5, 18:21,
19:17, 24:2
**psychologist**
173:21, 173:22,
213:7
**psychology**
45:7
**psychopharmacolo-
gy**
10:1, 13:17,
13:21, 13:22,
14:4, 15:8, 17:9
**psychosis**
68:7, 68:8,
69:20, 69:22,
70:7, 70:13,
80:6, 84:6,
105:20, 105:21,
108:20, 112:20,
115:14, 118:15,
119:2, 121:23,
127:4, 135:24,
136:4, 136:6,
136:9, 136:12,
137:19, 179:15,
214:22, 222:6,
227:4, 227:7,
227:15, 227:18,
227:19, 228:8,
228:11, 229:13,
229:19, 233:15

**psychosocial**
165:4
**psychotherapy**
17:15
**psychotic**
82:18, 82:22,
94:1, 95:18,
98:22, 99:14,
112:24, 116:20,
116:22, 118:23,
119:2, 119:15,
121:17, 134:23,
135:1, 135:15,
174:16, 179:5,
179:7, 180:20,
192:22, 197:2,
197:14, 197:19,
207:11, 224:13,
225:18, 227:4,
227:9, 227:17,
228:23, 229:5
**psychotropic**
141:4, 141:13,
141:18, 142:7,
214:24
**public**
1:24, 4:3,
65:2, 71:1,
77:25, 87:21,
126:16, 137:11,
140:5, 140:9,
191:11, 191:24,
211:23, 238:3,
239:25, 240:7
**publication**
21:18, 21:23,
23:6, 224:5
**publications**
8:18, 8:20,
20:5, 25:9
**published**
20:5, 20:21,
21:6, 21:9,
21:11
**publisher**
21:14, 21:15
**pull**
227:11

**pulled**
65:2
**pulls**
133:13
**punitive**
59:7, 60:1,
60:4, 60:9,
60:14, 101:1
**purely**
170:15
**purport**
7:4, 94:23
**purported**
128:19, 129:3
**purpose**
166:9
**purposely**
212:5
**purposes**
9:5, 36:6
**pursuant**
4:19
**pursued**
139:16, 139:21
**pursuing**
139:15, 144:24
**put**
16:24, 17:6,
45:20, 71:25,
93:1, 96:12,
142:7, 197:22,
230:18
**putting**
65:21, 69:17
**putz**
134:16

———— **Q** ————

**qua**
193:12
**qualification**
12:7, 55:7
**qualified**
12:10, 55:16,
59:21, 111:8,
191:1, 191:5
**quantity**
49:12

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

284

**question**
14:13, 16:4,
17:6, 17:8,
20:4, 20:11,
36:17, 36:22,
38:15, 38:16,
41:3, 44:19,
54:7, 56:4,
56:10, 56:19,
58:21, 68:11,
68:12, 89:23,
90:2, 91:4,
91:8, 91:10,
92:13, 92:18,
101:9, 102:9,
119:11, 132:11,
133:11, 135:18,
145:11, 173:1,
192:10, 202:18,
203:2, 205:8,
205:20, 210:2,
219:6, 221:12,
228:6, 229:16
**question's**
195:14
**questioning**
125:13
**questions**
12:7, 15:10,
16:5, 16:15,
38:17, 43:5,
44:9, 48:12,
48:14, 53:20,
54:1, 54:2,
54:3, 54:5,
56:1, 65:16,
109:8, 112:16,
128:8, 138:21,
192:24, 193:3,
196:11, 218:18,
218:23, 230:20
**quick**
166:16
**quickly**
8:17, 40:19,
67:14
**quiet**
79:15, 125:5,

129:21
**quietly**
200:15, 200:17
**quite**
21:24, 26:4,
31:11, 41:22,
42:11, 61:22,
94:2, 132:18,
220:12
**quote**
72:17, 92:4,
93:6, 108:13,
108:25, 110:9,
119:3, 181:16,
182:18, 194:12,
194:15, 208:24
**quotes**
213:2

**R**

**rader**
79:11, 79:12,
81:21, 97:3,
198:17
**rader's**
76:10
**radiologist**
61:8
**radiology**
35:12
**rage**
158:2, 160:14,
160:16, 160:24,
162:9, 162:21,
165:15, 167:15,
167:25, 169:9,
169:18, 169:22,
181:14, 199:9,
201:18, 203:22,
203:24, 207:13
**rages**
207:15
**rains**
204:1
**raise**
20:17
**raised**
22:9, 44:19,

228:7
**ramifications**
222:7
**ran**
14:16, 168:16
**rang**
34:19
**range**
55:3, 107:4,
146:25
**rapid**
165:14
**rate**
45:12, 45:14,
45:15
**rather**
233:9
**rational**
108:17, 223:17,
234:6
**rationale**
136:19
**reach**
28:10, 45:7,
82:11, 83:13,
191:17, 192:6,
192:17, 192:20,
209:8
**reached**
57:21, 91:25,
100:10, 216:9
**reaching**
39:11, 209:20
**reactive**
82:24
**read**
52:4, 96:1,
98:2, 105:4,
125:10, 125:13,
125:16, 169:3,
169:6, 173:13,
173:20, 176:18,
188:11, 195:10,
196:21, 196:23,
238:11, 238:12
**readership**
23:5
**reading**
141:1, 201:10,

240:13
**real**
39:8, 151:12
**reality**
227:25, 228:5
**realize**
183:7
**realized**
97:23, 156:8
**really**
11:6, 11:7,
12:18, 14:8,
26:12, 28:11,
30:22, 31:11,
32:23, 33:8,
34:4, 36:18,
44:22, 54:9,
57:12, 83:4,
115:15, 135:19,
145:9, 157:17,
167:21, 170:18,
196:6, 196:8,
202:14, 216:13,
222:7, 222:8,
223:7, 231:11
**realm**
10:10, 11:8,
12:17, 14:4,
16:7, 16:16,
27:5, 27:7,
28:3, 85:7
**realms**
16:20, 227:20
**reason**
12:10, 21:22,
22:6, 22:11,
38:8, 46:7,
97:20, 98:21,
125:17, 125:21,
130:21, 131:21,
136:23, 155:4,
171:1, 200:24,
201:21, 201:24,
202:20, 202:22,
203:3, 203:7,
223:11, 227:15
**reasonable**
95:12, 95:16,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

285

114:8, 137:12,
137:20
**reasons**
40:3, 40:17,
41:10, 43:6,
47:11, 47:20,
120:24, 141:24,
180:21, 214:24
**reassure**
168:5
**recalcitrant**
83:19
**recall**
21:1, 24:24,
27:17, 28:13,
28:15, 28:18,
34:9, 34:13,
125:1, 125:8,
212:22, 214:9
**recalled**
79:7
**recalls**
160:6
**receive**
39:7, 47:23,
216:17
**received**
5:5, 6:23, 9:8,
44:13, 47:24,
48:16, 48:20,
49:2, 49:4,
53:5, 63:17,
107:7, 128:3,
196:8, 203:5,
217:20
**receives**
90:4, 199:16
**recent**
11:9, 19:2,
19:22, 26:25,
29:14, 69:8,
73:10, 162:21
**recently**
49:4, 69:6,
177:15
**recertification**
14:2, 14:15,
15:3, 15:12

**recertified**
9:24, 13:25,
14:1, 14:16,
14:20
**recess**
74:23, 166:19,
208:9
**recitation**
57:10, 58:14,
58:25
**recognizing**
153:1
**recollections**
51:23, 52:1
**recommend**
40:2, 60:24,
162:8, 162:11
**recommendation**
39:25, 162:3
**recommended**
60:21, 142:9,
215:1, 215:12,
215:14, 215:18
**reconnected**
234:19, 234:23
**reconstructive**
51:24
**record**
60:12, 76:15,
100:3, 142:10,
142:20, 158:20,
165:1, 166:18,
207:6, 208:5,
208:8, 229:20,
232:7, 238:9,
238:14
**record's**
75:11
**records**
49:6, 49:10,
49:12, 52:4,
53:10, 60:13,
100:25, 212:15
**recounting**
209:6
**recourse**
235:23
**recreation**
143:12

**recreational**
180:16
**recruiting**
36:12
**recruits**
36:24
**rectified**
217:24
**recuffed**
136:18, 136:19,
137:3
**recurrent**
162:16
**recurring**
183:1, 186:4
**refer**
96:2
**reference**
18:22, 51:21,
65:21, 83:25,
120:10, 140:5,
141:7, 164:22,
167:22, 170:6,
188:10, 203:14
**referenced**
20:7, 120:17,
121:1, 170:9,
173:11
**references**
21:21
**referencing**
64:15, 73:14,
197:9, 225:25
**referral**
140:5, 169:21
**referred**
67:15, 127:20,
202:12
**referring**
105:6, 140:8,
142:3, 147:9,
148:14, 179:1,
193:17, 197:3
**reflect**
85:5, 99:6,
108:17, 109:20,
114:21, 176:22
**reflected**
28:25, 44:10,

68:23, 69:19,
84:24, 98:22,
100:3, 115:12,
129:8, 168:1,
179:6
**reflecting**
169:13, 174:1,
185:6, 197:20
**reflective**
106:9, 228:8,
228:18, 229:5
**reflects**
64:22, 83:3,
107:3, 107:14,
109:25, 167:23,
175:5
**reframe**
59:10
**refuse**
233:20
**refused**
111:1, 111:5,
111:9, 113:13,
113:23, 114:5,
131:20, 180:7,
213:24
**refusing**
141:4, 143:1
**regard**
23:1, 75:14,
110:15, 117:24,
159:5
**regardless**
140:23
**regards**
201:16
**register**
188:11
**registered**
1:23, 169:4,
216:6, 240:6
**regrettable**
231:22, 231:23
**regularly**
8:24
**rehabilitation**
3:22, 53:11,
106:18, 106:24,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

286

107:15, 216:23
**rejection**
114:21
**relate**
57:16, 57:20,
57:24, 80:1,
204:15, 204:20
**related**
23:20, 25:3,
25:8, 30:7,
30:8, 44:4,
44:6, 44:15,
53:21, 75:14,
76:12, 108:25,
137:24, 168:2,
221:17, 225:8,
240:16
**relates**
20:24, 57:5,
115:13, 115:15,
117:24, 133:5,
200:4, 200:6,
225:10
**relating**
58:9
**relation**
101:2, 132:14
**relationship**
38:3, 52:10,
52:13, 55:10,
56:6, 57:3,
112:25, 113:2,
114:15, 115:12,
115:17, 115:21,
150:5, 209:16,
214:2, 214:11,
214:14, 227:6
**relative**
224:17
**relatives**
146:20
**relay**
51:2
**released**
78:13, 86:1,
86:5, 86:9,
86:12, 93:6,
93:8, 93:10,

93:12, 93:21,
101:17, 220:10,
220:16, 220:24,
221:2, 221:24
**relevance**
37:18, 39:5,
95:19, 129:8
**relevant**
58:20, 65:17
**relied**
45:2, 45:6,
60:12
**rely**
195:18, 217:3
**relying**
13:15, 47:7
**remain**
79:24, 133:3
**remaining**
79:18
**remarkable**
231:19
**remember**
23:11, 24:17,
29:12, 30:3,
34:15, 88:10,
94:17, 155:5
**remembrances**
44:6
**remote**
125:7, 172:16
**removal**
97:24
**remove**
145:19, 147:5,
150:17
**removed**
65:11, 72:5,
72:8, 85:23,
123:11, 145:1,
145:14, 145:18,
230:11
**removing**
115:10, 146:23
**renew**
10:3
**renewed**
14:8

**repeated**
209:23, 231:13
**repeatedly**
79:8, 119:21,
120:15, 168:6
**repeating**
110:2, 115:3,
118:13, 135:22,
137:15
**repercussions**
100:16, 222:10,
222:11
**replicative**
65:5
**report**
3:19, 3:21,
6:18, 6:23,
6:24, 7:1, 38:5,
40:16, 41:3,
41:5, 41:6,
41:8, 41:11,
41:12, 41:17,
41:21, 42:16,
42:25, 44:10,
45:3, 46:24,
47:14, 47:15,
47:16, 50:16,
50:17, 51:22,
53:3, 53:16,
54:1, 54:2,
58:22, 62:9,
62:17, 76:12,
79:9, 93:5,
117:23, 147:3,
158:21, 162:10,
165:24, 167:16,
169:5, 173:25,
178:17, 188:5,
188:10, 190:8,
190:22, 191:13,
192:25, 196:10,
196:15, 196:22,
231:11
**report's**
62:11
**reported**
174:4, 215:24
**reporter**
1:24, 238:8,

240:6
**reports**
62:22, 163:18,
174:3, 216:19
**represent**
4:11, 5:14,
8:11, 183:14,
213:20
**representative**
27:24, 28:24
**representatives**
1:6, 4:13
**represented**
9:4, 52:19,
141:15
**repudiation**
114:22
**request**
20:1, 24:12,
24:13, 25:11,
135:20, 233:13
**requested**
5:15, 5:17,
8:6, 8:9, 240:14
**requests**
191:25
**require**
8:15, 140:5,
140:12, 184:8,
217:13
**required**
132:7, 132:13,
192:13
**requirement**
15:3, 15:4,
230:11
**requirements**
110:10, 143:22
**requires**
10:4, 140:23
**research**
36:3, 37:6,
117:20
**research^**
37:16
**reservations**
67:19
**residency**
9:13, 9:15

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

287

residents
18:15
resilience
224:17
resist
78:19
resistance
71:2
resisting
78:18, 78:23,
79:3, 79:6
resolution
115:2, 146:7
resolve
44:25, 61:21,
73:17, 83:14,
145:10, 179:21
resolved
38:23, 39:2,
65:11, 131:16,
223:5
resources
38:10, 43:16,
56:14, 227:15
respect
20:4, 67:6,
75:2, 105:7,
121:6, 123:25,
210:13, 231:16
respectfully
138:9, 207:5
respond
137:13, 146:9,
220:8
responded
36:13, 131:12,
168:20
respondents
123:25, 140:24
responding
175:12, 202:18
response
36:20, 40:23,
144:1, 223:13,
228:20, 228:21
responses
67:12
responsibilities
9:1, 36:23,

37:5
responsible
36:6, 36:10,
36:12, 36:14,
36:15, 36:19,
69:22, 152:21,
219:13
responsive
3:16, 5:25,
116:10, 135:17,
135:18, 136:21,
138:20, 152:24
responsiveness
191:25
rest
151:17
restaurant
112:1, 188:22,
188:25, 189:20,
189:23, 190:1,
190:4, 190:6
restrain
137:22
restraint
81:4
restrict
127:2
restricting
219:1
result
56:13, 70:23,
117:19, 146:18,
146:19, 146:20,
163:10, 240:18
resulted
137:2, 137:6
results
169:20
resumed
222:9
retrieve
86:18, 93:16
return
73:6, 73:9,
113:21, 113:24,
114:4, 189:6,
189:7, 189:11
returned
75:21, 86:11,

86:13, 86:14,
86:15, 88:23,
89:25, 93:14,
149:5, 193:13
review
19:16, 36:11,
40:4, 40:13,
41:4, 41:14,
41:15, 41:16,
42:5, 43:8,
43:15, 43:22,
44:16, 47:10,
47:19, 53:9,
53:21, 112:6,
124:25, 188:7,
196:12, 196:19
reviewed
38:6, 39:22,
39:24, 40:1,
40:17, 41:4,
41:7, 43:18,
47:13, 47:14,
47:16, 47:25,
48:17, 49:14,
53:7, 57:10,
58:1, 59:1,
76:4, 76:7,
100:25, 110:8,
188:9
reviewer
26:1
reviewers
36:12
reviewing
24:7, 39:19
revisit
38:23, 128:23,
129:4
ride
96:16, 124:16,
125:19, 126:1,
194:20, 197:15,
211:7
ridiculous
226:19
right
10:10, 22:15,
26:19, 30:20,

31:6, 31:7,
37:1, 37:9,
38:4, 46:15,
53:13, 62:5,
64:10, 67:2,
73:1, 77:19,
79:23, 79:24,
80:1, 87:5,
92:12, 92:17,
103:23, 108:5,
108:11, 109:24,
126:14, 138:15,
144:22, 147:8,
149:12, 150:2,
154:7, 154:10,
156:1, 166:13,
173:18, 173:24,
174:10, 187:17,
188:18, 193:16,
193:17, 194:13,
194:14, 205:6,
218:6, 219:8,
220:11, 221:5,
221:10, 222:1,
223:14, 226:9,
237:20, 238:7
risk
23:22, 39:15,
113:3, 128:22,
129:4, 129:6,
166:2, 166:24,
167:8, 167:12,
184:1, 227:9
risks
13:24
rit
106:4, 173:9
ritual
94:24
road
2:5
robert
1:5, 4:12
rochester
211:19, 211:22,
212:4, 212:10,
212:14
roger
158:23, 161:13,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

288

162:14, 214:15
**role**
25:2
**rolling**
26:13
**room**
75:21, 76:20,
78:9, 81:15,
86:17, 87:7,
88:20, 88:24,
89:14, 89:16,
90:12, 90:21,
91:12, 91:16,
93:16, 100:5,
100:6, 100:12,
101:4, 101:13,
101:15, 101:18,
102:5, 102:10,
102:17, 103:10,
104:1, 108:2,
108:6, 114:24,
114:25, 121:22,
122:8, 122:24,
129:22, 130:14,
131:8, 133:15,
134:12, 134:19,
135:21, 145:10,
145:19, 148:10,
148:15, 148:19,
148:21, 148:22,
151:21, 152:13,
154:10, 184:11,
185:10, 199:23,
199:25, 200:25,
223:1, 230:11,
233:11, 233:12,
233:14, 235:19,
236:16, 237:24
**roommate**
97:9, 97:11,
97:15, 126:24,
130:9, 130:13,
130:22, 134:4,
134:6, 148:1,
149:6, 152:14,
164:20, 164:24,
198:4, 198:11,
198:12, 198:20,

198:24, 223:18,
225:6, 226:2,
226:13
**roommate's**
126:24, 130:24,
134:6, 134:8,
198:6, 198:13
**roommates**
91:12
**rooms**
103:5, 132:19
**rotating**
9:10
**rough**
195:16, 195:18,
238:15, 238:16,
238:19
**roughly**
64:7, 138:11
**rpr**
240:25
**rule**
6:14, 12:12
**rules**
8:14
**ruminate**
235:3
**run**
74:20, 166:15
**running**
99:16
**rush**
52:14

---
**S**
---

**s**
2:1, 147:16
**s-c-h-i-c-c-i-t--**
**a-n-o**
30:5
**sacchetti**
1:4, 4:12,
49:1, 49:18,
49:21, 50:14,
56:21, 120:19,
152:6, 155:2,
155:11, 160:21,
161:22, 167:17,

168:11, 168:23,
171:20, 172:3,
173:4, 174:22,
175:6, 175:13,
175:16, 175:19,
176:2, 176:14,
176:23, 177:1,
178:2, 178:11,
178:12, 178:19,
181:15, 181:20,
182:17, 183:3,
185:20, 205:11,
207:20, 208:13,
235:1
**sacchetti's**
53:6, 168:9
**sadness**
165:15
**safely**
31:8
**safety**
65:2, 71:1,
77:25, 87:21,
126:16, 137:11,
140:5, 140:9,
191:11, 191:24,
211:23, 238:3
**said**
46:7, 60:2,
60:17, 64:16,
66:18, 70:5,
77:24, 79:10,
87:6, 104:20,
109:11, 109:17,
110:5, 121:9,
122:3, 125:3,
130:23, 130:25,
134:4, 134:5,
148:13, 152:4,
153:11, 154:14,
164:20, 168:18,
172:15, 186:23,
188:3, 190:5,
193:19, 193:21,
193:22, 193:24,
194:17, 194:20,
194:25, 199:25,
201:11, 201:23,

201:25, 203:8,
205:25, 206:13,
206:20, 211:6,
211:12, 211:14,
216:4, 217:2,
221:6, 222:2,
226:5, 229:1,
235:17, 239:12,
240:17
**salaried**
35:19
**salient**
43:4
**same**
9:2, 11:23,
11:24, 12:20,
12:21, 20:4,
22:14, 22:25,
23:7, 31:17,
32:3, 58:9,
63:22, 66:4,
69:5, 70:12,
74:22, 84:6,
84:10, 84:11,
84:12, 85:17,
85:19, 118:13,
122:17, 133:6,
137:16, 137:23,
140:11, 163:24,
192:17, 202:1,
203:14, 206:21,
207:4, 209:8,
224:18
**sample**
27:24
**sat**
46:21, 47:1
**saturday**
103:4, 103:5
**saw**
6:17, 77:7,
77:12, 77:13,
119:24, 120:19,
158:3, 164:25,
165:1, 170:3,
180:23
**say**
12:8, 23:4,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

289

23:10, 24:18,
25:23, 27:11,
27:13, 28:9,
29:12, 31:8,
32:5, 32:20,
32:21, 33:10,
36:18, 36:25,
37:2, 43:14,
46:2, 54:20,
55:2, 55:16,
55:18, 57:12,
59:5, 71:2,
71:3, 71:9,
72:20, 82:17,
83:24, 90:9,
90:12, 99:4,
101:13, 102:1,
110:5, 112:16,
116:22, 122:1,
131:15, 133:23,
145:5, 146:5,
151:5, 154:16,
166:8, 168:1,
172:3, 172:6,
172:9, 180:3,
183:23, 184:12,
184:13, 193:23,
200:14, 203:12,
205:18, 205:19,
206:16, 210:10,
210:18, 210:23,
210:24, 228:10,
228:19, 229:12,
230:2, 230:16,
233:6, 234:6,
238:2
**saying**
40:5, 48:1,
48:8, 57:14,
60:8, 69:10,
71:25, 91:2,
99:4, 103:3,
104:22, 104:24,
106:2, 120:11,
122:1, 122:17,
129:17, 130:20,
130:22, 133:24,
135:10, 136:1,

137:17, 139:23,
139:24, 139:25,
144:15, 146:3,
150:11, 152:10,
153:5, 153:6,
154:20, 154:23,
155:14, 167:18,
179:4, 179:18,
184:6, 185:3,
201:5, 205:9,
205:21, 206:5,
207:4, 219:22,
219:24, 230:22,
230:25, 236:2
**says**
57:12, 70:25,
104:7, 104:25,
153:19, 154:9,
154:14, 154:17,
157:13, 161:19,
164:25, 171:16,
175:23, 177:11,
184:15, 198:24,
199:16, 201:6,
206:6
**scan**
12:4
**scary**
184:8
**scenario**
110:6
**scenarios**
219:15
**scene**
81:8, 146:23
**schedule**
37:3
**scheduled**
158:5
**scheduling**
14:16, 36:7
**scherrenberg**
74:7, 75:20
**schiccitano**
30:4
**schizoaffective**
178:21, 178:24,
178:25, 179:1,

179:2, 179:3,
179:12, 179:17,
180:4, 181:4,
207:10
**schizophrenia**
82:21, 179:13
**scholarship**
96:12, 96:15,
96:17, 96:22,
99:8, 99:9,
222:18
**school**
97:5, 209:17,
210:19, 235:1
**schools**
216:24
**schroeder**
121:8
**sciences**
35:11
**scientific**
15:17, 16:4
**scientifically**
37:11
**score**
15:10, 163:21,
165:22
**scores**
25:22, 25:24
**scramble**
61:20
**scrambled**
71:18
**scratch**
57:14
**scrutiny**
200:1
**se**
150:3, 150:11
**searched**
81:14, 122:24
**second**
48:25, 49:2,
53:6, 56:10,
57:17, 112:6,
117:16, 121:8,
125:10, 166:16,
174:2, 174:12,

175:13, 195:10,
195:25, 221:21
**secondary**
162:21
**seconds**
210:7
**secretary**
224:1, 224:2
**section**
57:17, 58:22
**secure**
115:11
**securities**
15:25, 27:7,
32:1, 32:19,
32:21, 33:2,
33:12, 33:13
**sedate**
184:17
**sedative**
180:14
**see**
7:23, 11:7,
13:10, 15:7,
16:7, 16:17,
16:19, 18:17,
22:16, 26:20,
32:3, 51:9,
67:5, 70:18,
71:20, 71:24,
72:3, 72:14,
73:12, 97:6,
101:24, 110:25,
111:3, 118:7,
120:20, 142:20,
145:6, 158:25,
159:2, 162:3,
165:3, 174:8,
174:13, 184:10,
201:5, 213:6,
216:24
**seeing**
137:15, 181:4
**seek**
111:8, 120:11,
121:3
**seeking**
64:25, 225:11

seem
22:10
seems
219:6, 220:6
seen
6:6, 6:15,
8:12, 16:21,
43:9, 63:3,
76:22, 102:1,
102:7, 102:12,
107:5, 107:6,
121:1, 129:22,
158:21, 163:16,
163:20, 164:18,
164:23, 168:24,
169:8, 170:21,
171:17, 178:9,
178:16, 187:9,
197:2, 200:17,
204:19, 204:22,
206:7, 213:7,
213:13, 213:15,
213:19, 213:22
sees
11:25, 199:18
seizure
175:3
seizures
119:19, 141:8,
141:12, 214:20,
224:21, 225:3
seldom
26:21
selective
48:8, 58:18
self
127:15, 169:24
self-care
83:2, 85:5
self-medicated
143:4, 180:10,
181:16
self-medicating
143:9, 143:14
self-medication
143:11
semester
66:1, 84:17,

96:8, 96:20,
98:7, 98:8, 98:9
send
128:9, 144:2,
184:18
senior
36:1, 152:21
sense
38:18, 39:5,
53:18, 53:20,
92:11, 100:21,
104:9, 114:19,
127:12, 210:18,
221:13, 223:8,
227:25, 229:2,
229:3, 229:4,
236:2
sensed
168:11
sensitivity
208:14
sent
66:9, 124:16,
171:5, 186:17,
186:18, 201:20,
211:18, 211:20,
233:10
sentence
118:13, 154:9
sentimental
106:8
separate
85:16, 151:14,
207:18
separated
130:13, 146:21,
184:9, 188:23,
189:23
separating
148:1, 149:6
separation
114:23
seppuku
94:18, 95:14,
95:22
september
216:10, 216:15
sequence
56:22, 66:24

series
15:9, 55:7,
171:5, 171:8,
222:3
seriously
212:11
services
119:22, 120:1,
120:7, 120:10,
121:4, 174:5,
191:10, 212:18,
213:2, 219:18
serving
4:15
session
174:16
set
5:18, 67:13,
216:11, 219:15,
239:10, 240:21
settings
186:12
several
18:8, 18:13,
26:1, 27:4,
29:24, 32:23,
35:10, 40:3,
101:17, 114:20,
135:6, 177:13
severe
160:16, 163:22,
212:19
sex
108:14, 197:11
shame
97:23, 221:15
shared
97:19, 126:2
sharing
211:3
sharp
22:15
shelter
151:10, 151:13
shifts
159:15, 165:15
shoe
228:25

shoots
224:7
short
62:2, 220:14,
223:24
short-term
231:9
shorthand
240:13
shortly
220:24
should
14:14, 40:22,
46:2, 47:24,
57:12, 57:13,
120:11, 128:16,
131:25, 132:12,
133:10, 139:16,
139:18, 178:11,
200:7, 205:21
show
6:13, 63:15,
106:22, 158:12,
164:4, 164:6,
173:16, 207:6,
207:7, 221:24
showed
96:7, 123:4,
167:16
shower
204:1
showing
116:17, 116:23,
120:15
shown
167:22
shows
122:6, 125:18,
223:19
si
165:16, 165:17
side
26:8, 27:4,
27:18, 28:22,
29:9, 29:18,
32:15, 215:4
sign
63:8, 83:19,

127:21, 127:25,
131:18, 238:11
**signal**
213:16
**signature-k1pdc**
240:23
**signed**
6:25, 127:22
**significance**
16:4, 231:6
**significant**
100:18, 116:18,
130:11, 169:7,
169:11, 201:9,
223:5, 230:4,
230:6, 231:4
**significantly**
204:10
**signing**
240:14
**signs**
116:17
**silence**
80:4, 80:6,
135:21
**silent**
79:19, 79:24,
136:9, 198:7
**similar**
193:20
**simple**
126:25
**simply**
16:24, 17:6,
58:14, 143:12
**simultaneously**
9:15
**since**
25:16, 35:5,
42:25, 48:21,
69:10, 93:20,
160:5, 213:7
**sine**
193:12
**singled**
64:19
**sir**
13:1, 34:23,

58:6, 66:2
**sister**
106:3, 111:25,
188:21, 188:23,
189:14, 237:16
**sit**
25:18, 196:6
**site**
21:24, 107:16
**sits**
200:17
**sitting**
15:3, 15:9,
200:22
**situation**
73:17, 109:22,
143:23, 144:8,
144:17, 197:17,
231:18
**situation-specif-
ic**
146:14
**situations**
11:7, 124:1
**six**
181:2
**skill**
13:14
**skills**
14:5
**slate**
236:5
**sleep**
150:22
**sleeping**
90:17, 150:23
**slicing**
95:7
**slight**
166:12
**slightly**
46:10
**small**
27:21, 27:25,
28:4, 213:20
**smaller**
48:13, 49:12
**smashes**
200:19

**smothering**
187:24
**some**
12:6, 12:16,
20:16, 23:21,
24:15, 34:1,
38:17, 39:13,
40:10, 42:12,
42:13, 44:14,
51:8, 54:13,
65:5, 69:13,
72:19, 86:15,
86:17, 87:6,
87:25, 88:5,
88:6, 90:22,
93:24, 99:1,
100:20, 104:17,
106:5, 115:8,
119:14, 119:16,
121:17, 135:25,
145:4, 146:6,
146:11, 146:13,
146:18, 146:19,
153:2, 154:5,
154:6, 159:3,
161:3, 161:9,
165:1, 166:12,
170:8, 171:2,
181:20, 184:20,
191:11, 192:18,
192:20, 196:19,
207:14, 209:15,
209:18, 210:17,
216:4, 222:12,
230:23, 235:7
**somebody**
55:17, 59:24,
70:25, 79:21,
103:6, 122:17,
122:20, 127:19,
129:23, 129:24,
132:14, 133:13,
134:11, 151:16,
184:10, 200:13
**somehow**
71:19
**someone**
40:4, 48:14,

84:13, 87:24,
90:18, 97:22,
121:1, 127:9,
127:13, 127:15,
129:25, 132:20,
132:21, 133:1,
133:13, 139:20,
144:18, 151:5,
154:4, 184:3,
184:21, 191:9,
200:13, 202:16,
209:14
**someone's**
180:2, 199:25
**something**
14:17, 23:8,
23:21, 26:10,
40:19, 54:20,
55:4, 55:19,
55:22, 55:24,
59:24, 60:20,
60:22, 61:1,
68:9, 68:16,
69:7, 69:14,
70:5, 83:3,
83:5, 83:20,
83:24, 84:22,
85:6, 92:5,
95:17, 103:2,
103:4, 130:10,
141:17, 145:7,
157:17, 157:25,
168:11, 169:4,
172:24, 175:21,
188:7, 188:10,
193:19, 196:5,
203:10, 204:15,
204:17, 216:6,
221:24, 222:16,
224:25, 226:25,
228:22, 229:25,
230:16, 231:4
**sometime**
93:9
**sometimes**
12:14, 16:16,
17:4, 40:2,
40:4, 40:7,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

292

40:9, 161:14,
212:25
**somewhat**
161:15
**somewhere**
38:3, 45:21,
46:8, 46:9,
46:14, 142:10,
164:24
**son**
4:14, 171:21,
178:20, 181:24,
183:5, 185:20
**son's**
155:15, 208:14
**soon**
146:4
**sorry**
16:6, 19:4,
22:21, 49:9,
57:13, 57:14,
62:4, 72:19,
72:22, 79:12,
91:4, 92:13,
96:2, 102:8,
113:14, 119:4,
124:22, 126:11,
128:24, 131:5,
141:11, 159:21,
161:8, 164:2,
164:4, 167:2,
174:11, 175:8,
176:6, 188:2,
197:5, 205:7,
214:22, 215:9,
216:2, 225:19,
227:21
**sort**
23:12, 29:8,
32:7, 32:23,
34:4, 41:19,
52:11, 100:8,
101:14, 144:19,
145:4, 151:6,
171:2
**sought**
225:15
**source**
39:18, 39:19,

48:6
**sources**
44:22, 47:7,
47:12, 47:13,
47:18, 54:23,
81:10
**spanish**
64:5
**spanning**
105:14
**speak**
48:5, 48:7,
55:5, 55:13,
84:15, 119:6,
170:17
**speaking**
69:23, 146:12,
179:8, 223:7,
237:21
**speaks**
12:15
**special**
210:20
**specialized**
211:5
**specialties**
10:14, 26:2
**specific**
16:3, 17:7,
17:21, 18:7,
23:22, 34:13,
36:24, 52:5,
58:21, 82:19,
84:25, 111:23,
200:11, 203:21
**specifically**
18:4, 19:8,
61:5, 83:1,
92:21, 120:3,
152:23, 168:10,
168:22, 172:23,
205:25, 220:22
**specified**
164:12
**spectrum**
10:17
**spencer**
74:1, 74:4,

81:9, 225:9
**spend**
30:18, 33:3,
46:15, 46:18,
151:4
**spent**
46:20, 63:14,
86:16, 87:6,
101:17, 151:1,
210:4, 210:7
**spice**
181:7, 181:9
**spills**
10:19
**spite**
88:5
**spoke**
39:6, 48:10,
148:7
**spoken**
48:10, 60:11,
103:19, 214:15
**spot**
7:23
**spring**
3:21, 62:16,
62:23, 63:21,
96:20, 98:9
**squarely**
12:18
**ss**
240:3
**st**
164:7, 164:25,
165:2, 202:11,
240:21
**stability**
150:6
**stabilizer**
141:22, 141:25,
214:23
**stable**
71:10, 115:11
**stabs**
133:13
**staff**
59:6, 60:3
**stage**
41:17, 41:19,

41:20, 41:21,
41:22
**stages**
41:18
**standard**
131:8, 238:16
**standing**
61:13, 64:12,
67:8, 70:22,
71:10, 89:8,
89:12, 90:3,
92:4, 92:21,
97:5, 222:8,
230:7
**standpoint**
24:24, 29:3,
42:10, 55:21,
100:13
**stands**
54:14
**staple**
141:25
**stare**
80:10, 135:23,
136:12, 137:14,
198:7
**staring**
75:15, 79:15,
134:10
**started**
51:7, 52:9,
138:13, 138:16,
158:6
**starting**
160:13, 212:6,
212:12
**state**
1:25, 4:4,
24:14, 24:16,
69:12, 128:18,
147:14, 166:2,
175:25, 232:14,
232:19, 233:14,
233:15, 233:19,
239:3, 240:2,
240:7
**stated**
108:13, 110:17,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

293

| | | | |
|---|---|---|---|
| 168:23 | stem | stressful | subset |
| **statement** | 96:12 | 204:10 | 26:15, 27:21, |
| 92:3, 92:19, | **step** | **stressor** | 27:25 |
| 119:3, 124:4, | 135:21, 136:22, | 111:13, 112:12, | **subspecialties** |
| 155:10, 176:20, | 145:8 | 113:3, 113:7, | 15:18, 35:12 |
| 193:15, 194:8, | **step-wise** | 114:3 | **subspecialty** |
| 208:12, 209:25, | 38:12 | **stressors** | 11:9, 15:22 |
| 211:2 | **steps** | 105:3, 105:7, | **substance** |
| **statements** | 41:9, 56:12, | 105:16, 117:3, | 15:19, 170:13, |
| 79:25 | 117:18 | 162:20 | 184:13, 195:7, |
| **states** | **steve** | **stretch** | 200:8, 215:22 |
| 1:1, 159:16, | 2:28, 218:17, | 11:23 | **substances** |
| 239:7 | 218:25 | **strike** | 143:5, 170:12, |
| **static** | **steven** | 73:2, 138:3, | 183:23, 207:14 |
| 103:8 | 2:27 | 189:9 | **substantial** |
| **stating** | **stevens** | **strikes** | 191:21 |
| 174:6, 216:11 | 24:16 | 54:14, 54:15 | **substantively** |
| **station** | **still** | **stripped** | 61:11, 61:18, |
| 145:8 | 19:20, 19:23, | 233:20, 234:5 | 111:15, 199:6 |
| **status** | 22:2, 26:3, | **strongly** | **succeed** |
| 161:25 | 66:10, 93:23, | 111:7, 157:18 | 68:6, 237:11 |
| **statute** | 124:9, 133:16, | **structural** | **succeeding** |
| 147:17 | 147:18, 183:4, | 12:3 | 225:20 |
| **stay** | 184:18 | **structure** | **successful** |
| 88:20, 90:19, | **stop** | 115:11, 150:6 | 84:18, 95:8 |
| 91:20, 91:21, | 158:13, 215:2 | **struggling** | **sue** |
| 91:23, 92:9, | **stopped** | 79:4, 110:3 | 61:12, 71:16, |
| 101:10, 101:13, | 14:2, 156:4, | **student** | 120:25 |
| 101:22, 102:13, | 156:12, 213:11 | 17:17, 68:1, | **suffering** |
| 103:9, 103:10, | **stops** | 68:4, 83:20, | 232:12 |
| 103:25, 104:11, | 170:18 | 110:25, 150:23 | **sufficient** |
| 115:1, 115:7, | **store** | **student's** | 37:16, 55:1, |
| 151:11, 152:13, | 156:5, 156:8, | 124:5 | 55:14, 139:10 |
| 176:16 | 156:12, 156:13 | **studied** | **sufficiently** |
| **stay-away** | **story** | 220:18, 220:20 | 44:17 |
| 85:25, 86:25, | 29:7, 33:7, | **study** | **suffocate** |
| 87:3, 90:24, | 33:8 | 216:25 | 193:15, 193:16, |
| 91:5, 91:11, | **straight** | **stuff** | 194:1, 194:12, |
| 101:5, 101:7, | 51:10, 149:21, | 51:21, 196:15 | 194:13 |
| 101:8, 154:21, | 176:16 | **style** | **suffocating** |
| 211:15 | **street** | 203:17 | 194:8 |
| **stayed** | 1:21, 2:24, | **subject** | **suggest** |
| 91:20, 101:12, | 35:1, 154:4 | 79:21 | 178:11 |
| 101:19 | **stress** | **submitted** | **suggested** |
| **staying** | 11:2, 204:20 | 50:16, 196:15 | 83:21, 90:19, |
| 102:4, 136:9, | **stress-induced** | **subpoena** | 110:24, 111:3, |
| 230:12, 235:23 | 82:23 | 3:17, 5:25 | 178:12, 201:11 |
| **stays** | **stresses** | **subscribed** | **suggesting** |
| 101:14 | 222:21 | 239:18 | 121:21 |

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

294

| | | | |
|---|---|---|---|
| **suggestion** | 20:6, 20:25, | **suicides** | 125:20, 126:22, |
| 90:17 | 22:8, 22:18, | 20:9, 21:2, | 127:3, 139:2, |
| **suicidal** | 22:22, 23:15, | 22:14, 27:19, | 142:2, 148:24, |
| 75:8, 75:17, | 23:23, 24:4, | 28:8, 95:2 | 159:23, 161:8, |
| 75:22, 76:1, | 24:21, 24:24, | **suite** | 163:13, 169:3, |
| 80:8, 82:8, | 25:2, 25:4, | 2:5, 2:14 | 169:15, 169:17, |
| 105:12, 105:13, | 25:8, 27:25, | **suited** | 171:4, 175:15, |
| 105:15, 106:5, | 29:18, 30:2, | 215:6 | 201:1, 201:5, |
| 106:9, 112:17, | 30:4, 30:7, | **sum** | 202:21, 205:19, |
| 113:5, 113:6, | 30:12, 57:3, | 32:14 | 207:22, 208:6, |
| 115:14, 116:16, | 93:22, 94:8, | **summarize** | 209:12, 221:11, |
| 117:6, 117:14, | 94:14, 94:18, | 9:6 | 226:12, 236:22 |
| 118:18, 165:17, | 94:24, 95:3, | **summary** | **surreptitious** |
| 165:20, 173:4, | 95:13, 95:20, | 57:25, 59:15 | 223:19 |
| 173:10, 176:15, | 105:4, 105:7, | **summer** | **survivors** |
| 177:3, 177:16, | 105:13, 105:15, | 204:1 | 10:18 |
| 177:22, 177:25, | 105:24, 105:25, | **sunshine** | **susan** |
| 178:4, 178:11, | 112:12, 113:3, | 204:2 | 84:2 |
| 185:21, 186:2, | 114:11, 114:15, | **superiors** | **suspended** |
| 186:11, 199:9, | 115:12, 115:17, | 59:9, 83:19 | 71:22, 92:22 |
| 199:12, 199:14, | 115:18, 115:21, | **supplement** | **suspension** |
| 200:2, 201:6, | 147:21, 148:11, | 195:25 | 99:19, 99:24 |
| 201:17, 201:19, | 148:23, 149:3, | **support** | **sustain** |
| 201:24, 202:2, | 149:10, 149:19, | 64:17, 64:25, | 84:17 |
| 202:4, 202:6, | 149:23, 150:1, | 67:7, 71:4, | **sustained** |
| 202:8, 205:2, | 183:16, 187:24, | 110:11, 165:6, | 83:3, 83:10, |
| 205:3, 205:5, | 201:7, 209:3, | 165:9, 222:19, | 84:6 |
| 205:14, 205:25, | 211:11, 211:19, | 234:17 | **swathe** |
| 212:5, 212:25, | 211:21, 212:11, | **supposed** | 64:25 |
| 223:15, 225:16, | 219:11, 219:13, | 14:14, 61:1 | **swear** |
| 225:23, 227:8, | 219:23, 220:4, | **supreme** | 119:6 |
| 227:13, 229:12, | 220:7, 220:11, | 24:22, 25:1 | **sweating** |
| 229:19, 229:20, | 220:12, 221:3, | **sure** | 125:4, 172:25 |
| 230:21, 230:23, | 221:4, 221:15, | 7:16, 8:7, 9:8, | **sweaty** |
| 231:1, 234:7, | 221:17, 221:20, | 12:6, 17:3, | 172:15 |
| 234:8 | 221:23, 223:16, | 20:3, 20:17, | **swept** |
| **suicidality** | 224:19, 224:24, | 23:16, 23:23, | 32:7 |
| 75:5, 79:19, | 227:7, 227:18, | 24:12, 25:10, | **swing** |
| 80:11, 80:15, | 229:13, 229:19, | 28:9, 31:16, | 127:14, 130:21, |
| 80:18, 185:8, | 230:1, 231:2, | 31:20, 32:3, | 134:18, 226:3 |
| 205:13, 205:16, | 231:22, 231:25, | 36:13, 36:18, | **swinging** |
| 205:23, 207:12, | 233:4, 233:5, | 38:15, 42:19, | 75:15 |
| 220:1, 227:5 | 233:23, 236:10, | 46:1, 47:5, | **switch** |
| **suicide** | 237:1, 237:7, | 59:20, 59:23, | 216:24 |
| 17:18, 17:21, | 237:13 | 68:18, 70:4, | **sworn** |
| 18:2, 18:5, | **suicide-related** | 75:11, 85:22, | 4:2, 239:7, |
| 18:7, 18:23, | 22:10 | 86:10, 107:10, | 239:18 |
| 19:8, 19:18, | **suicided** | 114:6, 124:18, | **swung** |
| | 219:16, 230:25 | | 74:4 |

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

**symptom**
12:21, 227:19,
233:3
**symptoms**
99:15, 105:21,
119:15, 127:4,
128:6, 162:5,
179:20, 207:11,
225:4, 227:3,
228:10
**synthesizing**
229:9
**synthetic**
181:7, 181:10,
181:11
**syria**
13:11
**system**
184:14, 204:18
**systems**
63:8

**T**

**t2**
213:16
**tag**
131:6
**taint**
25:12
**take**
5:22, 8:8,
19:1, 19:14,
24:18, 31:4,
50:19, 51:12,
54:19, 74:19,
101:1, 107:11,
128:13, 133:21,
138:22, 145:8,
146:4, 148:4,
152:1, 176:16,
177:9, 185:9,
185:16, 199:22,
200:25, 201:18,
201:21, 203:3,
203:7, 204:17,
205:4, 206:2,
234:23
**taken**
1:20, 74:23,

85:24, 90:13,
122:12, 126:23,
131:19, 132:12,
133:14, 133:18,
145:1, 145:3,
166:19, 172:24,
175:17, 203:23,
207:21, 207:22,
208:9, 213:14,
219:15, 219:16,
233:9, 237:5,
239:9, 240:10
**takes**
127:14, 140:17
**taking**
7:18, 107:8,
127:11, 127:12,
134:14, 135:14,
141:16, 141:17,
180:21, 187:12,
192:1, 199:10,
215:2, 215:6,
226:8
**talk**
51:22, 80:2,
80:3, 92:15,
167:24, 176:10
**talked**
51:23, 52:7,
54:18, 69:12,
130:23, 176:9,
185:2
**talking**
27:22, 28:12,
70:19, 112:3,
122:2, 123:7,
133:8, 169:24,
186:24, 192:19,
197:9, 222:14,
226:1, 232:1,
234:22, 234:24,
235:2, 235:12
**tally**
26:13
**tangent**
69:4
**tape**
223:19

**targeting**
44:22
**teach**
161:16
**teacher**
57:6, 61:21,
67:21, 68:20,
71:16, 72:10,
98:16, 231:13,
231:14
**teacher's**
71:4
**teaching**
23:16
**team**
81:22
**technology**
212:4, 212:10,
212:15
**technology's**
211:23
**ted**
81:23, 82:2,
82:4
**tegretol**
215:8, 215:9
**telephone**
124:23
**tell**
24:2, 24:3,
24:11, 25:18,
26:21, 27:20,
29:2, 29:13,
30:20, 34:17,
47:24, 50:13,
94:25, 100:23,
153:4, 155:19,
161:22, 175:19,
224:19, 224:22
**telling**
71:21, 72:4,
87:11, 88:19,
92:3, 101:21,
102:13, 134:11,
137:8, 155:15,
167:11, 201:15,
205:10, 210:5,
210:7

**tells**
136:22, 171:9,
198:21, 199:2
**temptation**
210:9
**ten**
31:4, 218:21
**tenure**
113:20
**term**
69:8, 69:16,
183:7, 190:18
**terms**
10:5, 29:11,
33:2, 33:3,
36:9, 45:9,
54:16, 55:23,
84:20, 99:25,
100:14, 102:4,
103:8, 112:1,
146:22, 146:24,
161:10, 166:2,
169:11, 169:12,
202:18, 216:7,
218:7, 226:23,
229:8
**terrorist**
10:20
**terrylene**
1:4, 4:12,
56:20, 56:21,
120:19, 174:21,
208:13
**test**
15:12
**tested**
99:13
**testified**
4:5, 8:4,
26:17, 27:1,
27:2, 29:17,
29:20, 29:23,
30:1, 30:11,
30:14, 105:19,
125:20, 160:23,
236:21
**testify**
26:21, 26:22,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

27:13, 95:11,
95:15
**testifying**
28:19, 37:22,
37:24, 123:19
**testimonial**
8:1, 25:17
**testimony**
6:15, 25:5,
26:12, 26:23,
27:10, 27:23,
28:23, 28:25,
29:11, 29:14,
30:7, 45:13,
112:7, 125:18,
196:23, 230:20
**testing**
98:20
**text**
92:15, 124:16,
125:15, 153:15,
153:19, 155:23,
156:23, 168:4,
169:13, 178:6,
199:16, 200:5,
201:20, 203:5
**texted**
152:3, 182:21
**texts**
125:6, 125:19,
171:5, 171:9,
171:14, 178:5,
186:17, 186:18,
187:1, 187:20
**th**
35:1, 89:2,
89:5, 89:20,
89:22, 89:24,
91:16, 93:9,
93:11, 102:14,
126:10, 126:11,
126:12, 126:16,
126:17, 151:22,
151:25, 173:12,
196:15, 225:15
**thank**
7:25, 13:9,
70:3, 123:9,

153:18, 215:9,
235:6
**theatrics**
195:4
**thelma**
121:7
**themes**
226:1
**themselves**
11:6, 112:18,
112:21, 117:5,
133:24, 134:1,
183:15, 183:19,
184:5, 184:14,
184:22, 227:11
**theory**
151:15
**therapeutic**
60:20, 60:21,
60:24, 61:1
**therapeutically**
10:25
**therapist**
216:18
**therapy**
17:14
**thereof**
240:19
**thing**
8:8, 12:9,
23:7, 37:4,
51:8, 69:5,
71:12, 101:4,
122:17, 133:6,
137:16, 151:4,
151:6, 185:11,
203:20, 207:4,
228:15
**things**
10:24, 16:17,
17:13, 18:8,
23:3, 29:8,
38:24, 44:1,
67:11, 83:15,
87:25, 103:7,
130:22, 131:1,
133:8, 134:10,
134:13, 134:20,

153:6, 159:3,
180:15, 203:1,
207:19, 218:14,
219:16, 223:11,
231:20, 237:22,
238:1
**think**
6:8, 7:16,
7:22, 12:21,
19:3, 21:20,
21:22, 22:6,
22:10, 24:23,
24:25, 25:5,
25:6, 25:22,
29:9, 29:19,
30:13, 30:14,
31:6, 31:8,
32:20, 37:1,
39:4, 43:14,
46:3, 46:8,
46:9, 48:3,
48:24, 49:3,
54:12, 54:17,
55:21, 62:8,
63:4, 66:22,
68:7, 68:8,
72:24, 77:6,
84:12, 85:11,
91:22, 93:18,
98:13, 104:15,
106:13, 106:14,
109:25, 116:9,
116:12, 128:7,
138:21, 145:22,
146:14, 147:4,
153:5, 164:1,
167:17, 169:22,
170:6, 171:20,
172:16, 172:24,
173:2, 175:21,
176:11, 178:6,
178:22, 183:6,
192:7, 192:12,
197:19, 199:6,
199:25, 202:20,
202:24, 209:12,
218:15, 222:23,
227:2, 234:11,

235:15, 238:5
**thinking**
72:18, 73:20,
75:4, 98:23,
108:17, 112:24,
116:15, 116:23,
117:4, 124:23,
174:16, 174:17,
180:20, 226:1,
231:1
**third**
56:19, 102:6
**this___**
239:18
**thought**
38:15, 43:3,
47:21, 48:10,
54:6, 94:4,
128:22, 129:4,
222:12, 224:5
**thoughts**
38:14, 234:4,
235:3, 237:21
**threat**
75:20, 99:23,
134:14, 135:2,
135:4, 194:3,
194:6, 198:6,
200:2, 200:6,
202:16, 237:10
**threatened**
64:18
**threatening**
129:11, 129:20
**threatens**
127:14
**threats**
105:24, 128:20,
129:4, 131:25,
133:24, 134:1,
134:2, 198:3,
198:11, 198:12,
198:13, 198:19,
198:20
**three**
27:2, 30:21,
35:24, 41:18,
46:20, 46:23,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

297

50:20, 54:1,
56:1, 63:7,
84:16, 138:16,
147:4, 177:5,
177:13, 185:1,
213:11, 228:6
**threw**
152:15
**through**
14:21, 19:15,
42:18, 42:22,
43:19, 44:21,
45:1, 47:6,
73:18, 85:9,
155:13, 162:1,
177:14, 185:2,
196:7, 196:9,
204:18, 227:15,
231:2, 234:6,
234:9
**throw**
160:15
**thumann**
58:8, 58:13,
58:24, 59:9,
60:6
**thumbdrive**
3:16, 5:12,
5:24, 43:9,
46:4, 46:25
**tickets**
229:17
**till**
210:5
**time-thought**
94:1
**timely**
36:13, 36:20
**times**
26:22, 27:14,
29:16, 46:12,
67:12, 119:17,
147:4, 156:23,
181:6, 185:13,
202:5, 202:6,
202:8, 204:19,
204:22, 230:21
**timing**
53:18, 98:17,

115:16
**tire**
229:25
**tissue**
163:8
**title**
22:16, 23:12,
239:10
**today**
4:16, 5:9,
5:12, 25:18,
26:18, 217:11,
217:23, 217:24
**today's**
46:16, 46:19,
47:3
**together**
27:12, 27:16,
39:3, 42:19,
69:17, 137:12,
187:11, 227:11
**toiletries**
104:14, 104:16
**told**
88:12, 88:15,
89:3, 89:13,
89:17, 92:20,
92:21, 102:24,
103:24, 104:4,
109:18, 109:20,
120:19, 124:12,
152:12, 152:13,
153:8, 156:9,
156:14, 161:13,
180:5, 180:9,
181:23, 182:2,
185:8, 186:17,
186:18, 187:22,
212:9, 212:17,
213:5, 216:16,
216:22
**tone**
66:23, 66:24,
236:7
**took**
14:19, 52:25,
78:14, 79:3,
112:1, 118:8,

123:2, 130:21,
170:23, 185:15,
223:6, 226:3,
231:14, 231:19
**topic**
17:21, 18:4,
23:22, 37:8,
37:9, 40:21,
57:1, 65:17,
109:9
**topical**
55:21
**topics**
9:2, 52:18
**tornadoes**
10:18
**total**
46:5
**totality**
137:19
**totally**
16:8, 200:9
**touch**
38:21
**touches**
55:9
**touching**
134:10
**tougher**
22:15
**toward**
47:15, 150:12,
165:13
**toxic**
10:19
**toxicology**
35:12
**track**
26:11, 26:12,
139:16, 139:17,
139:19, 139:21,
144:7, 144:25
**traffic**
36:7
**trail**
64:21
**trained**
81:22

**training**
9:16, 9:17,
11:17
**transcribed**
48:25, 52:23
**transcript**
195:20, 196:24,
239:8, 239:11
**transcription**
240:12
**transferring**
182:18
**translate**
169:25
**transpired**
78:3
**treat**
162:11, 214:20,
214:22, 215:15,
215:19
**treated**
50:8, 128:5,
131:13, 143:3,
222:6, 233:8
**treatment**
17:10, 23:1,
30:8, 52:18,
53:19, 53:22,
111:4, 119:18,
122:25, 127:24,
128:3, 130:16,
141:4, 141:25,
143:1, 184:15,
219:18
**tree**
131:15
**tregerol**
215:7
**trembling**
160:8
**triage**
44:21
**trial**
8:5, 26:23,
27:13
**tried**
180:6, 193:15,
193:16, 194:1,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

298

194:12, 194:13,
215:12
**triggered**
232:15
**trouble**
97:23, 98:5,
99:16
**true**
239:11, 240:12
**trust**
216:17
**try**
22:3, 144:19,
215:15
**trying**
18:17, 29:12,
44:25, 73:17,
78:19, 129:16,
159:22, 161:15,
166:7, 166:11,
189:16, 197:11,
214:21, 226:6,
236:4
**turn**
40:20, 237:22
**twice**
9:25, 23:7
**two**
27:2, 29:19,
46:20, 46:23,
47:19, 47:22,
49:1, 50:15,
81:10, 120:19,
123:8, 127:5,
127:7, 128:7,
132:17, 164:3,
169:25, 174:14,
177:1, 184:20,
190:8, 194:14,
196:17, 207:19,
210:25, 213:11,
218:23
**two-minute**
74:19
**two-person**
102:5
**type**
45:5, 52:22,

101:1, 163:9
**typical**
129:23
**typically**
17:12, 26:11,
41:13
**typing**
52:25

---

**U**

**uh-huh**
109:19, 164:10,
164:14, 174:23,
176:4
**ultimately**
44:2, 47:14,
47:16, 67:20,
99:25, 126:25,
128:5, 149:12,
200:23, 202:9
**unable**
14:18, 22:1,
39:11, 99:2,
109:15
**unaware**
92:10
**uncertain**
32:9, 39:3
**unclear**
82:19, 87:17,
90:7, 100:16
**uncomfortable**
67:16
**uncommunicative**
125:3, 125:5,
172:17, 172:18,
172:20
**uncuffing**
137:1
**undated**
7:14
**under**
58:22, 85:9,
99:23, 132:22,
133:16, 144:25,
146:16, 147:16,
168:18, 174:4,
183:25, 188:16,

219:14, 221:16,
235:24
**underlying**
140:2, 162:22
**understand**
4:15, 11:10,
13:18, 14:23,
34:21, 37:20,
40:15, 40:16,
47:5, 52:21,
120:9, 124:25,
129:10, 129:16,
132:10, 144:15,
147:3, 152:10,
161:17, 171:20,
183:22, 221:11,
229:1
**understanding**
53:23, 77:3,
88:3, 97:13,
100:10, 125:23
**understandings**
13:23
**understood**
70:4
**undertreated**
21:3
**unexpected**
137:21
**unfamiliar**
161:10
**union**
150:24
**unique**
10:22
**unit**
132:24, 133:17,
198:1
**united**
1:1
**universally**
210:24
**universe**
15:16, 15:24,
32:5, 34:1
**universes**
16:23
**university**
1:11, 4:11,

9:9, 9:17,
17:17, 56:14,
68:1, 68:3,
70:19, 70:21,
70:22, 71:8,
71:11, 71:21,
71:25, 72:4,
85:21, 86:21,
87:2, 87:11,
89:8, 89:12,
90:3, 90:8,
90:10, 91:6,
91:13, 92:3,
92:19, 93:14,
94:9, 96:15,
100:11, 100:20,
102:13, 103:14,
103:17, 103:21,
103:24, 104:4,
104:20, 109:16,
113:10, 113:20,
117:9, 117:14,
117:20, 123:11,
124:4, 147:9,
147:23, 149:7,
150:17, 154:24,
155:12, 155:14,
173:14, 191:6,
191:18, 208:13,
236:24
**university's**
114:21, 115:10
**unkempt**
107:23
**unless**
39:17
**unlike**
30:24
**unmanageable**
174:5
**unpack**
201:13
**unraveling**
116:17
**unreasonable**
103:1
**unrelated**
16:8

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

299

unremarkable
110:9, 231:18
unresponsive
192:1
unstable
160:5
unsuitability
65:3
unsuitable
64:23
unsympathetic
191:25
until
32:22, 58:12,
58:23, 82:13,
196:21, 208:1,
210:8, 210:10,
211:11, 235:13,
237:18
unusual
38:12, 95:3,
95:6
updated
8:22, 9:22
upper
65:1
upset
168:24, 169:8,
171:17, 178:9,
187:9, 197:16,
197:22, 199:18,
201:1, 206:7
upstate
29:21
urgency
67:13, 92:1,
114:20, 153:13,
155:20, 191:11,
191:23, 236:7
urgent
178:13
use
100:11, 115:8,
227:21
user
172:2, 172:5
using
180:23, 183:7,

183:23, 190:23,
202:24, 215:16
usually
8:8, 218:14

**V**

v-a-n-n-i-e-r
24:14
vacancy
94:4
vacuum
136:14, 137:18,
221:7
vannier
24:14
variant
115:8, 170:21,
181:9
variants
181:10
varies
30:20, 30:21
variety
5:7, 10:14,
39:18, 54:16,
54:22, 170:16,
179:6, 181:8,
202:3, 204:5
various
17:25
vary
31:2
vein
22:14
venn
16:19
venture
39:14
venued
28:16
verbally
214:6
verbatim
63:6, 64:3,
79:14, 217:23
verbiage
191:14
version
195:22, 238:17

versions
8:22
versus
19:18, 19:19,
22:14
viability
38:19
victims
140:24
video
51:2, 51:8
view
115:16, 148:3,
180:3
violence
16:15, 23:21,
123:20, 123:24,
124:1, 132:8,
132:15, 140:13,
140:22, 143:23,
144:17, 146:17
virgina
2:15
virtually
32:11
virtue
130:20, 131:21,
221:13, 223:19
visit
102:5, 107:16
visited
103:16
visits
228:17
vitae
3:20, 7:8,
7:13, 7:15, 7:20
vocational
49:9
voicing
225:23
volatile
228:7, 228:10,
228:12
volume
30:25
voluntarily
127:21, 127:23,

131:18
vr
64:16
vs
1:10

**W**

wait
168:19
walked
69:10
walking
51:24, 137:13,
189:15
wallet
87:19, 124:12,
152:17, 156:9,
156:15, 156:17,
156:20, 189:25
want
5:2, 23:16,
23:23, 25:4,
31:16, 37:11,
40:13, 47:5,
64:17, 67:24,
70:4, 71:5,
73:9, 75:11,
90:22, 108:14,
112:5, 116:9,
120:22, 134:18,
139:2, 142:1,
142:20, 144:2,
158:4, 177:12,
184:15, 184:16,
184:18, 197:19,
201:6, 210:5,
216:16, 231:12,
236:22
wanted
40:20, 53:17,
54:25, 73:4,
79:5, 84:15,
90:8, 90:10,
111:24, 113:8,
113:9, 113:21,
114:4, 158:16,
189:5, 190:6,
195:6, 195:7,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

210:9, 218:12,
225:9
**wanting**
85:1
**war**
13:12, 181:16,
181:21
**washing**
226:7, 226:14
**washington**
1:13, 2:25,
110:19, 115:9,
152:23, 223:21
**wasting**
210:12
**watch**
22:18, 22:22
**water**
20:23
**waters**
2:17, 3:4, 3:7,
4:7, 4:11, 5:1,
5:21, 6:3, 6:12,
6:21, 7:11,
8:14, 49:8,
62:7, 62:11,
62:14, 62:20,
63:1, 73:1,
74:21, 74:25,
76:16, 91:9,
106:11, 106:14,
106:21, 123:9,
129:15, 138:2,
138:5, 138:12,
138:15, 138:18,
139:1, 166:21,
189:8, 195:16,
195:19, 195:23,
208:6, 208:11,
214:8, 218:15,
218:21, 232:17,
232:22, 233:16,
233:22, 233:24,
234:2, 235:5,
235:7, 235:10,
238:6, 238:10,
238:15
**waters@wilsonels-**
**er**
2:18

**wave**
79:2, 79:4
**way**
10:17, 16:18,
29:10, 32:2,
32:3, 32:4,
32:8, 37:19,
38:17, 38:25,
39:10, 40:11,
40:15, 41:9,
48:2, 65:13,
68:25, 69:11,
73:3, 83:14,
85:9, 89:6,
91:18, 97:13,
106:6, 106:8,
109:25, 116:16,
127:24, 130:1,
130:17, 142:25,
143:13, 144:22,
145:11, 145:24,
153:23, 154:6,
154:8, 155:16,
155:19, 155:25,
156:4, 168:2,
179:22, 181:24,
184:19, 195:8,
196:19, 197:17,
218:14, 222:8,
225:1, 226:17,
227:14, 234:6,
234:10, 237:6
**ways**
137:4, 204:5
**we'll**
5:22, 41:13,
41:15, 41:16,
92:15, 101:14,
138:22, 145:10,
238:3
**we're**
5:2, 26:17,
27:22, 28:11,
31:2, 31:17,
40:7, 69:3,
71:7, 97:1,
131:17, 133:8,
139:2, 145:6,

146:5, 146:6,
171:4, 179:7,
192:19, 206:4,
232:1
**we've**
26:13, 196:7,
206:5, 207:25
**wear**
153:7
**web**
21:24
**website**
21:7
**weekend**
77:11, 151:18
**weekly**
216:12
**weeks**
48:19, 153:9,
177:13
**weitz**
34:6
**welfare**
130:7, 137:10
**well-being**
110:15
**welled**
160:16
**welner**
1:20, 3:3, 4:1,
4:8, 239:7,
239:15, 240:10
**went**
42:12, 46:24,
86:8, 86:18,
93:15, 101:11,
144:10, 153:14,
155:7, 155:17,
156:7, 160:24,
176:8, 176:11,
188:21, 188:22,
188:23, 190:1,
196:9, 202:11,
222:5, 223:11,
234:20, 235:16,
235:19, 236:16
**weren't**
87:6, 218:11,

222:19
**west**
35:1
**westpark**
2:14
**whatever**
43:14, 85:16,
116:24, 145:16,
151:17, 155:4,
185:2, 204:14,
224:21, 228:14,
234:16
**whenever**
108:13, 109:7
**whereof**
240:20
**whereupon**
74:23, 166:19,
208:9, 238:20
**wherewithal**
14:6, 196:6
**whether**
15:18, 18:18,
21:21, 23:14,
24:4, 27:7,
32:3, 34:17,
34:18, 42:8,
42:9, 59:6,
59:7, 60:3,
60:4, 65:19,
84:11, 84:21,
84:23, 86:14,
87:6, 90:2,
91:15, 91:17,
97:4, 98:24,
98:25, 101:24,
101:25, 102:25,
106:9, 108:4,
111:20, 112:2,
112:23, 112:25,
113:2, 114:22,
114:23, 114:24,
115:1, 115:6,
121:1, 121:2,
121:8, 133:9,
133:10, 140:16,
140:18, 141:11,
142:21, 143:11,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

301

143:12, 144:14,
144:18, 145:6,
145:9, 145:16,
145:18, 151:15,
170:12, 170:19,
170:22, 170:25,
172:7, 173:9,
191:18, 193:11,
194:25, 200:7,
200:14, 200:21,
200:22, 204:10,
204:16, 204:18,
209:16, 209:17,
214:19, 231:6,
236:4
**white**
213:17, 228:25
**whoever**
166:7
**whole**
27:24, 126:22,
185:11, 231:24
**willing**
151:16
**wilson**
2:12
**wire**
217:17, 218:13
**wired**
217:25, 218:10
**wise**
240:18
**wiser**
227:11
**wishes**
140:24
**withdraw**
73:13
**withdrawal**
61:21, 63:10,
65:25, 71:19,
96:9, 96:10,
98:9
**withdrawn**
71:15, 172:15
**withdrew**
63:8
**within**
1:24, 4:3,

10:16, 14:13,
17:7, 17:24,
18:6, 18:8,
19:9, 27:7,
28:3, 32:24,
35:18, 44:1,
44:18, 48:2,
55:19, 67:12,
71:11, 90:4,
105:16, 114:8,
157:6, 169:19,
178:5, 201:3,
220:14, 223:4,
223:24
**without**
13:13, 39:10,
87:20, 88:5,
123:12, 212:5,
213:14, 230:12
**withstanding**
67:16
**witness**
3:2, 4:1,
50:10, 51:1,
106:16, 166:15,
207:23, 208:2,
208:4, 232:4,
238:7, 238:12,
240:10, 240:20
**witnessing**
190:19
**wondered**
106:8, 173:9
**word**
54:19, 66:17,
66:20, 172:16,
178:22, 190:21,
190:22, 190:23,
201:8
**wording**
55:23, 56:1
**words**
8:24, 38:13,
83:9, 130:19,
135:20, 140:16,
200:8, 200:9,
227:12
**work**
17:4, 31:7,

32:12, 34:3,
35:17, 37:16,
39:3, 67:21,
68:4, 196:4,
196:14, 238:3
**worked**
22:7, 33:17,
33:21, 34:18,
38:12, 132:19,
146:16, 209:13
**workers**
27:3, 31:21,
32:16, 34:1,
34:2
**working**
16:25, 17:3,
17:6, 27:17,
30:18, 31:2,
34:9, 34:24,
41:24, 67:22,
204:17
**workplace**
209:17
**workup**
12:14
**worried**
173:8
**worse**
169:22, 170:21,
224:23, 226:11,
229:22
**worsening**
72:18, 73:20,
75:3
**worst**
203:19
**wouldn't**
7:18, 10:22,
24:6, 61:7,
61:8, 69:1,
84:16, 84:17,
150:23, 172:7,
195:17, 199:23,
200:3, 218:10,
219:23, 230:17
**writes**
176:14
**writing**
23:7, 54:9,

228:16
**writings**
67:3
**written**
23:10, 178:4
**wrong**
168:11
**wrote**
23:8, 64:15,
167:9

| X |
|---|

**x**
1:3, 1:17

| Y |
|---|

**yeah**
7:24, 17:3,
38:9, 39:23,
101:3, 163:15,
168:12, 172:2,
173:20, 173:23,
184:7, 184:20,
188:20, 195:17,
196:11, 208:3,
219:21
**year**
8:22, 9:15,
14:16, 14:17,
14:19, 14:20,
18:16, 26:22,
27:14, 33:10,
33:11, 33:12,
166:14, 169:10,
226:16
**year-ago**
34:4
**year-old**
67:25, 68:18,
208:21
**years**
8:5, 11:9,
14:1, 14:9,
14:15, 21:1,
25:24, 26:25,
27:2, 27:12,
29:24, 30:3,
31:11, 32:17,

Transcript of Michael Welner, M.D.
Conducted on July 14, 2017

302

| | | | |
|---|---|---|---|
| 32:23, 33:25, 34:16, 159:13, 213:11 | **00141** 107:4 | 42:2, 72:25, 159:16, 160:5, 160:14, 213:7 | **2001** 20:21, 21:11, 23:9 |
| **yelling** 84:15, 118:12, 160:8 | **00455** 1:9 | **15** 1:9, 138:16, 158:6, 158:15, 159:17, 174:2, 210:10 | **2003** 13:21, 63:6 |
| **yesterday** 37:10, 217:18, 218:1 | **01** 208:10 | | **2004** 19:4, 19:23 |
| **york** 1:21, 1:22, 1:25, 4:4, 9:12, 9:14, 18:19, 29:20, 29:21, 33:23, 35:2, 240:2, 240:4, 240:8 | **05** 208:10 | **150** 1:21 | **2007** 14:1 |
| | **06** 166:20 | **16** 1:22, 21:1 | **2010** 14:1 |
| | **0775** 62:17, 62:21, 63:2 | **17** 20:23, 93:11 | **2013** 3:21, 44:16, 53:21, 57:12, 57:13, 57:14, 61:12, 61:19, 62:3, 62:5, 62:16, 62:22, 65:25, 72:16, 72:23, 78:5, 84:2, 96:8, 117:24, 119:13, 121:16, 124:20, 160:15, 164:9, 165:19, 174:24, 175:7, 202:1, 212:19, 213:3, 213:14, 214:8, 216:10, 216:16 |
| | **09** 74:24 | **18** 22:21, 164:9 | |
| **young** 223:17 | | **1855** 2:5 | |
| **yourself** 35:21, 35:22, 104:14 | **—— 1 ——** **1** 1:22, 138:14, 158:5 | **19** 23:17, 70:5 | |
| **yvonne** 155:3 | **10** 14:15, 27:12, 28:10, 57:20, 70:5, 158:10, 159:7, 160:6, 166:22, 167:5, 167:6, 181:2, 210:7 | **1996** 14:21 | |
| **—— Z ——** | | **1997** 21:11, 24:21 | |
| **zelaya** 216:8, 216:16 | | **1998** 35:5 | |
| **—— $ ——** | **101** 63:23, 65:25 | **1999** 19:15 | |
| **$3,250** 217:10 | **1011** 175:9 | **1:—cv—rbw** 1:9 | **2014** 3:21, 18:17, 57:7, 57:12, 57:14, 57:15, 62:16, 62:23, 63:21, 66:5, 73:4, 82:13, 103:21, 107:2, 107:3, 107:17, 111:13, 113:10, 113:15, 113:17, 114:3, 121:22, 122:8, 123:12, 126:6, 182:21, 232:11 |
| **—— . ——** | **106** 3:22 | **—— 2 ——** **2** 74:24 | |
| **.6607** 2:26 | **11** 10:20, 58:5, 160:6, 197:7, 216:15 | **2.75** 64:8, 96:20, 98:10 | |
| **.8550** 2:7 | **112** 64:5 | **20** 24:3, 24:15, 28:10, 34:4, 67:1, 160:15, 164:9 | |
| **.9300** 2:16 | **12** 6:24, 58:9, 166:20, 208:19, 214:8 | **2000** 23:10, 62:4 | |
| **—— 0 ——** **00** 138:14, 158:5, 185:14, 207:23, 207:25, 237:18 | **13** 160:15 | **20001** 2:25 | **2015** 18:18, 18:19 |
| **00140** 107:4 | **14** 1:22, 20:8, | **20002** 1:13 | **2016** 9:3, 18:16, |

41:25
**2017**
1:22, 6:25,
9:2, 18:17,
42:25, 48:21,
239:19, 240:22
**2018**
164:9
**202.724**
2:26
**206**
64:1
**21**
174:24, 240:21
**213**
64:3
**219**
3:5
**22102**
2:15
**224**
35:1
**23**
24:21, 67:25,
68:18, 93:23,
117:24, 121:24,
122:2, 208:21
**232**
3:6
**235**
3:7
**24**
107:3
**25**
25:24, 31:10,
175:7
**26**
6:14
**27**
7:14, 121:16,
212:19, 213:3
**28**
42:18, 42:22,
43:19, 44:15,
45:2, 47:6,
74:1, 78:5,
89:2, 89:22,
121:22, 122:8,

126:10, 126:11,
126:16, 144:23,
216:10, 225:15
**29**
50:17, 86:5,
89:5, 89:20,
89:24, 91:16,
93:9, 93:11,
102:14, 105:20,
121:22, 122:8,
123:12, 126:6,
126:12, 126:17,
144:23, 151:22,
151:25, 165:19,
171:6, 173:12,
178:6, 183:3,
232:11

---
**3**
---
**3**
74:24
**30**
6:25, 31:7,
35:1, 38:4,
42:25, 46:10,
47:22, 48:16,
48:21, 53:4,
124:11, 138:14,
182:21, 195:20,
196:15, 210:5,
210:6, 210:8
**305.571**
2:7
**31**
107:2
**32,500**
46:13
**3250**
45:17
**33004**
2:6

---
**4**
---
**4**
138:14
**4.0**
63:6, 96:7,
96:9, 96:11,

98:7, 98:8,
98:18
**40**
31:5, 107:20
**42**
1:21
**441**
2:24
**46**
165:23, 166:6,
238:20
**470**
2:5
**48**
163:22
**49**
166:6

---
**5**
---
**5**
158:5, 158:6,
158:15, 166:20,
185:14, 237:18
**50**
38:4, 45:21,
46:8, 46:11,
46:12
**51**
158:13, 167:17
**510**
2:14
**52**
164:2, 164:7
**57**
153:16
**58**
74:24

---
**6**
---
**6**
207:23, 207:25,
208:10, 210:5,
210:6, 210:8,
210:10, 238:20
**60**
31:5
**62**
3:21

**650**
45:16, 46:12
**6500**
45:17
**6th**
2:24

---
**7**
---
**70**
31:5, 31:8
**703.245**
2:16
**77**
173:17

---
**8**
---
**800**
1:12
**806**
35:1
**82**
3:14, 4:24, 5:3
**83**
3:16, 5:22,
5:23, 6:1
**84**
3:18, 6:6,
6:10, 6:14
**8444**
2:14
**85**
3:19, 6:19,
6:22, 62:12
**86**
3:20, 7:9,
7:12, 62:10
**87**
3:21, 62:15,
62:18, 106:13,
106:16
**88**
3:22, 106:12,
106:20, 106:23

JOURNAL OF FORENSIC
SCIENCES

*J Forensic Sci*, September 2014, Vol. 59, No. 5
doi: 10.1111/1556-4029.12470
Available online at: onlinelibrary.wiley.com

**PAPER**

**GENERAL**

*Michael Welner,*[1] *M.D.; Emily E. Davey,*[1] *M.A.; and Adam Bernstein,*[1] *B.A.*

# Peer-Reviewed Forensic Consultation in Practice: Multidisciplinary Oversight in Common Expertise



EXHIBIT
D
_____

**ABSTRACT:** The fallibility of forensic science consultation is an ongoing and major justice concern. Prospective peer-reviewed forensic consultation has over 10 years of application in American criminal and civil courts, adapting from the traditional oversight of teaching hospitals, rules of evidence and discovery, conventions of testimony of expert witnesses, and attorneys' overall trial strategy. In systematizing heightened oversight, this process ensures greater accountability in forensic science consultation. The integration of peer reviewers' complementary expertise and experience enhances the sophistication and overall quality of assessment. Forensic examination frequently involves the interface of different specialties. Multidisciplinary peer review augments expert proficiency with that of professional peers having different vantage points from relevant disciplines. This approach ensures greater sophistication of a case inquiry, built-in accountability, and streamlined processes when multiple experts are necessitated. Here, the authors present examples of several cases and the primary and secondary benefits of this collaborative, rigorous, cross-disciplinary exercise.

**KEYWORDS:** forensic science, expert witness, peer-reviewed forensic consultation, peer review, forensic evaluation, oversight, multidisciplinary consultation

Expert witnesses are placed on a pedestal by the attorneys who present them and may also be highly valued by juries for varying attributes of both juror and expert (1–4). Jurors may have little choice but to simply trust that the science presented before them is correct. However, experts within the forensic sciences are not immune to error (5–9), the consequences of which can be enormous. Notwithstanding simple oversight or human error, experts must deal with bias and pressure from the retaining party (10). Peer review, a valued practice in clinical settings (11), is emerging as a safeguard against human error on the witness stand (12,13).

The term peer review in forensic sciences may suggest a retrospective critique of work already completed, such as for learning or audit purposes. However, when engaged continuously throughout an evaluation, peer review serves to prospectively marshal oversight and protect the examination from bias, ensure its diligence, and enhance its adherence to established scientific understandings of a given area. Experts with complementary or supplemental expertise provide not only oversight, but the quality of in-service training that enhances the expertise of the examiner and confidence in the foundation of the examination. No two pathologists, for example, have identical expertise; each can learn from the experiences and erudition of the other.

Prospective peer review disciplines the forensic consultation before mistakes happen (14). The oversight of peer reviewers

who can interact with a primary examiner as knowledgeable, objective, and experienced academic and professional colleagues identifies blind spots of inadequate facts, inadequate knowledge, bias, and other contaminants before they advance far enough to seriously limit the validity of an exam. A peer-reviewed examination is always an organic, self-perpetuating process, and its actual form is determined by the observed needs and demands of the case itself.

Subspecialties do not mingle academically. Conferences for psychiatry understandably have no room for pathology, radiology, or toxicology, for example. Applied to the forensic inquiry, however, a specialist's lack of fluency in a separate discipline may fatally handicap the fact finding and analysis. Often, in cases such as death investigations or claims of sexual abuse, the overlapping expertise can be identified early. On other occasions, the relevance of another subspecialty emerges into view only after review of most, or even all, of the data. A question of central importance to the jury's understanding may position itself just beyond the expert's comfort zone.

The justice system tends to accommodate this challenge in three ways. First, attorneys may hire a separate expert in the specialty of newly appreciated importance. Second, the original expert may scramble through unfamiliar journals to quickly familiarize themselves with the literature, incorporating only a superficial understanding of the unknown field. And third, the expert may barrel ahead, take to the witness stand and tactically avoid questions on the minds of all of the jurors.

All of these approaches have flaws. Retaining an additional expert requires the costs of a completely separate record review and may slow the case down. Once that expert's work is

[1]The Forensic Panel, New York, NY 10001, USA.

Received 15 Oct. 2012; and in revised form 1 May 2013; accepted 14 July 2013.

© 2014 American Academy of Forensic Sciences

completed, pressures may arise from the conflicting perspectives of different specialties. A child psychiatrist may interpret data differently from a pediatrician. Attorneys, worried about how opposing counsel exploits such variation to damage the credibility of both, confront pressures to bring the opinions into conformity. Skilled attorneys working with collaboratively minded experts may successfully conduct such an orchestra. The artifice of opinions shaped directly by the litigant's trial strategy risks rendering the opinions to be reflective only of how an evaluation would be performed for that individual case. However, an expert's opinions should reflect conclusions one would have regardless of the retaining party, with facts being the same. Conformity arranged by the advocate risks producing something that is not scientific but "based on science," not unlike an adapted screenplay.

The expert who stops cold at the border of one's expertise is commendable for adhering to boundaries of their professional contribution and scientific integrity. But when a pivotal question remains unanswered, and that expert could clearly have contributed more than a layman, the result is that the jury is less informed than it needs to be.

The expert who explores literature outside one's own expertise to embrace the pursuit of knowledge is admirable for expanding their viewpoint. However, peripheral scientific exploration, no matter how well-intentioned, cannot replicate the contribution of a fully knowledgeable expert in the relevant field. Aside from possessing, necessarily, a comprehensive foundation of relevant knowledge, experts may rely upon different sources of information than their peers from other fields of specialty. An expert exploring uncharted territory on their own may not know what he does not yet know. So, too, is the jury in a similar position.

Forensic evaluation is an organic process, and each undertaking entirely unique. Some cases interfacing multiple forensic sciences require separate examinations by separate examiners. Other cases involve other disciplines only to a limited degree. In these instances, peer review is all the more important to address evidence that clearly tests the boundaries of customary expertise. Peer review enforces the responsible acknowledgement of the limits of a primary examiner's expertise while affording opportunity for the symphony of multiple disciplines to provide oversight.

Multidisciplinary peer review extends the quality of sophistication available to forensic analysis and relieves the examiner of the pressures of defining borders of one's expertise and necessary self-training in a vacuum. At first blush, one might not consider the oversight of others in separate disciplines to be peer review, because these colleagues do not share identical expertise and are therefore not "peers." This is a fair semantic argument. However, peer review in many academic subspecialty journals is conducted by multiple disciplines. Forensic psychiatry journals, for example, employ peer reviewers from sociology, criminology, nursing, and forensic psychology, as well as forensic psychiatry.

What establishes one as a peer is expertise in the core area of scrutiny, academic, or in this case, medicolegal. Different disciplines have expertise in the same topic. But because their specialties encompass distinctive training and literature, their individual expertise is actually incomplete by not allowing for cross-disciplinary scholarship. The inherent multidisciplinary nature of certain medicolegal questions invites the convergence of expertise unique to separate disciplines that overlap in their common knowledge of a particular topic matter, be it death in anxiolytic withdrawal, lithium toxicity, critical care morbidity, or mechanism of injury.

In practical application, peer-reviewed examination necessitates a number of critical intervals for conference. Primary examiners present the case data, the sources from which it originates, the tests employed and their results, as well as their analyses and conclusions to peer reviewers for critical feedback. These peer review forums provide structured oversight and accountability from the start – including accountability to peer reviewers that would be missing from blind peer review.

The specific role of each peer reviewer is defined by the unique challenges of every case. Peer reviewers educate the other case participants about the salient literature in a given area and teach the significance of the specialty data to evidence gathered by the primary examiner. Peer reviewers incorporate their unique expertise into actual evidence-gathering by augmenting questions for witnesses. Expertise from multiple forensic disciplines not only enhances these processes, but further aids the identification of pertinent sources of information otherwise unbeknownst to the primary examiner.

## Case Examples

### The Case of Mr. M

Mr. M was a 33-year-old male with a history of panic disorder, managed by his psychiatrist through a monitored regimen of quetiapine (Seroquel), paroxetine (Paxil), and alprazolam (Xanax). He was convicted of driving while intoxicated and sentenced to 30 days in jail. Jail policy prohibited benzodiazepines such as alprazolam due to their potential for abuse. To manage the risks of alprazolam withdrawal symptoms, including seizures, Mr. M scheduled to serve 7 days per week for 15 weeks to refrain from discontinuing alprazolam for one continuous month. He was medicated with a long-acting 10 mg dose of diazepam (Valium) prior to entering jail, on the expectation that the long-acting agent would diminish his risk for withdrawal seizure. He received his last dose of alprazolam the day before entering jail.

Jail psychiatrists prescribed paroxetine and chlorpromazine (Thorazine) to treat Mr. M's panic symptoms and to sedate anxiety. Two days later, he reported feeling unwell and was taken to the hospital unit at 5:20 am. He returned to his cell by 6:38 am with some degree of improvement. At 8:20 am, he went into the shower, and at 8:35 am, he was found unresponsive with blood in his mouth. He was pronounced dead at 9:10 am, just prior to his scheduled discharge. The autopsy found a previously undetected sarcoidosis of the heart, and sarcoidosis was listed as the cause of death.

The case was referred for a peer-reviewed forensic consultation to probe the range of potential causes of death, including the effects of alprazolam withdrawal. A forensic pathologist was assigned as the death investigation's primary examiner. Questions regarding the metabolism of diazepam and the nature of its protective effect necessitated the involvement of a forensic toxicologist, who was assigned to peer-review the forensic pathologist and contribute a more sophisticated analysis of the above. Alprazolam withdrawal has specific clinical manifestations, and other medicines were administered by the jail to limit panic symptoms, warranting additional peer review from an expert in psychopharmacology.

Jail medication administration records noted paroxetine was to have been given early in the morning of Mr. M's death, after he had been taken to the infirmary at 5:20 am. Testimony from jail officials and records offered contradictory information about what medication was administered and when. The toxicology

report from the autopsy showed a level of paroxetine higher than the upper limit of its therapeutic range and chlorpromazine at a level below the optimal therapeutic range. Neither diazepam nor alprazolam were detected in his system. The autopsy did not examine the oral cavity for signs of trauma, despite blood having been found in Mr. M's mouth.

When presenting the case to colleagues, the forensic pathologist primary examiner referenced experiences of those who have had terminal seizures in the shower. The forensic psychiatrist peer reviewer cited chlorpromazine's well-recognized risk for lowering seizure threshold, and paroxetine's clinical quality of noticeably calming some patients after they take the medicine. The forensic toxicologist calculated the amount of paroxetine and chlorpromazine that could have been administered from perimortem blood levels. The psychopharmacologist noted the potential for rebound anxiety and the need to distinguish rebound anxiety from physiological withdrawal from alprazolam. Both peer reviewers identified witnesses who might further fill the gaps and discrepancies of information, the timeline, and Mr. M's presentation along the course of his demise.

With a more comprehensive inventory of identifiable informants, and a more thorough line of questioning from peer review input, the primary examiner yielded a considerable amount of new historical data. Ultimately, cause of death was determined to be a terminal seizure due to alprazolam withdrawal, precipitating a cardiac arrhythmia in a heart scarred by sarcoidosis. Chlorpromazine was irrelevant to the cause of death for being dosed too low and too remote in time to have facilitated a seizure or to have itself caused an arrhythmia.

Ultimately, multidisciplinary peer review extended the scientific investigation to more fully query witnesses and to account for a fuller range of potential causes of death. The final determination resolved many of the ambiguities. Multidisciplinary peer review reduced the potential for speculation where gaps once existed.

### The Case of Ms. D

Ms. D, a 51-year-old female, resided in a group rehabilitation facility with diagnoses of mental retardation and bipolar disorder. Her psychotropic treatment plan included valproic acid (Depakote), risperidone (Risperdal), olanzapine (Zyprexa), trazodone (Desyrel), and lithium carbonate. In addition, she was prescribed levothyroxine (Levoxyl) for hypothyroidism.

A pharmacy incorrectly filled her lithium carbonate prescription, doubling her customary prescription dose, and the living facility staff dispensed her medication as ordered on the pill bottle. Seventeen days later, she began experiencing insomnia. A week after the onset of insomnia, she showed symptoms of agitation, such as screaming and loss of balance. Two days later, she began refusing to eat or drink, and her insomnia persisted. In another 2 days, her condition had deteriorated to the point where the living facility rushed her to the emergency room. Dehydration was immediately noted, and initial blood work revealed levels of lithium of 6.8 mg/mL, sodium of 166 mEq/L, potassium of 7.1 mEq/L, blood urea nitrogen of 98 mg/dL, and creatinine of 2.6 mg/dL. Doctors diagnosed Ms. D with severe dehydration, hypernatremia, and lithium toxicity. She died 2 days after entering the hospital from acute renal failure and hypotension.

The question presenting for forensic assessment related to breaches of standards once the patient had presented at the emergency room. Naturally, the erring pharmacy was targeted for

litigation, but civil claims for malpractice were filed against many targets. What standards were breached, and to what degree did they relate to Ms. D's demise?

An expert in inpatient psychiatric care acted as primary examiner in this matter. Lithium toxicity, whether its presentation reflected the course one would expect from the doubled dosage, and expectations for monitoring lithium levels given a change in her presentation, all drew early scrutiny.

Because a number of medical problems presented in the emergency room, and in the critical care setting preceding Ms. D's death, peer reviewers from emergency medicine and critical care medicine were assigned to provide oversight to the primary examiner psychiatrist. Evidence from medical records and laboratory testing were all the more emphasized because Ms. D was not verbal and could not have communicated changes in her presentation to a degree that would enable the customary pinpointing of when she began to feel differently. Due to her mental retardation and consequent possession of limited communication skills, traditional symptoms of lithium toxicity such as nausea or disorientation would have been impossible to diagnose.

Peer reviewers contributed to the determination that dehydration substantially aggravated the effects and presentation of lithium toxicity and risk to Ms. D's life. In this case, both peer reviewers examined chart documentation near the time of Ms. D's death to better draw out the medical decision-making during her critical stages. Chart documentation revealed that dialysis and aggressive treatment were withheld after her family opted for a "do not resuscitate" order and to withhold aggressive measures. The emergency physician and critical care specialist, with a sophistication beyond that of the experienced psychiatrist, were able to point out that the documentation reflected efforts by the medical staff to employ dialysis and other aggressive measures to save the life of Ms. D, prevented by the family. The peer reviewers, referencing available literature from their respective professional communities, expressed their opinion that Ms. D's condition was not so irretrievable that aggressive intervention would not have been able to reverse the effects of lithium toxicity on the patient's kidneys.

Ultimately, the primary examiner felt that the psychiatrist's management of the case breached standards by failing to monitor Ms. D's lithium level in the face of clinical changes, even though the patient was unable to communicate. However, peer reviewers with specific expertise in treating acute lithium toxicity beyond the boundaries of psychiatric inpatient management felt that this critically ill patient could have been saved by following the emergency department's recommended treatment plan. It was family – the same family that later brought litigation – that made a decision that ensured Ms. D's death. Whatever the breach of standard, its impact was reversible but for the decision to withhold treatment.

### The Case of Mr. C

Mr. C was a 79-year-old male suffering from end-stage cancer, complicated by a medical history that included hypertension, diabetes, and chronic renal insufficiency. He was admitted to the hospital to receive a standard chemotherapy regimen, but passed away 16 days later. During that hospital stay, Mr. C's will was changed. His debilitated condition introduced questions of his testamentary capacity.

Mr. C had completed a 10 day course of radiation when admitted to the hospital, and by the end of the treatment course, his medication profile included 21 different medications with

morphine and Percocet among them. During the course of hospitalization, a number of different specialists examined Mr. C, and his records show that many of the physicians and hospital staff noted how the patient's mental status continued to decline.

As a result, a medical toxicologist was assigned as primary examiner. Peer reviewers included a forensic psychiatrist to focus on the mechanics of establishing testamentary capacity and what had been established before the will was changed, and a critical care medicine specialist to speak to the progression of Mr. C's medical conditions during the course of his hospitalization.

Documentation of Mr. C's mental status was noted by the primary examiner to be contradictory. Eleven days into his stay, Mr. C was "obtunded···arousable to verbal command." Yet the following day Mr. C executed a last will and testament in the presence of an attorney, his sister, a nurse, and a social worker. Peer review from a forensic psychiatrist informed the primary examiner that waxing and waning of delirium could present in just this way. Delirium could also manifest in a superficially clear sensorium that under deeper scrutiny would reveal signs of confusion. Mr. C showed signs of depression, which needed to be accounted for in the overall assessment of whether the beneficiary of the changes to the will exploited Mr. C through undue influence.

However, forensic psychiatry could not inform the severity of medical conditions the days following Mr. C's radiation regiment. Delirium is the by-product of an acute medical condition or drug effect, but a psychiatrist does not have the requisite expertise in establishing the cause of the delirium. With no medical or toxicological source, the recorded history could be no more than a reflection of who is doing the documentation.

The medical toxicologist, by reviewing of the multiple prescribed medicines, when they were being administered, drug interactions, the half-lives of their metabolism, and the time of documentation, concluded that Mr. C's medications would not be expected to compromise his mental status.

The critical care specialist focused on the successive laboratory tests and considerable documentation by many medical specialists and identified several medical conditions, primarily renal failure, that were acute and severe as early as 9 days into radiation treatment, 3 days before Mr. C changed his will. Any one of these conditions would have been advanced to the degree that they could be responsible for a delirium.

Each of these respective specialties could have been tasked with the primary examiner role, and each of the specialties could have worked independently. But Mr. C's case illustrates how the borders of expertise would have handicapped each of the examinations, for different reasons. The psychiatrist would have been unable to resolve whether delirium, depression, or neither was operative, for lack of familiarity with the fine points of the acute conditions at the time of the changing the will. Likewise, even with knowledge of the administered medications, these included opiates (morphine and Percocet) that can contribute to confusion if sufficiently dosed or poorly metabolized and accumulating in the system.

A forensic psychiatrist under such circumstances, peer-reviewed only by others within his or her specialty, would be speculating a conclusion on these points. When assessment is forced to leap in analysis, the adversarial process may guide the examiner to bias in favor of the retaining party. This is why diminishing gray areas is so pivotal to promoting a valid forensic analysis from any specialty.

From the medical toxicology standpoint, that primary examiner would never have been able to discern more if peer-reviewed only by toxicology colleagues. Psychiatrists deal every day with delirium and can recognize it even when it avoids detection by the naked eye. Likewise, without input from critical care medicine, medical toxicology would be left with nothing remarkable about the decline to interpret the chart as anything more than sloppily documented. Additionally, critical care medicine can appraise the progression and severity of medical illness. Applying this analysis to interpretation of a question as specific as the disposition of one patient's assets is not part of the expertise of a medicine specialist.

It is entirely possible that were the three examiners to have evaluated the case in parallel, all would have reached different opinions. An attorney may have then moved to reconcile the opinions in a way that created an artificial compatibility. Peer review as an interactive and critical exercise aims at reaching a scientifically valid answer, not at reconciling multiple answers so that they play right in court.

*The Case of Mr. H*

Mr. H, a law enforcement official, received a call from his neighbor telling him that someone was trying to break into his car. He exited his home carrying a semiautomatic rifle and observed two men attempting to break into his vehicle. As Mr. H approached, one of the thieves jumped into a getaway vehicle. To determine whether there was a second individual in the car, Mr. H stepped into the vehicle's path, shining his flashlight toward the front windshield. The vehicle accelerated forward and Mr. H opened fire, but the vehicle continued. The driver of that vehicle could have fled the scene, but he turned and he accelerated back toward where Mr. H was standing. Mr. H fired toward the driver's side windshield. The getaway vehicle careened off the street and crashed into a neighboring house. The driver of the car was wounded in the face and filed suit against Mr. H, contending he had been shot after his vehicle had crashed and was helpless, posing no threat to Mr. H.

Records indicate that Mr. H fired more than 20 bullets from the semiautomatic rifle. Mr. H asserted that the shots were fired in self-defense as the vehicle attempted to run him over twice. The driver of the vehicle, however, asserted that he was cruelly shot in the head from behind after the car had already crashed into the neighboring house.

The case was referred for reconstruction of the confrontation based upon the wounds sustained by the driver of the vehicle and the extensive physical evidence encountered. A forensic pathologist was assigned as the primary examiner, given his experience in wound analysis. Initially, he was assigned peer reviewers from forensic pathology with similar experience in integrating evidence from ballistics, crime scene analysis, medical records, motor vehicle wreckage, and police investigative interviews.

The primary examiner, benefiting from peer reviewer oversight, carried out an exceptionally diligent examination, disciplined for its objectivity and for not extending beyond the expertise customary to even an experienced forensic pathologist. An impasse emerged, however.

After the driver litigant had been shot, he was hospitalized and treated surgically. Records from the hospital were seemingly detailed; however, they needed not concern themselves with whether the bullet entered his face from behind in the neck region and traveling back to front, or whether the bullet entered the face through the front windshield and while the driver was directing his car at Mr. H. So whatever the diagrams and

detailed surgical summary, this question remained unresolved and critical. At this point, the case and the plaintiff's injuries and studies were presented to a forensic radiologist in peer review. The case file included X-rays and CT scans, performed prior to reconstructive surgery, from the affected area.

The radiologist contributed questions from his own unique expertise to those being posed to witnesses. However, he was able to transcend the forensic pathology opinion to offer an informed opinion, on the basis of X-ray data and his qualification of interpretation, about where the bullet entered the plaintiff, and its trajectory. Radiographic evidence available included pre- and postoperative CT scans of the facial wound. Photographs of the preoperative wounds proved to be less helpful than imagined due to the amount of blood pooled around the injury, leaving the injury site and wound tract obstructed. CT scans demonstrated a bullet entering the face close to the nose area and fragmenting as it came into contact with the underlying bone, in a left to right directionality, finally exiting through the right cheek area.

This is an example where even excellent work cannot venture beyond a clear boundary of expertise. The ability of peer review from a different specialty of emerging relevance essentially completed the exercise of forensic science evaluation. Such contribution to a case facing an impasse can be done cost-effectively and can save an otherwise correct and thorough examination from being compromised because it cannot address emerging question that clearly would matter to a jury.

## General Discussion

Multidisciplinary peer review is an established practice in some clinical settings, with potential to enhance not only the quality of clinician supervision (15) but also the quality of patient care and treatment outcome (16,17). In a forensic setting, peer review from colleagues with complementary expertise offers a similarly wide array of benefits. Here, it protects an examination against bias, promotes necessary diligence, and ensures adherence to updated standards of the field. It follows from the above that whatever a primary examiner's inability to account for all of the most recent progress in his field, that examiner would be especially unable to account for progress in other disciplines that may be pivotal to that case. Moreover, being blinded to updated standards in a discipline relevant to the case contributes, both consciously and unconsciously, to bias.

More often, the multidisciplinary approach to forensic investigations is performed by individuals denominated a forensic "team." For example, a forensic anthropology examination of the Daegu Subway Disaster highlighted the team's multidisciplinary approach, with the authors concluding that "[t]hanks to the multidisciplinary team effort, we were able to declare the number of victims with reasonable certainty" (18). The National Transportation Safety Board (NSTB) is another example of multidisciplinary investigative process (19).

The key distinction of the cases in this article is that a primary forensic examiner with the requisite expertise to examine the core medicolegal question is designated, and those from other disciplines are not examining as a team, but providing oversight on a topic of shared expertise while enhancing the sophistication of an already qualified expert through their complementary expertise. In that regard, multidisciplinary peer review is no different than peer review by those in the same discipline; all specialists have expertise that has strengths and weaknesses of understanding and experience relative to a peer. For example, the psychologist who treats trauma in refugees is exposed to a range of responses distinct to this population. A given forensic psychiatrist may have experience in assessing trauma claims in civil litigation, but does not have the treatment experience with patients from that country. The civil case at hand may involve someone who originates from that country and same culture, but is not a refugee and was not exposed to the same stressors – yet has PTSD. Either examiner has acceptable qualifications for conducting an examination without need for a team. Oversight by one specialist of the other therefore imbues the quality of the analysis with complementary expertise and the oversight one cannot muster in solitude.

Multidisciplinary peer review therefore acknowledges the presence and importance of aspects of the case at hand which encroach upon and may cross into a different expertise altogether. Integrating these specialists from other disciplines promotes learning in the primary examiner and the honesty of acknowledging what one cannot say.

The approach presented from the examples of this article does not promote witnesses testifying beyond their expertise. Their boundaries remain defined by the limits of their specialty qualification. However, their fluency in the topic area, be it death investigation in the incarcerated mental health consumer, the course of lithium toxicity, decision-making capacity during critical illness, and injury reconstruction is more fully informed through the shared experience and complementary expertise of peers. When questioning at trial extends into the science of another discipline, just as it does within clinical practice, the primary examiner demurs. Either litigating attorney may then choose to call the relevant peer-reviewing specialist to add supportive testimony (if deemed necessary) or to confront (if deemed sensible).

An interactive peer review results in different specialties organically fitting together seamlessly, including fitting together in a way that appropriately negates the merit of a case. This outcome reflects on the validity of the process, not just its efficiency. The alternative, without this peer review, is multiple experts with different vantage points producing qualified but incongruous opinions because they have not integrated the perspectives of disciplines and areas of expertise that are distinct from their own.

Creating a platform of learning from experienced, if unrelated, colleagues enhances the knowledge of the primary examiner through case review itself. The primary examiner discovers research he never knew existed, noted in journals he would never otherwise have read. And the contribution of the other disciplines is extensive, layered, and imbues the primary examiner with training to apply to casework.

Such cumulative knowledge inevitably evokes an appreciation for the wisdom of "three heads are better than one." Experience teaches the authors that courts find this oversight and collectivism bolsters the validity of forensic examination, an exercise that is inherently vulnerable to blind spots.

In many respects, the application of PRFC is no different from traditional models of the attorney-consulting specialist or court-consulting specialist relationship. The attorney reserves the right to approve the primary examiner and peer reviewers before any work is undertaken. The work product is a matter of the attorney-expert work product. The process itself is subject to deposition and cross-examination in the same vein as DNA testing might hold chain of custody accountable and raise a basis for doubt based in fact or perception.

Primary examiners have clearly reviewed each of the materials and are charged with the ultimate opinion. Primary examiners are in line to testify, but peer reviewers may be called by either side to give accountability to the process or expose flaws in its quality control. However, the impetus remains on the primary examiner to produce a scientifically objective and informed opinion derived from thorough checks and balances.

Because the model of the cases above involved oral presentation of the data by the primary examiner to peer reviewers, the process requires a careful internal quality control and good faith understanding by peer reviewers that they are hearing a full presentation of all potentially relevant data. Peer reviewers may then solicit more information through additional questioning. Some data are necessarily shared, such as photographs of autopsies and death scenes. But text material, for example, is expected to be properly distilled. Doing so saves the costs of separate examiners consuming what may be a tremendous investigative file. Like laboratories performing sophisticated assays, PRFC requires excellent in house materials management and organization in order to ensure the cost-effective implementation of a vibrant and critical oversight system. As humans are involved and machines are not, all involved must be as serious and committed as surgeons around an operative field.

Experience has demonstrated that this protocol, which vets human error before release of findings, promotes settlement and therefore saves time and court costs, whether the PRFC is an arrangement agreed upon by both parties or solicited by one side of an adversarial proceeding.

As a matter of trial strategy, if internal scientific regulation of the exam weakens an opinion, an attorney may find such an approach unwelcome. Strategically, it comes down to whether an attorney is willing to risk findings that are less favorable by a process in which science disciplines the inquiry rather than an attorney's control over the flow of information or the nuance of how it is spun.

Peer reviewers may have different conclusions about a case, sometimes so pronounced that peer reviewers withdraw support for the primary examiner's work. This is the prerogative of the peer reviewer and where PRFC departs conspicuously from the planned conformity of the attorney managed model. For this reason, some attorneys deem such a PRFC exercise an unnecessary risk. However, the role of peer review is to ensure objectivity, adequate diligence, and conclusions that show fidelity to the facts and to the science. Oversight promotes the integrity of the forensic expert, but is not meant to compete for decision-making responsibility.

Science is a cumulative endeavor, and as such, it is essentially collaborative. The information gleaned by our predecessors and peers necessarily informs our contemporary scientific and medical opinion and remains relevant across specialties. Forensic science should reflect the same standards (20).

Forensic consultation has a particular vulnerability to narrow thinking. Experts may be asked to consult matters from a highly specific vantage point or theoretical challenge. It is far too easy to lose the forest for the trees while responding to what may be an attorney's respectful inquiry. Multidisciplinary peer-reviewed forensic consultation ensures an examination process with dramatically upgraded quality control. As we struggle within the forensic sciences to promote realistic, cost-effective approaches that truly refine the application of forensic sciences to the law (21,22), multidisciplinary peer review proves to be a welcome approach for the present and future.

## References

1. Schweitzer NJ, Saks MJ. The CSI effect: popular fiction about forensic science affects public expectations about real forensic science. Jurimetrics 2007;47(3):357–64.
2. Grøndahl P, Grønnerød C, Sexton J. The magic or myth of expertise: a comparison of judgment processes between forensic experts and lay persons based on psychiatric case vignettes. Psychiatr Psychol Law 2012;19 (5):662–71.
3. Krauss DA, Sales BD. The effects of clinical and scientific expert testimony on juror decision making in capital sentencing. Psych Pub Pol and L 2001;7(2):267–310.
4. McQuiston-Surrett D, Saks MJ. The testimony of forensic identification science: what expert witnesses say and what factfinders hear. Law Hum Behav 2009;33(5):436–53.
5. Dror IE, Cole SA. The vision in "blind" justice: expert perception, judgment, and visual cognition in forensic pattern recognition. Psychon Bull Rev 2010;17(2):161–7.
6. Budowle B, Bottrell MC, Bunch SG, Fram R, Harrison D, Meagher S, et al. A perspective on errors, bias, and interpretation in the forensic sciences and direction for continuing advancement. J Forensic Sci 2009;54 (4):798–80.
7. Gutheil TG, Simon RI. Narcissistic dimensions of expert witness practice. J Am Acad Psychiatry Law 2005;33:55–8.
8. Brent RL. The irresponsible expert witness: a failure of biomedical graduate education and professional accountability. Pediatrics 1982;70 (5):754–62.
9. Dror I, Rosenthal R. Meta-analytically quantifying the reliability and biasability of forensic experts. J Forensic Sci 2008;53(4):900–3.
10. Saviers KD. Ethics in forensic science: a review of the literature on expert testimony. J Forensic Identification 2002;52(4):449–62.
11. Luiselli JK, Russo DC. Clinical peer review: description of a comprehensive model in behavioral healthcare. Behav Modif 2005;29(3):470–87.
12. American Psychiatric Association. Peer review of expert testimony position statement. APA Position Statement;1991. Document No.: 910011. Arlington, VA: American Psychiatric Association, 1991.
13. American Psychiatric Association. American Psychiatric Association resource document on peer review of expert testimony. J Am Acad Psychiatry Law 1997;25(3):359–73.
14. Welner M, Mastellon T, Stewart JJ, Weinert B, Stratton JMB. Peer-reviewed forensic consultation: safeguarding expert testimony and protecting the uninformed court. J Forensic Psychol Pract 2012;12(1):1–34.
15. Gillig PM, Barr A. A model for multidisciplinary peer review and supervision of behavioral health clinicians. Community Ment Health J 1999;35(4):361–5.
16. Brulhart MI, Wermeille JP. Multidisciplinary medication review: evaluation of a pharmaceutical care model for nursing homes. Int J Clin Pharm 2011;33(3):549–57.
17. Lamb BW, Brown KF, Nagpal K, Vincent C, Green JSA, Sevdalis N. Quality of care management decisions by multidisciplinary cancer teams: a systematic review. Ann Surg Oncol 2011;18(8):2116–25.
18. Park DK, Park KH, Ko JS, Kim YS, Chung NE, Ahn YW, et al. The role of forensic anthropology in the examination of the Daegu Subway Disaster. J Forensic Sci 2009;54(3):513–8.
19. http://www.ntsb.gov/index.html.
20. Cole SA. Acculturating forensic science: what is 'scientific culture', and how can forensic science adopt it? Fordham Urban Law J 2010;38 (2):435–72.
21. McHenry CR, Biffl WL, Chapman WC, Spain DA. Expert witness testimony: the problem and recommendations for oversight and reform. Surgery 2005;137(3):274–8.
22. Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council. Strengthening forensic science in the United States: a path forward. Washington, DC: National Academy of Sciences, 2009.

Additional information and reprint requests:
Michael Welner, M.D.
The Forensic Panel
224 West 30th Street
Suite 806
New York
NY 10001
USA
E-mail: drwelner@forensicpanel.com

WEDNESDAY, OCTOBER 17, 2012 | CHICAGO DAILY LAW BULLETIN | PAGE 5

# Courts face challenges with forensic psychiatry, psychology evidence

This is part one of a three-part series. The second column will appear on Oct. 24.

• • • • •

Emerging as an organized field only within the last century, the forensic sciences include a multitude of subspecialties as they intersect with the law. The undeniable impact of DNA evidence on justice and the court system has spurred reliance upon forensic science and, perhaps, unrealistic expectations. In 2006, Congress asked the National Academy of Sciences (NAS) to, among other things, "make recommendations for maximizing the use of the forensic technologies and techniques ... and disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency."

Three years later, NAS issued a report of its findings about necessary steps to strengthen the forensic sciences. However, some forensic sciences were overlooked. This column, which will appear as a three-part series, places one of those highly relied upon forensic sciences — forensic psychiatry — under unapologetic scrutiny and makes recommendations about how Illinois trial courts can better ensure its relevance, reliability and validity.

So, what is forensic psychiatry? Forensic psychiatry refers to the intersection and application of behavioral science to legal matters. Along with forensic psychology and forensic neuropsychology, forensic psychiatry draws from the extensive clinical research in the behavioral sciences, the brain and behavior.

Forensic psychiatry is at the heart of many current news and policy issues, from the dynamics of terrorism and interrogation of terrorists to domestic violence in returning military personnel, school and community mass shootings, Internet predators and designer drugs and steroids as well as brain damage in athletes.

Although psychiatry has well-established diagnostic and treatment standards, the contextual application of these standards to the life cycle of the criminal and civil case is lacking. The Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-TR (and coming DSM V) advises clinicians to take caution when applying diagnoses to legal settings and consciously avoids application to forensics. Therefore, even as forensic psychiatry draws from a foundation of clinical research stronger than most of the forensic sciences covered in the NAS report, its validity to inform on specific legal issues requires relevant and responsible application to context. And, to bridge the gap between clinical standards and legal context, the methodology of forensic psychiatric practice has to be as systematic and evidence-driven as possible.

The current state of affairs is quite the opposite. This is not because forensic psychiatry cannot contribute valid, reliable and relevant data, rather, it is because courts accept a milquetoast status quo, often infused with ideological bias, that is the polar opposite of the precision inherently demanded by the consequence of legal decision-making.

In this regard, forensic psychiatry's problem differs from most forensic sciences. Be they fingerprint and hair analysis, toxicology or even the more directly medical discipline of pathology, other forensic specialties compromise justice by claiming more evidentiary basis than their underlying science allows. The behavioral sciences, on the other hand, consistently offer less evidence-based contribution than they are capable of and less than should be expected of them.

The major challenge confronting trial courts receiving forensic psychiatry and psychology evidence is the demand of rigor and transparency. Of course, when analyzing a piece of latent print evidence, judges require standards to ensure that the analysis is reliable. And when looking for the presence of cocaine in a sample, judges require proof



**FORENSIC CONSULT**

**BY DAVID J. ROBINSON & DR. MICHAEL WELNER**

*David J. Robinson is an Illinois lawyer, adjunct professor, author, and law clerk to the Justice Robert J. Steigmann. Dr. Michael Welner has been the leading psychiatric examiner on numerous highly sensitive cases spanning Guantanamo to Hong Kong and is the principal researcher of evidence-based determination of depravity in crime www.depravityscale.org.*

> **The major challenge confronting trial courts receiving forensic psychiatry and psychology evidence is the demand of rigor and transparency."**

of protocols to ensure the proper qualitative and quantitative analysis.

Forensic psychiatry does not analyze assays or look at specimens under a microscope. It does, however, deal in one of the most important yet inscrutable forms of evidence — human evidence — via the forensic interview and the human evidence gathered from an interview with a fact witness, eyewitness, family member, neighbor, co-worker or even a cell mate.

Human evidence reflects on both the fallibility and promise of forensic psychiatric interviews. The evidence of forensic psychiatry — the persons interviewed — have conflicts, agendas and biases. Yet human evidence is tangible, cumulative and can be assessed to account for reliability and sources of error. Forensic psychiatry can conquer the challenge of validating its human evidence just as any legitimate forensic science does by 1) proactively gathering as much relevant collateral data as possible, 2) integrating physical and other forensic science evidence and 3) employing the oversight of peer review to ensure objectivity and the correctness of scientific interpretation.

The NAS report reflects the universal perspective that the preservation of evidence is vital to the integrity of the forensic sciences. In much the same way, any analysis performed by a forensic expert must include full disclosure of the data upon which said analysis relied as well as legible notes of those interviews and analyses.

For the reasons we will outline further in the weeks to come, trial judges should begin considering these disclosures when deciding issues of admissibility in cases involving testimony from forensic psychiatrists.

---

Every Friday read about the local law schools in **Law School Notes** on page 3 of the Law Bulletin.



**EXHIBIT**

E

tabbies

**EXHIBIT**

tabbies

F

WEDNESDAY, OCTOBER 24, 2012 | CHICAGO DAILY LAW BULLETIN | **PAGE 5**

# Courts need to demand higher standards from psychiatric evidence

This is part two of a three-part series. The third column will appear on Oct. 31.

★ ★ ★ ★ ★

Last week, we touched on transparency as a safeguard for the practice of forensic science. Legitimate forensic sciences who analyze physical specimens provide full data, share specimens and account for chain of custody. Unfortunately, forensic psychiatry and psychology face no such requirements, despite the vulnerability of its evidence to inadequate sampling (insufficient diligence), summary reporting and for its analysis to be colored by bias. In actuality, forensic psychiatrists often submit evaluations to courts based upon interviews without providing their interview notes or offer conclusions based on no more than the invested litigant.

In instances when psychiatric experts do release the notes of their interviews, their documentation is often scant (so as to report only a fraction of the generated human evidence) or illegible. Indeed, 4th District Appellate Justice James A. Knecht expressed concern about the quality of interview notes almost two decades ago in *People v. Luker*, 255 Ill. App. 3d 367-373-74 (4th Dist. 1993) (J.Knecht dissenting). Knecht's concerns were spot-on, as illegible or faulty notes, of course, render evidence as uninterpretable as a degraded DNA specimen.

In an age of ubiquitous and accessible technology, as portable as a smartphone, videotaped psychiatric interviews are unacceptably rare. For a specialty that derives its science from the scrutiny of what is asked, how it is asked, what is said, how it is said and how a person appears when saying it, poorly preserved psychiatric evidence handicaps a colleague's opportunity to appraise the methodology of the interview, the validity of the detail or even the accuracy of quotes

attributed to the examinee. Such a status quo would be reviled by any other forensic science. That it is tolerated by forensic psychiatry is no reason for courts to demand less than it does of other forensic sciences.

The addition of qualitative criteria for forensic science reports is a needed step. Disclosure of data allows the trier of fact to weigh it as a source of error. Courts seeking relevant, reliable and valid forensic psychiatry should no longer accept testimony without a foundation of human evidence and without full disclosure of generated interview data.

Strengthening the standards for the admission of forensic testimony also means appreciating how human evidence mandates corroboration. That corroboration necessitates the interview of collateral sources, be they neighbors, teachers or counselors and full input from social media, school and juvenile records and any other data that looks into the window of diagnosis and its criteria.

Exceptions to the rule excluding hearsay enshrined in Illinois Rule of Evidence 803(4) (eff. April 26, 2012) enable expert psychiatrists to testify about information gathered in these collateral interviews and how those interviews influenced their opinion. Trial judges act as gatekeepers to the admissibility of this evidence for probative value versus prejudicial impact. So why not use that same discretion to require higher standards?

The practice of trial judges excluding psychiatric testimony about collateral interviews has numerous consequences. First, the fact-finder is left unaware of important facts and therefore does not truly know the case it is deliberating. Second, the psychiatric analysis limits itself to statements of a self-serving litigant, compromising the validity and reliability of the data. Third, psychiatrists are discouraged from attempting to corroborate the



**FORENSIC CONSULT**

**BY DAVID J. ROBINSON & DR. MICHAEL WELNER**

*David J. Robinson is an Illinois lawyer, adjunct professor, author, and law clerk to the Justice Robert J. Steigmann. Dr. Michael Welner has been the leading psychiatric examiner on numerous highly sensitive cases spanning Guantanamo to Hong Kong and is the principal researcher of evidence-based determination of depravity in crime www.depravityscale.org.*

human evidence they gather. The probative value of psychiatric evidence in the court is more limited. The by-product is a compromised expertise or an expert that is accessible only because he purposely avoids asking questions.

To be clear, psychiatry has the standards of hard science. It also has frontier areas that give rise to genuine disagreements. Forensic psychiatrists may otherwise disagree for primarily two reasons: 1) one forensic psychiatrist is relying upon more data to inform an opinion or 2) bias has affected one or both of the forensic psychiatrists' work.

The National Academy of Sciences (NAS) report that we out-

lined in our previous column quite clearly notes the challenges that expert witnesses face in overcoming contextual and cognitive biases. The report concedes, "There is no good evidence to indicate that the forensic science community has made a sufficient effort to address the bias issue."

Complicating this challenge is a system in which the forensic psychiatry or forensic psychology witness works in solitude with no one to answer to for his blind spots. Whereas the laboratory gets inspected and the forensic pathologists convene to review the autopsies of the moment, the forensic psychiatrist and forensic psychologist conducts an admittedly more impressionistic assessment alone, with all of the attendant risks of the echo chamber.

The NAS report proposes the development of standard operating procedures for detecting and minimizing potential biases and sources of human error in forensic practice. These standard operating procedures, notes the NAS report, should apply to all forensic analyses used in litigation. This involves implementing feedback loops for identifying errors, establishing source of error and correcting mistakes that lead to error.

Implementing the requirement that experts demonstrate that their conclusions are subject to peer review as a standard operating procedure in both forensic psychiatric and other forensic science atmospheres would enhance the validity of forensic specialties as well as decrease the potential for human error.

Peer review proactively protects expertise from knowingly or unwittingly misleading the court and pushes the examination to apply higher standards of diligent inquiry and sober, disciplined analysis and communication of findings.

Next week we will discuss where we go from here — that is, we will outline our proposals for ensuring that forensic experts are testifying reliably.

> ❝ *The practice of trial judges excluding psychiatric testimony about collateral interviews has numerous consequences.* ❞



# Judges can follow certain standards so expertise doesn't mislead

This is the third part in a three-part series.

\* \* \* \* \*

In our last column on Oct. 24, we explained how transparency, diligence and peer review of forensic psychiatrists and forensic psychologists' methodology acts to prevent expertise from misleading a trier of fact, including the trial judge. This week, we conclude our series by outlining the standards that trial judges can use to ensure that the expertise does not mislead them or the trier of fact.

What can trial judges look to in order to be sure that the forensic experts in their courtroom are testifying with valid and reliable evidence? The court should inquire into, for example, whether the expert has 1) produced the data relied upon, including complete legible notes of those interviews and analyses; 2) engaged in collateral evidence gathering, especially interviewing of third-party witnesses; 3) videotaped interviews to enable transparency; 4) engaged in the relevant training on current issues; 5) incorporated integrative approaches for those disciplines with significant cross-reference; 6) taken steps to be recertified in the particular discipline, emphasizing proficiency in the most current problems and relevant techniques of the profession (and documented any accreditation and certification); 7) implemented qualitative criteria in his reports; and 8) employed forensic peer review as standard operating procedure.

Instituting these protocols will allow the trial court to ensure the relevance, validity and reliability of the psychiatric testimony. Similar protocols have been used by trial judges for many years, even if subconsciously.

For example, in *Broussard v. Huffman Mfg. Co.*, 108 Ill. App. 3d 356, 362 (3rd Dist. 1982), a tort action based upon the failure of a fuel tank, the appellate court directed the trial court not only to require a plaintiff's expert engineer to be an engineer by trade and education, but directed the court to insist that 1) he was knowledgeable about the specific type of fuel tanks and how they operate and 2) his opinion was grounded in some objective baseline. Too often, rather than treating forensic psychiatrists like the engineer from *Broussard*, trial judges accept that forensic psychiatrists are "qualified" as experts based solely upon their general credentials.

Judges would do well to require videotapes of the psychiatric interview of litigants. Videotaping adds powerful probative value to evidence. Through the institution of a policy of videotaping interrogations, for example, arresting officers would preserve evidence and ensure fairness to people in police custody and defendants against whom confessions may be the most powerful evidence for guilt.

Videotaping forensic psychiatric interviews of all examinees in their entirety and making the tape available to both sides of litigation is eminently more informative than solely a psychiatrist's pontification about what he felt was important and increases transparency and promotes confidence in the data.

In addition, courts should require complete disclosure of the notes of expert interviews of collateral witnesses. These are not merely the interviews of witnesses, but questioning conducted by a trained professional focusing on resolving nuanced scientific questions. Forensic psychiatry should be providing even greater specificity of both questions and answers than law enforcement, as well as better reproduction, instead of the current scant scribble or notes at all. But this remedy will only happen when courts demand it, because the institution of forensic psychiatry will not reform itself.

Forensic case peer review has been tested and implemented and will go far to remedy the need for minimizing bias and identifying errors before they become an injustice. Oversight in hindsight can only undo so much.

Much as a doctor engages colleagues for their thoughts on a patient's medical condition, the result of peer review is a refining of the work product provided to the court. The process is not blind — the peer reviewers are interactive and a lack of anonymity forces peer reviewers to be engaged, invested in the quality and responsible for the objectivity and validity of the examination.

Unlike academic periodicals, where there is no accountability for those who approve what goes into print, forensic peer reviewers are required to sign off on their analysis and are thus responsible and accountable in the public record for the integrity of the forensic work product.

The trial courts' requiring peer review in forensic science expert assessments would promote internal oversight at the agency or practitioner level. Prospective peer review would therefore reduce errors that may otherwise lead to miscarriages of justice.

By implementing standards for admissibility for forensic psychiatrists and psychologists that are already expected of other forensic sciences, trial judges can nudge the professions into more reliably informing the court and at the same time, protect courts from being misled by forensic psychiatry, the only major expertise accountable to no qualitative demand, no protection from disguised subjectivity and no oversight.

These higher expectations of standard practice will fortify the integrity of the legal process and promote the responsible potential of forensic science.



FORENSIC CONSULT

BY **David J. Robinson** & **Dr. Michael Welner**

*David J. Robinson is an Illinois lawyer, adjunct professor, author, and law clerk to the Justice Robert J. Steigmann. Dr. Michael Welner has been the leading psychiatric examiner on numerous highly sensitive cases spanning Guantanamo to Hong Kong and is the principal researcher of evidence-based determination of depravity in crime www.depravityscale.org.*

> **These higher expectations of standard practice will fortify the integrity of the legal process..."**

**Around the Water Cooler** offers you quirky legal news. Find out what life is like from the in-house lawyer perspective, read summaries of recent court decisions, and get some PR tips, all at h2ocooler.wordpress.com.