**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CASE NO.: 1:15-cv-00455-RBW**

TERRYLENE SACCHETTI, individually and
ROBERT MANGANELLI, individually and as
co-personal representatives of the Estate of
GIANNI MANGANELLI,

      Plaintiffs,

v.

GALLAUDET UNIVERSITY and
THE DISTRICT OF COLUMBIA,

      Defendants.

_____/

**PLAINTIFFS' OPPOSITION TO DEFENDANT GALLAUDET UNIVERSITY'S**
**MOTION TO EXCLUDE TESTIMONY OF**
**PLAINTIFF'S EXPERT DR. MICHAEL WELNER**

Justin D. Grosz
Washington D.C. Bar No. 1018414
MORELLI ALTERS, LLP
DCOTA Design Center of the Americas
1855 Griffin Road, Suite C470
Dania Beach, Florida  33004
Telephone (305) 571-8550
Facsimile (305) 571-8558

Counsel for Plaintiffs

## TABLE OF CONTENTS

Introduction ……………………………………………………………………...….6

Relevant Facts ……………………………………………………………………....7

   A.  General Background Relevant to Dr. Welner's Opinions…………………………..7

   B.  Dr. Welner's Qualifications and His Opinions……………………………..…………9

Applicable Law…………………………………………………………………......12

Argument ………………………………………………………………….…14

   I.     Dr. Welner's Opinions Are Based on a Psychiatric Methodology Routinely
         Employed in This Type of Case, Not *Post Hoc ErgoPropter Hoc* or *Ipse Dixit*
         Reasoning……………………………………………..……………………14

   II.    Gallaudet's Challenges Based on a Purported "Lack of Factual Support"
         Are Not Grounds for Exclusion ………………..……………………………21

   III.   Dr. Welner's Testimony is Relevant as It would Help the Jury Understand
         Key Contested Issues in the Case……………………………………...…….…23

         A.  Dr. Welner's Opinions Are Relevant Because They Plainly Speak to
            Causation by Connecting Gallaudet's Tortious Conduct to Plaintiffs' Injury
            and Damages………………………………………………………..23

         B.  Dr. Welner's Opinions are Relevant Regardless of Whether They Satisfy
            The "Irresistible Impulse" Test, to the Extent That Test Applies at all to
            Plaintiffs' Intentional Tort Claim…………………………………….…24

            1.  Dr. Welner expressly addressed the "irresistible impulse" test………..25
            2.  Dr. Welner's opinions meet the "irresistible impulse" test,
               Which does not eliminate substantial factor causation……………..…25
            3.  The "irresistible impulse" test does not apply at all in this case
               Because Plaintiffs' false arrest claim is an intentional tort…………....28

   IV.   Gallaudet's Remaining Arguments are not Grounds for
         Excluding Dr. Welner…………………………………………………..31

CASE NO.: 1:15-cv-00455-RBW

# TABLE OF AUTHORITIES

*Ambrosini v. Labarraque*
     101 F.3d 129, 135-36 (D.C. Cir. 1996)……………………………………………24,31

*Bennett v. Forest Labs.*
     2015 WL 1579404, *5 (M.D. Fla. Apr. 9, 2015) …………………….……..14, 17, 18, 26

*Blanchard v. Eli Lilly & Co.*
     207 F. Supp. 2d 308, 316 (D. Vt. 2002)………………………………......………13, 15

*Burkhardt v. Wash. Metro. Area Transit Auth*
     112 F.3d 1207, 1212-13 (D.C. Cir. 1997))………………………………….……...33

*Clift v. Narragansett Television L.P.*
     688 A.2d 805, 812 (R.I. 1996)……………………………………………....29, 30

*Cloud v. Pfizer, Inc.*
     198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001)……………………………...…15, 21

*Daubert v. Merrell Dow Pharm., Inc.*
     509 U.S. 579, 588 (1993)……………………….…6, 12, 13, 14, 15 20, 22, 24, 26, 28, 32

*District of Columbia v. Chinn*
     839 A.2d 701, 705 (D.C. 2003)………………………………...……………..29

*District of Columbia v. Peters*
     527 A.2d 1269, 1275 (D.C. 1987)……………………………………………..26, 28

*District of Columbia v. Zukerberg*
     880 A.2d 276, 283 (D.C. 2005)………………………………………………..26, 27

*Giles v. Wyeth Inc.*
     500 F. Supp. 2d 1048, 1051 (S.D. Ill. 2007)……………………………………14, 15, 28

*In re Neurontin Mktg., Sales Practices, and Prods. Liab. Litig.*
     2009 WL 3756328, *4 (D. Mass. Aug. 14, 2009)……………………..... 13, 14, 15, 17, 28

*Kimberlin v. DeLong*
     637 N.E.2d 121, 126 (Ind. 1994)…………........……………………………… 29, 30

*Koho v. Forest Labs.*
     2015 WL 11201281, *5(W.D. Wash. Mar. 31, 2015)………………..……………..22, 28

*Kumho Tire Co., Ltd. v. Carmichael*
     526 U.S. 137, 150 (1999)……………………………………………….…..12, 18

*Lacy v. District of Columbia*
    424 A.2d 317, 322 (D.C. 1980)……………………………………………………..27

*Longoria v. Texas*
    2007 WL 4618452, *4 (E.D. Tex. May 18, 2007)………………………………….13

*McLean v. 988011 Ontario Ltd.*
    224 F.3d 797, 801 (6th Cir. 2000)…………………...…………………………….22

*Maras v. Avis Rent A Car System, Inc.*
    393 F. Supp. 2d 801, 804-05 (D. Minn. 2005)……………………...……………………20

*Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*
    401 F.3d 901, 916 (8th Cir. 2005)……………………….……………………...22

*Matthews v. Kroger Texas, LP*
    2015 WL 11022774, *2 (N.D. Tex. Aug. 21, 2015)………………………...……...20

*Mayer v. Town of Hampton*
    497 A.2d 1206, 1209-10 (N.H. 1985)……………………………………...….. 29, 31

*Miller v. Pfizer Inc.*
    196 F. Supp. 2d 1062 (D. Kan. 2002)……………………………………...…20, 21

*Nagle v. Gusman*
    2016 WL 560688 (E.D. La. Feb. 12, 2016)…………………………………...…….....32

*Nichols v. Am. Nat'l Ins. Co.*
    154 F.3d 875, 883 (8th Cir. 1998)……………………...……………………….20

*Nnadili v. Chevron USA, Inc.*
    435 F. Supp. 2d 93, 99-100 (D.D.C. 2006)………………………………...…………23

*North Shore Pharm. Servs., Inc. v. Breslin Assocs. Consulting LLC*
    2004 WL 6001505, *4 (D. Mass. June 22, 2004)…...……………………………29, 31

*Prosser and Keeton on The Law of Torts*
    § 9, at 40 (5th ed. 1984)……………………………………………………30

*R.D. v. W.H.*
    875 P.2d 26, 31 (Wyo. 1994)………………………………………………30

*Robinson v. District of Columbia*
    75 F. Supp. 3d 190, 200 (D.D.C. 2014)…………………………………………..19, 22

*Rowe v. Marder*
750 F. Supp. 718, 724 (W.D. Pa. 1990)……………………………………………31

*Stollings v. Ryobi Technologies*
725 F.3d 753, 765 (7th Cir. 2013)…………………………………………….…..23, 32

*Tate v. Canonica*
180 Cal. App. 2d 898, 909 (Cal. App. 1960)……………………………………………31

*The Suicidal Decedent: Culpable Wrongdoer or Wrongfully Deceased?*
24 J. Marshall L. Rev. 463, 471 n.32 (1991)……………………………………...…………30

*United States v. Allen*
390 F.3d 944, 949 (7th Cir. 2004)………………………..…………………………...24

*United States v. Frazier*
387 F.3d 1244, 1262 (11th Cir. 2004)…………………………………………...12, 24, 32

*United States v. Scholl*
959 F. Supp. 1189, 1195 & 1196 (D. Ariz. 1997)………………………………………20

**Codes and Rules**:

Federal Rules of Evidence 702…………………………………..…………………….……..10

Plaintiffs, Terrylene Sacchetti, individually and Robert Manganelli, individually and as co-personal representatives of the Estate of Gianni Manganelli ("Plaintiffs"), respectfully submit this Opposition to Defendant Gallaudet University's ("Gallaudet") Motion to Exclude Testimony of Plaintiff's Expert, Dr. Michael Welner (D.E. 60), and state as follows.

## **INTRODUCTION**

Gallaudet's motion to exclude — with its 10-page recitation of facts — reads more like a motion for summary judgment, raising issues that go far beyond the ***relevance*** and ***reliability*** of Dr. Welner's expert opinions. Instead, the motion asks this Court to exclude Dr. Welner's opinions based on the conclusions he reached, which, of course, the Supreme Court has expressly directed District Courts not to do when conducting a *Daubert*/Rule 702 inquiry. In a moment of unguarded candor, Gallaudet reveals the true character of its motion when it argues: "Frankly, Dr. Welner's opinions strain credulity too far." [D.E. 60 at 9].

As discussed below, the methodology employed by Dr. Welner has been approved and recognized as generally accepted and reliable by federal courts across the country. While Gallaudet's motion is peppered with generic legal propositions and off-point cases, Plaintiff discusses below several decisions expressly approving that methodology in cases analogous to this one — *i.e.*, where expert psychiatrists have offered opinions on the cause of a decedent's suicide. To the extent Gallaudet challenges the purported "lack of factual support" for Dr. Welner's opinions, the argument is grossly overstated and, in any event, that is classic fodder for cross-examination, not grounds for excluding an expert opinion.

CASE NO.: 1:15-cv-00455-RBW

## RELEVANT FACTS

**A.      General Background Relevant to Dr. Welner's Opinions[1]**

Gianni Manganelli ("Gianni") was a 23-year-old deaf student attending Gallaudet University when he committed suicide during the early morning hours of March 30, 2014. (*See* Ex. 85. Welner Expert Report at 1). Following his false arrest and release from custody,[2] Gianni knelt down at the bank of a creek and committed Seppuku, slicing open his forearms and abdomen in a ritualistic fashion, disemboweling himself and collapsed into the flowing waters. Gianni drowned to death after suffering multiple sharp force wounds. (Ex. 97). The suicide marked the end of a tumultuous few weeks for Gianni, which culminated with his unlawful arrest early in the morning of March 29, 2014 for simple assault for allegedly threatening his roommate, Spencer Opie, and a charge of threats to do bodily harm stemming from his interaction with Mr. Opie's friend, Jason Scherrenberg, in Gianni's Gallaudet dorm room. (*Id.*). As a result of the unlawful arrest, on March 29, Gianni was ordered to stay away from his roommate, effectively barring him from returning to his Gallaudet dorm room. (Ex. R. Welner Dep. at 85-86)(Ex. 85 at 5).

Gianni did not have alternative housing at Gallaudet following his arrest, even though he had requested it several times. In fact, a few hours before his arrest, Gianni had asked Adrienne Morgan, Gallaudet's Coordinator of Residential Education, to assign him to a different room because he did not feel safe or comfortable around Mr. Opie. (Ex. 85 at 4). Gianni's request for alternate housing was denied, even though "Gallaudet had the available provision for emergency

---

[1] The exhibit numbering convention followed during discovery is being followed throughout; however, not every exhibit identified in discovery has been utilized herein as a result of which there may be gaps in the exhibit numbers referenced.

[2] Set forth in greater factual detail in the Plaintiff's Statement of Genuine Issues of Fact which is being filed contemporaneously in support of their opposition to the Defendants' motions for summary judgment,

housing that is specifically provided…in instances of conflict between students," and even though Ms. Morgan reported being concerned about Gianni's mental well-being in the hours before his arrest. (*Id.* at 4, 9). This prompted Dr. Welner to conclude that Gianni "was effectively evicted from the Gallaudet community." (*Id.* at 5).

Dr. Welner's report also discussed Gianni's academic standing at Gallaudet. On March 10, 2014, Gianni wrote an email to his academic advisor concerning a dispute he was having with his linguistics professor, Christina Healy, whom Gianni accused of "bullying" him and "making it especially difficult for me to complete the class." (Ex. 85 at 3). Gianni wrote that "I can't afford to drop or fail this class," recognizing that failure would put his financial aid at risk. (*See also* Ex. R. at 99: "He did not perform at a level of scholarship material in his midterm. The scholarship was financially important, obviously…"). Significantly, Gianni had already narrowly avoided failing his linguistics class the prior semester, doing so only by withdrawing from the class. (Ex. R. at 71) ("[H]e scrambled to somehow extract a withdrawal from the jaws of an F."). This prompted Dr. Welner to conclude that Gianni had "substantively failed" the prior course and, therefore, "was desperate to avoid further jeopardizing his standing at Gallaudet." (Ex. 85 at 4).

Gianni had a long history of psychiatric illness, which Dr. Welner addressed at length in his report and throughout his deposition. In July 2013, Gianni had been diagnosed with bipolar disorder. (Ex. R. at 164). A month later, in August 2013 Capitol Police transported Gianni to the Comprehensive Psychiatric Emergency Program ("CPEP") where it was noted that Gianni "had some condition which was characterized by psychotic symptoms, and he had a history of some degree of anxiety and depression at earlier times." (Ex. R. at 119). Later, in the weeks leading up to his arrest and suicide, Dr. Welner agreed that Gianni was experiencing "psychosis and a

deteriorating condition." (Ex. R. at 70). Nevertheless, he stated that Gianni's suicide could not be attributed solely to the "normal progression of his disease process," explaining "there was no advancement of symptoms of his condition." (*See* Ex. R. at 224-25). Rather, he opined that it was Gianni's unlawful arrest and its consequences that ultimately caused him to commit suicide.

> And an arrest in his life would have been more significant than a person who has not invested in maintaining good standing at Gallaudet. And the arrest occurred at Gallaudet. It had clear consequences, the consequences being forcibly…removed from his room without any kind of provision for staying on campus. So there were clear consequences. It was more of – more than an arrest. It was an arrest with consequences.

(Ex. R. at 230. *See also* Ex. 85 at 6 ("It is therefore my professional opinion, with a reasonable degree of psychiatric certainty, that the arrest and its consequences precipitated Gianni Manganelli's suicide.")).

Dr. Welner also explained that Gianni's arrest and its impact on Gianni's standing in the Gallaudet community would have caused him great shame or dishonor. (Ex. 85 at 6). He noted that the method Gianni chose for killing himself, slicing open his abdomen, "is a very peculiar method" and "one possible explanation is seppuku[3], which is associated with dishonor." (Ex. R. at 95). He stated that was a reasonable possibility based on the fact that Gianni was known to be "an enthusiast of Japanese culture." (*Id.*).

## B. Dr. Welner's Qualifications and His Opinions

Dr. Welner is board-certified in psychiatry, forensic psychiatry, and psychopharmacology. (*See* Ex. R. at 9-10). Since 1998, Dr. Welner has been the chairman of a medical practice called The Forensic Panel, which provides consulting on "medical/legal matters

---

[3]  Seppuku, also known as "hara-kiri," is a Japanese form of "ritual suicide by cutting the abdomen" which "was practiced by high-ranking Japanese of the military class in lieu of execution or to avoid disgrace." Webster's New World College Dictionary, *available at*: http://www.yourdictionary.com/hara-kiri#websters?direct_search_result=yes

in several disciplines." (*Id.* at 35). Additionally, Dr. Welner has been a psychiatrist in private practice in New York City for the past 25 years. (Curriculum Vitae of Dr. Michael Welner, M.D. (attached as **Exhibit 86**), at 1). He also spent 20 years teaching forensic psychiatry and psychopharmacology at the New York University School of Medicine, leaving in 2012 as a Clinical Associate Professor. (Ex. 86 at 1). Dr. Welner is a Fellow of the American Academy of Forensic Sciences and serves on the editorial boards of several medical and scientific journals, including the Journal of Forensic & Legal Medicine and the Journal of Practicing Forensic Psychology. (*Id.* at 2-3).

Dr. Welner has written articles and given presentations on forensic psychiatry to academic, medical, legislative, and judicial audiences all over the world over the past 25 years. (Ex. 86 at 3-25). Several of Dr. Welner's forensic psychiatry articles and presentations addressed the issue of suicide. (Ex. R. at 17-18: ("I have given perspectives on death investigation in forensic psychiatry, and within forensic psychiatry, I've covered the various arenas in which death investigation is pertinent, one of which is suicide.")). Some of the relevant presentations he cited during his deposition include "Forensic Psychiatry in Death Investigation: Psychological Autopsy and Assessment of Motive" and "Psychological Autopsy for Civil Courts," (*Id.* at 18, 19; *see also id.* at 24 (discussing "a couple of articles here about psychological autopsy")). He has consulted in "scores" of civil cases as a forensic psychiatric expert (*id.* at 25), and estimated that somewhere between 10 and 20 of those cases involved suicides (*id.* at 28).

Dr. Welner's expert report lists the materials he reviewed to formulate his opinions in this case. (Ex. 85 at 2). The list comprises 28 separate items, including:

- transcripts of depositions of five witnesses taken in this case, including Gianni's parents, a witness to his arrest, and two arresting officers;
- affidavits from Mr. Opie and Mr. Scherrenberg, whom Gianni was charged with assaulting on the night of his arrest;

- police reports documenting the events surrounding his arrest and suicide;

- a police interview of Gianni's mother the day after his suicide;

- extensive medical records, including psychiatric records from seven different health care providers;

- autopsy and toxicology reports, as well as the Chief Medical Examiner's Report of Gianni's suicide;

- various documents from Gallaudet University, including its Department of Public Safety procedures for responding to incidents and email correspondence among school officials regarding Gianni;

- Gianni's personal, handwritten notes prepared in the weeks before his death in March 2014;

- text messages exchanged between Gianni and his mother in March 2014, including hours before his suicide.

(*Id.*). Dr. Welner also relied on a 3-hour interview he conducted with Gianni's mother. (Ex. R. at 50). When asked during his deposition **by Gallaudet's counsel** whether "they are the types of materials that are normally relied upon by experts in forensic psychology in order to reach an opinion," Dr. Welner responded "Yes." (Ex. R. at 45). Dr. Welner testified he devoted "in excess of 50 hours" to reviewing the materials and preparing his expert report detailing his opinions in this matter. (*Id.*).

Dr. Welner's primary opinion was that "the arrest and its consequences precipitated Gianni Manganelli's suicide." (Ex. 85 at 6). In reaching that conclusion, Dr. Welner acknowledged that Gianni's mental illness may have played some role, then explained why he did not believe the disease, by itself, was responsible. (Ex. R. at 227 ("So I think he would have continued to deteriorate with symptoms of a psychotic condition. But psychosis does not equate with suicidality…Suicide is not a symptom of psychosis")). Dr. Welner also ruled out other potential explanations for his suicide, stating "[n]o other stressors preceded Mr. Manganelli's suicide, which occurred within hours of his eviction from campus." (Ex. 85 at 6). Dr. Welner's opinion that the arrest and its consequences precipitated the suicide was further bolstered by the

fact that he found "no evidence" that Gianni had planned the suicide in advance. (*See id.* (noting he "used a weapon that he acquired only just before he killed himself" and left no suicide note)). Finally, Dr. Welner also ruled out the possibility that the suicide was the result of some drug-induced condition, noting "[h]is toxicology screen on autopsy was negative." (*Id.*).

## APPLICABLE LAW

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, the rule imposes two key requirements as thresholds for the admissibility of expert testimony: relevance and reliability.

The standard for relevance is set forth in the text of the rule itself — *i.e.*, it must "help the trier of fact to understand the evidence." Fed. R. Evid. 702(a). One federal appellate court further explained that such testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).

As for reliability, the Supreme Court in *Daubert* set out a list of several factors that bear on the inquiry, but later clarified that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

150 (1999). The Court in *Kumho Tire* also held that trial judges "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Accordingly, "[s]everal courts have commented on the particular need to reach beyond these four factors in cases involving psychiatric, psychological, or other 'social science' testimony." *In re Neurontin Mktg., Sales Practices, and Prods. Liab. Litig.*, 2009 WL 3756328, *4 (D. Mass. Aug. 14, 2009) (collecting cases). That court went on to observe that, "when dealing with 'social science' testimony, 'other indicia of reliability…including professional experience, education, training, and observations' guide the inquiry." *Id.* (quoting *Longoria v. Texas*, 2007 WL 4618452, *4 (E.D. Tex. May 18, 2007)). *See also Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308, 316 (D. Vt. 2002) (holding "[t]he reliability of expert opinion testimony based on psychiatric or psychological observation and analysis does not readily lend itself to evaluation using the specific *Daubert* factors" and declining to apply them).

Finally, district courts must keep in mind the following principles announced by the Supreme Court to frame the proper scope of any *Daubert*/Rule 702 inquiry. In *Daubert* itself, the Supreme Court noted "the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). The high court expressly directed district judges to refrain from evaluating an expert's substantive conclusions. *Id.* at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Finally, the Supreme Court held that, in most cases, the traditional tools of the adversary system, not exclusion, should be employed to challenge expert testimony. *Id.* ("Vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## **ARGUMENT**

## I. DR. WELNER'S OPINIONS ARE BASED ON A PSYCHIATRIC METHODOLOGY ROUTINELY EMPLOYED IN THIS TYPE OF CASE, NOT *POST HOC ERGO PROPTER HOC* OR *IPSE DIXIT* REASONING

As discussed above, Dr. Welner arrived at his opinions after reviewing an extensive amount of Gianni's medical records and reams of other factual documents relevant to this case, including police reports, autopsy and toxicology reports, deposition transcripts and affidavits of several witnesses with direct knowledge of Gianni's actions in the weeks before his death, an interview with Gianni's mother, and even Gianni's own handwritten notes and text messages sent immediately prior to his death. (Ex. 85 at 2). He then applied his extensive education, training, and experience as a forensic psychiatrist, including experience forensically determining the cause of suicide, to those case-specific materials and formed the opinions reflected in his expert report.

Notably, several courts considering *Daubert* challenges in similar contexts — *i.e.*, where a forensic psychiatrist or other mental health professional offers an expert opinion on the cause of a suicide — have recognized this same methodology, often labeled a "psychological autopsy,"[4] as reliable and generally accepted in the mental health community. *See, e.g.*, *In re Neurontin*, 2009 WL 3756328, at *6 and n.3 ("Defendants prudently are not pressing a general challenge to the 'psychological autopsy' model; this approach has been published in peer-reviewed scientific literature and has been described by numerous courts as a generally accepted

---

[4]  A psychological autopsy has been described as "reconstructing an individual's psychological life[,] particularly the person's lifestyle and those thoughts, feelings, and behaviors manifested during the weeks preceding death." *Giles v. Wyeth Inc.*, 500 F. Supp. 2d 1048, 1051 (S.D. Ill. 2007). Dr. Welner's expert report and deposition confirm that is just what he did in this case.

methodology for analyzing what led to a suicide") (collecting cases); *Bennett v. Forest Labs.*, Case No. 06-CV-72, 2015 WL 1579404, slip op. at *5 (M.D. Fla. Apr. 9, 2015) ("A psychological autopsy is considered by some organizations as a best practice postmortem procedure to reconstruct the proximate and distal causes of death by suicide."); *Giles*, 500 F. Supp. 2d at 1061 ("[A] number of courts have held that a psychological autopsy is a generally accepted methodology for determining the cause of a suicide."); *Blanchard*, 207 F. Supp. 2d at 312 n.2 ("The psychological autopsy is a generally accepted methodology for trying to determine what led to a suicide."); *Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001) ("[T]hese types of post-mortem autopsies appear to be generally accepted."). In perhaps the most detailed opinion on the subject to date, Judge Patti Saris, current Chief Judge of the District of Massachusetts, observed in the *Neurontin* opinion:

> Suicide is a multi-factorial phenomenon with factors which cannot be ruled out by a testable, established scientific method. Instead, suicide experts and other health care professionals rely on tools like the psychological autopsy — along with their professional experience, education, training, and observations — to 'rule in' or 'rule out' various factors. This approach will never produce the definite and testable results expected and demanded in many scientific inquiries; ***it is, however, the generally accepted methodology for analyzing the causes of a particular suicide and far from the 'junk science' that Daubert and Rule 702 are designed to exclude.***

2009 WL 3756328, at *9 (emphasis added).

Gallaudet argues that Dr. Welner's opinions are "the product of *post hoc ergo proper hoc* reasoning and *ipse dixit* declarations." (Gallaudet Mot. at 12). Specifically, Gallaudet contends "the sole basis for his conclusions that Gianni's March 29, 2014 arrest caused his subsequent suicide is the temporal proximity between the two events." (Mot. at 13). Notwithstanding Gallaudet's counsel's deft attempts to bait Dr. Welner into this desired narrative, the totality of Dr. Welner's testimony makes clear that he relied on much more than the mere temporal

proximity as the basis for his opinion. Instead, Dr. Welner did two things: (*i*) he explained that

the arrest and its consequences created a feeling of "hopelessness" in Gianni which, based on his

experience, precipitated his suicide; and (*ii*) he explained why he determined that other possible

explanations (such as simply a worsening of Gianni's mental illness or some drug-induced

condition) were not as likely to have caused his suicide. As to the former, the following

exchange encapsulates Dr. Welner's reasoning:

> Q. [Gallaudet's counsel]: You indicated here that it is your
> professional opinion within a reasonable degree of psychiatric
> certainty that the arrest and its consequences precipitated Gianni
> Manganelli's suicide.
>
> A. [Dr. Welner] Yes.
>
> Q. What do you mean by precipitated?
>
> A. He became hopeless. And hopeless has a direct relationship to
> suicide.
>
> Q. What's your evidence that Gianni became hopeless?
>
> A. Because he – he left campus with no place – he left campus
> with a great sense of urgency. He did so at a time where several
> data points reflect the university's rejection and repudiation of him,
> whether it be his arrest, whether it be the fulfillment of a separation
> order by kicking him out of his room, whether not making an
> emergency room available to him, or giving him anyplace to stay,
> whether it be that coupled with the lack of resolution of what was
> happening in a linguistics class that he was repeating, that the
> combination of these events contributed to his hopelessness about
> his prospects at Gallaudet.

(Ex. R. at 114). To be clear, Dr. Welner acknowledged that the timing of the arrest was very

significant, not because it was the sole basis for Dr. Welner's opinion, but because the arrest

came at time when Gianni "was already demonstrating disorganization of thinking and poor

control of his behavior." (*Id.* at 116).

Dr. Welner also discussed why he ruled out other potential causes of Gianni's suicide,

including why his mental illness was not the sole cause. As noted above, Dr. Welner explained at

length why he did not think the suicide was merely the "normal progression of his disease

process." (*See* Ex. 85). He noted that, although "[h]is behavior was peculiar and it was attracting attention, he was voicing no suicidal ideation to his – to anyone around him" immediately prior to his suicide. (Ex. R. at 225). Addressing Gianni's psychiatric condition, Dr. Welner explained why he believed Gianni's arrest and its consequences were sufficient to trigger his suicide, while getting a "flat tire" or "bouncing a check" — two alternative stressors which defense counsel suggested might have triggered a psychotic person to kill himself — would not have been enough. (Ex. R. at 229-30). As further support that Gianni's suicide was caused by his arrest and its consequences (not just the "normal progression" of his mental illness), Dr. Welner explained that his review of the case materials yielded no evidence that Gianni had planned his suicide in advance. (Ex. 85 at 6). He also ruled out the possibility of a drug-induced suicide based on the negative toxicology screen in Gianni's autopsy report. (*Id.*).

The *post hoc ergo propter hoc* argument is commonly raised by defendants in suicide cases, and routinely rejected where, like here, the expert provides some basis for his causation opinion other than mere timing. For example, in *Neurontin*, the defendants argued the plaintiff's expert "relies solely on the temporal relationship between Mr. Smith's purported use of Neurontin and his suicide…[and therefore] applies the logical fallacy of *post hoc ergo propter hoc*..." *In re Neurontin*, 2009 WL 37563285, at *8. The court rejected that argument, stating:

> Certainly, if an expert bases a causation opinion **solely** on the fact that a patient was exposed to an agent prior to his or her illness, the reliability of the opinion would be called into question. However, that is not the case here. Dr. Maris appropriately addresses the temporality criteria, pointing to specific evidence that, after he began taking Neurontin, Mr. Smith exhibited "dramatic changes," including a worsening or risk factors such as depression, and even became "suddenly suicidal." Dr. Maris does not, however, make these statements in a vacuum….[T]here is scientific evidence that Neurontin puts some people at increased risk for depression and impulsive, aggressive, or suicidal behavior. Dr. Maris discusses

> this research, as well as scientific literature connecting depression
> and hopelessness to suicide.

*Id.* at \*10 (emphasis added). Likewise, in *Bennett*, the defendant argued that the plaintiff's expert "improperly used a temporal relationship, *post hoc ergo propter hoc* fallacy, and *ipse dixit* analysis to reach his conclusions." 2015 WL 1579404, at \*5. In denying defendant's motion to exclude, the court found that plaintiff's expert "did not merely look at [the decedent's] suicide after the use of Lexapro to reach his conclusion" and, thus "[t]his is not a situation with a *post hoc ergo propter hoc* fallacy or improper *ipse dixit* assertion." *Id.* at \*6. In rejecting the defendant's argument, the court in *Bennett* noted that the plaintiff's expert had "objectively provide[d] reasons for eliminating other causes for [the decedent's] suicide." *Id.*

Gallaudet's *ipse dixit* argument is puzzling. The thrust of its motion is clearly that Dr. Welner's conclusion is flawed (and, therefore, must be excluded) because Gallaudet believes it was Gianni's psychosis, and not the arrest and its consequences, that caused his suicide. Indeed, much of the deposition is devoted to exhaustively detailing Gianni's prior psychiatric history. Yet, Gallaudet also argues that Dr. Welner "does not articulate any basis" — other than his own *ipse dixit*, supposedly — for his asserting that Gianni was "overtly psychotic." (Mot. at 15). The argument fails for a number of reasons.

First, Dr. Welner is a forensic psychiatrist with 25 years' experience in private practice, including 20 years as a professor at NYU School of Medicine. By its very nature, forensic psychiatry often involves an after-the-fact assessment of a subject's mental state based on prior medical records and other factual sources, such as police reports, interview notes, deposition transcripts, and the like. Dr. Welner confirmed this is standard practice among forensic psychiatrists. (Ex. R. at 45). Thus, he was plainly qualified to render an opinion as to Gianni's mental state based on the sources available to him. *See Kumho Tire*, 526 U.S. at 150 ("In other

cases, the relevant reliability concerns may focus on personal knowledge or experience."); *id.* at 152 (holding the "objective" of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes practice of an expert in the relevant field").

Second, Dr. Welner plainly ***did*** give a basis for why he believed Gianni was "psychotic," explaining "it was borne out by the kinds of features, specifically, the decline in his appearance, as well as the decline in his self-care." (Ex. R. at 82-83; *see also id.* at 134-35 ("Q. What behavior at the time of the arrest was overtly psychotic? A. The threat to the friend that inspired a call to the police.")). Also, contrary to Gallaudet's motion, Dr. Welner did "explain how it [Gianni's psychosis] relates to the subsequent suicide." (*See* Ex. R. at 116-17 ("[T]he fact that he was psychotic and showing that he was disorganized in his behavior…would have diminished his capabilities of coping with the kinds of stressors that he was presented with"); *id.* at 227 ("Q. What's the relationship between psychosis and suicide? A. It's – if a person is suicidal and they are psychotic, then they are at greater risk because they don't have the coping organization to pull themselves together and make a wiser, more adaptive choice.")).

On a more general note, Gallaudet's assertion that Dr. Welner "offers no factual support for his conclusions" (Mot. at 14) is the classic argument that courts deem an inappropriate basis for exclusion. *See, e.g.*, *Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 200 (D.D.C. 2014) ("While [an expert's] testimony may or may not ultimately prove persuasive to a jury, it is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak. Instead, these are subjects Plaintiff can address through cross-examination.") (internal citations and quotations omitted). To the extent Gallaudet wants to quarrel with whether

or not Gianni was overtly psychotic — even though that would seem to contradict its very theory of the cases — it remains free to do so through cross-examination and by introducing its own psychiatric expert.

Finally, unlike the cases discussed above, virtually none of the cases cited in Gallaudet's motion address the issue at hand — namely, a reliability challenge to a mental health expert's opinion on the cause of a suicide. Gallaudet cites four cases for the generic proposition that courts "frequently exclude psychiatrists from giving unreliable testimony under *Daubert*," (Mot. at 15), but those cases are all readily distinguishable. *See Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998) (excluding expert's testimony "impugning [plaintiff's] psychiatric creditability" as improper subject of expert testimony because credibility determinations are reserved for the jury); *Matthews v. Kroger Texas, LP*, 2015 WL 11022774, *2 (N.D. Tex. Aug. 21, 2015) (excluding expert testimony that plaintiff was malingering on ground that "credibility is a matter for the jury" and any probative value was substantially outweighed by danger of unfair prejudice); *United States v. Scholl*, 959 F. Supp. 1189, 1195 & 1196 (D. Ariz. 1997) (excluding expert testimony where expert admitted "he did not bring anything scientifically to support the idea that pathological gamblers cannot truthfully report gambling income on an income tax form because that does not exist" and conceded "it was not his opinion that gamblers could not truthfully report on their income tax returns"); *Maras v. Avis Rent A Car System, Inc.*, 393 F. Supp. 2d 801, 804-05 (D. Minn. 2005) (excluding psychiatrist's opinion that car accident caused plaintiff's fibromyalgia where expert conceded that "nobody knows what actually causes fibromyalgia").

The only mildly relevant case cited by Gallaudet is *Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1062 (D. Kan. 2002), but that, too, is easily distinguishable. In *Miller*, the plaintiffs brought

products liability and negligence claims against Pfizer, alleging their 13-year-old son's suicide was caused by taking the anti-depressant Zoloft. In excluding the plaintiff's expert psychiatrist and neuropsychopharmacologist, the court found fault with his methodology for establishing general causation – *i.e.*, that Zoloft was even **capable** of causing suicidal ideation. *Id.* at 1085. The court also found unreliable the expert's methodology for opining on specific causation on the ground that he "had not even bothered to review much of the factual evidence regarding Matthew's symptoms, behavior and social and family circumstances," *id.*, and also because the expert "has given scant attention to evidence of factors – other than Zoloft – which may have caused Matthew's suicide," *id.* at 1086. *Accord Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118, 1136 (D. Ariz. 2001) (excluding expert in drug-induced suicide case where he "issued his opinion before reviewing the autopsy report, the St. Mary's hospital records, and records of [the decedent's] prescribing physicians and therapist" and had "not produced any evidence to show that [expert] considered alternative explanations for the suicide").

*Miller* is inapposite because general causation is not at issue in this case and because, as explained above, Dr. Welner considered extensive case-specific materials and explained why he ruled out other factors (including "normal progression" of his mental illness or some drug-induced condition) as the causes of Gianni's suicide.

## II.   GALLAUDET'S CHALLENGES BASED ON A PURPORTED "LACK OF FACTUAL SUPPORT" ARE NOT GROUNDS FOR EXCLUSION

In section III of its motion, Gallaudet ask this Court to exclude Dr. Welner's opinion unreliable based merely on Gallaudet's disagreement with Dr. Welner's interpretation of the facts. For example, it takes issue with Dr. Welner's arguments that Gianni was "hopeless," that his "academic standing at Gallaudet was in jeopardy" (Mot. at 17), and that he was "essentially evicted from Gallaudet" (Mot at 18). As explained in the Facts discussion above, Dr. Welner

discussed at length, both in his report and during his deposition, his reasons for drawing those conclusions, all of which find support in the record. Gallaudet is certainly entitled to argue its contrary view of those facts, but it is not entitled to exclude Dr. Welner's opinions on that basis. *See McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("Mere weaknesses in the factual basis of an expert witness's opinion…bear on the weight of the evidence rather than on its admissibility."); *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005) (affirming denial of exclusion of plaintiff's expert and noting "even post-*Daubert*, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility"; "It was [defendant's] responsibility at trial, through careful cross-examination of [plaintiff's expert] and direct examination of its own experts, to alert the jury to the weaknesses in the factual basis of [the expert's] analysis"); *Robinson*, 75 F. Supp. 3d at 200 ("[I]t is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak. Instead, these are subjects Plaintiff can address through cross-examination."); *Koho v. Forest Labs.*, 2015 WL 11201281, *5 (W.D. Wash. Mar. 31, 2015) ("Defendants' concerns that [expert's] conclusions were ill-founded or insufficiently supported go to the weight of his testimony, not its admissibility, and are matters for cross-examination."). *Accord Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Gallaudet also asks this Court to exclude Dr. Welner's opinion "that Gianni's mother could not have affected the outcome" on the ground that it is "untenable." (Mot. at 18). But, once again, it seeks exclusion based only on its argument that the Court should accept Gallaudet's view of the evidence instead of the view adopted by Dr. Welner. Dr. Welner's report provides a

cogent explanation for why, based on the evidence he reviewed, he opined that Gianni's mother could not have prevented her son's suicide — namely, because she did not have enough information about the nature or extent of her son's crisis. (Ex. 85 at 10-12). To the extent Gallaudet wants to argue to the jury that Dr. Welner's opinion is "untenable," it can present to a jury all of the evidence cited in its motion and cross-examine him on the subject; however, that is not a basis for exclusion. *See Stollings v. Ryobi Technologies*, 725 F.3d 753, 765 (7th Cir. 2013) ("But the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony. The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.").

## III.   DR. WELNER'S TESTIMONY IS RELEVANT AS IT WOULD HELP THE JURY UNDERSTAND KEY CONTESTED ISSUES IN THE CASE

Gallaudet's relevance argument is based on two faulty premises: first, that Dr. Welner does not address causation with respect to Plaintiffs' false arrest claim; and second, that Plaintiff must establish that Gianni's false arrest and its consequences were the ***sole cause*** for Gianni's suicide. Because neither premise is correct, Dr. Welner's opinions cannot be excluded on the basis of relevance.

### A.   Dr. Welner's Opinions Are Relevant Because They Plainly Speak to Causation by Connecting Gallaudet's Tortious Conduct to Plaintiffs' Injury and Damages

At the very least, the parties agree that Dr. Welner never purported to opine on the lawfulness of Gianni's arrest. (Mot. at 20). Rather, the purpose of Dr. Welner's testimony is to establish the causal connection between the false arrest (and its consequences) and Plaintiffs' injury and damages. As Gallaudet's motion states, recoverable damages for a false arrest claim include "any ***physical suffering*** and mental anguish, including fright, ***shame***, and mortification from the indignity and ***disgrace*** that resulted from the false arrest itself." (Mot. at 19-20 (citing *Nnadili v. Chevron USA, Inc.*, 435 F. Supp. 2d 93, 99-100 (D.D.C. 2006)) (emphases added). Dr.

Welner's opinions will help the jury understand the connection between Gianni's arrest and his resulting ***mental anguish***, ***shame*** and, ultimately, the extreme ***physical suffering*** of suicide by disembowelment. (*See* Welner Report at 5 (noting the Gianni's suicide by disembowelment "just hours after being released from custody…evokes suicide in the context of dishonor"); *id.* at 6 ("For someone who realized that he was in academic trouble, the shame of the arrest and the removal from Gallaudet – with his entire academic future on the line – was all the more powerful…It is therefore my professional opinion, within a reasonable degree of psychiatric certainty, that the arrest and its consequences precipitated Gianni Manganelli's suicide.")). Accordingly, Dr. Welner's testimony will "help the trier of fact understand the evidence" relevant to this key issue, Fed. R. Evid. 702(a), because the psychiatric nature of that testimony plainly "concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).

**B. Dr. Welner's Opinions are Relevant Regardless of Whether They Satisfy the "Irresistible Impulse" Test, to the Extent That Test Applies at all to Plaintiffs' Intentional Tort Claim**

Gallaudet also argues that Dr. Welner's opinions should be excluded as irrelevant because they "fail to address the irresistible impulse standard." (Mot. at 22). As a threshold matter, even assuming Gallaudet were factually correct, it is black-letter law that "an expert need not have an opinion on the ultimate question to be resolved to satisfy the relevance requirement." *United States v. Allen*, 390 F.3d 944, 949 (7th Cir. 2004). The D.C. Circuit addressed this very issue in an early post-*Daubert* opinion, holding as follows:

> The fitness prong of the *Daubert* admissibility inquiry primarily concerns relevance. The dispositive question is whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, ***not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial***…That Dr. Strom's testimony alone may be insufficient for the Ambrosinis to survive

> summary judgment does not necessarily defeat its admissibility
> under the "fitness" prong of *Daubert*.

*Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996) (internal quotations and citations omitted) (emphasis added). Thus, Gallaudet's relevance argument is really just a challenge to Plaintiffs' ability to establish causation in general – not a basis for excluding Dr. Welner's testimony. Although this is enough to deny Gallaudet's motion based on relevance, its relevance argument fails on its merits for three additional reasons.

### 1. Dr. Welner expressly addressed the "irresistible impulse" test

First, Dr. Welner plainly and expressly did address the irresistible impulse test, as demonstrated by the following exchange during his deposition:

> Q. And then would it be fair to say that the arrest and the events that followed the arrest, meaning the manner in which he was treated, being taken to the jail in the Fifth District rather than any intervention, being sent back to campus and not offered any alternative, being escorted to his room and escorted out, not being provided with a room and having previously been denied a request for a room, that those events drove him from his state of psychosis into his state of hopelessness?
>
> MR. WATERS [Gallaudet's Counsel]: Objection.
>
> A. Yes.
>
> Q. Would you agree that at the time Gianni was in a state of hopelessness, that he was essentially stripped of his ability to refuse impulses?
>
> MR. WATERS: Objection.
>
> Q. -- to commit suicide?
>
> MR. WATERS: Objection.
>
> A. Essentially, yes.
>
> Q. Explain that.
>
> MR. WATERS: Objection.
>
> A. …[H]e was stripped of his ability to process through his future in a rational way. And so I say essentially yes, because he acted on a suicidal impulse after processing through his future in a highly irrational way. And making a choice at that time.

25

(Ex. R. at 233-34). Accordingly, the Court can, and should, reject Gallaudet's relevance challenge on that basis alone.

### 2. Dr. Welner's opinions meet the "irresistible impulse" test, which does not eliminate substantial factor causation

Second, Dr. Welner's opinions — as reflected in the rest of his deposition testimony and his expert report — were sufficient to establish causation, even taking into consideration the "irresistible impulse" requirement. Gallaudet argues the "irresistible impulse" test has replaced substantial factor causation. But that argument misconstrues the role of the "irresistible impulse" test.

The District of Columbia Court of Appeals explained the origin and role of the "irresistible impulse" test as follows:

> [A]s a general rule, one may not recover damages in negligence for the suicide of another. The act of suicide generally is considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death. This general rule is subject to an important exception.

*District of Columbia v. Peters*, 527 A.2d 1269, 1275 (D.C. 1987). The court went on to recite that "important exception" which was the irresistible impulse test: "If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if ***his delirium or insanity***…***makes it impossible for him to resist an impulse*** caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason." *Id.* at 1275-76 (quoting Restatement (Second) of Torts § 455 (1977)) (emphasis added).

Thus, the irresistible impulse test modifies the degree of the "delirium or insanity" brought on by the defendant's conduct; it does not supersede or replace substantial factor causation needed to connect the defendant's conduct to the delirium or insanity. Accordingly, the

connection between Gallaudet's conduct and Gianni's mental state immediately prior to his suicide remains governed by substantial factor causation. *See District of Columbia v. Zukerberg*, 880 A.2d 276, 283 (D.C. 2005) ("The substantial factor test is properly applicable whenever there are concurring causes of a single injury, regardless of whether the other causes are relatively passive or preexisting, such as a physical condition, or relatively active and occur subsequently, such as intervening negligent act.") (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 322 (D.C. 1980)). Applying the rule to this case, Dr. Welner testified that the false arrest and its consequences were a substantial factor cause of the hopelessness that ultimately prompted Gianni to take his own life. (Ex. R. at 114 ("He became hopeless. And hopeless has a direct relationship to suicide"); *id.* at 236 ("[A]t that time he was experiencing hopelessness and it culminated in his suicide.")). Dr. Welner also opined that this hopelessness was so severe that Gianni was "stripped of his ability to process through his future in a rational way" such that he "acted on a suicidal impulse." (Ex. R. at 234).

The relevance of Dr. Welner's opinion is not undermined by Gallaudet's argument that other factors may have contributed to Gianni's suicide. (*See* Mot. at 21 ("Dr. Welner admits that Gianni was experiencing the psychiatric condition that led to his suicide prior to the arrest…[and] that Gianni could have survived the arrest if his mother had taken him for emergency medical treatment when he texted her that his life was in danger.")).[5] As noted above, substantial factor causation is not defeated by other concurring causes, "whether the other causes are relatively passive or preexisting" like Gianni's prior mental illness, or "occur[ring]

---

[5] To be precise, Dr. Welner stated that "[if] his mother was ***aware that he had been a threat to others***…and if his mother would have been able to succeed in ***having him involuntarily committed***, that he would not have committed suicide." (Ex. R. at 237). Of course, both of those conditions were completely outside of Ms. Sacchetti's control so Gallaudet's argument that her inaction severs causation is specious.

subsequently," such as his mother's failure to have him involuntarily committed. *Zukerberg*, 880 A.2d at 283.

Consistent with the analysis above, courts have routinely rejected this same "failure to rule out other causes of suicide" argument asserted by defendants raising *Daubert* challenges in suicide cases. *See, e.g.*, *Giles v. Wyeth Inc.*, 500 F. Supp. 2d 1048, 1062 (S.D. Ill. 2007) (denying defendant's *Daubert* motion and stating "[b]ecause a combination of factors generally cause one to commit suicide, it is not surprising that [the expert] would refuse to admit that depression, financial hardship, and other factors played no role in Jeff's suicide"); *In re Neurontin*, 2009 WL 3756328, at *7 ("Though an expert should consider and analyze alternative causes of a disease or side-effect, he or she is not required to rule out each and every other possible cause before offering a causation opinion…In fact, under…general hornbook torts law, the plaintiff must prove only that Neurontin was a substantial factor in causing the harm."); *Bennett v. Forest Labs.*, 2015 WL 1579404, *4 (M.D. Fla. Apr. 9, 2015) (denying *Daubert* motion and rejecting defendant's argument that plaintiff's expert "did not eliminate depression as the cause of [decedent's] suicide"); *Koho*, 2015 WL 11201281, at *5 (denying *Daubert* motion where plaintiff's expert did not "definitively rule out" the drug Trazodone and depression as "contributing factors" in decedent's suicide because "doing so was not necessary").

### 3. The "irresistible impulse" test does not apply at all in this case because Plaintiffs' false arrest claim is an intentional tort

Finally, even if Dr. Welner's testimony did not address the "irresistible impulse" test, that would not be a basis for excluding his opinion because the test is inapplicable to this case. In fact, because the test is entirely inapplicable to intentional tort claims, Plaintiffs do not need to satisfy it even to establish causation for purposes of opposing summary judgment.

Both the Restatement and *Peters* make clear that the "irresistible impulse" test applies to negligence claims. *See*, 527 A.2d at 1275 ("[O]ne may not recover damages **in negligence** for the suicide of another" subject to the exception created by irresistible impulse test); RESTATEMENT (SECOND) OF TORTS § 455 (1977) ("If the actor's **negligent conduct** so brings about the delirium or insanity of another…"). A Massachusetts federal court canvassing the law of several jurisdictions on this discrete issue observed that "[t]he distinction between intentional and negligent conduct is significant in deciding whether there is liability for an act of suicide." *North Shore Pharm. Servs., Inc. v. Breslin Assocs. Consulting LLC*, 2004 WL 6001505, *4 (D. Mass. June 22, 2004). While the undersigned has not located any District of Columbia decision addressing this specific question, courts across the country have expressly held the irresistible impulse test does not apply to intentional tort claims.[6]

The Rhode Island Supreme Court explained the rationale for this distinction as follows: "The analysis of whether a defendant is liable for a suicide allegedly caused by intentional conduct differs from the analysis of liability for negligent conduct because there is no superseding-cause concept applicable to intentional torts." *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 812 (R.I. 1996). More than a decade earlier, in a case where the plaintiff asserted claims for assault, battery, and false imprisonment, the New Hampshire Supreme Court offered the following rationale for declining to apply the irresistible impulse standard:

> The law of torts recognizes that a defendant who intentionally causes harm has greater culpability than one who negligently does so…In most cases of intentional torts, the defendant's liability for the resulting harm extends…to consequences which the defendant did not intend, and could not reasonably have foreseen, upon

---

[6] There can be no doubt that false arrest is an intentional tort. *See District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) (listing "false arrest" as an intentional tort, along with assault, battery, and several others). Indeed, Gallaudet affirmatively asserted, twice, that "[f]alse arrest is not a negligence claim." (D.E. 59 (Gallaudet's Motion for Summary Judgment) at 12, 28).

the obvious basis that it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim.

*Mayer v. Town of Hampton*, 497 A.2d 1206, 1209-10 (N.H. 1985). *See also Kimberlin v. DeLong*, 637 N.E.2d 121, 126 (Ind. 1994) (rejecting irresistible impulse standard and stating "[l]iability for intentional torts extends beyond foreseeability because 'it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim.'") (quoting W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 9, at 40 (5th ed. 1984)); Allen C. Schlinsog, Jr., *The Suicidal Decedent: Culpable Wrongdoer or Wrongfully Deceased?*, 24 J. Marshall L. Rev. 463, 471 n.32 (1991) ("If the suicide is a result of an intentional tort, the mere fact that the decedent is a wrongdoer will not prevent liability…[B]ecause the tortfeasor is equally as culpable as the decedent, public policy does not warrant protection for the tortfeasor.").

Based on these principles, the majority of jurisdictions that have addressed the issue have declined to apply the "irresistible impulse" standard to intentional tort claims, holding that liability can be imposed based on a showing that the defendant's conduct was a substantial factor cause of the decedent's suicide. One example is the Wyoming Supreme Court's opinion in *R.D. v. W.H.*, where the court held that "an actor will be liable when he intentionally commits a tort…and the commission of that tort causes an emotional or psychiatric illness which is a substantial factor in bringing about the suicide of the victim." 875 P.2d 26, 31 (Wyo. 1994). Notably, the court held that "the actor will be liable for the result even though he does not intend to cause the emotional or psychiatric illness" because "[t]he substantial factor rule recognizes that a higher degree of responsibility exists for those who commit intentional acts than for those who merely act negligently." *Id.*

Although the precise wording of the test varies, other courts have joined in rejecting the "irresistible impulse" test in intentional tort cases. *See Clift*, 688 A.2d at 812 (holding liability can be imposed "where the actor intended to cause injury, and the injury is a substantial factor in bringing about the suicide"); *Kimberlin*, 637 N.E.2d at 128 (holding liability can be imposed upon a showing that "defendant's willful tortious conduct was intended to cause a victim physical harm and where the intentional tort is a substantial factor in bringing about the suicide"); *Rowe v. Marder*, 750 F. Supp. 718, 724 (W.D. Pa. 1990) (holding imposition of liability would "require the intentional wrong to be a substantial factor in causing the suicide"); *Mayer*, 497 A.2d at 1211 (holding liability can be imposed upon a showing that defendant "intentionally wronged a victim and that this intentional conduct caused severe emotional distress in his victim which was a substantial factor in bringing about the suicide of the victim"); *Tate v. Canonica*, 180 Cal. App. 2d 898, 909 (Cal. App. 1960) (holding liability can be imposed "where the actor intended to cause injury, and the injury is a substantial factor in bringing about the suicide"). *Accord*, *North Shore Pharm. Servs., Inc. v. Breslin Assocs. Consulting LLC*, 2004 WL 6001505, *5 (D. Mass. June 22, 2004) (collecting cases and concluding "this court believes that Massachusetts is likely to join the 'trend of recent cases' recognizing a cause of action for wrongful death by suicide where the suicide results from an intentional wrong").

Accordingly, because the "irresistible impulse" test is entirely inapposite to this case, it cannot serve as a basis for excluding Dr. Welner's testimony on grounds of relevance.

## IV.   GALLAUDET'S REMAINING ARGUMENTS ARE NOT GROUNDS FOR EXCLUDING DR. WELNER

Gallaudet's final arguments are an assortment of complaints which, yet again, misunderstand the court's gatekeeper role.

As for Dr. Welner's purported "attempt to exonerate Gianni's mother" (Mot. at 22), the testimony is appropriate for several reasons. First, it demonstrates Dr. Welner's has considered other events that might be contributing causes; indeed, Gallaudet argues that Ms. Sacchetti's inaction severs causation under its (misguided) view of the irresistible impulse standard. (Mot. at 21). To the extent Gallaudet argues Dr. Welner's opinion "is not a matter of psychiatric opinion" (Mot. at 22), that is plainly wrong. Whether Ms. Sacchetti would have been able to prevent her son's suicide turns on Gianni's mental state — a subject upon which Dr. Welner, as a forensic psychiatrist, is eminently qualified to opine and which is clearly beyond the capacity of a jury of laypersons. *Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996) ("The dispositive question is whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue…"); *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (expert testimony assists trier of fact "if it concerns matters that are beyond the understanding of the average lay person").

Finally, Dr. Welner's statements that Gianni was in academic jeopardy and that Gallaudet acted with "contempt and indifference" were not offered as expert opinions on "academic standing" or "higher education" and "university policing standards." (Mot. at 21-22). He was simply stating his view of facts he relied upon in forming his opinion, based on record evidence that was provided to him and which he discussed during his deposition. As discussed above, Gallaudet is free to challenge Dr. Welner's interpretation of those facts at trial, but it is not a basis for excluding his opinions. *See Stollings v. Ryobi Technologies*, 725 F.3d 753, 765 (7th Cir. 2013) ("But the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony. The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). In *Nagle v. Gusman*, 2016 WL

560688 (E.D. La. Feb. 12, 2016), the trial court rejected a similar argument by a defendant raising a *Daubert* challenge to the plaintiff's forensic psychiatrist in a case arising out of a jail inmate's suicide. The court stated: "To the extent that Dr. Ford makes any factual statements in her report as she explains her expert opinion, this is not impermissible…[A]n expert may offer her opinion as to facts that, if found, would help the jury resolve a particular issue." *Id.* at *6 (citing *Burkhardt v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997)).

## CONCLUSION

For all the reasons stated above, the Court should deny Gallaudet's motion in its entirety.


Dated:  February 1, 2018                    Respectfully submitted,

                                             /s/ Justin D. Grosz
                                            Justin D. Grosz
                                            Washington D.C. Bar No. 1018414
                                            MORELLI ALTERS, LLP
                                            DCOTA Design Center of the Americas
                                            1855 Griffin Road, Suite C470
                                            Dania Beach, Florida  33004
                                            Telephone (305) 571-8550
                                            Facsimile (305) 571-8558

                                            Counsel for Plaintiffs

CASE NO.: 1:15-cv-00455-RBW

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of February, 2018, the foregoing was served via CM/ECF for the U.S. District Court of the District of Columbia to all counsel of record.


_____/s/ Justin D. Grosz_____