# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————————— )
TERRYLENE SACCHETTI and )
ROBERT MANGANELLI, )
      )
     Plaintiffs, )
      )
     v. )     Civil Action No. 15-455 (RBW)
      )
GALLAUDET UNIVERSITY and )
the DISTRICT OF COLUMBIA, )
      )
     Defendants. )
———————————————————————————— )

## MEMORANDUM OPINION

The plaintiffs, Terrylene Sacchetti and Robert Manganelli, in their individual capacities and as representatives of the Estate of Gianni Manganelli, bring this suit against defendants Gallaudet University ("Gallaudet") and the District of Columbia (the "District"), asserting violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213 (2012), and common law claims for false arrest. Compl. ¶¶ 160–272. Currently pending before the Court are Defendant Gallaudet's Motion to Exclude Testimony of [the] Plaintiff's Expert Michael Welner, M.D. ("Gallaudet's 702 Mot."); the Plaintiffs' Motion to Strike the District of Columbia's Undisclosed Exhibits ("Pls.' Mot. to Strike"), and the defendants' motions for summary judgment, see Defendant Gallaudet University's Motion for Summary Judgment ("Gallaudet's Summ. J. Mot."); Defendant the District of Columbia's Motion for Summary Judgment ("District's Summ. J. Mot."). Upon careful consideration of the parties' submissions,[1]

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Gallaudet University's Memorandum in Support of Its Motion for Summary Judgment ("Gallaudet's Summ. J. Mem."); (2) Defendant Gallaudet University's Statement of Material Facts Genuinely Not at Issue in Support of Its Motion for Summary Judgment ("Gallaudet's Facts"); (3) the Memorandum of Points and Authorities

(continued . . . )

the Court concludes that it must grant Gallaudet's motion to exclude the testimony of Dr.

Welner, deny the plaintiffs' motion to strike the District's exhibits, and grant in part, deny in

part, and hold in abeyance in part the defendants' motions for summary judgment.

## I. BACKGROUND

### A. Factual Background

The following facts are undisputed by the parties, unless otherwise indicated. The

plaintiffs are the parents of Gianni Manganelli ("Manganelli"), see Gallaudet's Facts ¶¶ 1–2;

Pls.' Reply to Gallaudet's Facts ¶¶ 1–2, who is now deceased, see Gallaudet's Facts ¶ 164; Pls.'

Reply to Gallaudet's Facts ¶ 164. Manganelli "was deaf from the age of two onward."

Gallaudet's Facts ¶ 3; see Pls.' Reply to Gallaudet's Facts ¶ 3. "During the summer of 2013,

[Manganelli] decided . . . to enroll at Gallaudet," and he "accepted admission to Gallaudet [ ] for

the school year beginning August 2013." Gallaudet's Facts ¶¶ 45–46; see Pls.' Reply to

Gallaudet's Facts ¶¶ 45–46. Manganelli "and Spencer Opie became roommates at Gallaudet at

the start of the 2014 [s]pring semester." Gallaudet's Facts ¶ 64; see Pls.' Reply to Gallaudet's

Facts ¶ 64.

---

( . . . continued)
in Support of Defendant District of Columbia's Motion for Summary Judgment ("District's Summ. J. Mem.");
(4) The District of Columbia's Statement of Undisputed Material Facts in Support of Its Motion for Summary
Judgment ("District's Facts"); (5) the Plaintiffs' Omnibus Response in Opposition to the Defendants' Motions for
Summary Judgment ("Pls.' Summ. J. Opp'n"); (6) the Plaintiffs' Statement of Genuine Issues of Material Fact in
Support of Their Omnibus Opposition to the Defendants' Motions for Summary Judgment ("Pls.' Facts"); (7) the
Plaintiffs' Response to the District of Columbia's Statement of Undisputed Material Facts in Support of Its Motion
for Summary Judgment ("Pls.' Reply to District's Facts"); (8) the Plaintiffs' Response to Defendant Gallaudet
University's Statement of Material Facts ("Pls.' Reply to Gallaudet's Facts"); (9) Gallaudet University's Reply in
Support of Its Motion for Summary Judgment ("Gallaudet's Summ. J. Reply"); (10) Defendant the District of
Columbia's Reply to Plaintiff[s'] Opposition to Its Motion for Summary Judgment ("District's Summ. J. Reply");
(11) Defendant Gallaudet University's Memorandum in Support of Its Motion To Exclude Testimony of Plaintiffs'
Expert Michael Welner, M.D. ("Gallaudet's 702 Mem."); (12) the Plaintiffs' Opposition to Defendant Gallaudet
University's Motion to Exclude Testimony of Plaintiff's Expert Dr. Michael Welner ("Pls.' 702 Opp'n");
(13) Defendant Gallaudet University's Reply in Support of Its Motion to Exclude Testimony of Plaintiffs' Expert
Michael Welner, M.D. ("Gallaudet's 702 Reply"); (14) Defendant the District of Columbia's Memorandum of
Points and Authorities in Opposition to Plaintiffs' Motion to Strike Exhibits ("District's Strike Opp'n"); and (15) the
Plaintiffs' Memorandum in Reply to the District of Columbia's Opposition to the Plaintiffs' Motion to Strike
Undisclosed Exhibits ("Pls.' Strike Reply").

### 1. Manganelli's Interactions with Opie on March 28, 2014

"Around midday on Friday, Marc[h] 28, 2014, [ ] Manganelli . . . was in his dorm[itory] room folding clothes when . . . Opie . . . walked in and tried to talk to him." Pls.' Facts ¶ 1; see Gallaudet's Facts ¶ 73 (asserting that "on March 28, 2014, [Opie] returned to the dorm[itory] room"). Manganelli "just stared [blankly at Opie], with no response," Pls.' Facts ¶ 1; see Gallaudet's Facts ¶ 74 (asserting that Manganelli "stared menacingly at [ ] Opie"), which "Opie thought . . . was odd" behavior, Pls.' Facts ¶ 3 (citing Pls.' Summ. J. Opp'n, Exhibit ("Ex.") K (Deposition of Spencer Opie (May 4, 2017) ("Opie Dep.")) 83:10–15). According to Opie, Manganelli's "behavior had been strange since Spring Break," and Manganelli "seemed scared and paranoid." Id. ¶ 2 (citing Pls.' Summ. J. Opp'n, Ex. K (Opie Dep.) 81:24–82:6). Manganelli "went to the bathroom[,] and when he came back[, he] said that '[Opie] had ruined everything,'" id. ¶ 4 (quoting Pls.' Summ. J. Opp'n, Ex. K (Opie Dep.) 31:11–13), and he "drew an imaginary line down the middle of the room and asked Opie to stay on his side" of the line, id. ¶ 6; see Gallaudet's Facts ¶ 74 (asserting that Manganelli "told [Opie] that he was mad at [him], that [ ] Opie had 'ruined everything,' and insisted that [ ] Opie stay on his side of the room"). Then, "Opie 'got up' and approached" Manganelli, and in response, Manganelli "'almost raised his hand openly and then he left.'" Pls.' Facts ¶ 7 (quoting Pls.' Summ. J. Opp'n, Ex. K (Opie Dep.) 31:18–20); see Gallaudet's Facts ¶ 75 ("Opie testified that [Manganelli] raised a hand as if to hit him but did not make contact, storming out of the room instead.").

Manganelli "went directly to the bathroom," and "Opie immediately pursued [him]." Pls.' Facts ¶¶ 8–9. On the way, "Opie ran into a friend, John, in the hallway, and . . . [they both] went into the bathroom," where "[t]hey found [Manganelli] in a shower stall." Id. ¶¶ 10–11; see Gallaudet's Facts ¶ 76 ("Opie testified that he went to look for [Manganelli] and that he and a friend, John Delatto, found [Manganelli] hiding in the men's shower."). "Opie confronted

[Manganelli,] asking[,] 'What's wrong with you?'" Pls.' Facts ¶ 13 (quoting Pls.' Summ. J.

Opp'n, Ex. K (Opie Dep.) 33:11–12). In response, Manganelli "pulled his arm back but did not

swing at Opie," id. ¶ 14, and "John stepped in between Opie and [Manganelli]," id. ¶ 15.

Manganelli "told Opie and John to leave him alone," id. ¶ 16, and "Opie and John left the

bathroom," id. ¶ 17, with "John [telling] Opie that '[Manganelli] seems pretty emotional, just let

him be,'" id. ¶ 18.

Following this incident, Manganelli "went to class." Id. ¶ 19. Afterward, he "made a

report to [a] [r]esident [a]ssistant, . . . advising her that he had been violated by . . . Opie, who

had walked into him intentionally while he was in the shower after [he] made it clear to [Opie]

that [Opie] was to leave him alone." Id. ¶ 43 (second and third alterations in original) (internal

quotation marks omitted). The resident assistant then "authored and submitted an incident report

documenting [Manganelli's] concerns about [ ] [Opie] . . . , which was routed to Adrienne

Morgan, [a] Coordinator of Residential Education (CRE) at Gallaudet." Id. ¶ 44. Then,

Manganelli "went to see [ ] Morgan," id. ¶ 45, "and told her he was concerned about Opie's

personal violations and asked [her] for another room," id. ¶ 47; see Gallaudet's Facts ¶ 82

(asserting that Manganelli "visited [ ] Morgan[] . . . to ask[] for another room because he felt that

his roommate . . . had violated his boundaries and he no longer felt safe"). However,

"Morgan[] . . . rejected his request." Pls.' Facts ¶ 53; see Gallaudet's Facts ¶ 83 ("Morgan

inquired, but she did not feel [Manganelli]'s explanation justified an emergency room re-

assignment.").

"In the meantime, . . . Opie . . . ran into a friend, Jason Scherrenberg." Pls.' Facts ¶ 37.

After "explain[ing to Scherrenberg] what happened with [Manganelli] earlier that afternoon," id.

¶ 39, "Scherrenberg offered to let Opie stay at his room for the night," id. ¶ 38. "Around

midnight, [ ] Opie returned to [his] dorm[itory] with [ ] Scherrenberg to collect [his] belongings from [his] room." Gallaudet's Facts ¶ 87; see Pls.' Reply to Gallaudet's Facts ¶ 87. When "Opie went up to the room and opened the door," Pls.' Facts ¶ 60, Manganelli "did not say anything to Opie," id. ¶ 61. However, "when Scherrenberg tried to come into the room[,] [ ] [Manganelli] got up from where he was sitting," id. ¶ 63, and "told Scherrenberg that he did not know him and did not want him in his room," id. ¶ 64. Manganelli "asked Scherrenberg to leave," id. ¶ 65, but "Scherrenberg resisted and would not leave," id. ¶ 66. In response, Manganelli "approached Scherrenberg and told [him] that he [ ] would fight him [ ] if Scherrenberg [did not] leave." Id. ¶ 67. "Scherrenberg and Opie left without getting Opie's toiletries." Id. ¶ 68.

Then, "Opie and [ ] Scherrenberg went to Laura Crowder, the Residential Assistant [ ] for [the dormitory], to report what happened." Gallaudet's Facts ¶ 89; see Pls.' Reply to Gallaudet's Facts ¶ 89. "Crowder prepared a report of the incident on Gallaudet's reporting system," Gallaudet's Facts ¶ 90; see Pls.' Reply to Gallaudet's Facts ¶ 90, and, according to Crowder, she "also contacted Gallaudet's [Department of Public Safety ("DPS")] via instant message," Gallaudet's Facts ¶ 91; see Pls.' Reply to Gallaudet's Facts ¶ 91 ("[a]dmitting that [ ] Crowder claims to have contacted DPS"). Meanwhile, Manganelli "sent an email to Gallaudet CRE Thuan Nguyen, at 12:38 a.m.," Pls.' Facts ¶ 72, which described the incident in the bathroom, stated that Manganelli was "afraid for [his] safety around" Opie, and requested that Nguyen "assign [him] to a different room immediately," id. (internal quotation marks and citation omitted); see Gallaudet's Facts ¶ 92 (asserting that Manganelli "sent an email complaining about the incident to . . . Nguyen").

### 2. Manganelli's Interactions with Gallaudet DPS Officers

Thereafter, at "[a]bout 12:30 a.m. [on March 29, 2014], DPS dispatched Lieutenant Daniel Bauer . . . via text" to Manganelli and Opie's room. Gallaudet's Facts ¶ 93; see Pls.'

Reply to Gallaudet's Facts ¶ 93 ("[a]dmitting that Bauer was dispatched by Gallaudet to respond to a room in the dorm[itory], which was ultimately discovered to belong to [Manganelli] and Opie").[2]  According to Lieutenant Bauer's deposition testimony, which the plaintiffs dispute, see Pls.' Reply to Gallaudet's Facts ¶¶ 93, 95–108,[3] the text message "stat[ed] that there was 'a man in a room hurting ten [ ] people,'" Pls.' Facts ¶ 74 (quoting Pls.' Summ. J. Opp'n, Ex. A (Deposition of Lieutenant Daniel Bauer (Mar. 6, 2017) ("Bauer Dep.")) 22:1–23:8).  However, it is undisputed that, at the time he received the message, Lieutenant "Bauer did not know [Manganelli] or that it was his dorm[itory] room."  Gallaudet's Facts ¶ 100; see Pls.' Reply to Gallaudet's Facts ¶ 100.

"At about 12:45 a.m.[,] . . . [Lieutenant] Bauer arrived at [Manganelli's] door."  Pls.' Facts ¶ 73.  According to Lieutenant Bauer's testimony, which, again, the plaintiffs dispute in many respects, see Pls.' Reply to Gallaudet's Facts ¶¶ 96–107, the following events ensued: "Upon arriving at [Manganelli]'s dorm[itory] room . . . , [Lieutenant] Bauer sent a text [message] requesting back up[,] [and] then waited in the hallway outside the dorm[itory] room for his backup to arrive."  Gallaudet's Facts ¶ 96; see Pls.' Reply to Gallaudet's Facts ¶ 96 ("[a]dmitt[ing] that [Lieutenant] Bauer requested backup," but "[d]en[ying] that he waited in the hallway").  "While [Lieutenant] Bauer waited in the hallway, [Manganelli] opened the door to

---

[2] The plaintiffs deny that Bauer was dispatched at 12:30 a.m., see Pls.' Reply to Gallaudet's Facts ¶ 93, but they do not identify any facts which suggest that he was dispatched at a different time, see id., and they admit that Bauer arrived at Manganelli's room "at about 12:45 a.m.," Pls.' Facts ¶ 73.

[3] The plaintiffs assert that "there are conflicts within [Lieutenant Bauer's] testimony as well as from the testimony of others, including Kalina Johnson, which undermine[] the credibility of the factual assertions [Lieutenant] Bauer makes."  Pls.' Reply to Gallaudet's Facts ¶ 107; see Pls.' Facts ¶¶ 97–98 (asserting that Lieutenant "Bauer claimed that [Manganelli] had his hands behind his back during their exchange at the threshold of [Manganelli's] room," but "testified that [Manganelli] was using his hands to sign during their exchange").  However, the Court need not determine whether these conflicts create a genuine factual dispute because, as discussed infra, see Part III.B.1, even accepting Lieutenant Bauer's testimony as true, that testimony is not sufficient to demonstrate that Gallaudet is entitled to summary judgment on the plaintiffs' false arrest claim as a matter of law.

[the] room," Gallaudet's Facts ¶ 97, and Lieutenant Bauer observed that "the lights inside [the room] were out," id. ¶ 98; see Pls.' Reply to Gallaudet's Facts ¶ 98 ("[a]dmitting that the lights were out when the door was opened"). Lieutenant "Bauer asked [Manganelli] to step out into the hall and talk to him." Gallaudet's Facts ¶ 100. When Manganelli "did not respond[,] [ ] [Lieutenant] Bauer asked him to step out [of the room] and speak with him a second time." Id. ¶ 101. At some point, Manganelli "began signing . . . to ask why he was being told to step out of his own room." Pls.' Facts ¶ 89; see Gallaudet's Facts ¶ 102 ("[Manganelli] asked why he needed to step out of the room."). "[Lieutenant] Bauer explained to [Manganelli] that he had a report that there were injured people in the room." Gallaudet's Facts ¶ 104. Manganelli "did not respond, at which point, [Lieutenant] Bauer informed [Manganelli] that if he would not cooperate, [he] would need to place him in handcuffs for both of their safety." Id. ¶ 105. After Manganelli "did not respond[,] . . . [Lieutenant] Bauer placed him in handcuffs." Id. ¶ 106. According to Resident Assistant Kalina Johnson, who testified that she had arrived at Manganelli's room shortly after Lieutenant Bauer arrived, see Pls.' Facts ¶¶ 106–08, Lieutenant "Bauer told [Manganelli] he was under arrest," id. ¶ 113 (citing Pls.' Summ. J. Opp'n, Ex. B (Deposition of Kalina Johnson (May 15, 2017) ("Johnson Dep.")) 35:13–15).

Sometime thereafter, "DPS Captain Patrick Rader responded to the scene as the backup requested by [Lieutenant] Bauer." Gallaudet's Facts ¶ 109; see Pls.' Reply to Gallaudet's Facts ¶ 109. "Once on [the] scene, [Captain] Rader checked [Manganelli]'s room[.]" Pls.' Facts ¶ 115; see Gallaudet's Facts ¶ 111 (asserting that Lieutenant Bauer and Captain Rader "swept the dorm[itory] room"). According to testimony from Captain Rader and Lieutenant Bauer, which the plaintiffs dispute, see Pls.' Reply to Gallaudet's Facts ¶ 111–14, "after Lieutenant Bauer told [Captain Rader] what had happened, [Captain Rader] explained to [Manganelli] why he was

being detained," Pls.' Summ. J. Opp'n, Ex. D (Deposition of Captain Patrick Rader (Mar. 6, 2017) ("Rader Dep.")) 38:18–20. Because he was handcuffed behind his back, Manganelli "was signing . . . off to the side of his body, '[w]hy, why, why,'" id., Ex. D (Rader Dep.) 39:13–14, so Captain Rader "asked [Manganelli], '[a]re you going to give us a problem if I handcuff you in the front?,'" id., Ex. D (Rader Dep.) 39:25–40:2; see id., Ex. A (Bauer Dep.) 51:5–6 (testifying that Captain "Rader asked [Manganelli] if we could handcuff him in the front, that way he could communicate much easier"). However, Manganelli "did[] [not] say anything" in response. Id., Ex. D (Rader Dep.) 40:11. Then, Captain Rader "told [Manganelli] that [he] was going to take [Manganelli's] handcuffs off and move [them] to being handcuffed in the front," and again "said, '[a]re you going to give us a problem if I do that?'" Id., Ex. D (Rader Dep.) 40:20–23. Again, Manganelli "did[] [not] say anything." Id., Ex. D (Rader Dep.) 40:23–24. Captain Rader testified that although Manganelli "did[] [not] reply to [his] question, [he] felt that communication was important," id., Ex. D (Rader Dep.) 40:23–41:1, so he uncuffed "one wrist," id., Ex. D (Rader Dep.) 41:8–10; see Pls.' Facts ¶ 124 ("The officer released a handcuff from one of [Manganelli's] wrists, leaving the other wrist secured[.]"), and he and Lieutenant Bauer "moved [Manganelli's] hands to the front of his body," Pls.' Summ. J. Opp'n, Ex. D (Rader Dep.) 42:7–8.

According to Gallaudet, "as soon as the handcuffs came off, [Manganelli] began resisting." Gallaudet's Facts ¶ 112; see Pls.' Summ. J. Opp'n, Ex. D (Rader Dep.) 42:25–43:4 (testifying that Manganelli "was physically struggling" and "would[] [not] let [the officers] recuff him"). Captain Rader testified that during this process, Manganelli "kept saying, ' . . . why are you arresting me?'" Pls.' Summ. J. Opp'n, Ex. D (Rader Dep.) 42:17–18. Captain Rader further testified that he and Lieutenant Bauer "were trying to explain to [Manganelli] that

he[] [was] being detained and [ ] he need[ed] to stop, but [Manganelli] refused." Id., Ex. D

(Rader Dep.) 42:18–20. Although the plaintiffs largely dispute this account, see Pls.' Reply to

Gallaudet's Facts ¶¶ 112–13, they agree that when the officers "were moving the handcuffs to

the front[,] [ ] [Manganelli] 'was signing in the process,'" Pls.' Facts ¶ 126 (quoting Pls.' Summ.

J. Opp'n, Ex. D (Rader Dep.) 44:13–23); see id. ¶ 129 ("[W]hen the handcuff was released from

one wrist, [Manganelli] brought his arms around and was trying to use his hands to

communicate[.]"). Ultimately, "[Lieutenant] Bauer and [Captain] Rader took [Manganelli] to the

ground and re-cuffed him." Gallaudet's Facts ¶ 114; see Pls.' Reply to Gallaudet's Facts ¶ 114

("[a]dmitt[ing] that [Lieutenant] Bauer and [Captain] Rader took [Manganelli] to the ground and

re-cuffed his hands behind his back"). Captain Rader testified that he then "texted the

dispatcher" and told the dispatcher that they "needed [the Metropolitan Police Department

("MPD")]." Pls.' Summ. J. Opp'n, Ex. D (Rader Dep.) 48:5–8.

At some point thereafter, "Opie returned to the dorm[itory] [ ] with [ ] Scherrenberg."

Gallaudet's Facts ¶ 120; see Pls.' Reply to Gallaudet's Facts ¶ 120. According to their

testimony, when they arrived, Manganelli "was already in custody and [ ] face down [on the

floor] in handcuffs." Pls.' Facts ¶ 159. By then, "Morgan [had also] arrived on [the] scene."

Gallaudet's Facts ¶ 119; see Pls.' Reply to Gallaudet's Facts ¶ 119. Although the parties dispute

who Opie, Scherrenberg, and Morgan spoke to and what they spoke about, they agree that "Opie

told DPS that [Manganelli] was bipolar." Gallaudet's Facts ¶ 124; see Pls.' Reply to Gallaudet's

Facts ¶ 124. "[T]he DPS officers and [ ] Morgan searched [Manganelli's] dorm[itory] room for

medication," but "did not find [any] psychiatric medication." Gallaudet's Facts ¶¶ 125–26; see

Pls.' Reply to Gallaudet's Facts ¶¶ 125–26.

### 3.      Manganelli's Interactions with the MPD Officers

At 1:03:36 a.m. on March 29, 2014, the "District [received a] call from Gallaudet requesting District officers to respond."  Pls.' Facts ¶ 140; see District's Facts ¶ 11 (asserting that "[]DPS[] called 9-1-1 to report that a male student was acting very irate, fighting school security[,] and acting strange").  At 1:04:02 a.m., MPD "[O]fficers [Cassandra] Velez[ and Christopher] Lehigh [were] [ ] dispatched to Gallaudet," and at 1:10:02 a.m., they "arrive[d] on [the] scene."  Pls.' Facts ¶ 140; see District's Facts ¶ 12.  Then, at 1:10:51 a.m., MPD "Officer John Armstrong . . . [wa]s dispatched to pick up [Manganelli]."  Pls.' Facts ¶ 153; see District's Facts ¶ 12.  Although the parties largely dispute who the MPD officers spoke to on the scene and what they discussed, it is undisputed that "Officer Armstrong transported [Manganelli] to MPD's Fifth District Station" (the "Fifth District Station") at 1:32 a.m.  District's Facts ¶ 22; see Pls.' Facts ¶ 171 (asserting that Officer "Armstrong le[ft] Gallaudet with [Manganelli]" at 1:32:59 a.m.).  It is also undisputed that, "[f]ollowing . . . removal of [Manganelli] from the dorm[itory] by MPD, [ ] Opie and [ ] Scherrenberg [ ] provided signed written statements to MPD," Gallaudet's Facts ¶ 136; see Pls.' Reply to Gallaudet's Facts ¶ 136 ("[a]dmit[ting] that [ ] statements provided by Opie and Scherrenberg were . . . provided after [Manganelli] had already been arrested"), and "[t]hey also gave partially[] video recorded [oral] statements to MPD . . . around 2:00 a.m.," Gallaudet's Facts ¶ 137; see Pls.' Reply to Gallaudet's Facts ¶ 137 ("[a]dmit[ting] [ ] that video recorded statements were taken at 2:00 a.m.").

"Manganelli arrived at [the] Fifth District Station at 1:41 a.m.," at which time "MPD Officer Wesley Shifflett prepared [ ] arrest paperwork, . . . which charged Manganelli with simple assault domestic violence and threats to do bodily harm."  District's Facts ¶ 28; see Pls.' Reply to District's Facts ¶ 28.  According to Officer Shifflett's testimony, "as [he] prepared the arrest paperwork, he communicated with Manganelli through handwritten notes."  District's

Facts ¶ 29; see Pls.' Reply to District's Facts ¶ 29 ("[a]dmitt[ing] that Officer Shifflett testified as such"). At some point thereafter, "Manganelli was transported from MPD's Fifth District Station to the Central Cell Block . . . [at] MPD's headquarters." District's Facts ¶ 30; see Pls.' Reply to District's Facts ¶ 30. And, "[l]ater . . . [that] morning . . . , Manganelli was transferred to the custody of the U.S. Marshal[s] [Service] and was held in a lock-up in the basement of the District of Columbia Superior Court while he was awaiting [presentment]." District's Facts ¶ 35; see Pls.' Reply to District's Facts ¶ 35.[4] "At some point . . . while Manganelli was awaiting [presentment], [a] Pretrial Services [o]fficer . . . tried to make contact with Manganelli by calling out his name into the . . . cell block," District's Facts ¶ 41; see Pls.' Reply to District's Facts ¶ 41; however, "Manganelli did not respond when his name was called," and the officer "completed [her pre-presentment] report without [Manganelli's] input," District's Facts ¶ 42; see Pls.' Reply to District's Facts ¶ 42.

Thereafter, Manganelli "appeared in Superior Court and received a no-contact order requiring that he stay away from [his] dorm[itory] room . . . and stay away from [ ] Opie and [ ] Scherrenberg." Gallaudet's Facts ¶ 139; see Pls.' Reply to Gallaudet's Facts ¶ 139. "After his release on March 29, 2014, [Manganelli] went back to campus and [ ] DPS [ ] escort[ed] him to his dorm[itory] room to collect some belongings." Gallaudet's Facts ¶ 140; see Pls.' Reply to Gallaudet's Facts ¶ 140. After Manganelli "collected his items and left the dorm[itory, he] sent several text[] [messages] to his mother[, plaintiff Sacchetti,] asking her to pick him up." Gallaudet's Facts ¶ 143; see Pls.' Reply to Gallaudet's Facts ¶ 143. Thereafter, "Sacchetti picked up [Manganelli] on campus." Gallaudet's Facts ¶ 147; see Pls.' Reply to Gallaudet's Facts ¶ 147.

---

[4] The parties have misidentified Manganelli's court appearance as an arraignment because the appearance did not follow the issuance of an indictment and it is therefore properly identified as a presentment.

According to Sacchetti's deposition testimony, "[o]nce they [arrived at] Sacchetti's

apartment in Maryland, . . . [Manganelli] asked her to take him back to Gallaudet."  Pls.' Reply

to Gallaudet's Facts ¶ 153; <u>see</u> Gallaudet's Facts ¶ 153 (asserting that "after they arrived back at

[Sacchetti's] apartment[,] . . . [Manganelli] demanded to return to Gallaudet").  However,

"Sacchetti was supposed to pick up her . . . daughter from a birthday party," Pls.' Reply to

Gallaudet's Facts ¶ 153, and when Manganelli "would not get back in the car," <u>id.</u> ¶ 154,

"Sacchetti went to pick up her daughter . . . and [later] drove around looking for [Manganelli]

without success," Gallaudet's Facts ¶ 156; <u>see</u> Pls.' Reply to Gallaudet's Facts ¶ 156.

According to Sacchetti's testimony, Manganelli "returned to [her] apartment around 5:00

a.m. on March 30, 2014."  Gallaudet's Facts ¶ 157; <u>see</u> Pls.' Reply to Gallaudet's Facts ¶ 157.

"[S]he attempted to convince [Manganelli] to go to the hospital, and . . . he seemed to agree."

Gallaudet's Facts ¶ 161; <u>see</u> Pls.' Reply to Gallaudet's Facts ¶ 161.  "[H]owever, [ ] once she left

the room [to get dressed], [Manganelli] went past her in the hallway and out the front door."

Gallaudet's Facts ¶ 162; <u>see</u> Pls.' Reply to Gallaudet's Facts ¶ 162.  "Sacchetti . . . attempted to

follow [Manganelli], but she could not keep up, so she returned to the apartment and contacted

the police."  Gallaudet's Facts ¶ 163; <u>see</u> Pls.' Reply to Gallaudet's Facts ¶ 163.  "Shortly

thereafter, around 6:00 a.m., [Manganelli] was found deceased . . . in a local creek."  Gallaudet's

Facts ¶ 164; <u>see</u> Pls.' Reply to Gallaudet's Facts ¶ 164.  "The Office of the Medical Examiner for

the State of Maryland performed [a] Post-Mortem Examination and determined, among other

things, that[] [ ] [Manganelli] suffered multiple sharp force injuries including a . . . wound [ ]

across the abdomen . . . [and] drowned."  Pls.' Facts ¶ 196; <u>see</u> Pls.' Summ. J. Opp'n, Ex. 97

(Post Mortem Examination Report, Office of the Chief Medical Examiner ("Post Mortem

Examination Report")) at 8.  "Sacchetti testified that she later learned [Manganelli] had taken a

butcher knife from her kitchen when he left the apartment." Gallaudet's Facts ¶ 165; see Pls.'

Reply to Gallaudet's Facts ¶ 165. The "[p]olice investigation showed that the manner of death

[wa]s SUICIDE." Pls.' Summ. J. Opp'n, Ex. 97 (Post Mortem Examination Report) at 8.

## B.    Procedural History

The plaintiffs filed this action against the defendants on March 30, 2015. See Compl. at

1.  The Complaint asserts six causes of action based on common law claims for wrongful death,

negligent infliction of emotional distress, and false arrest, as well as claims for violations of the

ADA. See Compl. ¶¶ 160–272. On June 12, 2015, the defendants each filed a motion to dismiss

the plaintiffs' Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure

12(b)(6). See Defendant Gallaudet University's Motion to Dismiss Plaintiffs' Complaint

Pursuant to Federal Rule of Civil Procedure 12(b)(6); Defendant District of Columbia's Motion

To Dismiss. Thereafter, the Court issued a memorandum opinion and order granting in part and

denying in part the defendants' motions to dismiss. See Sacchetti v. Gallaudet Univ., 181 F.

Supp. 3d 107, 131 (D.D.C. 2016). Specifically, the Court denied the motions with respect to the

plaintiffs' common law false arrest claims against both defendants, as asserted in their sixth and

seventh causes of action, as well as the plaintiffs' wrongful arrest and failure to accommodate

claims under the ADA against the District, as asserted in their fifth cause of action.[5] See id. The

Court granted the motions with respect to the plaintiffs' wrongful death/negligence, survival,

negligent infliction of emotional distress, and ADA claims against Gallaudet, as asserted in their

first, second, third, and fourth causes of action, as well as the plaintiffs' failure to train claim

---

[5] This cause of action is mislabeled the "Fourth Cause of Action" in the Complaint, compare heading above Compl. ¶ 230, with heading above id. ¶ 192, causing all subsequent causes of action to be mislabeled. For ease of reference, the Court has re-labeled this cause of action and the remaining causes of action by continuing the consecutive numbering, starting with the ADA claims asserted against the District, which begin at paragraph 230 of the Complaint.

under the ADA against the District, as asserted in their fifth cause of action. See id.

Thereafter, the parties conducted discovery, which closed on September 27, 2017. See Min. Order (Aug. 4, 2017). Then, on December 18, 2017, following the close of discovery, the defendants filed their motions for summary judgment, see Gallaudet's Summ. J. Mot. at 1; District's Summ. J. Mot. at 1,[6] and Gallaudet filed its motion to exclude the testimony of Dr. Welner, a forensic psychiatrist designated by the plaintiffs as an expert pursuant to Federal Rule of Evidence 702, see Gallaudet's 702 Mot. at 1. On February 2, 2018, the plaintiffs filed their motion to strike two exhibits attached to the District's motion for summary judgment. See Pls.' Mot. to Strike at 1. These motions are the motions that are the subject of this Memorandum Opinion.

## II.    ANALYSIS

### A.    The Parties' Evidentiary Motions

Before addressing the defendants' summary judgment motions, the Court will first address the parties' evidentiary motions, since the resolution of these motions will impact the Court's analysis of the summary judgment motions.

### 1.    Gallaudet's Motion to Exclude Testimony of Dr. Welner

Gallaudet argues that the Court should exclude testimony proffered by the plaintiffs from Dr. Michael Welner, see Gallaudet's 702 Mem. at 1, who the plaintiffs have designated as an expert on the issue of causation, see Pls.' 702 Opp'n at 23. Specifically, Gallaudet argues that Dr. Welner's opinions should be excluded because they "fail to meet the threshold requirements of reliability and relevance under [ ] Federal Rule[] of Evidence [702] and Daubert v. Merrell

---

[6] The District had previously filed a motion for partial summary judgment on the plaintiffs' false arrest claim against it, see Defendant District of Columbia's Motion for Partial Summary Judgment at 1, which the Court denied in an Order issued on November 1, 2016, see Order at 10 (Nov. 1, 2016), ECF No. 41.

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)." Gallaudet's 702 Mem. at 1. As to relevance, it argues that "Dr. Welner's opinions are irrelevant because they do not relate to the applicable legal standard" for causation. Id. at 20. As to reliability, it argues, inter alia, that Dr. Welner "offers no factual support for his conclusions, nor any foundation in scientific evaluation or analysis," id. at 14, and does not "ever refer to a treatise, manual, study, or any other source of scientific data that might support his purported diagnosis [that Manganelli was psychotic] or conclusions regarding [Manganelli's] alleged 'hopelessness,'" id. at 15.

The plaintiffs respond that "Dr. Welner arrived at his opinions after reviewing an extensive amount of [Manganelli]'s medical records and . . . other [relevant] documents . . . , [and] appl[ying] his extensive education, training, and experience as a forensic psychiatrist, including experience forensically determining the cause of suicide, to those case-specific materials." Pls.' 702 Opp'n at 14. They further argue that "several courts considering Daubert challenges in similar contexts[] . . . have recognized this same methodology, often labeled a 'psychological autopsy,' as reliable and generally accepted in the mental health community." Id. (footnote omitted) (collecting cases).

"The admission of expert testimony is governed by Federal Rule of Evidence 702." United States v. Straker, 800 F.3d 570, 631 (D.C. Cir. 2015). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In <u>Daubert</u> . . . , the Supreme Court held Rule 702 requires courts to ensure that expert testimony is 'not only relevant, but reliable.'" <u>Heller v. District of Columbia</u>, 801 F.3d 264, 271 (D.C. Cir. 2015) (quoting <u>Daubert</u>, 509 U.S. at 589). As to reliability, "courts are obligated to 'determine whether [expert] testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.'" <u>Id.</u> (alterations in original) (quoting <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 149 (1999)). In conducting this inquiry, "trial judges [must] focus on experts' 'principles and methodology, not on the conclusions that they generate.'" <u>United States v. Day</u>, 524 F.3d 1361, 1368 (D.C. Cir. 2008) (quoting <u>Daubert</u>, 509 U.S. at 595). And, "[a]lthough <u>Daubert</u> lists a number of factors that a court may consider in determining whether to admit or exclude expert testimony, the Supreme Court made it clear that '[t]he inquiry envisioned by Rule 702 is . . . a flexible one.'" <u>Id.</u> (omission in original) (quoting <u>Daubert</u>, 509 U.S. at 594). Ultimately, a "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." <u>Kumho Tire</u>, 526 U.S. at 152. Finally, "[t]he proponent of the expert testimony bears the burden to establish the admissibility of the testimony and the qualifications of the expert." <u>United States v. McGill</u>, 815 F.3d 846, 903 (D.C. Cir. 2016).

The plaintiffs offer Dr. Welner's testimony "to establish the causal connection between the false arrest (and its consequences) and [the p]laintiffs' injury and damages." Pls.' 702 Opp'n at 23. On the issue of whether Manganelli's arrest "ha[d] any causal relationship to his suicide," Gallaudet's 702 Mot., Ex. B (Letter from Michael Welner, M.D., to Justin Grosz (May 30, 2017) ("Welner Report")) at 2, Dr. Welner states that "[i]t is [ ] [his] professional opinion, with a reasonable degree of psychiatric certainty, that the arrest and its consequences precipitated [ ] Manganelli's suicide," <u>id.</u>, Ex. B. (Welner Report) at 6. In his deposition, Dr. Welner further

opined that the arrest and the events flowing from it led Manganelli to "bec[o]me hopeless[, a]nd

hopeless[ness] has a direct relationship to suicide." Pls.' Summ. J. Opp'n, Ex. R (Deposition of

Michael Welner, M.D. (July 14, 2017) ("Welner Dep.")) 114:12–13. Specifically, he observed

that Manganelli

> left campus with a great sense of urgency[,] . . . at a time where several data points
> reflect the university's rejection and repudiation of him, whether it be his arrest,
> whether it be the fulfillment of a separation order by kicking him out of his room,
> whether not making an emergency room available to him, or giving him any[]place
> to stay, whether it be that coupled with the lack of resolution of what was happening
> in a linguistics class that he was repeating, that the combination of these events
> contributed to his hopelessness about his prospects at Gallaudet.

Id., Ex. R (Welner Dep.) 114:19–115:5. Regarding other potential causes of Manganelli's

suicide, Dr. Welner further opined that

> [n]o other stressors preceded [ ] Manganelli's suicide, which occurred within hours
> of his eviction from campus. There is no evidence that it had been planned well in
> advance. [ ] Manganelli used a weapon that he acquired only just before he killed
> himself. He wrote no note. His toxology screen on autopsy was negative.

Gallaudet's 702 Mot., Ex. B (Welner Report) at 6. He additionally testified that although it was

his opinion that prior to the arrest, Manganelli "was deteriorating psychiatrically[] and that [the

psychiatric deterioration] reflected psychosis," Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.)

69:18–20, "suicide is not a symptom of psychosis," id., Ex. R (Welner Dep.) 227:18–19.[7]

---

[7] In addition to Dr. Welner's testimony seeking to establish a causal link between the alleged false arrest and the
plaintiffs' damages, the plaintiffs have also proffered testimony from Dr. Welner on two other issues: (1) that
Manganelli's "suicide . . . could have potentially been prevented had [Gallaudet] provided [ ] Manganelli with
alternative housing," Gallaudet's 702 Mot., Ex. B (Welner Report) at 9, or referred Manganelli to "established
vehicles for mental health intervention" rather than to "arrest and incarceration," id., Ex. B (Welner Report) at 8–9;
and (2) that "[b]ecause [ ] Sacchetti and [Robert] Manganelli had no information made available to them [about
Manganelli's arrest or the events that followed it], they had no wherewithal to report their son as a risk to himself or
to others," id., Ex. B (Welner Report) at 12. Because the Court has dismissed the plaintiffs' negligence claims
against Gallaudet, see Sacchetti, 181 F. Supp. 3d at 122 (dismissing the plaintiffs' "wrongful death and survival
claims, which are predicated on a theory of negligence," and their negligent infliction of emotional distress claim),
and the plaintiffs have not explained, nor is it otherwise apparent to the Court, how this testimony relates to the
claims still remaining in this case, the Court must exclude it for failure to satisfy Rule 702's relevance requirement.
See Fed. R. Evid. 702(a) (providing that expert testimony must "help the trier of fact to understand the evidence or
[ ] determine a fact in issue"); see also Daubert, 509 U.S. at 591 ("Expert testimony which does not relate to any
issue in the case is not relevant and, ergo, non-helpful.").

Upon careful consideration of Dr. Welner's proposed testimony as set forth in his report and during his deposition, the Court cannot conclude that the "testimony is the product of reliable principles and methods" or that Dr. Welner "has reliably applied the principles and methods to the facts of this case." Fed. R. Evid. 702. Even assuming that a "psychological autopsy" would be a reliable method for assessing causation in this case, Dr. Welner does not purport to have employed this method. Although he testified that he had given two lectures with the term "psychological autopsy" in the title, see Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.) 18:20–21, 19:17–19 (referring to lectures given in 2015 and 1999), he does not make any other references to a psychological autopsy in his report or deposition testimony or otherwise suggest, at least not in any way discernible to the Court, that he used that method to formulate his opinions in this case. To the extent that the plaintiffs assert that Dr. Welner's analysis is nonetheless reliable because it is consistent with descriptions of psychological autopsies provided by experts in other cases, see Pls.' 702 Opp'n at 14 n.4 (asserting that a psychological autopsy is a "reconstructi[on of] an individual's psychological life[,] particularly the person's lifestyle and those thoughts, feelings, and behaviors manifested during the weeks preceding death" (quoting Giles v. Wyeth, Inc., 500 F. Supp. 2d 1048, 1051 (S.D. Ill. 2007))), the Court is not in a position to opine on whether Dr. Welner's methods in this case comport with a scientific method that Dr. Welner has neither invoked nor explained, see Day, 524 F.3d at 1368 (instructing that the reliability inquiry does not require "judges [to] become scientific experts").

In any event, the cases relied upon by the plaintiffs suggest that a psychological autopsy is more rigorous than the analysis conducted by Dr. Welner in this case. For example, in In re Neurontin Marketing, Sales Practices, and Products Liability Litigation, the Court described a psychological autopsy as "a standardized, systematic checklist which could be used to assemble

and organize information so that a qualified suicidologist or other appropriate health care professional would have the information necessary to consider all of the various risk factors which may or may not have contributed in a material way to any person's suicide." Civ. Action No. 04-10981, 2009 WL 3756328, at *6 (D. Mass. Aug. 14, 2009). Here, Dr. Welner does not purport to use any "standardized, systematic checklist[s]" or other specific tools to guide his analysis. And, while he appears to have identified and ruled out certain "risk factors" for suicide in developing his opinion on causation, see Gallaudet's 702 Mot., Ex. B (Welner Report) at 6 (opining that "[n]o other stressors preceded [ ] Manganelli's suicide"); see also Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.) 227:18–19 ("suicide is not a symptom of psychosis"), he does not explain how he identified those risk factors or whether they are factors typically considered by professionals who analyze suicide causation.

Perhaps more important, while methods other than a psychological autopsy might also be appropriate means of assessing causation, see, e.g., In re Neurontin, 2009 WL 3756328, at *12, *14 (admitting expert testimony regarding suicide causation that was based on the "differential diagnosis" method, although it was "largely duplicative of [another expert's] more thorough psychological autopsy"), Dr. Welner does not identify any specific method that he used to formulate his opinions in this case. Rather, he simply asserts that he provided a "forensic psychiatric assessment" based on his "review[] [of] a range of records in connection with the events preceding [Manganelli's] death" and an interview with Sacchetti. Gallaudet 702 Mot., Ex. B (Welner Report) at 1. However, he does not explain what a forensic psychiatric assessment typically involves or how exactly it was undertaken in this case. He testified only that "forensic psychiatry" is a catchall term for "working within legal matters where there's a specific context to the clinical question." Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.) 17:6–8.

And, although Dr. Welner testified that the materials he relied upon are the type of materials that experts in forensic psychology normally rely upon, see id., Ex. R (Welner Dep.) 45:5–8, and that he only reviewed the "most informative" materials given to him in light of his time and budget constraints, id., Ex. R (Welner Dep.) 47:18–48:14, he does not explain why the materials he reviewed are sufficient to support his opinions on causation in the context of this particular case.

To the extent that Dr. Welner seeks to rely on his experience alone, the Court cannot conclude that he has satisfied the prerequisites for doing so. As this Circuit has explained, "a witness who is 'relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Heller, 801 F.3d at 272 (quoting Fed. R. Evid. 702 Advisory Committee Note). Here, Dr. Welner makes no reference to his experience in his discussions of his opinions regarding whether the alleged false arrest of Manganelli caused Manganelli's suicide. Moreover, he does not explain how his experience or specific knowledge informed any of his conclusions in this case. For example, he testified during his deposition that Manganelli "became hopeless[,] [a]nd hopeless has a direct relationship to suicide." Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.) 114:14–15. However, he did not describe his personal experience evaluating or treating hopeless patients who express suicidal ideations or otherwise explain the connection between his experience and his conclusion in this or any other case. Nor does he cite any studies or other authorities supporting the link between hopelessness and suicide. Cf. Heller, 801 F.3d at 272 (concluding that the trial judge did not abuse his discretion in admitting proffered expert testimony because "[i]n addition to invoking his or her generalized 'experience,' each expert claimed to have relied upon specific news stories, academic studies, or other research in forming an opinion[,] [and] each of the three experts was in a position to state whether the

cited materials comported with his or her personal experience"). The same can be said for Dr. Welner's conclusions purporting to tie the alleged false arrest to shame or other mental suffering by Manganelli. See Gallaudet's 702 Mot., Ex. B (Welner Report) at 6 (asserting that "[i]t is clear from [ ] Manganelli's communications with others that he was proud and strong-willed," and that "the shame of the arrest and removal from Gallaudet . . . was all the more personally powerful" for Manganelli, because he "realized . . . his entire academic future [was] on the line"); see also id., Ex. B (Welner Report) at 5 (suggesting that Manganelli's "eviscerati[on of] himself with a butcher knife" is a Japanese "method [called] seppuku [that] evokes suicide in the context of dishonor").[8] Thus, Dr. Welner has not demonstrated that his opinions are reliable solely on the basis of his experience.

The Court is mindful that psychiatric methods by their nature often "cannot have the exactness of 'hard' science methodologies," and therefore appreciates that it may "need to reach beyond the[] four [Daubert] factors" to assess the reliability of such methods. In re Neurontin, 2009 WL 3756328, at *4 (citation omitted). However, as the Supreme Court instructed in Kumho, the "basic gatekeeping obligation" announced in Daubert applies to all expert testimony, regardless of whether it is "scientific" in the traditional sense, 526 U.S. at 147–48, and requires courts "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," id. at 152. Here, the Court cannot say that the plaintiffs have satisfied this standard. As already explained, Dr. Welner does not

---

[8] Although Dr. Welner testified that "given [his] expertise in death investigation, and having had proximity to a number of suicides, [ ] disemboweling is a very unusual method of suicide," Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.) 94:25–95:03, he concedes that he is not an expert in Japanese culture or Japanese ritual suicide, see id., Ex. R (Welner Dep.) 94:21–25, and is not prepared to testify to a reasonable degree of certainty that Manganelli committed suicide by seppuku, id., Ex. R (Welner Dep.) 95:11–22.

purport to have employed either of the methodologies employed by the suicide causation experts in the cases cited by the plaintiffs. See Bennett v. Forest Labs., Civ. Action No. 6-72, 2015 WL 1579404, at *5 (M.D. Fla. Apr. 9, 2015) (admitting testimony by an expert who relied on a psychological autopsy to determine that the drug Lexapro was a significant contributing factor in a suicide); In re Neurontin, 2009 WL 3756328, at *1, *11, *15 (admitting testimony by experts who used a psychological autopsy and differential diagnosis as the basis for their conclusions that the drug Neurontin caused a suicide); Giles, 500 F. Supp. 2d at 1061 (admitting testimony by experts who "used differential diagnoses and a psychological autopsy to determine that [the drug] Effexor caused [a] suicide"); Cloud v. Pfizer, Inc., 198 F. Supp. 2d 1118, 1132, 1135 (D. Ariz. 2001) (recognizing that "post-mortem [psychological] autopsies appear to be generally accepted").[9] Moreover, Dr. Welner's testimony raised additional questions as to whether his analysis satisfies the relevant professional standards. Specifically, Dr. Welner testified that due to budgetary constraints, his report in this case was not peer reviewed, see Pls.' Summ. J. Opp'n, Ex. R (Welner Dep.) 38:5–11, even though he normally has his opinions peer reviewed, see id., Ex. R (Welner Dep.) 39:21–24, and his "evaluation proceeded in an unusual[] . . . step-wise fashion," id., Ex. R (Welner Dep.) 38:11–13. Although Dr. Welner's testimony suggested that a lack of peer review was not entirely atypical, see id., Ex. R (Welner Dep.) 40:2–14 (describing circumstances in which peer reviews are not conducted), and that the "step-wise" process ultimately "worked," id., Ex. R (Welner Dep.) 38:12–13, he did not provide any meaningful

---

[9] Although each of these cases involved a claim that a pharmaceutical caused a suicide, and in such cases, unlike this one, the plaintiffs had to establish general causation, i.e., "that exposure to a substance can cause a particular disease," in addition to specific causation, i.e., that "a given exposure is the cause of an individual's disease," In re Neurontin, 2009 WL 3756328, at *2, the courts' conclusions cited above were reached in the context of assessing the reliability of an expert's testimony on the issue of specific causation, and thus, are applicable here. Moreover, in relying on these cases to demonstrate that Dr. Welner's testimony is reliable, see Pls.' 702 Opp'n at 14–15, the plaintiffs appear to concede that the standards applied in these cases are applicable in this case.

explanation as to why these issues did not implicate the reliability of his opinions offered in this case.

In sum, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 Advisory Committee Note (2000) (quoting Daubert, 43 F.3d 1311, 1319 (9th Cir. 1995)). Here, where Dr. Welner has not identified or explained his methods or how they were applied in this case, the Court simply cannot conclude that the requirements of Rule 702 and Daubert have been satisfied. See Patteson v. Maloney, 968 F. Supp. 2d 169, 175 (D.D.C. 2013) ("Rule 702 and Daubert require [ ] that the method used to arrive at a scientific conclusion be reliable and reliably applied." (emphasis added) (citing Daubert, 509 U.S. at 595)). Thus, although "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 Advisory Committee Note, the Court concludes that it must exclude Dr. Welner's testimony in this case, see Campbell v. Nat'l R.R. Passenger Corp., 311 F. Supp. 3d 281, 300 (D.D.C. 2018) (excluding the plaintiff's proposed expert testimony as unreliable, in part because the expert "ha[d] not identified any particular principles or methodology he used in forming his opinions . . . [or] cite a single study, report or other source for his opinions"); see also Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions, and their assurances of reliability. Under Daubert, that's not enough."); Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S., 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (excluding expert testimony as unreliable, in part because the expert "ha[d] not identified any [ ] principles or methodology[,] . . . [but] note[d] only that he reviewed certain documents and reached a series of conclusions"). Accordingly, the Court will grant Gallaudet's motion to exclude Dr. Welner's testimony.

## 2. The Plaintiffs' Motion to Strike the District's Exhibits

The plaintiffs, "pursuant to Federal Rule of Civil Procedure 37(c)[,] [ ] move to strike from the record two undisclosed exhibits" attached to the District's summary judgment motion "as a sanction against the District for not disclosing such evidence in discovery as required by Federal Rule of Civil Procedure 26." Pls.' Mot. to Strike at 1. Specifically, the plaintiffs seek to strike: "(1) a December 4, 2017 declaration from [MPD] [O]fficer [ ] Velez . . . and (2) a hearing transcript from a proceeding which followed [ ] Manganelli's arrest . . . and which was, apparently, first transcribed on April 27, 2017." Id. at 2. The plaintiffs argue that Officer Velez's declaration must be stricken because it "seeks to offer information which [Officer] Velez had never previously provided[] [in her deposition], [ ] which is not subject to cross examination by [the p]laintiffs," and was "never provided [ ] to the [p]laintiffs" before the close of discovery as required by Rule 26. Pls.' Mot. to Strike at 3. They further argue that the hearing transcript must be stricken because it was "previously undisclosed" in violation of Rule 26 and "impermissible surprise . . . flows from the District's concealment and use of" it, as "[t]he [p]laintiffs have no ability, at this stage, to explore the statements or what information may or may not have been known to any of the declarants at the time of, or which may have precipitated, the statements." Pls.' Strike Reply at 6.

"The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion," Canady v. Erbe Elektromedizin GmbH, 384 F. Supp. 2d 176, 180 (D.D.C. 2005), and "[t]he moving party 'bears a heavy burden as courts generally disfavor motions to strike,'" Ng v. Lahood, 952 F. Supp. 2d 85, 92 (D.D.C. 2013) (quoting Canady, 384 F. Supp. 2d at 180). However, Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or harmless." Fed. R. Civ. P. 37(c)(1). Rule 26(a) provides in relevant part that "a party

must[] . . . provide to the other parties":

    i.    the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment; [and]

    ii.    a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment[.]

Fed. R. Civ. P. 26(a)(1)(A)(i)–(ii). Rule 26(e) provides, in part, that:

A party who has made a disclosure under Rule 26(a)[] . . . must supplement or correct its disclosure . . .

    (A)    in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Fed. R. Civ. P. 26(e)(1).

Here, the Court cannot conclude that the District breached its discovery obligations in

regards to either of the two exhibits the plaintiffs seek to have stricken. Regarding Officer

Velez's declaration, as the District notes, its "Rule 26[](a) initial disclosures to [the p]laintiffs

identified . . . Officer [ ] Velez as a witness," District's Strike Opp'n at 1; see also id., Ex. 1

(Defendant District of Columbia's Rule 26 Initial Disclosures ("District's Initial Disclosures"))

at 3, and described her as a "responding officer[] to the incident that occurred on March 28,

2014[,] that resulted in [Manganelli's] arrest," id., Ex. 1 (District's Initial Disclosures) at 3.

These disclosures put the plaintiffs on notice that Officer Velez was likely to have discoverable

information regarding topics related to the arrest, such as the arrest paperwork and arrestee

processing practices discussed in Officer Velez's declaration. See District's Summ. J. Mot., Ex.

16 (Declaration of Officer Cassandra Velez (Dec. 18, 2017) ("Velez Decl.")) ¶¶ 4, 8 (offering information regarding the MPD's practice of handwriting "notification . . . [of an] arrestee['s] [ ] special requirements" on an arrestee's PD 163 report[10] and the "process that is followed to present arrests to the U.S. Attorney for prosecution"). Indeed, in their deposition of Officer Velez, the plaintiffs questioned her regarding the PD 163 report prepared in connection with Manganelli's arrest. See, e.g., Pls.' Summ. J. Opp'n, Ex. F (Deposition of Cassandra Velez (Mar. 8, 2017) ("Velez Dep.")) 30:2–4. Thus, the Court cannot conclude that the District's initial disclosures regarding Officer Velez violated Rule 26(a), or that Officer Velez's declaration establishes that these initial disclosures were "in some material respect . . . incomplete or incorrect," such that the District was required to supplement its initial disclosures under Rule 26(e). Fed. R. Civ. P. 26(e)(1)(A). Rather, Officer Velez's declaration is consistent with the requirements of Rule 56(c)(4), which "expressly contemplate[s] declarations in support of summary judgment regardless of when in the discovery process the motion is filed." Ng, 952 F. Supp. 2d at 92.

Moreover, the cases cited by the plaintiffs do not support their position that the District violated Rule 26. Two of these cases found a violation of Rule 26(a)(1) based on a party's failure to disclose the identity of a witness in its initial disclosures or at any point during discovery. See Thomas v. Paulson, 507 F. Supp. 2d 59, 79 (D.D.C. 2007) (Walton, J.) (declining to consider the plaintiff's affidavit from a witness who she "failed to identify . . . as a relevant witness during the discovery period in this case"); see also Brooks v. Kerry, 37 F. Supp. 3d 187, 203 (D.D.C. 2014) (concluding that the plaintiffs' "disclosure of [a] declaration [wa]s untimely under Rule 26" because she "never identified [the declarant] as a possible witness in her initial

---

[10] A PD 163 report is an "Arrest/Prosecution Report" created and used by the MPD to document the events surrounding arrests. See District's Summ. J. Mot., Ex. 6 (Arrest/Prosecution Report) at 1.

Rule 26(a) disclosures").  And, another case found that a Rule 26(b) violation had been committed based on a defendant's failure to disclose the identity of a witness in response to an interrogatory propounded by the plaintiff.  See Elion v. Jackson, 544 F. Supp. 2d 1, 7 (D.D.C. 2008).  Other cases cited by the plaintiffs found violations of Rule 26(a)(2) based on a party's failure to disclose expert testimony in accordance with the specific and more stringent requirements for expert disclosures set forth in that Rule.  See Fed. R. Civ. P. 26(a)(2)(B) (requiring an expert disclosure to "be accompanied by a written report . . . [that] contain[s]," inter alia, "a complete statement of all opinions the witness will express and the basis and reasons for them"); see also Daniels v. District of Columbia, 15 F. Supp. 3d 62, 68, 70 (D.D.C. 2014) (precluding the proffered witnesses from testifying as experts because "the plaintiff made no disclosures regarding the [ ] [w]itnesses that are required[] under [Rule 26(a)(2)]"); Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. 15, 18 (D.D.C. 2013) (excluding proffered expert testimony because the plaintiff's "belated disclosure [of the expert's report wa]s not permitted under Fed. R. Civ. P. 26(a)(2)[]"); Minebea Co. v. Papst, 231 F.R.D. 3, 6 (D.D.C. 2005) (excluding the proffered supplemental expert report because it violated Rule 26(a)(2), which specifically "prevents experts from 'lying in wait' to express new opinions at the last minute").[11]

The Court is also not persuaded by the plaintiffs' argument that Officer Velez's deposition testimony "provide[s] further support for the[ir] [ ] motion to strike."  Pls.' Strike Reply at 4.  To the extent that the plaintiffs seek to invoke the sham affidavit rule—which "precludes a party from creating an issue of material fact by contradicting prior sworn testimony

---

[11] The plaintiffs also rely on Coles v. Perry, 217 F.R.D. 1 (D.D.C. 2003), for the proposition that a court must exclude "documents first produced to the plaintiff after the discovery period ended."  Pls.' Mot. to Strike at 6; see Coles, 217 F.R.D. at 6 (concluding that a defendant violated Rule 26 by seeking to introduce "documents not identified in . . . [its] Initial Disclosure").  However, none of the documents at issue in Coles was a declaration from a timely disclosed witness submitted in support of a motion for summary judgment, see Coles, 217 F.R.D. at 5 (describing the documents at issue), which, for the reasons already explained, is not untimely under Rule 26.

unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony," Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting Pyramid Secs. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991))—Officer Velez's declaration does not violate that rule.  As this Circuit has instructed, "the important considerations [in applying the rule] are whether the [later-filed] affidavit contradicts a prior sworn statement without justification or [whether] the filing party breached its obligations in discovery," id., and as to the former consideration, other members of this Court have deemed an affidavit contradictory only if it "clearly contradict[s]" prior testimony as opposed to "clarify[ing] confusing or ambiguous testimony," St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc., 573 F. Supp. 2d 152, 160 (D.D.C. 2008) (emphasis added); see Raymond v. Architect of the Capitol, 49 F. Supp. 3d 99, 105 n.5 (D.D.C. 2014).

Here, the plaintiffs argue that Officer Velez's "assertions[] in her [ ] [d]eclaration[] . . . are belied by her deposition testimony," Pls.' Strike Reply at 5, namely, her testimony that she "did not author the [PD 163 report]" prepared in connection with Manganelli's arrest, id.; that she did not know when the word "DEAF" was handwritten at the top of the PD 163 report, see id. at 4; that "she had no recollection of" many of the events related to Manganelli's arrest, id. at 5; and that she had not "seen [any documentation] that suggests that [she] provided any accommodations to [ ] Manganelli in recognition of his being deaf or hard of hearing," id. at 4. However, none of this testimony is "clearly contradict[ed]" by Officer Velez's declaration, which largely purports to describe the MPD's typical practices for preparing a PD 163 report and for processing arrestees, but does not assert that the MPD followed those practices in this particular case.  See District's Summ. J. Mot., Ex. 16 (Velez Decl.) ¶ 8 ("When the PD 163 [report] is completed, notification is handwritten at the top of the first page[] if the arrestee has

special requirements[,] e.g.[,] deaf arrestees would have the word 'DEAF' written on the first page[.]"); see also id., Ex. 16 (Velez Decl.) ¶ 15 ("[A]t papering, the U.S. Attorney's Office gets the original PD 163 [report] completed by the arresting officer[.]").  Although Officer Velez's declaration does make limited representations about the PD 163 report prepared in connection with Manganelli's case, she does not purport to base these representations on any prior participation in creating this particular report, but instead appears to base them only on her general knowledge of the MPD's practices regarding PD 163 reports.  See id., Ex. 16 (Velez Decl.) ¶ 14 ("I can tell that Exh[ibit] 15 is [ ] Manganelli's original PD 163 [report] because it has 'wet' signatures[] from [Officer] Shifflett and a[n] MPD supervisor.").  Thus, because the Court "'cannot find within [Officer Velez's] deposition testimony any unambiguous assertion that is directly contradicted by the later [declaration],' [ ] the Court [ ] 'must conclude that a sham would be too expansive a characterization of the testimony and the later [declaration].'" Johnson v. Shinseki, 811 F. Supp. 2d 336, 343–44 (D.D.C. 2011) (second and fifth alterations in original) (quoting Hinch v. Lucy Webb Hayes Nat'l Training Sch., 814 A.2d 926, 931 (D.C. 2003)).  Thus, the plaintiffs have not established that the District's reliance on Officer Velez's declaration violates Rule 26 or otherwise warrants striking the declaration from the record. Accordingly, the Court will deny the plaintiffs' motion to strike as to Officer Velez's declaration.

As to the hearing transcript, the Court concludes that Rule 26(e) did not require the District to supplement its initial disclosures with this exhibit because the relevant information in the exhibit was "otherwise [ ] made known to the [plaintiffs] during the discovery process."  Fed. R. Civ. P. 26(e)(1)(A).[12]  As the District notes, the plaintiffs "disclosed . . . to [the d]efendants

---

[12] Because the plaintiffs appear to concede that the hearing transcript was not created until April 27, 2017, see Pls.' Mot. to Strike at 4 ("The transcript appears to have first been transcribed on April 27, 2017[.]"); see also District's Summ. J. Mot., Ex. 18 (Hearing Transcript) at 13 (reflecting a transcription date of April 27, 2017), they also

(continued . . . )

with their initial disclosures" the "court's release order," District's Strike Opp'n at 4, which reflects that the judge had ordered Manganelli, as a condition of his release, to "[r]eport to [the Pretrial Services Agency] for [an] evaluation" by the Agency's Specialized Supervision Unit ("SSU"). Gallaudet's Summ. J. Mot., Ex. YY (Release Order Addendum) at Gianni0583; see District's Facts ¶ 46 (defining the acronym "SSU"). And, this condition of release is precisely the information from the transcript that the District seeks to rely upon in support of its summary judgment motion. See District's Summ. J. Reply at 24 ("[T]he [ ] judge granted the prosecutor's recommendation that Manganelli be 'screened for SSU[,]' which provides specialized services to defendants with mental illness."). Thus, the plaintiffs' production of the release order during discovery demonstrates that the plaintiffs were "on notice" of the information the District now seeks to introduce. See United States ex rel. Landis v. Tailwind Sports Corp., 234 F. Supp. 3d 180, 192 (D.D.C. 2017) (rejecting the defendant's argument that the plaintiff's failure to name certain witnesses in its initial disclosures violated Rule 26(e) because the defendant was otherwise "on notice that each of the[] witnesses could have potentially relevant and discoverable information"). Alternatively, the District's failure to disclose this information was harmless because the plaintiffs were already aware of it and, therefore, does not warrant a sanction pursuant to Rule 37. See Robinson v. District of Columbia, 75 F. Supp. 3d 190, 196 (D.D.C. 2014) (concluding that "it [wa]s difficult to see how [the plaintiff] was harmed by [the District's] failure to produce" photographs of a motorcycle "[s]ince the motorcycle itself was in [the p]laintiff's possession"). Thus, the District's nondisclosure of the hearing transcript did not

---

( . . . continued)
necessarily concede that the transcript was not a document that the District "ha[d] in its possession, custody, or control" at the time of its initial disclosures, Fed. R. Civ. 26(a)(1)(A)(ii), which were made on January 17, 2017, see District's Strike Opp'n, Ex. 1 (District's Initial Disclosures) at 5. Thus, the District was not required to disclose the transcript as part of its initial disclosures.

violate Rule 26(e), or alternatively, does not warrant a sanction under Rule 37. Accordingly, the Court will also deny the plaintiffs' motion to strike as to the District's hearing transcript exhibit.

## B. The Defendants' Summary Judgment Motions

A Rule 56 motion for summary judgment can be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id. The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment; rather, "there

must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### 1. The Plaintiffs' False Arrest Claim Against Gallaudet (Sixth Cause of Action)

To establish a claim for false arrest under District of Columbia law, a plaintiff must show: "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." Harris v. U.S. Dep't of Veterans Affairs, 776 F.3d 907, 911–12 (D.C. Cir. 2015). Gallaudet only disputes the second element here. See Gallaudet's Summ. J. Mem. at 12 (conceding that Manganelli "was 'arrested' within the meaning of the common-law tort [of false arrest] when he was 'detained . . . against [his] will'" (alteration in original) (quoting D.C. Std. Civ. Jury Instr. No. 18-1)). "The detention of a plaintiff by a defendant police officer is lawful if the officer effected the detention constitutionally—that is, with probable cause if the detention was an arrest, or upon reasonable suspicion if the detention amounted only to a Terry stop." Olaniyi v. District of Columbia, 876 F. Supp. 2d 39, 53 (D.D.C. 2012) (Walton, J.) (quoting Zhi Chen v. District of Columbia, 808 F. Supp. 2d 252, 257 (D.D.C. 2011)). "Alternatively, regardless of whether the detention was constitutional, 'a police officer may justify an arrest by demonstrating that (1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable.'" Id. (quoting Weishapl v. Sowers, 771 A.2d 1014, 1020–21 (D.C. 2001)); accord Minch v. District of Columbia, 952 A.2d 929, 937 (D.C. 2008).

Here, viewing the evidence in the light most favorable to the plaintiffs, as the Court must, the Court finds that a reasonable juror could conclude that when Lieutenant Bauer first placed Manganelli in handcuffs, he arrested Manganelli, as opposed to merely detaining him pursuant to an investigative stop. See Pls.' Facts ¶¶ 110, 113 (stating that after Lieutenant "Bauer emerged from inside the room with [Manganelli], already in handcuffs, behind his back," Lieutenant

"Bauer told [Manganelli] he was under arrest" (citing Pls.' Summ. J. Opp'n, Ex. B (Johnson

Dep.) 35:13–15)); see also Pls.' Summ. J. Opp'n, Ex. B (Johnson Dep.) 35:13–15 (testifying that

the "DPS [officer] said[,] I'm arresting you for your and my safety"); id., Ex. A (Bauer Dep.)

38:3–5 (referring to "the moment [he] placed handcuffs on [Manganelli] and . . . placed [him]

under arrest" (emphasis added)).[13]  Indeed, Gallaudet appears to concede this point for purposes

of its summary judgment motion.  See, e.g., Gallaudet's Summ. J. Mem. at 1 (arguing that

"Gallaudet's officers lawfully arrested [Manganelli] for the stated criminal offenses" (emphasis

added)); see also id. at 12 (arguing that "the material facts underlying the arrest are not in

dispute" (emphasis added)).  Thus, in order to demonstrate that it is entitled to summary

judgment on the plaintiffs' false arrest claim, Gallaudet must identify lawful grounds for the

arrest.

        "An arrest made pursuant to legal authority, such as a warrant properly issued and

facially valid and fair, provides no basis for an action for false arrest."  Enders v. District of

Columbia, 4 A.3d 457, 461 (D.C. 2010) (internal quotation marks omitted).  However, "[w]hen

the plaintiff in a false arrest case shows that he was arrested without a warrant, a rebuttable

presumption arises that the arrest was unlawful, and the burden shifts to the [defendant] . . . ."

Karriem v. District of Columbia, 717 A.2d 317, 320 (D.C. 1998).  Then, the central issue

becomes "whether the arresting officer was justified in ordering the arrest of the plaintiff . . . ."

Scott v. District of Columbia, 493 A.2d 319, 321 (D.C. 1985) (quoting Dellums v. Powell, 566

F.2d 167, 175 (D.C. Cir. 1977)).  On this issue, a defendant may satisfy its burden by

---

[13] D.C. Code, Chapter 5, addressing warrants and arrests, defines a "law enforcement officer" as "an officer or member of the Metropolitan Police Department of the District of Columbia, or of any other police force operating in the District of Columbia," D.C. Code § 23–501(2) (2012), which includes Gallaudet's DPS officers, see Dep't of Public Safety, Gallaudet Univ., https://www.gallaudet.edu/academic-catalog/services-and-activities/campus-services/department-of-public-safety (last visited Oct. 10, 2018) ("Gallaudet's public safety officers are considered 'special police officers' and are commissioned by the District of Columbia.").

demonstrating "either that probable cause existed to arrest <u>or</u> that the arresting officer believed, reasonably and in good faith, that probable cause existed." <u>Minch</u>, 952 A.2d at 937. Under District of Columbia law, probable cause sufficient "to effect a warrantless arrest[] . . . means either probable cause to believe a felony has been committed or probable cause to believe a misdemeanor has been committed in a manner specified in [D.C. Code] § 23–581." <u>Enders</u>, 4 A.3d at 467. D.C. Code § 23–581(a)(1) provides, in relevant part:

> A law enforcement officer may arrest, without a warrant . . . —
>
> > (A) a person who he has probable cause to believe has committed or is committing a felony;
> >
> > (B) a person who he has probable cause to believe has committed or is committing an offense in his presence; [or]
> >
> > (C) a person who he has probable cause to believe has committed or is about to commit any offense listed in paragraph (2) and, unless immediately arrested, may not be apprehended, may cause injury to others, or may tamper with, dispose of, or destroy evidence.

D.C. Code § 23–581(a)(1) (2012). Additionally, § 23–581 provides that "[a] law enforcement officer may arrest a person without a[] [ ] warrant if the officer has probable cause to believe the person has committed an intrafamily offense as provided in section 16–1031(a)." <u>Id.</u> § 23–581(a-1).

Gallaudet argues that "[l]egal justification existed for Gallaudet's officers to detain [ ] Manganelli," Gallaudet's Summ. J. Mem. at 9, because (1) "constitutionally-sufficient probable cause existed to detain and involuntarily commit [Manganelli]," Gallaudet's Summ. J. Reply at 10; (2) "the only information available to Lieutenant Bauer at the time of the arrest was that multiple people were in danger in the dorm[itory] room where he found [Manganelli] unresponsive and uncooperative," Gallaudet's Summ. J. Mem. at 17; (3) "D.C. Code § 16–1031(a) not only justified, but actually required, [Manganelli]'s detention," <u>id.</u> at 14; and

(4) Manganelli "provided additional grounds for his detention" by "resisting arrest," id. at 17–18. The Court will address each purported justification in turn.

### i. Justification To Detain Manganelli for Involuntary Psychiatric Treatment Under D.C. Code § 21–521

Gallaudet argues that "[b]y conceding that constitutionally-sufficient probable cause existed to detain and involuntarily commit [Manganelli]" for psychiatric evaluation pursuant to D.C. Code § 21–521, "[the p]laintiffs necessarily concede that it was reasonable for Gallaudet's officers to believe that their decision to restrict [Manganelli]'s movement against his will was lawful." Gallaudet's Summ. J. Reply at 10; see Gallaudet's Summ. J. Mem. at 12 (arguing that the "[p]laintiffs' admission that Gallaudet's DPS officers had cause to detain [Manganelli] for involuntary psychiatric treatment is fatal to their false arrest claim"). The plaintiffs respond that "probable cause for an arrest on criminal charges is not[] . . . the equivalent of [probable cause for] a detention for the purpose of mental health intervention under D.C. Code § 21–521." Pls.' Summ. J. Opp'n at 41. The Court agrees with the plaintiffs.

As already explained, the facts viewed in the light most favorable to the plaintiffs establish that Lieutenant Bauer arrested Manganelli, and it is undisputed that he did not have a warrant authorizing him to do so. Thus, in order to demonstrate that the arrest was lawful, Gallaudet must show that "either probable cause [existed] to believe a felony . . . [or] a misdemeanor ha[d] been committed in a manner specified in [D.C. Code] § 23–581," Enders, 4 A.3d at 467, or that "the arresting officer believed, reasonably and in good faith, that [such] probable cause existed," Minch, 952 A.2d at 937. D.C. Code § 21–521 is not a criminal offense and is not identified in § 23–581 as a lawful basis for a warrantless arrest. Notably, § 21–521 does not purport to authorize an officer to make an arrest, nor does it require an officer to have probable cause to believe that any criminal offense has been committed, let alone one that is

recognized by § 23–581.  Rather, it requires an officer to determine only that "a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained," and, upon making that determination, authorizes the officer to "take the person into custody, transport him to a public or private hospital, or to the Department [of Mental Health of the District of Columbia], and make application for his admission thereto for purposes of emergency observation and diagnosis."  D.C. Code § 21–521.  Thus, the statute does not purport to authorize arresting a person and taking him to jail.

Gallaudet's argument that "constitutional probable cause to justify [a] detention" under § 21–521 necessarily justified its officers' warrantless arrest of Manganelli, Gallaudet's Summ. J. Reply at 9, conflicts with controlling precedent from the D.C. Court of Appeals, which has explicitly rejected "an equation between the constitutional probable cause standard and the defense of privilege in a false arrest suit."  Enders, 4 A.3d at 465.  In Enders, the court found erroneous the trial judge's jury instruction that if the arresting "officer had probable cause to arrest the plaintiff [for any crime,] . . . the officer was legally justified in making the arrest," id. at 460, explaining that it "is only true [that probable cause will defeat a claim of false arrest] to the extent that 'probable cause' is synonymous with legal justification to effect the particular arrest in question," id. at 466.  It further clarified that "an action for false arrest will lie if the arrest was made in contravention of the local law, despite the presence of probable cause," id. at 465, and, under District of Columbia law, "[l]egal justification to effect a warrantless arrest[]" based on the existence of probable cause is limited to "either probable cause to believe a felony has been committed or probable cause to believe a misdemeanor has been committed in a manner specified in § 23–581," id. at 467.  Applying these principles here, even if Gallaudet had constitutional probable cause to detain Manganelli for psychiatric evaluation under § 21–521,

that does not establish that it had "probable cause to believe a felony . . . [or] a misdemeanor ha[d] been committed in a manner specified in § 23–581." <u>Id.</u> And, for the reasons explained below, Gallaudet has not otherwise demonstrated that Manganelli's arrest was legally justified under § 23–581.

### ii. D.C. Code § 16–1031(a)

Gallaudet argues that "D.C. Code § 16–1031(a) not only justified, but actually required, [Manganelli]'s detention." Gallaudet's Summ. J. Mem. at 14. Section 16–1031(a) criminalizes "intrafamily offense[s]" that either "resulted in physical injury," D.C. Code § 16–1031(a)(1), or "caused or w[ere] intended to cause reasonable fear of imminent serious physical injury or death," <u>id.</u> § 16–1031(a)(2). An "intrafamily offense" includes "interpersonal[] . . . violence," <u>id.</u> § 16–1001(8), which includes "act[s] punishable as a criminal offense that [are] committed or threatened to be committed by an offender upon a person[] [ ] [w]ith whom the offender shares or has shared a mutual residence," <u>id.</u> § 16–1001(6)(A).

The Court cannot find that a reasonable jury would be compelled to conclude that Lieutenant Bauer or Captain Rader reasonably believed that probable cause existed to arrest Manganelli for committing a criminal offense under § 16–1031(a). Probable cause, and thus, a reasonable belief in probable cause, turns on "the facts and circumstances within th[e arresting officers'] knowledge" "at the moment the arrest was made." <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964). Gallaudet concedes that "the only information available to Lieutenant Bauer at the time of [Manganelli's] arrest was that multiple people were in danger in the dorm[itory] room where he found [Manganelli] unresponsive and uncooperative." Gallaudet's Summ. J. Mem. at 17. Critically, it also concedes that Lieutenant Bauer "did not know [Manganelli] or that it was his dorm[itory] room." Gallaudet's Summ. J. Mem. at 16; <u>see also</u> Gallaudet's Facts ¶ 100; Pls.' Summ. J. Opp'n, Ex. A (Bauer Dep.) 22:4–7 (stating that the "message from the dispatcher . . .

didn't say who, just said there were ten people in a room").  Given the absence of evidence

available to Lieutenant Bauer at the time the arrest was made to support the existence of any

"intrafamily" aspect of an offense under § 16–1031(a), namely that an offense had been

committed "upon a person[] [ ] [w]ith whom [Manganelli] share[d] . . . a mutual residence," D.C.

Code § 16–1001(6)(A), the Court cannot conclude as a matter of law that Lieutenant Bauer

reasonably believed there existed probable cause to arrest Manganelli for such an offense, <u>see</u>

<u>Enders</u>, 4 A.3d at 469–71 (in a case involving a plaintiff's challenge to his arrest for the offense

of malicious destruction of property of $200 or more, finding that the court "simply cannot

conclude that there was undisputed evidence <u>requiring</u> a conclusion, as a matter of law, that the

officers had a reasonable, good faith belief in the lawfulness of the arrest" given "the paucity of

evidence as to the damage to [the property] that was visible at the scene"); <u>see also</u> <u>District of</u>

<u>Columbia v. Murphy</u>, 631 A.2d 34, 39 (D.C. 1993) (in a case involving a plaintiff's challenge to

his arrest for the offense of unlawful entry, where "the record d[id] not exclude the possibility

that the police seized the [plaintiff] without knowing whether [he had been] asked [ ] to leave,"

which is an element of the offense, the court concluded that it could not "say as a matter of law

that the police officers had . . . a reasonable good faith belief that they were acting lawfully in"

making the arrest).

Although Gallaudet appears to rely, in part, on Opie's testimony regarding his

interactions with Manganelli earlier in the day as justification for Lieutenant Bauer's arrest, <u>see</u>

Gallaudet's Summ. J. Mem. at 15, the existence of probable cause, and therefore a reasonable

belief in the existence of probable cause, depends on the "facts and circumstances within the[]

[officers'] knowledge" "<u>at the moment the arrest was made</u>," <u>Beck</u>, 379 U.S. at 91 (emphasis

added).  However, as already discussed, Gallaudet concedes that, at the time of the arrest,

Lieutenant Bauer did not have any information about Opie and Manganelli's interactions earlier that day. See Gallaudet's Summ. J. Mem. at 17 ("[T]he only information available to Lieutenant Bauer at the time of the arrest was that multiple people were in danger in the dorm[itory] room where he found [Manganelli] unresponsive and uncooperative."). And, the record establishes that those with knowledge of Opie and Manganelli's interactions—Opie, Scherrenberg, and Morgan—did not arrive on the scene until some period of time after Lieutenant Bauer's initial arrest of Manganelli, see Gallaudet's Facts ¶ 119 ("[Lieutenant] Bauer and [ ] Morgan both testified that [ ] Morgan arrived on [the] scene after the DPS officers."); see also Gallaudet's Facts ¶ 120 ("Following [Captain Rader's re-handcuffing of Manganelli], [ ] Opie returned to the dorm[itory] [ ] with [ ] Scherrenberg"). Thus, Gallaudet has failed to establish that, as a matter of law, Lieutenant Bauer had a good faith, reasonable belief that probable cause existed to arrest Manganelli for an intrafamily offense under D.C. Code § 16–1031(a).

### iii.  Safety Concerns

Gallaudet also asserts that Lieutenant Bauer's arrest of Manganelli was "legally justified" because, given "the [ ] information . . . [he had received] that multiple people were in danger in the dorm[itory] room where he found [Manganelli] unresponsive and uncooperative," "Lieutenant Bauer believed that he needed to detain [Manganelli to] . . . ensure the safety of the people who may have been inside," Gallaudet's Summ. J. Mem. at 17, as well as his own safety and Manganelli's safety, see id. at 16 (referring to Lieutenant Bauer's testimony that he "informed [Manganelli] that he would need to place him in handcuffs for both of their safety"). However, Gallaudet does not cite any authority to support its claim that Lieutenant Bauer's concerns legally justified his arrest of Manganelli. As already explained, to demonstrate that its arrest of Manganelli was lawful, Gallaudet must demonstrate either that Lieutenant Bauer had "probable cause . . . or believed, reasonably and in good faith, that probable cause existed" as

provided under D.C. Code § 23–581. See Minch, 952 A.2d at 937. Lieutenant Bauer's safety concerns could potentially justify his use of handcuffs to detain a suspect during an investigative stop, see Hargraves v. District of Columbia, 134 F. Supp. 3d 68, 83 (D.D.C. 2015) (concluding that an officer's "decision to place handcuffs on the plaintiff for safety reasons" constituted a "reasonable use . . . of force during [an] investigative stop[]"), but Gallaudet does not take the position that Lieutenant Bauer detained Manganelli during an investigative stop, see, e.g., Gallaudet's Summ. J. Mem. at 17 (arguing that Lieutenant Bauer's "actions to secure [Manganelli] were legally justified" in light of the "information available to Lieutenant Bauer at the time of the arrest" (emphasis added)), and in any event, as already explained, the facts viewed in the light most favorable to the plaintiffs establish that Lieutenant Bauer did not simply detain Manganelli, but arrested him. Even assuming that Lieutenant Bauer's testimony that Manganelli "did not respond to [his] instructions" is undisputed as Gallaudet claims, Gallaudet's Summ. J. Mem. at 16, Gallaudet does not assert that Lieutenant Bauer believed that Manganelli's non-responsiveness constituted a criminal offense, such that Lieutenant Bauer believed "he ha[d] probable cause to believe . . . [Manganelli wa]s committing an offense in his presence," D.C. Code § 23–581(a)(1)(B). Nor does Gallaudet assert that Lieutenant Bauer believed he had probable cause to arrest Manganelli for an offense arising from the information "that several people were in danger in a Gallaudet dorm[itory] room because there was a man in the room hurting people." Gallaudet's Summ. J. Mem. at 16. As already explained, Gallaudet has failed to establish that Lieutenant Bauer had reason to believe at the time of the arrest that Manganelli had committed an intrafamily offense under D.C. Code § 16–1031(a). And, to the extent that Gallaudet claims that Lieutenant Bauer's arrest was justified by his belief that Manganelli had committed a "simple assault" within the meaning of D.C. Code § 22–404, a statute that Gallaudet

does not explicitly invoke in its filings, it never asserts that the information Lieutenant Bauer received from his dispatcher was the basis for believing that such an assault had occurred. Rather, it asserts only that any "simple assault ar[ose] from [Manganelli's] threats and attempted violence against his roommate," Gallaudet's Summ. J. Reply at 17, which, as already explained, is information that was not available to Lieutenant Bauer at the time of the arrest. Thus, Gallaudet has failed to establish that Lieutenant Bauer's safety concerns demonstrate as a matter of law that his arrest of Manganelli was lawful.

### iv. Resisting Arrest Under D.C. Code § 22–405.01

Finally, Gallaudet argues that even if Manganelli's arrest was not legally justified on the grounds already discussed, it was alternatively justified by Captain Rader's good faith, reasonable belief that probable cause existed to arrest Manganelli for resisting arrest in violation of D.C. Code § 22–405.01(b). See Gallaudet's Summ. J. Mem. at 17–18 & n.3 ("Captain Rader testified that he considered [Manganelli]'s actions to constitute resisting arrest and [Manganelli] could have been arrested on that charge."). As the plaintiffs note, see Pls.' Summ. J. Opp'n at 29, Manganelli was not ultimately charged with resisting arrest, see District's Facts ¶ 27 (asserting that the District charged Manganelli with "simple assault domestic violence and threats to do bodily harm"). However, as Gallaudet notes, "when an officer lacks probable cause 'to arrest a plaintiff on the announced charge, but where probable cause existed to believe that [t]he [plaintiff] committed a different offense proffered by the defense after the fact,' the officer 'can avoid liability if the consequences for the plaintiff probably would have been substantially as unfavorable if he had been arrested' on the latter charge." Gallaudet's Summ. J. Reply at 17 (quoting Etheredge v. District of Columbia, 635 A.2d 908, 920–21 (D.C. 1993)); see Enders, 4 A.3d at 469 (explaining that a defendant alleged to have committed a false arrest "can prevail if it can show that probable cause existed to arrest for any offense [recognized under D.C. Code

§ 23–581], even if it differs from the offense for which the arrest was actually made, provided that the consequences for the plaintiff probably would have been substantially as unfavorable" (citing Etheredge, 635 A.2d at 920–21).[14]

D.C. Code § 22–405.01 makes it unlawful to, "without justifiable and excusable cause[,] intentionally resist[] an arrest by an individual who he or she has reason to believe is a law enforcement officer." D.C. Code § 22–405.01(b). The parties vigorously dispute whether Captain Rader reasonably believed that Manganelli's movements constituted resistance. See Pls.' Summ. J. Opp'n at 29–30 (arguing that "Johnson[] . . . testified [ ] that [Manganelli] was not resisting, but was attempting to communicate via sign language when the officers removed one handcuff"); Gallaudet's Summ. J. Reply at 18 (arguing that Johnson "cannot comment on whether [Manganelli] was resisting arrest" because "[s]he was not in physical contact with [Manganelli]"). However, the Court need not address whether there exists a genuine factual dispute based on this issue, because the facts in the record create a genuine factual dispute as to whether the officers reasonably believed that another element of § 22–405.01 had been satisfied; namely, whether an arrest was taking place when Manganelli allegedly resisted.[15]

Here, the facts in the record, including the facts asserted by Gallaudet itself, create a genuine factual issue regarding whether the DPS officers were arresting or continuing an arrest

---

[14] Gallaudet asserts that "Capt[ain] Rader testified that at th[e] time [of the arrest], it was his intention that [Manganelli] be criminally arrested for resisting arrest." Gallaudet's Facts ¶ 115. To the extent that Gallaudet seeks to argue that resisting arrest was in fact the charge "announced" by Gallaudet, and thus, that Gallaudet need not rely on Etheredge, evidence in the record belies this claim. See, e.g., Gallaudet's Summ. J. Mot., Ex. LL (DPS Report #14-0267) at GU_00001 (classifying the incident involving Manganelli on March 29, 2014, as "Assault Simple/Threat Menace Manner"). In any event, Gallaudet has explicitly invoked Etheredge. See Gallaudet's Summ. J. Reply at 22.

[15] Although the District asserts that Manganelli's alleged resistance constituted an "assault[] [of] a law enforcement officer" in violation of D.C. Code § 22–405(b), see District's Summ. J. Mem. at 17 (citing D.C. Code § 22–405(b)), which makes it unlawful to "assault[] a law enforcement officer . . . engaged in the performance of his or her official duties," D.C. Code § 22–405(b), Gallaudet has not invoked this statute. Thus, the Court need not consider whether it would have provided a lawful basis for Gallaudet's arrest of Manganelli.

of Manganelli when he allegedly resisted. Although, as already explained, evidence in the record suggests that Lieutenant Bauer arrested Manganelli when he first placed him in handcuffs prior to Captain Rader's arrival, see Pls.' Summ. J. Opp'n, Ex. B (Johnson Dep.) 35:13–15 (testifying that the "DPS [officer] said[,] I'm arresting you for your and my safety"), Lieutenant Bauer's testimony, albeit inconsistent on the issue, suggests that he merely detained Manganelli pursuant to an investigative stop, see id., Ex. A (Bauer Dep.) 50:11–14 (testifying that Manganelli "was[] [not] under arrest[, but] was just being detained while [the officers] [ ] investigate[d]"); see also id., Ex. A (Bauer Dep.) 49:15–17, 22–23 (explaining that he reported to Manganelli's dormitory room "to investigate . . . if a crime happened or not," and that he "had to detain [Manganelli] for his safety to move him out of the room"). But see id., Ex. A (Bauer Dep.) 38:3–5 (referring to "the moment [he] placed handcuffs on [Manganelli] and . . . placed [him] under arrest" (emphasis added)); id., Ex. A (Bauer Dep.) 46:18 (referring to "[w]hen [he] arrested [Manganelli]" (emphasis added)). A juror who credits Lieutenant Bauer's testimony that he merely detained Manganelli could reasonably believe that Lieutenant Bauer did not arrest Manganelli prior to Captain Rader's arrival. Moreover, a reasonable juror who credits Captain Rader's testimony that Manganelli was only "being detained," id., Ex. D (Rader Dep.) 42:18–20; see Gallaudet's Facts ¶ 113 (asserting that after Captain Rader uncuffed one of Manganelli's hands, "he tried to explain to [Manganelli that] he was not under arrest, just being detained" (emphasis added)), could also conclude that Captain Rader did not arrest Manganelli either. And because there appears to be no evidence in the record to suggest that Captain Rader believed that Lieutenant Bauer had arrested Manganelli, see Pls.' Summ. J. Opp'n, Ex. D (Rader Dep.) 35:7–9 (testifying that Lieutenant Bauer only "told [him] what happened, what [Manganelli] did, and why [Manganelli] was put in handcuffs"); see also id., Ex. D (Rader Dep.) 35:11–15 (testifying

that Lieutenant Bauer "said that [Manganelli] was uncooperative[] . . . and was resisting," and "for safety purposes, [Lieutenant Bauer] . . . put him in handcuffs"); id., Ex. A (Bauer Dep.) 48:12–18 (testifying that the only thing he told Captain Rader when he arrived was to "check" Manganelli's room and "make sure no one[] [was] hurt"), that juror could further conclude that Captain Rader did not believe he was continuing an arrest by Lieutenant Bauer.[16]  Thus, because a reasonable juror could find that the DPS officers were not arresting or continuing an arrest of Manganelli when he allegedly resisted them, or reasonably and in good faith believed that they were arresting him, that juror could reasonably conclude that the officers did not have a reasonable, good faith belief that probable cause existed to arrest Manganelli for resisting an arrest in violation of D.C. Code § 22–405.01(b).  See Wesby v. District of Columbia, 765 F.3d 13, 20 (D.C. Cir. 2014) ("[T]he police cannot establish probable cause without at least some evidence supporting the elements of a particular offense[.]"), reversed on other grounds by 138 S. Ct. 577 (2018).

In sum, the Court cannot conclude that a reasonable juror must find that probable cause existed or that Gallaudet's DPS officers had a good faith, reasonable belief that probable cause existed to arrest Manganelli for any of the reasons proffered by Gallaudet and discussed above. Accordingly, the Court must deny Gallaudet's motion for summary judgment on the plaintiffs' false arrest claim against Gallaudet.

---

[16] Although Lieutenant Bauer testified that Manganelli "was resisting" when Lieutenant Bauer first put handcuffs on him, see Pls.' Summ. J. Opp'n, Ex. A (Bauer Dep.) 46:20, Gallaudet does not assert that this resistance formed a basis for the offense of resisting arrest, see Gallaudet's Summ. J. Mem. at 17 (arguing that Manganelli "provided additional grounds for his detention after . . . Captain [ ] Rader[] arrived" (emphasis added)).

## 2. The Plaintiffs' False Arrest Claim Against the District (Seventh Cause of Action)

The District asserts that it is entitled to summary judgment on the plaintiffs' false arrest claim against it because the "MPD arresting officers had probable cause to arrest Manganelli for assault on Opie based on information they received from Opie, Scherrenberg, and [the] DPS officers," District's Summ. J. Mem. at 13, and "also . . . for assault on a special police officer [as] reported by [the] DPS officers," id. at 17. The plaintiffs respond "that the record evidence plainly establishes, by Officer Velez's own testimony, that she could not possibly have developed probable cause before [Manganelli's] arrest," Pls.' Summ. J. Opp'n at 34, because Manganelli "was already under arrest at 1:10:51 a.m., when the District dispatched its jail transport van to pick up [Manganelli] and take him to the Fifth District jail," id. (citing Pls.' Facts ¶ 153), or, alternatively, the "MPD [o]fficers arrested [Manganelli], at the very latest, by 1:32 a.m., when he departed Gallaudet in the back of an MPD transport van bound for the Fifth District [j]ail," id.; see also Pls.' Facts ¶ 171, which occurred before Officer Velez "interviewed Opie and Scherrenberg at Gallaudet DPS headquarters," Pls.' Summ. J. Opp'n at 35 (citing Pls.' Facts ¶¶ 170, 176).

As already explained, "[a]n arrest is supported by probable cause if, at the time of the arrest, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" McGovern v. George Wash. Univ., 245 F. Supp. 3d 167, 184 (D.D.C. 2017) (emphasis added) (quoting Beck, 379 U.S. at 91). Here, the plaintiffs have created a genuine factual issue regarding the timing of the MPD officers' arrest of Manganelli. Specifically, they have presented evidence from which a reasonable juror could conclude that the arrest occurred "within [forty-nine] seconds of [Officers] Velez and

Lehigh's arrival on scene," Pls.' Facts ¶ 153; namely, that Officers Velez and Lehigh "arrive[d] on [the] scene" at 1:10:02 a.m., id. ¶ 140; see District's Facts ¶ 12, "[O]fficer [ ] Armstrong (Wagon 51) [wa]s dispatched to pick up [Manganelli]" at 1:10:51 a.m., Pls.' Facts ¶ 153; see District's Facts ¶ 12, and that Officer Armstrong testified "that the only reason he would have been dispatched to a location, during that shift on March 29, 2014, would have been to pick up a subject who had already been arrested," Pls.' Facts ¶ 149 (citing Pls.' Summ. J. Opp'n, Ex. H (Deposition of John Armstrong (Apr. 28, 2017) ("Armstrong Dep.")) 25:14–26:3 ("Q[:] . . . If your role was limited to transporting from Gallaudet to the jail, would that have been the only purpose that you were sent to Gallaudet for?  A[:] Yes, sir.  Q[:] To pick up an arrestee to bring back to the jail?  A[:] Yes, sir.").

The District's reply entirely ignores the plaintiffs' evidence supporting the view that the MPD officers arrested Manganelli at some point before or at the time when Officer Armstrong was dispatched to Gallaudet.  And, the District does not dispute the time when the MPD officers arrived on the scene or the time when the MPD transport vehicle was dispatched.  See District's Facts ¶ 12.  Nor has it presented any facts to dispute Officer Armstrong's testimony that an MPD transport vehicle would only be dispatched to a scene if a suspect had already been arrested, such as it being the District's policy to dispatch a transport vehicle regardless of whether an arrest has been made or that, in this particular case, the MPD transport vehicle was dispatched for some other reason prior to Manganelli's arrest.  Indeed, Officer Velez's testimony is consistent with Officer Armstrong's testimony that a transport vehicle would not be dispatched until a suspect had actually been arrested, as she testified that arrestees are typically transported in a vehicle like the one dispatched to Gallaudet on the night of the alleged false arrest, see Pls.' Summ. J. Opp'n, Ex. F (Velez Dep.) 53:11–19, and that the appropriate time to request a transport vehicle is

"[w]hen we establish that we need it, which would follow establishing probable cause," id., Ex. F (Velez Dep.) 182:3–7.

Additionally, the apparent absence of the indicators of an arrest typically relied upon by courts further supports the existence of a genuine factual issue as to the timing of the arrest. For example, the District has not identified any evidence that the MPD officers stated to Manganelli or others that Manganelli was or was not under arrest. Cf. Alderete v. City of Albuquerque, Civ. Action No. 17-500 JAP/LF, 2017 WL 6271257, at *9 (D.N.M. Dec. 8, 2017) (not "consider[ing] [the plaintiff] to have been arrested when [the arresting o]fficer [ ] handcuffed [him]" where the "[o]fficer [ ] told [the plaintiff] several times [before he was handcuffed] that he was not yet being arrested and was merely being detained while the police officers continued to investigate"). Nor is there evidence that the MPD officers handcuffed Manganelli or used force against him. Cf. Morris v. Noe, 672 F.3d 1185, 1192 (10th Cir. 2012) (in considering "whether [a] seizure should be characterized as a Terry stop or a full arrest," concluding that the officer's "actions in throwing down [the plaintiff] constituted an arrest" because "an unreasonable level of force transforms a Terry detention into an arrest requiring probable cause"); Cortez v. McCauley, 478 F.3d 1108, 1115–16 (10th Cir. 2007) ("'[T]he use of firearms, handcuffs, and other forceful techniques' generally exceed the scope of an investigative detention and enter the realm of an arrest." (alteration in original)). Testimony from witnesses at the scene suggests that Manganelli was already handcuffed when the MPD officers arrived, see Pls.' Facts ¶ 159 (citing Opie's deposition testimony that, when he arrived at the scene, Manganelli "was already in custody and [ ] face down [on the floor] in handcuffs"), and neither Officer Velez nor Officer Lehigh recalls putting handcuffs on Manganelli or whether he was already handcuffed when they arrived, see

Pls.' Summ. J. Opp'n, Ex. F (Velez Dep.) 61:8–12; id., Ex. J (Deposition of Christopher Lehigh (Mar. 8, 2017)) 22:16–21.

Critically, the factual dispute surrounding the time of arrest is material because the existence of probable cause, and therefore a reasonable belief in the existence of probable cause, depends on the "facts and circumstances within the[] [officers'] knowledge" "at the moment the arrest was made," Beck, 379 U.S. at 91; cf. Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004) (instructing that regarding probable cause, "the material facts[] [include] what the police knew at the moment of the arrest"). And here, if a juror determined that Manganelli had already been arrested when Officer Armstrong was dispatched to the scene, see Pls.' Facts ¶ 153, that juror could reasonably conclude that the information known to the MPD officers at that time was not sufficient to form the basis for probable cause, or a reasonable, good faith belief that there was probable cause. Although the District asserts that "MPD arrested Manganelli" "[a]fter Opie and [Captain] Rader told the MPD [o]fficers about [ ] Manganelli's assault of Opie and his actions resisting DPS officers," District's Facts ¶ 22, the only evidence that it cites for this proposition is Officer Armstrong's testimony that he "transported someone to [the Fifth District]," Pls.' Summ. J. Opp'n, Ex. H (Armstrong Dep.) 33:16–17, and the Fifth District arrest log, which reflects that Manganelli arrived at the station at 1:41 a.m., see id., Ex. 26 (Fifth District Prisoner's Arrest Book), neither of which establishes when the MPD officers received the relevant information from Opie and Captain Rader. Even if a reasonable juror found that the MPD officers acquired this information at some point before Manganelli was transported to the Fifth District, it would nonetheless be reasonable for a juror to infer that the officers were not able to obtain the information in the approximate forty-nine seconds that elapsed between when they arrived on the scene and when the MPD transport vehicle was dispatched to the scene. See

Pls.' Facts ¶ 153.  Moreover, the District does not argue that the information conveyed to the MPD officers by the dispatcher—that there was a simple assault in progress, see Pls.' Summ. J. Opp'n, Ex. F (Velez Dep.) 117:20–22—was sufficient to establish probable cause or a reasonable good faith belief that probable cause existed to arrest Manganelli.  See Enders, 4 A.3d at 470–71 ("[T]he relevant inquiry in a false arrest defense is . . . what the officers could reasonably conclude from what they were told and what they saw on the scene." (emphasis added)).  Thus, the plaintiffs have demonstrated that a genuine dispute of material fact exists as to the timing of the arrest, which precludes the Court from determining as a matter of law whether the District's arrest of Manganelli was lawful.  Accordingly, the Court must deny the District's motion for summary judgment on the plaintiffs' false arrest claim against the District.

### 3.    Causation

#### i.    Damages Under the District of Columbia's Wrongful Death Act

The defendants argue that the plaintiffs cannot recover damages for Manganelli's suicide under the District of Columbia's Wrongful Death Act[17] because the "[p]laintiffs' evidence fails to meet the 'irresistible impulse' standard," Gallaudet's Summ. J. Mem. at 22; see District's Summ. J. Mem. at 32 ("[T]he undisputed facts do not show that Manganelli's arrest created the legally required 'irresistible [suicidal] impulse.'" (second alteration in original) (citation omitted)), which requires a plaintiff to "adduce testimony that would support a jury finding that [the] decedent could not have decided against and refrained from killing himself," Gallaudet's Summ. J. Mem. at 22 (quoting District of Columbia v. Peters, 527 A.2d 1269, 1277 (D.C.

---

[17] The Wrongful Death Act provides: "When[] . . . the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, . . . damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, to the spouse or domestic partner and the next of kin of the deceased person." D.C. Code. § 16–2701(a)–(b).  Such damages "shall include the reasonable expenses of last illness and burial," id. § 16–2701(b), as well as other "economic . . . and non-economic damages," Burton v. United States, 668 F. Supp. 2d 86, 110 (D.D.C. 2009).

1987)).  Specifically, Gallaudet argues that "[t]he only evidence proffered in this case to connect [Manganelli's] arrest to his suicide is the [inadmissible] expert report and testimony of [the p]laintiff[s'] expert psychiatrist[, Dr.] Welner," id. at 26, which it argues is not admissible for the reasons explained in its motion to exclude that testimony, see id. at 26–27.  The District additionally argues that in light of Manganelli's "long history of mental illness[,] . . . it is impossible to say that the District's treatment of Manganelli le[]d to an 'irresistible [suicidal] impulse.'"  District's Summ. J. Mem. at 32 (third alteration in original) (citations omitted).  The plaintiffs respond that "[t]here is sufficient record evidence from which a jury could find that [the p]laintiffs meet the 'irresistible impulse' test."  Pls.' Summ. J. Opp'n at 50.  Alternatively, they argue that "the 'irresistible impulse' test[, which] applies to negligence claims," "does not apply . . . in this case because [the p]laintiffs' false arrest claim is an intentional tort."  Id. at 56. Rather, they argue that "liability can be imposed based on a showing that the defendant's conduct was a substantial factor cause of the decedent's suicide," id. at 57, and "the record evidence, including most notably, Dr. Welner's testimony, shows [that Manganelli]'s false arrest was a substantial factor cause of his hopelessness and suicide," id. at 59.

The Court concludes that it need not decide which of the legal tests cited by the parties should apply in this case because the plaintiffs have failed to identify sufficient evidence to satisfy either test.  As Gallaudet notes, see Gallaudet's Summ. J. Mem. at 26, the plaintiffs rely exclusively on Dr. Welner's testimony to establish a causal link between the alleged false arrest and Manganelli's suicide, see Pls.' Summ. J. Opp'n at 51 ("The most obvious and direct evidence [of Manganelli's 'irresistible impulse'] is the deposition testimony of [the p]laintiffs' expert forensic psychiatrist, Dr. [ ] Welner[.]"); see also id. at 51–56 (citing only Dr. Welner's testimony as support for the plaintiffs' conclusion that they "have adduced sufficient evidence to

permit a jury to find that [the d]efendants' conduct was a substantial factor cause of the hopelessness, which, in turn, triggered an irresistible impulse in [Manganelli] to take his own life"); id. at 59 (citing only Dr. Welner's testimony to support the plaintiffs' assertion that "the record evidence . . . shows [that Manganelli's] false arrest was a substantial factor cause of his hopelessness and suicide"). Although the plaintiffs, in their opposition, alleged the existence of other evidence that they contend supports causation, see id. at 51 (asserting that "the record contains ample evidence to permit a jury to find [that] the [irresistible impulse] test has been met"), they fail to specifically identify what evidence other than Dr. Welner's testimony they are referencing. Notably, the plaintiffs' argument that the substantial factor test has been satisfied here relies on their ability to demonstrate that the arrest caused Manganelli to be hopeless, see, e.g., id., which they have only sought to establish through Dr. Welner's testimony. Moreover, although it is undisputed that Manganelli's suicide occurred within approximately thirty hours of the alleged false arrest, see Gallaudet's Facts ¶¶ 157, 164; Pls.' Reply to Gallaudet's Facts ¶¶ 157, 164, "a mere temporal coincidence between two events does not necessarily entail a substantial causal relation between them," Lasley v. Georgetown Univ., 688 A.2d 1381, 1387 (D.C. 1997). Thus, the plaintiffs have "fail[ed] to make a showing sufficient to establish" that the alleged false arrest caused Manganelli to experience an irresistible impulse to commit suicide or was a substantial factor that contributed to Manganelli's suicide. Celotex Corp., 477 U.S. at 322. Accordingly, the Court must grant summary judgment to both defendants on the plaintiffs' claims for damages under the Wrongful Death Act.

### ii.     Damages Under the District of Columbia's Survival Act

Gallaudet also argues that the "[p]laintiffs' evidence fails to establish compensable damages for false arrest as part of a survival claim" under the District of Columbia's Survival Act. Gallaudet's Summ. J. Mem. at 28. Specifically, it argues that Manganelli "was

51

unemployed[] and [ ] did not incur costs in securing his release[,] [t]here is no indication that [he] sustained any physical injuries as a result of the arrest[, and] there is no evidence with respect to what, if any, suffering or shame [Manganelli] might have experienced due to the arrest." Id. The plaintiffs respond that "conscious pain and suffering may be inferred from" the "frightful manner of [Manganelli's] death," Pls.' Summ. J. Opp'n at 62–63, and that they are also entitled to damages for "the obvious intense feeling of shame [Manganelli] endured as a result of being dragged from his dorm[itory] room in handcuffs, slammed to the floor[,] and hauled off to jail as his classmates looked on," id. at 62.[18]

The Survival Act provides that, "[o]n the death of a person in whose favor . . . a right of action has accrued for any cause prior to his death, the right of action, for all such causes, survives in favor of . . . the legal representative of the deceased." D.C. Code § 12–101. Thus, "[u]nder the Survival Act, recovery by the decedent's estate is comprised of that which the deceased would have been able to recover had he lived." Burton v. United States, 668 F. Supp. 2d 86, 109 (D.D.C. 2009). Here, the parties agree that, "once liability is established for an intentional tort such as false arrest, a plaintiff may recover nominal damages, at least, as well as compensation for 'mental suffering, including fright, shame, and mortification from the indignity and disgrace . . . [of] an illegal detention.'" Barnes v. District of Columbia, 452 A.2d 1198, 1199 (D.C. 1982) (emphasis removed) (quoting Neisner Brothers, Inc. v. Ramos, 326 A.2d 239, 240 (D.C. 1974)).

---

[18] Both Gallaudet and the plaintiffs rely in part on Dr. Welner's testimony to support their respective positions. See Gallaudet's Summ. J. Mem. at 29 (arguing that Manganelli's alleged lack of expression during the arrest is irrelevant because Dr. Welner "testified at length about [Manganelli's] pre-existing declining psychiatric condition" and associated Manganelli's lack of expression with that condition); Pls.' Summ. J. Opp'n at 62 (arguing that "Dr. Welner provided ample evidence to reach the jury on th[e] issue" of shame). However, because the Court has concluded that Dr. Welner's testimony is not admissible, it will not consider that evidence in determining whether Gallaudet is entitled to summary judgment on the issue of damages for mental suffering.

For the reasons already explained with respect to the plaintiffs' claims for damages under the Wrongful Death Act, the Court must conclude that the plaintiffs cannot recover damages under the Survival Act for any physical or mental suffering that Manganelli may have experienced due to his suicide. As Gallaudet points out, the plaintiffs' claim for such damages "presupposes a link between the suicide and [the] arrest," Gallaudet's Summ. J. Reply at 25, and the Court has already concluded that the plaintiffs have failed to identify admissible evidence to support a causal link between Manganelli's alleged false arrest and his suicide.

Nonetheless, the Court cannot agree with Gallaudet that there exists no evidence which demonstrates that the plaintiffs may recover any other damages under the Survival Act for Manganelli's alleged false arrest. First, as Gallaudet acknowledges, see Gallaudet's Summ. J. Mem. at 28, the District of Columbia Court of Appeals has held that "[g]iven the very nature of the tort [of false arrest], . . . it is . . . appropriate for a jury in a false arrest case to consider loss of liberty per se as a basis for [an] award of compensatory damages," Phillips v. District of Columbia, 458 A.2d 722, 725 (D.C. 1983). Second, contrary to Gallaudet's position that there exists "no evidence with respect to what, if any, suffering or shame [Manganelli] might have experienced due to the arrest," Gallaudet's Summ. J. Mem. at 28, testimony regarding the circumstances of Manganelli's arrest and Manganelli's behavior at the time of and after the arrest clearly could support a reasonable inference that Manganelli experienced "mental suffering, including fright, shame, and mortification," Barnes, 452 A.2d at 1199. As the plaintiffs note, see Pls.' Summ. J. Opp'n at 62, the record evidence demonstrates that Lieutenant Bauer removed Manganelli from his dormitory room after midnight and placed him in handcuffs, see Gallaudet's Facts ¶¶ 73, 106. Then, Lieutenant Bauer and Captain Rader "took [Manganelli] to the ground and re-cuffed" him in the hallway outside of his dormitory room with Johnson present, see id.

¶ 114, at which point Morgan, Opie, and Scherrenberg arrived at the scene, see id. ¶¶ 119–20; Pls.' Reply to Gallaudet's Facts ¶¶ 119–20, and observed Manganelli lying "face down [on the floor] in handcuffs," Pls.' Facts ¶ 159. Moreover, the evidence demonstrates that Manganelli remained in this position for some period of time, see Pls.' Summ. J. Opp'n, Ex. K (Opie Dep.) 54:13 (testifying that at some point, Manganelli was put "[o]n his knees"), and that during that time, because Manganelli's hands were handcuffed behind his back, see, e.g., id., Ex. K (Opie Dep.) 54:2–3, his ability to communicate was restricted, see id., Ex. D (Rader Dep.) 40:14–17 ("Q[:] You agree that communication was limited to a certain extent because his hands were handcuffed behind his back?  A[:] Yes."). And, persons present at the scene testified that Manganelli appeared to have various emotional reactions to these events. See id., Ex. B (Johnson Dep.) 67:12, 15–16 (testifying that Manganelli "dropped one tear" "just after [Morgan] . . . arrived"); see also id., Ex. B (Johnson Dep.) 35:17–21 (testifying that Manganelli "was very, very, very mad" after Lieutenant Bauer arrested him and "had him up against the wall"); id., Ex. D (Rader Dep.) 38:25 (testifying that Manganelli was "not happy" at the time that Captain Rader arrived). The Court concludes that this evidence is clearly sufficient to establish that a reasonable juror could conclude that Manganelli experienced mental suffering due to the alleged false arrest.

Gallaudet's counterarguments are misplaced. Gallaudet argues that the plaintiffs cannot establish any mental suffering resulting from the alleged false arrest because "[t]he record is notably absent of any indication that [Manganelli] ever mentioned the arrest to anyone from the time he was release[d] until his suicide," Gallaudet's Summ. J. Mem. at 28–29, and that "[a]lthough . . . Johns[on] testified that she recalled seeing [Manganelli] express a single tear while he was detained in the hallway, . . . [e]very other witness who saw [Manganelli] in the

hallway before his departure from campus recalled that he was expressionless," id. at 29.

However, these arguments ask the Court to weigh and draw inferences from the record evidence, which is not the Court's function on summary judgment. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[] . . . [when] ruling on a motion for summary judgment[.]"). And, in any event, "all justifiable inferences [must] be drawn in [the plaintiffs'] favor." Id. In the Court's view, a reasonable juror could conclude that the lack of evidence that Manganelli told anyone about his arrest, while it might indicate otherwise, can also support the inference that Manganelli felt ashamed by the event. Thus, although the Court concludes that the plaintiffs may not recover damages for physical and mental suffering due to Manganelli's suicide under the Survival Act, the plaintiffs have identified sufficient evidence to demonstrate that they may be entitled to recover other damages due to the alleged false arrest. Accordingly, the Court will grant in part and deny in part Gallaudet's motion for summary judgment as to the plaintiffs' claims for damages under the Survival Act.

### 4. The Plaintiffs' ADA Claims Against the District (Fifth Cause of Action)

As explained in the Court's prior opinion in this case,

[t]o state a claim under Title II [of the ADA,] a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) who was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.

Sacchetti, 181 F. Supp. 3d at 125 (quoting Lee v. Corr. Corp. of Am., 61 F. Supp. 3d 139, 142–43 (D.D.C. 2014)). And,

[i]n the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the

investigation or arrest, causing him to suffer greater injury or indignity than other
arrestees.

Id. at 127 (first quoting Waller ex rel. Estate of Hunt v. City of Danville, 556 F.3d 171, 175 (4th

Cir. 2009); then citing Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999); then citing J.V.

v. Albuquerque Pub. Schs., 813 F.3d 1289, 1296 (10th Cir. 2016); and then citing Lewis v.

Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997)).  Here, the plaintiffs bring both types of claims

against the District.  The District does not dispute that Manganelli was a "qualified individual

with a disability" under the ADA or that it is a "public entity," see District's Summ. J. Mem. at

20–26; however, the District disputes the remaining elements of the plaintiffs' ADA claims and

argues that it is entitled to summary judgment on those claims.  The Court will address each

claim in turn.

> ### i.        The Plaintiffs' Wrongful Arrest Theory of Liability Under the ADA

To establish a claim for wrongful arrest under the ADA, the plaintiffs must show that the

MPD officers "arrested [Manganelli] because of legal conduct related to his disability."  Lewis,

960 F. Supp. at 178; see Gohier, 186 F.3d at 1220 (describing a wrongful arrest under the ADA

as a situation where "police wrongly arrest[] someone with a disability because they

misperceive[] that disability as criminal activity").  The District argues that it is entitled to

summary judgment on the plaintiffs' wrongful arrest claim, in part "[b]ecause MPD's decision to

arrest was based on information they received from the complainant and others rather than any

direct observation of Manganelli's conduct, [and thus,] MPD's arrest could not have been based

on a misperception of the effects of Manganelli's deafness as criminal activity."  District's

Summ. J. Reply at 20.  The plaintiffs respond that Manganelli's "alleged assault on a special

police officer [ ]—was, in fact, conduct symptomatic of his disability [], as . . . [Manganelli] was

merely trying to communicate with the officers using sign language." Pls.' Summ. J. Opp'n at 45 (internal citations and quotation marks omitted).

The Court concludes that the plaintiffs have not identified evidence that would support a wrongful arrest claim under the ADA. Specifically, the plaintiffs have not demonstrated that the District's officers arrested Manganelli "because of lawful conduct related to his [deafness]." Lewis, 960 F. Supp. at 178. The MPD officers testified that they arrested Manganelli for simple assault allegedly perpetrated against Opie, see, e.g., Pls.' Summ. J. Opp'n, Ex. F (Velez Dep.) 116:7–21, and Manganelli was ultimately "charged [ ] with simple assault domestic violence and threats to do bodily harm," District's Facts ¶ 27; see also Pls.' Reply to District's Facts ¶ 28.[19] Thus, the plaintiffs have failed to establish that the District arrested Manganelli for any lawful conduct related to his deafness, and the plaintiffs have not raised any other theory that supports a wrongful arrest ADA claim.[20] Accordingly, the Court must grant summary judgment to the District on the plaintiffs' wrongful arrest ADA claim.

### ii.     The Plaintiffs' Failure to Provide Reasonable Accommodations Theory of Liability Under the ADA

#### 1.     Manganelli's Deafness

The plaintiffs contend that the District failed to reasonably accommodate Manganelli's deafness by not "allowing him the use of [his] hands to communicate [or] obtaining[] an independent [American Sign Language ('ASL')] interpreter" for him, Compl. ¶ 252, and by

---

[19] The District has only invoked the conduct underlying the alleged assault on the DPS police officers on the theory that the MPD officers could have relied on this conduct as a basis for their arrest, not that they did in fact rely on that conduct. See District's Summ. J. Mem. at 17. Indeed, the plaintiffs argue that "there is no evidence that [Officer] Velez had any information about any 'assault on a special police officer' at the time she says she arrested [Manganelli]." Pls.' Summ. J. Opp'n at 31.

[20] Although the plaintiffs also argue that "the evidence demonstrates a lack of . . . legal justification for [Manganelli]'s arrest," Pls.' Summ. J. Opp'n at 45, they do not argue that the absence of legal justification alone would be sufficient to demonstrate that the MPD officers wrongfully arrested Manganelli in violation of the ADA.

"fail[ing] to adequately document or communicate . . . [to] the Pre-Trial Services Agency

[('Pretrial Services')] . . . that [Manganelli] was deaf and in need of an interpreter," which they

allege caused Manganelli to "not receive any kind of pre-[presentment] screening[,] . . .

includ[ing] screening aimed at early identification of mental health issues," id. ¶ 142. The

District argues that "[b]ecause the undisputed facts show that Manganelli could and did

communicate with the DPS and MPD officers, and there is no evidence that he ever requested an

ASL interpreter or any other type of assistance in communicating with MPD [officers], [the

p]laintiffs cannot proceed to trial on their claim that the arresting officers' communications with

Manganelli during and after his arrest violated his rights under the ADA." District's Summ. J.

Mem. at 25–26. The plaintiffs respond that "the District ignores clear law that a specific request

for accommodation is not required when the need is obvious," Pls.' Summ. J. Opp'n at 49, "and

that questions of material fact remain as to whether the District provided [Manganelli] with

reasonable accommodations" for his deafness, id. at 50.

As already explained, to establish disability discrimination under Title II, a plaintiff must

demonstrate that he "was either excluded from participation in or denied the benefits of a public

entity's services, programs, or activities, or was otherwise discriminated against by the public

entity." Lee, 61 F. Supp. 3d 139, 142–43. Relevant here, "'[d]iscrimination' under [Title II]

includes 'not making reasonable accommodations to the known physical or mental limitations of

an otherwise qualified individual with a disability . . . .'" Waller, 556 F.3d at 174 (quoting 42

U.S.C. § 12112(b)(5)(A)); see Updike, 870 F.3d at 951 ("The 'failure to provide reasonable

accommodation can constitute discrimination.'" (quoting Vinson v. Thomas, 288 F.3d 1145,

1154 (9th Cir. 2002)). For example, "[a] public entity [must] make reasonable modifications in

policies, practices, or procedures when the modifications are necessary to avoid discrimination

on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).[21] And, "[a] public entity [must also] take appropriate steps to ensure that communications with . . . members of the public with disabilities are as effective as communications with others," id. § 35.160(a), including "furnish[ing] appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity," id. § 35.160(b)(1).

First, the Court agrees with the plaintiffs that any failure by Manganelli to request an interpreter or any other accommodation for his deafness is irrelevant. As another member of this Court has explained, although

> there are times in which courts have held that a disabled person must request
> accommodation[,] . . . it is [ ] clear that the legal significance of the request
> requirement is merely to put [an] entity on notice that the person is disabled; it does
> not serve as a means of shifting the burden of initiating the accommodations process
> to the disabled individual. . . . [W]here[ ] . . . the inmate's disability is obvious and
> indisputably known to the provider of services, no request is necessary.

Pierce v. District of Columbia, 128 F. Supp. 3d 250, 270 (D.D.C 2015) (internal citation omitted) (collecting cases). Here, the District does not dispute that the MPD officers were aware of Manganelli's inability to communicate verbally due to his deafness, see District's Summ. J. Mem. at 20–31, and, in any event, his disability appears to have been obvious, see Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1197–98 (10th Cir. 2007) ("[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation."); see also Pierce, 128 F. Supp. 3d at 271 (concluding that a deaf "inmate's disability [wa]s

---

[21] Although a public entity need not provide such modifications if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i), the Court need not address this exception to the rule, as the District has not argued that this exception applies to the accommodations the plaintiffs contend should have been provided to Manganelli.

obvious"). Thus, no request for accommodation was required to inform the officers of Manganelli's disability. Moreover, given that Manganelli had a "communications-related disability," the Court finds the District's position to be "baffling as a matter of law and logic," as it would render "the protections of . . . Title II . . . unavailable to [similarly] disabled persons unless they somehow manage to overcome their communications-related disability sufficiently enough to convey their need for accommodations." Pierce, 128 F. Supp. 3d at 269–70. Thus, the Court cannot conclude that the District had no duty to reasonably accommodate Manganelli's deafness because Manganelli did not request an accommodation.

Next, the Court is also unpersuaded by the District's argument that it did not need to provide the accommodations requested by the plaintiffs because it is undisputed that "Manganelli could and did communicate in ASL with the DPS officers who initially detained and handcuffed him," and that, at "the Fifth District station, MPD Officer Shifflett . . . communicated with [him] using handwritten notes." District's Summ. J. Mem. at 25. This position fails for two reasons. First, "[i]t is well-settled that Title II . . . create[s] a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." Updike v. Multnomah Cty., 870 F.3d 939, 954 (9th Cir. 2017) (third alteration in original) (internal quotation marks omitted); see Pierce, 128 F. Supp. 3d at 272 (holding that under Title II, the District had "an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody"). Here, there is no evidence that the MPD officers or the District made any attempt whatsoever to determine what, if any, accommodations Manganelli needed. Notably, the District has identified no evidence that anyone consulted Manganelli himself on this issue. Rather, the MPD officers appear to have simply presumed that the presence of the DPS officers on the scene and the ability to

communicate with Manganelli with handwritten notes at the police station were sufficient. However, such presumptions do not satisfy the ADA. See Pierce, 128 F. Supp. 3d at 270 (rejecting the position that "Title II permit[s] reliance on guesswork and happenstance with respect to the provision of accommodations, [because] the law clearly requires otherwise"). Consequently, the lack of any evidence to show that the District satisfied its obligations to investigate what, if any, accommodations Manganelli required, precludes summary judgment on the plaintiffs' claim that the District failed to reasonably accommodate Manganelli's deafness. See Updike, 870 F.3d at 952, 954 (reversing a district court's grant of summary judgment to the defendant county on a deaf pretrial detainee's Title II claim because the defendant county "fail[ed] . . . [to] conduct[] an adequate investigation of [the plaintiff]'s disability and the efficacy of other ways to communicate"); see also Pierce, 128 F. Supp. 3d at 272 (granting summary judgment to a deaf inmate on his Title II claim, in part because the District failed "to assess the potential accommodations needs of" the inmate).

Moreover, the District's claim that Manganelli "could and did communicate in ASL with the DPS officers," District's Summ. J. Mem. at 25, does not establish that no accommodations were necessary to satisfy the ADA. To satisfy the ADA, an accommodation must place Manganelli "on equal footing with other [hearing] arrestees" and enable him to "achieve effective communication." Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1087 (11th Cir. 2007); see 28 C.F.R. § 35.160(a); Pierce, 128 F. Supp. 3d at 267 ("[A] public entity discriminates in violation of Title II if qualified individuals with disabilities are given an 'opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others.'"). Here, there is evidence in the record that supports the plaintiffs' position that Manganelli was unable to effectively communicate with the DPS officers. The evidence

suggests that from the time that the MPD officers arrived on the scene until Manganelli was transported to MPD, Manganelli's hands were handcuffed behind his back, and, for some of that time, he was lying face down on the floor. See, e.g., Pls.' Facts ¶ 159. Although there exists evidence in the record which demonstrates that Manganelli was able to communicate to some extent with the DPS officers prior to that point, the evidence also demonstrates that because his hands were handcuffed behind his back, his ability to communicate was limited, so much so that Captain Rader testified that he believed he "needed to be able to communicate better with [Manganelli]." Pls.' Summ. J. Opp'n, Ex. D (Rader Dep.) 39:17–18, 40:10–13 (testifying that Manganelli "was [ ] signing very small because his hands were constrained," and that he and Lieutenant Bauer "needed to be able to communicate better with [Manganelli]"); see id., Ex. D (Rader Dep.) 40:14–17 ("Q[:] You agree that communication was limited to a certain extent because his hands were handcuffed behind his back? A[:] Yes."). Based on these facts, a reasonable juror could conclude that the presence of the DPS officers did not permit Manganelli to communicate to the degree that the District had no obligation to provide Manganelli any accommodations.

For these reasons, the Court concludes the District is not entitled to summary judgment on the plaintiffs' ADA claim that the District failed to reasonably accommodate Manganelli's deafness, with one exception. That exception is the plaintiffs' claim that the District violated the ADA by "fail[ing] to adequately document or communicate . . . [to Pretrial] Services . . . that [Manganelli] was deaf and in need of an interpreter." Compl. ¶ 142. As already explained, Title II requires "[a] public entity [to] make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). The plaintiffs appear to argue that

informing Pretrial Services of Manganelli's deafness was necessary to permit Manganelli access to a service provided by Pretrial Services, namely, a pre-presentment screening. See Compl. ¶ 142 (alleging that the District's failure to inform Pretrial Services caused Manganelli to "not receive any kind of pre-[presentment] screening"). Although an accommodation is "necessary" when it is required to provide "increased access to a public service," Pollack v. Reg'l Sch. Unit 75, 886 F.3d 75, 81 (1st Cir. 2018); see 28 C.F.R. § 35.160(b)(1) (requiring "[a] public entity [to] furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities[] . . . an equal opportunity to participate in, and enjoy the benefits of, a service program, or activity of a public entity"); Henrietta D. v. Bloomberg, 331 F.3d 261, 282 (2d Cir. 2003) ("A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access to the program or services sought.'" (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985))), a pre-presentment screening by Pretrial Services does not appear to qualify as a "public service" contemplated by Title II. As the District notes, "Pretrial Services . . . is a federal agency," District's Facts ¶ 36 (citing D.C. Code § 24–133(a) (2012)); see Pls.' Reply to District's Facts ¶ 37 (admitting that Pretrial Services is federal agency), and as such, is not a "public entity" subject to Title II, see 42 U.S.C. § 12131(1)(A)–(B) (defining "public entity," in relevant part, as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). The plaintiffs have made no attempt to explain how Title II, which only covers public entities as that term is defined in the statute, can require a public entity to provide an accommodation— informing Pretrial Services of Manganelli's deafness—on the theory that the accommodation is necessary to ensure access to a service provided by a non-public entity, or why it would otherwise require the District to inform Pretrial Services of Manganelli's deafness. See Pls.'

Summ. J. Opp'n at 46–50 (not addressing their claim that the District violated the ADA by failing to inform Pretrial Services of Manganelli's disability). In other words, the plaintiffs have failed to explain how the District can be held liable under Title II for failing to inform Pretrial Services of Manganelli's need for accommodations in order for Pretrial Services to provide Manganelli with services it provides to arrestees who do not have a disability. Thus, the plaintiffs have failed to demonstrate that informing Pretrial Services of Manganelli's disability was a "necessary" accommodation required by Title II.[22] Accordingly, the Court must grant summary judgment to the District as to this aspect of the plaintiffs' reasonable accommodations claim under Title II of the ADA.

## 2. Mental Illness

The plaintiffs assert that the District also failed to reasonably accommodate Manganelli's mental illness by not "contacting mental health care providers[] [or] transporting him to a medical or mental health facility." Compl. ¶ 247. The District argues that the "[p]laintiffs'

---

[22] Although the Court concludes that Title II did not require the District to inform Pretrial Services of Manganelli's disability, at least not on the theory advanced by the plaintiffs in this case, it is nonetheless troubled by the potential impact of the District's failure to communicate such information to Pretrial Services, i.e., the denial of a service provided by Pretrial Services to persons with disabilities. However, this concern cannot provide a basis for imposing a duty Title II itself does not impose. In any event, the Court notes that even if it could conclude that the plaintiffs' claim is cognizable under Title II and should survive summary judgment, the plaintiffs would likely have an impossible task demonstrating at trial that the denial of a pre-presentment screening caused Manganelli harm. The plaintiffs suggest that a pre-presentment screening was critical because it "traditionally includes screening aimed at early identification of mental health issues to be reported to the [j]udge handling the first appearance," Compl. ¶ 142; however, the plaintiffs do not argue that the judge presiding over Manganelli's presentment would have taken different actions had the judge received such a report, and in any event, the evidence in the record demonstrates that the judge was aware that such mental health issues may have existed, see Gallaudet's Summ. J. Mot., Ex. YY (Release Order Addendum) at Gianni0583 (reflecting that the judge ordered Manganelli, as a condition of his release, to "[r]eport to [Pretrial Services] for [an] evaluation" by the agency's SSU). Moreover, evidence in the record suggests that even if Manganelli had been identified by Pretrial Services as someone requiring mental health services, such services would not have been available to him on March 29, 2014, the day he was in federal custody, see Pls.' Summ. J. Opp'n, Ex. W (Deposition of Sheena Baynes-Bagley (Apr. 28, 2017)) 12:20–13:9 (testifying that Pretrial Services' liaison from the Department of Behavioral Health is not available on Saturdays); see also Pls.' Reply to District's Facts ¶ 40 (admitting that "March 29, 2014[,] was a Saturday"). Thus, it appears that merely identifying Manganelli as in need of mental health intervention would not have permitted him access to mental health services prior to his appearance in court.

suggestion that MPD should have contacted mental health care providers is not reasonable" because

> [p]olice officers are not medical doctors[] and there is no evidence that the officers had any information about how to identify and contact appropriate mental health care providers for Manganelli, how many they should . . . contact, how long [the] officers should have waited for a mental health provider . . . , or what the officers should have permitted [mental health care providers] to do when and if they arrived.

District's Summ. J. Mem. at 23. Additionally, the District argues that the "[p]laintiffs' suggestion that the ADA required MPD to transport Manganelli to a mental health facility is unreasonable" because "MPD . . . [was] responding to a volatile situation," and, in any event, Title II only requires "public entities [to] provide disabled individuals with equal access to . . . [their] 'services, programs, or activities'" and does not "impose[] . . . affirmative obligation[s] on public entities to provide emergency mental health care to mentally ill individuals." Id. at 24 (quoting 42 U.S.C. § 12132). The plaintiffs respond that discrimination under Title II "include[s] not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," Pls.' Summ. J. Opp'n at 46 (internal quotation marks omitted), and the District cannot "justify its inaction" by quoting cases involving "responding officers [who] face[d] . . . grave risks" because "[i]t is undisputed that, at the time the [MPD] officers arrived on scene . . . , [Manganelli] was already in handcuffs, face down with his hands behind his back . . . with two DPS officers standing over him," id. at 46. They further argue that "MPD Officer Velez's deposition testimony directly contradicts" the District's argument that its officers lacked information about how to identify and contact mental health providers for Manganelli. Id. at 47.

First, the Court must reject the District's argument that Title II could never require a public entity to provide or facilitate "mental health care for mentally ill individuals" if the entity itself does not otherwise provide such services. See District's Summ. J. Mem. at 24 (arguing that

"[s]o long as a public entity does not deny an individual with a disability access to the benefits of the services, programs, and activities that they otherwise provide, it complies with Title II").  As the plaintiffs aptly note, see Pls.' Summ. J. Opp'n at 46, a plaintiff may establish disability discrimination under Title II by demonstrating that he "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity," Lee, 61 F. Supp. 3d at 142–43 (emphasis added); see also Bircoll, 480 F.3d at 1085 ("[T]he final clause of § 12132 'protects qualified individuals with a disability from being subjected to discrimination by any such entity, and is not tied directly to the services, programs, or activities of the public entity.'" (quoting Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist., 133 F.3d 816, 821–22 (11th Cir. 1998)).  And, "'[d]iscrimination' under [Title II] includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . .'" Waller, 556 F.3d at 174 (quoting 42 U.S.C. § 12112(b)(5)(A)); see Updike, 870 F.3d at 951 ("The 'failure to provide reasonable accommodation can constitute discrimination.'" (quoting Vinson v. Thomas, 288 F.3d 1145, 1154 (9th Cir. 2002)).  As already explained, public entities have an affirmative obligation to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7)(i).  Indeed, at least one court has suggested, albeit in dicta, that there are circumstances in which Title II would require a law enforcement officer to "reasonably accommodate [a mentally ill individual's] disability [by] handling and transporting him to a mental health facility."  Hainze v. Richards, 207 F.3d 795, 802 & n.34 (5th Cir. 2000) (citing 28 C.F.R. § 35.130(b)).

However, "[a] critical component of a Title II claim for failure to accommodate[] . . . is proof that [a] disability and its consequential limitations were known by the [entity providing public services.]" Windham v. Harris Cty., 875 F.3d 229, 237 (5th Cir. 2017) (internal quotation marks and citation omitted); see Waller, 556 F.3d at 174 ("'Discrimination' under [Title II] includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . .'" (emphasis added)). Although the District does not argue that Manganelli's mental illness was unknown to it, see District's Summ. J. Mem. at 20–31; District's Summ. J. Reply at 21–25, the plaintiffs have not identified, nor is the Court able to locate, any evidence in the record demonstrating that the District knew of Manganelli's mental illness, see Pls.' Summ. J. Opp'n at 45 (asserting, without identifying any evidence, that "[i]t is undisputed that . . . the District[] had actual knowledge of [Manganelli's] disabilities at all material times"). And, although the plaintiffs argue that Manganelli's "mental illness w[as] obvious," Pls.' Summ. J. Opp'n at 50, they have not identified any specific facts to support this claim either, see Crandall v. Paralyzed Veterans of Am., 146 F.3d 894, 898 (D.C. Cir. 1998) (observing that, to satisfy the knowledge element of a disability discrimination claim, a plaintiff must demonstrate that a disabled person's "behavior [wa]s so obviously [a] manifestation[] of an underlying disability that it would be reasonable to infer that [the defendant] actually knew of the disability"). Given that the District's knowledge is a prerequisite to the viability of the plaintiffs' claim, the Court finds it appropriate to request further briefing from the parties on this issue. Thus, the Court will hold in abeyance the District's motion for summary judgment on the plaintiffs' claim that the District failed to reasonably accommodate Manganelli's mental illness pending further briefing by the parties.

### 3.     Compensatory Damages

Finally, the District argues that the plaintiffs cannot recover compensatory damages

under Title II because "[t]here is no evidence that the District was deliberately indifferent to Manganelli['s] need for accommodation[s] based on his deafness or his mental illness, or that it intentionally discriminated against him." District's Summ. J. Mem. at 29. Because the Court has not yet determined the viability of the plaintiffs' claim that the District violated the ADA by failing to reasonably accommodate Manganelli's mental illness, it need not address whether compensatory damages would be available for that claim at this time. However, the Court finds it appropriate to consider the availability of compensatory damages for the plaintiffs' claim that the District failed to reasonably accommodate Manganelli's deafness, having already concluded that that claim survives summary judgment.

In order to "recover compensatory damages for violations of Title II[,] . . . [a plaintiff must show] that the defendant's discriminatory actions were intentional," Pierce, 128 F. Supp. 3d at 278, and while "the majority of circuits" have held that this standard requires a plaintiff to "establish[] that the defendant acted with 'deliberate indifference' to the plaintiff's rights," id. (collecting cases), the District has failed to demonstrate that the plaintiffs cannot satisfy this standard as to their claim that the District failed to reasonably accommodate Manganelli's deafness. As another member of this Court has explained,

> [d]eliberate indifference is "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." The "knowledge" element is satisfied where the public entity has notice of the plaintiff's accommodation need, and the "failure to act" element is satisfied by conduct that is "more than negligent, and involves an element of deliberateness."

Id. (internal citation omitted) (quoting Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)). The District does not dispute that the first element has been satisfied here, and its position that the plaintiffs cannot establish the second element lacks merit. As the Court has already explained, the evidence adequately suggests that the District failed to make any attempt to assess Manganelli's accommodation needs with respect to his deafness, and, as the court in

Pierce recognized, such a failure "easily satisfies" the deliberate indifference standard. 128 F.

Supp. 3d at 279 (concluding that "the District's knowing failure to evaluate [a deaf inmate's]

need for accommodation" "plainly amount[ed] to deliberate indifference").

The District's counterarguments are unavailing. It attempts to distinguish Pierce on the

ground that "Manganelli was in the District's custody for only . . . twelve hours as opposed to

fifty one days," and because "there is no evidence that Manganelli was denied any benefit or

service during that time because he was deaf." District's Summ. J. Mem. at 31. However, the

District fails to explain why the comparatively short duration of Manganelli's custody would

require a reasonable juror to conclude that the District was not deliberately indifferent to its

obligation to assess Manganelli's accommodations needs. Although the duration of his custody

might be an appropriate consideration in determining the amount of damages, it does not compel

the conclusion that the plaintiffs are entitled to no damages whatsoever. And, to the extent that

the District suggests that the relatively short duration of time that Manganelli was in its custody

made conducting an assessment unreasonable, it is not apparent to the Court why twelve hours

would not be sufficient time to make the requisite assessment of Manganelli's mental health.

Moreover, the Court has already rejected the District's argument that a Title II claim always

requires a plaintiff to demonstrate that he or she was denied a public entity's benefits or services.

See infra Part III.E.2.ii; see also, e.g., 28 C.F.R. § 35.160(a) ("A public entity [must] take

appropriate steps to ensure that communications with . . . members of the public with disabilities

are as effective as communications with others.").

Additionally, the District argues that "there is no evidence that Manganelli requested any

accommodation," see District's Summ. J. Mem. at 31; however, the Court has already explained

that no such request was necessary in this case to trigger the District's obligations, see Pierce,

69

128 F. Supp. 3d at 271. The Court must also reject the District's argument that "the District had in place a policy . . . to [e]nsure that deaf detainees receive accommodations," and "MPD had a longstanding policy governing the processing of persons who are suspected of having mental illness," and that "[t]he very existence of these policies shows that the District was not deliberately indifferent to Manganelli's rights under the ADA." District's Summ. J. Mem. at 31. However, the existence of such policies may prove to be irrelevant, given that the District has not asserted that they were followed in this case or that they comport with the ADA.

In sum, the Court concludes that the plaintiffs have identified evidence sufficient to demonstrate that the District failed to reasonably accommodate Manganelli's deafness in violation of the ADA, and that the plaintiffs are entitled to potentially recover compensatory damages for that failure. However, the Court concludes that it must grant summary judgment to the District on the plaintiffs' claim that the District violated the ADA by failing to inform Pretrial Services of Manganelli's deafness, and must hold in abeyance the District's summary judgment motion as to the plaintiffs' claim that the District failed to reasonably accommodate Manganelli's mental illness. Accordingly, the Court must grant in part, deny in part, and hold in abeyance in part the District's summary judgment motion as to the plaintiffs' reasonable accommodation claim under the ADA.

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that it must exclude Dr. Welner's proposed expert report and testimony as unreliable, but that striking the District's alleged undisclosed summary judgment exhibits is not warranted. Additionally, the Court concludes that summary judgment for the defendants is not warranted on the plaintiffs' false arrest claims against both defendants, as well certain aspects of the plaintiffs' ADA claim against the District

for its alleged failure to reasonably accommodate Manganelli's deafness.  However, the Court concludes that summary judgment for the defendants is appropriate on the plaintiffs' ADA claims against the District for wrongful arrest and for failure to inform Pretrial Services of Manganelli's deafness, as well as the plaintiffs' claims for damages arising from Manganelli's suicide under the Wrongful Death Act and the Survival Act.  Finally, the Court concludes that it must hold in abeyance the District's summary judgment motion as to the plaintiffs' ADA claim for failure to reasonably accommodate Manganelli's mental illness pending further briefing by the parties.  Accordingly, the Court will grant Gallaudet's motion to exclude the testimony of Dr. Welner, deny the plaintiffs' motion to strike the District's alleged undisclosed exhibits, and grant in part, deny in part, and hold in abeyance in part the defendants' motions for summary judgment.[23]

       **SO ORDERED** this 29th day of October, 2018.

REGGIE B. WALTON
United States District Judge

---

[23] The Court shall contemporaneously issue an Order consistent with this Memorandum Opinion.